# EXHIBIT 2



AWARD

裁决

قرار التحكيم

LAUDO ARBITRAL

SENTENCE ARBITRALE

АРБИТРАЖНОЕ РЕШЕНИЕ

LCIA

Arbitration and ADR worldwide

**Arbitration No: 101721**

www.lcia.org

The London Court of International Arbitration

LONDON COURT OF INTERNATIONAL ARBITRATION
Certified true copy of original

*[signature]* LCIA Deputy Registrar
Date 12/11/14   KEISHA WILLIAMS

# LONDON COURT OF INTERNATIONAL ARBITRATION

## CASE NO. 101721

between

### VITALY IVANOVICH SMAGIN

Claimant

and

### KALKEN HOLDINGS LIMITED

First Respondent

### ASHOT YEGIAZARYAN

Second Respondent

## FINAL AWARD

11 November 2014

BEFORE THE ARBITRAL TRIBUNAL
Mr. Michael Lee
Mr. Per Runeland
Prof. Dr. Kaj Hobér, Chair

## TABLE OF CONTENTS

| | | | |
|---|---|---|---|
| I. | PROCEDURAL HISTORY | | 1 |
| II. | FACTUAL BACKGROUND | | 8 |
| III. | SUMMARY OF THE PARTIES' POSITIONS | | 12 |
| | A. | The 2003 Agreement | 12 |
| | B. | The Shareholders' Agreement and the Escrow Agreement | 13 |
| | C. | The 2008 Agreement | 17 |
| | D. | Quantum | 21 |
| III. | PRAYERS FOR RELIEF | | 24 |
| V. | REASONS | | 25 |
| | A. | Jurisdiction | 26 |
| | | A.1  Introduction | 26 |
| | | A.2  Jurisdiction with respect to First Respondent | 27 |
| | | A.3  Jurisdiction with respect to Second Respondent | 29 |
| | B. | Merits | 35 |
| | | B.1  Second Respondent | 35 |
| | | B.2  First Respondent | 40 |
| | | B.3  Joint and several liability | 44 |
| | C. | Quantum | 44 |
| | D. | Interest and Costs | 46 |
| | | D.1  Interest | 46 |
| | | D.2  Costs | 47 |
| AWARD | | | 49 |

## I.   PROCEDURAL HISTORY

1.   Claimant in this arbitration is Vitaly Ivanovich Smagin (hereinafter "**Mr. Smagin**" or "**Claimant**"). Mr. Smagin, a Russian citizen, is a businessman involved in the real-estate market. He is domiciled at Krasnoproletarskaya st., h. 9, 127006, Moscow, Russia. Mr. Smagin is represented in this arbitration by Mr. James Hargrove, Dr. Stuart Dutson, Mr. Neil Newing and Ms. Judith Mulholland of Eversheds LLP, One Wood Street, London EC2V 7WS, United Kingdom.

2.   First Respondent is Kalken Holdings Limited (hereinafter "**Kalken**" or "**First Respondent**"), a company existing under the laws of Cyprus, registered under Company No. 167709 and with its address at 15 Agiou Pavlou Street, LEDRA House, Agios Andreas 1105, Nicosia, Cyprus. Kalken is represented in this arbitration by Mr. Barry Leon, Mr. R. Aaron Rubinoff, Mr. Daniel Taylor and Mr. John Siwiec of Perley-Robertson, Hill & McDougall LLP, 1400 - 340 Albert Street, Ottawa, Canada K1R 0A5.

3.   Second Respondent is Ashot Yegiazaryan (hereinafter "**Mr. Yegiazaryan**" or "**Second Respondent**"). Mr. Yegiazaryan is a Russian national domiciled at 655 Endrino Place, Beverly Hills, California 90201, United States of America. Mr. Yegiazaryan is represented in this arbitration by Mr. Cyrus Benson, Mr. Laurence Shore and Mr. Doug Watson of Gibson, Dunn & Crutcher LLP, Telephone House, 2-4 Temple Avenue, London, EC4Y 0HB, United Kingdom. Mr. Yegiazaryan is also represented by Mr. Drew Holiner of Monckton Chambers, 1&2 Raymond Buildings, Gray's Inn, London WC1R 5NR, United Kingdom.

4.   By a Request for Arbitration dated 26 October 2010, Claimant requested arbitration against Respondents pursuant to Article 1 of the LCIA Rules.

5.   In the Request for Arbitration, Claimant relied on the arbitration clauses of two agreements: (a) article 12.2 of a shareholders' agreement dated 26

December 2006 between Claimant, First Respondent and Mr. Dimitry Garkusha ("**the Shareholders' Agreement**") and (b) article 9.2 of an escrow agreement dated 13 November 2007 between Claimant, First Respondent, Mr. Garkusha and Deutsche Bank AG ("**the Escrow Agreement**"). These clauses are identical and provide the following:

> "[12].2 Arbitration. In the case of any dispute, difference, controversy or claim arising out of this Agreement, including any question regarding its existence, validity or termination (a "Dispute") the Parties shall attempt to resolve such Dispute amicably.
>
> [12].2.1 If the Parties are unable to so amicably resolve the Dispute, then upon the written request of either Party such Dispute shall be referred to and finally resolved by arbitration under the rules of LCIA.
>
> [12].2.2 Unless the Parties agree otherwise, the place of arbitration shall be London, England, and the language of the arbitration shall be English.
>
> [...]"

6.  The agreements provide that English law is to govern them.

7.  On 29 December 2010, First Respondent and Second Respondent submitted their respective responses.

8.  On 19 March 2011, pursuant to Articles 5.4 and 5.5 of the LCIA Rules, the LCIA Court appointed Mr. Michael Lee, Mr. Per Runeland and Professor Kaj Hobér to be the Arbitral Tribunal in this arbitration, with Professor Hobér presiding.

9.  Claimant filed his Statement of Claim on 24 August 2011. It was supplemented on 28 October 2011 by pleadings on quantum.

10. On 8 September 2011, Second Respondent filed an Objection to Jurisdiction alleging that Claimant had repudiated any existing arbitration agreement by submitting a claim for compensation in Russian criminal proceedings against Second Respondent.

11. On 28 October 2011, Claimant filed a Response to Second Respondent's Objection to Jurisdiction. Claimant submitted an expert opinion on Russian

law by Professor Larisa N. Maslennikova. On the same day, Claimant submitted his pleadings on quantum.

12.     On 14 December 2011, Second Respondent filed his Reply to Claimant's Response. Second Respondent also submitted an expert report by Ms. Galina A. Krylova.

13.     On 6 January 2012, Claimant filed a Rejoinder to the Reply and a supplementary opinion by Professor Maslennikova.

14.     On 13 January 2012, the Arbitral Tribunal heard the parties' submissions on jurisdiction at a hearing in London. Professor Maslennikova and Ms. Krylova were both made available for cross-examination at the hearing. Second Respondent put questions to Professor Maslennikova.

15.     First Respondent has not challenged the jurisdiction of the Arbitral Tribunal.

16.     On 14 February 2012, the Arbitral Tribunal rendered its award on jurisdiction. The Arbitral Tribunal denied Second Respondent's request that the Arbitral Tribunal dismiss Claimant's claim for lack of jurisdiction. It also rejected Second Respondent's request for an order directing Claimant to discontinue the claim put forward within the Russian criminal proceedings.

17.     On 30 March 2012, Second Respondent submitted his Statement of Defence and Request for Proposed Consent Order. The same day, First Respondent filed its Statement of Defence and Response to the Second Respondent's request for a Proposed Consent Award.

18.     On 30 April 2012, Claimant sent a letter to the Arbitral Tribunal stating that he could not accept the consent award suggested by Second Respondent.

19.     On 13 June 2012, Claimant submitted his request for production of documents to the Arbitral Tribunal. This request included Claimant's request, Second Respondent's objections of 7 June 2012 and Claimant's comments on Second Respondent's objection of 12 June 2012.

20.    On 26 June 2012, the Arbitral Tribunal ruled on Claimant's first request for production of documents.

21.    On 16 July 2012, Claimant sent a letter to the Arbitral Tribunal indicating that he might submit a request for an interim order provided that Respondents did not take certain action.

22.    On 23 July 2012, Claimant submitted an application for an interim order. The Second Respondent objected to the request on 30 July 2012. Both parties submitted briefs and documentation in support of their respective positions.

23.    On 31 July 2012, Claimant sent a letter to the Arbitral Tribunal claiming that Second Respondent had failed to comply with the Tribunal's decision on production of documents dated 26 June 2012 and requesting that the Arbitral Tribunal order Respondents to conduct further searches and hand over certain documents.

24.    On 2 August 2012, Second Respondent objected to Claimant's request stating that an adequate search had been conducted and that all responsive documents which are in Second Respondent's possession, custody and control had been disclosed.

25.    On the same day, 2 August 2012, Claimant sent a letter to the Arbitral Tribunal addressing Second Respondent's letter of 30 July regarding the request for an interim order.

26.    On 6 August 2012, Claimant sent a letter to the Arbitral Tribunal addressing Second Respondent's letter of 2 August 2012.

27.    On 9 August 2012, Second Respondent sent an email objecting to Claimant's request for an interim order.

28.    On 13 August 2012, Claimant sent an email addressing Second Respondent's objections to Claimant's request for an interim order.

29.     On 23 August 2012, the Arbitral Tribunal denied Claimant's order for an interim order.

30.     On 7 September 2012, the Arbitral Tribunal issued Procedural Order No. 6 denying Claimant's request for further orders in relation to Respondents alleged failure to abide by the Arbitral Tribunal's order regarding the production of documents. The Arbitral Tribunal also noted that if it became clear that documents which should have been produced remained undisclosed, the Arbitral Tribunal would draw adverse inferences based on such fact.

31.     On 7 September 2012, Claimant submitted his Statement of Reply.

32.     On 21 December 2012, Claimant sent a letter to the Arbitral Tribunal stating that First Respondent had failed to comply with the Arbitral Tribunal's decision regarding production of documents.

33.     On 11 February 2013, Claimant submitted an expert report of Irina Novikova.

34.     On 25 March 2013, First Respondent and Second Respondent filed their Rejoinders.

35.     On 19 April 2013, Second Respondent filed his evidence on quantum including an expert report of Mr. Hall of Smith & Williamson.

36.     On 5 June 2013, Claimant submitted its Sur-Rejoinder accompanied by an expert reports of Dr. Giles and Mr. Grigoriev.

37.     On 12 June 2013, Claimant submitted further written evidence.

38.     On 17 June 2013, Claimant submitted the Second Expert Report of Ms. Irina Novikova and a supplemental report of Cushman & Wakefield.

39.     On 19 June 2013, First Respondent submitted its comments on Claimant's Sur-Rejoinder.

40.     On 21 June 2013, Claimant submitted further documents, an addendum to Dr. Giles's report and witness statements.

41.     On 25 June 2013, the parties filed their Skeleton Arguments.

42.     On 28 June 2013, the Tribunal issued Procedural Order No. 7. Due to difficulties for certain witnesses to obtain visas, the hearing scheduled for 1 – 5 July 2013 was cancelled by Procedural Order No. 8 issued on 29 June 2013.

43.     On 11 July 2013, the Tribunal issued Procedural Order No. 9 deciding that the hearing would take place on 23-27 September 2013.

44.     On 19 August 2013, Second Respondent informed the Tribunal that Mr Lesnovich could not attend the hearing due to an injury.

45.     On 3 September 2013, Claimant submitted additional evidence.

46.     On 12 September 2013, Second Respondent commented on Claimant's submission of 3 September 2013.

47.     On 18 and 19 September 2013, Claimant commented on Second Respondent's letter of 12 September 2013.

48.     On 20 September 2013, Claimant filed comments on Second Respondent's Skeleton Argument.

49.     On 20 September 2013, the Tribunal issued Procedural Order No. 10 deciding that the documents submitted by Claimant on 3 September 2013 were admissible and that an additional hearing would take place on 14 January 2014.

50.     A hearing was held in London on 23-27 September 2013.

51.     On 18 October and 18 December 2013, Claimant submitted additional evidence.

52.     On 24 December 2013, Claimant filed a supplementary report of his quantum expert Ms Irina Novikova.

53.     On 13 January 2014, Second Respondent submitted materials for the presentation of his hand writing expert, Mr Lesnovich.

54.     On 13 January 2014, Claimant sent several emails with comments on Second Respondent's submission of the same date. Second Respondent replied to Claimant's emails the same day.

55.     On 14 January 2014, a hearing was held in London.

56.     On 28 January 2014, Claimant's hand writing expert submitted a supplemental report.

57.     On 11 February 2014, Second Respondent's hand writing expert filed a supplemental report.

58.     On 28 February 2014, Claimant submitted additional evidence.

59.     On 7 March 2014, Second Respondent submitted comments on Claimant's letter of 28 February 2014. Claimant addressed Second Respondent's letter in his reply dated 28 March 2014.

60.     On 4 April 2014, all parties submitted their post-hearing briefs.

61.     On 11 April 2014, Claimant and Second Respondent filed a list of issues that they agreed the Tribunal would need to address.

62.     On 14 April 2014, Claimant submitted a letter concerning a correction of his post hearing brief and a separate letter addressing an issue in Second Respondent's post hearing brief.

63.     On 15 April 2014 a final hearing was held to discuss issues that the parties had agreed that the Arbitral Tribunal needed to determine.

64.     On 9 May 2014, Claimant filed its submission regarding the calculation of
        interest.

65.     On 4 June 2014, Second Respondent submitted its comments on Claimants
        submission regarding interest and his schedule of costs requesting USD
        1,807,130.60. On the same day, Claimant submitted his schedule of costs.[1]
        First Respondent submitted its schedule of cost asking for USD 827,066.30.

66.     On 19 June 2014, Second Respondent submitted comments on Claimant's
        schedule of costs. On the same day, Claimant submitted his comments on
        Second Respondent's schedule of costs.

67.     On 23 June 2014, First Respondent submitted its comments on Claimant's
        schedule of costs.

## II.     FACTUAL BACKGROUND

68.     What follows is a brief summary of certain key facts relevant to this dispute,
        some of which are disputed, without prejudice to the full factual record in the
        arbitration.

69.     In early 2000, Claimant started to develop Europark, a retail complex in
        Moscow, together with two business partners. The complex was developed
        through a company called LLC Centurion Alliance ("**Centurion**"). In 2002,
        Claimant's business partners at that time wished to withdraw. Claimant came
        into contact with Ashot Yegiazaryan (Second Respondent) and Mr. Garkusha
        who were interested in investing in Europark.

---

[1] Total Eversheds' fees: GBP 3,087,340.55, total Eversheds' disbursements: GBP 245,451.30, total
PricewaterhouseCoopers fees and disbursements (incl. 18% VAT): USD 642,745, total Cushman &
Wakefield fees and disbursements (incl. 18% VAT): USD 253,727.11, total fees and disbursements of
Ms. Maslennikova: RUB 765,000, total fees and disbursements of Mr. Grigoriev: RUB 1,350,000, total
LCIA/Tribunal fees: GBP 204,000, total other disbursements incurred directly by Claimant: GBP
7,410.72 and RUB 1,830,000.

70.    On 29 August 2003, Claimant, Mr. Garkusha and a group of four Russian companies (which Claimant argues were controlled by Second Respondent) concluded an agreement (the "**2003 Agreement**").[2] Among other things, this agreement is said to have regulated how profits from Europark/Centurion were to be divided. The 2003 Agreement does not include an arbitration clause.

71.    Following the 2003 Agreement, the board of directors of Centurion was changed. The parties to the agreement co-operated well. Europark was completed in May 2005 and, following an unsuccessful start, re-opened in January 2006.

72.    Claimant states that Second Respondent approached him in 2006 with a request that Europark be used as security for a loan that Second Respondent was trying to obtain from Deutsche Bank for the purposes of financing the refurbishment of a hotel in Moscow (Hotel Moscow).

73.    Claimant asserts that Second Respondent assured him that the value of the deal in relation to the Moscow Hotel was substantial and that there was no actual risk that the loan agreement with Deutsche Bank would be breached. Claimant agreed that the shares in Centurion could be used as security for the loan from Deutsche Bank.

74.    In order to achieve this, on instructions from Deutsche Bank, the ownership structure of Europark was altered. The ownership of Centurion was transferred to a company named Doralin Trading & Investments ("**Doralin**"), a Cyprus company, which in turn was owned by a company named Tufts Invest & Trade Inc ("**Tufts**"), a British Virgin Islands company. The shareholders of Tufts were First Respondent (which Claimant alleges is controlled by Second Respondent) with a 73% holding, Claimant with a 20% holding and Mr. Garkusha with a 7% holding, thus reflecting their shareholding in Centurion.

---

[2] The 2003 Agreement, Exhibit C-132.

75.    Claimant argues that Second Respondent used First Respondent as a way to circumvent limitations imposed on Second Respondent as a member of the Russian Duma. This has been disputed by Second Respondent.

76.    On 26 December 2006, Claimant, Mr. Garkusha and First Respondent entered into the Shareholders' Agreement regarding Tufts. The Shareholders' Agreement included an arbitration clause.[3]

77.    According to Claimant, the Shareholders' Agreement aimed to safeguard and protect Claimant's interest in Europark if the loan was not repaid within a year, as promised by Second Respondent. Furthermore, to provide Claimant with security, it was agreed that First Respondent's shareholding in Tufts was to be placed in escrow with Deutsche Bank by way of the Escrow Agreement signed by the shareholders in Tufts and the bank.[4] If Second Respondent failed to repay the loan used for Hotel Moscow, Claimant would have a right to the shares in escrow. The Escrow Agreement also included an arbitration clause.

78.    According to Claimant, the Shareholders' Agreement and the Escrow Agreement ensured that Claimant would receive the Tufts shares held in escrow, that Claimant had the right to sell those shares (and the shares in Centurion and/or Europark) to repay the loan to Deutsche Bank and recover his investment. Claimant asserts that any excess following such a sale would be paid to First Respondent which also stood the risk of any shortfall and, if the sale of the shares in escrow would not be sufficient to repay the loan and Claimant's investment, Second Respondent would be required to compensate Claimant for the discrepancy.

79.    Claimant has stated that, soon after the signing of the Shareholders' Agreement and the Escrow Agreement, he became aware of the fact that First Respondent had not delivered the shares in Tufts into escrow. Claimant has

---

[3] The Shareholders' Agreement, Article 12.2 (Exhibit C-80).
[4] The Escrow Agreement (Exhibit C-81).

also stated that repeatedly over the following years he was promised by Second Respondent that Claimant's interest in Europark was safe. Furthermore, Claimant contends that he and Second Respondent, by, in particular, making various promises and representations entered into a collateral agreement whereby Second Respondent assumed the obligation to protect and preserve Claimant's interest in Europark by ensuring that (a) Claimant could obtain a transfer of the shares in Tufts, and (b) that the ownership structure of Europark would remain intact, i.e. that Tufts would remain the owner of Europark. Respondents dispute that there was an obligation, implied or otherwise, to maintain the ownership structure of Europark.

80.     In 2008, the loan to Deutsche Bank had not been repaid and the shares in Tufts had not been placed into escrow. After raising his concerns, Claimant asserts that he and Second Respondent entered into a partnership agreement on 3 March 2008 (the "**2008 Agreement**"). Second Respondent has argued that the 2008 Agreement is not binding and that his signature on the document submitted by Claimant is a forgery. According to Claimant, since Second Respondent could not repay the loan at that time, Claimant agreed to continue to provide Europark (through the shareholding in Tufts) as security for the loan in return for the increase of Claimant's shareholding in Tufts to 50%.

81.     The 2008 Agreement has an arbitration clause – Article 2.10 – which reads as follows:

> "If Partner 2 [Second Respondent] fails to perform his obligations set forth in clauses 2.1-2.4, Partner 1 [Claimant] will seek to enforce his rights under the Shareholder's Agreement by filing a claim against Partner 2 with the London Court of International Arbitration and require, among other things, enforcement of Clause 9.1.5 of the Shareholders' Agreement, limitation of restrictions on use of his property (shares in TUFTS, MTC, Europark), and indemnification for losses."[5]

---

[5] The 2008 Agreement, Article 2.10 (Exhibit C 134).

82.     In addition to arguing that his signature on the 2008 Agreement was forged, and that the agreement never became valid, or effective, Second Respondent has contended that, in any event, the 2008 Agreement does not state that Second Respondent has agreed to arbitration relating to the Shareholders' Agreement and the Escrow Agreement.

83.     The shares in Tufts were never transferred in to an escrow account.

84.     On 20 November 2009, the articles of association of Tufts were amended so as to allow the removal of a director by a simple majority vote. Previously the articles required a 75% majority. Claimant was removed as director of Tufts and replaced by MPH Law Services.

85.     In early 2010, Tufts transferred its shareholding in Doralin to companies called Investments Limited and Famulatus Limited. Claimant argues that, as a consequence of this transfer, he lost his interest in and control of Europark. Claimant still owns the shares in Tufts.

## III.     SUMMARY OF THE PARTIES' POSITIONS

86.     Claimant's case is primarily based on four agreements: the 2003 Agreement, the Shareholders' Agreement, the Escrow Agreement and the 2008 Agreement. The following summarises in brief the arguments and the parties' respective positions in relation to these agreements, and to the question of quantum which are fully set out in the parties' submissions.

## A.     The 2003 Agreement

87.     Claimant has argued that the 2003 Agreement entitles him to payments based on Europark's/Centurion's financial performance and ensures him an appointment as chairman of the board of directors of Centurion. Claimant also contends that he is entitled to an annual payment corresponding to 20 % calculated on the basis of Centurion's EBIT (earnings before interest and tax).

88.     As regards jurisdiction, Claimant asserts that First Respondent agreed to
        arbitrate disputes under the 2003 Agreement when entering into the
        Shareholders' Agreement and Escrow Agreement. Claimant argues that
        Second Respondent was in control of the four companies (CJSC Centurion
        Alliance which included CJSC Titul, LLC Milea, CJSC Trading House
        Unicomimpex and LLC Merhkav) which were parties to the 2003
        Agreement. Moreover, Claimant asserts that Second Respondent became
        bound, and is now bound, by the 2003 Agreement and the arbitration clause
        in the Shareholders' Agreement by having signed the 2008 Agreement (see
        Sections B and C below).

89.     Claimant asserts that Respondents actively participated in the
        misappropriation of Claimant's interest in Europark and failed to pay
        Claimant in accordance with the 2003 Agreement. Claimant's arguments in
        relation to these alleged breaches are addressed below.

90.     Both Respondents have argued that they were not parties to the 2003
        Agreement and, therefore, are not bound by it. Consequently, they submit, the
        Tribunal has no jurisdiction over Respondents.

91.     Second Respondent has argued that, even if he were bound by the 2003
        Agreement, and the Tribunal had jurisdiction, all rights and obligations under
        that agreement were eliminated by the Shareholders' Agreement since Article
        13.3 states that the Shareholders' Agreement and the Escrow Agreement
        supersede any prior agreement and that any prior agreement shall be of no
        continuing effect. Furthermore, Second Respondent claims that, even in the
        absence of Article 13.3, the scope of the Shareholders' Agreement and the
        Escrow Agreement is limited and does not concern distribution of profits
        which is what Claimant in essence is asking for under the 2003 Agreement.

## B.      The Shareholders' Agreement and the Escrow Agreement

92.     Claimant submits that the Shareholders' Agreement and the Escrow
        Agreement (i) required that First Respondent (on behalf of Second

Respondent) deposit the shares in Tufts into an escrow account held by Deutsche Bank, (ii) obligated Respondents to keep safe, protect and preserve at all times Claimant's shareholding interest, and (iii) granted Claimant the right to require that the shares in Tufts held by First Respondent be transferred to him by Deutsche Bank if the encumbrances created by the mortgage over Europark and the pledge of shares in Doralin were not removed by 13 December 2008. In addition, Claimant argues that by implication the Respondents were obliged under both the Shareholders' Agreement and the Escrow Agreement to ensure that the ownership structure of Centurion and Europark be maintained. Without Europark as an asset, the shares in Tufts would have no value. Claimant also asserts that Second Respondent repeatedly assured him that his interest in Europark was protected. Claimant has argued that First and Second Respondent are jointly and severally liable. According to Claimant, First Respondent was Second Respondent's agent and both Respondents are liable since First Respondent did not solely act as an agent, but also had a material role as the legal owner of the shares in Tufts.

93.     As regards jurisdiction, Claimant contends that both Respondents are bound by the Shareholders' Agreement and the Escrow Agreement. First Respondent is bound as it signed the agreements. Second Respondent is bound since (i) First Respondent acted as his agent, (ii) it was the parties' intention that Second Respondent be party to the Shareholders' Agreement and the Escrow Agreement, and (iii) the 2008 Agreement confirms that Second Respondent is a party to the Shareholders' Agreement and the Escrow Agreement. Claimant also argues that the parties to the Shareholders' Agreement and Escrow Agreement agreed to submit any dispute under the 2003 Agreement to the LCIA dispute resolution mechanism included in the first mentioned agreements.

94.     Claimant has addressed the objections raised by the Respondents – summarized below – in the following way.

95.     Claimant argues that the Shareholders' Agreement and the Escrow
        Agreement were not abandoned as First Respondent alleges. According to
        Claimant, First Respondent has failed to establish that the parties agreed to
        abandon the agreements, expressly or by implication, which is a requirement
        under English law.

96.     Claimant states that First Respondent's claim that the escrow account was not
        opened is wrong. The escrow account was indeed opened as stated in the
        Escrow Agreement, which Deutsche Bank signed. Moreover, Claimant
        asserts that First Respondent's suggestion that it has no liability since the
        current directors of First Respondent have no knowledge of any previous
        dealings of the company is irrelevant.

97.     Claimant also argues that First Respondent's allegation to the effect that, as
        an agent, it cannot be held liable for its principal is an incorrect interpretation
        of the English law of agency.

98.     First Respondent has stated that, on 10 November 2010, First Respondent's
        original director resigned and that the registered address changed. In
        connection with this change, First Respondent lost all its files. It has therefore
        had to rely on the documents and facts presented by Claimant in this case.

99.     First Respondent has argued that, according to Claimant's own position, it is
        an agent which never acted for its own account, independently for its own
        interests. Under English law, an agent acting on behalf of a disclosed
        principal cannot itself be liable to a third party. Any agreement entered into is
        binding on the principal, and only the principal can be sued or liable under
        such contracts. Since Claimant argues that First Respondent is an agent,
        Claimant has no claim against First Respondent.

100.    Furthermore, First Respondent argues that its current administration played
        no role in the alleged appropriation of Claimant's interest in Europark and
        can therefore have no liability. The transfer of shares in Doralin was
        performed by Tufts and not First Respondent. First Respondent also argues

that there was no implied obligation to maintain the ownership structure of Europark. In any event, First Respondent did not play any role in the sale of shares in Doralin and was never in a position to transfer the Tufts shares into escrow due to Claimant's failure to open the escrow account.

101.    First Respondent has also asserted that it did not owe Claimant a fiduciary duty and that, in any event, Claimant has failed to substantiate his claim that First Respondent played any role, or dishonestly assisted Second Respondent, in any appropriation of Claimant's interest in Europark, or breach of Second Respondent's alleged duties.

102.    Finally, First Respondent contends that the Shareholders' Agreement and the Escrow Agreement were abandoned and that the parties have no further obligations under them. Given the short timelines provided under these agreements (13 months), First Respondent claims that the relatively long period of delay and inactivity has resulted in the abandonment of the agreements.

103.    Second Respondent has argued that the Tribunal lacks jurisdiction since he is not a party to either the Shareholders' Agreement or the Escrow Agreement. According to Second Respondent, there is no legal justification under English law to pierce First Respondent's corporate veil. Second Respondent has never been a beneficial owner of shares in First Respondent. Consequently, even if the corporate veil could be pierced and First Respondent could be viewed as the agent of its controlling shareholder, Second Respondent would not be liable.

104.    Furthermore, continues Second Respondent, there is no merit to Claimant's suggestion that the parties' "common intent" was to bind Second Respondent to the Shareholders' Agreement and the Escrow Agreement. Even if there were some kind of "common intent" such legal concept is alien to English law. Even if such concept had existed, Claimant willingly, and with full knowledge of the corporate structure and ownership of First Respondent, entered into the Shareholders' Agreement and the Escrow Agreement.

105.   Second Respondent also argues that the Shareholders' Agreement is inconsistent with Claimant's claim that Second Respondent be liable for First Respondent's obligations under the agreement. This argument is based on the definition of the terms "Party" and "Parties" (which contains no reference to Second Respondent) in the Shareholders' Agreement and on Article 10.3.3 of the same agreement which warrants that none of the Tufts shares, Doralin shares, Centurion shares, nor Europark itself are pledged, under arrest, or under management, nor encumbered with other rights of third persons. Second Respondent claims that it has no right as a third party to the Shareholders' Agreement to bring a claim against any party to the agreement. Consequently, no party to the Shareholders' Agreement is able to bring a claim against Second Respondent under the same agreement.

106.   Concerning Claimant's argument that First Respondent entered into the Shareholders' Agreement and the Escrow Agreement as an agent for Second Respondent, Second Respondent emphasises that there is no agency agreement of any kind between Respondents. Moreover, First Respondent as a separate legal entity with obligations, liabilities and rights cannot act as an agent for its (alleged) controlling shareholder.

107.   As regards the argument that Second Respondent, in his capacity as a member of the Russian State Duma, was precluded by Russian law from being a party to the Shareholders' Agreement and the Escrow Agreement, Second Respondent asserts that the issue is irrelevant and that the law does not in any event prevent Second Respondent from taking or holding interests in private enterprises, or exercising shareholder rights.

## C.   The 2008 Agreement

108.   Claimant has argued that the 2008 Agreement sets forth (i) an obligation to ensure that the ownership structure of Centurion and Europark be maintained, (ii) an obligation to keep safe and preserve at all times Claimant's shareholding interest, (iii) an obligation to abide by the terms of the Shareholders' Agreement and the Escrow Agreement, (iv) an obligation to

arrange for the shares in First Respondent to be transferred into escrow in accordance with the Shareholders' Agreement, the Escrow Agreement and the 2008 Agreement, (v) a guarantee that the documents relating to Tufts and Doralin could only be executed by Claimant and Second Respondent jointly and (vi) an obligation to credit to Claimant his profit entitlement under the 2003 Agreement. In addition, Claimant asserts that Second Respondent has fiduciary obligations in relation to all agreements and the parties' relationship of mutual trust and confidence. Claimant also contends that he and Second Respondent have a joint undertaking to develop Europark. This gives rise to a fiduciary obligation of loyalty. By the 2008 Agreement, Claimant also increased his shareholding in Europark to 50%.

109.    As regards jurisdiction, Claimant contends that, by signing the 2008 Agreement, Second Respondent agreed to accept the arbitration provision in the Shareholders' Agreement (Article 2.10 of the 2008 Agreement). According to Claimant, the condition for the Tribunal's jurisdiction set out in Article 2.10 in the 2008 Agreement is fulfilled. Moreover, according to Claimant, Second Respondent's application for an anti-suit injunction constituted a waiver of any objection to the Tribunal's jurisdiction.

110.    Claimant argues that First Respondent and Second Respondent breached their obligations under the Shareholders' Agreement, the Escrow Agreement and the 2008 Agreement, and staged an intricate plot to misappropriate Claimant's interest in Europark, by:

    (i)    Not paying Claimant the profit-related payments from the 2003 Agreement;

    (ii)   Not transferring the shares in Tufts into the escrow account as agreed;

    (iii)  Not removing the encumbrances over the pledged shares;

    (iv)  Unilaterally changing the ownership structure of Europark by effectuating a transfer of the Centurion shares from Doralin to two other Cypriot nominee companies;

(v)   Amending the articles of association of Tufts and by passing resolutions, which were instigated by Second Respondent, in order that Tufts could transfer its shares in Doralin to other companies; and

(vi)   Second Respondent entering into a deal with Tashir to take control of Centurion and Europark, to the complete exclusion of Claimant.

111.   Claimant has addressed the objections put forward by Respondents in the following way.

112.   Claimant did not act in bad faith when dismissing the suggestion of a consent award as suggested by Second Respondent, since the proposal was not enforceable. It was unacceptable to Claimant.

113.   Claimant argues that Second Respondent's allegation that his signature was forged is without any merit and the burden of proof falls on Second Respondent. Claimant has filed an expert opinion of Ms. Mymrikova in support of the claim that Second Respondent's signature is authentic.

114.   According to Claimant, Second Respondent's objection that the 2008 Agreement is not binding since it was never performed is without merit. A number of core obligations contained in the 2008 Agreement were performed, including (i) the appointment of Claimant and Second Respondent as directors of Tufts, (ii) the issue to them of a joint general power of attorney to represent the interests of Tufts and Doralin, (iii) the revocation of the power of attorney granted to Mr Garkusha, and (iv) the termination of the appointment of the company secretary of Tufts.

115.   Claimant disagrees with Second Respondent's argument that the 2008 Agreement was a letter of intent or similar and not an enforceable agreement. According to Claimant, the fact that certain details in the 2008 Agreement were left blank does not prevent it from being legally binding.

116.   First Respondent's objections have been described in sections 86 and B above.

117.  Second Respondent has argued that his signature on the 2008 Agreement was forged. In support of this claim, Second Respondent has filed an expert opinion by Mr. Gus Lesnevich concluding that the signature is a forgery. According to Second Respondent, the correspondence from the lawyers at Herbert Smith in connection with the alleged conclusion of the 2008 Agreement also proves that no final agreement was reached between the parties. The 2008 Agreement is thus not binding and the Tribunal has no jurisdiction.

118.  Furthermore, Second Respondent asserts that the 2008 Agreement, even if it were not a forgery, was never performed, it never became valid or effective and, even if it had been effective, it provides no basis for the Tribunal's jurisdiction.

119.  Second Respondent claims that the 2008 Agreement was a letter of intent, or an agreement in principle, neither of which is enforceable under English law. Further, several key issues were not agreed in the 2008 Agreement. It is therefore not enforceable.

120.  Second Respondent argues that the 2008 Agreement was never concluded and that none of the obligations in the agreement was ever performed by either party. According to Second Respondent, the fact that the contract was never performed is evidence that it was never intended to be binding.

121.  Second Respondent contends that, even if the 2008 Agreement were enforceable, the arbitration agreement linking a breach of a specific article in the 2008 Agreement to the right to invoke an arbitration provision in a separate agreement to which Second Respondent is not a party is not binding. According to Second Respondent, even if the Tribunal were to find that the 2008 Agreement was signed, binding and enforceable, it provides no basis for jurisdiction over Second Respondent. Article 2.10 of the 2008 Agreement on which Claimant relies deals with establishing a new escrow agreement. The time period by which this was supposed to have been done is left blank in the agreement and therefore cannot be breached. Second Respondent has not

breached Article 2.10 of the 2008 Agreement. The necessary requirement to trigger the arbitration clause has therefore not been satisfied.

122.   Finally, Second Respondent has stated that a party to a contract who has not fulfilled his own obligations cannot demand performance of the other party's obligations or payment from the other party.

123.   Second Respondent denies that its conduct in this arbitration constitutes a waiver of the right to object to the Tribunal's jurisdiction. A waiver would have required that Second Respondent clearly and without any ambiguity expressed his intent to concede the point. Second Respondent has not given such a waiver and has acted in accordance with the LCIA Rules which state that any jurisdictional objection should be raised no later than in the Statement of Defence. The argument that Second Respondent's request for an anti-suit injunction constitutes a waiver (despite the expressed reservation in respect of jurisdiction) lacks merit.

## D.   **Quantum**

124.   Claimant claims compensation for (i) his interest in Centurion and Europark and (ii) his alleged right to profits generated by Europark under the 2003 Agreement. Claimant and Second Respondent have submitted expert reports regarding the calculation of Claimant's alleged loss.

125.   Several issues regarding the calculation of damages are disputed, including (i) what is the appropriate "yield" to be applied to the valuation of Europark, (ii) should disposal costs be deducted from the valuation, (iii) should the value of Centurion be calculated on the basis of a "Fire Sale" scenario or a "Foreclosure" scenario or on some other basis, (iv) should there be an adjustment of the valuation for corporate income tax, (v) on what basis should the net operating income of Europark be calculated, and (vi) should the valuation of Centurion be adjusted for Mr. Smagin's alleged entitlement to profit.

126.    Claimant argues that he suffered losses as a result of Respondent's breaches
        since the breaches resulted in Claimant losing his interest in Centurion and
        Europark and since he has never obtained his entitlement to the profits
        generated by Europark. In support of his calculation of damages, Claimant
        has filed expert reports by Irina Novikova of Price Waterhouse Coopers and
        by Cushman & Wakefield.

127.    Claimant has presented alternative damage calculation scenarios: (i) a sale
        pursuant to Claimant's best efforts, (ii) a sale based on a "fire sale" scenario,
        and (iii) a sale based on a scenario where Claimant still owned 20% of
        Centurion and did not sell it (the "Continuous Holding Scenario"). Claimant
        has used the net asset valuation method which includes a valuation of the
        Europark complex and Centurion. Based on this method, Claimant contends
        that the value of his 20% shareholding in Centurion is (i) USD 72,243,000 on
        the basis of a Continuous Holding Scenario calculation, or (ii) USD
        71,545,000 on the basis of a best efforts sale scenario.

128.    Claimant has also calculated the alleged profit entitlement under the 2003
        Agreement. According to Claimant, Respondents are obligated to pay 20%
        calculated on the basis of Centurions EBIT (earnings before interest and tax)
        from their own funds, not from Centurion's reserves. Claimant asserts that
        the loss Centurion made in 2005 should not be deducted from this claim and
        that the total profit entitlement amounts to USD 27,294,000.

129.    In summary, Claimant argues that the total loss should be calculated as
        follows:

        (a)    loss on the basis of a Continuous Holding Scenario calculation of USD
               72,243,000, plus profit entitlement of USD 27,294,000, resulting in a
               total loss of USD 99,537,000; or

        (b)    loss on the basis of a best efforts sale scenario of USD 71,545,000, plus
               profit entitlement of USD 27,294,000, resulting in a total loss of USD
               98,839,000.

130.  Claimant disagrees with Second Respondent's allegation that there is no
      causation between the alleged breach by not transferring the shares in Tufts to
      an escrow account and any alleged damage caused since Claimant still owns
      20% of the shares in Tufts (i.e. no damage has been suffered). Claimant
      argues that the 20% holding in Tufts is worthless after Tufts lost its only
      asset, i.e. Europark.

131.  Claimant argues that Second Respondent's allegation to the effect that he
      cannot, on any theory, have caused more than half of the alleged loss since
      Mastero only received half of the shares in Doralin, and since the transfer to
      Famulatus only occurred after First Respondent was controlled by Tashir, is
      misconceived. According to Claimant, the transfer was carried out by First
      Respondent, but instigated by Second Respondent; moreover the direct
      ownership of Famulatus is irrelevant to this issue.

132.  Claimant requests that interest should be awarded from 30 June 2013 until the
      date of the Tribunal's award. The applicable interest rate is the average
      annual deposit interest rate as found on the Central Bank of Russia's website.
      Claimant also requests post-award interest at the rate of 8%.

133.  Second Respondent argues that Claimant's calculation of damages is
      excessive and that there is no causation between the alleged breach and
      Claimant's alleged loss. To support its position, Second Respondent has filed
      expert reports by Mr Hall of Smith & Williamson.

134.  As regards the valuation of the shares in Tufts, Second Respondent has
      argued (i) that none of the alleged loss was caused by the alleged
      wrongdoing, (ii) that Claimant has overestimated the damage, (iii) that he
      cannot on any theory have caused more than half of the alleged losses and
      (iv) that Claimant's conduct amounts to contributory negligence.

135.  Second Respondent points out that Claimant has the burden of proving that
      the alleged breach caused his loss. According to Second Respondent,
      Claimant's alleged loss has no connection to whether shares in Tufts were

transferred into escrow since Deutsche Bank did not accelerate or seek to foreclose on its security for the loan for which the shares were used as security. Second Respondent emphasises that Claimant still owns 20% of the shares in Tufts and that the alleged breaches of the Shareholders' Agreement and the Escrow Agreement have no connection to the transfer of Europark to Mastero and Famulatus, which is the basis for Claimant's loss. As described above, it is Second Respondent's position that there was no implied obligation to maintain the corporate structure of Europark.

136. Second Respondent claims that Claimant has overestimated his loss and that the actual loss is in the range of USD 29.1 to USD 43.9 million assuming a 10% yield and USD 21.7 to USD 32.3 million assuming a 14% yield.

137. Second Respondent has argued that when the second transfer of Doralin shares was made by Tufts in April 2010 (50% of the shares), Second Respondent, on Claimant's case, had no interest in First Respondent or Tufts, whether direct, indirect, or otherwise. Thus, it cannot be liable for half of the alleged loss.

138. Second Respondent has objected to Claimant's argument that pre-award interest should be awarded from 30 June 2013 and argued that this date has been arbitrarily selected and has no basis in principle.

## III.    PRAYERS FOR RELIEF

139. Claimant has asked for the following relief:

> (i) Damages to compensate Mr. Smagin for the loss of his interest in Europark through his shareholding in Centurion, as set out in the quantum section above (i.e. either USD 72,243,000 on the basis of a Continuous Holding Scenario and USD 71,545,000 on the basis of a best efforts sale scenario);
>
> (ii) Damages to compensate Mr. Smagin for his entitlement to the profit payment amounting to USD 27,294,000;
>
> (iii) Interest (annual Russian deposit interest rates, currently 7.86%) on all sums awarded from 1 July 2013 to the date of the Award;

(iv) Post-award interest of 8% on all amounts awarded; and

(v) All costs and expenses incurred in connection with the preparation and conduct of this proceeding, to include Mr. Smagin's costs of this arbitration (including the fees and expenses of the LCIA and of the Tribunal), and all legal fees and costs (including those of legal counsel, witnesses, and experts), together with interest thereon. The legal fees and expenses amount to GBP 3,101,990.05 (not including the fees and expenses of the LCIA and of the Tribunal).

140. First Respondent has raised the following prayers for relief, asking that:

(i) All claims advanced by Claimant with respect to Kalken be dismissed; and that

(ii) Kalken be awarded against the Claimant all of its costs and expenses incurred in relation to defending this Arbitration totalling USD 827,066.30, including the fees and expenses of the LCIA and of the Tribunal, with interest.

141. Second Respondent has asked that the Arbitral Tribunal

(a) Declare that there is no jurisdiction over him and dismiss the Claimant's claims against him in their entirety;

(b) In the alternative,

1. dismiss the Claimant's "profits" claim for lack of jurisdiction; and

2. stay this proceeding with respect to the Claimant's remaining claims in the Russian court;

(c) In the further alternative, issue an order directing that the Claimant apply to lift the injunction in the Russian criminal proceedings to allow the transfer or sale of the Centurion shares to ensure an equitable distribution;

(d) Reimburse the Second Respondent's arbitration costs, including attorneys' fees with USD 1,807,130.60; and

(e) Any other relief that the Tribunal may deem appropriate.

## V.    REASONS

142. The parties have relied on a multitude of facts, arguments and evidence. The Tribunal has reviewed, analysed and considered all of them. In the following,

the Tribunal presents the reasons which it has found necessary to rule on the prayers for relief presented to the Tribunal.

143.     By ruling on the prayers for relief, the Tribunal has also dealt with the issues identified in the list of issues agreed between Claimant and Second Respondent, and submitted to the Tribunal on 11 April 2014.

## A.     Jurisdiction

### A.1    Introduction

144.     Both Respondents have raised jurisdictional objections, also subsequent to the Tribunal's Award on Jurisdiction dated 14 February 2012. In that award the Tribunal did not accept Second Respondents' argument that Claimant had repudiated the arbitration agreement by initiating criminal proceedings in Russia and by asking for compensation within the framework of those proceedings. In that award the Tribunal also denied a request from Second Respondent for an anti-suit injunction.

145.     Claimant now argues that Second Respondent has waived the right to raise jurisdictional objections. In Claimant's view this is a consequence of the fact that Second Respondent applied for a final, mandatory anti-suit injunction thus relying on an arbitration agreement. As mentioned above, this application was denied by the Tribunal in its Award of 14 February 2012. Claimant also contends that Second Respondent is now precluded from denying that he is a party to the arbitration agreement, because Second Respondent repeatedly told Claimant that he would perform the Shareholder's Agreement and the Escrow Agreement.

146.     Second Respondent submits that he has not waived his right to raise jurisdictional objections. This is because he expressly and repeatedly reserved his right to challenge the jurisdiction of the Tribunal. Second Respondent also relies on Article 23.2 of the LCIA Rules which states that a jurisdictional objection must be made not later than in the Statement of Defence. Second

Respondent refers to his Statement of Defence and Request for Proposed Consent Award dated 30 March 2012 where jurisdictional objections were made.

147. For the reasons articulated and explained by Second Respondent, the Tribunal finds that he is not precluded from now raising jurisdictional objections. The Tribunal will thus proceed to try the jurisdictional objections raised by Second Respondent, as well as those raised by First Respondent. In so doing, the Tribunal is mindful of the doctrine of separability and its consequences, and refers to Article 23.1 of the LCIA Rules.

148. In their pleadings the parties have generally presented arguments relating to the existence, validity and applicability of the agreements without distinguishing between the arbitration agreement in question and the relevant commercial contracts. While it is generally accepted that the arbitration agreement is to be viewed and treated as separate from the commercial contract in which it is included, it is also accepted that the same factual circumstances may be relevant with respect to both agreements, but without automatically leading to the same legal consequences. This may be so, for example, because different legal rules may apply to arbitration agreements and commercial contracts.

149. In the following the Tribunal will focus on those facts and arguments which may be relevant when determining the existence, validity and applicability of any arbitration agreement.

**A.2     Jurisdiction with respect to First Respondent**

150. The 2003 Agreement was not signed by First Respondent. It does not include any arbitration clause. These undisputed facts are sufficient for the tribunal to conclude that it does not have jurisdiction over First Respondent based on the 2003 Agreement.

151. By contrast, both the Shareholders Agreement and the Escrow Agreement have been signed by First Respondent. Both agreements have arbitration

clauses referring to arbitration under the rules of LCIA. This leads to the *prima facie* conclusion that First Respondent is bound by these arbitration clauses.

152.   Even though First Respondent has not objected to the jurisdiction of the Tribunal, it has argued that it only acted as an agent for Second Respondent and never for its own account in relation to the breaches alleged by Claimant. This is a central theme of the parties as far as the merits of the dispute are concerned. As far as the arbitration agreement is concerned, First Respondent has not been able to establish to the satisfaction of the Tribunal that the arbitration agreements in, respectively, the Shareholders Agreement and the Escrow Agreement, were entered into only for and on behalf of First Respondent. Consequently, the Tribunal finds that it has jurisdiction over First Respondent on the basis of the arbitration clauses in the afore-mentioned agreements.

153.   First Respondent has also raised the argument that the Shareholders Agreement and the Escrow Agreement were abandoned and that therefore the parties have no further obligations under them. This argument was advanced primarily with respect to the merits, and is discussed below. Even if it were correct as far as the merits are concerned, this would not automatically affect the arbitration clauses in the above-mentioned agreements. Those agreements were entered into in 2006. The Request for Arbitration was filed on 26 October 2010. Even though an arbitration agreement could perhaps, *arguendo*, be abandoned under English law,  the Tribunal holds that a period of four years is too short to bring about such a result, unless it is established that this was the intention of the parties to the arbitration agreement in question. In the circumstances, First Respondent has not been able to show that this was the intention of the parties to the Shareholders Agreement and the Escrow Agreement. In other words, First Respondent remains bound by the arbitration clauses in the afore-mentioned agreements.

154.   It follows from the foregoing that it is not necessary for the Tribunal to rule on the effect of the 2008 Agreement on the Tribunal's jurisdiction over First

Respondent. The Tribunal notes, however, that, while First Respondent is referred to in the Preamble of the 2008 Agreement, First Respondent has not signed this agreement.

## A.3      Jurisdiction with respect to Second Respondent

### A.3.1      Introduction

155.    In asserting that the Tribunal has jurisdiction with respect to the claims raised by Claimant in this arbitration, Claimant is relying on the 2003 Agreement, the Shareholders Agreement, the Escrow Agreement as well as the 2008 Agreement. Many of the arguments presented by Claimant and Second Respondent with respect to jurisdiction seem to focus primarily on the validity and applicability, in general, of the afore-mentioned agreements, and not specifically on purported arbitration agreements entered into between the parties. In the following, the Tribunal will consider the arguments put forward by Claimant and Second Respondent in so far as they are relevant to the validity and applicability of any arbitration agreement only, as it must do pursuant to the doctrine of separability.

156.    At the outset the Tribunal notes that the 2003 Agreement, entered into between Claimant and Mr. Garkusha, does not have an arbitration clause. Claimant has argued, however, that it and Second Respondent have subsequently agreed that disputes under the 2003 Agreement are to be resolved under the arbitration rules of the LCIA. Claimant has also argued that the 2008 Agreement gives the Tribunal jurisdiction over Second Respondents' alleged breaches not only of that agreement, but of also over the alleged breaches of the Shareholders Agreement, the Escrow Agreement, as well as over alleged breaches of what it refers to as "the collateral agreements", which in its view includes agreements, oral or otherwise, to the effect that disputes under the 2003 Agreement were to be settled by arbitration under the LCIA arbitration rules.

157.    Against the background of this alleged overarching effect of the 2008
        Agreement, the Tribunal will first address this agreement with a view to
        determining whether, and to what extent, if any, the 2008 Agreement gives
        the Tribunal jurisdiction to consider Claimant's claims against Second
        Respondent.

158.    In so far as jurisdiction is concerned, Second Respondent has raised three
        objections with respect to the 2008 Agreement. *First*, Second Respondent
        says that he has not signed the 2008 Agreement; his signature on that
        document is a forgery. *Secondly*, Second Respondent argues that the 2008
        Agreement was an unenforceable agreement in principle. *Thirdly*, Second
        Respondent says that even if signed, binding and enforceable, the 2008
        Agreement provides no basis for jurisdiction because the purported
        arbitration clause does not cover the claims raised by the Claimant.

        The Tribunal will deal with these objections seriatim.

### A.3.2    Has the 2008 Agreement been signed by Second Respondent?

159.    Second Respondent has argued that the signature on the 2008 Agreement is
        not his signature. It is a forged signature. In support of this allegation, Second
        Respondent has relied on the expert opinion of Dr. Gus Lesnevich. His
        conclusion is that the signature on the 2008 Agreement, which purports to be
        the signature of Second Respondent, is not a genuine signature.

160.    Claimant relies, *inter alia*, on the expert report and testimony of Dr. Audrey
        Giles.

161.    Neither Mr. Lesnevich nor Dr. Giles have had access to the original 2008
        Agreement, but have analysed copies thereof. Due to the absence of the
        original for examination, Dr. Giles concluded that she was unable to
        determine if the signature on the 2008 Agreement was genuine, or a
        simulation of a genuine signature of Second Respondent.

162.    In support of his position that the signature is genuine, Claimant has relied also on other expert reports. In particular he has referred to a report prepared by Ms. Ekaterina Mymrikova in the context of the criminal proceedings in Russia. According to her report, she had access to the original of the 2008 Agreement, as well as to more than 20 original comparison samples of Second Respondent's signature. Based on her analysis, Ms. Mymrikova concluded that the signature on the 2008 Agreement is Second Respondent's genuine signature.

163.    In the view of the Tribunal, Ms. Mymrikova's report is strong evidence that the Second Respondent's signature on the 2008 Agreement is genuine.

In addition, in his written statement Claimant has explained and described how the agreement was discussed by him and Second Respondent, and eventually signed. Claimant has also relied on the witness statements of Messrs. Garkusha, Zhigulin and Ageev, which in the opinion of the Tribunal to a certain extent, at least indirectly, support Claimant's contention that the 2008 Agreement was signed by Second Respondent. In contrast, Second Respondent has not submitted any witness evidence to support his assertion that he did not sign the agreement. Nor has Second Respondent himself appeared as a witness in the arbitration, or submitted a written statement.

164.    On the basis of the evidence before it, the Tribunal finds that Second Respondent has not been able to prove that the signature on the 2008 Agreement is not genuine. The burden of proof for an allegation of forgery must lie with the part making the allegation. Second Respondent has not met that burden of proof. The Tribunal will thus proceed on the basis that the signature on the 2008 Agreement is Second Respondent's genuine signature.

### A.3.3   Is the 2008 Agreement binding and enforceable?

165.    Second Respondent has taken the view that even if he had signed the 2008 Agreement, it never became binding and enforceable. It was simply a pre-contract document to serve as a guideline for future negotiations. None of

the key obligations set out in the agreement was performed. In this context Second Respondent refers to Articles 2.1, 2.2, 2.4, 2.6, 2.7 and 2.8, as well as to Articles 4.4, 4.5 and 5 of the 2008 Agreement.

166.   Claimant, on the other hand, takes the view that the 2008 Agreement became binding, was enforceable and was in fact performed, albeit partially.

167.   The arguments of both Claimant and Second Respondent with respect to this issue have focused on the substantive aspects of the 2008 Agreement, and not on the arbitration clause in it. The arguments thus form part of the merits of the dispute.

168.   It follows from the doctrine of separability that the arguments so presented are not automatically relevant for, or applicable to, the questions of the validity and interpretation of a purported arbitration agreement. Article 2.10 of the 2008 Agreement sets forth an arbitration clause which refers to the "London Court of International Arbitration". Neither Second Respondent nor Claimant has referred to, let alone discussed, Article 2.10 when presenting their arguments with respect to the binding nature and enforceability of the 2008 Agreement.

169.   In the view of the Tribunal, the fact that Second Respondent has signed the 2008 Agreement – with an arbitration clause – means that he is also bound by the arbitration clause. There is nothing in the arbitration clause, nor in English law which makes the clause unenforceable. The arbitration agreement is thus binding and enforceable.

The scope of application of the arbitration clause will be addressed in section A.3.4, below.

### A.3.4   Does the arbitration clause in the 2008 Agreement cover the claims raised by Claimant?

170.   Article 2.10 – the arbitration clause – of the 2008 Agreement reads:

> "If Partner 2 fails to perform his obligations set forth in clauses 2.1-2.4,
> Partner 1 will seek to enforce his rights under the Shareholder's Agreement by

> filing a claim against Partner 2 with the London Court of International
> Arbitration and require among other things, enforcement of Clause 9.1.5 of the
> Shareholders' Agreement, limitations of restrictions on use of his property
> (shares in TUFTS, MTC, Europark), and indemnification for losses".

171.    The Second Respondent has taken the view that Article 2.10 gives Claimant a
        conditional right to arbitration. It is only if the obligations referred to in that
        article have not been performed that Claimant can initiate arbitration, in the
        view of Second Respondent. Since Second Respondent has not failed to
        perform any obligation, he continues, Claimant has no right to arbitration.
        The Tribunal therefore lacks jurisdiction.

172.    The Tribunal disagrees with this interpretation of the arbitration clause.

        Even though the language of Article 2.10 is somewhat unorthodox, the
        ultimate meaning of it is traditional and clear: if Claimant alleges that Second
        Respondent has failed to perform certain obligations, such disputes are to be
        referred to arbitration. *Whether* Second Respondent has in fact failed to
        perform the obligation in question, as well as the legal consequences thereof,
        is to be determined in the arbitration.

173.    To establish the scope of application of the arbitration clause, it is necessary
        to determine to what rights and obligations Article 2.10 refers. The article
        refers to the obligations of Second Respondent "set forth in clauses 2.1-2.4".
        These clauses read:

> 2.1 Partners (shareholders designated by them) will enter into an amendment
> agreement to the TUFTS Shareholders' Agreement, no number, dated
> December 26, 2006, which shall govern the revenue distribution procedure of
> CJSC CA.
>
> 2.2 In connection with a default and termination of the Escrow Agreement, no
> number, dated November 13, 2007 the Parties will enter into a similar escrow
> agreement whereunder Deutsche Bank AG will act as an escrow agent, and
> will procure for its performance by all parties and when entering into such
> agreement they will remove all inconsistencies that existed before. Partner 2
> (shareholders designated by him) will also execute and deliver to Deutsche
> Bank AG instruments of transfer with respect to all TUFTS shares owned
> (controlled) by him.
>
> 2.3 The constituent documents of Blidensol, Doralin and TUFTS will need to
> be amended to provide that any document of any of such companies shall be

considered to be duly executed and having legal force only upon its execution by two authorized persons, namely Partner 1 and Partner 2.

2.4 Partner 2 will appoint the General Director of CJSC CA, and Partner 1 will appoint Chief Accountant and control the Financial Director (any other senior finance positions) [*handwritten comment indicates a change of the sentence "Partner 1 will appoint Chief Accountant and control the Financial Director" to "Partner 1 will appoint and control Chief Accountant and Financial Director". The word "control" is crossed-out in manuscript]. [Further handwritten comment: illegible]*

Article 2.10 then goes on to refer to Claimants "rights under the Shareholders' Agreement."

174.    The Tribunal finds that the language of Article 2.10 and of Articles 2.1-2.4 as well as of the Shareholders' Agreement, to which reference is made, is broad enough to give the Tribunal jurisdiction over the claims raised by Claimant, insofar as they are based on the Shareholders' Agreement, the Escrow Agreement and the 2008 Agreement.

175.    By contrast, however, there is no reference in Article 2.10 to the 2003 Agreement, nor to any rights and obligations flowing from that agreement. The Tribunal therefore finds that Article 2.10 does not give it jurisdiction to try claims based on the 2003 Agreement. Nor has Claimant been able to convince the Tribunal that Second Respondent and Claimant have otherwise agreed that disputes arising out of, or in connection with, the 2003 Agreement are to be resolved by this arbitration. Consequently, the Tribunal lacks jurisdiction to try claims based on the 2003 Agreement and Claimant's request for relief concerning profit payments in the amount of USD 27,294,000 must be dismissed.

176.    It follows from the foregoing, that it is not necessary for the Tribunal to deal with the Shareholders' Agreement and the Escrow Agreement from a jurisdictional perspective.

## B.      Merits

### B.1      Second Respondent

### B.1.1      Introduction

177.      In support of his prayers for relief Claimant has relied on the obligations that Second Respondent has undertaken in the Shareholder's Agreement, the Escrow Agreement and the 2008 Agreement. In so doing Claimant has argued that under the 2008 Agreement, Second Respondent, among other things, undertook to abide by the terms of the Shareholders' and Escrow Agreements until Claimant and Second Respondent had entered into new versions of those agreements.

178.      The Tribunal will first deal with the 2008 Agreement, because if Claimant is right in this respect, the question whether Second Respondent was a party to the Shareholder's Agreement and the Escrow Agreement becomes moot.

### B.1.1.1      *The 2008 Agreement*

179.      Second Respondent has raised a number of objections with respect to the 2008 Agreement.

180.      The Tribunal has already found that Second Respondent's signature on the 2008 Agreement is not a forgery.

181.      Second Respondent has also taken the view that the 2008 Agreement is not binding and enforceable. He has argued that the agreement was only an agreement in principle which required further negotiations to become binding. Second Respondent has submitted that the 2008 Agreement left important points open which made the agreement incomplete and uncertain, and therefore unenforceable. He has also argued that a number of the obligations listed in the 2008 Agreement -Articles 2.1, 2.2, 2.4, 2.6, 2.7, 2.8, 4.4, 4.5 and 5 - were never performed and that this meant that the agreement never took effect.

182.    The Tribunal notes that the copy of the 2008 Agreement presented to it has a
        number of handwritten comments and questions on it. There also seems to be
        a few items which have not been expressly addressed in the agreement. One
        such item is Article 2.5, which envisages that the actions specified in Articles
        2.1-2.4 are to be taken by a certain date. No date, is, however, indicated in
        Article 2.5. In the view of the Tribunal, this does not mean that the
        remaining provisions are not binding. In reaching this conclusion, the
        Tribunal has analysed the 2008 Agreement in its totality, the background to it
        and the purported reasons for it, as explained to the Tribunal by Mr. Smagin.
        Ideally, of course, a date should have been inserted. That fact that this was
        not done does not, however, mean that the undertakings in Article 2.1-2.4
        fall away.

183.    The Second Respondent argues that the 2008 Agreement never took effect
        because a number of the activities foreseen in the agreement, never happened.
        *First*, the Tribunal notes that none of the activities referred to by Second
        Respondent is identified as a condition for the entry into force of the
        agreement. *Secondly*, given the foregoing, the fact that the activities did not
        take place would rather seem to be an indication that the agreement had been
        breached. Whilst some of the activities to which Second Respondent refers
        were supposed to be performed by Claimant, some of them were undoubtedly
        dependent on prior action having been taken by Second Respondent. In the
        final analysis, the Tribunal finds that the fact that certain activities did not
        take place, did not prevent the 2008 Agreement from becoming final and
        binding.

**B.1.1.2    *What does the 2008 Agreement mean?***

184.    As mentioned above, Claimant takes the view that Second Respondent has
        undertaken the obligation to abide by the terms of the Shareholders'
        Agreement and the Escrow Agreement. In that context he has also
        undertaken, says Claimant, to procure that the shares in First Respondent be
        transferred into escrow pursuant to the Shareholders' and Escrow
        Agreements.

185.   Based on its analysis of Articles 2.1, 2.2 and 2.10 of the 2008 Agreement, the
       Tribunal agrees with Claimant that these are obligations of Second
       Respondent.

186.   Claimant has also contended that Second Respondent was under an obligation
       to ensure that documents relating to Tufts and Doralin could only be executed
       by Claimant and Second Respondent. This obligation follows directly from
       Article 2.3 of the 2008 Agreement.

187.   In addition, Claimant has argued that the 2008 Agreement put Second
       Respondent under the obligation to keep safe, protect and preserve at all
       times Claimant's shareholding interest, and under the obligation to ensure
       that the ownership structure of Centurion and Europark be maintained such
       that Claimant would through his shareholding in Tufts retain the value of his
       interest in Europark.

188.   Whilst there is no explicit term in the 2008 Agreement articulating these
       obligations, Claimant takes the view that these obligations result from an
       implied term in the agreement. In Claimants view the fundamental purpose of
       the 2008 Agreement was to protect and preserve his interest in Europark. In
       order to give business efficacy to the agreement, and to ensure therefore that
       its purpose could be achieved, it was necessary that the ownership structure
       of Europark be maintained.

189.   Second Respondent has rejected the argument concerning implied terms,
       albeit in the context of discussing causation in relation to Claimant's alleged
       loss under the Shareholders' and Escrow Agreements.

190.   Based on the evidence presented to the Tribunal – including, in particular, the
       testimony of Claimant – it is convinced that the purpose of the Shareholders'
       and Escrow Agreements was to protect the ownership structure of Europark
       and thus the interests of the shareholders in Tufts, being the ultimate indirect
       owner of Europark. The Tribunal is also convinced that the 2008 Agreement
       was specifically designed to protect Claimant's interest in Europark. This

follows from an analysis of Article 1 of the Preamble of the 2008 Agreement – where the shareholding structure is described in detail – and Articles 2.1-2.4 and 2.10. The conclusion is also supported by the reference in Article 2.10 to Article 2.1.5 of the Shareholders' Agreement, which in turn refers to Article 5 of that agreement which in its turn depends on the ownership and shareholding structure described in the whereas clauses of the Shareholders' Agreement.

191.    If the ownership structure of Europark was not maintained, the protection intended to be afforded to Claimant would be illusory, a house of cards.

### B.1.1.3   *Has Second Respondent breached the 2008 Agreement?*

192.    Claimant has alleged that Second Respondent breached the following obligations under the 2008 Agreement:

- The Tufts shares were never delivered to Deutsche Bank to be placed into escrow;

- The Encumbrances were not removed by 13 December 2008, and have still not been removed;

- The ownership structure of Europark was unilaterally and covertly dismantled such that Doralin – and thus Centurion and Europark – was sold to Tashir and Second Respondent through their respective companies Mastero and Famulatus;

- The Tufts Articles of Association were amended, and corporate resolutions in Tufts passed, in order to enable Tufts to transfer its shares in Doralin to Famulatus and Mastero;

- Second Respondent and Tashir agreed a deal to take control of Centurion and Europark to the complete exclusion of Claimant.

193.    Based on the evidence presented to it, the Tribunal notes that Second Respondent has not disputed that these events in fact occurred. The defences

raised by Second Respondent are rather based on his analysis of the legal consequences of the events.

194.   *First*, Second Respondent argues that Claimant has not been able to establish causation of his loss. Second Respondent is asserting that Claimant suffered no loss because he still owns 20 per cent of Centurion. In 2010, however, the shareholding structure was fundamentally re-arranged such that Claimants' shares in Tufts became worthless. As the Tribunal has noted above, maintaining the ownership structure of Europark was an implied term of the 2008 Agreement, as well as of the Shareholders' and Escrow Agreements. In the 2008 Agreement Second Respondent confirmed that he controlled 73 per cent of all the shares in Tufts, including the shares held by First Respondent. In that capacity Second Respondent caused First Respondent to take the necessary steps for the transfer of the Doralin shares to Famulatus and Mastero. Such steps included the changing of the Tufts Articles of Association and the removal of Claimant as a director of Tufts. By so doing, Second Respondent breached his obligations under the 2008 Agreement, Articles 2.3 and 2.4.

195.   *Secondly*, Respondent has also argued that he did not cause Claimant's alleged loss because there was no acceleration of, or foreclosure under, the Loan pursuant to the Shareholders' and Escrow Agreements. It will be recalled that Article 2.10 of the 2008 Agreement refers to the right of Claimant to enforce his rights under Article 9.1.5 of the Shareholders' Agreement. Pursuant to that provision, Claimant had the right to ask for the transfer to him of First Respondent's shares in Tufts – which were supposed to be held in escrow – and to sell those shares, provided that the Loan had not been repaid and the Encumbrances not removed. The Loan has not been repaid and the Encumbrances have not been removed. Nor were the Tufts shares ever transferred into escrow. Consequently, Claimant was deprived of the possibility to sell the Tuft's shares. Second Respondent thus failed to take measures required of him under the 2008 Agreement, Articles 2.1 and 2.2.

196.   *Thirdly*, Second Respondent has taken the position that he has not caused more than half of Claimant's alleged loss. This argument is based on the fact that Second Respondent only owns Mastero – which received half of the shares in Doralin – and that the transfer of the Tuft's shares to Famalatus took place only after First Respondent was controlled by Tashir. As noted above, the Tribunal has found that Second Respondent caused First Respondent to take the measures leading to the transfer of the Tufts shares. These measures included the removal of Claimant as director of Tufts and replacing him with another director – MPH Law – that brought about the transfer of the shares. Any losses that Claimant may have incurred were thus caused by Second Respondent's breaches of the 2008 Agreement.

197.   *Fourthly*, Second Respondent has contended that his activities were taken to protect and safeguard Europark. The Tribunal has not been able to find any elaboration of, nor support for, this contention, in the case presented by Second Respondent.

198.   *In conclusion*, the Tribunal finds that Second Respondent has breached the 2008 Agreement. Against this background, as noted above, there is no need for the Tribunal to rule on whether Second Respondent was party to the Shareholders' and Escrow Agreements.

**B.2   First Respondent**

199.   First Respondent is a party to the Shareholders' and Escrow Agreement. It is also a party to the re-stated Escrow Agreement dated 13 November 2007.

200.   A number of defences have been raised by First Respondent.

201.   *First*, it has been stated by First Respondent that it has had a limited role in the events complained of by the Claimant, and that its original directors have been replaced. It has also explained that its current management has no knowledge of the events in question, thereby seemingly suggesting that it is not liable for what prior directors did. As a matter of English law neither of

these statements is a defence. As a legal entity, First Respondent may still be held liable.

202.    *Secondly*, First Respondent has argued that the escrow account was never opened. Therefore it had no obligation to transfer the Tufts shares into escrow. First Respondent has not provided any evidence – either written or oral – in support of this statement. Claimant, on the other hand, has testified that he completed the requisite documentation to open the escrow account foreseen in the Escrow Agreement. In addition, Claimant has relied on the re-stated Escrow Agreement dated 13 November it this respect. Article 2.1 of that agreement states that First Respondent and Second Respondent "have opened [an escrow account] with [Deutsche Bank] in their joint names". Based on the foregoing, the Tribunal concludes that an escrow account has in fact been opened. First Respondent thus had an obligation to transfer the Tufts shares into escrow. It did not.

203.    *Thirdly*, First Respondent has contended that the Shareholders' and Escrow Agreements have been abandoned. In support of this argument it has pointed to the fact that the longest expected duration of the Shareholders' Agreement was 13 months, having been signed on 26 November 2006, and that the Escrow Agreement was not concluded until 13 November 2007. In order for the Escrow Agreement to become effective, the Tufts shares had to be transferred to the Escrow Account. First Respondent goes on to say that Claimant failed to bring about the transfer.

204.    The Tribunal notes that it has concluded above that it was First Respondent which was under the obligation to transfer the shares into escrow. First Respondent cannot rely on its own breach of obligations in support of an argument that the agreements in question were abandoned.

205.    Under English law it is clear that to establish abandonment of an existing agreement, the party so alleging must prove mutual agreement to such abandonment. Such mutual agreement may be express or inferred.

206.    First Respondent has not been able to prove any express mutual agreement, nor can any such agreement be inferred from the facts of the case. Claimant has testified that he regularly and repeatedly asked First Respondent, as well as Second Respondent, to arrange for the transfer of the Tufts shares into escrow. This must have left First Respondent in no doubt that Claimant insisted on the performance of First Respondent's obligations under the Shareholders' and Escrow Agreements.

For the foregoing reasons, the Tribunal finds that the agreements in question have not been abandoned.

207.    *Fourthly*, First Respondent has denied any role in or liability for the transfer of the Tufts shares. Although it holds 73 per cent of the Tufts shares, it denies any role in the transfer of Tufts Doralin shares to Famulatus and Mastero. First Respondent denies that it approved any such transaction.

208.    Based on the sequence of events leading to this transfer, the Tribunal finds that First Respondent was an active participant in this transaction.

209.    The chronology of events is the following:

(i)     On 8 September 2008, Claimant was appointed a director of Tufts;

(ii)    The original Tufts' Articles of Association, dated 18 September 2006 required 75% of shareholder votes to remove a director. This threshold meant that First Respondent (73% shareholder in Tufts) had to vote with Claimant (20% shareholder) and/or Mr. Garkusha (7% shareholder) to remove a director;

(iii)   On 23 November 2009, First Respondent amended the 2006 Tufts Articles, without Claimant's knowledge, to change this 75% vote threshold to a 50% shareholder vote threshold to remove a director. This meant that under the 2009 Amended Tufts Articles, First Respondent could remove Mr. Smagin as a director of Tufts alone; two days after amending the 2006 Tufts Articles, on 25 November 2009,

First Respondent unilaterally resolved to remove Claimant as a director of Tufts, without informing Claimant;

(iv)   Also, under the 2009 Amended Tufts Articles, the directors of Tufts, acting together, were authorised to approve the transfer of Tufts' assets. This enabled First Respondent, once Claimant had been removed, to appoint a controlled entity (acting under the ultimate direction of Second Respondent) as sole director, and thereby unilaterally transfer out of Tufts all its assets;

(v)    As a result of Claimant's removal as a director of Tufts, his consent was no longer required to approve the transfer by Tufts of Tufts' Doralin Shares to Mastero and Famulatus;

(vi)   On 25 November 2009 First Respondent appointed MPH Law Services Limited ("MPH Law") as the sole director of Tufts. MPH Law is, on Second Respondent's own testimony, an entity controlled by him. Therefore, this had the effect of placing the entirety of Tufts' affairs, including the authority to transfer Tufts' Doralin Shares, in the control of Second Respondent;

(vii)  On 16 January 2010 and 13 April 2010, Tufts resolved to transfer the Tufts' Doralin Shares to Mastero and Famulatus. By this transaction, Claimant's shareholding interest in Centurion/Europark was misappropriated

210.   By participating in the transfer of the shares in this way, First Respondent breached the implied obligation on it to maintain and not interfere with the ownership structure of Europark. As the Tribunal has noted above, this was an implied term of the 2008 Agreement, as well as of the Shareholders' and Escrow Agreements.

211.   Thus, *in conclusion* First Respondent has breached its obligations under the Shareholders' and Escrow Agreements.

**B.3**     **Joint and several liability**

212.    In the foregoing the Tribunal has found that Second Respondent has breached his obligations under the 2008 Agreement and that First Respondent has breached its obligations under the Shareholders' and Escrow Agreements. Their respective breaches relate to the same events, i.e. the transfer of the Tuft' shares in Doralin to Famulatus and Mastero whereby Claimant's interest in Europark was lost. First and Second Respondents are both responsible for any losses suffered by Claimant. First Respondent and Second Respondent were both active participants in the events in question. Their liability must therefore be joint and several.

## C.     Quantum

213.    Claimant's primary claim for compensation of losses is based on the so-called continuous holding scenario, that is to say that, but for the breaches of contract by First and Second Respondents, the share ownership structure in Centurion would not have been dismantled, and Claimant would have continued to hold 20 per cent of Europark, a valuable asset. On this basis Claimant has asked for USD 72,243,000 representing his share of Centurion (20 percent) the value of which has been determined to be USD 361,214,000 as per 15 January 2013. This valuation is found in Ms. Irina Novikova's Second Report submitted to the Tribunal.

214.    In Claimant's view the loss suffered by him corresponds to the value of his shareholding in Centurion which owns Europark. In the view of the Tribunal, the so-called continuous holding scenario is an acceptable method to determine the compensation due to Claimant.

215.    In arriving at the aforementioned valuation of Centurion, Ms. Novikova has used the same values as for her valuations based on the two other approaches used by the experts, i.e. a best efforts sale and a so-called fire sale. Ms. Novikova, when using the net asset approach, has used the fair value of Europark as estimated by Cushman & Wakefield and deducted all the

liabilities which existed in the financial statements of Centurion. She has, however, made certain adjustments which in her view are necessary in the so-called continuous holding scenario. For example, since there is no sale, she has not made any deductions for a fire sale effect, sales tax and sale disposal costs.

216.    In addition to the expert reports mentioned above, Claimant has submitted two more reports of Ms. Novikova and three expert reports of Cushman & Wakefield. Second Respondent submitted one expert report, prepared by Mr. Hall of Smith & Williamson. No expert report was filed by First Respondent.

217.    The expert retained by Second Respondent, Mr. Hall of Smith & Williamson has not addressed the continuous shareholding scenario in his report. At the oral hearing, he did however comment on Ms. Novikova's valuation. In his opinion, it was not appropriate to use the same "adjusted net asset" approach used for the best efforts and fire sales scenarios. In his opinion one should rather base the valuation on Centurion's financial statements. However, no financial statements were presented to the Tribunal by him nor by Second Respondent. As pointed out by Ms. Novikova at the hearing, without full financial statements it is not possible to perform the analysis suggested by Mr. Hall, even if one were to accept that method as such.

218.    Whilst there are several issues on which the experts disagree, there are many important areas where there was agreement. Mr. Hall accepted, for example, that the market value of Europark is determinative of the value of Centurion. He also accepted the net assets method as the appropriate methodology for valuing Claimant's interest in Europark. In the end, Mr. Hall also agreed that the appropriate yield to apply to the valuation was 10 per cent, whereas he had initially insisted on 14 per cent. The experts also agreed that 1 per cent of the proceeds of sale of the shares in Centurion should be deducted as disposal costs, save for calculations based on the so-called continuous holding scenario. On the other hand, there were disagreements on other important issues, including whether there should be a discount to sale value on the basis

of the fire sale scenario, whether there should be adjustments for corporate income tax, and with the respect to the basis on which the net operating income of Europark should be calculated. With respect to these differences of opinion and approach, the Tribunal is minded to accept the approach taken by Claimant's experts primarily due to their experience and expertise in the Russian market.

219.    On balance, the Tribunal finds that Ms. Novikova's valuation and calculations are acceptable and result in a reasonable compensation to Claimant for losses incurred. Claimant is thus to be awarded USD 72,243,000..

## D.    Interest and Costs

### D.1    Interest

220.    Claimant has asked for interest from 1 July 2013 until the date of the award at an annual rate corresponding to the average annual deposit interest rate of the Central Bank of Russia. Claimant has stated that as per 9 May 2014 that rate was 7,86 per cent. Claimant has asked that interest be compounded on a monthly basis.

221.    The Tribunal has found that Claimant incurred losses when the shareholding structure concerning Europark was fundamentally re-arranged. This occurred in 2010. Claimant has asked for interest as from 1 July 2013.

222.    First Respondent has made no submission with respect to interest. Second Respondent has argued that the date for Claimant's interest calculation has been arbitrarily selected and has no basis in principle. No further comments have been made by Second Respondent.

223.    Since Claimant has suffered losses as a result of First and Second Respondents' breaches of contract, he is entitled to compensation therefor, as well as interest on such compensation. The Tribunal finds that interest is to be calculated as from 1 July 2013, as requested by Claimant. Claimant has asked

for compensation in US dollars. Against this background, the Tribunal finds it reasonable to award simple interest at an annual rate of 7 per cent. Consequently, Claimant is to be awarded such interest on USD 72,243,000 as from 1 July 2013 until the date of this award., in the amount of USD 6,899,701.32.

224. Claimant has also asked for post-award interest as from the date of the award until payment. Claimant has stated that post-award interest should be calculated on the same basis as that applied to the calculation of pre-award interest. In the alternative, Claimant has requested simple interest at an annual rate of 8 per cent, corresponding to the Judgment Act and Judgement Debt (Rate of Interest Order) 1993.

225. The Tribunal finds that post-award interest at the rate of 8 percent is reasonable. Post-award interest is to be awarded on the damages – i.e. USD 72,243,000 – as well as on the interest accrued thereon prior to the rendering of this Award. Further, with respect to post-award interest the Tribunal finds it reasonable to award compound interest, albeit compounded on a quarterly basis.

## D.2    Costs

226. In his Statement of Costs, dated 4 June 2014, Claimant has asked for compensation for legal fees and disbursements in the following amounts:

| | |
|---|---|
| Total Eversheds' fees: | GBP 3,087,340.55 |
| Total Eversheds' disbursements: | GBP 245,451.30 |
| Total PwC fees and disbursements (incl. 18% VAT): | USD 642,745 |
| Total C&W fees and disbursements (incl. 18% VAT): | USD 253,727.11 |
| Total fees and disbursements of Ms. Maslennikova: | RUB 765,000 |
| Total fees and disbursements of Mr. Grigoriev: | RUB 1,350,000 |
| Total LCIA/Tribunal fees: | GBP 204,000 |
| Total other disbursements incurred directly by Claimant: | GBP 7,410.72 RUB 1,830,000 |

227. First Respondent has asked for reimbursement of legal fees and costs in the total amount of USD 827,066, and Second Respondent in the total amount of USD 1,807,130.

228. The parties have exchanged comments on their respective Statements of Costs. In particular, both Respondents have been critical of the quantum of Claimant's legal fees.

229. Given the peculiarities and complexities of the present case, the Tribunal finds that the legal fees of Claimant are not unreasonable, per se. Due account taken of the outcome of the case, the Tribunal having dismissed Claimant's prayer for relief relating to profit payments amounting to USD 27,294,000, the Tribunal decides that Claimant is to recover 75 per cent of its incurred costs. Accordingly, First and Second Respondent will be ordered, jointly and severally, to pay 2 658 151,93 GBP, 672 354,08 USD and 2 958 750,00 RUB to Claimant.

230. As far as arbitration costs are concerned , they have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules, to be as follows:

| | |
|---|---|
| Registration fee: | GBP 1,500.00 |
| LCIA's administrative charges: | GBP 30,785.02 |
| Tribunal's fees and expenses: | GBP 405,342.06 |
| Hearing costs: | GBP 1,822.32 |
| Total net costs of the arbitration: | GBP 439,449.40 |

These costs are subject to VAT in the amount of GBP 30,312.62.

Total costs of the arbitration, therefore, amount to GBP 469,762.02

231.   Also with respect to the arbitration costs, the Tribunal finds that Claimant is to bear 25 per cent of the above costs and the First and Second Respondents are to bear 75 per cent of the above costs.

232.   The Claimant has lodged a registration fee and deposits amounting to GBP 235,762.26 and is to bear only 25 per cent of the total costs of the arbitration, in the amount of GBP 117,440.51. The Claimant is, therefore, entitled to recover the difference between these two amounts, being GBP 118,321.75, jointly and severally from the First and Second Respondents.

233.   Accordingly, First and Second Respondents are ordered, jointly and severally, to pay to Claimant an amount of GBP 118,321.75.

For the foregoing reasons, the Tribunal renders this Award.

## AWARD

1.   Mr Vitaly Ivanovich Smagin's prayer for relief concerning profit payments in the amount of USD 27,294,000 is dismissed for lack of jurisdiction;

2.   Kalken Holdings Limited and Mr Ashot Yegiazaryan are ordered, jointly and severally, to pay to Mr Vitaly Ivanovich Smagin an amount of USD 72,243,000 as compensation for losses suffered;

3.   Kalken Holdings Limited and Mr Ashot Yegiazaryan are ordered, jointly and severally, to pay interest on USD 72,243,000 at an annual simple rate of 7 per cent as from 1 July 2013 until the date of this Award in the amount of USD 6,899,701.32;

4.   Kalken Holdings Limited and Mr Ashot Yegiazaryan are ordered, jointly and severally, to pay interest on USD 72,243,000, as well as on the interest accrued pursuant to item 3 above, as from the date of this Award until payment, at an annual, quarterly compounded, rate of 8 per cent;

5.      Kalken Holdings Limited and Mr Ashot Yegiazaryan are ordered, jointly and severally, to reimburse Mr Vitaly Ivanovich Smagin an amount of 2 658 151,93 GBP, 672 354,08 USD and 2 958 750,00 RUB for legal fees and disbursements;

6.      Kalken Holdings Limited and Mr Ashot Yegiazaryan are ordered, jointly and severally, to reimburse Mr Vitaly Ivanovich Smagin an amount of GBP 118,321.75 for arbitration costs;

7.      Kalken Holdings Limited and Mr Ashot Yegiazaryan shall bear their own costs for legal fees and disbursements.

8.      All other claims are dismissed.

Seat of Arbitration: London, England.

_____

11 November    2014

Michael Lee

Per Runeland

Kaj Hobér

(Chairman)