# EXHIBIT 7

Stamp: STG 2020/099
RECEIPT
STATE COURT – OFFICE
28th Oct. 2020

GOVERNMENT OFFICE
28th Oct. 2020

To
State Court
of the Principality of Liechtenstein
through the government
of the Principality of Liechtenstein
9490 Vaduz

COMPLAINANT / LIABLE PARTY:   Ashot Yegiazaryan
REDACTED
Beverly Hills 90201
California
United States of America


represented by:            SCHURTI & PARTNERS
ATTORNEYS AT LAW LTD.
Zollstarsse 2 9490 Vaduz Liechtenstein
Tel. +41 44 244 2000 Mail: schurtipartners.com

(Reference to the granted power of attorney
pursuant to Art. 8 para. 2 RAG)

DEFENDANT / COMPLAINANT PARTY:     Vitaly Ivanovich Smagin
REDACTED
REDACTED Moscow Russia

represented by:
Advocatur Seeger, Frick & Partner AG
Landstrasse 81
9494 Schaan

1

PARTIES INVOLVED /      1. Mag. Jur. Rudolf Schächle
THIRD-PARTY DEBTOR:  2. Mag. iur. Raphael Näscher LL.M
                             Pflugstrasse 16 9490 Vaduz

in their capacity as trustees of
ALPHA TRUST
(FL-002.510.771-1)
known trusteeship

represented by:
Wohlwend Naescher Schächle Rechtsanwälte AG
Pflugstrasse 16
9490 Vaduz

RELEVANT AUTHORITY.  Princely Court of Appeal 9490 Vaduz
AGAINST.                Decision of the Princely Court of Appeal dd.
15th September 2020 to 08 EX.2016.5802, ON 143

CONCERNING.         Violation of rights granted by the Constitution
and guaranteed by the ECHR (value in dispute:
CHF 100,000.00)

## I.     INDIVIDUAL COMPLAINT

## II. CLAIM FOR SUSPENSORY EFFECT AND OTHER PRECAUTIONARY MEASURES

Triple copies according to the index

l.   INDIVIDUAL COMPLAINT

In a case referred to on the reverse, the complainant appeals against the decision of the Princely Court of Appeal dd. 15th September 2020 on 08 EX. 2016.5802, ON 143, delivered to the complainant through his designated legal representative on 30 September 2020, within open deadline.

## INDIVIDUAL COMPLAINT

Pursuant to Art. 15, Para. 1 StGHG to the State Court of the Principality of Liechtenstein for the violation of rights granted by the Constitution and guaranteed by the ECHR.

The complaint is submitted against the whole decision of the Princely Court of Appeal specified above. The reason for the complaint is the violation of the following rights guaranteed by the Constitution of the Principality of Liechtenstein and guaranteed by the ECHR:

 -  Violation of the obligation to state reasons; -violation of the right to be heard;
 -  Violation of the arbitrary prohibition.

 The details of the above are as follows:

1      Admissibility of the appeal

1.1      Timeliness

 1. The contested decision of the Princely Court of Appeal was handed to the complainant through his designated legal representative on 30th September 2020. This complaint is therefore filed within the open four-week period pursuant to Art. 15, Para. 4 StGHG.

1.2      Right of appeal

1.2.1. Capacity to sue and be sued and competence to proceed

2      Capacity to sue and be sued is the capability to be an independent carrier of rights and obligations in the process (in one's own name), i.e. the capability to act as a party in specific proceedings; the capability to sue and be sued arises from the legal capacity of civil law. [1] Thus, the one who is legally capable is capable to sue and be sued.

---

[1] Wille, Liechtenstein Constitutional Procedural Law, LPs 43, 464 f.

Pursuant to Art. 9, Para. 1 PGR everyone is legally capable. Therefore, any legal subject that can be the bearer of private rights (and corresponding obligations) is capable to sue and be sued. Thus, all natural persons are capable to sue and be sued (Art. 9, Para. 2 PGR), regardless of whether they are nationals or foreigners; so does the complainant.

3    Competence to proceed is the ability to effectively initiate or accept all procedural actions in person or through an appointed by them representative; competence to proceed is the procedural equivalent to civil capacity to act and is therefore also called procedural legal capability. [2] A person who is capable of legal action under civil law has procedural capability. The competence to proceed of a foreigner is to be assessed according to the norms of either their home state or Liechtenstein law, whichever is more favourable. The complainant has full legal capacity under both his home law and Liechtenstein law and has therefore procedural capacity.

1.2.2. Right to appeal in the strict sense

(i) Fundamental rights

4    The aspect of fundamental rights deals with the question whether a complainant can actually be the bearer of the fundamental rights invoked by him in the complaint or whether he can actually claim a violation of those fundamental rights, whereby it is sufficient for the affirmation of the fundamental rights to be sufficient, if the appellant is at least the bearer of one of the fundamental rights which he claims to be violated. [3]

5    All natural persons are generally eligible for fundamental rights.

6    The complainant is a foreigner. After the ratification of the ECHR in 1982, the protection of fundamental rights was generally extended to foreigners. Most of the fundamental rights of the national constitution, in particular those mentioned in the ECHR, also apply to foreigners unconditionally, with the exception of the freedom to acquire property and the freedom of establishment according to Art. 28 para. 1 and 2 LV. No violation of a fundamental right, which is reserved exclusively for Liechtenstein nationals, is claimed.

7    Since the complainant is subject to the jurisdiction of the Principality of Liechtenstein with regard to the contested decision, his fundamental legal capacity also should be affirmed in accordance with the provisions of Art. 1 ECHR.

---

[2] Wille, Liechtenstein Constitutional Procedural Law, LPs 43, 466 f

[3] Wille, Liechtenstein Constitutional Procedural Law, LPs 43, 537 f.

(ii) Complaint and current legitimate interest in the proceedings

8      According to Art. 42, Para. 1 StGHG and Art. 38 StGHG in conjunction with Art. 92, Para. I LVG, the State Court shall determine the legitimation requirement of the complaint and the current legitimate interest in the proceedings in the settled case law. It requires the complainant to be individually adversely affected (harmed or disadvantaged) by the official contested decision, and it must be affirmed, if the complainant has personally suffered a disadvantage (has been adversely affected) by the official contested decision and this can be remedied by the required revocation, if, in other words, the disadvantage suffered still exists at the time of the judgment by the State Court and would be remedied by approving the appeal (current interest in bringing the appeal).[4]

9      The complainant is adversely affected by the contested decision to the extent that his appeal has not been taken to judicial assistance and that the Princely Court of Appeal has given the contested decision notwithstanding the opening of foreign bankruptcy proceedings concerning the assets of the defendant. If the appeal is approved, the disadvantage would be removed as long as the decision of the Princely Court of Appeal dd. 15th September 2020 on 08 EX. 2016.5802 would be annulled and remitted to the Princely Court of Appeal for a new decision, binding on the legal view of the State Court.

(iii) Party status in the previous proceedings

10     Pursuant to Art. 16 sentence 2 A. E. StGHG, the complainant must prove his party status in the previous proceedings. The party status in the previous proceedings is therefore a prerequisite for filing the individual complaint. In any case, the complainant had a party status in the previous proceedings as a liable person and appeal lodger. He is the addressee of the contested decision.

(iv) Interim conclusion

11     According to the above, the complainant's right of appeal is to be affirmed without limitation.

1.3   Suitable Object of Complaint

12 An object of an individual complaint may be, in accordance with Art. 15, Para. 1 StGHG, only a final decision or order.

---

[4] Wille, Liechtenstein Constitutional Procedural Law, LPS 43, 542 and 544 with further references.

5

13 According to the jurisprudence of the State Court, a decision is (in any case) final, if it has been issued in a separate institution and not as a remittal decision. [5]

14 The final institution shall then affirm, if all the ordinary remedies provided for by the procedural law for the respective proceedings have been exhausted by the complainant. [6]

15 Since the contested decision is not a remittal decision and no appeal against the contested decision of the Princely Court of Appeal is admissible, the decision in question is final and thus constitutes a suitable object of complaint.

2 The facts of the case

16 By the decision dd. 21 November 2016 (ON 3), the Princely Land Court granted the defendant the execution against the present complainant by attachment of the total rights to which the complainant was entitled in his capacity as trustee, protector and beneficiary of the ALPHA TRUST vis-à-vis CTX Treuhand AG as (then) Trustee of the ALPHA TRUST.

17 Both the complainant and CTX Treuhand AG, as (then) third party debtor appealed against this first court decision (ON 3) to the Princely Court of Appeal. By the decision dd. 3 August 2017 (ON 36), the Princely Court of Appeal upheld both appeals in the sense of rejecting the execution applications.

18 The defendant appealed against this decision of the Princely Court of Appeal (ON 36) to the Princely Supreme Court. By the decision dd. 7 September 2018, the Princely Supreme Court upheld the respondent's appeal and restored the original court decision dd. 21 November 2016 (ON 3).

19 On the other hand, the complainant and CTX Treuhand AG, as (at the time) third-party debtor, raised an individual complaint to the State Court. With the judgment dd. 29 October 2019 on StGH 2018/111, the State Court did not uphold the individual complaints.

20 By the written pleading dd. 24 July 2017, substantiated by the written pleading dd. 11 February 2020, the present defendant sought the disposal of the previously seized full rights. By the decision dd. 2 March 2020 (ON 109), the Princely State Court approved the application.

<hr/>

[5]  Wille, Liechtenstein Constitutional Procedural Law, LPS 43, 561 f; StGH 2013/089 with further references.
[6]  Wille, Liechtenstein Constitutional Procedural Law, LPS 43, 566.

21   Against this decision (ON 109) the complainant appealed to the Princely Court of Appeal. By the decision dd. 15 September 2020 (ON 143), which has now been contested, the Princely Court of Appeal did not uphold this appeal. By the decision dd. 15 October 2020 (ON 152), the decision dd. 15 September 2020 (ON 143) was then corrected in its head.

22   By the written pleading dd. 11 September 2020, and thus even before the Princely Court of Appeal decided on the contested decision about the appeal of the present complainant, a Mr. Evgenii Nikolaevich Ratnikov submitted a request for interruption of proceedings. Mr Ratnikov justified this with the fact that on the 20th of August 2020 he had been appointed by the Bankruptcy Court of Moscow as the insolvency administrator of the assets of the current defendant. Mr. Ratnikov pointed out that according to Section 159 ZPO in conjunction with Art. 20, Para. 1 CO, all legal disputes in which the insolvent debtor (i.e. the defendant) is a party are interrupted ex lege by opening bankruptcy insofar as those concern the assets belonging to the bankruptcy estate. In addition, Mr. Ratnikov announced that in the near future he would obtain an overview of all pending proceedings concerning the present complainant and then return to the Princely Court of Appeal. In the contested decision, the Princely Court of Appeal did not refer to the opening of bankruptcy with a single word.

23   Mr Ratnikov's claim to suspend was only delivered to the complainant at the hands of his undersigned legal representative together with the contested decision, so that the complainant had no opportunity to comment on the claim to suspend.

## 3   Violations of fundamental rights

### 3.1 Violation of the obligation to state reasons

24   The State Court acknowledges the legal basis of Art. 43 sentence 3 LV obligation to give reasons in the settled case law as an independent fundamental right, which is to be asserted independently. The fundamental right to justification can also be based on Art. 6 para. 1 ECHR, but the corresponding scope of protection does not exceed that of Art. 43 LV.

25   The fundamental right to a minimal justification is infringed, if relevant issues of a decision are stated so succinctly that the conclusions drawn cannot be understood in detail and there is an unjustifiable lack of dispute of the contested decision and the complainant's arguments or, if a contested order or decision does not deal with issues relevant to the decision at all or omits them.

The obligation to state reasons therefore provides a right to a detailed, but at least comprehensible justification, irrespective of any claim. A statement of reasons must indicate the intention to justify the decision taken in a convincing manner. This is the case, when it arises from the decision what considerations were taken into account by the authority or the court when assessing the evidence. A decision must at least be drafted in such a way that it is possible for the person concerned to appeal against it. [7] Thus, the greater the freedom of action of an authority and the more serious the interference with the legal status of the person concerned are, the higher the requirement to state reasons is. The same applies, if complex legal or factual issues are to be assessed. [8]

26    In the present case, in the contested decision, the Princely Court of Appeal violated its obligation to state reasons as it did not state at all why, despite the opening of the foreign bankruptcy proceedings on the assets of the present defendant by order of the Bankruptcy Court of Moscow dd. 20 August 2020, it was of the opinion that it could take the contested decision.

27    In his written submission dd. 11 September 2020, Mr Ratnikov fairly pointed out that pursuant to Art. 51 EO in conjunction with S 159 ZPO in conjunction with Art. 20, Para. 1 all legal disputes in which the insolvent debtor (i.e. the present defendant) is a party are suspended ex lege by the opening of bankruptcy, insofar as these relate to the assets belonging to the bankruptcy estate. [9] This is to be assumed unconditionally with regard to the defendant's objectively relevant claim against the complainant, which is referred to here, and which is to be brought in by means of the actual execution. The suspension effect also applies to pending execution and appeal proceedings. [10]

28    As Mr Ratnikov also quite fairly pointed out in his written pleading dd. 11 September 2020, the suspension occurs ipso facto and the decision on the occurrence of the suspension due to the opening of bankruptcy, which is common in court practice, has only declarative effect. [11] With the opening of bankruptcy, the insolvent debtor basically loses the power of management and disposition concerning the bankruptcy estate and he can no longer set procedural acts. This lack of litigation authority

---

[7] Wille, Liechtenstein constitutional procedural law, LPS 43, 369.
  LES 2003, 296.
[8] Wille in KleyNallender (ed.), Fundamental Rights in Practice in Liechtenstein, LPS 52, 554 ff and Wille, Liechtenstein constitutional litigation, LPS 43, 368.
[9] LES 2003, 296
[10] LES 2017, 215; cf. Art. 51 EO in conjunction with S 159 ZPO in conjunction with Art. 20 Abs. 1 KO.
[11] GE 2017, 215; LES 2003, 296 Leitsatz a.

is to be equated with the missing litigation prerequisite for inability to proceed and justifies an officially executed nullity of the proceedings affected by this deficiency. In addition, in property disputes, the insolvent debtor is replaced by the insolvency administrator on behalf of the bankruptcy estate.[12]

29    It is further stated in Mr Ratnikov's pleading dd. 11 September 2020, pursuant to Art. 1 Z 6 of the Russian Insolvency Act (hereinafter "ruInsG") unless there are any international treaties, decisions of foreign courts in bankruptcy matters in Russia are recognized on the basis of reciprocity.

30    In view of the above, it is almost inexplicable how the Princely Court of Appeal could come to the conclusion that it could take the present decision despite the claim to suspend and the obvious opening of bankruptcy. The opening of bankruptcy is obviously of the greatest importance for the present proceedings, especially since it can easily be assumed that the defendant's claim against the complainant, which is to be brought in, also forms part of the bankruptcy estate.

31    In the contested decision, the Princely Court of Appeal should have at least justified why it simply ignored the opening of foreign bankruptcy proceedings against the assets of the defendant, which was on file at the time of the decision and was therefore known to the court. Since the Princely Court of Appeal has failed to do so, the contested decision violates the complainant's constitutionally guaranteed subjective right to legal justification. For this reason alone, the contested decision must be repealed.

### 3.2   Violation of the right to be heard

32    The State Court derives the right to be heard primarily from the principle of equality in accordance with Art. 31, Para. 1 LV ab, however, in combination with the principle of fair procedure, since it largely coincides with the right to a fair trial, which is also guaranteed by Art. 6, Paragraph 1 of the ECHR (and is recognized by the State Court as a separate national fundamental right), [13] and is thus closely related to the right to be heard. [14]

33    The principal content of the right to be heard is that the person concerned has an opportunity to present their point of view, appropriate to the subject matter of the proceedings and to the gravity of the threat of sanction;

---

[12] LES 2007, 280
[13] Vogt, in: Kley/Vallender (ed.), Basic legal practice in Liechtenstein, LPS 52, 567 Fn. 5 with further references
[14] Wille, Liechtenstein Constitutional Procedural Law, LPS 43, 337 f.

persons concerned by the proceedings have the right to be heard on their request and they must have the opportunity to comment on all points of the respective proceedings. [15] In a landmark decision that has been regularly referred to, the State Court has also made it plain that the right to be heard also serves to ensure that all parties to the proceedings are able to comment not only on matters of fact, but also on legal issues. In fact, nothing else results from the case law of the ECHR regarding the right to be heard or the right to a fair trial pursuant to Art. 6 ECHR. [16] Also, according to the jurisdiction of the State Court, the right to be heard is fundamentally of a formal nature, i.e. it is irrelevant whether the violation of fundamental rights actually influences the outcome of the proceedings. [17]

34      Even in accordance with the jurisdiction of the European Court of Human Rights (ECHR), the parties to the proceedings are entitled to an opportunity to express their factual and legal opinion in accordance with the fair trial principle, which requires that they must be informed on the presentation of the other party and all evidence documents, whether they have been obtained from the other party or ex officio and whether they are relevant to the decision or not.[18]

35      Since Mr Ratnikov's claim to suspend was only served on the present complainant at the hands of his designated legal representative together with the contested decision, the present complainant had no opportunity to comment on the claim to suspend in proper time before the contested decision was taken. If the complainant had received the claim to suspend in advance, he could have pointed out (with reference to the statements below in connection with the violation of the prohibition of arbitrary action) that the Russian bankruptcy proceedings had an effect on the present executive proceedings and that, for this reason, the appeal against the decision of the court of first instance may not be currently decided.

---

[15] Vogt, in: Kley/Vallender (ed.), Basic legal practice in Liechtenstein, LPS 52, 570 ff; Willie, Liechtenstein constitutional procedural law, LPS 43, 336 f.

[16] StGH 04.12.2017, StGH 2017/95 (LES 2018, 17) ext. 2.3

[17] StGH 28.10.2014, StGH 2014/97 (LES 2015, 14) ext. 2.1 with reference to StGH 2010/40 ext. 2.1, StGH 2009/5 ext. 2.2.2, StGH 2008/1 ext. 2.1, StGH 2007/88 ext. 1, as well as StGH 2007/60 ext. 2.3. Cf. also Vogt, in: Kley/Vallender (ed.), Basic legal practice in Liechtenstein (2012) 585 Para. 31

[18] StGH 04.12.2017, StGH 2017/95 (LES 2018, 17) ext. 2.1; StGH 29.10.2013, StGH 2013/102 ext. 2.1 with reference to StGH 2008/78 Erw. 2.2.2.

36    As it can be seen from the practice of law of the State Court, the simultaneous delivery of a written statement (here: the claim to suspend) with the decision cannot effect the cure for the infringement of the right to be heard.[19] In this sense, the State Court has ruled that as a result the infringement of the right to be heard must not lead to the significant restriction of the party rights of a complainant.[20] Ungerank fairly has noted in his gloss on this decision (gloss on LES 2017, 1) that the State Court understands the phrase "party rights are not significantly restricted, as follows: there must be available an instance with full competence (or with the same competence as the previous instance has), where a position can be taken without any significant prejudice.

37    In summary, the complainant's right to be heard has been violated due to the late delivery of Mr Ratnikov's claim to suspend. A subsequent cure of this infringement of the right to be heard is rejected. For this reason as well, the individual complaint in question is justifiable.

38    In connection with the right to be heard, the following must also be observed: A very essential basic prerequisite for the observance of the right to be heard is the competence of the parties affected to proceed. If a party involved in the proceedings loses their competence to proceed and there is no legal representative being engaged in the proceedings or the latter subsequently grants no approval, there occurs an infringement of the right to be heard.[21]

39    The legal position of the Insolvent Debtor is restricted through opening bankruptcy proceedings. The Insolvent Debtor fundamentally loses their power to manage and dispose of the bankruptcy estate. Besides, they can no longer perform any procedural actions over claims which concern the assets related to the bankruptcy estate.[22] Moreover, the bankruptcy court appoints an insolvency administrator who acts instead of the Insolvent Debtor. With regard to their legal status, there is a theoretical dispute[23], however, it has no practical significance in terms of the Insolvent Debtor's lack of power to manage and dispose. Without reviewing this theoretical dispute in more detail, the viewpoint according to Kodek[24] seems to be more convincing; according to it, the insolvency administrator is considered a legal representative of the debtor

---

[19] StGH 04.12.2017, StGH 2017/95 (LES 2018, 17).

[20] StGH 05.09.2016, StGH 2016/14 (LES 2017, 1).

[21] See Pimmer in Fasching/Konecny[3] § 477 ZPO Rz 56, 59.

[22] LES 2007, 280.

[23] According to the Office Theory, the insolvency administrator acts in their own name; they claim their own rights, but for someone else's account. In this theory, the bankruptcy estate has no legal personality of its own; it is simply the estate in which regard the administrator's actions are performed. According to the representative theorie, the administrator is a legal representative of the bankruptcy estate which is not regarded as a legal entity. According to the organ theory, the administrator is a representative of the bankruptcy estate, which is regarded as a legal person. For more information, see Kodek, Insolvency Law Rz 70 ff.

[24] Kodek, Insolvency Law, Rz 73

11

if the insolvency administrator manages the Debtor's estate related to the insolvency proceedings, and if the insolvency administrator has been assigned with additional tasks stipulated by law (e.g. insolvency contestation).

40    As a result, the insolvent debtor's lack of authorities to manage and dispose of the bankruptcy estate means in any event a lack of competence to proceed with regard to legal disputes concerning the bankruptcy estate.[25] The litigation authority means the authority to be able to litigate in one's own name the claimed right during the proceedings. It must be given for both the plaintiff and the defendant.[26] While there are insolvency proceedings, the insolvent debtor is not allowed to take part in civil litigation related to the bankruptcy estate. The lack of litigation authority equals the missing litigation prerequisites for no competence to proceed. Also, in the enforcement proceedings, both parties must have competnect to proceed during the enforcement proceedings.[27] The competence to proceed of a party is therefore a prerequisite in the enforcement proceedings, which must be present in every moment of the proceedings and which lack must be recognized ex officio. The missing competence to proceed represents a violation of the requirement for legal representation and ultimately means the invalidity of the relevant legal proceedings in terms of Section 446 (1) (5) ZPO, which must be recognized ex officio.[28]

41    There can be no question of approval by the insolvency administrator. Moreover, he has just claimed the suspension himself.

42    In the absence of voidability of the voided decision, this ground for invalidity can no longer be included in ordinary appeal proceedings. However, the ground for invalidity covers a fundamental right dimension, which means an infringement of the right to be heard guaranteed in Art 6 ECHR. For example, in its decision of July 16, 2009, Bsw 20.082 / 02 in the Zehentner v. Austria case, the ECHR saw a violation of the ECHR in the fact that the apartment of the obligated party was auctioned regardless of its missing competence to proceed; and the award could no longer be contested. Although the loss of competence to proceed during the enforcement proceedings does not affect the complainant as an obligated party, but rather the defendant as a complainant party, nothing else can apply in the present case. Finally, with regard to the general enforcement proceedings prerequisite of the competence to proceed of the parties, the enforcement proceedings make no difference to the party roles; any other interpretation would also contradict the principle of equality.

43    The complainant is well aware that the ground for invalidity of Section 446 (1) (5) ZPO can solely be applied by those whose legal protection has been impaired or violated by neglecting the provisions.[29] However,  in decision 1

---

[25] LES 2007, 280; LES 2004, 28.

[26] LES 2002, 302.

[27] See Neumayr/Nunner-Krautgasser, Law on Enforcement Proceedings [4], 57.

[28] LES 2007, 280; LES 2012, 27.

[29] See Pimmer in Fasching/Konecny[3]  §477 ZPO Rz 62 mwN

Ob 10 / 02f of a winning party,  the öOGH has granted a nullity action, because the violation of the opposing party's right to be heard leads to the situation, where the won enforcement title won was not enforced and the nullity could not be cured by a new, proper service to the opposing party.

44     On the basis of similar considerations, the complainant must also objectively be allowed to assert the infringement of the right to be heard to the detriment of the defendant due to insufficient competence to proceed. In the present case, the complainant is also at risk of disadvantages due to the fact that the Princely Court of Appeal did not take into account the complainant's insufficient competence to proceed. So there is a concrete risk that the complainant could take further steps in property disposal despite the bankruptcy proceedings opened against him, while the opening of bankruptcy means that such disposal steps had no debt-discharging effect from the point of view of the complainant. As a debtor, the complainant has an interest in ensuring that every action of the disposal enforced on the basis of the contested ruling or the disposal authorization confirmed by it in any case discharges the debt. On the basis of these considerations, it must be possible for the complainant to denounce the violation of the requirement of legal representation of the defendant and the associated infringment of the defendant's right to be heard.

45     In summary, the contested decision must therefore also be cancelled because of the infringement of the right to be heard shown as a result of the failure to deliver Mr Ratnikov's claim to suspend to the complainant on the one hand and as a result of the violation of the requirement of legal representation of the defendant on the other hand.

## 3.3 Violation of the prohibition of arbitrary behavior

46     The State Court has consistently recognized the unwritten fundamental right of arbitrariness as a classic right of defense against the state in the sense of a catching all basic right, which serves as the last line of defense of the law against such obvious injustice that cannot be tolerated in a modern state. Arbitrariness is not given still if the State Court qualifies a decision as incorrect as long as the decision is based on justifiable grounds; rather, an official decision is arbitrary if as a result the reasoning is obviously untenable, undoubtly contradicts with the actual situation, grossly violates a norm or an undisputed legal principle or contradicts with the idea of justice in an offensive manner, if the decision cannot be justified objectively, is not justifiable or downright offensive. The obviousness of a legal error is also a feature of the check for arbitrary behavior, so that there is the violation of the of arbitrary behavior if the decision is obviously illegal or if a court or an authority has made an obviously wrong decision.[30]

47     Exactly such situation has occured here, at that the Princely Court of Appeal has disregarded the opening of the foreign bankruptcy proceedings to be

---

[30] Vogt in Kley / Vallender (Hrsg), *Practice of Fundamental Law in Liechtenstein*, LPS 52, 309 and 313 ff with further references

recognized in the pending procedures of the defendant's property disposal without a word of reason, which is downright arbitrary.

48    According to Art. 20 para. 1 KO, all pending legal disputes in which the debtor is a plaintiff or a defendant, with the exception of the disputes specified in Art. 19 para. 3 KO, are to be suspended due to the opening of bankruptcy proceedings. According to the practice of law of the Liechtenstein courts, this also applies to enforcement proceedings and thus also to the disposal operations in question.

49    Thus, in its decision of September 7, 2017, the Princley Supreme Court clearly stated concerning 08 EX.2012.6905:[31]

> *"According to Art. 20 Paragraph 1 KO, all pending legal disputes in which the insolvent debtor is a plaintiff or a defendant, with the exception of the disputes specified in Art. 19 Paragraph 3 KO, are to be suspended due to the opening of bankruptcy proceedings. According to Art 20 Paragraph 2 KO, the proceedings of the insolvency administrator, of the co-defendant of the insolvent debtor and of the opponent can be accepted.*
>
> *After the suspension of the proceedings, judicial acts that do not merely take into account the situation created due to the suspension of the proceedings are inadmissible while the proceedings are still at a standstill. In particular, there should be given no judgments (rulings) which were not already made in a manner binding to the court before the suspension (RIS-Justiz RS0036996 etc.). The suspension in bankruptcy covers not only the proceedings of courts of first instance, but also the appeal proceedings (öOGH 7 Ob 647/87 and others; 9 ObA 132/101).*
>
> *If one of the parties falls into bankruptcy after the writ of appeal (cross-appeal) has been lodged and the files have been submitted to the Supreme Court, the decision concerning the writ of appeal or cross-appeal, provided that the subject of the legal dispute is an asset belonging to the bankruptcy estate, is not to be handed down while the proceedings are suspended, and the documents are to be returned to the court of the first instance (RIS-Justiz RS0036752 and others).*
>
> *In the present case, the disputed claim undoubtedly concerns the bankruptcy estate of the insolvent debtor. A decision has not been made by the Princely Supreme Court in the present case yet.*

---

[31] OGH 07.09.2017, 08 EX.2012.6905 GE 2017, 215.

> *It means that pursuant to Art. 20 Paragraph 2 KO, it was to be decided with declarative effect that the cross-appeal proceedings in question should be suspended.*

> *The documetns were to be returned to the court of first instance"*

50   Likewise, in the proceedings as to the opposition to the enforcement permit, the Princely Court of Appeal ruled as follows[32]:

> *"The norm of suspension are fundamentally of a mandatory nature and the occurrence of the suspension is to be observed ex officio (see Fink in Fasching2, Rz 13 to §158 6ZPO).*

> *The extent to which the proceedings are suspended when there are opened bankruptcy proceedings as to the estate of a party, is determined by the Bankruptcy Code (KO, Konkursordnung) (Section 159 ZPO). According to Art. 20 KO, the pending legal disputes where the debtor is a plaintiff or a defendant, with the exception of the disputes referred to in Art. 19 Para. 3 KO, are suspended due to the opening of bankruptcy proceedings. Contrary to the legal opinion of the court of first instance, this also applies in principle to legal disputes regarding claims for separate satisfaction (segregation), as these claims basically concern the assets belonging to the bankruptcy estate; the assets burdened with a right to segregation do not cease to be a part of the bankruptcy estate (cf. RZ 1958, 139). Therefore, legal disputes regarding claims for separate satisfaction (segregation),  are generally suspended due to the opening of the bankruptcy proceedings; they can be continued against the insolvency administrator (see OG Vienna, EvBI. 1934/168).*

> *Despite the fact that the suspension has occurred and decisions that have been made admissibly are not ineffective according to the prevailing opinion, but they can be contestable, whereby as a rule nullity is to be assumed according to § 477 Paragraph 1 Z. 4 and 5 ZPO.*

> *Appeals that are lodged after the suspension of the proceedings and during their effect are to be rejected unless they serve to ensure the suspension effect or to clarify the question of whether an suspension has occurred at all (see JBI . 2008, 730).*

---

[32] OG 12.10.2017, 2 R EX.2016.991, ON 60

*This is exactly the case we have here, because in the present case it is asserted that at the time the decision was issued, it was issued in violation of the suspension effect caused by the opening of the bankruptcy proceedings. Only if the party falls into bankruptcy after the appeal has been lodged, there is no decision to be taken, and the documents must be returned to the court of first instance ccording to the case law (RIS Justiz RS0036752, RS00370039).*

*When the proceedings are suspended, court acts that do not merely take into account the situation generated by the suspension of the proceedings, are inadmissible during the standstill of the proceedings. In particular, rulings may no longer be issued, unless they are issued in a manner binding to the court before the suspension (RIS Justiz RS0035996 and others). It is also correct that, as a result of the opposition, the enforcement permit is not (yet) standing in good law. The subject of the legal dispute within opposition proceedings is an asset belonging to the bankruptcy estate, whereby the suspension effect also includes the claim lodged within the enforcement proceedings (see OGH 07.09.2017, 08 EX.2012.6905, regarding the same obligated party Josef Abela Family Foundation).*

*The contested ruling was therefore to be cancelled as void. "*

51    The proceedings are suspended ex lege at every stage of the proceedings, including – as it is here - at the stage of the appeal proceedings. When the proceedings are suspended, court acts that do not merely take account of the situation generated by the suspension of the proceedings, are inadmissible during the standstill of the proceedings. In particular, no (appeals) decisions are allowed to be issued.[33]  In the event of an suspension during the appeal proceedings, the documents  are rather to be returned to the court of first instance.[34] The insolvency administrator acts instead of the insolvent debtor; the proceedings can only be continued upon the insolvency aministrator's claim.

52    *The ex lege-suspension of the disposal operation, also at the appeal stage, should not only allow the insolvency administrator to gain an overview of the proceedings and the chances for success, but ultimately secure the disposal of the bankruptcy estate.*

53    *The fact that there are foreign bankruptcy proceedings in Moscow bankruptcy court cannot change anything regarding the ex lege-suspension of the disposal operation at the appeal stage:*

54    *With regard to international issues in connection with bankruptcy proceedings, the bankruptcy code in question can follow either the principle of territoriality*

---

[33] See RIS-Justiz RS0036996
[34] See RIS-Justiz RS0036752

*or the principle of universality in its design and evaluation. While the principle of territoriality means that in general bankruptcy proceedings work within the country's own national borders only, the principle of universality has in common a certain degree of openness to foreign bankruptcy proceedings.[35]*

55   *While earlier the practice of law of the Liechtenstein courts was still based on the principle of territoriality[36], the more recent practice of law of the Liechtenstein courts, with a view to Art. 5 Para. 2 KO[37], demonstates the openness towards foreign bankruptcy proceedings to the extent that there is reciprocity with regard to the recognition of bankruptcy effects.*

56   *In the ruling of December 16, 1991, the Princely Supreme Court held that, since the entry into force of the Swiss PILA, the reciprocity stipulated by Art. 5 (2) KO as a prerequisite for the surrender of domestic movable property of a insolvent debtor to the foreign bankruptcy authorities, should be affirmed in terms of bankruptcy proceedings pending abroad in relation to Switzerland.[38]*

57   *In the ruling of January 30, 1995, the Princely Supreme Court explicitly spoke of the validity of the principle of universality with regard to the Liechtenstein Bankruptcy Code.[39]*

58   *In 2003, the Princely Supreme Court dealt with this issue again in relation to bankruptcy proceedings pending in Germany against the assets of the second defendant in a lawsuit in Liechtenstein. The Princely Supreme Court stated that Liechtenstein international bankruptcy law has just a single, very rudimentary regulation in Art. 5 KO. Based on this, however, the Princely Supreme Court concluded that the legislature had the principle of universality in mind and wanted foreign bankruptcies to have legal consequences domestically. In particular, the Princely Supreme Court mentioned those voices from the literature that had long called for overcoming the "territorial blinkers". Furthermore, the reciprocity with Germany already resulted from §§ 237, 238 dKO old and also from the practice of law of the German courts. Reciprocity is now clarified by the German Bankruptcy Code, which came into force in 1999, and its introductory law. According to Art. 102 dEGInsO, foreign bankruptcy proceedings also include assets of the debtor located in Germany. In addition, the Princely Supreme Court referred to the practice of*

---

[35] *Hanisch, UZ 1982, 65 (66).*

[36] *Neudorfer, LJZ 1988, 132 (136).*

[37] *"The domestic movable property of a insolvent debtor which has become the subject matter of bankruptcy proceedings opened abroad is to be disclosed to the foreign bankruptcy authorities at their request, unless bankruptcy is opened domestically. The assets may only be surrendered after satisfaction of the rights to segregation and exclusion acquired as of the request is received. The surrender is to be refused, unless the foreign state observes reciprocity."*

[38] *OGH 1 C 8 / 81-21, LES 3 / 92.*

[39] *OGH S 110/92-124, LES 4/96*

*law of the Swiss Federal Supreme Court, which stipulates that in Art. 166 Para. 1 lit. c chlPRG old there is the requirement of reciprocity interpreted extremely extensively. Finally, the Princely Supreme Court affirmed the reciprocity between Germany and Liechtenstein and recognized the German bankruptcy proceedings in Liechtenstein. Thus, the insolvency administrator was allowed to exercise all the powers that he/she is entitled to under the law of the state where the bankruptcy proceedings were opened, in particular the exclusive competence to proceed. From the moment the bankruptcy proceedings were opened in Germany, the competence to proceed, which was to be assessed under Liechtenstein procedural law and constituted a prerequisite for proceedings, was transferred from the second defendant to the German insolvency administrator. Reference was made to Art. 20 KO regarding the consequences of the loss of competence to proceed due to the opening of the foreign bankruptcy proceedings.[40]*

59     A decision of the Princely Supreme Court from 2011 dealt with the procedural consequences of the opening of debt settlement proceedings against the plaintiff's assets in Austria in relation to a pending civil proceedings in Liechtenstein. The Princely Supreme Court, in turn, confirmed the principle of universality of the Liechtenstein Bankruptcy Code and checked the reciprocity between Liechtenstein and Austria. Since Art. 5 Para. 2 KO provides for the reciprocity, it was first necessary to study the autonomous Austrian international insolvency law and to check whether and to what extent the reciprocity with respect to the bankruptcy proceedings opened in Liechtenstein is being maintained. In accordance with the European Insolvency Law, §240 Section (1) öIO requires that (i) the focus of the debtor's main interests lies in the other state, and (ii) insolvency proceedings are basically comparable to Austrian ones. The Princely Supreme Court assumed that insolvency proceedings would be recognized in Austria according to the Liechtenstein Bankruptcy Code and that therefore there would be reciprocity. As a result, it held that Austrian debt settlement proceedings against the plaintiff's assets in Liechtenstein were to be recognized. The Princely Supreme Court further stated that it was in accordance with the regulations of both states that a insolvent debtor who is not able to dispose of his/her property after the opening of bankruptcy proceedings, is no longer able to initiate civil proceedings, especially since he/she lacks the legitimacy of the process.[41]

60     In the present case, the bankruptcy proceedings,  so-called debt settlement proceedings, to be more exact, were opened against the defendant's property in Russia by order of the Moscow Bankruptcy Court dated August 20, 2020 for A 40-17597 / 20-4-36 F; and Mr. Evgenii Nikolaevich Ratnikov as an insolvency administrator was appointed.

---

[40] *LES 2004, 28; in detail: Neudorfer, LJZ 1996, 166 (167)*
[41] LES 2012, 27.

61   Although there is no international treaty between Russia and Liechtenstein in the area of bankruptcy law, nonetheless the reciprocity can be affirmed. For example, the OLG Hamburg[42] affirmed the reciprocity between Germany and Russia and effected the suspension of the pending proceedings in Germany. The decision in question refers, among other things, to Art. 1 no. 6 rulnsG, which states that, in the absence of international treaties, decisions by foreign courts in insolvency matters in Russia are recognized on the basis of reciprocity. With reference to Russian court practice, which affirms reciprocity with regard to § 343 dlnsO, this was ultimately confirmed by the Hamburg Higher Regional Court (OLG). Since Russia also seems to follow the principle of universality, subject to the condition of reciprocity, there is no apparent reason that would prevent recognition of the effects of the Russian bankruptcy proceedings and their effects in the Liechtenstein enforcement proceedings.

62   As we can see in the legal opinion dated September 12, 2020 submitted by lawyer Pavel Jakovlevitch Tscherniak by the Russian insolvency administrator in the relevant proceedings, the person against whom debt settlement proceedings have been initiated, is subject to numerous legal restrictions in accordance with Art. 213.11 rulnsG. In particular, the insolvent debtor is prohibited to undertake legally relevant actions on his own. Without the written consent of the insolvency administrator, the insolvent debtor is not entitled on his own to take any decision with respect to obligations, the amount of which exceeds 50,000 rubles. Likewise, the participation of the insolvent debtor in proceedings with regard to amounts over 50,000 rubles without the written consent of the insolvency administrator is illegal.

63   In the country report on the Russian Federation at Schwartz / Fahland in the Münchener Kommentar, InsO3 IV, Rn 58 states that the debtor's management bodies lose their authorities at the moment the bankruptcy proceedings are opened. Paragraph 61 states that the insolvency administator is entitled to dispose of the debtor's property. In the handbook for insolvency law in Europe published by Kindler / Nachmann, the section on the Russian Federation edited by Yukhnin in Rn 441 states that, from the date on which the court issues the decision to declare the debtor to be insolvent and to initiate bankruptcy, the debtor's right of disposal is imposed on the insolvency administrator. Rn 444 states that in the case of pending legal disputes, the insolvency administrator enters the current proceedings as a person who represents the debtor without special powers. He/she is entitled to recognize the claim, to reject the claim or to reach a settlement. For the reasons mentioned, it can therefore be assumed that with the opening of bankruptcy proceedings,  the competence to proceed is transferred to the insolvency administrator.[43]

---

[42] OLG Hamburg 01.03.2018, 6 U 242/15

[43] IdS OLG Hamburg 01.03.2018, 6 U 242/15 Rz 46 f mwN

64    As it was already considered by the Hamburg Higher Regional Court (OLG) in the aforementioned decision, the legal opinion submitted by Mr. Ratnikov also confirms that in the absence of international treaties, decisions by foreign courts in insolvency issues in Russia are recognized on the basis of reciprocity (Art 1 Z. 6 rulnsG) . According to the legal opinion, decisions of the courts of foreign states within insolvency proceedings based on the principle of reciprocity are recognized in the territory of the Russian Federation, including decisions of the Principality of Liechtenstein. By virtue of the trust that has developed between the legal systems of Russia and Liechtenstein, the decision of the Moscow bankruptcy court of August 20, 2020 for A 40-17597 / 20-4-36 F, where the bankruptcy proceedings were opened against the defendant's assets, and where Mr Evgenii Nikolaevich Ratnikov was appointed as an insolvency administrator, is to be recognized in Liechtenstein.

65    In summary, it should be noted that the opening of the foreign bankruptcy proceedings against the defendant's assets would suspend ex lege the disposal operation at the appeal stage. As a result, the Princely Court of Appeal could no longer issue any an appeal decision due to these proceedings status. Nonetheless, without any justification, the Princely Court of Appeal disregarded the decision contested under Art. 20 Para. 1 KO and the ongoing practice of law of the Liechtenstein courts regarding the impact of bankruptcy opening on pending enforcement proceedings, including appeal proceedings.

66    Blatant errors in solving a legal question are to be qualified to be arbitrary. In the present case, the Princely Court of Appeal grossly and thus arbitrarily violated Article 20, Paragraph 1 of the KO; and arbitrarily disregarded the established practice of law of the Liechtenstein courts by issuing the contested decision which is qualified as incorrect, ignoring the ex lege suspension of the proceedings. It seems to be a violation of the prohibition of arbitrary behavior.

4 Claims

For all these reasons, the complainant thus makes the following

CLAIMS:

May the State Court:

1. satisfy this complaint and establish that the ruling of the Princely Court of Appeal dated 15, 2020 for 08 EX.2016.5802, ON 143, violates the complainant's constitutionally guaranteed rights and the rights guaranteed by the ECHR; and therefore cancel the ruling of the Princely Court of Appeal dated September 15, 2020 for 08 EX.2016.5802, ON 143, and refer back the

case to the Princely Court of Apeal to make a new decision, subject to the legal opinion of the State Court; and

2. oblige the defendant to reimburse the complainant's costs incurred and specified therein for the attention of his designated legal representative within 14 days in the event of other execution.

## II. CLAIM FOR SUSPENSORY EFFECT AND OTHER PRECAUTIONARY MEASURES

67   According to the practice of law of the State Court, the goal to ensure the suspensory effect according to Art. 52 Paragraph 2 StGHG or other precautionary measures according to Art. 53 Paragraph 1 StGHG, does not consist in letting the final judgment of the State Court be obsolete by the fact that in the course of the proceedings the subject of the dispute is available, it is irretrievably lost, or other factual circumstances arise which make the enforcement of the judgment pointless.[44] In other words, the claimant must incur an irretrievable and disproportionate disadvantage through the enforcement of the contested act of sovereignty. A disadvantage is disproportionate, if in the event of the interim execution of the contested act of sovereignty the complainant is threatened with a disadvantage due to the situation of the facts caused thereby, which even after the contested act of sovereignty is repealed in the court proceedings, cannot be remedied; and it is therefore likely to affect the legal protection to be granted by the State Court.[45]

68   The enforcement proceedings on which the present individual complaint is based is about the fact that the current respondent is attempting to file a claim against the current claimant based on an arbitration award through enforcement in the trust assets of the ALPHA TRUST. This is to be made possible for the current respondent specifically by the fact that the joint and several rights of the current claimant as a trustor, a protector and a beneficiary of the ALPHA TRUST have been distrained upon by way of execution and subsequently the disposal of these joint and several rights has been approved. With the contested ruling, the Princely Court of Appeal supported this disposal authorization.

69   It is true that the respondent has already exercised the distrained joint and several rights to the effect that he dismissed the former trustee of ALPHA TRUST, CTX Treuhand AG, and has appointed Messrs. Mag. Iur. Rudolf Schaechle and Mag. iur. Raphael Naescher as new trustees of ALPHA TRUST.

70   However, the changing of the trustee is simply not enough if the respondent wants to have his claim paid from the trust assets of ALPHA TRUST. Moreover, the respondent will also have to approve any distribution resolution

---

[44] *T. Wille, Liechtenstein Constitutional Procedural Law, LPS 43, p. 741 with further details.*
[45] *T. Wille, Liechtenstein Constitutional Procedural Law, LPS 43, p. 745*

by the trustees, at least in exercising the protector rights distrained upon. A settlement of the relevant claim of the defendant from the trust assets of ALPHA TRUST can only be taken into account in the form of a distribution (especially since the ALPHA TRUST is not originally the debtor of the respondent). And in accordance with clause 14.4 in conjunction with 5 of the ALPHA TRUST trust deed, distributions to beneficiaries must be approved by the protector.

71   In addition, it is currently not clear whether the respondent can still be discharged from the debt at all. Because, as mentioned, bankruptcy proceedings were recently opened against the respondent in Russia. As a debtor, the claimant obviously has an interest in discharging the respondent from the debt.

72   The claimant therefore has a legitimate interest in the relevant individual complaint with suspensory effect being awarded and the respondent being prohibited from exercising the distrained joint and several rights as a precautionary measure for the duration of the relevant individual complaint proceedings. Otherwise, there would be the risk that during the individual complaint proceedings in question, the distrained joint and several rights are disposed of in a way (e.g. by making a payment to the respondent from the trust assets of ALPHA TRUST) which would not allow to cancel or it could be canceled with difficulties afterwards (e.g. the funds are transferred to a foreign account of the respondent) and which in the worst case does not even have a debt-discharging effect for the respondent.

73   In addition, there are no compelling public interests that would take precedence over the claimant's interest in granting the suspensory effect and other precautionary measures claimed.

74   It should be pointed out that the present claim should be handled without first hearing the respondent in order not to thwart the purpose of the suspensory effect and the precautionary measures claimed. Otherwise there is a risk that the respondent will exercise the distrained rights, e.g. resolution on approval within the meaning of clause 14.4 in conjunction with 5 of the trust deed of ALPHA TRUST), even before the chairman of the State Court can decide on the claim in question, in which case the granting of suspensory effect and the precautionary measure claimed would become obsolete

*For all these reasons, the claimant provides the*

## CLAIM

*May the chairman of the State Court*

1. *in accordance with Art. 52 Para. 2 StGHG, grant the individual complaint in question the suspensory effect; and*

2. *in accordance with Art. 53 (1) StGHG, order that till the individual complaint proceedings in question is considered in the State Court, the respondent is prohibited to exercise invalid actions, regarding the claimant's joint and several rights as a trustor, a protector and a beneficiary of the trusteeship known under the name ALPHA TRUST, which were distrained with the ruling of the Princely Court of November 21, 2016 for 08 EX.2016.5802, ON 3, and their disposal was approved with the ruling of the Princely Court of Appeal of March 2, 2020 for 08 EX.2016.5802, ON 109.*

*Vaduz, October 28, 2020*

*NBI / KBI*

*Enclosures:*

- *Ruling of the Princely Court of Apeal of October 15, 2020 for 08 EX.2016.5802, ON 152, in copy*
- *Claim to suspend in the enforcement proceedings for 08 EX.2016.5802 by the invsolvency administrator Evgenii Nikolaevich Ratnikov dated September 11, 2020, including the enclosures, in copy*
- *Document submission in the enforcement proceedings for 08 EX.2016.5802 by the invsolvency administrator Evgenii Nikolaevich Ratnikov from September 18, 2020 including enclosures, in copy*

*Costs are recorded: (value in dispute: CHF 100,000.00)*

| dual complaint, TP 3C, 40% ES | CHF | 2'494.80 |
|---|---|---|
| plus 10% StGZ | CHF | 249.48 |
| Subtotal | CHF | 2744.28 |
| plus 7.7% VAT. | CHF | 211.31 |
| Fee for individual complaint | CHF | 4000,00 |
| Deferment Claim Fee | CHF | 800,00 |
| Total | CHF | **7755.59** |

24

STGH **2020/099**
Eingang

2 8. Okt. 2020

STAATSGERICHTSHOF-KANZLEI

REGIERUNGSKANZLEI

E   2 8. Okt. 2020

CS

An den
Staatsgerichtshof des
Fürstentums Liechtenstein
im Wege der Regierung
des Fürstentums Liechtenstein
9490 Vaduz

BESCHWERDEFÜHRER /
VERPFLICHTETE PARTEI:

Ashot Yegiazaryan
REDACTED
Beverly Hills 90201
Kalifornien
Vereinigte Staaten von Amerika

vertreten durch:

**SCHURTI : PARTNERS**
RECHTSANWÄLTE AG | ATTORNEYS AT LAW LTD
Zollstrasse 2 | 9490 Vaduz | Liechtenstein
Tel +41 44 244 2000 | mail@schurtipartners.com

(Berufung auf erteilte Vollmacht gemäss
Art. 8 Abs. 2 RAG)

BESCHWERDEGEGNER /
BETREIBENDE PARTEI:

Vitaly Ivanovich Smagin
REDACTED
REDACTED Moskau
Russland

vertreten durch:

Advocatur Seeger, Frick & Partner AG
Landstrasse 81
9494 Schaan

| | |
|---|---|
| BETEILIGTE PARTEIEN / DRITTSCHULDNER: | 1. Mag. iur. Rudolf Schächle<br>2. Mag. iur. Raphael Näscher LL.M.<br>Pflugstrasse 16<br>9490 Vaduz<br><br>in ihrer Eigenschaft als Treuhänder der unter dem Namen<br><br>ALPHA TRUST<br>(FL-002.510.771-1)<br><br>bekannten Treuhänderschaft<br><br>vertreten durch:<br><br>Wohlwend Näscher Schächle Rechtsanwälte AG<br>Pflugstrasse 16<br>9490 Vaduz |
| BELANGTE BEHÖRDE: | Fürstliches Obergericht<br>9490 Vaduz |
| GEGEN: | Beschluss des Fürstlichen Obergerichts vom 15. September 2020 zu 08 EX.2016.5802, ON 143 |
| WEGEN: | Verletzung verfassungsmässig gewährleisteter und durch die EMRK garantierter Rechte<br>(Streitwert: CHF 100'000.00) |

## I.     INDIVIDUALBESCHWERDE

## II.    ANTRAG AUF AUFSCHIEBENE WIRKUNG UND ANDERE VORSORGLICHE MASSNAHMEN

dreifach
Beilagen laut Verzeichnis

## I.      INDIVIDUALBESCHWERDE

In umseits bezeichneter Rechtssache erhebt der Beschwerdeführer gegen den Beschluss des Fürstlichen Obergerichts vom 15. September 2020 zu 08 EX.2016.5802, ON 143, dem Beschwerdeführer zu Handen seiner ausgewiesenen Rechtsvertreterin zugestellt am 30. September 2020, binnen offener Frist

## INDIVIDUALBESCHWERDE

gemäss Art. 15 Abs. 1 StGHG an den Staatsgerichtshof des Fürstentums Liechtenstein wegen der Verletzung verfassungsmässig gewährleisteter und durch die EMRK garantierter Rechte.

Die betreffende Entscheidung des Fürstlichen Obergerichts wird vollumfänglich angefochten. Als Beschwerdegrund wird die Verletzung der nachstehenden, durch die Verfassung des Fürstentums Liechtenstein gewährleisteten und durch die EMRK garantierten Rechte geltend gemacht:

- Verletzung der Begründungspflicht;
- Verletzung des rechtlichen Gehörs;
- Verletzung des Willkürverbots.

Hierzu wird im Einzelnen ausgeführt, was folgt:

## 1      Zulässigkeit der Beschwerde

### 1.1      Rechtzeitigkeit

1      Die hiermit angefochtene Entscheidung des Fürstlichen Obergerichts wurde dem Beschwerdeführer zu Handen seiner ausgewiesenen Rechtsvertreterin am 30. September 2020 zugestellt. Die vorliegende Beschwerde ergeht somit innert der offenen vierwöchigen Frist gemäss Art. 15 Abs. 4 StGHG.

### 1.2      Beschwerdelegitimation

### 1.2.1      Partei- und Prozessfähigkeit

2      Unter Parteifähigkeit versteht man die Fähigkeit, im Prozess selbständiger Träger von Rechten und Pflichten (im eigenen Namen) zu sein, d.h. die Fähigkeit, im konkreten Verfahren als Partei auftreten zu können; die Parteifähigkeit ergibt sich aus der

3

Rechtsfähigkeit des bürgerlichen Rechts.[1] Parteifähig ist sohin, wer rechtsfähig ist. Gemäss Art. 9 Abs. 1 PGR ist jedermann rechtsfähig. Die Parteifähigkeit kommt daher jedem Rechtssubjekt zu, das überhaupt Träger von Privatrechten (und entsprechenden Pflichten) sein kann. Parteifähig sind daher alle natürlichen Personen (Art. 9 Abs. 2 PGR), gleichgültig, ob sie In- oder Ausländer sind; sohin auch der Beschwerdeführer.

3    Die Prozessfähigkeit ist die Fähigkeit, alle Prozesshandlungen selbst oder durch einen selbst gewählten Vertreter wirksam vorzunehmen oder entgegenzunehmen; die Prozessfähigkeit ist das verfahrensrechtliche Pendant zur bürgerlichen Handlungsfähigkeit und wird deshalb auch prozessuale Handlungsfähigkeit genannt.[2] Prozessfähig ist, wer nach bürgerlichem Recht verpflichtungsfähig ist. Die Prozessfähigkeit eines Ausländers ist nach der für ihn günstigeren Norm entweder seines Heimatstaats oder des liechtensteinischen Rechts zu beurteilen. Der Beschwerdeführer ist sowohl nach seinem Heimatrecht als auch nach liechtensteinischem Recht voll geschäftsfähig und daher prozessfähig.

### 1.2.2.   Beschwerdelegitimation im engeren Sinne

#### (i)   Grundrechtsträgerschaft

4    Der Aspekt der Grundrechtsträgerschaft setzt sich mit der Frage auseinander, ob ein Beschwerdeführer auch tatsächlich Träger der von ihm in der Beschwerde angerufenen Grundrechte sein bzw. eine Verletzung dieser Grundrechte auch wirklich behaupten kann, wobei es für de Bejahung der Grundrechtsträgerschaft genügt, wenn der Beschwerdeführer zumindest Träger eines der von ihm als verletzt gerügten Grundrechte ist.[3]

5    Grundrechtsfähig sind zunächst grundsätzlich einmal alle natürlichen Personen.

6    Bei dem Beschwerdeführer handelt es sich um einen Ausländer. Nach der Ratifizierung der EMRK im Jahre 1982 wurde der Grundrechtsschutz generell auf Ausländer ausgedehnt. Die meisten Grundrechte der Landesverfassung, insbesondere die auch in der EMRK beinhalteten, gelten ohne weiteres auch für Ausländer, mit Ausnahme der Vermögenserwerbsfreiheit und der Niederlassungsfreiheit nach Art. 28 Abs. 1 und 2 LV. Gegenständlich wird keine Verletzung eines Grundrechts gerügt, welches ausschliesslich liechtensteinischen Staatsangehörigen vorbehalten ist.

7    Da der Beschwerdeführer in Bezug auf die angefochtene Entscheidung der Jurisdiktion des Fürstentums Liechtenstein untersteht, ist seine Grundrechtsfähigkeit weiters auch im Lichte von Art. 1 EMRK zu bejahen.

---

[1] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 464 f.

[2] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 466 f.

[3] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 537 f.

4

### (ii)   Beschwer und aktuelles Rechtsschutzinteresse

8   Aus Art. 42 Abs. 1 StGHG sowie Art. 38 StGHG i.V.m. Art. 92 Abs. 1 LVG leitet der Staatsgerichtshof in ständiger Rechtsprechung die Legitimationsvoraussetzung der Beschwer und des aktuellen Rechtsschutzinteresses ab. Sie verlangt, dass der Beschwerdeführer durch den angefochtenen Hoheitsakt individuell beschwert (verletzt oder benachteiligt) ist, und ist zu bejahen, wenn der Beschwerdeführer durch den angefochtenen Hoheitsakt persönlich einen Nachteil erlitten hat (Beschwer) und dieser durch die verlangte Aufhebung beseitigt werden kann, wenn also m.a.W. der erlittene Nachteil im Zeitpunkt der Beurteilung durch den Staatsgerichtshof noch besteht und durch eine Gutheissung der Beschwerde beseitigt würde (aktuelles Rechtsschutzbedürfnis).[4]

9   Der Beschwerdeführer ist durch die angefochtene Entscheidung insoweit beschwert, als seinem Rekurs nicht Folge gegeben wurde und das Fürstliche Obergericht ungeachtet der Eröffnung eines ausländischen Konkursverfahrens über das Vermögen des Beschwerdegegners die angefochtene Entscheidung gefällt hat. Durch die Gutheissung der Beschwerde würde der Nachteil insoweit beseitigt, als der Beschluss des Fürstlichen Obergerichts vom 15. September 2020 zu 08 EX.2016.5802 aufgehoben und zur neuerlichen Entscheidung unter Bindung an die Rechtsansicht des Staatsgerichtshofes an das Fürstliche Obergericht zurückverwiesen würde.

### (iii)   Parteistellung im vorangegangenen Verfahren

10   Gemäss Art. 16 Satz 2 a. E. StGHG hat der Beschwerdeführer seine Parteistellung im vorangegangenen Verfahren nachzuweisen. Die Parteistellung im vorangegangenen Verfahren ist somit Voraussetzung für die Erhebung der Individualbeschwerde. Als Verpflichteter und Rekurswerber hatte der Beschwerdeführer im vorangegangenen Verfahren jedenfalls Parteistellung. Er ist Adressat der angefochtenen Entscheidung.

### (iv)   Zwischenfazit

11   Nach dem Gesagten ist die Beschwerdelegitimation des Beschwerdeführers ohne weiteres zu bejahen.

## 1.3   Taugliches Anfechtungsobjekt

12   Anfechtungsobjekt einer Individualbeschwerde kann gemäss Art. 15 Abs. 1 StGHG nur eine enderledigende und letztinstanzliche Entscheidung oder Verfügung sein.

---

[4] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 542 und 544 m.w.N.

13    Nach der Rechtsprechung des Staatsgerichtshofes ist eine Entscheidung (jedenfalls) dann enderledigend, wenn sie in einem gesonderten Instanzenzug und nicht als Zurückverweisungsentscheidung ergangen ist.[5]

14    Die Letztinstanzlichkeit ist dann zu bejahen, wenn alle für das jeweilige Verfahren vom Verfahrensgesetz vorgesehenen ordentlichen Rechtsmittel vom Beschwerdeführer ausgeschöpft worden sind.[6]

15    Da der angefochtene Beschluss keine Zurückverweisungsentscheidung ist und gegen den angefochtenen Beschluss des Fürstlichen Obergerichts kein Rechtsmittel mehr zulässig ist, ist die betreffende Entscheidung enderledigend und letztinstanzlich und bildet sohin ein taugliches Anfechtungsobjekt.

## 2    Sachverhalt

16    Mit Beschluss vom 21. November 2016 (ON 3) bewilligte das Fürstliche Landgericht dem nunmehrigen Beschwerdegegner die Exekution gegen den nunmehrigen Beschwerdeführer durch Pfändung der dem Beschwerdeführer in seiner Eigenschaft als Treugeber, Protektor und Begünstigter des ALPHA TRUST gegenüber der CTX Treuhand AG als (damaliger) Treuhänderin des ALPHA TRUST zustehenden Gesamtrechte.

17    Gegen diesen erstgerichtlichen Beschluss (ON 3) erhoben sowohl der Beschwerdeführer als auch die CTX Treuhand AG als (damalige) Drittschuldnerin jeweils Rekurs an das Fürstliche Obergericht. Das Fürstliche Obergericht gab mit Beschluss vom 3. August 2017 (ON 36) beiden Rekursen im Sinne einer Abweisung der Exekutionsanträge Folge.

18    Gegen diesen Beschluss des Fürstlichen Obergerichts (ON 36) erhob der Beschwerdegegner Revisionsrekurs an den Fürstlichen Obersten Gerichtshof. Mit Beschluss vom 7. September 2018 gab der Fürstliche Oberste Gerichtshof dem Revisionsrekurs des Beschwerdegegners Folge und stellte den Beschluss des Erstgerichts vom 21. November 2016 (ON 3) wieder her.

19    Dagegen erhoben der Beschwerdeführer und die CTX Treuhand AG als (damalige) Drittschuldnerin Individualbeschwerde an den Staatsgerichtshof. Mit Urteil vom 29. Oktober 2019 zu StGH 2018/111 gab der Staatsgerichtshof den Individualbeschwerden keine Folge.

20    Mit Schriftsatz vom 24. Juli 2017, konkretisiert mit Schriftsatz vom 11. Februar 2020, begehrte der nunmehrige Beschwerdegegner die Verwertung der zuvor gepfändeten

---

[5] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 561 f; StGH 2013/089 m.w.N.
[6] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 566.

Gesamtrechte. Mit Beschluss vom 2. März 2020 (ON 109) bewilligte das Fürstliche Landgericht die Verwertung antragsgemäss.

21   Gegen diesen Beschluss (ON 109) erhob der Beschwerdeführer Rekurs an das Fürstliche Obergericht. Mit dem nunmehr angefochtenen Beschluss vom 15. September 2020 (ON 143) gab das Fürstliche Obergericht diesem Rekurs keine Folge. Mit Beschluss vom 15. Oktober 2020 (ON 152) wurde der Beschluss vom 15. September 2020 (ON 143) sodann in seinem Kopf berichtigt.

22   Mit Schriftsatz vom 11. September 2020, und damit noch bevor das Fürstliche Obergericht mit dem angefochtenen Beschluss über den Rekurs des nunmehrigen Beschwerdeführers entschied, stellte ein Herr Evgenii Nikolaevich Ratnikov einen Antrag auf Verfahrensunterbrechung. Herr Ratnikov begründete dies damit, dass er am 20. August 2020 vom Konkursgericht Moskau zum Masseverwalter über das Vermögen des nunmehrigen Beschwerdegegners bestellt worden sei. Herr Ratnikov wies darauf hin, dass gemäss § 159 ZPO iVm Art. 20 Abs. 1 KO durch eine Konkurseröffnung sämtliche Rechtsstreitigkeiten, in denen der Gemeinschuldner (sprich: der nunmehrige Beschwerdegegner) Partei ist, *ex lege* unterbrochen werden, soweit diese das zur Konkursmasse gehörende Vermögen betreffen. Zudem kündigte Herr Ratnikov an, sich in nächster Zeit einen Überblick über sämtliche anhängigen Verfahren betreffend den nunmehrigen Beschwerdeführer zu verschaffen und sich anschliessend wieder an das Fürstliche Obergericht zu wenden. Das Fürstliche Obergericht setzte sich im angefochtenen Beschluss mit keinem Wort mit der Konkurseröffnung auseinander.

23   Der Unterbrechungsantrag des Herrn Ratnikov wurde dem nunmehrigen Beschwerdeführer zu Handen seiner unterzeichneten Rechtsvertreterin erst gemeinsam mit der angefochtenen Entscheidung zugestellt, sodass der nunmehrige Beschwerdeführer keine Möglichkeit hatte, sich zum Unterbrechungsantrag zu äussern.

# 3   Grundrechtsverletzungen

## 3.1   Verletzung der Begründungspflicht

24   Der Staatsgerichtshof anerkennt die sich aus Art. 43 Satz 3 LV ergebende Begründungspflicht in ständiger Rechtsprechung als eigenständiges Grundrecht, welches selbständig geltend zu machen ist. Der grundrechtliche Anspruch auf Begründung lässt sich auch aus Art. 6 Abs. 1 EMRK ableiten, doch geht der entsprechende Schutzbereich nicht über denjenigen von Art. 43 LV hinaus.

25   Der grundrechtliche Anspruch auf minimale Begründung ist dann verletzt, wenn massgebliche Fragen einer Entscheidung derart knapp ausgeführt werden, dass die gezogenen Schlüsse nicht im Einzelnen nachvollzogen werden können und eine nicht zu rechtfertigende fehlende Auseinandersetzung mit der angefochtenen Entschei-

dung und dem Vorbringen des Beschwerdeführers vorliegt oder wenn sich eine an-
gefochtene Verfügung oder Entscheidung mit entscheidungsrelevanten Fragen über-
haupt nicht auseinandersetzt bzw. diese übergeht. Die Begründungspflicht vermittelt
somit zwar keinen Anspruch auf eine ausführliche, aber immerhin auf eine nachvoll-
ziehbare Begründung. Eine Entscheidungsbegründung muss die Absicht erkennen
lassen, die getroffene Entscheidung in überzeugender Weise zu rechtfertigen. Dies
ist dann der Fall, wenn aus der Entscheidung hervorgeht, welche Erwägungen die
Behörde oder das Gericht bei der Beweiswürdigung angestellt hat. Eine Entschei-
dung muss zumindest so abgefasst sein, dass es dem von ihr Betroffenen möglich
ist, diese anzufechten.[7] Dabei sind die Anforderungen an die Begründung umso hö-
her, je grösser der Handlungsspielraum einer Behörde und je schwerwiegender der
Eingriff in die Rechtsstellung des Betroffenen ist. Dasselbe gilt, wenn komplexe
Rechts- oder Sachverhaltsfragen zu beurteilen sind.[8]

26   Im gegenständlichen Fall hat das Fürstliche Obergericht im angefochtenen Beschluss
seine Begründungspflicht insoweit verletzt, als es mit keinem Wort dargetan hat, wa-
rum es trotz der - zum Zeitpunkt der Fällung des angefochtenen Beschlusses akten-
kundigen und somit gerichtsnotorischen - Eröffnung des ausländischen Konkursver-
fahrens über das Vermögen des nunmehrigen Beschwerdegegners durch Beschluss
des Konkursgerichts Moskau vom 20. August 2020 der Ansicht war, den angefochte-
nen Beschluss fällen zu können.

27   In seinem Schriftsatz vom 11. September 2020 wies Herr Ratnikov zu Recht darauf
hin, dass gemäss Art. 51 EO i.V.m. § 159 ZPO iVm Art. 20 Abs. 1 durch eine Kon-
kurseröffnung sämtliche Rechtsstreitigkeiten, in denen der Gemeinschuldner (sprich:
der nunmehrige Beschwerdegegner) Partei ist, *ex lege* unterbrochen werden, soweit
diese das zur Konkursmasse gehörende Vermögen betreffen.[9] Davon ist in Bezug auf
die hier gegenständlich interessierende Forderung des Beschwerdegegners gegen-
über dem Beschwerdeführer, welche mittels der gegenständlichen Exekutionsführung
einbringlich gemacht werden soll, ohne weiteres auszugehen. Die Unterbrechungs-
wirkung gilt auch für anhängige Exekutions- und Rechtsmittelverfahren.[10]

28   Wie Herr Ratnikov in seinem Schriftsatz vom 11. September 2020 ebenfalls völlig zu
Recht betonte, tritt die Unterbrechung *ipso facto* ein und hat der in der Gerichtspraxis
gängige Beschluss über den Eintritt der Unterbrechung wegen Konkurseröffnung nur
deklarative Wirkung.[11] Mit der Konkurseröffnung verliert der Gemeinschuldner grund-
sätzlich die Verwaltungs- und Verfügungsbefugnis über die Konkursmasse und er
kann keine Verfahrenshandlungen mehr setzen. Diese fehlende Prozessführungsbe-

---

[7] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 369.

[8] *Wille* in *Kley/Vallender* (Hrsg), Grundrechtspraxis in Liechtenstein, LPS 52, 554 ff und *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 368.

[9] LES 2003, 296.

[10] LES 2017, 215; vgl. Art. 51 EO i.V.m. § 159 ZPO i.V.m. Art. 20 Abs. 1 KO.

[11] GE 2017, 215; LES 2003, 296 Leitsatz a.

fugnis ist der fehlenden Prozessvoraussetzung der Prozessunfähigkeit gleichzuset-
zen und begründet eine amtswegig wahrzunehmende Nichtigkeit des von diesem
Mangel betroffenen Verfahrens. Zusätzlich tritt in vermögensrechtliche Streitigkeiten
an die Stelle des Gemeinschuldners der Masseverwalter namens der Konkurs-
masse.[12]

29   Wie dem Schriftsatz des Herrn Ratnikov vom 11. September 2020 weiter zu entneh-
men ist, werden gemäss Art. 1 Z 6 des russischen Insolvenzgesetzes (nachfolgend
"**ruInsG**") bei Fehlen internationaler Verträge Entscheidungen ausländischer Gerichte
in Konkursangelegenheiten in Russland auf Grundlage der Gegenseitigkeit aner-
kannt.

30   Vor dem Hintergrund des Ausgeführten ist es geradezu unerklärlich, wie das Fürst-
liche Obergericht zum Schluss gelangen konnte, trotz des Unterbrechungsantrags
und der offensichtlich erfolgten Konkurseröffnung den gegenständlichen Beschluss
fassen zu können. Die Konkurseröffnung ist für das gegenständliche Verfahren offen-
sichtlich von grösster Bedeutung, zumal ohne weiteres davon auszugehen ist, dass
auch die gegenständlich einbringlich zu machende Forderung des Beschwerdegeg-
ners gegenüber dem Beschwerdeführer Teil der Konkursmasse bildet.

31   Das Fürstliche Obergericht hätte im angefochtenen Beschluss zumindest begründen
müssen, warum es sich über die - zum Zeitpunkt der Entscheidungsfällung aktenkun-
dige und somit gerichtsnotorische - Eröffnung des ausländischen Konkursverfahrens
über das Vermögen des Beschwerdegegners einfach hinweggesetzt hat. Da das
Fürstliche Obergericht dies verabsäumt hat, verletzt die angefochtene Entscheidung
den Beschwerdeführer in seinem verfassungsrechtlich gewährleisteten subjektiven
Recht auf rechtsgenügliche Begründung. Bereits aus diesem Grund ist die ange-
fochtene Entscheidung aufzuheben.

## 3.2   Verletzung des rechtlichen Gehörs

32   Der Staatsgerichtshof leitet den Anspruch auf rechtliches Gehör primär aus dem
Gleichheitssatz gemäss Art. 31 Abs. 1 LV ab, allerdings in Kombination mit dem
Grundsatz des fairen Verfahrens, da er sich weitgehend mit dem Anspruch auf ein
faires Verfahren, der auch von Art. 6 Abs. 1 EMRK gewährleistet wird (und vom
Staatsgerichtshof im Übrigen als eigenes innerstaatliches Grundrecht anerkannt
wird),[13] deckt und dadurch eng mit dem rechtlichen Gehör verwoben ist.[14]

33   Zentraler Gehalt des Anspruchs auf rechtliches Gehör ist, dass der Verfahrensbe-
troffene eine dem Verfahrensgegenstand und der Schwere der drohenden Sanktion
angemessene Gelegenheit erhält, seinen Standpunkt zu vertreten; Verfahrensbe-

---

[12] LES 2007, 280.

[13] *Vogt* in *Kley/Vallender* (Hrsg.), Grundrechtspraxis in Liechtenstein, LPS 52, 567 Fn. 5 m.w.N.

[14] *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 337 f.

troffene haben Anspruch darauf, mit ihrem Begehren gehört zu werden, und sie müssen Gelegenheit haben, zu allen Punkten des jeweiligen Verfahrens Stellung nehmen zu können.[15] In einer mehrfach bestätigten Leitentscheidung hat der Staatsgerichtshof zudem klargestellt, dass das rechtliche Gehör gerade auch dazu diene, dass sich alle Verfahrensbeteiligten nicht nur zu Sachverhalts-, sondern auch zu Rechtsfragen äussern können. Nichts anderes ergebe sich im Übrigen aus der Rechtsprechung des EGMR zum Gehörsanspruch bzw. zum Anspruch auf ein faires Verfahren gemäss Art. 6 EMRK.[16] Auch ist nach der Rechtsprechung des Staatsgerichtshofes der Gehörsanspruch grundsätzlich formeller Natur, d.h. es ist irrelevant, ob die Grundrechtsverletzung den Verfahrensausgang tatsächlich beeinflusst.[17]

34   Auch nach der strengen Rechtsprechung des Europäischen Gerichtshofs für Menschenrechte (EGMR) haben die Verfahrensbeteiligten im Sinne eines fairen Verfahrens Anspruch auf Gelegenheit zur tatsächlichen und rechtlichen Äusserung, was voraussetzt, dass sie den Vortrag der Gegenseite und alle Beweisunterlagen zur Kenntnis- und Stellungnahme mitgeteilt bekommen, gleich ob sie von der Gegenseite oder von Amts wegen eingeholt wurden und ob sie entscheidungserheblich sind oder nicht.[18]

35   Indem der Unterbrechungsantrag des Herrn Ratnikov dem nunmehrigen Beschwerdeführer zu Handen seiner ausgewiesenen Rechtsvertreterin erst gemeinsam mit der angefochtenen Entscheidung zugestellt wurde, hatte der nunmehrige Beschwerdeführer keine Möglichkeit, sich zum Unterbrechungsantrag rechtzeitig vor Fällung der angefochtenen Entscheidung zu äussern. Hätte der Beschwerdeführer den Unterbrechungsantrag vorgängig zugestellt erhalten, so hätte er (unter Verweis auf die untenstehenden Ausführungen im Zusammenhang mit der Verletzung des Willkürverbots) darauf hinweisen können, dass das russische Konkursverfahren für das gegenständliche Exekutionsverfahren Wirkungen zeitigt und aus diesem Grund derzeit nicht über den Rekurs gegen den erstinstanzlichen Verwertungsbeschluss entschieden werden darf.

36   Wie aus der Rechtsprechung des Staatsgerichtshofs hervorgeht, kann die gleichzeitige Zustellung eines Schriftsatzes (hier: des Unterbrechungsantrags) mit der Entscheidung keine Heilung der Gehörsverletzung bewirken.[19] In diesem Sinne hat der Staatsgerichtshof judiziert, dass die Gehörsverletzung im Ergebnis nicht dazu führen darf, dass die Parteirechte eines Beschwerdeführers in erheblicher Weise einge-

---

[15] *Vogt* in *Kley/Vallender* (Hrsg.), Grundrechtspraxis in Liechtenstein, LPS 52, 570 ff; *Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, 338 f.

[16] StGH 04.12.2017, StGH 2017/95 (LES 2018, 17) Erw. 2.3.

[17] StGH 28.10.2014, StGH 2014/97 (LES 2015, 14) Erw. 2.1 unter Verweis auf StGH 2010/40 Erw. 2.1, StGH 2009/5 Erw. 2.2.2, StGH 2008/1 Erw. 2.1., StGH 2007/88 Erw. 1 sowie StGH 2007/60 Erw. 2.3. Vgl. auch *Vogt* in *Kley/Vallender* (Hrsg.), Grundrechtspraxis in Liechtenstein (2012) 585 Rz 31.

[18] StGH 04.12.2017, StGH 2017/95 (LES 2018, 17) Erw. 2.1; StGH 29.10.2013, StGH 2013/102 Erw. 2.1 unter Verweis auf StGH 2008/78 Erw. 2.2.2.

[19] StGH 04.12.2017, StGH 2017/95 (LES 2018, 17).

schränkt werden.[20] *Ungerank* hat in seiner zu dieser Entscheidung verfassten Glosse (Glosse zu LES 2017, 1) zu Recht darauf hingewiesen, dass der Staatsgerichtshof unter der Wendung "*Parteirechte nicht in erheblicher Weise eingeschränkt*" versteht, dass noch eine Instanz mit voller Kognition (bzw. mit gleicher Kognition wie die Vorinstanz) zur Verfügung stehen muss, bei der ohne wesentlichen Nachteil Stellung genommen werden kann.

37    Zusammengefasst ist der Beschwerdeführer aufgrund der nicht rechtzeitigen Zustellung des Unterbrechungsantrags des Herrn Ratnikov in seinem Anspruch auf rechtliches Gehör verletzt. Eine nachträgliche Heilung dieser Gehörsverletzung ist ausgeschlossen. Auch aus diesem Grund ist die gegenständliche Individualbeschwerde berechtigt.

38    Weiter gilt es im Zusammenhang mit dem rechtlichen Gehör zu beachten: Eine ganz wesentliche Grundvoraussetzung für die Wahrnehmung des rechtlichen Gehörs ist das Vorliegen der Prozessfähigkeit der Verfahrensbetroffenen. Kommt es im Laufe des Verfahrens zu einem Verlust der Prozessfähigkeit eines Verfahrensbeteiligten, ohne dass der gesetzliche Vertreter dem Verfahren beigezogen wird oder dieser nachträglich seine Genehmigung erteilt, liegt eine Gehörsverletzung vor.[21]

39    Durch die Eröffnung eines Insolvenzverfahrens wird die Rechtsstellung des Gemeinschuldners beschränkt. Dieser verliert grundsätzlich die Verwaltungs- und Verfügungsbefugnis über die Konkursmasse. Ausserdem kann er keine Verfahrenshandlungen mehr über Ansprüche setzen, welche das zur Konkursmasse gehörige Vermögen betreffen.[22] Vielmehr tritt an die Stelle des Gemeinschuldners der vom Insolvenzgericht bestellte Masseverwalter. Hinsichtlich dessen Rechtsstellung hat sich ein Theorienstreit[23] entwickelt, dem allerdings im Hinblick auf die fehlende Verwaltungs- und Verfügungsbefugnis des Gemeinschuldners keine praktische Bedeutung zukommt. Ohne auf diesen Theorienstreit näher einzugehen, erscheint nach *Kodek*[24] jene Auffassung überzeugender, derzufolge der Insolvenzverwalter als gesetzlicher Vertreter des Schuldners gesehen wird, soweit er dessen insolvenzunterworfenes Vermögen verwaltet, darüber hinaus aber vom Gesetz weitere Aufgaben (zB Insolvenzanfechtung) zugewiesen erhalten hat.

40    Die mangelnde Verwaltungs- und Verfügungsbefugnis des Gemeinschuldners über die Konkursmasse bedeutet im Ergebnis jedenfalls eine fehlende Prozessführungs-

---

[20] StGH 05.09.2016, StGH 2016/14 (LES 2017, 1).

[21] Vgl. *Pimmer* in *Fasching/Konecny*[3] § 477 ZPO Rz 56, 59.

[22] LES 2007, 280.

[23] Nach der Amtstheorie tritt der Masseverwalter im eigenen Namen auf; er macht eigene Rechte geltend, allerdings auf fremde Rechnung. Die Insolvenzmasse hat bei dieser Theorie keine eigene Rechtspersönlichkeit; sie ist einfach jene Vermögensmasse, auf die sich das Handeln des Masseverwalters auswirkt. Nach der Vertretertheorie ist der Masseverwalter gesetzlicher Vertreter der Insolvenzmasse, ohne dass diese als juristische Person angesehen wird. Nach der Organtheorie ist der Masseverwalter organschaftlicher Vertreter der Insolvenzmasse, die als juristische Person angesehen wird. Näheres dazu *Kodek*, Insolvenzrecht Rz 70 ff.

[24] *Kodek*, Insolvenzrecht Rz 73.

befugnis im Hinblick auf die die Konkursmasse betreffenden Rechtsstreitigkeiten.[25] Die Prozessführungsbefugnis bezeichnet die Befugnis, über das behauptete, im Prozess streitige Recht im eigenen Namen einen Rechtsstreit führen zu können. Sie muss sowohl für den Kläger als auch für den Beklagten gegeben sein.[26] Dem Gemeinschuldner ist für die Dauer des Insolvenzverfahrens das Führen massebezogener Zivilverfahren verwehrt. Der Mangel der Prozessführungsbefugnis ist der fehlenden Prozessvoraussetzung der Prozessunfähigkeit gleichzusetzen. Auch im Exekutionsverfahren müssen beide Parteien während der Dauer des Exekutionsverfahrens prozessfähig sein.[27] Die Prozessfähigkeit einer Partei stellt sohin auch im Exekutionsverfahren eine allgemeine Exekutionsvoraussetzung dar, die in jeder Lage des Verfahrens vorliegen muss und deren Mangel von Amts wegen wahrzunehmen ist. Der Mangel der Prozessfähigkeit stellt einen Verstoss gegen das Erfordernis der gesetzlichen Vertretung dar und bedeutet letztlich eine Nichtigkeit der betreffenden Prozesshandlungen im Sinne des § 446 Abs 1 Z 5 ZPO, welche amtswegig wahrzunehmen ist.[28]

41   Von einer Genehmigung durch den Masseverwalter kann gegenständlich keine Rede sein. Vielmehr hat dieser gerade selber die Unterbrechung beantragt.

42   Mangels Anfechtbarkeit der angefochtenen Entscheidung kann dieser Nichtigkeitsgrund zwar nicht mehr im ordentlichen Rechtsmittelverfahren aufgegriffen werden. Allerdings erreicht der Nichtigkeitsgrund eine grundrechtlich Dimension, die eine Verletzung des in Art 6 EMRK garantierten Rechts auf rechtliches Gehör bedeutet. So hat der EGMR in seiner Entscheidung vom 16. Juli 2009, Bsw 20.082/02 in der Rechtssache *Zehentner gegen Österreich* etwa eine Verletzung der EMRK darin gesehen, dass die Wohnung der verpflichteten Partei ungeachtet deren Prozessunfähigkeit versteigert wurde und der Zuschlag nicht mehr angefochten werden konnte. Wenngleich der Verlust der Prozessfähigkeit während des Exekutionsverfahrens vorliegend nicht den Beschwerdeführer als verpflichtete Partei, sondern den Beschwerdegegner als betreibende Partei betrifft, kann im gegenständlichen Fall nichts anders gelten. Schliesslich macht das Exekutionsverfahren im Hinblick auf die allgemeine Exekutionsvoraussetzung der Prozessfähigkeit der Parteien keinen Unterschied bei den Parteirollen; jede andere Auslegung würde überdies dem Gleichheitssatz widersprechen.

43   Dem Beschwerdeführer ist durchaus bewusst, dass den Nichtigkeitsgrund des § 446 Abs 1 Z 5 ZPO grundsätzlich nur derjenige geltend machen kann, dessen gesetzlicher Schutz durch die Ausserachtlassung der Vorschriften beeinträchtigt oder verletzt wurde.[29] Doch hat der öOGH in der Entscheidung zu 1 Ob 10/02f einer <u>obsie-</u>

---

[25] LES 2007, 280; LES 2004, 28.
[26] LES 2002, 302.
[27] Vgl *Neumayr/Nunner-Krautgasser*, Exekutionsrecht[4], 57.
[28] LES 2007, 280; LES 2012, 27.
[29] Vgl *Pimmer* in Fasching/Konecny[3] § 477 ZPO Rz 62 mwN.

genden Partei eine Nichtigkeitsklage zugestanden, weil die Verletzung des rechtli-
chen Gehörs der Gegenpartei dazu führte, dass der ersiegte Exekutionstitel nicht
vollstreckt und die Heilung der Nichtigkeit durch neuerliche ordnungsgemässe Zu-
stellung an den Prozessgegner nicht bewirkt werden konnte.

44   Aufgrund ähnlicher Überlegungen muss es gegenständlich auch dem Beschwerde-
führer zugestanden werden, die zulasten des Beschwerdegegners erfolgte Verlet-
zung des rechtlichen Gehörs aufgrund mangelnder Prozessfähigkeit geltend zu ma-
che. Denn dem Beschwerdeführer drohen vorliegend aufgrund der Nichtberücksichti-
gung der mangelnden Prozessfähigkeit des Beschwerdeführers durch das Fürstliche
Obergericht ebenfalls Nachteile. So besteht konkret die Gefahr, dass der Beschwer-
deführer trotz des über ihn eröffneten Konkursverfahrens weitere Verwertungsschritte
setzen könnte, während aufgrund der Konkurseröffnung die Gefahr besteht, dass sol-
che Verwertungsschritte aus Sicht des Beschwerdeführers gar keine schuldbefrei-
ende Wirkung hätte. Als Schuldner hat der Beschwerdeführer ein Interesse daran,
dass jede aufgrund des angefochtenen Beschlusses bzw. der durch diesen bestätig-
ten Verwertungsbewilligung vorgenommene Verwertungshandlung jedenfalls schuld-
befreiend wirkt. Aufgrund dieser Überlegungen muss es dem Beschwerdeführer ge-
genständlich möglich sein, auch den Verstoss gegen das Erfordernis der gesetzlichen
Vertretung des Beschwerdegegners und die damit einhergehende Verletzung des
rechtlichen Gehörs des Beschwerdegegners zu rügen.

45   Zusammengefasst ist die angefochtene Entscheidung also auch aufgrund der aufge-
zeigten Gehörsverletzungen infolge der nicht rechtzeitigen Zustellung des Unterbre-
chungsantrags des Herrn Ratnikov an den Beschwerdeführer einerseits und infolge
des Verstosses gegen das Erfordernis der gesetzlichen Vertretung des Beschwerde-
gegners andererseits aufzuheben.

## 3.3   Verstoss gegen das Willkürverbot

46   Der Staatsgerichtshof anerkennt in ständiger Rechtsprechung das ungeschriebene
Grundrecht der Willkür als klassisches Abwehrrecht gegen den Staat im Sinne eines
Auffanggrundrechts, welches gewissermassen als letzte Verteidigungslinie des
Rechts gegenüber derart offensichtlichem Unrecht dient, das in einem modernen
Staat nicht zu tolerieren ist. Willkür ist nicht schon dann gegeben, wenn der Staatsge-
richtshof eine Entscheidung als unrichtig qualifiziert, solange sich die Entscheidung
auf vertretbare Gründe stützt; eine behördliche Entscheidung ist vielmehr erst dann
willkürlich, wenn die Begründung im Ergebnis offensichtlich unhaltbar ist, mit der tat-
sächlichen Situation in unverkennbarem Widerspruch steht, eine Norm oder einen
unumstrittenen Rechtsgrundsatz krass verletzt oder in stossender Weise dem Ge-
rechtigkeitsgedanken zuwiderläuft, wenn die Entscheidung m.a.W sachlich nicht zu
begründen, nicht vertretbar bzw. geradezu stossend ist. Dabei ist auch die Offen-
sichtlichkeit eines Rechtsfehlers ein Merkmal bei der Willkürprüfung, sodass ein Will-

13

kürverstoss vorliegt, wenn eine Entscheidung ersichtlich gesetzwidrig ist oder wenn ein Gericht oder eine Behörde offensichtlich falsch entschieden hat.[30]

47   Genau dies ist hier geschehen, indem sich das Fürstliche Obergericht ohne ein Wort der Begründung geradezu willkürlich über die Eröffnung des im anhängigen Verwertungsverfahren anzuerkennenden ausländischen Konkursverfahrens über das Vermögen des Beschwerdegegners hinweggesetzt hat.

48   Gemäss Art. 20 Abs. 1 KO sind alle anhängigen Rechtsstreitigkeiten, in denen der Gemeinschuldner Kläger oder Beklagter ist, mit Ausnahme der in Art. 19 Abs. 3 KO bezeichneten Streitigkeiten, durch die Konkurseröffnung unterbrochen. Nach der Rechtsprechung der liechtensteinischen Gerichte betrifft dies auch Exekutionsverfahren und somit auch das gegenständliche Verwertungsverfahren.

49   So hat der Fürstliche Oberste Gerichtshof in seiner Entscheidung vom 7. September 2017 zu 08 EX.2012.6905 klar ausgesprochen:[31]

> "Gem Art 20 Abs 1 KO werden alle anhängigen Rechtsstreitigkeiten, in denen der Gemeinschuldner Kläger oder Beklagter ist, mit Ausnahme der im Art. 19 Abs 3 KO bezeichneten Streitigkeiten, durch die Konkurseröffnung unterbrochen. Gem Art 20 Abs 2 KO kann das Verfahren vom Masseverwalter, von Streitgenossen des Gemeinschuldners und vom Gegner aufgenommen werden. Nach Eintritt der Unterbrechung des Verfahrens sind Gerichtshandlungen, die nicht bloss dem durch die Unterbrechung des Verfahrens geschaffenen Zustand Rechnung tragen, während des Stillstands des Verfahrens unzulässig. Insbesondere dürfen Urteile (Beschlüsse) nicht mehr ergehen, die nicht schon vor der Unterbrechung in einer für das Gericht bindenden Art gefällt wurden (RIS-Justiz RS0036996 ua). Von der Unterbrechung im Konkurs wird nicht nur das erstgerichtliche, sondern auch das Rechtsmittelverfahren betroffen (öOGH 7 Ob 647/87 ua; 9 ObA 132/10t). Verfällt eine der Parteien nach Erhebung der Revision (Revisionsrekurses) und nach Vorlage der Akten an den OGH in Konkurs, ist über die Revision bzw über den Revisionsrekurs, sofern Gegenstand des Rechtsstreits ein zur Konkursmasse gehöriges Vermögen ist, während der Dauer der Unterbrechung des Verfahrens nicht zu entscheiden, sondern sind die Akten dem Erstgericht zurückzustellen (RIS-Justiz RS0036752 ua).
>
> Im gegenständlichen Fall betrifft die streitgegenständliche betriebene Forderung zweifellos das Konkursvermögen der Gemeinschuldnerin. Eine Entscheidung wurde im gegenständlichen Fall vom Fürstlichen Obersten Gerichtshof noch nicht gefällt.
>
> Daraus folgt, dass gem Art 20 Abs 2 KO mit deklarativer Wirkung zu beschliessen war, dass die gegenständlichen Revisionsrekursverfahren unterbrochen werden.

---

[30] *Vogt in Kley/Vallender* (Hrsg), Grundrechtspraxis in Liechtenstein, LPS 52, 309 und 313 ff m.w.N.
[31] OGH 07.09.2017, 08 EX.2012.6905 GE 2017, 215.

*Dem Erstgericht waren die Akten zurückzuleiten.*"

50  Ebenso hat das Fürstliche Obergericht in einem Verfahren über den Widerspruch gegen die Exekutionsbewilligung wie folgt ausgesprochen:[32]

"*Die Unterbrechungsnormen sind grundsätzlich zwingender Natur und ist der Eintritt der Unterbrechung von Amts wegen zu beachten (vgl. Fink in Fasching[2], Rz 13 zu § 158 öZPO).*

*Inwiefern bei Eröffnung des Konkurses über das Vermögen einer Partei eine Unterbrechung des Verfahrens eintritt, wird durch die Konkursordnung bestimmt (§ 159 ZPO). Nach Art. 20 KO werden die anhängigen Rechtsstreitigkeiten, in denen der Gemeinschuldner Kläger oder Beklagter ist, mit Ausnahme der in Art. 19 Abs. 3 KO bezeichneten Streitigkeiten durch die Konkurseröffnung unterbrochen. Dies gilt entgegen der Rechtsauffassung des Erstgerichts grundsätzlich auch für Rechtsstreitigkeiten über Absonderungsansprüche, betreffen diese doch grundsätzlich das zur Konkursmasse gehörige Vermögen; die mit einem Absonderungsrecht belasteten Sachen hören nicht auf, Massebestandteil zu sein (vgl. RZ 1958, 139). Daher werden auch Rechtsstreitigkeiten über Absonderungsansprüche durch die Konkurseröffnung grundsätzlich unterbrochen; sie können gegen den Masseverwalter fortgesetzt werden (vgl. OG Wien, EvBl. 1934/168).*

*Trotz eingetretener Unterbrechungswirkung und zulässigerweise ergangene Entscheidungen sind nach herrschender Auffassung nicht wirkungslos, sondern anfechtbar, wobei in der Regel Nichtigkeit nach § 477 Abs. 1 Z. 4 und 5 ZPO anzunehmen ist.*

*Rechtsmittel, die nach Eintritt der Unterbrechung des Verfahrens und während deren Wirkung eingebracht werden, sind zurückzuweisen, wenn sie nicht der Sicherung der Unterbrechungswirkung oder der Klärung der Frage dienen, ob eine Unterbrechung überhaupt eingetreten ist (vgl. dazu JBl. 2008, 730). Dies ist gerade hier der Fall, weil im vorliegenden Fall geltend gemacht wird, dass zum Zeitpunkt der Erlassung des Beschlusses dieser unter Verletzung der durch die Konkurseröffnung eingetretenen Unterbrechungswirkung ergangen ist. Lediglich dann, wenn die Partei erst nach Erhebung des Rechtsmittels in Konkurs verfällt, ist darüber nicht zu entscheiden, sondern sind die Akten nach der Judikatur zunächst dem Erstgericht zurückzustellen (RIS-Justiz RS0036752, RS00370039).*

*Nach Eintritt der Unterbrechung des Verfahrens sind Gerichtshandlungen, die nicht bloss dem durch die Unterbrechung des Verfahrens geschaffenen Zustand Rechnung tragen, während des Stillstands des Verfahrens unzulässig. Insbesondere dürfen Beschlüsse nicht mehr ergehen, die nicht schon vor der Unterbrechung in einer für das Gericht bindenden Art gefällt wurden (RIS-Justiz RS0035996 u.a.). Richtig ist auch, dass infolge des Widerspruchs die Exekutionsbewilligung (noch) nicht rechtskräftig ist. Gegenstand des Rechtsstreits im Widerspruchsverfahren ist*

---

[32] OG 12.10.2017, 2 R EX.2016.991, ON 60.

> *ein zur Konkursmasse gehöriges Vermögen, wobei von der Unterbrechungswirkung auch die im Exekutionsverfahren betriebene Forderung erfasst wird (vgl. OGH 07.09.2017, 08 EX.2012.6905, betreffend dieselbe verpflichtete Partei Josef Abela Family Foundation).*
>
> *Der angefochtene Beschluss war daher als nichtig aufzuheben."*

51    Die Unterbrechung des Verfahrens tritt *ex lege* in jeder Lage des Verfahrens ein, sohin auch - wie hier - im Stadium des Rechtsmittelverfahrens. Nach Eintritt der Unterbrechung des Verfahrens sind Gerichtshandlungen, die nicht bloss dem durch die Unterbrechung des Verfahrens geschaffenen Zustand Rechnung tragen, während des Stillstands des Verfahrens unzulässig. Insbesondere dürfen auch keine (Rechtsmittel-)Entscheidungen mehr ergehen.[33] Im Falle einer Unterbrechung während des Rechtsmittelverfahrens sind die Akten vielmehr dem Erstgericht zurückzustellen.[34] An die Stelle des Gemeinschuldners tritt der Masseverwalter; nur auf dessen Antrag hin kann das Verfahren fortgesetzt werden.

52    Die *ex lege*-Unterbrechung des Verwertungsverfahrens auch im Rechtsmittelstadium soll dem Masseverwalter nicht nur dazu dienen, sich einen Überblick über das Verfahren und die Erfolgsaussichten zu verschaffen, sondern ihm letztlich die Verwertung für die Konkursmasse sichern.

53    Dass es sich gegenständlich um ein ausländisches Konkursverfahren des Konkursgerichts Moskau handelt, vermag an der *ex lege*-Unterbrechung des Verwertungsverfahrens im Rechtsmittelstadium nichts zu ändern:

54    Im Hinblick auf internationale Sachverhalte im Zusammenhang mit Konkursverfahren kann die betreffende Konkursordnung in ihrer Ausgestaltung und Wertung entweder dem Territorialitätsprinzip oder dem Universalitätsprinzip folgen. Während nach dem Territorialitätsprinzip Konkursverfahren grundsätzlich nur innerhalb der eigenen Staatsgrenzen wirken, ist dem Universalitätsprinzip eine gewisse Öffnung gegenüber ausländischen Konkursverfahren gemein.[35]

55    Während die ältere Rechtsprechung der liechtensteinischen Gerichte noch dem Territorialitätsprinzip verhaftet war,[36] lässt sich bei der jüngeren Rechtsprechung der liechtensteinischen Gerichte mit Blick auf Art. 5 Abs. 2 KO[37] insoweit eine Öffnung gegenüber ausländischen Konkursverfahren beobachten, als dass Gegenseitigkeit im Hinblick auf die Anerkennung der konkursrechtlichen Wirkungen besteht.

---

[33] Vgl RIS-Justiz RS0036996.

[34] Vgl RIS-Justiz RS0036752.

[35] *Hanisch*, LJZ 1982, 65 (66).

[36] *Neudorfer*, LJZ 1988, 132 (136).

[37] *"Das im Inland befindliche bewegliche Vermögen eines Gemeinschuldners, über dessen Vermögen der Konkurs im Auslande eröffnet wurde, ist der ausländischen Konkursbehörde auf deren Verlangen auszufolgen, sofern nicht der Konkurs im Inland eröffnet wird. Das Vermögen darf erst nach Befriedigung der bis zum Einlangen des Ersuchens erworbenen Aussonderungs- und Absonderungsrechte ausgefolgt werden. Die Ausfolgung ist abzulehnen, insoweit der ausländische Staat nicht Gegenseitigkeit beobachtet."*

56   So hielt der Fürstliche Oberste Gerichtshof in einem Beschluss vom 16. Dezember 1991 fest, dass seit dem Inkrafttreten des schweizerischen IPRG im Allgemeinen die in Art. 5 Abs. 2 KO geforderte Gegenseitigkeit als Voraussetzung für die Ausfolgung von inländischem beweglichen Vermögen eines Gemeinschuldners an die ausländische Konkursbehörde im Rahmen eines im Ausland anhängigen Konkursverfahrens im Verhältnis zur Schweiz zu bejahen sei.[38]

57   In einem Beschluss vom 30. Januar 1995 sprach der Fürstliche Oberste Gerichtshof explizit von der Geltung des Universalitätsprinzips im Hinblick auf die liechtensteinische Konkursordnung.[39]

58   Im Jahr 2003 beschäftige sich der Fürstliche Oberste Gerichtshof erneut mit dieser Thematik in Bezug auf ein in Deutschland anhängiges Konkursverfahren über das Vermögen der Zweitbeklagten eines in Liechtenstein geführten Prozesses. Der Fürstliche Oberste Gerichtshof führte aus, dass das liechtensteinische internationale Konkursrecht lediglich eine einzige, recht rudimentäre Regelung in Art. 5 KO erfährt. Daraus folgerte der Fürstliche Oberste Gerichtshof aber, dass der Gesetzgeber die Zugrundelegung des Universalitätsprinzips im Sinn hatte und Auslandskonkursen Rechtsfolgen im Inland zusprechen wollte. Insbesondere strich der Fürstliche Oberste Gerichtshof die Stimmen aus der Literatur hervor, die seit längerem die Überwindung der "territorialen Scheuklappen" forderten. Weiters habe sich die Gegenseitigkeit zu Deutschland bereits aus §§ 237, 238 dKO alt und auch aus der Rechtspraxis der deutschen Gerichte ergeben. Nunmehr sei die Gegenseitigkeit durch die 1999 in Kraft getretene deutsche Insolvenzordnung und deren Einführungsgesetz klargestellt. Nach Art. 102 dEGInsO umfasst ein ausländisches Konkursverfahren auch im Inland befindliche Vermögen des Schuldners. Darüber hinaus verwies der Fürstliche Oberste Gerichtshof auf die Rechtsprechung des schweizerischen Bundesgerichtes, das das in Art. 166 Abs. 1 lit. c chIPRG alt verankerte Erfordernis der Gegenseitigkeit überaus extensiv interpretierte. Schlussendlich bejahte der Fürstliche Oberste Gerichtshof die Gegenseitigkeit zwischen Deutschland und Liechtenstein und damit einhergehend die Anerkennung des deutschen Insolvenzverfahrens in Liechtenstein. Sohin durfte der Insolvenzverwalter sämtliche Befugnisse ausüben, die ihm nach dem Recht des Staates der Konkurseröffnung zustehen, insbesondere die ausschliessliche Prozessführungsbefugnis. Ab dem Zeitpunkt der Konkurseröffnung in Deutschland war die nach liechtensteinischem Prozessrecht zu beurteilende und eine Prozessvoraussetzung darstellende Prozessführungsbefugnis von der Zweitbeklagten auf den deutschen Insolvenzverwalter übergegangen. Zu den Folgen des Verlustes der Prozessführungsbefugnis im Zusammenhang mit der ausländischen Konkurseröffnung wurde auf Art. 20 KO verwiesen.[40]

---

[38] OGH 1 C 8/81-21, LES 3/92.

[39] OGH S 110/92-124, LES 4/96.

[40] LES 2004, 28; eingehend dazu *Neudorfer*, LJZ 1996, 166 (167).

59    In einer Entscheidung des Fürstlichen Obersten Gerichtshofs aus dem Jahr 2011 ging es um die verfahrensrechtlichen Folgen der Eröffnung eines Schuldenregulierungsverfahrens über das Vermögen der Klägerin in Österreich in Bezug auf einen in Liechtenstein anhängigen Zivilprozess. Wiederum bestätigte der Fürstliche Oberste Gerichtshof das Universalitätsprinzip der liechtensteinischen Konkursordnung und prüfte die Gegenseitigkeit zwischen Liechtenstein und Österreich. Da Art. 5 Abs. 2 KO Gegenseitigkeit voraussetzt, war zunächst auf das autonome österreichische internationale Insolvenzrecht einzugehen und zu prüfen, ob und inwieweit die Gegenseitigkeit gegenüber den in Liechtenstein eröffneten Insolvenzverfahren gewährt wird. § 240 Abs. 1 öIO fordert in Anlehnung an die Europäische Insolvenzverordnung diesbezüglich, dass (i) der Mittelpunkt der hauptsächlichen Interessen des Schuldners im anderen Staat liegt, und (ii) das Insolvenzverfahren in den Grundzügen einem österreichischen vergleichbar ist. Der Fürstliche Oberste Gerichtshof ging davon aus, dass ein Insolvenzverfahren nach der liechtensteinischen Konkursordnung in Österreich anerkannt wird und daher Gegenseitigkeit gegeben sei. Folglich hielt er fest, dass ein österreichisches Schuldenregulierungsverfahren über das Vermögen der Klägerin in Liechtenstein anzuerkennen sei. Der Fürstliche Oberste Gerichtshof führte weiters aus, dass es den Regelungen beider Staaten entspreche, dass ein Gemeinschuldner mangels Verfügungsfähigkeit über sein Vermögen nach Eröffnung des Konkursverfahrens ein zivilgerichtliches Verfahren nicht mehr einzuleiten vermag, zumal es ihm an der Prozesslegitimation fehle.[41]

60    Im gegenständlichen Verfahren wurde über das Vermögen des Beschwerdegegners in Russland ein Konkursverfahren, genauer ein sog. Schuldenbereinigungsverfahren, durch Beschluss des Konkursgerichts Moskau vom 20. August 2020 zu A 40-17597/20-4-36 F eröffnet und Herr Evgenii Nikolaevich Ratnikov als Masseverwalter bestellt.

61    Zwar gibt es zwischen Russland und Liechtenstein auf dem Gebiet des Konkursrechts kein völkerrechtliches Abkommen, doch kann die Gegenseitigkeit dennoch bejaht werden. So hat beispielsweise das OLG Hamburg[42] die Gegenseitigkeit zwischen Deutschland und Russland bejaht und die Unterbrechung des in Deutschland anhängigen Verfahrens festgehalten. In der betreffenden Entscheidung wird unter anderem auf Art. 1 Z. 6 ruInsG verwiesen, worin statuiert wird, dass bei Fehlen internationaler Verträge Entscheidungen ausländischer Gerichte in Insolvenzsachen in Russland auf der Grundlage der Gegenseitigkeit anerkannt werden. Unter Bezugnahme auf russische Judikatur, die die Gegenseitigkeit im Hinblick auf § 343 dInsO bejaht, wurde diese vom OLG Hamburg letztlich bestätigt. Da Russland ebenso dem Universalitätsprinzip vorbehaltlich der geübten Gegenseitigkeit zu folgen scheint, ist kein Grund ersichtlich, der einer Anerkennung der Wirkungen des russischen Kon-

---

[41] LES 2012, 27.
[42] OLG Hamburg 01.03.2018, 6 U 242/15.

kursverfahrens und deren Wirkungen im liechtensteinischen Exekutionsverfahren entgegenstehen würde.

62    Wie dem vom russischen Masseverwalter im gegenständlichen Verfahren vorgeleg-ten Rechtsgutachten von Herrn RA Pavel Jakovlevitch Tscherniak vom 12. Septem-ber 2020 zu entnehmen ist, unterliegt die Person, gegen die ein Schuldenbereini-gungsverfahren eingeleitet wurde, gemäss Art. 213.11 ruInsG zahlreichen rechtlichen Beschränkungen. Insbesondere wird dem Gemeinschuldner verboten, in Eigenregie juristisch relevante Handlungen vorzunehmen. Ohne schriftliche Zustimmung des Masseverwalters ist der Gemeinschuldner nicht berechtigt, selber bezüglich Ver-pflichtungen zu entscheiden, deren Höhe 50'000 Rubel überschreitet. Ebenso ist die Beteiligung des Gemeinschuldners an Verfahren, die von ihm betreffend Beträge über 50'000 Rubel betrieben werden, ohne schriftliche Zustimmung des Masseverwalters gesetzwidrig.

63    Im Länderbericht zur Russischen Föderation bei *Schwartz/Fahland* im Münchener Kommentar, InsO[3] IV wird in Rn 58 ausgeführt, dass zum Zeitpunkt der Konkurseröff-nung die Geschäftsführungsorgane des Schuldners ihre Befugnisse verlieren. In Rn 61 heisst es, dass der Konkursverwalter berechtigt ist, über das Schuldnervermö-gen zu verfügen. In dem von *Kindler/Nachmann* herausgegebenen Handbuch Insol-venzrecht in Europa heisst es in dem von *Yukhnin* bearbeiteten Teil zur Russischen Föderation in Rn 441, dass ab dem Datum, an dem das Gericht den Beschluss ge-fasst hat, den Schuldner für insolvent zu erklären und den Konkurs einzuleiten, das Verfügungsrecht des Schuldners dem Konkursverwalter auferlegt wird. In Rn 444 heisst es, dass bei anhängigen Rechtsstreiten der Konkursverwalter in das laufende Verfahren als Person eintritt, die den Schuldner ohne spezielle Befugnisse vertritt. Er ist berechtigt, die Forderung anzuerkennen, die Forderung abzulehnen oder einen Vergleich zu schliessen. Aus den genannten Gründen ist daher davon auszugehen, dass mit Insolvenzeröffnung die Prozessführungsbefugnis auf den Insolvenzverwalter übergeht.[43]

64    Wie bereits vom OLG Hamburg in der erwähnten Entscheidung erwogen, wird zudem auch in dem von Herrn Ratnikov vorgelegten Rechtsgutachten bestätigt, dass bei Fehlen internationaler Verträge Entscheidungen ausländischer Gerichte in Insolvenzsachen in Russland auf der Grundlage der Gegenseitigkeit anerkannt werden (Art 1 Z. 6 ruInsG). Nach dem Rechtsgutachten werden auf dem Territorium der Russischen Föderation Entscheidungen der Gerichte ausländischer Staaten in Insolvenzverfahren ausgehend vom Gegenseitigkeitsprinzip anerkannt, darunter auch Entscheidungen des Fürstentums Liechtenstein. Kraft des zwischen den Rechtssystemen Russlands und Liechtensteins entstandenen Vertrauens ist somit auch der Beschluss des Konkursgerichts Moskau vom 20. August 2020 zu A 40-17597/20-4-36 F, mit welchem über das Vermögen des Beschwerdegegners das

---

[43] IdS OLG Hamburg 01.03.2018, 6 U 242/15 Rz 46 f mwN.

Konkursverfahren eröffnet wurde und Herr Evgenii Nikolaevich Ratnikov als Masseverwalter bestellt wurde, in Liechtenstein anzuerkennen.

65    Zusammenfassend ist festzuhalten, dass durch die Eröffnung des ausländischen Konkursverfahrens über das Vermögen des Beschwerdegegners das Verwertungsverfahren im Rechtsmittelstadium *ex lege* unterbrochen wurde. Folglich hätte das Fürstliche Obergericht in dieser Verfahrenslage keine Rechtsmittelenscheidung mehr fällen dürfen. Nichtsdestotrotz hat sich das Fürstliche Obergericht mit der angefochtenen Entscheidung über Art. 20 Abs. 1 KO und die dazu ergangene ständige Rechtsprechung der liechtensteinischen Gerichte betreffend die Auswirkung einer Konkurseröffnung auf anhängige Exekutionsverfahren einschliesslich Rechtsmittelverfahren ohne irgendeine Begründung hinweggesetzt.

66    Krasse Fehler bei der Lösung einer Rechtsfrage sind als willkürlich zu qualifizieren. Im gegenständlichen Fall hat das Fürstliche Obergericht Art. 20 Abs. 1 KO krass und damit willkürlich verletzt und sich willkürlich über die dazu ergangene ständige Rechtsprechung der liechtensteinischen Gerichte hinweggesetzt, indem es ungeachtet der *ex lege* erfolgten Verfahrensunterbrechung qualifiziert unrichtig die angefochtene Entscheidung gefällt hat. Darin ist ein Verstoss gegen das Willkürverbot zu erblicken.

## 4    Anträge

Aus all diesen Gründen stellt der Beschwerdeführer sohin die folgenden

## ANTRÄGE:

Der Staatsgerichtshof möge:

1.    dieser Beschwerde Folge geben und feststellen, dass der Beschluss des Fürstlichen Obergerichts vom 15. September 2020 zu 08 EX.2016.5802, ON 143, gegen verfassungsmässig gewährleistete und durch die EMRK garantierte Rechte des Beschwerdeführers verstösst, und den Beschluss des Fürstlichen Obergerichts vom 15. September 2020 zu 08 EX.2016.5802, ON 143, deshalb aufheben und zur neuerlichen Entscheidung unter Bindung an die Rechtsansicht des Staatsgerichtshofes an das Fürstliche Obergericht zurückverweisen; und

2.    den Beschwerdegegner zum Ersatz der dem Beschwerdeführer entstandenen und hierin verzeichneten Kosten zuhanden seiner ausgewiesenen Rechtsvertreterin binnen 14 Tagen bei sonstiger Exekution verpflichten.

## II.   ANTRAG AUF AUFSCHIEBENDE WIRKUNG UND ANDERE VORSORG-LICHE MASSNAHMEN

67   Die Gewährung der aufschiebenden Wirkung nach Art. 52 Abs. 2 StGHG bzw. anderer vorsorglicher Massnahmen nach Art. 53 Abs. 1 StGHG haben nach der Rechtsprechung des Staatsgerichtshofes das Ziel, das Endurteil des Staatsgerichtshofes nicht dadurch obsolet werden zu lassen, dass im Laufe des Verfahrens über den Streitgegenstand verfügt wird, dieser unwiederbringlich verloren geht oder andere tatsächliche Verhältnisse eintreten, welche die Vollstreckung des Urteils sinnlos machen.[44] Dem Antragsteller muss mit anderen Worten durch den Vollzug des angefochtenen Hoheitsaktes ein unwiederbringlicher und unverhältnismässiger Nachteil erwachsen. Ein Nachteil ist dann unverhältnismässig, wenn bei einem zwischenzeitlichen Vollzug des angefochtenen Hoheitsaktes durch die dadurch bewirkte Lage der Tatsachen dem Beschwerdeführer ein Nachteil droht, der auch nach Aufhebung des angefochtenen Hoheitsaktes im Hauptverfahren nicht wieder gutzumachen und daher geeignet ist, den vom Staatsgerichtshof zu gewährenden Rechtsschutz zu beeinträchtigen.[45]

68   In dem der vorliegenden Individualbeschwerde zugrunde liegenden Exekutionsverfahren geht es darum, dass der nunmehrige Antragsgegner eine ihm gegenüber dem nunmehrigen Antragsteller aufgrund eines Schiedsspruches zustehende Forderung durch Exekution in das Trustvermögen des ALPHA TRUST einbringlich zu machen versucht. Dies soll dem nunmehrigen Antragsgegner konkret dadurch ermöglicht werden, dass die Gesamtrechte des nunmehrigen Antragstellers als Treugeber, Protektor und Begünstigter des ALPHA TRUST exekutiv gepfändet wurden und in weiterer Folge die Verwertung dieser Gesamtrechte bewilligt wurde. Mit dem angefochtenen Beschluss hat das Fürstliche Obergericht diese Verwertungsbewilligung gestützt.

69   Zwar hat der Antragsgegner die gepfändeten Gesamtrechten bereits dahingehend ausgeübt, dass er die ehemalige Treuhänderin des ALPHA TRUST, die CTX Treuhand AG, abberufen und an ihrer Stelle die Herren Mag. iur. Rudolf Schächle und Mag. iur. Raphael Näscher als neue Treuhänder des ALPHA TRUST bestellt hat.

70   Indes ist es mit der Auswechslung des Treuhänders alleine noch nicht getan, wenn der Antragsgegner seine Forderung aus dem Trustvermögen des ALPHA TRUST bezahlt erhalten will. Vielmehr wird der Antragsgegner zusätzlich zumindest noch in Ausübung der gepfändeten Protektorenrechte einem etwaigen Ausschüttungsbeschluss der Treuhänder zustimmen müssen. Denn eine Begleichung der gegenständlichen Forderung des Beschwerdegegners aus dem Trustvermögen des ALPHA TRUST kommt nur in Form einer Ausschüttung in Betracht (zumal der ALPHA

---

[44] *T. Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, S. 741 m.w.H.

[45] *T. Wille*, Liechtensteinisches Verfassungsprozessrecht, LPS 43, S. 745.

TRUST ja originär nicht Schuldner des Antragsgegners ist). Und gemäss Klausel 14.4 iVm 5 der Trusturkunde des ALPHA TRUST bedürfen Ausschüttungen an Begünstigte zwingend der Zustimmung des Protektors.

71   Hinzu kommt, dass derzeit gar nicht klar ist, ob an den Antragsgegner überhaupt noch schuldbefreiend geleistet werden kann. Denn wie erwähnt, wurde über den Antragsgegner kürzlich in Russland ein Konkursverfahren eröffnet. Als Schuldner hat der Antragsteller offensichtlich ein Interesse daran, dass eine Leistung an den Antragsgegner schuldbefreiend wirkt.

72   Der Antragsteller hat somit ein berechtigtes Interesse daran, dass der gegenständlichen Individualbeschwerde die aufschiebende Wirkung zuerkannt und es dem Antragsgegner im Sinne einer vorsorglichen Massnahme für die Dauer des gegenständlichen Individualbeschwerdeverfahrens untersagt wird, die gepfändeten Gesamtrechte auszüüben. Andernfalls bestünde die Gefahr, dass während der Dauer des gegenständlichen Individualbeschwerdeverfahrens über die gepfändeten Gesamtrechte in einer Weise verfügt würde (z.B. indem eine Zahlung an den Antragsgegner aus dem Trustvermögen des ALPHA TRUST getätigt würde), welche im Nachhinein nicht mehr oder nur noch schwer rückgängig gemacht werden könnte (z.B. weil das Geld auf ein ausländisches Konto des Antragsgegners transferiert würde) und welche schlimmstenfalls für den Antragsteller nicht einmal schuldbefreiende Wirkung hätte.

73   Im Übrigen stehen der Gewährung der beantragten aufschiebenden Wirkung und anderen vorsorglichen Massnahmen vorliegend keine zwingenden öffentlichen Interessen entgegen, die dem Interesse des Antragstellers an der Gewährung der aufschiebenden Wirkung vorgehen würden.

74   **Darauf hinzuweisen gilt es, dass der vorliegende Antrag ohne vorgängige Anhörung des Antragsgegners behandelt werden sollte, um nicht den Zweck der aufschiebenden Wirkung und der beantragten vorsorglichen Massnahmen zu vereiteln. Andernfalls besteht die Gefahr, dass der Antragsgegner die gepfändeten Rechte ausübt (und z.B. einen Zustimmungsbeschluss iSv Klausel 14.4 iVm 5 der Trusturkunde des ALPHA TRUST fasst), noch bevor der Vorsitzende des Staatsgerichtshofs über den gegenständlichen Antrag entscheiden kann, in welchem Fall die Gewährung der aufschiebenden Wirkung und der beantragten vorsorglichen Massnahme obsolet würde.**

Aus all diesen Gründen stellt der Antragsteller den

**ANTRAG,**

der Vorsitzende des Staatsgerichtshofes möge:

1.   gemäss Art. 52 Abs. 2 StGHG der gegenständlichen Individualbeschwerde die aufschiebende Wirkung zuerkennen; und

2.   gemäss Art. 53 Abs. 1 StGHG verfügen, dass es dem Antragsgegner bis zum Abschluss des gegenständlichen Indvidualbeschwerdeverfahrens vor dem Staatsgerichtshof bei sonstiger Ungültigkeit untersagt ist, über die Gesamtrechte des Antragstellers als Treugeber, Protektor und Begünstigter der unter dem Namen ALPHA TRUST bekannten Treuhänderschaft zu verfügen, welche mit Beschluss des Fürstlichen Landgerichts vom 21. November 2016 zu 08 EX.2016.5802, ON 3, gepfändet und deren Verwertung mit Beschluss des Fürstlichen Landgerichts vom 2. März 2020 zu 08 EX.2016.5802, ON 109, bewilligt wurde.

Vaduz, 28. Oktober 2020
NBI/KBI

Beilagen:

-   Beschluss des Fürstlichen Obergerichts vom 15. Oktober 2020 zu 08 EX.2016.5802, ON 152, in Kopie
-   Beschluss des Fürstlichen Obergerichts vom 15. September 2020 zu 08 EX.2016.5802, ON 143, in Kopie
-   Antrag auf Unterbrechung im Exekutionsverfahren zu 08 EX.2016.5802 durch Masseverwalter Evgenii Nikolaevich Ratnikov vom 11. September 2020 samt Beilage, in Kopie
-   Urkundenvorlage im Exekutionsverfahren zu 08 EX.2016.5802 durch Masseverwalter Evgenii Nikolaevich Ratnikov vom 18. September 2020 samt Beilagen, in Kopie

Kosten werden verzeichnet:
(Streitwert: CHF 100'000.00)

| | | |
|---|---|---|
| Individualbeschwerde, TP 3C, 40% ES | CHF | 2'494.80 |
| zzgl. 10 % StGZ | CHF | 249.48 |
| *Zwischensumme* | CHF | 2'744.28 |
| zzgl. 7.7 % MWSt. | CHF | 211.31 |
| Gebühr Individualbeschwerde | CHF | 4000,00 |
| Gebühr Aufschiebungsantrag | CHF | 800,00 |
| **Gesamt** | **CHF** | **7'755.59** |