# EXHIBIT 9

1

**COPY**

Case No. 1- 15/2018

SENTENCE
BY THE NAME OF THE RUSSIAN FEDERATION


Moscow                                                                                    May 31, 2018

Judge of Zamoskvoretsky District Court of Moscow E. P. Averchenko, with the participation of state prosecutors G. B. Ibragimova, E. O. Apukhtina, lawyer's defenders G. A. Aliev, who presented the ID certificate No. 9450 and warrant No. 604, lawyer I. S. Novikov, who presented the ID certificate No. 11735 and warrant No. 3704, lawyer O. V. Yeliseev, who presented ID certificate No. REDACTED and warrant No. 414, lawyer P. I. Anashkin, who presented the ID certificate No. REDACTED and warrant No. 204, victim V. I. Smagin, the representative of victim's lawyer D. A. Shashkov, in the presence of secretaries O. A. Logacheva, A. M. Golubev, V. V. Subbotin, A. M. Gordeeva, N. R. Katukiya, O. L. Kuznetsova, considered in the open court meeting the criminal case against

Ashot Gevorkovich Yeghiazaryan, born REDACTED 1965, in Moscow, the Russian Federation, without the place of residence or registration, a citizen of the Russian Federation, with higher education, married, having underage children, unemployed, without criminal background, accused of committing a crime under Article (Art.) 159, Paragraph (Par.) 4 of the Criminal Code of the Russian Federation;

Artem Gevorkovich Yeghiazaryan, born REDACTED 1977, in Moscow, registered at the address: REDACTED                        Moscow, a citizen of the Russian Federation, married, having a minor child, unemployed, without criminal background, accused of committing a crime under Art. 159, Par. 4 of the Criminal Code of the Russian Federation;

Vitaly Gramitonovich Gogokhiya, born REDACTED 1956, in the town of Akhalkalaki, Georgian SSR, registered at the address: Apt. 27, 21, Yu.V. Andropov Avenue, Moscow, a citizen of the Russian Federation, with higher education, married, having no underage children, unemployed, without any information on the military duty, without criminal background, accused of committing a crime under Art. 33, Par.5, Art. 159, Par.4 of the Criminal Code of the Russian Federation;

Maxim Alekseevich Klochin, born REDACTED 1975, in Moscow, registered at the address: REDACTED                        Moscow, a citizen of the Russian Federation and the United States of America, with higher education, single, unemployed, without criminal background, accused of committing a crime under Art. 33, Par. 5, Art. 159, Par.4 of the Criminal Code of the Russian Federation;


ESTABLISHED:


Ashot G. Yeghiazaryan and Artem G. Yeghiazaryan. are guilty of fraud, that is, acquisition of the right to the property of another person by deceit and abuse of trust, by a group of persons entered into a preliminary conspiracy, causing damage to a citizen on an especially large scale.

M. A. Klochin and V. G. Gogokhiya are guilty of complicity in fraud, that is, facilitating the acquisition of the right to the property of another person by deceit and abuse of trust, committed by a group of persons entered into a preliminary conspiracy, causing significant damage to a citizen, on an especially large scale, by providing information and means of committing a crime and by eliminating obstacles.

2

So, Ashot G. Yeghiazaryan, within a group of persons on a preliminary conspiracy with Artem G. Yeghiazaryan, with the complicity of V. G. Gogokhiya and M. A. Klochin, in the period from 26.12.2006 to 26.02.2010 at the territory of Moscow, made a purchase by deceit and abuse of trust of the right to the property of another, namely 20% of shares of the Closed Joint-Stock Company (CJSC) «Centurion Alliance» (Moscow) at the cost of not less than 720 605 444 rubles belonging to V. I. Smagin.

So, in 2006 V. I. Smagin was the owner of 460 ordinary registered uncertified shares that made up 20% of the total number of shares of CJSC «Centurion Alliance» which owns the shopping center «Europark» located at the address: 62, Rublevskoe Avenue, Moscow. The remaining 80% of the shares of the CJSC were in physical property of Ashot Yeghiazaryan through the associated individuals and legal persons.

In 2006, Ashot Yeghiazaryan, through the companies controlled by him, participated in the project on the reconstruction of the hotel «Moscow», which required financing, estimated at hundreds of millions of the US dollars. Ashot Yeghiazaryan was aware of the above-mentioned shares belonged to V. I. Smagin and in the period of October-November 2006 there arose his criminal intention to acquire the right to this property by deceit and abuse of trust for the implementation of which he (Ashot Yeghiazaryan) during the mentioned period of time in Moscow entered into a criminal conspiracy with his brother Artem Egiazaryan previously agreed on the joint commission of the crime. They attracted their friends M. A. Klochin and V. G. Gogokhiya as accomplices, who acted as their vicarious agents. In the period November - the first half of December 2006, in the premises of the Business Center «Daev Plaza» at the address: 20, Daev Lane, Moscow, Ashot Yeghiazaryan during the meeting with V. I. Smagin, who he had already known for several years and had mutual business, informed that «DEUTSCHE BANK A. G.» (hereinafter to be referred to as «Deutsche Bank») was ready to provide the company «BLIDENSOL TRADING & INVESTMENTS LIMITED» (hereinafter to be referred to as «Blidensol») controlled by Ashot Egiazaryan with the loan in the amount of 100 million US dollars for financing the reconstruction of the hotel «Moscow» on the guarantee of CJSC «Centurion Alliance» and pledging 100% of the shares of the company and the «Europark» property belonging to him as security measures. At that, the sole shareholder of CJSC «Centurion Alliance» has to be «DORALIN TRADING & INVESTMENTS» (hereinafter to be referred to as «Doralin») controlled by Ashot Egiazaryan, since its shares are also subject to the pledge in «Deutsche Bank». Ashot Yeghiazaryan, convincing V. I. Smagin to transfer his 20% of the shares of CJSC «Centurion Alliance» to «Doralin» and offering to conclude the sale and purchase agreement of the shares at their nominal value without their real payment, assured that his (Smagin's) property is not in danger, as 100% of the shares of the company «Doralin» are owned by the company «TUFTS INVEST 8, TRADE INC.» (hereinafter to be referred to as «Tufts»), in which 20% of the shares will be registered for V. I. Smagin, and the controlling share in the amount of 73% belongs to the company «KALKEN HOLDINGS LIMITED» (hereinafter to be referred to as «Kalken») controlled by Ashot Yeghiazaryan through his brother Artem Egiazaryan.

Ashot Yeghiazaryan, acting deliberately in realizing his criminal plan, convinced V. I. Smagin, having deceived him, that 20% of the shares of CJSC «Centurion Alliance» would be re-registered for the company «Doralin» for the period of not more than one year, after which the pledge would be terminated and V. I. Smagin would get his shareholdings back. In addition, Ashot Egiazaryan, inducing V. I. Smagin to the transfer of his shares, promised him to subsequently increase his (Smagin's) shares of CJSC «Centurion Alliance» to 50%, and also to organize his appointment to the position of the second director of the company «Tufts» with the authority to sign for providing the control over the disposal of the shares and property of the company «Doralin».

In order to mislead V. I. Smagin on his true intention, Ashot Yeghiazaryan proposed to change the charter of the company «Centurion Alliance», to appoint V. I. Smagin to the Chairman of the Board of Directors, to enter the position of the first deputy general director who will be appointed by the Board of Directors and to ensure the appointment of Smagin's vicarious agent to this position. In this case, according to the changes made to the charter of the joint-stock company, all transactions concluded on behalf of CJSC «Centurion Alliance» for the amount of more than 5 million rubles will be recognized as legal, only if there are both: the signature of the General Director and his First Deputy.

V. I. Smagin was not associated with the company «Blidensol» and with the project on the reconstruction of the hotel «Moscow», in connection with which the issue of granting this company the loan of 100 million US dollars was not related to his personal or commercial interests. For all that, the long-standing partnership with Ashot Yeghiazaryan and a wish to help him, made V. I. Smagin agree to transfer his 20% of the shares of CJSC «Centurion Alliance» to «Doralin» without suspecting that Ashot Yeghiazaryan abused his confidence and together with Artem Yeghiazaryan decided to implement the prefabricated plan for committing a crime, not intending to return him (V. I. Smagin) his shareholdings in the future.

On December 25, 2006 at the territory of Moscow Ashot Yeghiazaryan with the intention of giving some visibility to the fulfillment of his obligations towards V. I. Smagin ensured the adoption of the new version of the charter of CJSC «Centurion Alliance», where in Par. 9.9 there was established the limitation of the powers of the General Director, that is «... a transaction or several interrelated transactions concluded on behalf of the company by the General Director connected with the alienation, acquisition or possibility of alienation, purchase for more than 5 million rubles or for the equivalent in any other currency, can be considered legal and valid only if they are signed by both the General Director and the first deputy general director. In case of the absence of two signatures on the above-mentioned documents, they are considered invalid.

On December 26, 2006, being in the premises of the «Daev Plaza» business center and acting under the influence of deceit, V. I. Smagin signed the share purchase agreement dated 26.12. 2006, according to which he sold to the company "Doralin" 460 ordinary registered uncertificated shares, which is 20% of the total amount of the shares of CJSC «Centurion Alliance», at the nominal value of 4.6 million rubles, for which there wasn't any actual payment, on the same day in the register of shareholders of CJSC «Centurion Alliance» there were introduced the relevant changes.

In addition, V. I. Smagin at the above-mentioned time and at the indicated place, signed a share purchase and sale agreement dated December 26, 2006, according to which he bought from D. V. Garkusha, acting at the direction of Ashot Yeghiazaryan and being not aware of the criminal intentions of the latter, 2000 ordinary registered shares which makes up 20% of the total number of the shares of the company «Tufts», with the total value of 2000 US dollars, which in the ruble equivalent is equal to 52,705.6 rubles. (at the rate of the US dollar set by the Central Bank of Russia on December 26, 2006, 1 US dollar is 26.3528 rubles). In accordance with which, on 04.01. 2007, the relevant changes were made in the register of shareholders of the company «Tuft».

On December 26, 2006 Artem Yeghiazaryan, acting in the premises of the «Daev Plaza» business center, acting deliberately, in a group of persons on the preliminary conspiracy with Ashot Yeghiazaryan and in concert with him, signed on behalf of the company «Kalken» the shareholder agreement dated December 26, 2006 regarding the company «Tufts», containing the previously specified by Ashot Yeghiazaryan and V. I. Smagin conditions. Under these circumstances, this agreement was also signed by V. I. Smagin, who was under the influence of deceit, and D. V. Garkusha, who was not aware of the criminal intentions of the crime accomplices.

According to Par. 9.1.5 of the mentioned agreement, its validity period is set at one year from the date of signing. After that within one month the company «Kalken» is obliged to ensure the termination of the pledge of all shares of the company «Doralin» and CJSC «Centurion Alliance», as well as the shopping center «Europark». In case of non-fulfillment of these obligations, «Kalken» will ensure the transfer of, belonging to it, 73% of the «Tufts» shares to V. I. Smagin on the basis of transfer orders and other documents kept by the escrow agent who appointed the «Deutsche Bank» on the basis of the escrow agreement dated 26.12.2006. At the same time Ashot Yeghiazaryan and Artem Yeghiazaryan did not intend to fulfill the terms of the shareholders agreement misleading V. I. Smagin

Not later than February 5, 2007 Ashot Yeghiazaryan, creating the appearance of fulfilling his obligations towards V. I. Smagin, ensured the election of the latter to the position of the Chairman of the Board of Directors of CJSC «Centurion Alliance».

On December 27, 2006 in Moscow between the company «Blidensol» and «Deutsche Bank» there was signed the loan agreement in the amount of 100 million US dollars on the pledge of 100% of the shares of the company «Doralin», 100% of the shares of CJSC «Centurion Alliance» and the property complex «Europark».

On February 6, 2007 at the territory of Moscow, the General Director of CJSC «Centurion Alliance» M. A. Klochin, being an accomplice of Ashot Yeghiazaryan and Artem Yeghiazaryan, in order to create the appearance of fulfilling obligations towards V. I. Smagin, in execution of Par. 9.9 of the Charter of CJSC «Centurion Alliance», signed the Order No. 29-l dated 06.02.2007, according to which, V. I. Smagin's wife S. I. Smagina from the above-mentioned date was accepted for the position of the first deputy general director of CJSC «Centurion Alliance».

However, after signing the above-mentioned loan agreement, Ashot Yeghiazaryan and Artem Yeghiazaryan, acting deliberately, refused to transfer belonged to «Kalken» 73% of the «Tufts» shares, owned by the company «Doralin» to «Deutsche Bank», which violated the terms of the shareholders agreement and escrow agreement dated 26.12.2006, as well as the existing agreements and commitments towards V. I. Smagin

During 2007 and until March 2008 V. I. Smagin in the course of repeated meetings with Ashot Yeghiazaryan and Artem Yeghiazaryan, held in the territory of Moscow, requested the latter to fulfill the obligations assumed in the shareholders agreement and the escrow agreement dated 26.12.2006. However, these efforts led V. I. Smagin to nothing.

In March 2008, in the premises of the «Daev Plaza» business center, Ashot Yeghiazaryan deliberately acting as a part of the group of persons on the preliminary conspiracy with Artem Yeghiazaryan, with the aim of giving the appearance of legitimacy of his actions and fulfillment of his obligations towards V. I. Smagin, signed with the latter an agreement in which it is stated that Ashot Yeghiazaryan controls the company «Kalken», which is a shareholder of the company «Tufts» with the 73% of the share amount in the authorized capital, which in turn through the company «Doralin», CJSC «Centurion Alliance», owns the property complex «Europark». In accordance with Art. 2 of this agreement, Ashot Yeghiazaryan and the shareholders controlled by him have to sign and transfer to «Deutsche Bank» the transfer orders on all shares of the company «Tufts» owned and controlled by him (Ashot Yeghiazaryan); Ashot Yeghiazaryan is obliged to make changes to the Charter of the controlled companies «Blidensol», «Doralin» and «Tufts», according to which all documents on behalf of these companies are considered to be properly issued and valid only after they have been signed by two authorized persons - Artem Yeghiazaryan and V. I. Smagin, as well as to transfer the latter 50% of shares of «Blidensol» at their nominal value. Art. 4 and 5 of the agreement established the distribution of the income from the activities of CJSC «Centurion

5

Alliance» on the use of the property complex «Europark» between V. I. Smagin and Egiazaryan Ashot in the proportion of 50% to 50%.

Actually, Ashot Yeghiazaryan did not intend to fulfill the obligations enshrined in the above-mentioned agreement. Among the conditions enumerated above, only one was later fulfilled: V. I. Smagin became the director of the company «Tufts» since 18.08.2008, however on 25.11. 2009 by the decision of the director of the company "Kalken", acting at the direction of Ashot Yeghiazaryan, V. I. Smagin was dismissed from the position of the director of the company «Tufts» and accordingly he lost his control over the adoption of decisions in the company «Doralin». The Cyprus service company «MPH Law Ltd.» was appointed as the new director of «Tufts» on November 25, 2009 under the direction of Ashot Egiazaryan and Artem Yeghiazaryan acting in their interests.

Realizing the joint plan of committing the crime, in November 2007 at the territory of Moscow, Ashot Yeghiazaryan and Artem Yeghiazaryan, acting by a group of persons on the preliminary conspiracy for mercenary motives, ensured the formation of a number of unfulfilled loan obligations of CJSC «Centurion Alliance» in order to create the conditions for deliberate bankruptcy of this company and the onset of a technical default on the loan of «Blidensol».

Thus, V. G. Gogokhiya, acting as an accomplice in the commission of the crime by Ashot Yeghiazaryan and Artem Yeghiazaryan, on 31.12.2007 in Moscow on behalf of the company «HACKHAM INVEST & TRADE INC.» (hereinafter to be referred to as «Hackham») signed with CJSC «Decorum» in the person of first deputy general director E. V. Pavlyuchenko the contract No. 1, according to which it is stated that CJSC «Decorum» has the obligations to return the loan to the company «Hackham» in the amount of 134 849 918, 09 US dollars.

In addition, on the same day V. G. Gogokhiya on behalf of the company «Hackham» and M. A. Klochin on behalf of CJSC «Centurion Alliance», acting in the commission of the crime as accomplices of Ashot Yeghiazaryan and Artem Yeghiazaryan, signed the guarantee agreement No. 2/07 dated 31.12.2007 in Moscow, according to which «Centurion Alliance», being a guarantor, is responsible before the creditor - the company «Hackham» for its proper execution  by the debtor - CJSC «Decorum» under the above-mentioned contract No. 1 dated 31.12.2007.

At the same time M. A. Klochin, acting in the commission of the crime as an accomplice of Ashot Yeghiazaryan and Artem Yeghiazaryan and being in their actual submission to the position of the General Director of CJSC «Centurion Alliance», in violation of Par. 9.9 of the Charter of CJSC «Centurion Alliance», without the consent of first deputy general director S. I. Smagina, obligated by the above-mentioned guarantee agreement in case of default by CJSC «Decorum» of the obligations for the return of the funds in the amount of  134 849 918,09 US dollars, to pay the company «Hackham» the unreturned amount of the loan. In case of default of CJSC «Centurion Alliance», the company «Hackham» would receive the right to demand from CJSC «Centurion Alliance» the transfer of the building of the shopping center «Europark», as well as the right to lease the land plot valued at 2 636 320 806 rubles, which contradicts the loan agreement concluded between «Deutsche Bank» and «Blidensol», under which the shares of CJSC «Centurion Alliance» and the property complex «Europark» before the repayment of the loan of the company «Blidensol» are in pledge of «Deutsche Bank».

Further, in an unidentified place, V. G. Gogokhiya, acting as an accomplice of Ashot Yeghiazaryan and Artem Yeghiazaryan in committing a crime and being in their actual submission, following their instructions, on the basis of the assignment agreements No. 1 dated 01.09.2008 and No. 1/1 dated 03.09.2008 secured the transfer of the right of the claim on the above-mentioned indebtedness of CJSC «Decorum» (with CJSC «Centurion Alliance» as a guarantor) from the company «Hackham» to the company «DECORUM CORP. LIMITED» (hereinafter referred to as «Decorum Corp. Limited») and then to «LONGLAKE HOLDINGS LIMITED»

6

(hereinafter referred to as «Longlake Holding Limited») respectively. Besides, the deadline for repayment of the debt was reduced to 01.02.2009 and there was included the clause on the consideration of the disputes on the return of the debt in the arbitration court.

Until February 01, 2009 Ashot Yeiazaryan and Artem Yeghiazaryan, acting intentionally, did not take any measures to repay the debt of the companies CJSC «Decorum» and CJSC «Centurion Alliance» which were under their control to the company «Longlake Holding Limited». At the same time M. A. Klochin and Gogokhiya V. G., acting as accomplices of Ashot Yeghiazaryan and Artem Yeghiazaryan, informed the creditors in the writing form about the lack of money and about the impossibility of fulfilling their obligations to return the money.

In this regard, the company «Longlake Holding Limited» on April 30, 2009 filed a lawsuit to the permanent arbitration court attached to the non-profit partnership «Russian Gas Society», which on August 5, 2009 made a decision to collect from CJSC "Decorum" and CJSC "Centurion Alliance" jointly the total amount of debts, which at that time was 4 689 670 622, 74 rubles, and security measures were taken in the form of prohibition for CJSC "Centurion Alliance" to alienate the multifunctional shopping center "Europark" before the execution of this decision.

Thus, Ashot Yeghiazaryan and Artem Yeghiazaryan with the complicity of M. A. Klochin and V. G. Gogokhiya created the conditions for the recognition of CJSC «Centurion Alliance» bankrupt in order to ensure the onset of a technical default on the loan of «Blidensol».

In addition, on December 3, 2008 in Moscow, the exact location is not established, M. A. Klochin on behalf of CJSC «Centurion Alliance» and V. G. Gogokhiya on behalf of the company «Blidensol» acting in the crime as accomplices of Ashot Yeghiazaryan and Artem Yeghiazaryan, and at their direction, in order to create the conditions for the recognition of CJSC «Centurion Alliance» bankrupt, signed the supplementary agreement No.1 to the contract No.1 dated 08.12.2006, establishing the amount of liabilities for the return of the money by CJSC «Centurion Alliance» to the company «Blidensol». The specified additional agreement increased the interest rate from 1% to 12.5% per year for the debt amount of 1082 963 530 rubles. Moreover, M. A. Klochin in violation of Par. 9.9 of the Charter of CJSC «Centurion Alliance» signed the above-mentioned additional agreement without the consent of first deputy general director S. I. Smagina

On December 4, 2008 in Moscow M. A. Klochin on behalf of CJSC «Centurion Alliance» and Gogokhia B. G. on behalf of the company «Blidensol», acting in the crime as accomplices of Ashot Yeghiazaryan and Artem Yeghiazaryan and at their direction, signed the additional agreement No.2 to the contract No.1 dated 08.12.2006, according to which they changed the obligation currency on the repay of the above-mentioned debt from rubles to USA dollars in the equivalent amount. In addition, on December 30, 2008, in Moscow, M. A. Klochin and V. B. Gogokhiya V. B. signed the additional agreement No. 3 to the contract No. 1 dated 08.12.2006, according to which, since January 1, 2009, the interest rate has been raised up to 22.5% per year. At the same time, in violation of Par. 9.9 of the Charter of the CJSC «Centurion Alliance» this agreement was signed by M. A. Klochin without the consent of first deputy general director S. I. Smagina.

Thus, Ashot Yeghiazaryan and Artem Yeghiazaryan with the complicity of M. A. Klochin and V. G. Gogokhiya artificially increased the accounts payable of CJSC «Centurion Alliance» in order to create the grounds for its bankruptcy.

In addition, V. G. Gogokhiya, acting as an accomplice of Ashot Yeghiazaryan and Artem Yeghiazaryan being the General Director of CJSC «Progress Line» (Moscow), the sole shareholder of «Daev Plaza» controlled by Ashot Yeghiazaryan (Moscow), on 14.11.2007 appointed D. A. Fitisov. to the position of the General Director of LLC «Daev Plaza».

7

On December 25, 2008 M. A. Klochin, acting as an accomplice of Ashot Yeghiazaryan and Artem Yeghiazaryan, in violation of Par. 9.9 of the Carter of CJSC «Centurion Alliance», individually, without the consent of first deputy general director S. I. Smagina concluded on behalf of CJSC «Centurion Alliance» the contract of novation No. 12/08 with LLC «Daev Plaza», on behalf of which General Director D. A. Fitisov. acted, not aware of the criminal intentions of the accomplices of the crime and was in their actual submission.

According to Par. 1.2. of the contract there were terminated the loan and promissory notes obligations by novation in the amount of 187 926 359,26 rubles arising from the previously concluded contracts, as well as the obligation of CJSC «Centurion Alliance» to pay LLC «Daev Plaza» the debt in the amount of 187 926 359,26 rubles until January 31, 2009. Taking advantage of the fact that the debt did not return within the established period of time, Ashot Yeghiazaryan and Artem Yeghiazaryan filed a lawsuit to the permanent arbitration court attached to the non-profit partnership «Russian Gas Society» on 29.04.2009 in Moscow on behalf of LLC «Daev Plaza» on recovery of the loan amount. Based on this claim, on 13.05.2009, the permanent arbitration court decided to recover 187 926 359,26 rubles from CJSC «Centurion Alliance» in favor of LLC «Daev Plaza».

Using artificially created conditions for the recognition of CJSC «Centurion Alliance» as insolvent (bankrupt), Ashot Yeghiazaryan and Artem Yeghiazaryan, on 25.05. 2009 in Moscow, filed an application on behalf of LLC «Daev Plaza», controlled by them, to the Moscow Arbitration Court on recognition of CJSC «Centurion Alliance» insolvent (bankrupt).

In the period from May 2009 to January 2010, Ashot Yeghiazaryan, acting as a part of a group of persons on the preliminary conspiracy with Artem Yeghiazaryan, during the repeated meetings with representatives of «Deutsche Bank» in Moscow persuaded the latter of the possibility of the bankruptcy of CJSC «Centurion Alliance» and as a result - a technical default on the loan issued by «Deutsche Bank» to «Blidensol». Acting in this way, Ashot Yeghiazaryan gained from «Deutsche Bank» the rights for the Cyprian company «SKENDLEBY INVESTMENTS LIMITED» (hereinafter referred to as «Skendleby»), on behalf of which he acted, to redeem the above-mentioned loan.

Due to the agreement reached with «Deutsche Bank» on the purchase of the above-mentioned loan and the right to dispose of the pledge on this loan, Ashot Yeghiazaryan, acting deliberately as a part of a group of persons on the preliminary conspiracy with Artem Yeghiazaryan, in the period December 2009-January 2010 directed to the Moscow Arbitration Court the application on behalf of LLC «Daev Plaza» on the rejection of the application of recognition of CJSC «Centurion Alliance» insolvent (bankrupt). Based on this application, on 21.01.2010 the Arbitration Court of Moscow ceased the proceedings on the case of the recognition of CJSC «Centurion Alliance» bankrupt.

Ashot Yeghiazaryan and Artem Yeghiazaryan, obviously not intending to fulfill the assumed obligations to preserve the property rights of V. I. Smagin to his 20% of shares in CJSC «Centurion Alliance» and, accordingly, the property complex «Europark», continuing to realize their criminal intention, on 18.01.2010 provided the sale at the nominal price to the Cyprus company «Mastero Investments Ltd.» (hereinafter referred to as «Mastero») of 50% of shares of «Doralin», which were owned by «Tufts» and were in the pledge of «Deutsche Bank». However, V. I. Smagin, as the owner of 20% of shares in «Tufts», was not informed of this transaction, he did not give his consent to its commitment and he didn't receive any property compensation for this.

On January 18, 2010 between «Skendleby» and «Deutsche Bank» there was concluded an agreement on redemption of the rights of the claim on the loan of «Blidensol» dated December 27, 2006. As the result of this transaction, «Skendleby» completely replaced «Deutsche Bank» in terms of

the loan and pledge of property. At the same time, the shares of «Doralin», «Centurion Alliance», and the property complex «Europark» remained pledged as the collateral of the loan repayment.

Completing the implementation of the criminal intention, Ashot Yeghiazaryan and Artem Yeghiazaryan on February 25, 2010 organized the conclusion of the agreement "On disposal of property and termination of obligations" between the companies «Skendleby», «Doralin» and «Blidensol», according to which the pledge is withdrawn from the shares of «Doralin» and CJSC «Centurion Alliance», the debts of «Blidensol» before «Skendleby» are canceled, and 100% of shares of CJSC «Centurion Alliance» are transferred from the property of «Doralin» into the property of «Skandleby».

On February 26, 2010 in Moscow Artem Yeghiazaryan and Ashot Yeghiazaryan, taking into account the above-mention agreement dated 25.02.2010, signed the pledge order to terminate the pledge of «Centurion Alliance» shares and instructions for carrying out the operations with the securities, on the basis of which 2300 ordinary registered shares of CJSC «Centurion Alliance», which is 100% of the stockholder capital, including 460 shares previously owned by V. I. Smagin, were transferred from the depositary account No. K40DORN10001 of «Doralin», opened in «Deutsche Bank» (82, Sadovnicheskay Street, Bl. 2, Moscow), to the depositary account No. K40004020008 of the company «Skendleby», opened at the same bank.

Thus, on February 26, 2010, 100% of shares of CJSC «Centurion Alliance» were transferred to the property of «Skendleby», thus Ashot Yeghiazaryan and Egiazaryan Artem obtained a possibility to dispose of 20% of «Centurion Alliance» shares, formerly owned by V. I. Smagin, at their own discretion without any consent and any property compensation to the latter, that caused significant property damage to him (Smagin).

As the result of the above-mentioned actions of the accomplices of the crime, 20% of shares of «Tufts», owned by V. I. Smagin, since 26.02.2010 completely depreciated due to the release of the property complex «Europark» from the assets of «Tufts» and «Doralin».

Thus, in the period from December 26, 2006 to February 26, 2010 Ashot Yeghiazaryan and Artem Yeghiazaryan with complicity of M. A. Klochin and V. G. Gogokhiya by fraud and abuse of confidence of V. I. Smagin, illegally, free of charge and deliberately acquired the right to own 460 uncertified shares (20% of the total amount of the shares) of CJSC «Centurion Alliance» at the market value of not less than 720 605 444 rubles, which is the amount of a particularly large size, causing significant property damage to V. I. Smagin.

Defendants Ashot G. Yeghiazaryan, Artem G. Yeghiazaryan, M. A. Klochin, V. G. Gogokhiya, through the defenders, their guilt in committing the crime did not recognize; the case was examined in the order of Art. 247, Par. 5 of the Code of Criminal Procedure of the Russian Federation in the absence of the defendants who are outside the territory of the Russian Federation have been declared internationally wanted, and at the territory of a foreign state they were not brought to justice.

The guilt of the defendants is confirmed by the evidence proved in the court:

Testimony of victim Smagin V. I in the hearings was that in 2001-2002 he owned 35% of the shares in «Centurion Alliance», that built the shopping center «Europark» (62, Rublevskoe Avenue, Moscow), which members Kaplun and Loktionov decided to withdraw from the investment project therefore he (Smagin) began to look for the new partners.

With the deputy of the State Duma of the Federal Assembly of the Russian Federation Ashot Yeghiazaryan he (Smagin) met in spring of 2002, he (Yeghiazaryan) introduced him (Smagin) to his confidant and his right hand – Dmitry Garcusha, explaining that in connection with the status of a deputy he (Yeghiazaryan) cannot sign documents, own

public assets, and therefore Garkusha will perform all businesses from his (Yeghiazaryan's) person.

All their joint agreements with Ashot Yeghiazaryan on the further participation in the project of the construction of the shopping center were fixed in the agreement dated 29.08.2003, according to which he (Smagin) subsequently had 22% of shares in the company reorganized into CJSC, but he (Smagin) had to receive dividends only from the first year of the shopping center activity, however, his (Smagin's) share did not participate in the return of the borrowed funds. The construction of the shopping center «Europark» began around mid-summer 2003, and was completed in mid-2005. Until July 2003, the project documentation and preparatory work were paid for by the loans from various foreign companies owned by Egiazaryan Ashot. Smagin invested about 700 thousand US dollars from his personal funds into laying the communication lines. There was received a loan in the «Savings Bank» in the amount of 42 million US dollars, which was repaid due to the attraction by Yeghiazaryan of 45 million US dollars under the loan agreement with the company «Hekhem», controlled by Ashot Yeghiazaryan. Yeghiazaryan also borrowed loans from offshore companies to complete the construction work.

The total cost of the construction of the shopping center «Europark» of CJSC «Centurion Alliance» is about 1.5 billion rubles.

By 2006, he (Smagin) owned 22% of shares in the authorized capital of CJSC «Centurion Alliance», buying 20% of the shares from «Tekhenergodon», and 2% from «Titul» controlled by Ashot Yeghiazaryan. The structures controlled by Yeghiazaryan – CJSC «Titul», Trade House «Unikomimpeks» LLC «Milea», LLC «Merkhav» - owned 73% of the shares in total. Later, Smagin transferred 2% of his share, Ashot - 5% to the management fund in order to optimize the operation and management of the shopping center. Accordingly, General Director of «Centurion Alliance» Garkusha owned 7% of the shares at that time, which he did not return after his dismissal.

In addition to the construction of the shopping center Ashot Yeghiazaryan participated in an expensive reconstruction project of the hotel «Moscow» and he needed borrowed funds. In autumn of 2006 at one of the meetings at the «Daev Plaza» Business Center to the address: 20, Daev Lane, Moscow, Ashot Yeghiazaryan offered him (Smagin) to sell his share in CJSC «Centurion Alliance» by installment for 17 million US dollars as he wanted to consolidate 100% of shareholdings for their pledge in «Deutsche Bank» for getting a loan for the reconstruction of the hotel «Moscow».

Approximately in November-December 2006, during the meeting with Ashot Yeghiazaryan and Garkusha, Ashot Yeghiazaryan informed that Dmitry Garkusha was the owner of the company «Blidensol» (Cyprus), which would be the recipient of the loan of 100 million US dollars from «Deutsche Bank», as the bank did not want the shares of CJSC «Centurion Alliance» at the time of their pledge to belong to the Russian legal entities or individuals. Ashot Yeghiazaryan said that the scheme would look like this: he (Smagin), like the rest of the shareholders, had to sell his shares to the Cyprian company «Doralin» at their nominal amount of value. This company was founded by the citizens of Cyprus and Garkusha possessed the general power of attorney for management. The company «Tufts» (British Virgin Islands) would acquire 100% of «Doralin's» shares, and in the company «Tufts» the shares would be distributed as it was in «Centurion Alliance», that is, 73% would belong to Ashot Yeghiazaryan G., 7% - to Dmitry Garkusha, and 20% - to him (Smagin).

Ashot Yeghiazaryan said that he would join the company «Tufts» with the company «Kalen» (Cyprus) controlled by him. The general power of attorney for the management of this company belonged to Artem Yeghiazaryan – the brother of Ashot Yeghiazaryan.

10

At the same time, Ashot Yeghiazaryan assured him (Smagin) that his property would not be threatened by anything, and after numerous negotiations and proposals from Ashot Yeghiazaryan, he (Smagin) expressed his prior consent but insisted on the obligatory drawing up all documents and agreements in the written form with the involvement of lawyers.

In 2006-2007, Smagin was provided with supporting documents that «Tufts» was a 100% shareholder of «Doralin», respectively, owning 20% of shares in «Tufts», he indirectly owned 20% of shares in the company «Doralin», and, as a consequence, 20% of shares of CJSC «Centurion Alliance» and the shopping center «Europark», as it was the only asset of the company.

He (Smagin) met Klochin in summer of 2005 in the presence of Ashot Egiazaryan and Ananiev. They said they were not happy with the work of D. Garkusha in all their joint projects, in particular, on the shopping center «Europark», the opening of which was unsuccessful, and in this connection it was decided to appoint Klochin as the new General Director of «Europark» instead of Garkusha; Klochin was present at the meeting.

Artem Yeghiazaryan was appointed as the deputy general director of CJSC «Centurion Alliance» Klochin on general issues, meanwhile he followed the directions of his elder brother Ashot Yeghiazaryan.

He (Smagin) met Gogokhiya through Ashot Yeghiazaryan, they saw each other at Ashot Yeghiazarian's or his wife's birthdays parties, at «Daev Plaza»; Gogokhiya was a close person in the family of Ashot.

After the long negotiations Ashot Yeghiazaryan promised to fulfill his claims that he (Smagin) passes his shares to «Doralin» only under the condition that he can control this property through his participation in the company «Tufts» for the period of not more than a year; that all the documents are signed simultaneously and that an agreement between the shareholders should be signed with the participation of «Deutsche Bank», which is the guarantor of its execution. Ashot said he understands his concern about the risk with his right to 20% of shares in the «Europark» project, but assured that his property is not threatened. Under any circumstances, 20% of the shares will remain to him (Smagin), because in the event of the default of «Blidensol», Ashot Yeghiazaryan will give him (Smagin) the right to sell 73% of the shares controlled by him, which official value exceeded the cost of the loan obligations. In addition, Yeghiazaryan assured him that in the company "Tufts" no single document will have any legal force without his (Smagin's) signature.

Ashot Yeghiazaryan explained that he needed 100 million US dollars for one year to quickly complete the construction of the shopping gallery in the hotel "Moscow" and to launch the first stage of the reconstruction project, and then he will complete the hotel itself using other money, which looked plausible, because the hotel project was already in a high degree of readiness, and he (Smagin) had no reason to doubt it.

Also, Ashot Yeghiazaryan proposed him through the introduction of changes to the Charter of CJS1C «Centurion Alliance» to control the activity of the company, which he had previously been deprived of and could not expect to distribute dividends in an equitable way, also he offered to appoint him as the Chairman of the company's Board of Directors, introducing the position of First Deputy of the General Director who will be appointed by the Board of Directors, that is, in fact it will be his (Smagin's) confidant. Also, Ashot agreed with his (Smagin's) proposal to limit the CEO's right to conclude transactions for more than 5 million rubles and to introduce obligatory second signature of the first deputy general director for approval of such transactions, which was subsequently done.

Being in friendly and business-partner relations with Ashot Yeghiazaryan, he (Smagin) was forced to agree to his proposal.

11

On December 26, 2006 they signed the shareholders' agreement and the escrow agreement with the participation of «Deutsche Bank», under which the latter was to act as a guarantor of the fulfillment of obligations by shareholders.

The provisions of the shareholders agreement dated 26.12.2006 were aimed at protecting his (Smagin's) share in case of default of the loan obligations in the amount of 100 million US dollars, it prescribed the procedure for the sale of 73% of shares of «Tufts» owned by «Kalken», the value of which covered the cost of the loan of 100 million US dollars, which was the guarantee and protection of his share.

Under the terms of the agreements concluded between the shareholders, in order to ensure the return of the loan granted by «Deutsche Bank» to «Blidensol», the bank had to be provided with all security documents for the application of the non-juridical collection on the shares of «Doralin», «Centurion Alliance», and «Europark». In particular, «Deutsche Bank» as an independent (escrow) agent had to acquire for custody all the share transfer of «Doralin» from «Tufts» and 73% of «Tufts» shares, formally owned by «Kalken», controlled by Ashot Yeghiazaryan.

The escrow agreement did not provide the transfer for custody of 20% of the shares owned by him (Smagin) into «Deutsche Bank», according to the latter, as well as the agreement of the shareholders of «Tufts», in case of a default, Ashot Yeghiazaryan had to provide 73% of shares of «Kalken», and Smagin had to put them up for sale. In addition, the victim's shares did not have to be transferred, since he was not a shareholder of the hotel «Moscow» and the recipient of the loan.

However, after signing all the documents and obtaining the loan, Ashot Yeghiazaryan refused to fulfill his promises.

A year passed during which he (Smagin) saw that the shopping gallery in the hotel "Moscow" was not started and Ashot could not explain where the money had gone,

Since in January of 2008 there expired the legal year of the agreements concluded between them, he (Smagin) repeatedly addressed to Ashot Yeghiazaryan with the requirement to fulfill the obligations and to demand from the controlled by him persons, including his brother Artem Yeghiazaryan, to fulfill their promises properly. In February of 2008, he (Smagin) wrote a letter to «Deutsche Bank» to the name of Herbert Smith, which prevented Egiazaryan Ashot from obtaining the new tranche loan in «Deutsche Bank» for the hotel «Moscow».

Due to the persistent actions, he (Smagin) succeeded in signing the agreement with Ashot Yeghiazaryan on 03.03.2008, prepared by Head of the Legal Department of the company «Centurion Hypermarkets» Arapova Irine. Ashot Yeghiazaryan personally signed his agreement promises, including the fulfillment of the conditions in the agreements of 2006 on the transfer of his 73% of shares of the company «Tufts» for the custody into «Deutsche Bank», and the new escrow agreement with «Deutsche Bank», because the old agreements conducted in 2006 and 2007 had not been executed due to the fault of Ashot Yeghiazaryan; he (Smagin) for his part opened, under the terms of the agreement, an account in «Deutsche Bank».

He (Smagin) had an impression that Ashot Yeghiazaryan intends to comply with the terms of the agreement, because after its signing, Artem Yegiaziryan began to interact with him (Smagin) - together they revoked the power of attorney from Garkusha, becoming two directors of «Tufts» and obtained the mutual power of attorney from «Doralin» on the management of the shopping center «Europark»; he (Smagin) obtained the right of the second signature on behalf of the company «Tufts» to dispose of the property (shares) of the company «Doralin», in the absence of which a document would be invalid. All that created at Smagin the impression that Ashot was conducting honest business with him.

In addition, Ashot Yeghiazaryan promised to instruct his structures and lawyers to issue 50% of shares at par of «Blidensol» to him, so that he would not

worry. As a result, they identified the amount that Ashot Yeghiazaryan was to choose in the form of dividends in the amount of 34.5 million US dollars, after which his (Smagin's) share in CJSC «Centurion Alliance» would increase up to 50%, and they would become the partners at 50 to 50, that suited him (Smagin).

Later it turned out that «Blidensol» did not return the loan to «Deutsche Bank». In the beginning of 2009 the bank decided to sell the loan, while Egiazaryan assured him (Smagin) that he was keeping the situation under his control and offered different options for counteraction to «Deutsche Bank». However, the loan was put on the market for sale, despite the absence of problems with its servicing, due to the fact that the 100 million US dollar loan before «Deutsche Bank» was serviced at the expense of the shopping center «Europark», so the scheme worked like that: the interest that «Blidensol» paid to the bank acted as the repayment of the debt from CJSC «Centurion Alliance», which was actually the pledger, and the guarantor, and the interest payer in three persons.

So, on December 8, 2006 between CJSC «Centurion Alliance» and the company «Blidensol» in «Daev Plaza» there was concluded the loan agreement (novation) worth about 1.5 billion rubles, but there wasn't credit money of «Deutsche Bank», there were accumulated loans of the previous periods. The company «Heckham» and other foreign creditors of CJSC «Centurion Alliance» sold the right of claim under the loan agreements of the company «Blidensol» for 1 US dollar. It was done in order to make CJSC «Centurion Alliance» repay the loan not to the company «Hekhem but the company «Blidensol», which was the recipient of the loan from «Deutsche Bank» and the obtained from "Centurion Alliance" money used to pay off the interest on this loan.

Also, granting a loan in December 2006, at the end of January 2007 «Deutsche Bank» sold 90% of this loan, assigning it as a derivative to the US fund, leaving the role of a loan agent and a representative on the loan.

In February 2009, «Deutsche Bank», as it had been previously stated in the agreement dated 26.12.2006, offered him (Smagin) to redeem the loan or to find a buyer for this loan and obtain the rights to the pledged property.

When examining the loan package, he (Smagin) found out that there was not the part of the supporting documentation (transfer orders) giving «Deutsche Bank» the right to impose a non-judicial collection on the shares of «Doralin» and CJSC «Centurion Alliance», which meant that ter of the loan rights would not be able to obtain the shares of «Doralin» in non-judicial procedure in case of non-repayment of the loan by the company «Blidensol».

The bank employees repeatedly expressed their demands to Ashot Yeghiazaryan and his lawyers to transfer the missing part of the security documentation; there was also offered to re-sign these transfer orders, which in accordance with the management rules of the company «Tufts» had to be signed by him (Smagin) and Artem Yeghiazaryan as its new directors. However, Artem refused to do this, referring to the absence of the approval of his elder brother Ashot Yeghiazaryan.

Ashot Yeghiazaryan himself promised to transfer the transfer orders to «Deutsche Bank» during the negotiations at «Deutsche Bank» and «Daev Plaza», but he did not do it either.

Subsequently he (Smagin) found out that the loan was acquired by the company «Skendleby», which is a 100% owner of CJSC «Centurion Alliance» and its asset – the shopping center «Europark». One of two offshore companies-founders «Skendleby» belongs to Ashot Yeghiazaryan, so he did not need any transfer orders. Ashot Yeghiazaryan repurchased his loan himself, without risking anything; he could write transfer orders at any time.

However, the absence of these security documents during buying out the loan meant for him (Smagin) impossibility to get «Doralin» shares in non-judicial procedure, which were 100% owned by «Tufts», as well as the shares of «Centurion Alliance», which were 100% owned by «Doralin».

According to his (Smagin's) request, the law firm «Baker and Mackenzie» prepared the transfer orders and sent him an e-mail on September 25, 2009 for further transfer to Ashot Yeghiazaryan, however, there was no reaction from the latter.

The nominal directors of «Doralin» were Cypriots from the secretarial company, who performed only nominal administrative functions. With the directors he (Smagin) did not communicate, Artem Yeghiazaryan interacted with them. Since the only shareholder of «Doralin» was «Tufts», which shareholders were he (Smagin), Artem Egiazaryan and the company «CIG INTERNATIONAL GROUP LIMITED» (until 2007 - Garkusha D. V.), he and Artem Yeghiazaryan did not need to report to the directors of the company «Doralin». Their work as the representatives of the company «Doralin» was not paid anyway. All decisions that were made on behalf of the company «Doralin» were valid only if they were signed by Smagin and Artem Yeghiazaryan acting on behalf Ashot Yeghiazaryan.

In addition, during spring - summer 2009 he (Smagin) paid his attention to the fact that General Director of «Centurion Alliance» Klochin, at the direction of the brothers Yeghiazaryan, carried out the actions directed against CJSC «Centurion Alliance»: accounts payable is inflated, shady dealings are concluded, payments for amounts above 5 million rubles without his (Smagin's) awareness of it are executed, there is pressure on the loyal to him (Smagin) staff.

After the termination of the partnership between Ashot Yeghiazaryan and Garkusha as a consequence of the conflict, it turned out that in the period from 2008 to 2009, using the opportunity to run the company CJSC «Centurion Alliance» and the company «Blidensol», Ashot Yeghiazaryan in order to prevent the sale of the shopping center «Europark», which  building and land were pledged, and also its liquidity as an asset was reduced, through CEO of «Centurion Alliance» Maxim Klochin and trustee of the company «Blidensol» Vitaly Gogokhiya, without his (Smagin's) consent, changed the currency of the previously signed above-mentioned loan from rubles to US dollars and retroactively increased the interest rate from 1% to 12%, and then - up to 22% per annum.

Thus, by the end of 2009, at the time when «Deutsche Bank» continued its attempts to sell the above-mentioned loan, the artificially increased off-balance-sheet accounts payable of CJSC «Centurion Alliance» to «Blidensol» already amounted to more than140 million US dollars.

The arbitration proceedings on his (Smagin's) lawsuit, as well as on the lawsuits of «Titul», LLC "Milea" and CJSC trade house «Unikomimpeks» to the company «Doralin» were initiated by Ashot Yeghiazaryan to influence «Deutsche Bank», which considered the possibility of assigning 100% of shares of CJSC «Centurion Alliance» to other persons, or in the future could announce default on the loan. The claims to the arbitration court were so-called the protective measure of Ashot from the possible actions of «Deutsche Bank». The court's decision was to illustrate that if «Deutsche Bank» decides to assign100% of shares of «Centurion Alliance» to others, the latter will face legal problems and receive nothing. In addition, the existence of any litigation over the subject of a pledge significantly reduces its cost in case of assignment of rights on it.

In addition, «Centurion Alliance» also had obligations under the loan agreement towards the company «Daev Plaza», controlled by Ashot Yeghiazaryan, by approximately 160-180 million US dollars, while having on its account 200 million US dollars. Consequently, there could not be any actual bankruptcy. But exactly this company in May 2009 filed a bankruptcy petition of CJSC «Centurion Alliance» to the Moscow Arbitration Court in order to "frighten" «Deutsche Bank» and everyone who was willing to redeem the loan.

14

Despite the fact that this claim was withdrawn in a few months and the proceedings on the case were discontinued, this fact influenced the decision of «Deutsche Bank» to assign the rights to the loan as quickly as possible to any person who wished to do that. However, as of May 2009, the shopping center «Europark» yielded a profit sufficient to pay off all available accounts payable.

Despite the fact that «Deutsche Bank» put up the loan for sale for 75 million US dollars, there was practically nothing to buy from the bank, since it was a "through ticket" to the war with Ashot Yeghiazaryan or replacement of «Deutsche Bank» for the period of 10 years due to the lack of any opportunity to sell shares to repay the loan.

The measures taken by Yeghiazaryan to counteract «Deutsche Bank» reached their goal, and in autumn of 2009 the bank agreed to sell the loan for 55 million US dollars to the «Tashir» group of companies, which he (Smagin) found out in January 2010 from the newspaper «Vedomosti».

Thus, in his (Smagin's) opinion, for making such a decision «Deutsche Bank» was influenced by the factors connected with the «Daev Plaza» claim for the recognition of «Centurion Alliance» bankrupt, absence of transfer orders, increased accounts payable, arbitration awards, namely by the Permanent Court of Arbitration under the non-profit partnership "Russian Gas Society" on the return of the shares of CJSC «Centurion Alliance» to the former owners of four companies – «Milea», «Merkhav», «Titul», «Unicomimpex», which were transferred to «Doralin» on 26.12.2006. This affected the decrease in the cost of the loan by 45 million US dollars.

While Egiazaryan was hiding out from him (Smagin) and not getting in touch, he met with head of the «Tashir» group of companies Samvel Karapetyan, who explained that he had heard about him (Smagin) as a shareholder of «Europark» towards the end of January 2010 when Ashot promised to settle all problems with him (Smagin).

Regarding the claim to the Moscow Arbitration Court against the company «Doralin», he explained that such actions were a protective measure in case of accepting by «Deutsche Bank» the decision to sell the loan, which had been granted to the company «Blidensol», to the third parties. Legally it led to the fact that due to the non-payment by the company «Doralin» for the shares sold to them, they had to come back to its ownership. Later, at one of the meetings with Ashot Yeghiazaryan, the latter announced that none of the sellers of the shares except Garkusha received the payment, and they had to file a lawsuit to the court. According to the decision of Ashot Yeghiazaryan, lawyer Karevik represented the interests of the plaintiff in this process, to whom he (Smagin) handed over the originals of the sale and purchase agreement of the shares and the additional agreement to it, concluded between him (Smagin) and the company «Doralin» for presenting in the court. After the court refused to satisfy the claim, because lawyer Karevik had chosen the wrong reason for the claim, he (Smagin) demanded to return the originals of the sale and purchase agreement and the additional agreement to it, Karevik refused as he had given them to Ashot Yeghiazaryan. In March 2010, Ashot Yeghiazaryan explained to him (Smagin) that he would not return either the agreement or the additional agreement.

In the absence of the original documents, he (Smagin) was deprived of further opportunities to protect his interests under the agreement of sale and purchase. According to his (Smagin's) opinion, in this case, the arbitration process was intentionally initiated by Ashot Yeghiazaryan to seize the original documents in order to prevent him (Smagin) from the return to him of 20% of the shares of CJSC «Centurion Alliance», the actual owner of which he was. Thus, he was deprived of the opportunity to return his shares in the arbitration procedure under the Russian jurisdiction.

15

Suspecting the theft of his property, he (Smagin) sent a request to the Republic of Cyprus on providing information concerning the shareholders and directors of the company «Doralin», to which in April 2010 he received a reply that the company «Doralin» is owned not by «Tufts», but two Cypriot companies – «Mastero» and «Famulatos» in the ratio of 50% to 50%. One of these companies is controlled by the «Tashir» group of companies, owned by Samvel Karapetyan, and the second - by Ashot Yeghiazaryan himself, that testified to the loss of his (Smagin's) control over the shopping center «Europark».

In addition, the report stated that there had been changed the directors of the company «Doralin», the new directors were the company «New Generation Services Ltd.» (British Virgin Islands) and Russian citizen Demina Elena, who is an employee of one of the structures of S. S. Karapetyan. The directors of the company «Tufts», who were authorized to give binding instructions or dispose of the shares of the company «Doralin», were only he (Smagin) and Artem Yeghiazaryan. Under the conditions established in the joint-stock documents of the company «Tufts» and the shareholder agreement, they both had to sign documents for the realization of significant bargains with the property of «Tufts», which indirectly owns «Europark». However, he did not sign anything. On 18.01.2010 no one informed him (Smagin) about the sale of 50% of the shares of the company «Doralin» for 5 000 euros to the company «Mastero» by «Tufts»; he did not give any consent on the disposal of his property either to Ashot Yeghiazaryan, Samvel Karapetyan, their representatives or firms.

Only Ashot Yeghiazaryan could give the instructions to the director of the company «Tufts» - the company «MPN Law» on the sale of 50% of the shares of the company «Doralin» for 5 000 euros to the company «Mastero», because as of January 18, 2010 he controlled the companies «Kalken» and «Tufts».

As far as he (Smagin) knew, there were two editions of the «Tufts» charter. The first charter was adopted at the company's registration in 2006, the second - in November 2009, which he (Smagin) got to know about only in mid-October 2010 from his foreign lawyers. At that, the director of «Tufts» was obliged to notify him (Smagin) as a shareholder of the company about changing the charter; on November 25, 2009 he (Smagin) was dismissed from the position of the General Director, nominees were appointed to his place. Upon that, he (Smagin) was intentionally not informed about that, so he did not take any action in due time to protect his rights.

At the same time Klochin issued an order to dismiss his wife Smagina, chief accountant Volkova and other employees.

The actions of Ashot Yeghiazaryan were originally aimed at the theft of his (Smagin's) shares, non-payment of dividends and his withdrawal from the shareholders of CJSC «Centurion Alliance» with the subsequent acquisition of the shopping center «Europark».

The confirmation of the above-mentioned circumstances is the decision to increase the authorized capital of CJSC "Centurion Alliance» by issuing additional shares to raise shareholding and as consequence the "dilution" of his (Smagin's) equity stake. As a result of these actions, 20% of his (Smagin's) shares depreciate, and his 460 shares may become 5%.

Thus, Ashot Yeghiazaryan, having misled him (Smagin) about his true intentions, persuaded him (Smagin) to register the shares of «Centurion Alliance» to the company «Doralin», which he subsequently appropriated and issued without his (Smagin) knowledge or consent in favor of his controlled company and another person, deceiving him, thereby committed the theft of his property, the total value of which amounted to more than half a billion rubles.

Also, he (Smagin) in order to defend his rights filed a lawsuit into the London International Arbitration court, which on 11.11.2014 decided to recover from the defendants – Ashot Yeghiazaryan and the company «Kalken» jointly for his (Smagin's) benefit of the money to compensate for the damage.

However, Ashot Yeghiazaryan did not make any payments, as he scattered all his assets into various jurisdictions. On the accounts which during the investigation have been arrested, there are no means. The shopping center «Europark» and «Daev Plaza» are registered to other persons. It is not possible to compensate for the damage in Russia, since Ashot does not own anything, currently resides in the US and claims that he does not own anything; the enforcement proceedings have been initiated against him.

In June 2015, the Royal Court of England considered an appeal of Ashot Yeghiazaryan on the decision of the London Arbitration International Court dated 12.11.2014. Ashot Yeghiazaryan was interrogated in a court session using videoconferencing, who recognized his possession of 4 Russian companies - «Milea», trading house «Unikomimpex», CJSC «Titul», and also «Blidensol», which received the loan of 100 million US dollars in «Deutsche Bank»; the company «Kalken» belongs to Artem Yeghiazaryan, and he doesn't relate to it; he also confirmed his ownership of the offshore companies «Blidensol», «Doralin» and others, registered for the persons entrusted to him Artem Yeghiazaryan, Vitaly Gogokhia and Dmitry Fitisov, and he is their ultimate beneficiary. Garkusha was his employee but not a trusted person. According to the agreement reached with him (Smagin), he (Ashot Yeghiazaryan) had to organize the financing of the construction of the multi-purpose shopping center «Europark» as a capital provider of the project, invested his money in it, and in December 2006, through the company «Blidensol», took it under the guise of a loan in the amount of 100 million US dollars, despite the fact that this amount was twice as much as his personal investment in the project; he also argued that in Russia as a deputy of the State Duma he could own property, and the law allowed it to him.

Witnesses **Yu. M. Okorokov**, **V. V. Korshunov** and **N. N. Kaplun** in the court hearings stated the circumstances of their participation in the initial stage of the design and construction of the multi-purpose shopping center «Europark», according to which V. I. Smagin took the most active part in the organization of the construction of the shopping center, which was also invested by Yu. M. Okorokov and V. V. Korshunov, then in 2002 – N. N. Kaplun and A.G. Loktionov, but the latter, in a short while, sold their shares to a buyer, in whose interests there acted D. V. Garkusha, having formalized the transaction for legal entities.

The evidence of witness **M. B. Ananiev** in the court was that he was acquainted with Ashot Yeghiazaryan since 1982, from the student's years. In 1996, Ashot invited him to a new project in «Unikombank», where he served as the deputy of the chairman of the bank board of directors, and their personal and business relations lasted until 2009. In late spring - early summer 2002 at one of the meetings Ashot Yeghiazaryan told about the idea of building a shopping center in Rublyovskoye Highway, later named «Europark», and also introduced him to Vitaly Smagin, who originally with his idea of building the shopping center «Europark» came to Ashot Yeghiazaryan, offered him to participate in the project, as he had financial and administrative resources. Yeghiazaryan promised to finance the construction of the "Europark". For his part, Ashot Yeghiazaryan offered him (Ananiev) the participation in the form of monetary investments in the construction of the center. Due to the fact that neither he (Ananiev) nor Ashot Yeghiazar who was already a deputy of the State Duma of the Federal Assembly of Russia, could not do business, Ananiev offered Garkusha's candidacy as the manager of this project and allocated him 20% of shares in the «Invest-Center", whose controlling share belonged to his (Ananiev's) wife and cousin. In August 2002, the shares in the authorized capital were purchased by LLC «Centurion Alliance» from the owners of the project Smagin, Loktionov and Kaplun.

In order not to pass the approval procedure in the antimonopoly authority, Garkusha offered to enter the «Europark» project not by the «Invest-Center» itself, a major securities trading company, but through its subsidiaries; in March 2003, LLC «Centurion Alliance» was transformed into CJSC; 73% of the shares of CJSC «Centurion Alliance» were purchased by a number of subsidiaries: CJSC «Trading House Unikomimpex» (20%), CJSC «Titul» (18%) and LLC «Merhav» (20%), the sole shareholder of these companies was CJSC «Invest Center». Another 20% was bought by the company controlled by him with Garkusha – LLC «Milea». CJSC «Unicomimpex» is formally a subsidiary company, whose CEO became Ananiev's longtime friend Roman Novikov. Igor Troshin, his relative, was appointed by him (Ananiev) as the director of LLC «Milea», which was not directly affiliated with the «Invest-Center».

Concerning the loan of «Deutsche Bank», he (Ananiev) gave Novikov and Troshin an order to sign documents on the sale of the shares at par value to «Doralin», explaining that everything was agreed with him (Ananiev), after which all documents were signed on 26.12.2006.

In the period from 2003 to 2006, initially 25% of the shares of CJSC «Centurion Alliance" belonged to Smagin, 2% of shares - Garkusha, as an individual, and 73% of the shares were owned by the «Invest-Center» through its subsidiaries, taking into account the shares of LLC «Milea». Later, Smagin transferred some part of the shares to Garkusha. The actual owners of CJSC «Centurion Alliance» from 2003 to 2006 were he, Smagin and Garkusha.

In addition to entering with his company «Invest-Center» the project «Europark», he (Ananiev) invested his personal money. He completely trusted Ashot Yeghiazaryan, they were almost relatives. In 2003-2004, he transferred Yeghiazaryan 18 million US dollars to finance the projects «Europark» and the hotel «Moscow» in exchange for the promise to officially register the shares in the projects for him in proportion to the financing after his (Ananiev's) withdrawal from the civil service.

In spring 2005, he resigned from his position in the RFFP and asked Yeghiazaryan to order the structure of the holding and issue his share in CJSC «Centurion Alliance», being the owner of the «Europark», and in other projects. However, Ashot Yeghiazaryan asked him to wait with this, as the project «Europark» was actually issued for him (Ananiev) through OJSC «Invest-Center», and Ashot only controlled the money. With the similar request, he appealed to Ashot Yeghiazaryan and in 2006, but he said that then he had problems with the financing of the hotel «Moscow». In late 2006 or early 2007 Ashot Yeghiazaryan told him that at the moment Centurion Alliance shares were pledged to «Deutsche Bank» under the loan of 100 million US dollars, which Ashot expected to send for the reconstruction of the hotel «Moscow». In this regard, the entry into the founders of CJSC «Centurion Alliance» and the project for the reconstruction of the hotel «Moscow» became difficult, but he promised that he would try to fix somehow his (Ananiev's) right to the share in these projects, and asked him to wait.

In 2007, after his long and persistent demands, Ashot Yeghiazaryan suggested that he become the director of LLC «Daev Plaza» and independently solve the issue of the registration of his share in the projects jointly with the lawyers of the company «White and Case». He agreed to this option and in summer 2007 he occupied the position of the director of LLC «Daev Plaza».

With the lawyers of «White and Case», he discussed various options for his joining the shareholders of the companies which owned «Europark» and the hotel «Moscow». He communicated with Maya Melnikas and other lawyers who explained to him that Ashot Egiazaryan's brother Artem owns 100% of the shares of «Kalken», in turn, this company owns 73% of the shares of «Tufts», and «Tufts» is a 100% shareholder of the company «Doralin», which owns 100% of the shares in CJSC «Centurion Alliance». That is, Artem Yeghiazaryan actually owned 73% of the authorized

18

capital of «Centurion Alliance», though Artem was only the nominee owner of these shares in favor of his brother Ashot Yeghiazaryan.

The lawyers prepared a number of draft contracts for the purchase of the shares of the companies that actually own the «Europark» and the hotel «Moscow», for funds previously transferred to them by Yeghiazaryan Ashot. They began to coordinate the drafts of these contracts, but they did not satisfy Ashot Yeghiazaryan, he gave different excuses for not signing the contracts, as a result, they had to be constantly rearranged.

As a result, in 2008 Artem Yeghiazaryan phoned him and said that they had finally issued his shares in the « Europark», registering 40 shares (4%) in the authorized capital of «Kalen», the cost of which is about 4.2 million US dollars. He (Ananiev) absolutely did not like it. Moreover, when he got to know from Ashot about signing by him the heads of agreement with Smagin on the increase of the share of the latter up to 50% due to receiving no dividends, there arose misunderstanding between them because such a decision had been made without his (Ananiev's) participation. He demanded from Ashot to issue his shares, and since the projects «Europark» and the hotel «Moscow» were obsessed with the obligations to the bank and it happened without his participation, to transfer him a part of the shares of companies that are involved in the implementation of other projects.

As a result, Ashot agreed to transfer him 50% of the shared of OJSC «Kremlin Site», 50% of the shares of OJSC «Kamenny Most» that owned the land plots allocated for the construction of the complex of buildings on Sofiyskaya Embankment, as well as additional 73% of the shares in «Daev Plaza». Ashot proposed to consolidate all arrangements in the heads of agreement, explaining that since the shares will be transferred by the foreign company «BrookMill», which is a shareholder of the above-mentioned companies, the agreement with him will be signed by the trustee of Ashot, Vitaly Gogokhia, who has the authority to act on behalf of these companies. Ashot in exchange asked to give him OJSC «Invest-Center» entirely to have an equivalent exchange. OJSC «Ivest-Center» at that time owned 70% of the shares of the bank «Republican», and also almost 80% of the shares in the project «Europark». He agreed, as he was interested in the project on Sofiyskaya Embankment. D. Garkusha was charged with drafting the agreement. The agreement was signed by him (Ananiev) and Gogokhiya in the presence of Garkusha.

After he fulfilled his part of the agreement, he began to wait for the fulfillment Ashot Yeghiazaryan's obligations. However, after that, Ashot Yeghiazaryan began to avoid meeting him, referring to his businesses. In «Europark» some strange things happened too, he repeatedly asked the other shareholders of «Europark» in particular Smagin and Garkusha for the explanations. However, they explained that they rarely met with Ashot Yeghiazaryan, at that time «Kalken» owned 73% of the company «Tufts», 20% belonged to Vitaly Smagin and 7% to Garkusha.

Subsequently, Ananiev learned from Smagin that the company «Doralin», formerly owned by «Tufts», which had been set up to obtain a loan from «Deutsche Bank», was withdrawn by Ashot from the control of «Tufts» and was registered for two Cypriot companies «Mastero» and «Famulatus», that was done without his (Smagin's) signature, illegally, since Smagin and Artem Yeghiazaryan were the directors with the right to sign in this company only together.

With Ashot Yeghiazaryan, he (Ananiev) had close personal and business relations, however, in 2008 Ashot began to avoid friendly communication, before parting in 2010 he changed a lot.

Artem Yeghiazaryan, Maxim Klochin and Vitaly Gogokhiya, he (Ananiev) was personally acquainted with, were under the influence of Ashot Yeghiazaryan and were dependent on him.

Klochin Maxim, being appointed to the position of the General Director of CJSC «Centurion Alliance», followed the directions of Ashot and Artem Yeghiazaryan, the latter also acted only at the direction of his brother Ashot, did not take any independent decisions,

did not deal with financing the projects. Vitaly Gogokhiya was also devoted to Ashot and completely dependent on him, Ashot could "use" him anywhere and write to him anything he wanted.

The evidence of witness **S. I. Smagina** in the court session was that on February 6, 2007, she was appointed as the first deputy general director of the company by the decision of the board of directors of CJSC «Centurion Alliance», her husband V. I. Smagin owned 20% of the authorized capital of CJSC «Centurion Alliance», the companies affiliated with Ashot Yeghiazaryan owned 73% of the shares and 7% were owned by D. V. Garkusha, 2% of which were transferred to him to the management of her husband, and 5% - by Ashot Yeghiazaryan.

At the end of 2006, she learned from her husband that his business partner Ashot Yeghiazaryan, whom he has known since 2003, offered to reregister his (Smagin's) shares to a legal entity of the foreign jurisdiction - the company «Doralin» in exchange for 20% of the shares of the company «Tufts», which was the sole shareholder of the company «Doralin» in order to pledge «Europark» and 100% of the shares of «Centurion Alliance» to receive the loan of 100 million US dollars at «Deutsche Bank» for the construction of the «Moscow» hotel complex.

They were afraid to lose their property, because after making this transaction, they would lose the real control over the activities of CJSC «Centurion Alliance» in the form of 20% of the shares of «Europark», which, according to her information, was valued at 150 million US dollars. Their share was about 30 million US dollars. Since Smagin did not want to participate in any credit relations, he suggested that Ashot Egiazaryan buy out the shares from him, but the latter offered a ridiculous price by installment, and that did not suit them. Then Ashot Yeghiazaryan offered Smarin to make some changes in the Charter of the company which will set the limitation of the powers of the General Director of the company on making transactions that exceed the amount of 5 million rubles and introduce the position of the first deputy general director who will monitor the financial and economic activities of the company and payments that exceed 5 million rubles which will be made only with the consent of the latter and if there is his/her signature on the payment orders and contracts. Smagin will be elected as the Chairman of the Board of Directors. The decision on appointing the first deputy general director has to be taken by the Board of Directors of the company. According to the agreement with Ashot Yeghiazaryan, Smagin should recommend the person for the position of the first deputy director general.

Smagin agreed with these proposals only after his long consideration, taking into account the position and status of Ashot Yeghiazaryan and trust between them.

Approximately in 2006-2007 she personally met with Ashot Yeghiazaryan, who was a deputy of the State Duma of the Federal Assembly of the Russian Federation and his wife N. N. Tsagolovoy N, N., with whom they had friendly relations, and also the joint business organized by Tsagolova in late 2007, successfully existed in the SC «Europark» for several years. Tsagolova did not have any position, but she actively participated in the activities of the «Europark» in the absence of Klochin.

In December 2006, the loan agreement was concluded, as well as all contracts related to the security of the credit repayment. Smagin transferred his shares to the company «Doralin», and in return he received the shares of the company «Tufts». Ashot Yeghiazaryan had to transfer to «Deutsche Bank», as an escrow agent, 73% of the shares in «Tufts», the shareholder of which was the company «Kalken», nominally run by Artem Yeghiazaryan. The shareholders of the company fixed these agreements on 26.12.2006 by signing the shareholders agreement. The recipient of the loan had to be the company owned by Garkusha «Blendensol», which had been created for this transaction, and in 2008 her representative was Vitaly Gogokhiya.

In the course of her duties she (Smagina) met with the General Director of the society M. A. Klochin and his deputy Artem Yeghiazaryan, who was the trusted person of his brother Ashot Yeghiazaryan and the nominal owner of 73% of the shares in CJSC «Centurion Alliance». Initially, she conducted business relations with Klochin, he coordinated the activities of the company with Smagin, and transactions and payments exceeding 5 million rubles with her (Smagina). Smagin continued to actively engage in the activities of the Society, held meetings, solved current issues, he was constantly approached by the staff. This caused Artem Yeghiazaryan's strong irritation. As Artem Yeghiazaryan reported everything that was happening in the society to Ashot and acted only at his orders, he and Artem, and subsequently Klochin, disagreed on the issues of financial and economic activities of the society.

From the chief accountant of CLSC «Centurion Alliance» Volkova she became aware of the facts of payments over 5 million rubles without any coordination with her and Smagin. Volkova refused to make such payments, without the presence of two signatures, as stipulated in «the company's Charter, but Klochin argued that all these payments are carried out at the direction of Ashot Yeghiazaryan, and if she (Volkova) does not sign them, then she will have problems. At that time in «Centurion Alliance», everyone knew that the real owners of the company were Smagin and Ashot Yeghiazaryan. Taking into account that there were friendly relations between them, no one doubted that decisions were taken together. Since spring-summer 2009, Klochin ceased to answer her questions, invited to meetings; Klochin and Artem Yeghiazaryan began to conflict with Volkova.

During the meeting she explained the situation to the employees and informed them that the actual owners of the company are Ashot Yeghiazaryan and Smagin, between whom there are certain agreements assigned in the company's Charter and other documents, she asked them to fulfill their duties with good faith and comply with the provisions of the Charter. Klochin was absent at the meeting, but later she got to known that he had gathered the employees of CJSC «Centurion Alliance» and held another meeting she had not been invited for, and said that if anybody would carry out Smagina's instructions, he/she would be dismissed. At the same meeting, he announced that Ashot Yeghiazaryan is the sole owner of the company. Since Artem Yeghiazaryan and he are the trustees of Ashot Yeghiazaryan, everyone had to follow only their instructions. On 02.12.2009 Klochin signed an order on her (Smagina's) dismissal: In December, the new edition of the Charter of «Centurion Alliance» was adopted and registered, in which there were already no provisions on limiting the powers of the General Director, as well as the provisions for the first deputy general director and the Board of Directors.

In early 2009, concurrently with this situation, there began to arise the problems related to the repayment of the loan to «Deutsche Bank». The latter offered Smagin as the person who possessed the primary right to transfer the rights of the claim on the loan, to acquire rights under the loan agreement.

In the first half of the year Smagin participated in several negotiations with «Deutsche Bank» and he, as the potential acquirer, was provided with all the documents including all supporting documentation and correspondence with the debtor on the loan – the company «Blidensol». But as a result of the analysis of these documents conducted by Smagin and «Baker and McKenzie» lawyers, it became known about the absence of a part of the supporting documents – the signed transfer orders from the company «Tufts» on the assignment of the shares of the company «Doralin» in favor of a third party - the purchaser of the shares who gives the right to «Deutsche Bank» to impose a non-judicial collection on the shares of the company «Doralin».

Their availability was stipulated by the provision of the loan agreement. It meant that the acquirer of the rights under the loan would not be able to get the «Doralin» shares without legal proceedings in case of the debtor defaulting on the loan.

Smagin, along with the lawyers, came to the conclusion that Ashot Yeghiazaryan, as a person controlling the company «Tufts», «Doralin» and CJSC «Centurion Alliance», in case of announcement to «Deutsche Bank», or other creditor, of default on the loan, may delay the process of foreclosure on the shares of «Doralin», simultaneously initiating the procedure of bankruptcy of «Centurion Alliance» CJSC, which was later done by Ashot Yeghiazaryan in May 2009.

On December 8, 2006, between CJSC «Centurion Alliance» and «Blidensol» there was signed the loan agreement in the amount of about 1.5 billion rubles. In 2008-2009 using the opportunity to run the company «Centurion Alliance» and «Blidensol», Ashot Yegiazaryan through his "subordinates" Director of CJSC «Centurion Alliance» Klochin and Director of «Blidensol» Gogokhia, without any consent of V. I. Smagin changed the currency of the loan from rubles to dollars and the interest rate from 1% to 12%, and then to 20% annually, artificially increasing the accounts payable of CJSC «Centurion Alliance» to the company «Blidensol».

In addition, CJSC «Centurion Alliance» was also liable for the loan to the company LLC «Daev Plaza» controlled by Ashot Yeghiazaryan. The fact that Ashot Yeghiazaryan actually controlled the activities of LLC «Daev Plaza», she knew from the words of Klochin, Tsagolova and Smagin. Namely «Daev Plaza» filed in May 2009 a petition basically about the bankruptcy fraud of CJSC «Centurion Alliance» into the Moscow Arbitration Court, which also influenced the decision of «Deutsche Bank», to assign the rights on the loan to another person presented by Ashot Yeghiazaryan himself as soon as possible.

On April 14, 2009 V. I. Smagin met with Ashot Yeghiazaryan, the latter said that if «Deutsche Bank» announced default on the loan of the company «Blendensol» or sold the rights on the loan without his (Ashot's) approval, he would be able to organize a counteraction in the form of bankruptcy of CJSC «Centurion Alliance», with subsequent sale of the property, exactly, of the shopping center «Europark».

The employees of «Deutsche Bank» repeatedly expressed to Ashot Yeghiazaryan their demand to give them previously agreed and signed transfer orders regarding the shares of the company «Doralin»; Ashot Yeghiazaryan promised to do it, but he did not fulfill the promise; Ashot Yeghiazaryan did not react to the transfer orders sent him by e-mail for re-signing, which had been prepared by law firm at Smagin's request.

Smagin at the time, along with Artem Yeghiazaryan was the director of the company «Tufts» and was ready to sign such orders, but Artem Yeghiazaryan refused to sign them, referring to the absence of his brother's (Ashot Yeghiazaryan's) approval.

Subsequently, Smagin got to know about the purchase of the 55 million US dollar loan by the company «Tashir» and Ashot Yeghiazaryan at a lower price.

The shares owned by Smagin in «Tufts» depreciated, as the company «Tufts» ceased to be the sole shareholder of «Doralin», which 100% owned «Centurion Alliance». It became clear that Ashot Yeghiazaryan deceived them and deprived them of their property.

Witness **L. M. Volkova,** who in 2007-2009 was the chief accountant of CJSC «Centurion Alliance», in the court session gave the evidence similar to the evidence of witness S. I. Smagina and victim V. I. Smagin about the circumstances of the financial and economic activities of the company in the specified period and about the management of the shopping center «Europark» with the direct participation of Smagin, who was, along with Ashot Yeghiazaryan, the actual owner of the shopping

center, moreover, the witness explained that Smagin, Klochin and she (Volkova) in a limited number of people periodically attended the meetings organized by Ashot Yeghiazaryan at «Daev Plaza» at the address: 20, Daev Lane, Moscow. In the course of her work, she found out that CJSC «Centurion Alliance» is the guarantor on the loan agreement concluded in 2006, according to which «Deutsche Bank» provided the loan of 100 million US dollars to «Blidensol» to finance the reconstruction of the hotel «Moscow», also the company concluded agreements on the pledge of real property with «Deutsche Bank» as security for the fulfillment of «Blidensol» obligations towards the bank under the loan agreement. Between «Centurion Alliance» and «Blidensol» on 26.12.2006 there was concluded the contract of novation under the terms of which CJSC «Centurion Alliance» had to pay interest on the performance of «Blidensol» obligations towards «Deutsche Bank» under the loan agreement. The company «Blidensol» was completely under the control of Ashot Yeghiazaryan. In accordance with these agreements, CJSC «Centurion Alliance» timely repaid the debt of «Blidensol» to Deutsche Bank. Her (Volkova's) duties included the accumulation of funds on the accounts of the CJSC necessary for the timely payment to «Deutsche Bank» of the interest amounts for the use of the loan by «Blidensol». The funds in the amount necessary to pay interest for the use of the loan were initially transferred by CJSC «Centurion Alliance» to the current account of the company «Blidensol», after which the company «Blidensol» had to transfer them to pay the debts to «Deutsche Bank». In spring 2009, at the website of the Arbitration Court, she saw that «Daev Plaza» had laid a claim to the debt repayment, but it was not the third-priority creditor. Klochin and Artem Yeghiazaryan told her not to pay attention, because they had enough money - the average income from the tenants was more than a million US dollars a month.

In the spring of the same year, her relations with Klochin and Artem Yeghiazaryan were at their very worst. That was due to the fact that she began to ask Klochin the questions regarding payments to the third parties, as the amounts on their service cost were evidently overstated, not coordinated with Smagina and without Smagin's awareness. Receiving no explanations from him on the situation, except that the claims to pay those invoices were directly received from Ashot Yeghiazaryan, she refused to sign and pay suspicious accounts on behalf of the CJSC.

As a result, she found out that Klochin had opened a new current account of the CJSC in the Kiev branch of the Savings Bank of the Russian Federation, granting the right of the second signature to the deputy general director for security K. M. Kireev but not to the chief accountant, and from the above-mentioned account, Klochin began to pay the company's accounts, which she refused to sign and execute in connection with their apparent unreasonableness. On 11.19.2009 K. M. Kireev handed her the order of M. A. Klochin about her dismissal from the position of the chief

accountant. In early December, she received by mail the order dated 03.12.2009 about her dismissal for her absence from work. She wrote an application to the prosecutor's office, and also appealed to the court with a lawsuit on reinstatement in work. By the court decision she was reinstated in her former position, but on April 27, 2010, when she came to work, she could not start fulfilling her duties, because she did not have any access to the documents of the company, as Klochin and Artem Yeghiazaryan had forbidden all employees in the office to communicate with her under the threat of dismissal, that is, there were created unbearable conditions for her to work.

Since autumn 2009, if Smagin gave any instructions at the meetings, afterwards Klochin or Artem Yeghiazaryan immediately, after Smagin's departure, abolished them. At the same time Klochin began to very often declare that Smagin in the company was "nobody". Since spring 2009 Ashot Egiazaryan's wife N. N. Tzagolova began to attend the meetings, whose authorities were not officially formalized, but she often made decisions, the fulfillment of which was ensured by Klochin. Since the start of December 2009 Klochin instructed Kireev not to let Smagin enter the office

23

part of the building. At the end of December, it became known from the media and employees that Ashot bought the loan from «Deutsche Bank», issued to the company «Blidensol», for which they attracted the new partner - the group of companies «Tashir». On 09.12.2009 the new version of the Charter of the CJSC was approved, which didn't provide any restrictions on the powers of the General Director and regulations concerning the position of the First Deputy General Director and the Board of Directors. Her (Volkova's) attention was also attracted by large accounts payable towards the company «Blindensol», which was issued by the Contract No. 1 dated 08.12.2006. The total amount of the debt was approximately one and a half billion rubles and was formed due to the earlier loan agreements with various companies controlled by Ashot Yeghiazaryan. Subsequently, this debt was transferred to the company «Blidensol». As it was explained by Artem Yeghiazaryan, that had been done for CJSC «Centurion Alliance» to have a reason to transfer the money to «Blidensol» to pay interest on the loan issued by «Deutsche Bank» for the construction of the hotel «Moscow». Initially, the agreement No. 1 provided for the payment of interest on the amount of debt at a rate of 1% annually. All the money that CJSC «Centurion Alliance» received from using «Europark» was sent to «Blidensol» to repay the interest on the loan. On 01.06.2008 the was concluded the additional agreement No. 1, which changed the interest rate under the Contract No. 1 from 1% to 12.5% annually, and there was established the schedule for repayment of the debt on the principal amount of the debt and interest accrued from 09.12.2006 under the Contract No. 1, in connection with which the debt of CJSC «Centurion Alliance» towards 24 creditors increased. Later at the Accounting Department there was established the additional agreement No. 1 dated 03.12.2008, which also provided for the possibility of changing the interest rate   under this Agreement; On 04.12.2008 the additional loan No. 2 to the Agreement No. 1 dated 08.12.2006 changed the currency of the issued loan from rubles to the US dollars. Klochin, signing the additional agreements with unfeasible conditions, was aware that he mustn't have done that. She explained Klochin that during the period of the US dollar jump and crisis, they would not be able to find the necessary amount to pay the loan, and the bank could take away the shopping center. She always objected to making payments on the above-mentioned contract at such interest rates, as she realized that it negatively affected the financial performance of the enterprise and reduced liquidity. These issues were not agreed with either her or the Smagins. The additional agreement to the contract on the change of the interest rate was prepared by E. M. Zapuskalova. at the direction of Artem Yeghiazaryan, the signed agreement was handed to her by Artem Yeghiazaryan, there were no explanations on the reasons for the change of the interest rate, except one - that was Ashot Yeghiazaryan's instruction. Subsequently, at the beginning of 2009, the interest rate under the Contract No. 1 was increased up to 22.5% annually. She got to know about that in 2010, when she was summoned to appear at the 30th Tax Office for the inspection, held in CJSC «Centurion Alliance». All additional agreements on behalf of the company «Blendensol», which was in reality controlled by Ashot Yeghiazaryan, were signed by its director Vitaly Gogokhiya. She (Volkova), including Artyom Yeghiazaryan, knew that Gogokhia was on the federal wanted list, but the documents with his signature were brought to her by Artem Yeghiazaryuy and Klochin. Also in 2008 she communicated with Gogokhia in Moscow on the phone in Klochin's office in the presence of Artem Yeghiazaryan, the latter dialed the number that she did not know, and she talked with Gogokhia, who confirmed that he had sent the documents and asked to pay them; they also discussed the activities of the company «Hekhem» over the phone.

The evidence of witness **Ya. I. Seleznev** in the court was that from March 2008 to July 2009 he worked for «Centurion Alliance» as the deputy director of the legal department, but actually headed it due to the vacant position of the director. By virtue of his office, he provided legal support for the issues relating to the relationship between shareholders, represented the interests of the CJSC in the courts of general jurisdiction and arbitration courts, and also dealt with other issues. His immediate superior was General Director M. A. Klochin, he also followed the instructions of deputy general director for general issues Artem Yeghiazaryan. According to his (Seleznev's) opinion, Klochin held the nominee position, took no decisions himself, but only executed Artyom's orders. He (Seleznev) knew by the nature of his activities that Ashot Yeghiazaryan actually owned 73% of the shares in «Centurion Alliance», while Ashot Yeghiazaryan was a member of the State Duma of the Russian Federation from the faction of the Liberal Democratic Party of Russia, he was forbidden to directly own shares of companies, therefore, the nominal holder of the shares and the trustee was his brother Artem Yeghiazaryan; 20% of the company's shares belonged to V. I. Smagin and 7% - to D. V. Garkusha.

From the corporate documents of CJSC «Centurion Alliance», «Doralin», «Tufts» (that owned «Doralin») and shareholders register, it was clear that the shareholder structure was arranged in such a way that Smagin personally owned 20% of the shares in the company «Tufts» registered at the British Virgin Islands, and 73% were registered for «Kalken». The sole and 100% shareholder of CJSC «Centurion Alliance» was the Cyprian company «Doralin». D. V. Garkusha was the agent under power of attorney on behalf of this company until September 2008. From 20.02.2009 the agents under power of attorney on behalf of «Doralin» were Smagin and Artem Yeghiazaryan who had all rights of the shareholders of the company to make decisions in accordance with the Charter of CJSC «Centurion Alliance». On 10.09.2008, there was taken the decision by the sole shareholder of the Company to appoint the Board of Directors and to elect Smagin as the Chairman of the Board of Directors, which was signed by Garkusha. From 20.02.2009 until 20.02.2010 all decisions on behalf of the company «Doralin» had to be executed only if there were two signatures of authorized persons Smagin and Artem Yeghiazaryan, they were also the directors of the company «Tufts», which owned the company «Doralin».

In November 2008 Artem Yeghiazaryan and Klochin included him (Seleznev) into the working group as its member for the preparation and appraisal of the market price of the shopping center «Europark»; the group also included chief accountant L. M. Volkova and financial director Elena Zapuskalova. This assessment was conducted in accordance with the requirements of the loan agreement concluded between «Deutsche Bank» and «Blidensol» as a borrower, guarantor and pledgor which CJSC «Centurion Alliance» acted upon. In accordance with the terms of the loan agreement, if the assessment of the center is less than 150 million US dollars, it would be the basis for declaring a technical default, the bank had the right to demand early repayment of the loan. Based on the assessment, the cost of the center was 234 million US dollars. The liabilities of «Blidensol» towards «Deutsche Bank» were fulfilled on time, twice a year – the interest was paid in March and September. The money received by CJSC «Centurion Alliance» from the use of the shopping center was sent to the account of the company «Blidensol» to repay the loan. Artem Yeghiazaryan instructed Volkova to transfer the money to the accounts of the company «Blidensol», which was affiliated to Ashot Yeghiazaryan, and its director was Vitaly Gogokhiya, who was at that time on the federal wanted list. He (Seleznev) found out the fact that Gorokhiya was being looked for at one of the meetings held by Artem Yeghiazaryan in early April 2009.

Smagin and Ashot Yeghiazaryan was extremely worried about the current economic situation in the country, the risk of declaring a technical default and issuing a loan for sale, as a result of which the pledged assets that acted as security for the obligations could be sold to the third parties; therefore, there were discussed some possible options for the early repayment of the loan with his (Seleznev's) participation.

Artem Yeghiazaryan did not take any independent decisions on these issues, redirected them to his brother Ashot, who was always on the hotline, any question was discussed with him.

As a measure to retain control over «Europark» in case of threat of technical default announcement, Ashot Yeghiazaryan was offered to apply to the arbitration court on behalf of the companies under his supervision with the bankruptcy petition of CJSC «Centurion Alliance», in the meanwhile, it was planned that bankruptcy would be controlled and, according to Artem would help to retain the control over the asset of the CJSC – the shopping center «Europark». In mid-June 2009 Klochin began to openly ignore Smagin and Smagina, explaining that they are "no one" and not related to the company. All payments intended for «Blidensol», Klochin began to sign himself, despite the limitations of his rights provided by the Charter of the company, namely, the documents on the payment of more than 5 million rubles, there was no signature of first deputy general director Smagina. Artem Yeghiazaryan also ceased to fulfill this condition. The chief accountant constantly wrote office memorandums addressed to Klochin about agreeing payments with Smagina, refusing to implement them. For his part, he (Seleznev) personally sent memorandums to general director Klochin, in which he drew attention to the absence of the second signature by Smagina in the lease contracts; some tenants also pointed at the same circumstance.

Subsequently, Volkova was removed from the duties of the chief accountant due to her refusal to carry out payments that did not meet the requirements of the Charter. Klochin and Artem Yeghiazaryan also stopped attending meetings organized by Smagins, where there were discussed current financial issues.

Witness **S. V. Kornienko** gave the evidence to the court similar to the evidence of witnesses L. M. Volkov and Ya. I. Seleznev, explaining that in «Centurion Alliance» he worked since 2006 and witnessed a share conflict between actual owners of the shopping center «Europark» Smagin and Ashot Yeghiazaryan, in which there also participated general director of the company Klochin and his deputy on general issues Artem Yeghiazaryan – Ashot's brother.

Witness **I. V. Arapova** gave evidence that since 2007 she worked as the Head of the Legal Department for CJSC «Centurion Park» and CJSC «Centurion Hypermarkets», the owner of which and one of the shareholders was Smagin. She is also personally acquainted with Artem Yeghiazaryan, Klochin and Gogokhiya, the latter brought documents to the office of CJSC «Titul», where in the period from 1999 to 2007 she (Arapova) worked as a lawyer, the company also provided legal services. The director of CJSC «Titun» was V. V.  Balakin, who appointed her in 2006 to deal with the legal review of the documents on getting a loan by «Blidensol» in «Deutsche Bank»; the international law firms «Salans» and «White and Case» were attracted for preparation of the above-mentioned documents.  Thus, she (Arapova) checked the loan agreement and security and pledge agreements for compliance with Russian legislation prepared by the company «Salans», as well as the agreements between the parties, which she knows about according to Balakin and Garkusha, who was the General Director of LLC «Daev Plaza» and one of the shareholders of CJSC «Centurion Alliance». These organizations were involved in the upcoming transaction – LLC «Daev Plaza» had to be a guarantor, and CJSC «Centurion Alliance» pledged to secure the loan of the shopping center «Europark» and the land

plot under it. She did not check the shareholders agreement and Escrow agreement, which were dealt with by the firm «White and Case», because she is not an expert in the field of international law.

Around 2008 Smagin informed her that he had an intention to fulfill the above-mentioned shareholders agreements and escrow agreement, presenting her with those documents, which she had not previously seen in the signed form. That was the agreement of the shareholders of the company «Tufts», concluded between three shareholders - Smagin, Garkusha, as well as the company «Kalken» legally represented by Artem Yeghiazaryan, the message of which was that Smagin did not lose the right to the shopping center «Europark», because in case of «Deutsche Bank» enforced collection of the shopping center, Smagin had to obtain control over the shares of the company «Tufts», owned by the company «Kalken».

The point of Smagin's complaints was that the shares of «Tufts», which belonged to the company «Kalken», had not been placed at the account of Escrow, so he could not receive them. Ashot Egiazaryan's brother Artem illegally represented the company «Kalken». Smagin also told her that he was negotiating with Ashot Yeghiazaryan on the implementation of the above-mentioned agreement.

In late 2008 and early 2009 at the direction of Smagin, she was preparing a draft of the agreement between Smagin and Ashot Yeghiazaryan dated 2008 without signatures of the parties. Smagin told her that Ashot Yeghiazaryan did not want to sign it. In negotiations between Ashot Yeguazaryan and Smagin on the agreement, she was not present.

In early 2009, Smagin began to gather the documents to buy from «Deutsche Bank» that loan. As in April 2009 she resigned from Smagin's companies, she is not aware of the further development of the events.

According to the evidence of witness **A. I. Timchenko** in the court, in 2002 he was recruited to «Centurion Alliance» for the position of the General Director and was primarily involved in the construction and management of the shopping center «Europark», in March 2003 he was transferred to the position of the Executive Director of CJSC «Centurion Hypermarket», and in his place there was appointed D. V. Garkusha, who was the actual head of the organization before Klochin's appointment. Being in the new position, he (Timchenko), on behalf of the shareholders of the company, continued to solve a lot of questions concerning the «Europark» from the moment of its design until the moment of its completion, as the employees of CJSC «Centurion Alliance» did not have sufficient experience in construction. He knew that «Europark» was built on the borrowed funds from the "Savings Bank". Later in the period from 2007 to 2015 he (Timchenko) worked as CEO of «Centurion Park», and then – of «Centurion Group».

He got acquainted with the defendants during the construction of the shopping center «Europark» in 2006, communicated with Klochin and Artem Yeghiazayarn, with whom he had business relations. There were meetings with Ashot Yeghiazaryan and Gogokhia at «Daev Plaza», but there were not close contacts.

According to his (Timchenko's) opinion, Ashot Yeghiazaryan and Vitaly Smagin were the two owners of the shopping center. Artem Eghiazaryan and Klochin stated as they were full partners and all decisions had to be coordinated with them.

The partnership relations between Ashot Yeghiazaryan and Vitaly Smagin were documented in the Agreement dated 2008 concerning the implementation of the project on the construction of the shopping center «Europark», which he (Timchenko) was aware of from Smagin and Arapova, the lawyer who prepared the agreement. She assisted Smagin in an attempt to redeem the loan of «Deutsche Bank», which was connected to Smagin's share in the «Europark» project. Moreover, in spring and summer 2008, Arapov was engaged in the preparation of the contracts between Smagin, Garkusha and Ashot Yeghiazaryan, concerning redistribution of the ownership interests in CJSC «Centurion Alliance». He (Timchenko) worked with Arapova in the same office

in «Daev Plaza», owned by Yeghiazaryan Ashot, so he was aware of what was happening. At the beginning of 2008, Arapova informed him (Timchenko) that Smagin asked her again about negotiating with Ashot Yeghiazaryan on dividing the profit from the activities of «Europark». She asked him (Timchenko) for permission to provide this assistance, since this work distracted her from performing her direct duties, which he did not object to. Arapova periodically shared the news with him about the course of negotiating, showed the drafts of the text of the agreement she had drawn up between Smagin and Yeghiazaryan, which she asked him to pass to Smagin. During rendering services to Smagin, Arapova consulted at the law firm «Herbert Smith», as there had been also concluded a contract between the company and Smagin on proving legal services. The agreement between Smagin and Ashot Yeghiazaryan was signed in spring 2008, which he was informed about by Arapova at that time. On the same day he met with Smagin and he gave him the agreement with Ashot Yeghiazaryan and asked to put this document in a safe box, the key of which only he (Timchenko) had.

Witness **K. V. Olefir** gave the evidence in the court that from late December 2006 until July 2012 he worked as the Head of the Legal Department across Russia and the CIS of «Deutsche Bank», located at: 82, Sadovnicheskaya Street, Bld. 2, Moscow, the company is a subsidiary of «Deutsche Bank AG» (Germany), which has a branch in the UK in London. In 2006, the London branch of «Deutsche Bank AG» issued a loan to the company «Blidensol», registered in Cyprus, for the construction and reconstruction of the hotel «Moscow». The guarantor for the loan was CJSC «Centurion Alliance», which granted the shopping center «Europark» to the collateral security. Initially, the loan was planned for 200 million US dollars, the amount could be selected in tranches. It was a standard bargain for financing on the pledge of a property unit; the fact that the borrower was a Cypriot company was also a common practice both in Russia and abroad. The main idea of using a special purpose company in Cyprus and the British Virgin Islands is to improve the quality of the loan, because such a company is engaged only in servicing a loan, the third partied could not lay their claims that could interfere with the repayment of the loan. Such companies are in the jurisdiction that has a higher credit rating. He (Olefir) did not take part in negotiating and concluding bargains on the loan, Victor Makshantsev was engaged in the project in Moscow on behalf of the London branch of «Deutsche Bank»; Timothy Stubs and Sergei Trankhtenberg, the lawyers of the firm "Salans", provided legal support; the lawyers of the company "White and Case" presented by Maya Melnikas acted on behalf of the borrower - the company «Blidensol».

In fact, «Blidensol» was given 100 million US dollars, but after the financial crisis in late 2008 - early 2009, «Deutsche Bank AG» and its London branch reconsidered their position towards the investments into the Russian real estate. It was decided, he does not know by who exactly, that it was necessary to get rid of the loan – to sell it or to transfer the rights for it to the third parties. That was due to the fact that property prices in Russia were falling rapidly. Such a tactic of selling high-risk loans, like this, is standard in international banking practice and for «Deutsche Bank» in this situation it was profitable to sell this loan, and not to hold it on its balance sheet.

In 2009, from employee of the Structured Products Department of the bank, Alexander Ponomarenko, he knew that «Deutsche Bank» was interested in cession of rights on the loan of the company «Blidensol» to anyone who could afford to buy such a loan. First of all, it was offered to Smagin, the negotiations were also held with other

structures. He heard about Yegiazaryan for the first time from Ponomarenko, Yeghiazaryan also wanted to redeem this loan. The bank's task was to sell the loan at the most favorable price. Ponomarenko worried that it would not be possible to sell the loan, and the financial condition of CJSC «Centurion Alliance» could worsen, he said that there was a risk of bankruptcy of the pledgor - CJSC «Centurion Alliance», but at the moment of selling the loan, there was no default. The difference in prices for which the loan was sold and redeemed was caused by the economic situation in the country. The group of companies «Tashir» was considered as one of the buyers of the loan, eventually the loan was bought out by the company «Skandleby». In November 2010 representative of «Skandleby» K. R. Gazarova phoned them and asked to provide her with the collateral for the loan, that is, the documents on all rights of the claim for the pledge of the shopping center «Europark». His assistant explained that she had to address all her questions to the London office of «Deutsche Bank AG». After that, there were not more calls from «Scandleby». On 31.03.2011 he received a letter from the London branch of «Deutsche Bank», in which it was reported that the decision to issue and sell the above-mentioned loan was made by the London branch of «Deutsche Bank» itself. The office of «Deutsche Bank» in Moscow did not have such funds and could not issue such a loan. The role of the employees of the Moscow branch of the bank was limited up to providing consulting service to the representatives of the London branch of the bank on some aspects of Russian law.

At the stage of issuing the loan, there were not found any violations. No comments or complaints about the package of documents (some of which were kept in London, some part - in Moscow and Cyprus) at the moment of issuing the loan were not given. At the stage of selling the loan, it was found out that the package of documents that was in the London branch lacked the transfer order for the shares of «Blidensol». In this regard, he sent an e-mail to the London office to lawyer Alex Scott Gull, who confirmed that this document had been on the list of the signed documents, but was lost while we sending to London. However, after a while the document was found in the London branch of the bank in the lawyer's desk, later attached to the case, but was not used, and there was not any third party access to it. The document was of a technical nature, it could not prevent the sale of the loan to the third parties and had a goal of making convenience for quick obtaining the control over the shares of the borrower, in Cyprus it could be replaced by a decision of the directors. During consultations with Cypriot lawyers, he found out that the directors of «Blidensol» had been obliged to issue the similar transfer order to the new creditor, if the Cypriot directors had not fulfilled their duties under the law, they would have been threatened with civil or criminal liability.

Witness **S. V. Trakhtenberg** stated that since August 2005 he has been working for CJSC «Salans», which provides legal services in various fields of activity, in 2013 the company was renamed. Since 2006 «Deutsche Bank» is a client of CJSC «Salans» on the basis of the contract on provision of legal services. In August-September 2006, at the request of Victor Makshantsev, who headed the Real Estate Department in the bank, there was formed a group of lawyers to work on the project for issuing a loan to «Blidensol», which he also entered. He (Trakhtenberg) and Timothy Stubbs were introduced into the course of this case by Victor Makshantsev - the main participant in the negotiations on the loan. According to him «Deutsche Bank» was ready to issue the loan to the company «Blendensol» in the amount of 100 million US dollars. The representative of the company «Blidensol» was D. V. Garkusha, he was assisted by Eugene Sudets. Makshantsev informed their working group on the general conditions (term, amount, interest rate, etc.), after which they drafted the loan agreement. K. V. Olefir took part in the final stage of the transaction on the loan of «Blidensol», who examined the documentation as an internal lawyer of the bank and participated in the discussion.

At the time of drafting the loan agreement, there was fixed the guarantee structure, according to which 100% of «Centurion Alliance» shares must be owned by the Cyprus company «Doralin», and 100% of the shares of «Doralin» must be owned by «Tufts», registered in the British Virgin Islands, and these shares should be pledged in favor of «Deutsche Bank» in securing the loan. After making some changes, together with the lawyers of «White and Case» and the borrower's party, a copy of the loan agreement, signed in early October 2006, was prepared; it provided the complete package of supporting documentation agreed with the parties that was transferred to the bank, otherwise it would not issue any loan. In the course of work on the loan agreement, he found out that at the end of 2006 «Centurion Alliance» was restructured, as a result of which «Doralin» became the sole and 100% shareholder of «Centurion Alliance». According to the established practice, «Deutsche Bank» demanded from the borrower to concentrate all shares of CJSC «Centurion Alliance» on one legal entity for the subsequent pledge in securing the loan. In addition, foreign banks, as a rule, demand the shareholders of Russian companies to be foreign companies, so that in case of default on a loan, the bank could impose a court-enforced collection of the shares of such foreign companies, including extrajudicial procedure. In the case of the company «Doralin», the collection would occur in accordance with the legislation of Cyprus. Perhaps that was the reason for the change of shareholders and the concentration of 100% of the shares of CJSC «Centurion Alliance» in the company «Doralin». His work on the project was completed at the end of 2006. According to «Deutsche Bank», the loan was issued either in late 2006 or early 2007. He is familiar with Gogokhiya and Artem Yeghiazaryan, who he met in 2007, when «Deutsche Bank» intended to issue a loan to the company «Falmiro». He is also familiar with Klochin, who he met in December 2006 in the process of working on the project related to the issuance of the loan. He signed some documents on behalf of CJSC «Centurion Alliance».

Witness **M. Melnikas** gave the evidence in the court that from 1993 to 2013 she worked in the Moscow office of the American law firm "White and Case". Approximately in 2004-2005, through D. V. Garkusha D.V. she met with deputy of the State Duma of the Federal Assembly of the Russian Federation Ashot Yeghiazaryan Ashot, who was related to the group of companies including «Centurion Alliance», «DekMos», American company «Decorum» and «Daev Plaza». She was aware of this from Garkusha, who coordinated important issues arising during the negotiations with Ashot, also during the implementation of the project for the reconstruction of the hotel «Moscow». She met Artem Yeghiazaryan approximately in the period of 2006 - 2008 at the office of «White and Case» (Moscow), Garkusha introduced him as Ashot Yeghiazaryan's brother. Artem also took part in the negotiations related to crediting the project on the hotel «Moscow» or «Europark». He occupied some place in the chain of ownership of the companies that were more or less controlled by Ashot («Doralin», «Centurion Alliance», «Blidensol», and others). In 2010 she communicated with him during signing the documents at the office of the company «White Case» for the purchase of the rights of demand on the loan towards the company «Blidensol» from «Deutsche Bank» by «Skandleby». M. A. Klochin in the process of negotiations on obtaining the loan, provided «Deutsche Bank» with the information on the economic activities of «Europark», owned by «Centurion Alliance». She met V. G. Gogokhiya in 2008-2009. She knows that he was the General Director of the company «DekMos». She saw him during signing various documents on the pledges that «DekMos» could give, and when the issue of obtaining the loan for the hotel «Moscow» was being discussed. Since she was present during signing the documents personally, she saw his signature. There was another loan for the shopping center «Europark». She could hardly realize why Gogokhia was supposed to sign something for «Europark» being a representative of «DekMos». She knows V. I. Smagin as one

of the minority shareholders of «Centurion Alliance». They were introduced by Garkusha in about 2006 in the course of negotiations on the possibility of getting a loan from «Deutsche Bank» for «Blidensol» on the pledge of 100% of the shares of «Doralin», «Centurion Alliance» and «Europark». Around mid-summer 2006, Garkusha told her that, acting act under the power of attorney as a representative of «Blidensol», he came to an agreement with «Deutsche Bank» to provide the company with the loan of 100 million US dollars and invited her to participate in their work as an external lawyer. The transactions of such financing are common and implemented according to the established scheme at the market. The lawyers of the bank develop the first version of all necessary documents. Subsequently, the borrower's lawyers either give some comments, by submitting the list of their remarks on these documents, or make adjustments and transfers them to the bank. She, as a lawyer representing the borrower's party, softened or improved the provisions of the draft contract, so that they could be feasible and acceptable. If necessary, the parties meet to agree on certain points and eliminate controversions. The lawyers can agree on purely legal disputes, but, as a rule, commercial issues are left for their clients' consideration. The company «Blidensol» was established at the territory of the British Virgin Islands on the order of Garkusha, as the Executive Director of the group of companies called «Daev Plaza». The purpose of establishing the company was to use it as a recipient of the loan funds. That is, this company was technical. Ashot Yeghiazaryan was one of the owners or supervisors of the «Daev Plaza» group of companies, but that was not reflected in any documents. In the course of work, it was clear that Garkusha was engaged in the implementation of projects of the «Daev Plaza» group of companies, and Ashot Yeghiazaryan – in the coordination of the necessary issues at the highest level. Until 2008 Ashot Yeghiazaryan took the most important commercial decisions on the activities of the companies that were a part of the holding company "Daev Plaza", and after Garkusha left the group, he took part in negotiations, including the sale of the loans to the company "Skandleby." The company "Blidensol" was determined as the recipient of the loan by Garkusha, since he ordered the creation of this company for this purpose. The money was used by «Blidensol» to issue a subsequent loan to a legal entity from the chain of CJSC «DekMos» in order to realize the construction of the hotel «Moscow». The main negotiators from the company «Blidensol» were Garkusha and Eugene Sudets - Financial Director of the group of companies «Daev Plaza». V. I. Smagin did not take part in the negotiations on obtaining this loan. Although Klochin was the General Director of CJSC «Centurion Alliance», the actual management of the company was carried out by V. I. Smagin. On the part of «Deutsche Bank», Viktor Makshantsev, along with lawyer of the Moscow representative office of the international company «Salans» Trakhtenberg his and English partner, took part in the negotiations. The loan terms presented by «Deutsche Bank» were the established practice. Ashot Yeghiazaryan was not officially related to the companies «Doralin», «Tufts», «Kalken», but in fact through Artem Yeghiazaryan he controlled and made key decisions on the activities of the company «Kalken», which, in its turn, was the owner of the controlling share in the company «Tufts», which owned 100% of the shares of the company «Doralin», which owned 100% of the shares of CJSC «Centurion Alliance». The essence of the loan agreement for the shopping center «Europark» was that the real estate is mortgaged by the mortgage loans and on this pledge and the pledge of other rights, which the company has. In this case, the companies that are directly connected to «Europark». For example, the pledge of the shares in the chain of ownership of the shopping center, the pledge of rights to receive a lease payment in the shopping center, but the main thing is the pledge of the real estate itself. Under these pledges, a loan is obtained from one or a group of banks. In the future, the loan for several years is paid out of the income of the shopping center. The issue of pledging 100%

of the shares of the company «Doralin», 100% of the shares of CJSC «Centurion Alliance» and the building of «Europark» as the loan repayment, Garkusha agreed with Ashot Yeghiazaryan and Smagin, as the latter was a minority beneficial owner of CJSC «Centurion Alliance». Since she (Melnikas) was engaged in drafting the shareholders agreement between Smagin, Garkusha and Kalken concerning «Tufts» dated December 26, 2006, she explained that on 26.12.2006 the company «Kalken» owned 73% of the shares of «Tufts». This agreement was concluded to secure the rights of the minority shareholders who owned the shares (Smagin - 20% and Garkusha - 7%) of the company «Tufts». From this agreement it follows that if «Deutsche Bank» directed a written request about the need for early repayment of the loan to one of the persons of this chain – «Kalken», «Tufts», «Doralin», «Blidensol», «Centurion Alliance», Smagin, Garkusha, or it itself, as an escrow agent, Smagin would obtain the right to receive the shares of the company «Tufts», owned by the company «Kalken». Garkusha was supposed to provide an independent appraisal of the cost of the shopping center «Europark» not later than two years from the date of its implementation. After that, V. I. Smagin had to try to sell either «Europark», or 100% of the shares of «Centurion Alliance», or 100% of the shares of «Doralin», or 100% of the shares of «Tufts» at the highest price, but the price could not be lower than the independent appraisal of the cost of «Europark», and ensure repayment of the loan towards «Deutsche Bank» from the sale amount. If 73% of the sale amount is higher than the amount necessary to repay the loan, Smagin must repay the loan to «Deutsche Bank» at the expense of the above-mentioned funds within 5 working days after the purchase and sale transaction, and the remaining amount from 73% of the raised funds transfer to «Kalken». If 73% of the rased funds from the sale is less than the cost of the loan, «Kalken» assumes an obligation to transfer to Smagin the missing amount to repay the loan to «Deutsche Bank». The conditions necessary for entering into the content of the agreement were disclosed to her by Garkusha, after which they jointly drafted the above-mentioned shareholder agreement. Par. 9.1.5 of this agreement states that if within one year the company «Kalken» does not redeem 100% of the shares of the company «Doralin», 100% of the shares of CJSC «Centurion Alliance» and the shopping center «Europark», Smagin will obtain the right to get 73% of the shares of the company «Tufts», owned by the company «Kalken». In this case, the shareholders agreement cannot terminate its validity until the fulfillment of this condition, that is, until the transfer of the shares to Smagin. According to her (Melnikas') opinion, she would have removed these conditions into Par. 2.3, and would not have indicated the expiry date of this agreement in one year. This paragraph is assumed to have been introduced by someone at the direction of Garkusha or other persons who were signers of the shareholders agreement. The escrow agreement dated December 26, 2006 between Smagin, Garkusha, «Kalken» and «Deutsche Bank» was aimed at securing the rights of minority shareholders, but more of Smagin's rights from the sudden disappearance of 73% of the shares of «Tufts», owned by «Kalken». The saddest thing for any shareholder is when the bank picks up the property pledged. All shareholders would lose their shares. Under the terms of this agrrement, the company «Kalken» had to transfer 73% of the shares of «Tufts» to «Deutsche Bank». The shareholders agreement provides for the cases when paying the bank accounts payable by Smagin, the latter would obtain the right to get the shares of the company «Tufts», owned by «Kalken». To prevent the shares of the company «Taft» from any incident, they had to be transferred by shareholders of the company «Kalken» for storage to «Deutsche Bank» by placing them on a depositary account. Also, under the terms of escrow agreement, the release of the shares of the company «Kalken» from the deposit in "Deutsche Bank" could be carried out only with Smagin's consent. The proposed mechanism of the pledge implementation was typical for

32

such transactions and its definitions were common in the established practice. The mechanisms of the pledge realization have some nuances only if in the course of their performance there applied the legal standards of the country where the pledged property is located. In accordance with the agreed standards it is considered that the pledged shares or property are located within the territory of that country where the legal entity is registered, whose shares are in pledge. Since «Tufts» pledged the shares of «Doralin», registered in Cyprus, in accordance with the Cyprus law, in case of default on the loan, the shares of «Doralin» would have to be sold by re-registering «Deutsche Bank» as a pledgee or to the final buyer, depending on what method the bank decides to use. At the suggestion of the lawyers of the company «Salans», in the pledge agreement there was established the mechanism which provides the extrajudicial collection in case of default on the loan. Around the autumn of 2009 she got to know from Ashot Yeghiazaryan about his agreement with Samvel Karapetyan on repurchasing the right of the claim on the loan in the amount of 100 million US dollars, granted to the company «Blidensol» under the loan agreement dated 06.10.2006, from «Deutsche Bank» for 55 million US dollars on a parity basis. Smagin's name did not appear in the sale of the loan to the company «Skandleby». Ashot Yeghiazaryan asked him to assist in the execution of this transaction. «Deutsche Bank» decided to list the loan for sale due to the fact that in late 2008 and early 2009, CJSC «Centurion Alliance» was under the threat or in the process of bankruptcy procedures. Thus, «Deutsche Bank» wanted to liquidate the assets that do not have prospects, which as it seemed to her (Melnikas) was «Europark». She acted for and on behalf of the «Daev Plaza» group of companies for the benefit of the company «Skandleby». Her work consisted of conducting negotiations on the transaction and preparing documentation in two areas: joint parity participation in the transaction of the repayment of the claim on the loan for the group of companies «Daev Plaza» and the group of companies «Tashir»; negotiation and execution of the necessary documents directly related to the repayment of the claim on the loan between «Skandleby» and «Deutsche Bank». Ashot Yeghiazaryan attracted Artem Yeghiazaryan, Fitisov and lawyers of CJSC «Titul». «Tashir» group of companies participated in these negotiations, the interests of which were represented by the groups of lawyers from a respected Russian law firm, whose names she does not remember. The final beneficiary of the company «Skandleby» was one of the companies that was included into the «Daev Plaza» group, but how it was called she does not remember. The company «Skandleby» was obliged to pay 55.5 million US dollars to «Deutsche Bank», after which it became the new creditor of «Blidensol». When «Skandleby» bought out the loan from «Deutsche Bank», it had to obtain the rights on the loan. «Skandleby» had a pledge of the shares in CJSC «Centurion Alliance», but she could not explain whether it gave the right to take these shares if the loan had not been paid, or «Scandleby» had to get through the procedure of the open sale concerning the pledged shares in order to get the maximum price for them. In honor of the loan repayment, there was organized a festive dinner where she met S. S. Karapetyan, the main beneficiary of the «Tashir» group of companies, where Ashot Eghiazaryan, the lawyers of «Deutsche Bank» and «Tashir» were present. In addition, she clarified that as a result of the change in the shareholding structure of «Centurion Alliance», on 26.12.2006 Smagin began to own the shares of CJSC «Centurion Alliance»» not directly, but through two offshore companies – «Doralin» and «Tufts». In this regard, economically, the scope of Smagin's property rights to his shares may not have changed, but the scope of Smagin's rights has legally changed, allowing him to exercise the rights of the shareholder to the extent that he could sell them under the direct ownership of 20% of the shares in CJSC «Centurion Alliance». Perhaps he could not demand to receive any documents relating to the activities of «Europark» from the management of the shopping center, or to dispute any transactions made by its CEO.

Witness **K. A. Kuzin**, the Director of the Real Estate Department of the law firm «Baker and McKenzie Service Limited», stated in the court that he met Smagin in 2006, providing legal support on one of the projects of CJSC «Centurion Hypermarket», where V. I. Smagin was a shareholder. Among the defendants he is familiar with the brothers Yeghiazaryans, Ashot and Artem. He communicated with Ashot in the process of representing Smagin's interests. Artem formally appeared as the director of the company «Tufts» and the representative of the company «Kalken». He knows about M. A. Klochin that he signed additional agreements on behalf of CJSC «Centurion Alliance» between «Blidensol» and «Centurion Alliance», and he knows about Gogokhia that he participated in the management of «Centurion Alliance». In February 2009, Smagin asked him to take part in the negotiation process regarding the potential cession of the rights on the loan from «Deutsche Bank», issued to «Blidensol» in the amount of 100 million US dollars. This loan was issued by the bank in 2006. A 100% of the shares in «Centurion Alliance» acted as the loan security for «Deutsche Bank». The main asset of the company was the shopping center «Europark». Before issuing the loan, «Deutsche Bank» set forth conditions for restructuring the shareholding structure of «Centurion Alliance», so that its 100% of the shares would be owned by the Cyprus company «Doralin». In turn, the company «Doralin» owned the company «Tufts». In «Tufts», the shares were distributed in the same way as the shares among the shareholders of «Centurion Alliance» in 2006, that is 73% were owned by final beneficial owner of the company «Kalken» Ashot Yeghiazaryan, 20% - by Smagin and 7% - by Garkusha. That was done at the request of «Deutsche Bank» for processing, according to the bank, sufficient loan documentation. In late 2006, in exchange for 20% of the shares in CJSC «Centurion Alliance», Smagin received 20% of the shares in «Taft». From the examined documents and Smagin's explanations, it followed that the latter had ceded his shares in «Centauri Alliance» to «Doralin» at the request of Ashot Yeghiazaryan at the end of 2006 on the condition that he (Smagin) would control the activities of «Centurion Alliance» being the chairman of the board of directors, but really own the same property through the company «Tufts», where he became a shareholder of 20% and subsequently - the director of this company with the right of mandatory signature. The issue of selling the shares and, at the same time, acquisition of the shares in the company of «Tufts» by Smagin, should be considered as several interdependent transactions, but not as separate transactions that are not related to each other. It concerns not only the sale of the shares of CJSC «Centurion Alliance» and acquisition of the shares in «Taft». In this chain, it is necessary to include the acquisition of 100% in the company «Doralin» by the company «Tufts». Thus, Smagin continued to have the same minority share of 20% in the group of companies «Centurion Alliance», which he had actually had in the company «Centurion Alliance». In 2006 there was concluded the agreement between Smagin, Garkusha and «Kalken» that in case of default of «Blidensol» on the loan, Smagin would have the right to sell 73% of the shares in «Tufts», owned by «Kalken». According to the concluded escrow agreement, with the participation of the same persons and «Deutsche Bank» as an escrow agent, «Kalken» was required to transfer its 73% of the shares of «Tufts» to the escrow account. In case of the loan default, Smagin had an opportunity to sell the above-mentioned 73% of the shares of the company in the fact that his economic interest in «Europark» would not be affected by the default. Thus, Smagin was insured against the risk of imposing a levy by «Deutsche Bank» on his property and on the property controlled by him in CJSC «Centurion Alliance», as according to the agreement with Ashot Yeghiazaryan, the loan was repaid to «Deutsche Bank», under such scheme, entirely from Ashot Yeghiazaryan's property. That was due to the fact that only Ashot Yeghiazaryan, according to Smagin, used the loan funds of «Deutsche Bank» for his business projects. Neither Smagin, nor «Doralin», nor CJSC «Centurion Alliance» was related to the usage of the «Deutsche

Bank» loan. According to his (Kuzin's) opinion, the agreements of 2006-2007 had an exceptional character. The agreement of 2008 was signed personally by Ashot Egiazapyan and Smagin, according to which Yeghiazaryan was obliged to transfer 50% of the shares of the company «Tufts», or, more precisely, to increase the share up to 50%. It was signed only after the loan was issued, because Yeghiazaryan did not fulfill the promises, which he had given Smagin in 2006, 2007, 2008. The agreement dated 2008 was taken into account by the London Arbitration Court only in respect of jurisdiction, but not with respect to the percentage of the shares. Under the court's decision, Smagin was awarded the cost of 20% of the shares in the company «Tufts». At the time, when Smagin appealed to it, there occurred the crisis of 2008 and «Deutsche Bank» began to reduce its participation in the Russian market, selling off loans that it had given to Russian companies. As early as in 2007 «Deutsche Bank» documented Smagin's priority right to receive a proposal for concession of the rights of the claim on the loan if the bank ever decides to concede them, and in early 2009 the bank turned to Smagin with such an offer by providing documents relating to the loan, including all security documentation and correspondence with the debtor on the loan - the company «Blidensol». Analyzing the submitted documents, the employees of «Baker and McKenzie» came to the conclusion that a part of the supporting documentation which gives "Deutsche Bank" the right to impose an extrajudicial collection on the shares of the company «Doralin», was absent. However, the existence of such documentation was provided in the provisions of the loan agreement; in particular, there were not any signed transfer orders from the company «Tufts» on the assignment of the shares of the company «Doralin» in favor of the third party - the acquirer of the shares. Under Cypriot law, it is possible to sign such orders in advance in favor of an unnamed third person. Thus, during the occurrence of default on the loan, the bank has an ability to immediately transfer the pledged shares to the third party, thereby realizing the property. In the absence of such transfer orders, there required a lengthy procedure for enforced collection of such shares under Cypriot legislation. Thus, the acquirer of rights under the loan will not be able to receive shares of «Doralin» in extrajudicial procedure in case of default of the debtor on the loan. The representatives of «Deutsche Bank» confirmed that the transfer orders are really missing for two reasons - either they are lost, or perhaps, they were not signed by the pledgor, because the «Deutsche Bank» team engaged in issuing the loan was replaced and there were no people who could provide such information. The court's adoption of the decision on the obligation to sign such a document does not guarantee the execution of the court's demand on the part of «Blidensol», as a defendant, who did not provide all necessary supporting documents. The dispute would have been considered under the English law, since the security documents were concluded in accordance with it. Therefore, the only real mechanism of impact for the bank was to declare default on the loan. They came to the conclusion that the acquisition of this loan did not have any economic and legal meaning. Economic, because the loan did not provide the repayment of the principal amount of the loan until the end of the loan period, and legal - it was impossible to impose a penalty on the pledged shares of the company «Doralin». Smagin decided not to "buy" this loan, which the bank officially notified. Despite the fact that there were several reasons for declaring an official default: violation of the terms of the contract on the part of «Blidensol», for example, the absence of the above-mentioned transfer orders, the bankruptcy action on «Centurion Alliance», and other technical issues, but the bank did not want to do that, as it is enormously hard to realize a default loan. On 14.04.2009 at their joint meeting with Ashot Yeghiazaryan in «Daev Plaza» several scenarios of the development of the events were considered. The first scenario is V. I. Smagin and Ashot Yeghiazaryan jointly buy out a loan from «Deutsche Bank» with a discount. There were discussed the figures of 50-60 million US dollars, necessary for the purchase of a 100 million US dollar loan. Ashot Yeghiazaryan

35

expressed his readiness to sell his jet aircraft - a business jet to finance the repurchase of the loan from «Deutsche Bank». The second scenario is «Deutsche Bank» is trying to assign a loan to the third parties not realted to Ashot Yeghiazaryan and V. I. Smagin. In this case, Ashot Yeghiazaryan suggested different ways of counteracting such assignation, including the organization of the process of controlled bankruptcy of «Centurion Alliance» with subsequent sale of the property, namely the shopping center «Europark» by «Daev Plaza» as a creditor of «Centurion Alliance». Smagin was concerned about his 20% of the shares in the company «Tufts» and repeatedly expressed his concerns to Ashot Yeghiazaryan, but he assurd Smagin, telling him that nothing threatens his interest in «Europark». The employees of «Deutsche Bank» repeatedly expressed the demand to Ashot Yeghiazaryan to transfer them the previously agreed with them and signed transfer orders, in order to have the full package of the agreed security documents on the loan. «Baker and McKenzie», for its part, prepared the drafts of the transfer orders required by «Deutsche Bank», and on 25.09.2009 forwarded them to Smagin by e-mail for further transfer to Ashot Yeghiazaryan. Smagin at that time was, along with Artem Yeghiazaryan, the director of the company «Tufts» and was ready to sign such orders. However, in accordance with the company management rules «Tufts» for the legitimacy of the transfer order in respect of the shares there required two signatures, exactly Smagin's and Artem Yeghiazaryan's, the latter refused to sign anything because he did not receive the approval from his brother Ashot. Neither in 2007, nor later the Yeghiazaryans did not take any action to transfer the above-mentioned 73% of the shares into the escrow possession of «Deutsche Bank». Thus, Smagin was deprived of the possibility to sell 73% of the shares of «Tufts» and repay the loan. From the copies of the additional agreements submitted by Smagin to the loan agreement, he knows that on 08.12.2006 between CJSC «Centurion Alliance» and the company «Blidensol» there was signed the loan agreement for the amount of about 1.5 billion rubles. In 2008-2009 General Director of CJSC «Centurion Alliance» M. A. Klochin and director of the company «Blidensol» V. G. Gogokhiya without Smagin's consent changed the currency of the loan from rubles to dollars and the interest rate from 1% to 12%, and then to 22.5% annually. Thus, the accounts payable of CJSC «Centurion Alliance» to the company «Blidensol» was artificially increased. For the company «Blidensol», the change in the currency and the increase in interest rates meant receiving a significantly larger amount of money than it had originally had due to the loan agreement. Since «Blidensol» was 100% beneficially owned by Ashot Yeghiazaryan, «Centurion Alliance» was beneficially owned by him only 73%, so Yeghiazaryan redistributed the income from CJSC «Centurion Alliance» in his favor. Smagin was neither a shareholder, nor a beneficial owner of the company «Blidensol». The company «Centurion Alliance» was also a debtor under the loan agreement to LLC «Daev Plaza», the amount of the loan was not significant, however, in May 2009 «Daev Plaza» filed an application on the bankruptcy of CJSC «Centurion Alliance» to the Moscow Arbitration Court, but withdrew it as soon as «Deutsche Bank» sold the loan, which, according to his (Kuzin's) opinion, influenced the decision of the bank to assign the rights on the loan to any willing person as soon as possible. In early 2009, he (Kuzin) was present at the negotiations with «Deutsche Bank», when they announced the price of the loan repayment in the amount of 65-70 million US dollars, and in early 2010 the bank sold it to «Skandleby» for 55 million US dollars. The difference in price is explained by the time gap between their arrangements and the moment of selling the loan - that was one year, during which the bank could not get rid of the loan. Initially, «Deutsche Bank» had high expectations due to the absence of the information at the market concerning the sales of loans in Russia at that time, plus in May 2009 Ashot Yeghiazaryan began the bankruptcy procedure of CJSC «Centurion

36

Alliance» at the suit of «Daev Plaza». Accordingly, the value of the loan for any third party sharply decreased, that was used by Ashot Yeghiazaryan during his own negotiations with «Deutsche Bank». Despite the fact that Smagin remained a 20% owner of «Tufts», in fact he did not own anything, because there were no more assets in the possession of «Tufts». That was a rather tricky scheme - first, «Tufts» sold 50% of «Doralin» to two different Cypriot companies, «Famulatos» and «Mastero», which was the first stage of the withdrawal of the assets from «Tufts». After that, there was a second withdrawal of assets already from «Doralin», when «Doralin» sold 100% of shares of the «Centurion Alliance» to the company «Skandleby». In addition, at the end of 2008, Smagin's right to sign documents along with Artem Yeghiazaryan was removed from the documents of «Tufts», he (Smagin) ceased to be the director of the company «Tufts». At the end of 2009, there were made some changes in the constitutional documents without notification and consent of the minority shareholders, there was a change of the directors in the company «Taft», registered in the British Virgin Islands. In early 2010, the company «Tufts» sold its shares in the company «Doralin» to two legal entities – «Mastero» and «Famulatos», but they were sold not simultaneously, but with a difference in two months. Thus, in the company «Tufts» there was admitted a broad range of violations of shareholders' rights, and Smagin had valueless shares. At the same time, the theft of the shares occurred not when Smagin was transferring the shares, but when he was engaged in the fraudulent actions taken during seizing the assets of «Centurion Alliance». The final asset, which was taken possession of by foreign companies in Russia, was CJSC «Centurion Alliance». Currently the ownership scheme of the shopping center «Europark» is as following: it is still 100% owned by CJSC «Centurion Alliance»; the latter is 100% owned by «Skendleby», 50% of «Skandleby» belongs to «Jela», owned by «Tashir», and 50% of «Skandleby» is owned by «MPH», which keeps them in the interests of Ashot Yeghiazaryan. From late 2014 onwards, «Baker & McKenzie» has been working on executing the decision of the London International Arbitration Court dated 11.11.2014 against Ashot Yeghiazaryan and «Kalken» regarding the valuation of 20% of Smagin's shares.

Witness **L.V. Bystrykh** (Bogatskaya), before the court in session, stated that approximately from 28.02.2005 to the present time she has been working in JSC «Registrar Society "Status"», previously the company was located at the address: 64, Dobrovolcheskay Street, Moscow, then they moved to the address: 32, Novo Rogozhskaya Street, Bl. 32. On the terms and subject to the conditions of the agreement on maintenance of the register No. 94-03 dated from 07.07.2003 to 07.06.2010 JSC, «Status» was the registrar of «Centurion Alliance», in 2010 this agreement was terminated upon the written order of the issuer of «Centurion Alliance». If in 2006 CJSC «Status» transferred the securities from the personal accounts of the shareholders of «Centurion Alliance» to DEPOT accounts opened at the nominee holder -«Deutsche Bank» (Moscow), then, further crediting and withdrawals/subtractions of the «Centurion Alliance» securities from the DEPOT accounts in JSC «Status» did not reflect. Neither CJSC «Centurion Alliance» nor the nominee holder «Deutsche Bank» has to provide any information about it to JSC «Status». Recognized that, the rights to the shares, if they are transferred to the holder, are confirmed by an extract from the DEPOT account, which the owner receives by contacting the bank's depositary. In this case, «Deutsche Bank» is the depository. Therefore, JSC «Registrar society "Status"» didn't have any information about the companies «Doralin» and «Skandleby» as the new shareholders of CJSC «Centurion Alliance». Since the moment of crediting the shares to the account of the nominee holder, CJSC «Status» could not register the shares of the owners of «Centurion Alliance». In the register there is the nominee account, which is seen by the registrar, but the registrar has no information about it. The basis for the withdrawals/subtractions of 2300 shares of CJSC «Centurion Alliance» from the account of the nominee holder «Deutsche Bank» and their transfer to

the account of the nominee holder JSCB «Fora-Bank» was the order of «Deutsche Bank». After the operation, JSCB «Fora-Bank» became the nominee owner of the CJSC «Centurion Alliance» shares.

Witness **A. G. Ilyaev**, the vice-president of the group of companies «Tashir», before the court in session stated that in the period from 2009 to 2015 he was one of the two directors of the company «Skandleby». Of the defendants, he (Ilyaev) is familiar with everyone except Gogokhya. He met with Ashot Yeghiazaryan in 2001, in December 2009 - January 2010 he met Artem. From S. S. Karapetyan, the head of the «Tashir» group of companies, he (Ilyaev) got to know that Ashot Yeghiazaryan offered him, in a telephone conversation, to buy from «Deutsche Bank» the right of the demand on the loan agreement concluded with the company «Blidensol». In this regard S. S. Karapetyan appointed him (Ilyaev) to manage this project and participate in the meeting held in December 2009 at the office of the law firm «White and Case» where Karapetyan, Ashot and Artem Yegiazaryans, Fitisov, Deryugin took part. The lawyers of «White and Case» who represented Ashot Yegiazaryan's interests told about the situation with «Centurion Alliance» concerning the loan issuance; that it faces bankruptcy and the loss of property; during their negotiations there were presented the documents related to the loan agreement. Later, several more meetings were held on this issue, during which he found out from Artem Yegiazaryan and Fitisov that the company «Blidensol» could not repay the loan of «Deutsche Bank», for which reason there was a risk of the loss of the shares and property pledged to the bank. In this regard, «Deutsche Bank» offered all interested parties to acquire the rights of the claim on this loan agreement, and in late 2009, the bank's representatives announced their sale. He knows that Ashot Yeghiazaryan, who at that time was a member of the State Duma of the Federal Assembly of the Russian Federation, controls the company «Daev Plaza», as well as the companies «Kalken», «Blidensol», and «Doralin», which, in their turn, indirectly control the activity of «Centurion Alliance» that owns the shopping center «Europark». M. A. Klochin was the General Director of CJSC «Centurion Alliance» up to October 2010, he agreed on all matters relating to the revenue and expenditure of the company activity with Ashot Yeghiazaryan. Until Klochin's dismissal, he (Ilyaev) also discussed with him how to support the activity of «Centurion Alliance» and «Europark». During the absence of the latter, his duties were performed by P. V, Kovalev, whom he met through M. A. Klochin in February 2010. In February 2010, the company «Skandleby» became a 100% shareholder of CJSC «Centurion Alliance», that was fixed in the register of the shareholders, which they saw before August 2010, but then it disappeared, as it had been taken away by M. A. Klochin. After M. A. Klochin's departure, it was decided to appoint P. V. Kovalev as the director of the CJSC, that was regulated with him (Ilyaev) as the director of the company «Skandleby» and the second director of the Cyprian company «MPH», which was controlled by Ashot Yeghiazaryan during the time of the above-mentioned events. This decision was signed by them. After the appointment of Kovalev to this position, he (Ilyaev) gave him instructions on the expenditure, also Kovalev coordinated the payments of CJSC «Centurion Alliance» with him. The participation of «Tashir» group of companies in the management of «Europark» improved the economic situation, as the revenue increase, expenses decreased. He (Ilyaev) also knows that before 2009 V. I. Smagin was engaged in the management of «Europark». According to the documents, V. I. Smagin was a member of «Tufts», where he had a 20% share. After Ashot and Artem Yeghiazaryans and M. A. Klochin left the Russian Federation, V. I. Smagin filed a lawsuit against Ashot Yeghiazaryan about the damage caused as a result of losing control of the company «Tufts» over «Centurion Alliance», considered in the London Arbitration Court. One of the defendants was the company «Kalken». «Tashir» lawyers, hired abroad, took part in this process, thereby he (Ilyaev) had

an opportunity to learn the court documents. On 14.01.2010, between LLC «Daev Plaza» represented by Ashot Yeghiazaryan and «Tashir» group of companies represented by S. Karapetyan, there was coordinated and signed the framework agreement on the assets acquisition, that determined the sequence of actions of the parties after the acquisition of the rights of the claim on the loan agreement by the company «Scandleby». The subparagraphs from 4.1 to 4.16 of Section 4 of the framework agreement contain the conditions for the purchase of the «Centurion Alliance» assets obtained during the negotiations between the parties, where there determined the procedure and conditions for the acquisition of the assets in the proportion of 50 to 50. The buyer of the rights of the claim on the loan had to be the company «Skandleby» (Cyprus), which belonged to the secretarial company «MPH Law Services Limited, registered in Cyprus. To engage the company in the transaction as a buyer was offered by Ashot Yeghiazaryan. He also suggested that «Tashir» group acquire 50% of the shares in «Skandleby» from «MRN Law Services Limited» for entering the transaction and participating through it in the redemption of the rights of the claim on the loan. At that time, «Tashir» group of companies included the company «Jella Holding & Finance Inc», which he decided to use as a buyer of the shares of the company «Skandleby». For the management parity, in the framework agreement there was established the condition for appointing two directors in the company «Skandleby», one from each party for joint and unanimous decision-making. For the fulfillment of the obligations by Ashot Yeghiazaryan (Shareholder A), the framework agreement obliges Shareholder 1 to provide the conclusion of the purchase and sale agreement and transfer of 920 (92%) shares of «Kalken» at par value in favor of affiliated person S. Karapetyan (Shareholder B), and Shareholder B appoints the person for the director position for the company «Kalken». Eventually, the company «Skandleby» redeemed the loan for about 55 million US dollars. The source of its financing was the borrowed funds received from «Tashir» group of companies, namely OJSC «Kalugaglavsnab», LLC «Gasoiltrade», «Grover Holding» in the amount of about 33,250,000 US dollars. From the other companies related to A. G. Yeghiazaryan there were borrowed about 22,500,000 US dollars. Into the process of acquiring 100% of the shares of CJSC «Centurion Alliance» by «Skendleby», there were attracted the following companies: LLC «Daev Plaza», «Doralin», «Tufts», «Kalken», «Famulatus», and «Mastero», the last-named company is owned by the «Tashir» group. The transition of 100% of the shares of the CJSC «Centurion Alliance» from the company «Doralin» to the company «Skandleby» occurred on the basis of the "deed of settlement end termination" agreement dated 25.02.2010, the so-called «accord and satisfaction agreement» concluded between «Skandleby» and «Doralin», as well as on the basis of the transfer order. This agreement was drawn up approximately in January-February 2010 in Cyprus by the lawyers of «MPH Law Services Limited» and the lawyers of one of the secretarial companies of Cyprus, and was signed by him (Ilyaev), Michael Phillipow (as the director of the company «Skandleby») and the directors of the company «Doralin», one of whom was Elena Demina, in the framework of a guarantee for the loan issued by «Deutsche Bank» to the company «Blidensol». Its original is kept in Cyprus in the office of the company «Skandleby». Also, he (Ilyaev) knows that LLC «Daev Plaza» filed a petition into the Moscow Arbitration Court towards CJSC «Centurion Alliance» on the bankruptcy due to the existing accounts payable. As one of the conditions for the entry of the «Tashir» group of companies into the transaction with the shares of «Doralin» was the termination of proceedings under the bankruptcy application due to the risk of the property loss, the proceedings were dismissed due to the refusal of «Daev Plaza» from the application. Ashot Yeghiazaryan was the initiator of the «Centurion Alliance» bankruptcy procedure, but what purpose it had been done for, he (Ilyaev) doesn't know. Currently, the company «Scandleby» is administered by the Cyprus company «MPH Law Services Limited». Personally, he (Ilyaev) and the representatives of «Tashir» group did not give any instructions to the directors of the company «Tufts» to sell the shares of the company «Doralin», as it had happened before «Tashir» group became the owner of the company «Kalken», which in its turn is the owner of 73% of the shares of the company «Tufts». The directors

39

of the company «Tufts» independently carried out this transaction, the instructions for which could be given only by Ashot or Artem Yeghiazaryans.

Witness **V. A. Deryugin**, the Head of the Legal Department in the «Tashir» group of companies, and **Yu. F. Bortnikov**, a witness, who occupied the position of the senior lawyer in the law firm «Vegas Lex» at the time of the above-mentioned events, gave the evidence similar to the evidence of witness A. G. Ilyaev about the circumstances of the negotiations and acquisition from «Deutsche Bank» of the rights of the claim on the loan agreement concluded with the company «Blidensol», and obtaining by the «Tashir» group of companies the control over 50% of the «Europark»; also witness Yu. F. Bortnikov stated that during the talks, Ashot Yeghiazaryan convinced the representatives of the «Tashir» group that all individuals and legal entities included into the structure of the current ownership of the shopping center controlled by him (Ashot Yeghiazaryan), no questions had to arise,  they were also convinced that shareholders agreement dated 26.12.2006 and the escrow agreement were not valid, under the escrow agreement the company «Kalken», which is the shareholder of the company «Tufts», did not transfer the shares of «Tufts» into «Deutsche Bank», and the provisions of the shareholders agreement to release all encumbrances in a year after its signing were not fulfilled, Ashot and Artem Yeghiazaryans were only interested in the fast receipt of the funds  without any official commitments from them, despite the insistent demands on  providing guaranty by brothers Yeghiazaryans and preparing the drafts of two guarantees; the latter refused to sign them. He (Bortnikov) also knows that in January 2010 the company «Tufts» sold 50% of the shares of the company «Doralin» to the company «Mastero», a member of the group of companies «Tashir». On the part of «Tufts», the transaction was made by Artem Yeghiazaryan, who acted on behalf of «Tufts» on the basis of the general power of attorney, which he (Bortnikov) knows from Artem Yeghiazaryan's words. The result of the negotiations on acquisition by the «Tashir» group of 50% of the shares in CJSC «Centurion Alliance» by redeeming the rights of the claim on the loan of the company «Blendensol» from «Deutsche Bank» led to concluding the framework agreement dated 14.01.2010 between the group of companies «Daev Plaza» represented by Ashot Eghiazaryan and the group of companies «Tashir» represented by S. Karapetyan, in the development of which, he (Bortnikov) also took part.

Witness **Yu. V. Borisenko** stated in the court that from August 2009 to June 2010 he was a partner of the law firm «Vegas Lex», where the «Tashir» group, owned by Samvel Karapetyan, was a regular customer; the legal department was headed by V. A. Deryugin. Approximately in November 2009, at the request of the latter he (Borisenko) took part in the meeting held in the office of the «Tashir» group of companies, with the participation of Vice President Ilyaev, who explained that the «Tashir» group had an intention to realize the transaction on acquiring a share in a Cypriot company that owns the shopping center «Europark». In this respect, it would be necessary to obtain «Deutsche Bank» consent for this transaction and redeem a part of the loan for releasing the shares or the building of «Europark», which were pledged to secure the loan repayment of 100 million US dollars issued by «Deutsche Bank». He (Borisenko) participated in this transaction as a legal adviser, he was in charge of checking the legality of the construction of «Europark», concluding contracts with the tenants of the commercial premises in the shopping center, land lease agreements on the plot of the land where the shopping center stands and checking the documents related to the pledge of the property (the shares or the building of «Europark»); the owner of the above-mentioned facility was CJSC «Centurion Alliance», in its turn, the latter was owned by a foreign company.

Based on the results of the work, there was prepared a memorandum on the risks related to the real estate, where there was mentioned about the absence of any problems related to the above-mentioned issues.

Witness **E. V. Demina**, before the court in session, stated that from January 2008 to 2010 she worked as an economist for LLC «Ar-Invest», which is one of the subdivisions of «Tashir» holding, owned by S. S. Karapetyan. Approximately from January to February 2010, at the request of one of the directors of «Skandleby» A. Ilyaev, she became one of the directors of the Cyprus company «Doralin» combining the above-mentioned position for participation in some transaction. The second director in accordance with the requirements of the Cypriot legislation was the company «New Genesis».

The lawyers of «Vegas Lex», including Bortnikov, as well as the lawyers of the "Tashir" group represented by Deryugin explained to her that this company is the owner of the shares of CJSC «Centurion Alliance», which owns «Europark». The shareholder of the company «Doralin» is the company "Mastero". As a matter of fact, she got to know from the above-mentioned lawyers that the company «Blidensol» got a loan from «Deutsche Bank» in the amount of 100 million US dollars, the bank set the rights of the claim on the loan for sale. The company «Skandleby» bought these rights of the claim from «Deutsche Bank». The security for the loan was the pledge of the «Doralin» shares, therefore it was supposed to transfer them under the «deed of settlement and termination» agreement, the so-called «accord and satisfaction agreement» dated January - February 2010, to the company "Skandleby". After the transaction, this company did not participate in any other transactions, does not conduct any economic activities.

During the above-mentioned period of time, she signed contracts in English on the transfer of the shares of the company «Doralin» to the company «Skandleby», as well as the above-mentioned accord and satisfaction agreement. In the agreement the company "Skandleby" was presented by its directors, one of whom was Ilyaev, and the company «Doralin» - by her and the company «New Genesis». At her (Demina's) disposal there was the translation of the documents into Russian and consultations of the same lawyers. In January-February 2010, the tripartite agreement was concluded between the companies «Doralin», «Skandleby» and «Blendensol» regarding the agreement on the transfer of their shares to the company «Doralin» from «Scandleby». The agreement was drafted in English; its essence was also explained to her by the lawyers. She did not receive any payments, salaries, other rewards for her (Demins's) position, as she was the director in technical sense.

The testimony of the victim and witnesses confirmed by the following evidence:

- by V. I. Smagin's petition into the name of the Prosecutor General of the Russian Federation with a request to conduct an investigation of the theft by Ashot G. Yeghiazaryan and other persons on belonging to him (Smagin) property in the form of the shares of CJSC «Centurion Alliance» with the value of about 30 million US dollars; to bring the guilty persons to criminal liability (vol. 1, case sheets 78-82);

- by the General agreement dated 12.02.2002 between V. I. Smagin, V. V. Korshunov, Yu. M. Okorokov (Sellers) and A. G. Loktionov, N. N. Kaplun (Acquirers), according to which the Sellers agree and undertake to provide the Acquirers with 100% of the shares in LLC «Centurion Alliance», by transferring to each of them 50% of the shares in LLC «O.K.S. Holding», which is the sole participant of LLC «Centurion Alliance» (vol. 11, case sheets 187-194);

- by the agreement on the right to redeem the share dated 12.02.2002, according to which A. G. Loktionov and N. N. Kaplun (Sellers) agree and undertake by 31.09.2002 at the written request of V. I. Smagin (Acquirer) to transfer for 6 900 000 rubles to the Acquirer or the persons specified by him 30% of the participation interest in LLC «Centurion Alliance» (vol. 11, case sheets 194-200);

- by the agreement of participants dated 12.02.2002 between A. G. Loktionov, N. N. Kaplun and V. I. Smagin, due to which in accordance with the General agreement dated

12.02.2002 Smagin, Korshunov and Okorokov have to get together 8,000,000 US dollars, of which Smagin receives 3,150,000 US dollars minus the total debt of LLC «Cenutrion Alliance»; due to the fact that Loktionov and Kaplun, after acquiring 100% of the shares in LLC «Centurion Alliance», intend to transfer Smagin 30% of the share; the parties came to the conclusion that the value of this share is equal to 3,150,000 US dollars and the parties will arrange the offset of the cross obligations, the difference after offsetting in the amount to the total debt of LLC «Centurion Alliance» will be paid by Smagin to Loktionov and Kaplun (vol. 11, case sheets 201 205);

- by the agreement dated 30.05.2002 between V. I. Smagin (Party 1) and D. V. Garkusha (Party 2) on the joint-stock structure of the project for the construction of the shopping center at the address: Rublevskoe Highway, Moscow, near the village of Ekaterinovka.

The agreement states that Party 2 owns the companies CJSC «TH Unikumimpeks», LLC «Milea», LLC «Merhav», CJSC «Titul», LLC «Techenergodon».

Taking into account the arrangements with A. G. Yeghiazaryan, the parties agreed to acquire the shares of N. Kaplun and A. Loktionov in LLC «Centurion Alliance» under certain conditions. In particular, V. I. Smagin remains in the project and does not sell his share. Party 2 buys 100% of the shares of LLC «Centurion Alliance» for the companies owned by it. Party 2 guarantees to Party 1 the transfer of 33.3% of the share into LLC «Centurion Alliance», taking into account the arrangements with A. G. Yeghiazaryan, signing the purchase and sale agreements of 33.3% of the share in the two companies with the open date up to 01.07 .2002.

Party 2 agrees and undertakes to finance the construction in the full amount and at the expense of its own funds under the investment scheme without borrowing (vol. 11, case sheets 183-184);

- by the minutes No. 04/12 of the general meeting of the CJSC «Centurion Alliance» shareholders dated 04.12.2006, according to which a large transaction was concluded by a unanimous decision of the shareholders to conclude a guarantees and compensation act with «Deutsche Bank», where the company acts as a guarantor under the loan agreement for the full loan amount - 100 million US dollars, as well as interest for the use of the loan and other payments (vol.4. sheets 91 92);

- by the minutes No. 01/12 of the general meeting of the CJSC «Centurion Alliance» shareholders dated 01.12.2006, according to which the company approved, by a unanimous decision of the shareholders, a major transaction on the transfer to «Deutsche Bank the multi-purpose shopping centre «Europark», located at the address:62, Rublevskoe Highway, Moscow, and the leasehold rights of the land plot located under the building (vol. 4, sheets 93-94);

- by the decision No. 06/08 of the sole shareholder of CJSC «Centurion Alliance» dated 10.09.2008, according to which «Doralin» decided to elect the Board of Directors of CJSC «Centurion Alliance» consisting of A. I.Timchenko, M. A. Klochin, V. I. Smagin, D. V. Denisov and D. A. Fitisov. V. I. Smagin was elected as the Chairman of the Board of Directors, the decision was signed by representative of the sole shareholder D. V. Garkusha according to the power of attorney dated 19.09.2007 (vol. 4, sheet 99);

- by the charter of CJSC «Centurion Alliance», approved at the general meeting of the shareholders on 25.12.2006, in accordance with its clause 1.1. that CJSC «Centurion Alliance» was created by converting from LLC «Centurion Alliance» in accordance with the decision of its participants on December 27, 2002; the location area of the company is: 39, Kutuzovsky Avenue, Moscow;

the total amount of the shares is 2300 with a par value of 10,000 rubles each (clause 4.1);

the supreme management body of the Company is the general meeting of the shareholders (clause 7.1);

the Board of Directors of the Company exercises general management of the Company activities, with the exception of resolving the issues referred by the law and the charter to the exclusive competence of the general meeting of the shareholders (clause 8.1);

the General Director is the executive body of the Company, directs the current activities of the Company and solves all issues related to its current activities, except those that referred to the exclusive competence of the general meeting of the shareholders and the competence of the Company Board of Directors (clause 9.1);

the first deputy general director of the Company is appointed and removed by the Board of Directors (clause 9.8);

there established the restriction of the powers of the General Director: the transaction and / or several interrelated transactions concluded on behalf of the Company by the General Director and associated with the alienation / acquisition or the possibility of alienation / acquisition of more than 5 million rubles or the equivalent in any other currency are considered legal and valid only in the case when they are signed simultaneously by the General Director and the first deputy general director. In the absence of two signatures at the same time, the latter are considered invalid (clause 9.9) (vol. 4 case sheets 100-116);

- by the new edition of the Charter of CJSC «Centurion Alliance», approved at the general meeting of the shareholders on 09.12.2009, which lacks the provisions on the first deputy general director of the Company and the need for simultaneous presence of his/her signature and the signature of the General Director for the validity of the transactions for more than 5 million rubles (vol. 4 case sheets 118-130);

- by the agreement of 2008 (without the exact date) between V. I. Smagin (Partner 1) and Ashot G. Yeghiazaryan (Partner 2), in which Partner 1 is the owner of 20% of the shares in «Tufts», Partner 2 controls 73% of the company «Tufts» shares, which is the owner of 100% of the shares of the company «Doralin», which is the owner of 100% of the shares of CJSC «Centurion Alliance», which is the owner of the shopping center «Europark».

The company «Blidensol» (the Borrower) obtained a 100 million US dollar loan from «Deutsche» Bank (the Lender) in accordance with the loan agreement dated 06.10.2006.

The partners will conclude the additional agreement to the shareholder agreement of «Tufts» dated 26.12. 2006, which regulates the distribution of the CJSC «Centurion Alliance» income.

In connection with the failure to perform the escrow agreement dated 13.11.2007, Partners will conclude the similar escrow agreement and ensure its execution by all parties. Partner 2 is required to sign and transfer to «Deutsche Bank» the transfer orders for all of the «Tufts». shares, controlled by him.

It is necessary to alter the constituent documents of «Blidensol», «Doralin» and «Tufts», introducing the provisions that any document is considered to be duly executed and valid only after it has been signed by two authorized persons, namely Partner 1 and Partner 2.

Partner 1 acquires 50% of the «Blidensol» shares at par value and 23% of the «Tufts» shares (the price is not specified). If Partner 2 fails to fulfill his obligations, Partner 1 will file a lawsuit against Partner 2 at the London International Arbitration Court.

The partners confirm that in accordance with the agreements reached earlier and the agreement on the implementation of the project for the construction of the shopping center «Ekaterinovka» dated 29.08.2003, the obligation of Partner 2 to finance the project implementation at the cost of 52,500,000 US dollars has been fully implemented.

Partner 1 receives 50% of all income from the CJSC «Centurion Alliance» activities and independently manage these funds. Partner 2 receives 50% of all income from

43

the CJSC «Centurion Alliance» activities and directs them to repay the loan and pay interest for its use.

On the final sheet of the agreement there are signatures on behalf of V. I. Smagin and A. G. Yeghiazaryan (vol. 5, case sheets 76-79, 80-83);

- by the escrow agreement between V. I. Smagin (Party 1), D. V. Garkusha (Party 2), the company «Kalken» (Party 3) and «Deutsche Bank» (the escrow agent) dated December 26, 2006, which states that on December 26, 2006, the Parties entered into the shareholders agreement concerning «Tufts», according to which the company "Kalken" provided V. I. Smagin with the option to buy the «Tufts» shares under the certain conditions.

V. I. Smagin and the company «Kalken» agreed to jointly open an escrow account at the escrow agent – «Deutsche Bank» in their names. The company «Kalken» agreed to place its shares of «Tufts» on the escrow account. Under the condition of the option implementation by V. I. Smagin in accordance with the shareholders agreement, the Parties express their consent to file the joint written instructions to the escrow agent on the issuance of the shares to V. I. Smagin from the escrow account.

The agreement is subject to the regulation and interpretation in accordance with the law of England. The agreement was signed by V. Smagin. in the presence of witnesses E. L. Sudets, D. V. Garkusha. in the presence of witnesses N. M. Kurguzova, Artem G. Yeghiazaryan on behalf of the company «Kalken». On behalf of the escrow agent – «Deutsche Bank» the agreement was not signed (vol. 5, case sheets 90-100);

- by the escrow agreement (escrow) between V. I. Smagin (Party 1), D.V. Garkusha (Party 2), the company «Kalken» (Party 3) and «Deutsche Bank» (the escrow agent) dated November 13, 2007, according to which on 26 December, 2006 the Parties entered into the shareholders agreement concerning «Tufts», according to which the company «Kalken» provided V. I. Smagin with the option to buy the «Tufts» shares under the certain conditions.

V. I. Smagin and the company «Kalken» agreed to jointly open an escrow account at the escrow agent – «Deutsche Bank» in their names. The company «Kalken» agreed to place its shares of «Tufts» on the escrow account. Under the condition of the option implementation by V. I. Smagin in accordance with the shareholders agreement, the Parties express their consent to file the joint written instructions to the escrow agent on the issuance of the shares to V. I. Smagin from the escrow account.

The agreement is subject to the regulation and interpretation in accordance with the law of England. The agreement was signed by V. I. Smagin. in the presence of witnesses P. Doda, D. V. Garkusha in the presence of witnesses, E. L. Sudets, Artem G. Yeghiazaryan on behalf of the company «Kalken», Ben Hartley and Miriam Köhler on behalf of the escrow agent – «Deutsche Bank» (vol. 5, case sheets 135-163);

- by the certificate of the shares of the company «Tufts» dated 04.01.2007, according to which V. Smagin is a registered owner of 2000 shares without par value (vol. 5, case sheets 225, 230);

- by the shareholders agreement between V. I. Smagin, D. V. Garkusha and the company «Kalken» concerning «Tufts» dated December 26, 2006 that V. I. Smagin is the owner of 20% of the shares in the company «Tufts», which is the owner of 100% of the shares in the company «Doralin», which is the owner of 100% of «Centurion Alliance», which is the owner of the shopping center «Europark».

«Blidensol» (the Borrower) intends to attract the loan of up to 100 million US dollars from «Deutsche Bank» (the Lender) in accordance with the loan agreement dated October 6, 2006.

The agreement states that immediately after the entry of the escrow agreement into force, «Kalken» is obliged to transfer to the escrow agent «Deutsche Bank» all shares of «Tufts» and the transfer orders on them in favor of V. I. Smagin. In case of the loan withdrawal, the Parties will ensure the transfer by «Deutsche Bank» all shares of «Taft» into V. I. Smagin's ownership and disposal under the set forms of the transfer orders.

The company «Kalken» provides V. I. Smagin with the option to buy all shares of «Tufts» belonging to the company «Kalken» in case of sending a written request on the early repayment of the loan by the Lender to the Borrower, «Doralin», «Tufts» or any of the Parties.

44

According to Clause 9.1.5 of the above-mentioned agreement, its validity period is set at one year since the moment of signing. After that within one month the company «Kalken» is obliged to ensure the termination of the pledge of all shares of the company «Doralin» and CJSC «Centurion Alliance», as well as the shopping center «Europark» itself. In case of non-fulfillment of these obligations, «Kalken» provides the transfer of its 73% of the shares in «Tufts» to V. I. Smagin under the transfer orders and other documents kept by the escrow agent – «Deutsche Bank».

The agreement is subject to the regulation and interpretation in accordance with the law of England. The agreement is drawn up in Russian and is subject to the translation into English.

The agreement was signed by V. I. Smagin. in the presence of witnesses E. L. Sudets, D. V. Garkusha in the presence of witnesses A. Y. Philippov, Artem G. Yeghiazaryan on behalf of the company «Kalken» (vol. 5, case sheets 233-252);

- by V. Makshantsev's letter addressed to V. I. Smagin dated 22.01.2007 on forwarding the approved and signed document from «Deutsche Bank» about a possibility of purchasing by V. I. Smagin the claim on the loan granted by «Deutsche Bank» to «Blidensol» on pledge against of the hopping center «Europark» in case of default (vol. 5, case sheet 257);

- by the letter of the company «Herbert Smith» in the interests of their client – V. I. Smagin dated 19.02.2008 addressed to «Deutsche Bank», that the shareholders agreement dated 26.12.2006 ceased to be effective in accordance with Art. 9.1.5, which also states that the company «Kalken» is obliged within one calendar month from the date of the termination of the shareholders agreement to ensure the termination of the pledge of the «Doralin» shares and all shares of CJSC «Centurion Alliance», as well as the mortgage of the shopping center «Europark»; «Kalken» failed to fulfill its obligations, so Smagin intends to achieve the provision of his rights in accordance with the shareholders agreement by filing a lawsuit into the London International Court of Arbitration. The dispute between Smagin and Kalken may lead to the occurrence of the Event of Default in accordance with the loan agreement where «Deutsche Bank» is one of the Parties (vol. 5, case sheets 259, 260);

- by the additional agreement dated 02.03.2009 to the sale and purchase agreement dated 26. 12.2006 between V. I. Smagin and the company «Doralin», where the parties confirmed that the Buyer – «Doralin» did not fulfill its obligation to pay to the Seller – V. I. Smagin the transaction amount. The value of the shares makes up 9,200,000 rubles, which the Buyer pays to the Seller within three banking days following the date of signing this additional agreement. In case of non-fulfillment of this obligation to pay, the agreement of sale and purchase dated 26.12. 2006 is considered terminated on 31.03.2009, on behalf of «Doralin» the agreement was signed by Artem G. Yeghiazaryan under the general power of attorney (vol. 6, case sheet 22);

- by V. I. Smagin's statement of claim to the company «Doralin», which came to the Arbitration Court of Moscow on 02.06.2009, demanding to acknowledge Smagin's ownership of 460 shares of CJSC «Centurion Alliance» and to compel the company «Doralin» to return them to V. I. Smagin (vol. 6, case sheets 15-17);

- by the decision of the Arbitration Court of Moscow dated 10.11.2009, according to which V. I. Smagin's lawsuit to the company «Doralin» was denied due to the wrong choice of defence (vol. 6, case sheets 77-78);

- by the market valuation of the shopping center «Europark» as of 05.11.2008, according to which the market value of the property rights on «Europark» and the share of long-term lease of the land plot under it made up 234 300 000 US dollars (vol. 7, case sheets 93-172);

45

- by the loan agreement dated December 21, 2009, according to which CJSC «Centurion Alliance» (the Lender) issues to OJSC «Invest-Center» 51 800 000 rubles with the return period of not later than 21.01.2010 at 12% annually (vol. 7, case sheets 174-175);

- by the additional agreement No. 3 dated 30.12.2008 to the agreement No. 1 dated. 08.12.2006 between CJSC «Centurion Alliance» and «Blidensol», according to which, since 01.01.2009, the new interest rate of 22.5% annually has been set (vol. 7, case sheet 176);

- by V. I. Smagin's letter dated 20.02.2009 to «Deutsche Bank» that on 26.12.2006 there was signed the agreement of the «Tufts» shareholders and on 13.11.2007 - the escrow agreement, «Deutsche Bank» was involved as the escrow agent in the agreements, but these agreements were not executed by the company «Kalken», about which «Deutsche Bank» was notified by the letter dated 19.02.2008. Despite the notice, «Deutsche Bank» connived at the further violation of the agreement obligations by «Kalken», and on 22.01.2007 «Deutsche Bank» provided in writing to V. I. Smagin with the right to acquire the claims under the loan agreement upon the occurrence of the relevant circumstances. Taking it into his account, V. I. Smagin informed «Deutsche Bank» about the desire and solvency to acquire all rights of the claim under the loan agreement dated 06.10.2006 (vol. 4, case sheets 97-98);

- by the decision No. 06/08 of the sole shareholder of CJSC «Centurion Alliance» dated 10.09.2008, according to which the company «Doralin» decided to elect the board of directors of CJSC «Centurion Alliance» including A. I. Timchenko, M. A. Klochin, V. I. Smagin, D. V. Denisov and D. A. Fitisov. V. I. Smagin was elected as the Chairman of the Board of Directors. (vol. 4, case sheet 99);

- by the decision of the sole shareholder of CJSC «Centurion Alliance» - the company «Doralin» dated 9.12.2009, according to which the new edition of the company Charter was approved, the decision was signed by the director of «Doralin» - the company "New Generation Services Limited" (vol. 4, case sheet 131);

- by the certificate of registration of the encumbrance of the company «Doralin» dated 04.01.2007, under which a mortgage or encumbrance in favor of «Deutsche Bank" in the amount of 100 million US dollars provided all current and future assets of the company «Doralin» (vol. 4, case sheets 188-191);

- by the certificate of registration of the encumbrance of the company «Doralin» dated 05.01.2007, under which a mortgage or encumbrance in favor of «Deutsche Bank" in the amount of 100 million US dollars provided 2 300 shares of CJSC «Centurion Alliance», owned by «Doralin» (vol.4, case sheets 192- 195);

- by the written decision of the meeting of the «Tufts» shareholders dated 06.10.2008 that Artem Yeghiazaryan and Vitaly Smagin, the holders of 93% of the shares of the company made decisions about: the replacement of their registered agent for the company «Portkallis Trustnet»; the change of the registration address to the PO Box 344, Road Town, British Virgin Islands; and, that only two directors of the company, the current registered agent and the company «Portcollis Trustne» are authorized to execute any forms and documents and take all the actions necessary to complete the procedure on changing the registered agent and the registration address (vol. 4, case sheets196- 197);

- by the letter of Artem Yeghiazaryan and Vitaly Smagin dated 20.11. 2008 to directors of the company «Doralin» D. Demetriades and X. Demetriades, indicating the issuance of the decision of the company board of directors to authorize Artem Yeghiazaryan and Vitaly Smagin to jointly open an account at «Dresden Bank» and manage it, as well as to issue other necessary documents according to the forms of the bank (vol. 4, case sheets 198-200);

- by the letter of Artem Yeghiazaryan and Vitaly Smagin dated 11.02.2009 to directors of the company «Doralin» D. Demetriades and X. Demetriades with instructions to issue the general power of attorney in the name of Artem Yeghiazaryan and Vitaly Smagin with the right of the joint signature (vol. 4, case sheets 201-202);

- by the letter - agreement dated 18.08.2008 of participants of the company «Doralin» Vitaly Smagin and the company «Kalken» that the directors of the company receive instructions and

directions from Vitaly Smagin and Artem Yeghiazaryan, however, these powers of the participants are carried out only jointly with each other (vol. 4, case sheets 203-208);

- by the record of seizure dated 01.10.2010 from victim V. I. Smagin the documents cncerning CJSC «Centurion Alliance», «Doralin», «Taft», «Kalken» (vol. 5, case sheets 6-12). which were inspected on 01.10.2010 in the established order (vol. 5, case sheets 13-15);

- by the charter of CJSC «Centurion Alliance», approved at the general meeting of shareholders on 27.12. 2002, according to which CJSC «Centurion Alliance»  was created by transformation from LLC «Centurion Alliance»; the location of the Company is: 39, Kutuzovsky Avenue, Moscow; the total number of shares is 2300 with the nominal value of 10,000 rubles each (clause 4.1), when the Company is established, all its shares are placed among the founders - former participants of LLC «Centurion Alliance» (vol. 5, case sheets 46-61);

- by the founders agreement and the charter of «Tufts» dated 18.09.2006, according to which the first registered office of the company is located at the address: Pasea Estate, Road Town, Tortola, British Virgin Islands, the first registering agent |of the company is «Morgen and Morgen Trust Corporation Limited»; the company is authorized to carry out any type of activity or enter into any transactions, it is authorized to issue 10 000 shares of one class without par value. The Company has the right, under the decision of the shareholders or directors, to introduce the changes into the founders agreementor charter, except the case when under the directors' decision there can not be made any changes relating to the restriction of the rights or powers of the shareholders on introducing the changes into the founders agreement or the charter, the changes of the shareholders' amount, necessary for accepting decisions by the shareholders on introducing the changes into the founders agreement of the charte; under the circumstances when the shareholders can not introduce the changes in to the founders agreement or the charter; or clauses 6. 16.1, 8 or 11. The changes in the founders agreement or the charter will come into force after registration by the registrar of the notice on the change or new edition of the founders agreement or the charter submitted by the registered agent. According to clause 2.1 of the Charter, the company has to issue for each shareholder a certificate signed by the director of the company or sealed with the stamp indicating the number of the shares he owns. According to clause 8.1. any director of the company has the right to call the meetings of the company participants at that time, thus, in that place, on or off the territory of the British Virgin Islands, if the director considers it necessary or appropriate.

If there a need of the demand of the participants holding at least 30% of the company voting shares in the written form, the directors are entitled to call the meeting of the participants (clause 8.2).

The director, calling the meeting, has to inform the shareholders and other directors of the meeting not less than 7 days before the meeting (clause 8.3).

The meeting of the shareholders has to be duly conducted if at the moment of the beginning of the meeting, there present the owners of not less than 50% of the voting shares (clause 8.12).

According to section 9, the first directors of the company have to be appointed as the first registered agent within 6 months since the establishment of the company, and subsequently the directors have to be elected by the decision of the shareholders or by the resolution of the directors for the term determined by the shareholders or directors. The minimum number of the directors is 1, the maximum number is 12. The director can be removed from the position according to the decision of the shareholders at the shareholders' meeting or by the decision in the written form adopted by seventy-five percent of the company shareholders.

According to section 10, the directors have all the powers to run and manage the company activities. Each director has to exercise his powers in the interests of the company (vol. 5, case sheets 163-197);

- by the list of the CJSC «Centurion Alliance» shareholders as of 01.11.2005, according to which D. V. Garkush owned 161 shares (7%), V. I. Smagin - 460 shares (20%), CJSC «Titul» - 299 shares (13%), CJSC TH «Unikomimpeks» - 460 shares (20%), LLC «Merhav» - 460 shares (20%), LLC «Milea» - 460 shares (20%) (vol. 5, case sheets 198-199);

- by «Kalken» power of attorney dated 27.12. 2006 in the name of Artem G. Yeghiazaryan, valid for one year (vol. 5, case sheets 200-206);

- by the register of the shares of the company «Tufts» as of 29.09.2008, according to which from 18.09.2006 to 04.01.2007 D. Garkusha was the registered owner of 10 000 shares, V. Smagin is the registered owner of 2 000 shares since 04.01.2007, the company «Kalken» - 7300 shares since 04.01.200, D. Garkusha - 700 shares; since 27.08.2008. D. Garkusha is no longer the owner of 700 shares; since 27.08.2008 the company «CentreInvest Capital» (the Cayman Islands) became the owner of 700 shares (vol. 5, case sheee ts 219-224);

- by the certificate of the shares of the company «Tufts» dated 04.01.2007, according to which Vitaly Smagin is the registered owner of 2000 shares with no par value (vol. 5, case sheets 225-230);

- by the sale and purchase agreement of the shares dated 26.12.2006, according to which the seller – D. V. Garkusha D.V. transfers, and the buyer – V. I. Smagin accepts and pays for 2 000 ordinary registered shares of «Tufts» (certificate No. 1 dated 18.09.2006) without par value, which is 20% of all outstanding shares of the Company. The cost of the shares that the buyer pays to the seller is $ 2 000 US dollars (vol. 5, case sheets 253-254);

- by the certificate of the Ministry of Trade, Industry and Tourism of Cyprus dated 15.10.2008, according to which the sole shareholder of the company» Doralin» is the company «Tufts» – 461 000 shares (vol. 5, case sheets 261-262);

- by the record of the seizure dated 12.11.2010, during which there were seized the following documents from V. I. Smagin: the copy of the action proceedings on the lawsuit filed by V. I. Smagin to the Arbitration Court of Moscow, the evaluation documents of «Europark», the documents regarding the companies CJSC «Centurion Alliance» and «Doralin» (vol. 6, case sheets 3-6), which were inspected in accordance with the record on the documents inspection dated 07.01.2011 (vol. 6, case sheets 7-11);

- by V. I. Smagin's lawsuit to the Arbitration Court of Moscow dated 02.06.2009, with the claim to confirm V. I. Smagin's ownership of 460 shares of CJSC «Centurion Alliance" and oblige the company «Doralin» to return them to V. I. Smagin (vol. 6, case sheets 15-17); '

- by the additional agreement dated 02.03.2009 to the sale and purchase agreement dated 26.12.2006 between V. I. Smagin (the seller) and the company «Doralin» (the buyer) that the buyer did not fulfill its obligation to pay the seller the amount of the transaction; the value of the shares makes up 9 200 000 rubles, which the buyer pays to the seller within three banking days following the date of signing this additional agreement; in case of non-fulfillment of the obligation to pay, the saleand purchase agreement dated 26.12.2006 is considered to be terminated since 31.03.2009; on behalf of «Doralin» the agreement was signed by Artwm G. Yeghiazaryan on the general power of attorney (vol. 6, case sheet 22);

- by the decision of the Moscow Arbitration Court dated 10.11.2009, according to which there was refused in V. I. Smagin's lawsuit to the company «Doralin», because, in the court opinion, under the terms of the bargains concluded by the Parties concerning the shares of CJSC «Centururn Alliance», it is impossible to recognize the method of protection chosen by the defence as legitimate, described in the petitionary part of the claim (vol. 6, case sheets 77-78);

- by the estimation of the market value of the shopping center «Europark» as of 01.12.2006, which amounted up to 150 710 000 US dollars, which is equivalent to 3 964 600 000 rubles. According to the rate of the Central Bank of the Russian Federation as of the valuation date (vol. 6, case sheets 85-165);

- by the certificate of the state registration of the ownership of CJSC «Centurion Alliance» concerning the building area of 83,154.6 square meters, at the address: 62, Rublevskoe Highway, Moscow (vol. 7, case sheet 173);

48

- by the written resolution of the member of the company «Tufts» - the company «Kalken» represented by the director - the company «Ionics Directors Ltd.» dated 25.11.2009 on the appointment of the company «MRH Law Services Ltd.» (Cyprus) as the director of the company «Tufts» (vol. 7, case sheets 188, 195);

- by the written resolution of the member of the company «Tufts» - the company «Kalken» represented by the director - the company «Ionics Directors Ltd.» dated 25.11.2009 on the appointment of the company «MRH Law Services Ltd.» (Cyprus) as the secretary of the company «Tufts» and dismissing from this porition Pamela D. Hall (vol. 7, case sheets 189, 199);

- by the written resolution of the member of the company «Tufts» - the company «Kalken» represented by the director - the company «Ionics Directors Ltd.» dated 25.11.2009 on dismissing Artem Yeghiazaryan from the position of the director of the company «Tufts» (vol. 7, case sheets 190, 197);

- by the written resolution of the member of the company «Tufts» - the company «Kalken» represented by the director - the company «Ionics Directors Ltd.» dated 25.11.2009 on dismissing V. Smagin from the position of the director of the company «Tufts» (vol. 7, case sheets 191, 198);

- by the extract from the Unified state register of rights to immovable property and transactions with it dated 28.10.2010, according to which CJSC «Centurion Alliance» is the owner of the building with an area of 83,154.6 sq. m, at the address: 62, Rublyovskoye Highway, Mocow (vol. 8, case sheets 66-67);

- by the additional agreement No. 2 dated 18.11.2008 to the agreement No. 1 dated 31.12.2003 between CJSC «Decorum», represented by general director V. G. Gogokhiya and «Longlake Holdings Limited», represented by E. Nimmo-Smith, where the Parties confirmed that all disputes on the agreement No. 1 have to be resolved in an arbitration court attached to the non-profit partnership «Russian Gas Society» (vol. 8, case sheet 119);

- by the additional agreement No. 1 dated 03.09.2008 to the agreement No. 1 dated 31.12.2003 between CJSC «Decorum» represented by general director V. G. Gogokhiya and «Decorum Corp. Ltd.» represented by F. A. Pomorski, according to which the Parties confirmed that as of 03.09.2008 the total debt of CJSC «Decorum» under the agreement No. 1 dated 31.12.2007 makes up 3 496 548 775.28 rubles. The Parties agreed to replace the obligation by US dollars and monthly interest in the amount of 10% annually, as well as the dispute resolution is ascribed to the jurisdiction of the Arbitration Court attached to the non-profit partnership «Russian Gas Society» (vol. 8, case sheets 124-125);

- by the record of the seizure dated 25.03.2011, during which there were seized from V. I. Smagin the documents related to the companies «Decorum», «Heckham», «Longlake», «Blidensol», CJSC «Centurion Alliance», «Doralin» and the arbitration court attached to the non-profigt partnership «Russian Gas Society» (vol. 8, case sheets 85-90); which were inspected in accordance with the record of the documents inspection dated 07.01.2011 (vol. 8, case sheets 170-175);

- by the letter-message from the company «Doralin» dated 31.12.2009 addressed to M. A. Klochin that the board of directors of CJSC «Centurion Alliance» in 2008-2009 was not elected, in connection with which V. I. Smagin is not the chairman of the board of directors (vol. 8, case sheet 137);

- by the record of the seizure dated 11.05.2012 from V. I. Smagin of the documents related to V. I. Smagin's lawsuit to Ashot Yeghiazaryan and the company «Kalken», considered by the London International Arbitration Court (vol. 10, case sheets 30-34); which were inspected in accordance with the record of the documents inspection dated 07.01.2011 (vol. 10, case sheets 85-87);

- by the record of the seizure dated 20.03.2015 from CJSC «Centurion Park» of the documents related to the consideration by the London International Arbitration Court of V. I. Smagin's lawsuit to Ashot Yeghiazaryan and the company «Kalken» (vol. 12, case sheets156-160), which were inspected on 25.03.2015 (vol. 13, case sheets 253-257);

- V. I. Smagin's lawsuit dated 24.08.2011 to the London International Arbitration Court on the case No. 101721 against «Kalken» and Ashot Yeghiazaryan (vol. 12, case sheet 199);

- by the response to the lawsuit and petitioning on behalf of the second defendant - Ashot Yeghiazaryan, filed by the company «Gibson, Dunn & Crutcher LLP» to the London

49

International Arbitration Court in the case No. 101721, where the second defendant Ashot Yeghiazaryan agrees to organize the sale of 50% of the shares in the company «Europark» and to give 40% from the sale to V. I. Smagin, that is 20% of the total share of «Europark»; if the price agreement is not reached, Ashot Yeghiazaryan organizes the transfer of 20% of the shares of «Europark» to V. I. Smagin without denying the fact that V. I. Smagin lost the. rights to the 20% of the shares in CJSC «Centurion Alliance» (vol. 10, case sheets 38-58, 59-73);

- by the report on the evaluation of the shopping center «Europark», prepared by «Cushman and Wakefield LLC» as of 15.01.2013, according to which the market value of the shopping center «Europark» at the date of valuation was 348.7 million US dollars (vol.12? case sheets 24-81);

- by the second expert opinion of I. Novikova dated 13.06.2013, submitted to the London International Arbitration Court in the case No. 101721, according to which the corrected estimate of the total amount of the plaintiff's (V. I. Smagi's) losses, including the right to receive profit and the cost of 20% of «Centurion Alliance», is in the range of 85 million to 99.5 million US dollars (vol. 12, case sheets 82-153);

- by the final decision of the London International Arbitration Court dated 11.11.2014 in the case No. 101721 on V. I. Smagin's lawsuit (the Plaintiff) to the company «Kalken» (the First Defendant) and Ashot Yeghiazaryan (the Second Defedndant), according to which, it was established that in the early 2000s the Plaintiff started the project on the construction of «Europark», the shopping center in Moscow, together with two business partners. The construction of the center was carried out through the company called LLC «Centurion Alliance» (hereinafter referred to as «Centurion»), in 2002 the business partners of the Plaintiff decided, at that time, to withdraw from the project. The plaintiff contacted Ashot Yeghiazaryan (the Second Defendant) and Mr. Garkusha, who were both interested in investing into «Europark».

On August 29, 2003 the Plaintiff, Garkusha and the group of four Russian companies (which, according to the Plaintiff, were under the control of the Second Defendant entered into the agreement (hereinafter referred to as Agreement of 2003). Among the other things, this agreement, according to the evidence, regulated the order of the profit distribution from «Europark» / «Centurion».

After concluding the Agreement of 2003, the team of the directors of the company «Centurion» changed. The Parties of the agreement cooperated with each other in the ordinary way. The construction of «Europark» was completed in May 2005, and it had to be reopened in January 2006 after the unsuccessful launch.

The Plaintiff states that шгг 2006 the Second Defendant asked him to use «Europark» as the security on the loan that the Second Defendant was trying to obtain at «Deutsche Bank» for the purpose of financing the reconstruction of a hotel in Moscow (the hotel «Moscow»).

The plaintiff also claims that the Second Defendant assured him that the transaction price on the hotel Moscow was significant and that there were not any real risks of violation of the loan agreement with «Deutsche Bank». The plaintiff agreed to use his shares in «Centurion» as the security on the loan from «Deutsche Bank».

For the realization of that, the structure of the ownership in «Europark» was changed in accordance with the «Deutsche Bank» instructions. «Centurion» was transferred to the possession of the company «Doralin», registered in Cyprus, which in its turn belonged to the company «Tufts», registered in the British Virgin Islands. The shareholders of the company «Tufts» were the First Defendant (which, according to the Plaimtiff, is under the control of the Second Defendant) with 73% of the shares, the plaintiff with 20% of the shares and Garkusha - with 7% in «Centurion».

The plaintiff stated that the Second Defendant used the First Defendant to circumvent the restrictions, which the Second Defendant had as a deputy of the State Duma of the Russian Federation. It is litigated by the Second Defendant.

On 26 December 2006, the Plaintiff, Garkusha and the First Defendant entered into the shareholder agreement on the company «Tufts».

50

According to the Plantiff, the Shareholder Agreement was aimed at protecting the share of the Plaintiff's ownership in «Europark» in case of non-payment on the loan during a year, as the Second Defendant promised. Moreover, in order to provide the Plantiff with the security, the Parties agreed that the share held by the First Defendant in the shares of «Tufts» had be placed on the escrow at «Deutsche Bank» in accordance with the procedure established by the escrow agreement signed by the shareholders of the company «Tufts» and the bank. In case of non-return by the Second Respondent of the loan on the hotel Moscow, the Plaintiff would have the right to the shares in the escrow.

According to the plaintiff, the shareholder agreement and the escrow agreement ensured that the plaintiff obtained the shares of «Tufts» in the escrow and the right to sell these shares (as well as «Centurion» and / or «Europark» shares) to repay the loan to «Deutsche Bank» and return his investments. The plaintiff assured that any extra amounts on the results of such a sale would have been paid to the First Defendant who was also at the risk of failure to receive payments, and if the amounts received from the sale of the shares in the escrow were insufficient to pay the loan and the Plaintiff's investments from the Second Defendant, it would be necessary to compensate the difference to the Plaintiff.

The plaintiff stated that soon after signing the shareholders agreement and the escrow agreement, he found out that the First Defendant had not placed the «Tufts» shares into the escrow. The plaintiff also indicated that during the following years the Second Defendant repeatedly promised him to retain the shares of the plaintiff's ownership in «Europark». Moreover, the Plaintiff stated that he had entered into the security agreement with the Second Defendant who, in particular, had given various promises and declarations, and in accordance with this agreement, the Second Defendant assumed the obligation to protect and retain the share of the Plaintiff's ownership in «Europark», providing the following: a) that the Plaintiff will be able to receive the shares of the company «Tufts», and (b) that the composition of the owners and the ownership structure of «Europark» will remain unchanged, that is, the company «Tufts» will remain the owner of «Europark». The defendants litigate the existence of the obligation, implied or expressed in any other way, to retain the structure of «Europark» ownership.

In 2008, the loan to «Deutsche Bank» was not repaid and the shares of «Taufts» were not placed in the escrow. After the Plaintiff expressed his concern, he offered to conclude a cooperation agreement with the Second Defendant on March 3, 2008 (hereinafter referred to as the Agreement of 2008). The second Defendant stated that the Agreement of 2008 did not have any binding force and that his signature on the document, which was submitted by the Plaintiff, had been falsified. According to the Plaintiff, due to the fact that the Second Defendant could not repay the loan at that time, the plaintiff agreed to continue providing «Europark» (through his shares in the company «Tufts») with the security on the loan in exchange for the increase of the Plaintiff's participation in the company «Tufts» up to 50%.

On November 20, 2009 there was introduced a change into the charter of the company «Tufts» in such a way that the director's shift became possible by the majority of votes. Before, in accordance with the charter, the majority of 75% was required. The plaintiff was removed from the position of the director of the company «Tufts» and replaced by the company «MPH Law Services».

At the beginning of 2010, «Tufts» sold its shares to «Doralin» in favor of the companies «Mastero» and «Famulatus». The plaintiff stated that as a result of this sale, he lost his share of ownership in «Europark» and his control over it. The plaintiff still owns its shares in the company «Tufts».

The Plaintiff's position is mainly based on the following four arguments: Agreement of 2003, Shareholder Agreement, Escrow Agreement and Agreement of 2008.

The plaintiff stated that the Defendants took an active part in the misappropriation of the share of the Plaintiff's ownership in «Europark» and did not make any payments to the Plaintiff under the Agreement of 2003.

The plaintiff stated that in accordance with the shareholders agreement and the escrow agreement: (i) the First Defendant (on behalf of the Second Defendant) had to place the shares

of the company «Tufts» on the escrow account at «Deutsche Bank» (ii) the Defendants were required to ensure the safety, security and protection of the participation interest of the Plaintiff at any time, and (iii) the Plaintiff obtained the right to require «Deutsche Bank» to transfer the shares of the company «Tufts» belonging to the First Defendant, if the encumbrances established as a result of pledge of «Europark» and shares of the company «Doralin» would not be withdrawn by December 13, 2008. In addition, the Plaintiff stated that the Defendants were indirectly obliged under both the Shareholder Agreement and the Escrow Contract to ensure the preservation of the ownership structure of the «Centurion» and «Europark». In the absence of «Europark» as an asset, the shares of the company «Tufts» would not have any value. The Plaintiff also stated that the Second Defendant had repeatedly assured him that his participation interest in «Europark» would be preserved. The Plaintiff expressed the argument that the First and Second Defendants were jointly and severally liable. According to the Plaintiff, the First Defendant acted as the Second Defendant's agent and both Defendants were liable, as the First Defendant not only acted as an agent, but also played a significant role as the legal owner of shares in the company «Tufts».

The First Defendant argued that his current managers did not play any role in the alleged illegal appropriation of the participation interest of the Plaintiff in «Europark», and therefore were not liable for this. The shares of the company «Doralin» were sold by the company «Tufts», and not by the First Defendant. The First Defendant also stated that there was no implied obligation to preserve the ownership structure of «Europark». The First Defendant played no role in the sale of shares of the company «Doralin» and had never had the opportunity to transfer the shares of the company «Tufts» to the escrow, because the Plaintiff did not open the escrow account.

The Second Defendant stated that the Arbitration Court did not have jurisdiction over him because he is not a party to either the Shareholder Agreement or the Escrow Contract. The Second Defendant has never been the ultimate beneficiary of the First Defendant's shares.

The Plaintiff stated that the 2008 Agreement established the following: (i) the obligation to ensure the preservation of the ownership structure of «Centurion» and «Europark», (ii) the obligation to ensure the safety and protection of the participation interest of the Plaintiff at any time, (iii) the obligation to comply with the terms and conditions of the Shareholder Agreement and the Escrow Contract, (iv) the obligation to organize the transfer of the First Defendant's shares to the escrow in accordance with the Shareholder Agreement, the Escrow Contract and the 2008 Agreement, (v) a guarantee that the documents for the companies «Tufts» and «Doralin» can be issued solely by the Plaintiff and the Second Defendant, acting jointly, and (vi) the obligation to transfer to the Plaintiff a profit due to him under the 2003 Agreement. In addition, the Plaintiff stated that the Second Defendant had the duties of a trustee under all agreements and with regard to the mutually trusting relations of the parties. The Plaintiff also stated that he and the Second Defendant had a joint obligation to build «Europark», which led to the creation of a confidential obligation to maintain loyalty. In addition, in accordance with the 2008 Agreement, the participation interest of the Plaintiff in «Europark» increased to 50%.

The Plaintiff stated that the First Defendant and the Second Defendant violated their obligations under the Shareholder Agreement, the Escrow Contract and the 2008 Agreement, as well as organized a complex conspiracy to misappropriate the participation interest of the Plaintiff in «Europark» by the following actions:

- failure to pay to the Plaintiff the amounts associated with the profit, under the 2003 Agreement;

- non-transfer of shares of the company «Tufts» to an escrow account, as stipulated in the agreement;

- non-elimination of encumbrances with respect to pledged shares;

52

   - unilateral change of the ownership structure of
«Europark» by transferring the shares of «Centurion» from the company «Doralin» to two nominal
Cypriot companies;

    - change of the charter of the company «Tufts» and adoption of decisions initiated by the
Second Defendant so that the company «Tufts» could sell its shares of «Doralin» to other companies;
and

    - conclusion by the Second Defendant of a transaction with «Tashir» group in order to gain
control over «Centurion» and «Europark» and to completely exclude the Plaintiff from participation.

  The Second Defendant stated that his signature on the 2008 Agreement was forged. In support of
this statement, the Second Defendant cited the expert opinion of Dr. Gus Lesnevich that the signature
was forged.

    The Plaintiff claims compensation for (i) his participation interest in «Centurion» and
«Europark» (ii) and his claimed rights to profits received by «Europark» in accordance with the
provisions of the 2003 Agreement. The Plaintiff and the Second Defendant submitted the expert
opinions on the calculation of the Plaintiff's alleged losses.

  The Plaintiff stated that the assertion of the Second Defendant that he could not, according to any
theory, cause more than half of the claimed damage was incorrect as the company «Mastero»
received only half of the shares of «Doralin» and that the sale in favor of the company «Famulatus»
was made only after «Tashir» group had gained control over the First Defendant. According to the
Plaintiff, the sale was carried out by the First Defendant, but was initiated by the Second Defendant,
and in addition, the direct ownership of the company «Famulatus» was not relevant to this issue.

    Based on the evidence given, the Arbitration Court found that the Second Defendant could
not prove that the signature on the 2008 Agreement was not authentic. The burden of proving the
claim of forge should lied with the party that makes such a statement. The Second Defendant did not
submit the required evidence. The Arbitration Court found that the signature of the Second Defendant
on the 2008 Agreement was not forged.

    The Plaintiff held an opinion that the Second Defendant undertook to comply with the terms
and conditions of the Shareholder Agreement and the Escrow Contract. In this regard, he also
undertook, according to the Plaintiff, to ensure the transfer of his shares in the First Defendant to the
escrow in accordance with the Shareholder Agreement and the Escrow Contract.

    As a result of analyzing Articles 2.1, 2.2 and 2.10 of the 2008 Agreement, the Arbitration
Court supported the Plaintiff's arguments that these were the obligations of the Second Defendant.

    The Plaintiff stated that the 2008 Agreement obliged the Second Defendant to protect, defend
and preserve the participation interest of the Plaintiff at any time and to ensure that the ownership
structure of the companies «Centurion» and «Europark» should be maintained in such a way that the
Plaintiff, through his participation interest in the company «Tufts», retained the value of his
participation share in «Europark».

    Since there are no explicit conditions in the 2008 Agreement that establish these obligations,
the Plaintiff takes the position that these obligations arise from the implied terms and conditions of the
agreement. According to the Plaintiff, the main objective of the 2008 Agreement is to protect and
preserve his participation interest in the company «Europark». In order to make the agreement valid
and ensure the achievement of this goal, it was necessary to preserve the ownership structure of
«Europark».

        Based on the evidence submitted to the Arbitration Court, including in particular the
Plaintiff's testimony, the Arbitration Court was convinced that the purpose of the
Shareholder Agreement and the Escrow Contract was to protect the ownership structure
of «Europark» and, consequently, the interests of shareholders of the company «Tufts»,
which was the ultimate indirect owner of «Europark».

The Arbitration Court also ascertained that the 2008 Agreement was aimed at protecting the participation interest of the Plaintiff in the company «Europark». This follows from the analysis of Article 1 of the Preamble of the 2008 Agreement, which details the share distribution structure and the shareholding structure, as well as Articles 2.1-2.4 and 2.10. This conclusion is also supported by a reference in Article 2.10 to Article 2.1.5 of the Shareholder Agreement, which in turn refers to Article 5 of this agreement, which in turn depends on the ownership structure and the share distribution structure disclosed in the introductory part of the Shareholder Agreement.

Firstly, the Second Defendant objected that the Plaintiff could not establish a cause-and-effect relationship with the occurrence of his damage. The Second Defendant claims that the Plaintiff has not suffered any damage, as he still owns 20% of the company «Centurion». However, in 2010 the share distribution structure and the shareholding structure were radically changed, so that the shares belonging to the Plaintiff in the company «Tufts» were depreciated. As noted above by the Arbitration Court, the preservation of the ownership structure of «Europark» was an implied condition of the 2008 Agreement, as well as the Shareholder Agreement and the Escrow Contract. In the 2008 Agreement, the Second Defendant confirmed that he controlled 73 percent of shares of the company «Tufts», including the shares held by the First Defendant. In this capacity, the Second Defendant prompted the First Defendant to take the necessary actions to transfer the shares in the company «Doralin» to the benefit of «Famulatus» and «Mastero». Such actions included changing the Charter of the company «Tufts» and removing the Plaintiff from the position of the Director of the company «Tufts». Thus, the Second Defendant violated his obligations under the 2008 Agreement, Articles 2.3 and 2.4.

Secondly, the Respondent also objected that he had not caused the Plaintiff the alleged damage, as there was no early recovery of the Credit amount or foreclosure under the Shareholder Agreement and the Escrow Contract. Article 2.10 of the 2008 Agreement refers to the Plaintiff's right to enforce his rights under Article 9.1.5 of the Shareholder Agreement. In accordance with this provision, the Plaintiff had the right to demand the transfer of shares belonging to the First Defendant in the company «Tufts» (which were intended to be placed in the escrow) and to sell these shares, provided that the Credit was not returned and the Encumbrances were not withdrawn. The Credit was not paid, and the Encumbrances were not withdrawn, while the shares in the company «Tufts» had been never placed in the escrow. Accordingly, the Plaintiff was deprived of the opportunity to sell the shares of «Tufts». The Second Defendant, therefore, did not carry out the actions that he was to carry out in accordance with the 2008 Agreement, Articles 2.1 and 2.2.

Thirdly, the Second Defendant held an opinion that he caused no more than half of the damage claimed by the Plaintiff. This argument is based on the fact that the Second Defendant owns only the company «Mastero», which has acquired half of the shares in the company «Doralin», and the transfer of shares of «Tufts» in favor of the company «Famulatus» has occurred only after «Tashir» group has gained control over the First Defendant. As mentioned above, the Arbitration Court found that the Second Defendant prompted the First Defendant to commit the actions leading to the sale of shares of the company «Tufts». These actions included the Plaintiff's removal from the position of the Director of the company «Tufts» and his replacement by another Director, - the company «MPH Law», which sold the shares. Any losses that the Plaintiff could incur were thus caused by the breach of the 2008 Agreement by the Second Defendant.

Fourthly, the Second Defendant insisted that his actions were aimed at protection of the company «Europark». The Arbitration Court did not find any confirmation or clarification of such an allegation in the case files submitted by the Second Defendant.

54

The Arbitration Court found that the Second Defendant violated the 2008 Agreement. Based on these data, there is no need for the Arbitration Court to determine whether the Second Defendant has been a party to the Shareholder Agreement and the Escrow Contract.

The Arbitration Court noted that the duty to transfer the shares to the escrow was on the First Defendant. The First Defendant cannot refer to his own breach of obligations in support of the argument that the agreements in question have been canceled.

In accordance with the law of England, it is quite obvious that in order to prove the fact of refusal from the current agreement, the party declaring this should prove a mutual consent to such a refusal. Such mutual consent may be express or implied.

The First Defendant was unable to prove the existence of any express mutual consent, and such consent did not follow from the case facts. The Plaintiff testified that he repeatedly and regularly asked the First Defendant, as well as the Second Defendant, to ensure the transfer of shares of the company «Tufts» to the escrow. Due to this, the First Defendant had to clearly understand that the Plaintiff insisted on the performance of the First Defendant's obligations under the Shareholder Agreement and the Escrow Contract.

For the above reasons, the Arbitration Court found that the agreements in question were not cancelled.

Fourthly, the First Defendant denied any role in the transfer of shares of the company «Tufts» or responsibility for it. Despite the fact that he owns 73 percent of shares of the company «Tufts», he denies his role in selling shares owned by «Tufts» in the company «Doralin» in favor of «Famulatus» and «Mastero». The First Defendant had denied that he approved any such transactions.

Based on the sequence of events that led to the sale of shares, the Arbitration Court found that the First Defendant was actively involved in the transaction.

The events have the following chronology:

On September 8, 2008, the Plaintiff was appointed as the Director of the company «Tufts»;

In accordance with the Charter of the company «Tufts» in its initial version dated September 18, 2006, 75% of the shareholders' votes were required to remove the Director from his position. This minimum number of votes meant that the First Defendant (73% of shares of the company «Tufts») had to vote jointly with the Plaintiff (20% of shares) and/or Mr. Garkusha (7% of shares) to remove the Director;

On November 23, 2009, the First Defendant changed the Charter of the company «Tufts» dated 2006 without the Plaintiff's knowledge in such a way that the minimum number of votes for the Director's removal was reduced from 75% to 50% of shares. This meant that, in accordance with the Charter of the company «Tufts» in its version dated 2009, the First Defendant could individually displace Mr. Smagin from the position of the Director of the company «Tufts»; two days after making the amendments to the Charter of the company «Tufts» dated 2006, on November 25, 2009, the First Defendant unilaterally decided to remove the Plaintiff from the position of the Director of the company «Tufts» without notifying the Plaintiff thereof;

Also, in accordance with the Charter of the company «Tufts» in its version dated 2009, the Directors of the company «Tufts», acting jointly, were authorized to approve the asset sale transaction belonging to «Tufts». This enabled the First Defendant, after the Plaintiff's removal, to appoint a legal entity under his control (under the direct supervision of the Second Defendant) as the sole director, and thus unilaterally withdraw all of his assets from the company «Tufts»;

As a result of the Plaintiff's removal from the position of the Director of the company «Tufts», his consent was no longer required to approve the sale of shares owned by «Tufts» in «Doralin» to the benefit of the companies «Mastero»

and «Famulatus»;

On November 25, 2009, the First Defendant appointed the company «MPH Law Services Limited» (hereinafter - «MPH Law») as the sole director of «Tufts». The company «MPH Law», according to the Second Defendant's own assertion, is under his control. Thus, as a result of these actions, all of activities of the company «Tufts», including the power to sell the shares owned by «Tufts» in the company «Doralin», was placed under control of the Second Defendant;

On January 16, 2010 and April 13, 2010, «Tufts» decided to sell shares owned by «Tufts» in the company «Doralin» in favor of the companies «Mastero» and «Famulatus». As a result of this transaction, the participation interest of the Plaintiff in «Centurion»/«Europark» was illegally appropriated.

Thus, taking part in the sale of shares, the First Defendant violated the obligation implied on him to maintain and not violate the ownership structure of «Europark». As the Arbitration Court noted above, this condition was implied in the 2008 Agreement, as well as in the Shareholder Agreement and the Escrow Contract. The First Defendant violated his obligations under the Shareholder Agreement and the Escrow Contract.

The Arbitration Court found that the Second Defendant violated his obligations under the 2008 Agreement, and the First Defendant violated his obligations under the Shareholder Agreement and the Escrow Contract. The violation of each of them relates to the same events, namely, the sale of shares owned by the company «Tufts» in the company «Doralin» in favor of «Famulatus» and «Mastero», resulting in the loss of participation interest of the Plaintiff in «Europark». The First and Second Defendants are both responsible for any losses incurred by the Plaintiff. The First and Second Defendants both took an active part in the events in question. Therefore, they should bear joint and several liability.

According to the resolution part of a court decision, it was also established that the company «Kalken Holdings Limited» and Ashot Yeghiazaryan should jointly pay to Vitaly Ivanovich Smagin the amount of 72,243,000 US dollars in compensation for the losses incurred;

the company «Kalken» and Mr. Ashot Yeghiazaryan should jointly and severally pay the interests accrued on the amount of 72,243,000 US dollars at the rate of 7 percent per annum, starting July 1, 2013 prior to the date of this Decision, in the amount of 6,899,701.32 US dollars;

the company «Kalken» and Ashot Yeghiazaryan should jointly and severally pay interests accrued on the amount of 72,243,000 US dollars, and on the amount of interests accrued in accordance with clause 3 above, from the date of this Decision to the payment date, at a complex rate of 8 percent per annum, calculated on a quarterly basis (v. 94, case sheets 85-181);

- by the decision of the London International Arbitration Court dated January 9, 2015 in the case No. 101721 on the suit of V.I. Smagin against the company «Kalken» and Ashot Yeghiazaryan on correction of the arbitration award in accordance with Article 27.1 of the 1998 LCIA Regulations regarding technical mistakes (v. 94, case sheets 182-189);

- by the register of directors of the company «Tufts», according to which the company's directors were Luis a. Davis and Pamela D. Hall from September 18, 2006 to December 22, 2008, V.I. Smagin and Artem Yeghiazaryan from September 8, 2008 to November 25, 2009, and the company «MPH Law Services Ltd.» from November 25, 2009 (v. 14, case sheets 174, 179);

- by the register of shares of the company «Tufts», whereof it follows that D. Garkusha was the owner of 10,000 shares from September 18, 2006 to January 4, 2007 (v. 14, case sheets 175-178, 180-183);

- by the record of seizure dated October 14, 2010 from the witness D.V. Garkusha of the documents relating to the hotel «Moscow», CJSC «Decorum», OJSC «Invest-Center», «Blidensol», OJSC «DekMos», «Daev Plaza», CJSC «Centurion Alliance», «Kalken», «Tufts», «Hekhem», «Centerinvest», «Hamfest» (v. 15, case sheets 36-43), which were examined on October 15, 2010 (v. 15, case sheet 44);

- by a declaration on the establishment of trust property dated October 2, 2006 in respect of the company «Blidensol» (v. 15, case sheet 130);

- by the general power of attorney of the company «Blidensol» in the name of D.V. Garkusha dated September 19, 2007 for a period of 1 year (v. 15, case sheets 142-143);

- by the minutes No. 01/12 of the general meeting of shareholders of CJSC «Centurion Alliance» dated December 25, 2006, whereunder by the unanimous decision of shareholders: CJSC «Titul» (33%), LLC «Milea» (20%), JSC «TD Unikomimpeks» (20%), V.I. Smagin (20%), D.V. Garkusha (7%), by the Company and «Deutsche Bank» approved the rights assignment agreement under the insurance contracts of the shopping center «Europark» and liability of the Company for damage caused to third parties - visitors of the shopping center «Europark»; the rights pledge agreement on the bank accounts of the Company in CJSC «Republican Bank»; the rights assignment agreement under the lease agreements of the shopping center «Europark»; the debt obligation subordination agreement between the Company, «Blidensol», «Tufts», «Doralin», «Deutsche Bank» (v. 15, case sheets 160-161)

- by the contract of purchase and sale between D.V. Garkusha (the Seller) and V. Gogokhiya (the Buyer) in respect of the shares of «Hekhem» dated January 27, 2009, whereunder 10,000 shares of the company (100%) are sold for 1,000 US dollars (v. 15, case sheets 192-200);

- by the contract of purchase and sale between D.V. Garkusha (the Seller) and V. Gogokhiya (the Buyer) with respect to the shares of «Hamfast» dated Fabruary 1, 2008, whereunder the company «Hamfast» owns 100% of shares of «Blidensol», the Seller sells to the Buyer 100% of shares of the company «Hamfast» in exchange for a valid and valuable reward. In payment for the shares sold, the Buyer pays to the Seller 1,000,000 US dollars (v. 15, case sheets 233-244);

- by the Agreement No. 1 dated December 8, 2006 between CJSC «Centurion Alliance», represented by the General Director M.A. Klochin and «Blidensol» represented by a representative of D.V. Garkusha under the power of attorney, whereunder the parties state that CJSC «Centurion Alliance» has the obligations to «Blidensol» to return 1,495,512,541.88 rubles; the parties agree to terminate this obligation by replacing it with a new obligation - loan amount 1,399,963,530 rubles, interest rate - 1% per annum (v. 16, case sheets 18-21);

- by a declaration on the establishment of trust property dated February 1, 2008 in respect of the company «Hamfast», whereunder V. Gogokhiya recognizes and declares that he is a nominal holder of shares of the company «Hamfast» in the interests of the actual owner - Artem Yeghiazaryan (v. 17, case sheet 42);

- by the e-mail letter sent by V. Makshantsev victor.makshantsev@db.com to the e-mail address garkusha@daevnet.ru dated August 17, 2006, with the transaction description made in Moscow proposed by "our structurers" (v. 18, case sheets 130, 152);

- by the e-mail letter send by V.Makshantsev victor.makshantsev@db.com to the e-mail address garkusha@daevnet.ru dated October 27, 2006 on sending the documentation on the declaration of intent concerning the hotel «Moscow» (v. 18, case sheets 131, 154);

- by the confidentiality and exclusivity agreement with respect to the proposed transaction dated October 27, 2006 (draft), whereunder «Deutsche Bank» and OJSC «DekMos» wish to document the confidential and exclusive conditions that they will work with respect to the proposed transaction as described in the declaration of intent attached to this document; according to the scheme called "Transaction Structure", the shopping center «Europark» is owned by CJSC «Centurion

57

Alliance», 100% of which belong to a special purpose company located in the BVI, 100% of which, in turn, belong to the second special company located in the BVI; the company shares and the shopping center itself are subject to pledge (v. 18, case sheets 155-184);

by the protocol of seizure of the legal, registration, financial and accounting cases of CJSC «Centurion Alliance» dated November 19, 2010 in the Inspectorate of the Federal Tax Service of Russia No. 30 for Moscow (v. 21, case sheets 11-29); which were examined in accordance with the protocols dated December 24, 2010 (v. 30, case sheets 85-137), December 24, 2010 (v. 30, case sheets 138-154), December 27, 2010 (v. 30, case sheets 155-180);

- by the minutes No. 25/12 of the general meeting of shareholders of CJSC «Centurion Alliance» dated December 25, 2006, whereunder by the unanimous decision of shareholders: CJSC «Titul» (33%), LLC «Milea» (20%), JSC «TD Unikomimpeks» (20%), V.I. Smagin (20%), D.V. Garkusha (7%), was approved a new version of the charter of CJSC "Centurion Alliance" (v. 21, case sheet 74);

- by the minutes No. 01/11 of the general meeting of shareholders of CJSC «Centurion Alliance» dated November 1, 2005, whereunder M.A. Klochin was appointed to the position of the General Director of the Company by the unanimous decision of shareholders (v. 21, case sheets 92);

- by the certificate of state registration of a legal entity, whereunder it was made an entry in the Unified State Register of Legal Entities on the establishment of CJSC «Centurion Alliance» on March 21, 2003 (v. 21, case sheets 175);

- by an extract from the Unified State Register of Legal Entities dated March 21, 2003 with respect to CJSC «Centurion Alliance» (v. 21, case sheets 177-183);

- by the Minutes No. 1/12 dated December 27, 2002 of the general meeting of participants of LLC «Centurion Alliance», whereunder the Company's participants unanimously decided to transform the Company into CJSC, 2,300 shares were placed by their proportional exchange to the shares of the participants of transformed LLC, as a result of which CJSC «Titul» got 18% of shares, LLC «Milea» - 20%, LLC «TD Unikomimpeks» - 20%, LLC «Merkhav» - 20%, V.I. Smagin - 22% (v. 21, case sheets 198-202);

- by the transformation agreement (on the establishment by reorganization) dated December 2, 2002, whereunder the members of LLC «Centurion Alliance» - CJSC «Titul», LLC «Milea», LLC «TD Unikomimpeks», LLC «Merkhav», V.I. Smagin agreed to transform the Company into CJSC «Centurion Alliance» (v. 21, case sheets 203-205);

- by the contract of novation No. 9 dated September 30, 2009 between CJSC «Centurion Alliance» and LLC «Daev Plaza», whereunder the parties state that CJSC «Centurion Alliance» has a liability to LLC «Daev Plaza» to pay not later than September 30, 2009 the loan amount of 37 million rubles and interests; the specified obligation is replaced with a new one -write down and transfer to LLC «Daev Plaza» its own promissory note in the amount of 50,044,721.41 rubles with the payment date - upon presentation; on the part of CJSC «Centurion Alliance», the agreement was signed by the General Director M.A. Klochin, on the part of LLC «Daev Plaza» - by the General Director D.A. Fitisov (v. 27, case sheets 255-256);

- by the supplementary agreement No. 1 dated December 3, 2008 to the Agreement No. 1 dated December 8, 2006 between CJSC «Centurion Alliance», represented by the General Director M.A. Klochin, and «Blidensol», represented by the representative of V.G. Gogokhiya under the power of attorney, whereunder the parties agreed to establish the new interest rate - from June 1, 2008 -12.5% for the debt amount of 1,082,963,530 rubles (v. 28, case sheets 226-227);

- by the supplementary agreement No. 2 dated December 3, 2008 to the Contract No. 1 dated December 4, 2006 between CJSC «Centurion Alliance», represented by the General Director M.A. Klochin, and «Blidensol», represented by the representative of V.G. Gogokhiya, on the replacement of currency of monetary obligations for US dollars (v.28, case sheets 228-230);

- by the supplementary agreement No. 3 dated December 30, 2008 to the Contract No. 1 dated December 8, 2006 between CJSC «Centurion Alliance» and «Blidensol», whereunder the parties agreed to establish a new interest rate from January 22, 2009 at 22.5% per annum (v. 7 c.s.. 176);

- by the Contract No. 1 dated December 31, 2007 between CJSC «Decorum», represented by the first Deputy General Director E.V. Pavlyuchenko and the company «Hekhem», represented by the attorney

of .V.G. Gogokhiya, acting under the power of attorney dated October 31, 2005, wherein the parties state that CJSC «Decorum» has a debt in the amount of 134,849,918.05 US dollars, resulting from the loan agreements concluded for the period from September 3, 2003 to August 3, 2007, the parties agree on the termination of obligation of CJSC «Decorum» to pay the amount of money in rubles to the company «Hekhem» by the novation (v. 8, case sheets 91-94);

   - by the assignment agreement No. 1 dated September 1, 2008 between «Hekhem» (the Assignor), represented by V.G. Gogokhin, and «Decorum Corp. Ltd.» (the Assignee), represented by F.A. Pomorsky, where it is ascertained that «Hekhem» and CJSC «Decorum» (the Borrower) concluded the loan agreement No. 1 on December 31, 2007; the Borrower received 2,763,458,785.91 rubles as a loan. Under this agreement, the Assignor - «Hekhem» - transfers to the Successor - «Decorum Corp. Ltd.» - all its rights and obligations under the loan agreement No. 1 dated December 31, 2007, the Assignee shall pay to the Assignor 14,217,756 US dollars in a period not later than December 31, 2020 (v. 8, case sheets 101-106);

   - by the protocol of seizure dated June 5, 2012 to CJSC «Republican Bank», among other legal matters of JCS «Centurion Alliance», LLC «Merkhav», CJSC «Titul», CJSC «TD Unikomimpeks» (v. 30, case sheets 269-277), which were examined on July 31, 2012 (v. 30, case sheets 278-282);

   - by the search protocol dated December 1, 2010, during which it was seized the documents of CJSC «Centurion Alliance» relating to the construction, commissioning, use of non-residential premises of the shopping center «Europark», as well as accounting, constituent and registration documents of CJSC «Centurion Alliance» (v. 31, case sheets 5-16); which were examined on December 27, 2010 (v. 35, case sheets 1-41, v. 35, case sheets 42-73); January 24, 2011 (v. 35, case sheets 74-89);

   - by the extract from the Unified State Register of the rights to Real Estate Property and Transactions Therewith dated October 11, 2006 (v. 31, case sheets 17-20);

   - by the order No. 15-l dated November 1, 2005 of the General Director of CJSC «Centurion Alliance» M.A. Klochin, whereunder he starts to perform the duties of the General Director of this legal entity from November 1, 2005 in accordance with the decision of the General Meeting of Shareholders (v. 31, case sheets 77);

   - by the search protocol dated December 1, 2010, during which it was seized the documents of CJSC «Centurion Alliance» relating to the construction, commissioning, use of non-residential premises of the shopping center «Europark», as well as accounting, constituent and registration documents of CJSC «Centurion Alliance» (v. 36, case sheets 3-26); which were examined on December 27, 2010 (v. 40, case sheets 1-131); January 11, 2011 (v. 40, case sheets 132-229);

   - by the commission acceptance certificate dated May 27, 2005 completed by the construction of a multifunctional shopping center at the address: 62, Rublyovskoye Highway (Ekaterinovka village), Moscow (v. 36, case sheets 103-109);

   - by the letter of V.I. Smagin dated April 16, 2010 to Artem G. Yeghiazaryan with a request based on the contract of purchase and sale dated December 26, 2006 and the supplementary agreement dated March 2, 2009 to return the shares of CJSC «Centurion Alliance» in the amount of 460 pieces and give the corresponding order to CJSC «Registrar Company «Status» on making an entry in the register of shareholders (v. 36, case sheet 111);

   - by the contract of purchase and sale dated December 26, 2006, whereunder V.I. Smagin (the Seller) transfers and «Doralin», represented by D.V. Garkusha (the Buyer) accepts and pays 460 ordinary registered uncertified shares of CJSC «Centurion Alliance» with a nominal value of 10,000 rubles each (v. 37, case sheets 83-87);

        - by the mortgage agreement with respect to the shopping center «Europark» and the rights to lease a land plot at the address: Ekaterinovka village, Rublyovskoye Highway, Moscow dated December 15, 2006, concluded between «Deutsche Bank AG» (the Pledgee) and CJSC «Centurion Alliance» (the Pledger), pursuant to the Credit Agreement dated October 6, 2006 between «Blidensol» (the Borrower) and the Pledgee, the latter agrees to provide the borrower with a secured loan for a total amount of up to 100 million US dollars for a period of 10 years, the pledger agrees to pledge the shopping center «Europark» and the right to lease the land plot as

the provision of proper and accurate performance by the Borrower of its obligations (v. 37, case sheets 194-237);

- by the report No. 26/2009 on the determination of the market value of fixed assets of CJSC «Centurion Alliance», whereunder the market value of fixed assets, except for the building of the shopping center «Europark», is 216 million 400 thousand rubles, taking into account the allowable rounding, as of September 30, 2009 (v. 38, case sheets 1-243);

- by the list of shareholders dated February 10, 2009 of CJSC «Centurion Alliance» certified by the registrar - CJSC «Registrar Company «Status», whereunder 2,300 shares (100%) of CJSC «Centurion Alliance» are registered in the personal account of the nominal holder - «Deutsche Bank»; there is no information in the document in whose interests the nominal possession is carried out (v. 39, case sheet 6);

- by the list of persons dated June 30, 2008, having the right to participate in the annual general meeting of shareholders of CJSC «Centurion Alliance», whereunder the sole owner of 2,300 shares (100%) of CJSC «Centurion Alliance» is «Doralin» (v. 39, case sheet 10);

by the market value of the shopping center «Europark» as of November 11, 2008, whereunder the market value of the ownership right in respect of the shopping center «Europark» and the share of long-term lease of a land plot under it was 234,300,000 US dollars (v. 39, case sheets 199-283);

- by the protocol of seizure of the issuer's documents of CJSC «Centurion Alliance» dated October 27, 2011 in the Federal Service for Financial Markets in the Central Federal District (v. 41, case sheets 7-11), which were examined on November 16, 2011 (v. 42, case sheets 203-237);

- by the report on the results of securities issue of CJSC «Centurion Alliance», approved by the Board of Directors of CJSC «Centurion Alliance» dated June 3, 2003, registered on June 23, 2003 in the Federal Commission for the Securities Market of Russia in the Central Federal District, according to clause i of which CJSC «Centurion Alliance» has the following shareholders: CJSC «Titul» - 18%; LLC «Milea» - 20%; CJSC «TD Unikomimpeks» - 20%; LLC «Merkhav» - 20%; V.I. Smagin - 22%, the members of the Board of Directors: V.I. Smagin, D.V. Garkusha, I.A. Troshyn (v. 41, case sheets 24-27);

- by the minutes No. 2/03 of the meeting of the Board of Directors of CJSC «Centurion Alliance» dated June 3, 2003, whereunder the members of the Board of Directors I.V. Smagin, D.V. Garkusha and I.A. Troshin approved the decision on the first issue of the securities - ordinary registered shares of CJSC «Centurion Alliance» in the uncertified form with a nominal value of 10,000 rubles each for a total of 23 million rubles, approved the report on the results of securities issue and decided to register the share issue in the regional branch of the Federal Commission for the Securities Market of Russia in the Central Federal District (v. 41, case sheet 48);

- by the minutes of the general meeting of shareholders of CJSC «Centurion Alliance» No. 2/03 dated March 24, 2003, whereunder the shareholders elected the board of directors of CJSC «Centurion Alliance», consisting of V.I. Smagin, D.V. Garkusha, I.A. Troshyn (v. 41, case sheet 50);

- by the minutes of the general meeting of shareholders of CJSC «Centurion Alliance» No. 1/03 dated March 24, 2003, whereunder the company's shareholders elected D.V. Garkusha as the General Director of CJSC «Centurion Alliance». (v. 41, case sheet 54);

- by the participation interest transfer agreement between V.I. Smagin (the Purchaser) and LLC «Tekhenergodon» (the Seller) dated December 25, 2002, whereunder the seller shall transfer to the purchaser 20% of participation interest with the nominal value of 4,600,000 rubles in the authorized capital of LLC «Centurion Alliance», and the purchaser shall accept and pay to the seller the value of the participation interest in the amount of 6,000,000 rubles within three calendar months (v. 41, case sheets 170-175);

- by the participation interest transfer agreement between V.I. Smagin (the Purchaser) and LLC «Titul» (the Seller) dated December 25, 2002, whereunder the seller shall transfer to the purchaser 2% of participation interest with the nominal value of 460,000 rubles in the authorized capital of LLC «Centurion Alliance», and the purchaser shall accept and pay

to the seller the value of participation interest in the amount of 600,000 rubles within three calendar months (v. 41, case sheets 182-187);

- by the amendment No. 1 to the charter of LLC «Centurion Alliance» approved by the general meeting of participants on September 10, 2002, whereunder the authorized capital of the Company is 23,000,000 rubles, the participation interest of each participant is determined in percentage and amounts to 1. CJSC «Titul» - 20%; 2. LLC «Milea» - 20%; 3. CJSC «TD Unikomimpeks» - 20%; 4. LLC «Merkhav» - 20%; 5. LLC «Tekhenergodon» - 20% (v. 41, case sheet 197);

- by the charter of LLC «Centurion Alliance», approved by the decision of the general meeting of participants on April 3, 2002, whereunder the Company is located at the address: 39, Kutuzovsky prospect, Moscow; the Company's participants are A.G. Loktionov (50%) and N.N. Kaplun (50%); the authorized capital of the Company is 23,000,000 rubles and is paid for 100% in cash (v. 41, case sheets 198-207);

- by the letter of JSC «Registrar Company «STATUS» dated June 16, 2015, whereunder the documents (transfer orders) that appeared in 2006 as grounds for making entries in the register of security holders of CJSC «Centurion Alliance» on the transfer of share ownership were destroyed with regard to the expiration of the storage period; a record of crediting the securities to the personal account of the nominal holder JSCB «Fora-Bank» was entered in the register of CJSC «Centurion Alliance» on March 1, 2010 on the basis of an electronic document received by JSC «STATUS» from LLC «Deutsche Bank»; JSC «STATUS» did not make any entries about writing-off the securities from the personal account of the nominal holder CJSB «Fora-Bank» for the period of maintaining the register of CJSC «Centurion Alliance» (until June 7, 2010) (v. 46, case sheet 203);

- by the transfer order dated March 1, 2010, whereunder 2,300 shares of CJSC «Centurion Alliance» are transferred from the account of the nominal holder LLC «Deutsche Bank» to the account of the nominal holder CJSB «Fora-Bank» based on the client's instruction for the transfer dated February 27, 2010 (v. 46 c.s 204-207);

- by a questionnaire of the registered entity - JSCB «Fora-Bank» in JSC «Status» dated February 9, 2010, whereunder «Fora-Bank» is the nominal holder of the issuer CJSC «Centurion Alliance» (v. 46, case sheet 216);

- by the protocol of seizure of documents in relation to LLC «Milea» dated December 10, 2010 in the Inspectorate of the Federal Tax Service of Russia No. 8 for Moscow (v. 49, case sheets 11-18), which were examined on January 28, 2011 (v. 49, case sheets 229-250);

- by the expert opinion of the judicial appraisal examination No. 02/20-01-11 dated February 20, 2011, whereunder the market value of 20% shares of CJSC «Centurion Alliance» was 666,480,521 rubles as of December 26, 2006, 720,605,444 rubles - as of February 26, 2010 and March 1, 2010. (v. 51, case sheets 27-291);

- by the expert opinion of handwriting forensic examination No. 12/3115 dated June 24, 2011, whereunder the signature on behalf of Ashot Yeghiazaryan, located in the section "Partner Signatures" of the 2008 Agreement between V.I. Smagin and A.G. Yeghiazaryan was affixed by Ashot Yeghiazaryan (v. 55 c.s. 103-106);

- by the search protocol in the dwelling of M.A. Klochin dated December 1, 2010 at the address: apartment 171, 8/6, Kostyakova street, Moscow, during which the computer system unit and the documents were withdrawn (v. 57, case sheets 9-15) and examined on May 19, 2011 (v. 57, case sheets 26-28) and June 8, 2011 (v. 57, case sheets 37-39);

- by the list of documents for closing the purchase transaction of the shopping center «Europark» (v. 57, case sheets 29-33);

- by the search protocol dated December 13, 2010 in the office of OJSC «Kalugaglavsnab», during which the documents regarding the companies CJSC «Centurion Alliance», «Deutsche Bank», «Skendleby», «Kalken», «Doralin», «Blidensol» were withdrawn (v. 62, case sheets 10-16) and examined in accordance with the document examination record dated December 14, 2010 (v. 62, case sheets 261-279);

61

- by the loan agreement dated January 14, 2010 between LLC «Gasoiltrade» (the Creditor) and «Skendleby» (the Borrower), whereunder the creditor lends to the Borrower 16 million US dollars by transfer to an account with «Deutsche Bank» with a maturity date of not later than January 14, 2013, at a rate of 11% per annum (v. 62, case sheets 17-22);

- by the loan agreement dated January 14, 2010 between «Grover Holding & Invest Ltd.» (the Creditor) and «Skendleby» (the Borrower), whereunder the creditor lends to the Borrower 5 million US dollars by transfer to an account with «Deutsche Bank» with a maturity date of not later than January 14, 2013, at a rate of 9.51% per annum (v. 62, case sheets 23-28);

- - by the loan agreement dated December 30, 2009 between OJSC «Universal Commercial Investment Center» (the Creditor) and «Skendleby» (the Borrower), whereunder the creditor lends to the Borrower 20 million US dollars by transfer to an account with «Deutsche Bank» with a maturity date of not later than January 14, 2013, at a rate of 9.5% per annum (v. 62, case sheets 29-34); - by the loan agreement dated January 14, 2010 between OJSC «Kalugaglavsnab» (the Creditor) and «Skendleby» (the Borrower), whereunder the creditor lends to the Borrower 12,250,000 million US dollars by transfer to an account with «Deutsche Bank» with a maturity date of not later than January 14, 2013, at a rate of 9.5% per annum (v. 62, case sheets 35-40);

- by the agreement dated January 18, 2010 between «Deutsche Bank» (the Seller) and «Skendleby» (the Buyer) on the acquisition of the rights under a loan agreement for the amount of 100 million US dollars dated October 6, 2006 (amended on December 27, 2006) for «Blidensol» (redemption agreement) that the purchase price was 55 million US dollars, which the buyer should transfer to the seller's account not later than January 19, 2010, by the same date it should be transferred the security in cash in the amount of 500,000 US dollars, the agreement was signed on behalf of A. Ilyaev from the side of the company «Skendleby», the second signature was not specified (v. 62, case sheets 157-195 (original agreement with the annexes in English), case sheets 196-237 (translation of the agreement and annexes thereto certified by a notary));

- by the agreement dated January 2010 between «Deutsche Bank» as the Initial Creditor, the Initial Crediting Agent, the Initial Security Agent and «Scandleby» as the New Credit Agent and the New Security Agent on resignation and new appointment under the loan agreement for the amount of 100 million US dollars dated October 6, 2006 (as amended on December 27, 2006) for «Blidensol», in accordance with the terms and conditions of the Agreement dated January 15, 2010 on the acquisition of the rights between «Deutsche Bank» and «Skendleby», the Initial Creditor agrees to transfer in favor of the company «Skendleby» its Accepted Commitment and the total principal amount with respect to credits in the amount of 100 million US dollars under the Credit Agreement. The Initial Creditor intends to appoint the company «Skendleby» as the Security Agent and the Credit Agent for the Financial Parties (v. 62, case sheets 174-195, 216-237);

- by the basic agreement on asset acquisition dated January 14, 2010 between «Daev Plaza» group of companies, represented by Ashot Gevorkovich Yeghiazaryan (the Shareholder A) and «Tashir» group of companies, represented by Samvel Sarkisovich Karapetyan (the Shareholder B), whereunder the parties intend to make several transactions for the purposes of establishment of joint control in relation to CJSC «Centurion Alliance». The entry of the Shareholder B into the Project is due to the occurrence of certain conditions and guarantees of the Shareholder A. Until the date of entering into the transaction, the affiliated company of the Shareholder B «Jella Holding & Finance Inc.» (BVI) acquires, at the nominal value, from the affiliated company of the Shareholder A «MPN Law Services Ltd.» (Cyprus) 50% of shares of the company «Skendleby» solely created by the Shareholder B for the purposes of this transaction. The parties appoint two directors in «Skendleby», one from each of the parties, who will have the right to take decisions on all issues only jointly and unanimously. The Shareholder A will ensure the conclusion of the contract of purchase and sale and

62

the transfer of 920 (92%) shares of «Kalken» at nominal value in favor of the affiliated entity of the Shareholder V. The company «Skendleby» concludes the agreements on obtaining loans from the companies affiliated to the Shareholder A - OJSC «Universal Commercial Investment Center» and LLC «Decorum Corp. Ltd.» - for a total amount of 22,250,000 US dollars with a maturity date of January 11, 2013 with a rate of 9.5% per annum. From the companies affiliated to the Shareholder B - OJSC «Kalugaglavsnab», «Grover Holding & Invest» and LLC «Gasoiltrade» - for a total amount of 33,250,000 US dollars. The purpose of loans is to make payments to «Deutsche Bank» for the acquisition of all rights by «Skendleby» in accordance with the Redemption Agreement. «Skendleby» will enter into an agreement with «Deutsche Bank» on the acquisition of 100% of debt and all rights of the creditor and the pledgee for a loan arising from the credit agreement for 100 million US dollars. The Shareholder A provides the agreement conclusion between the company LLC «Daev Plaza» and CJSC «Centurion Alliance», controlled by him, to settle the terms and conditions of all overdue debts and transfer to the Shareholder B all the powers to submit, on behalf of LLC «Daev Plaza», to the Moscow Arbitration Court a request to declare the debtor bankrupt with the application of an agreement on the overdue debt settlement for the termination of proceedings in the bankruptcy case of CJSC «Centurion Alliance». The Shareholder A transfers 50% of shares of the company «Blidensol» and 50% of shares of the company «Doralin» to the companies of the Shareholder B. «Skendleby», «Blidensol» and «Doralin» will enter into the Obligation Settlement and Termination Agreement arising from the Credit Agreement and security agreements thereto on the following conditions:

> - «Skendleby» should receive the ownership rights to 100% of shares of CJSC «Centurion Alliance», and the obligations of the companies «Tufts», «Doralin» and «Blidensol», arising from the Credit Agreement and its supporting documentation should be terminated;

- the entry into force of the Debt Settlement Agreement is due to the moment of transition of all creditor rights from «Deutsche Bank» to «Skendleby» in accordance with the Redemption Agreement.

The Shareholder A gives guarantees to the Shareholder B that any of the transactions stipulated in this Basic Agreement will not be challenged as a result of the claims filed by the shareholders of «Tufts».

The Shareholder A does not have any agreements with third parties other than the Shareholder B on joint implementation of the Project at the time of conclusion of this Basic Agreement. If there is a violation of this condition by the Shareholder A, he should pay to the Shareholder B 10 million US dollars.

The Basic Agreement was signed by Ashot G. Yeghiazaryan and Artem G. Yeghiazaryan on behalf of the Shareholder A and by S.S. Karapetyan and A.G. Ilyaev - on behalf of the Shareholder B. (v. 62, case sheets 243-260);

- by the share purchase agreement dated December 29, 2009, whereunder the company «Jella J Holding & Finance Inc.» (the Buyer) bought 1,000 shares of «Skendleby» from the company «MRN Law Services Ltd.» (the Seller) for 1,000 euros, that is 50% of the issued and distributed shares of the company. At the time of sale, the Seller was the sole legal and beneficial owner of the company «Scandleby» (v. 63, case sheets 12-24, 25-37);

> - by the confirmation of the company «MRN Law Services Ltd.» dated December 29, 2009 that it received from «Jella Holding & Finance Inc.» full payment for the sale of 1,000 shares of «Scandleby» (v. 63, case sheets 38-39, 40-41);

> - by the decision of the company «MRN Law Services Ltd.» dated December 29, 2009, as the sole director of the company «Skendleby», on appointment of A.G. Ilyaev as an additional director of the company «Skendleby» (v. 63 c.s 42, 43);

> - by the decision of «MRN Law Services Ltd.» dated January 16, 2010, as the sole director of «Tufts», on the company's conclusion of the share purchase agreement, whereunder

the company will have to sell 230,500 of shares in the capital of the company «Doralin» the company «Mastero» at the nominal value (v. 63, case sheets 54, 55);

- by the payment receipt dated January 18, 2010, whereunder the company «Tufts», in accordance with the share purchase agreement of the company «Doralin» dated January 18, 2010 between the company «Tufts» and «Mastero», confirms receipt of 5,000 euros as payment of the purchase price from the company «Mastero» (v. 63, case sheets 58, 59);

- by the decision of the sole director of «Tufts» dated January 16, 2010, whereunder the director of the company «Tufts» - the company «MRN Law Services Ltd.» approves the transfer of 230 500 shares in the capital of the company «Doralin» in favor of «Mastero» (v. 63, case sheets 90, 91);

- by the decision of «New Generation Services Ltd.» and Elena Demina dated January 16, 2010 as directors of the company «Doralin» on approval of the transfer of 230,500 shares in the company's capital from «Tufts» in favor of «Mastero» (v. 63, case sheets 92, 93);

- by the share transfer certificate dated January 16, 2010, whereunder the company «Solid Rock Trading Ltd.» (British Virgin Islands) transfers to «Brich Trading SA» (British Virgin Islands) 855 shares with numbers 856-1710 in the capital of «Blidensol» (v. 63, case sheets 98, 99);

- by the share purchase agreement dated January 18, 2010, whereunder the company «Solid Rock Trading Ltd.» sold to the company «Brich Trading SA» 855 shares of the company «Blidensol» for 855 euros, which was 50% of the issued and distributed shares of the company (v. 63, case sheets 106-120, 121-135);

- by a special decision of the shareholders of «Blidensol» - the companies «Solid Rock Trading Ltd.» and «Brich Trading SA» dated January 16, 2010, whereunder it was unanimously decided to remove Article 74 (a) - (c) of the Charter and replace it with new Article 74 as follows: «74. The Board of Directors should consist of two directors. Each shareholder owning 50% of the share capital has the right to propose a candidate, appoint and remove one director. Notwithstanding any other provision of this Charter, all resolutions of the Board of Directors shall be adopted unanimously by two directors; and any agreement entered into by the company shall be valid only, if it is signed by all directors" (v. 63, case sheets 142, 143);

- by subordination letter of agreement dated January 18, 2010 addressed to «Deutsche Bank» on behalf of the companies LLC «Gasoiltrade», OJSC «Kalugaglavsnab», «Grover Holding & Invest Ltd.», «Skendleby», which confirms that all receipts under the subordinated loan agreement for a total amount of 55.5 million US dollars should be used by «Skendleby» exclusively for financing the purchase price under the Redemption Agreement dated January 18, 2010 with Deutsche Bank (v. 63, case sheets 282-284, 285-287, 288-291, 292-295);

- by the decision of the directors of «Skendleby» dated January 15, 2010 - the company «MRN Law Services Ltd.» and A.G. Ilyaev - on the fact that the company, as the Buyer, should enter into the redemption agreement with «Deutsche Bank», whereunder the Seller will agree to sell its rights as the Initial Creditor for the purchase price of 55 million US dollars under the Credit Agreement dated October 6, 2006 (as amended on December 27, 2006), and whereunder the Seller has provided a loan of 100 million US dollars to «Blidensol». The company shall ratify and approve 5 subordinated loan agreements for a total of 55 million US dollars between «Skendleby» as the borrower and each of the following entities: OJSC «Universal Commercial Investment Center», LLC «Decorum Corp. Ltd.», LLC «Gasoiltrade», OJSC «Kalugaglavsnab» and «Grover Holding & Invest Ltd.» as creditors with the sole purpose of financing the payment of the Purchase Price and other amounts due under the redemption agreement (v. 63, case sheets 302-303, 304-305);

- by the decision of the directors of «Skendleby» dated December 30, 2009 - «MRN Law Services Ltd.» and A.G. Ilyaev - that the company, as the borrower, will conclude the loan agreements with the company «Universal Commercial Investment Center» for the amount of 20

64

million US dollars, with LLC »Decorum Corp. Ltd.» - for 2,250,000 US dollars, with LLC
«Gasoiltrade» - for 16 million US dollars, with OJSC «Kalugaglavsnab» - for 12,250,000 US
dollars and with «Grover Holding & Invest Ltd.» - for 5 million US dollars (v. 63, case sheets
306, 307);

     - by the minutes of the meeting of the Board of Directors of the company «Kalken» dated
January 18, 2010, whereunder the decisions on approval of the transfer certificate of 920 shares
of the company in favor of L. Karapetyan and on the issue of a new joint-stock certificate No. 6
with the indication of L. Karapetyan as a registered owner of 920 shares of the company,
cancelling at the same the share certificate No. 5 dated March 5, 2008 (v. 63, case sheets 326,
327);

  - by the transfer certificate dated January 18, 2010, whereunder the company «Ionics
Nomenees Ltd.» (Cyprus) transfers to Lennik Karapetyan 920 shares of the company «Kalken»
numbered from 0081 to 1000 (v. 63, case sheets 320, 321);

    - by the refusal of M. Klochin, who is the owner of 40% of shares in «Kalken», of the pre-
emption right to 920 shares in favor of L. Karapetyan (v. 63, case sheets 322, 323);

  - by the refusal of M. Ananiev, who is the owner of 40% of shares in «Kalken», of the pre-
emption right to 920 shares in favor of
L. Karapetyan (v. 63, case sheets 324, 325);

  - by the minutes of the special meeting of the Board of Directors of the company «Kalken»
dated January 18, 2010, whereunder it was decided to appoint L. Karapetyan to the first position
of the company's Director (v. 63, case sheets 328, 329);

    - by the search protocol dated February 7, 2012 in the office of CJSC «Professional
Communications», where it was withdrawn the documents in relation to CJSC «Centurion
Alliance», shopping center «Europark», hotel «Moscow» (v. 64, case sheets 3-6), which were
examined on February 14, 2012 (v. 64, case sheets 220-227);

    - by the agreement dated August 29, 2003 on the project implementation for the
construction of the shopping center «Ekaterinovka» at the address: 62, Rublyovskoye Highway
(v. 64, case sheets 26-27);

    - by the protocol of seizure of the documents in relation to V.I. Smagin, d.v. Garkusha,
the companies «Doralin», CJSC «Titul», CJSC «TD Unikomimpeks», CJSC «Centurion
Alliance» dated November 23, 2010 in «Deutsche Bank» at the address: buid. 2, 82,
Sadovnicheskaya street, Moscow (v. 66, case sheets 72-88), which were examined on Janury 18,
2011 (v. 66, case sheets 89-127);

    - by the protocol of seizure of the documents in relation to V.I. Smagin, d.v. Garkusha,
the companies «Doralin», CJSC «Titul», CJSC «TD Unikomimpeks», CJSC «Centurion
Alliance» dated January 20, 2011 in «Deutsche Bank» at the address: buid. 2, 82,
Sadovnicheskaya street, Moscow (v. 66, case sheets 160-183), which were examined in
accordance with the document examination record dated January 21, 2011 (v. 70, case sheets
155-197);

    - by the instructions of V.I. Smagin to the depository department of LLC «Deutsche
Bank» dated December 25, 2006, whereunder an external transfer is effected without a change of
ownership of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460
pieces, the counterparty - V.I. Smagin, the counterparty's depository - «Deutsche Bank» , the
supplying agent - CJSC «Status» (v. 67, case sheet 13 (original);

    - by the notification of V.I. Smagin from CJSC «Status» dated December 25, 2006 on
the transaction conducted on the personal account, whereunder it was written off 460 shares of
CJSC «Centurion Alliance» from the personal account of V.I. Smagin in CJSC «Status», which
were credited to the personal account of the nominal holder - LLC «Deutsche Bank» - on
December 25, 2006 (v. 67, case sheet 14 (original);

        - by the instruction for carrying out the securities transactions from «Doralin» to
        the depository department of LLC «Deutsche Bank» dated December 26, 2006,
        whereunder an internal transfer is made with the change of the owner of the ordinary
        registered shares of CJSC «Centurion Alliance» in the amount of 161 pieces with

respect to the counterparty D.V. Garkusha under the share contract of purchase and sale dated November 24, 2006 (v. 67, case sheets 16, 17);

- by the instruction for carrying out the securities transactions from «Doralin» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty V.I. Smagin under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 20, 21);

- by the instruction for carrying out the securities transactions from «Doralin» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty CJSC «TD Unikomimpeks» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 24, 25);

- by the instruction for carrying out the securities transactions from CJSC «TD Unikomimpeks» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty «Doralin» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheet 26);

- by the instruction for carrying out the securities transactions from CJSC «Titul» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 759 pieces with respect to the counterparty «Doralin» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 29, 32);

- by the instruction for carrying out the securities transactions from «Doralin» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 759 pieces with respect to the counterparty CJSC «Titul» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 30, 31);

- by the instruction for carrying out the securities transactions from LLC «Milea» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty «Doralin» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 35, 37);

- by the instruction for carrying out the securities transactions from «Doralin» to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty LLC «Milea» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 36, 38);

- by the instruction for carrying out the securities transactions from D.V. Garkusha to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty «Doralin» under the share contract of purchase and sale dated November 24, 2006 (v. 67, case sheets 41, 42);

- by the instruction from V.I. Smagin to the depository department of LLC «Deutsche Bank» dated December 26, 2006, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 460 pieces with respect to the counterparty «Doralin» under the share contract of purchase and sale dated December 26, 2006 (v. 67, case sheets 44, 45, 46);

- by the instruction of the company «Skendleby» to the depository department of LLC «Deutsche Bank» dated February 27, 2010, whereunder an external transfer is effected without changing the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 2,300 pieces, No. of securities account - «K40004020008», counterparty - «Skendleby», the counterparty's depository - CJSC «Fora-Bank», the supplying agent - CJSC «Fora-Bank»; the documents confirming the transaction - Depository Agreement No. 16-1/SKIL/945 dated February 16, 2010, the Depository Agreement No. D -107/02/10 dated February 19, 2010 (v. 67, case sheet 52);

66

- by the statement on the depository account No. K40004020008 of the company «Skendleby» in the depository of «Deutsche Bank» dated February 27, 2010, whereunder the company «Skendleby» is the owner of 2,300 shares of CJSC «Centurion Alliance» (v. 67, case sheet 53);

- by the transfer order dated February 27, 2010, whereunder 2,300 of shares of CJSC «Centurion Alliance», not encumbered by any obligations, are transferred from the account of the nominal holder - LLC «Deutsche Bank» - to the account of the nominal holder - CJSC «Fora-Bank», the basis for entry in the register is the client's instruction for the transfer No. w/n dated February 27, 2010, the depository agreement No. 16-1/SKIL/945 dated February 16, 2010, the depository agreement No. Д-107/02/10 dated February 19, 2010 (v. 67, case sheet 56);

- by a pledge order of «Doralin» to the depository department of LLC «Deutsche Bank» dated February 26, 2010 with the purpose of pledge termination; the pledge agreement dated February 25, 2010, name of the issuer - CJSC «Centurion Alliance»; number of securities - 2,300 pieces, pledge holder - «Skendleby» (v. 67, case sheet 61);

- by the statement on the depository account No. K40DORN10001 of the company «Doralin» in the depository of «Deutsche Bank» dated February 26, 2010, whereunder the company «Doralin» is the owner of 2,300 shares of CJSC «Centurion Alliance» (v. 67, case sheet 62);

- by the notification of the transaction dated February 26, 2010,whereunder «Deutsche Bank» notifies that on the basis of the pledge termination instruction of the client «Doralin» No. 2 dated February 26, 2010 from section DORN1006 of the depository account No. K40DORN10001 to section DORN1001 "Main Section" of the depository account No. K40DORN10001, it was transferred 2,300 shares of CJSC «Centurion Alliance»; the number and date of the pledge agreement - Deed of Settlement and Termination - February 25, 2010 (v. 67, case sheets 63, 65);

- by the instruction for carrying out the securities transactions from «Skendleby» to the depository department of LLC «Deutsche Bank» dated February 26, 2010, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 2300 pieces with respect to the counterparty «Doralin» under the Deed of Settlement and Termination dated February 25, 2010 (v. 67, case sheet 66);

- by an extract from the depository account No. K40004020008 of «Skendleby» in the depository of «Deutsche Bank» dated February 26, 2010 at 04:05 p.m., whereunder the company «Skendleby» owns 2,300 shares of CJSC «Centurion Alliance» (v. 67, case sheet 67);

- by the instruction for carrying out the securities transactions from «Doralin» to the depository department of LLC «Deutsche Bank» dated February 26, 2010, whereunder an internal transfer is made with the change of the owner of the ordinary registered shares of CJSC «Centurion Alliance» in the amount of 2,300 pieces with respect to the counterparty «Skendleby» under the Deed of Settlement and Termination dated February 25, 2010 (v. 67, case sheet 69);

- by the Depository Agreement No. 16-1/SMGN/374 dated December 21, 2006, whereunder the Depository - LLC «Deutsche Bank» - renders to the Customer - I.V. Smagin - the services for the storage of securities certificates and registration and certification of the rights to securities through the opening of a separate depository account, as well as related services (v. 67, case sheets 72-95 (original),, case sheets 96-147 - original annex to the agreement);

- by the pledge order from «Doralin» to the depository of «Deutsche Bank» dated December 26, 2006, the order purpose - the pledge origin; date of the pledge agreement - December 26, 2006; issuer - CJSC «Centurion Alliance»; number of securities - 2,300 pieces; number of the deposit account of the pledger - K40DORN1001; number of the pledge subaccount - DORN 1004; beneficiary of the pledge - «Deutsche Bank» (v. 67, case sheets 179, 180);

- by the instructions on transactions with securities issued by «Doralin» to the Depository Department of «Deutsche Bank» dated 25.02.2010, according to which registered ordinary shares of CJSC «Centurion Alliance» in the amount of 2300 units are transferred internally with no change of the beneficiary to «Doralin», subaccount

DORN1006, pledged securities subaccount in favour of «Skendleby» (a new Pledge recipient under the Contract of redemption dated 18.01.2010), the counterparty depository - «Deutsche Bank», the place of settlement – «Deutsche Bank»; documents confirming the transaction – Contract of redemption between «Deutsche Bank» and «Skendleby» dated 18.01.2010 (v. 67, case sheets 185, 186);

- by the statement dated 15.02.2010 of the attorneys-in-fact for «Skendleby» company - K. R. Gazarova and M. V. Sukhov in «Deutsche Bank» on opening of the securities account (v. 69, case sheet 160);

- by the statement dated 25.03.2010 of the attorneys-in-fact for «Skendleby» company - K. R. Gazarova and M. V. Sukhov in «Deutsche Bank» on closing of the securities account (v. 69, case sheet 161);

- by the Depositary agreement No. 16-1/SKTL/945 dated 16.02.2010, according to which the depository – «Deutsche Bank» located at: 82, Sadovnicheskaya Str., Moscow, provides to the client – «Skendleby» company, the services on the custody of securities certificates and accounting and certification of the rights to the securities by opening a separate securities account, as well as related services, on behalf of «Skendleby» company the agreement was signed by the attorneys-in-fact K. R. Gazarova and M. V. Sukhov (v. 69, case sheets 63-188);

- by the General Power of Attorney issued by «Skendleby» company in the name of M. V. Sukhov and K. R. Gazarova dated 11.02.2010 for a period of 1 year (v. 69, case sheets 193-196);

- a certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 25.01.2010, whereby the companies MPH Law Services Ltd. (1,000 shares) and Jella Holding&Finance Inc. (1,000 shares) are the shareholders of «Skendleby» company (v. 69, case sheets 209, 210);

- by confirmation of beneficial ownership dated 29.01.2010, according to which MPH Law Services Ltd. owns 1,000 shares of «Skendleby» company as a Trustee and in the interests of Edward-Michael Nimmo-Smith (v. 69, case sheets 213, 214);

- a certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 25.01.2010, whereby the Directors of «Skendleby» company are Andrey Ilyaev and MPH Law Management Ltd., which is also the Secretary of the Company (v. 69, case sheets 227, 228);

- by the information about the Directors of MRN Law Management Ltd. dated 25.01.2010, according to which the Directors of the company are Michael Phillipow and Lucas Haviaras (v. 69 case sheets 232, 233);

- by the Depositary agreement No. 16-1/DORN/380 dated 25.12.2006, according to which the depository – «Deutsche Bank» provides to the client – «Doralin» company, the services on the custody of securities certificates and accounting and certification of the rights to the securities by opening a separate securities account, as well as related services, on behalf of «Doralin» company the agreement was signed by the attorney-in-fact D. V. Garkusha (v. 71, case sheets 88-165);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 19.09.2006, whereby the Directors of «Doralin» company are D.A. Demetriades and H.D. Demetriades, the secretary - «Dadlaw Secretarial Ltd.» (v. 71, case sheets 241-245);

- by the General Power of Attorney issued by «Doralin» company in the name of D. V. Garkusha dated 19.09.2007 for a period of 1 year (v. 71, case sheets 246-251);

- by the General Power of Attorney issued by «Doralin» company in the name of V. I. Smagin and Artem G. Yeghiazaryan dated 20.02.2009 for a period of 1 year (v. 71, case sheets 252-257);

- by the General Power of Attorney issued by «Doralin» company in the name of D. V. Garkusha dated 05.10.2006 for a period of 1 year (v. 71 case sheets 258-264);

- by the statement dated 22.12.2006 of the attorney-in-fact of «Doralin» company D. V. Garkusha to «Deutsche Bank» on opening of the securities account (v. 71, case sheet 286);

- by the corporate structure diagram of «Blendensol» company dated 04.03.2008, according to which 100% of the shares of «Blendensol» company are owned by

«Hamfast Investment Ltd» (British Virgin Islands), which is 100% owned by D. V. Garkusha, in the transaction D. V. Garkusha transmits 100% to Vitaly Gogokhiya. The share purchase agreement between D. Garkusha and V. Gogokhiya has been signed. The transaction is in the process of registration. This document is signed by the Directors of «Blendensol» company D.A. Demetriades and H.D. Demetriades (v. 72, case sheet 208);

- by the record of seizure of documents dated 18.03.2011 in the office of the Law Firm «Clifford Chance CIS Limited» (v. 72, case sheets 3-21), which has been viewed with the translations into the Russian language in accordance with the inspection protocols dated 11.04.2011 (v. 73, case sheets 313-337), 27.07.2011 (v. 77, case sheets 211-220), 27.07.2011 (v. 78, case sheets 262-270);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 02.08.2006, whereby the registered office of «Blendensol» company is located at: Tasou, 3 Dadlaw House, P.C. 1520, Nicosia, Cyprus (v. 72, case sheets 185-189 (a copy with translation);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 02.08.2006, whereby the Directors of «Blendensol» company are citizens of Cyprus – Demetrios A. Demetriades and Harris D. Demetriades, the secretary – «Dadlaw Secretarial Ltd.» (v. 72, case sheets 198-200);

- by the corporate structure diagram of «Blendensol» company dated 04.03.2008 signed by «Blendensol» company Directors Demetriades and H. D. Demetriades, according to which 100% of the shares of «Blendensol» company are owned by «Hamfast Investment Ltd» (British Virgin Islands), which is 100% owned by D. V. Garkusha, in the transaction D. Garkusha transmits 100% to Vitaly Gogokhiya; the share purchase agreement between D. Garkusha and V. Gogokhiya has been signed, the transaction is in the process of registration (v. 72, case sheet 208);

- by the loan agreement dated 11.01.2010 between «DECORUM CORP. Ltd.» (Creditor) and «Skendleby» (Borrower), whereby the creditor grants to the borrower USD 2,250,000 by bank transfer to the account in «Deutsche Bank» with the loan repayment not later than on 11.01.2013, at the rate of 9.5% per annum (v. 73, case sheets 286-291);

- by the loan agreement dated 06.10.2006, as amended on 27.12.2006, between «Blendensol» company as the Borrower and «Deutsche Bank» as the Loan Facilitator, Original Creditor, Facility Agent and Security Agent. Under this agreement, «Deutsche Bank AG» (Frankfurt am Main), acting through its London branch, grants the Borrower – «Blendensol» company, a loan of 100 million U.S. dollars, which the Borrower will use to achieve the overall objectives of the company, including the construction of the hotel at: 2 Okhotny Ryad, Moscow.

The Borrower is obliged to repay the loan in one payment at the Final Date for payment (clause 7.1.1) – the date that will come 10 years after the First Use of the loan.

The interest accrual periods on the Loan make 6 months each (clause 10.1.1) (v. 74, case sheets 16-137);

- by the agreement on pledge of shares and assets in exchange for a loan dated 22.12.2006 between «Tufts» company as the Pledger, and «Deutsche Bank» as the Security Agent, pursuant to which the Pledger is the registered holder of 461,000 shares in «Doralin» company. The Pledger agreed to enter into this pledge agreement as a security guaranteeing the due and timely performance by the Borrower – «Blendensol» company – of its secured obligations under the Loan Agreement dated 06.10.2006 (as amended on 27.12.2006). As the security the Pledger pledges and transfers to the Security Agent all of the shares owned by it in «Doralin» company (v. 75, case sheets 2-36, 37-71);

- by the pledge agreement for shares of CJSC «Centurion Alliance» dated 26.12.2006 between «Doralin» as the Pledger and «Deutsche Bank» as the Pledge Holder,

according to which, as the security for the performance by the Borrower («Blendensol» company) of the Secured obligations under the Loan Agreement dated 06.10.2006, the Pledger gives to the Pledge Holder as a pledge 100% shares of CJSC «Centurion Alliance» (v. 76, case sheets 67-91,92-116);

- by the agreement of pledge of working capital (assets) dated 22.12.2006 between «Blendensol» company (Pledger) and «Deutsche Bank» (Security Agent), according to which the Pledger encumbers through the pledge of its assets the company, the value of goodwill of the company and the property of any nature, including its current uncalled capital, to guarantee the fulfillment of secured obligations under the Loan Agreement dated 06.10.2006 (v. 76, case sheets 118-143, 144-169);

- by the deed of subordination dated 22.12.2006 between CJSC «Centurion Alliance», «Doralin» and «Tufts» as subordinated creditors, «Deutsche Bank» as the Security Agent and Facility Agent, and «Blendensol» company as the Borrower, which states that according to the Loan Agreement dated 06.10.2006 «Deutsche Bank» agreed to grant «Blendensol» company (Borrower) a loan in the amount of 100 million U.S. dollars, each subordinated creditor agrees to sign          this          agreement          as          a          security          document.

In this agreement the priority debt means all obligations of the Borrower for the payment of the capital amount of the debt, interests, fees, liens and other amounts in favour of «Deutsche Bank» under the Loan Agreement dated 06.10.2006; the subordinated debt means any indebtedness of the Borrower to any or all Subordinated Creditors.

In accordance with this agreement the payment of the whole or any part of the subordinated debt shall be delayed and shall be subordinate to full payment of the priority debt. No payments in respect of the subordinated debt shall be made until full repayment of the priority debt.

On behalf of «Blendensol», «Doralin» and «Tufts» companies the agreement is signed by D. Garkusha; on behalf of CJSC «Centurion Alliance» – by M. Klochin and V. Timchenko (v. 77, case sheets 2-24, 25-47);

- by the assignment agreement of insurance dated 22.12.2006 between CJSC «Centurion Alliance» as the Assignor and «Deutsche Bank» as the Security Agent, whereby it is stated that in accordance with the Loan Agreement dated 06.10.2006 «Deutsche Bank» grants the loan to «Blendensol» company (Borrower) in the amount of 100 mln U.S. dollars; the Assignor gave their consent to enter into this agreement with the aim of ensuring due and timely execution by the Borrower of its secured obligations; in accordance with this agreement, the Assignor irrevocably and unconditionally undertakes obligations of the Security Agent, which at any moment, when there has been and continues the Event of Default, after which the Borrower has been sent a notice of acceleration with a copy to the Assignor, resulting in the Assignor's on-demand payment and repayment of the Secured obligation at the due date for such payment; on behalf of CJSC «Centurion Alliance» the document is signed by M. Klochin and V. Timchenko (v. 77, case sheets 138-170, 171-203);

- by the letter from the General Director of «Daev Plaza» D. Fetisova to «Deutsche Bank» for the name of G. Kolesnitsky, according to which the sole beneficiary of LLC «Daev Plaza» is Vitaly Gogokhiya (v. 78, case sheet 31);

- by the certificate of transfer dated 19.01.2010 between «Deutsche Bank» (Current Lender) and «Skendleby» company (New Lender), whereby the Current Lender and the New Lender agree that the Current Lender shall give the New Lender by novation all of the obligations, rights and liabilities under the loan agreement dated

06.10.2006 (as amended on 27.12.2006) between «Blendensol» company and «Deutsche Bank»
(v. 78, case sheets 41-50);

- by the certificate of financial solvency dated 18.01.2010 addressed to «Deutsche Bank»,
according to which MPH Law Management Ltd. and Ilyaev as Directors of «Skendleby» company
declare that they have studied the provisions of the Cyprus Law on Insolvency in respect of the
«Skendleby» company's ability to fulfill its obligations under the Subordinated loans, including
without limitation: the acceptance of the amount of USD 55,500,000 of Subordinated loans for the
sole purpose of acquiring loans under the Loan Agreement and the Agreement dated 18.01.2010
between «Deutsche Bank» and «Skendleby» company; the completion of transactions executed
under the Agreement, including the purchase of loans under the Loan Agreement; repayment of
Subordinated loans (v. 78, case sheets 146-151);

- by the incumbency certificate in accordance with which MPH Law Management Ltd. as
the Secretary of «Skendleby» company confirms relevant information in respect of the company
as at 15.01.2010 (v. 78 case sheets 153-156, 158-161);

- by the declaration of trust dated 16.10.2006, under which the nominee «Dadlaw Secretarial
Ltd.» warrants and guarantees that it owns the shares of «Doralin» company as the nominee, for
and on behalf of the owner - «Tufts» company (v. 78, case sheets 163-164);

- by the letter of «Deutsche Bank» to CJSC «Centurion Alliance» dated 01.04.2009 with
the reference to the Pledge Agreement of the rights to the account dated 25.12.2006 and the request
for the documents in accordance with the specified Agreement (v. 78, case sheets 179-180);

- by the letter of «Deutsche Bank» to «Blendensol», «Tufts», «Doralin» and CJSC
«Centurion Alliance» dated 08.04.2009 with the reference to the Loan Agreement dated
06.10.2006 as amended on 27.12.2006, for the amount of USD 100 millio, with the request to
provide information and documents, including the original of the account statement from the
securities account of «Doralin» company in «Deutsche Bank» as the Depositary, confirming that
the pledge of all shares of CJSC «Centurion Alliance» has been duly registered, and the shares are
currently pledged in favour of «Deutsche Bank» (v. 78, case sheets 182-191);

- by the letter of «Inscred Company Corp.» (the Buyer) to «Deutsche Bank» (the Seller)
dated 13.04.2009 with the reference to the letter dated 19.03.2009 on granting the exclusive rights,
where it is reported that the Seller («Deutsche Bank») has not provided to the Buyer the certain
documents in respect of the pledge of «Doralin» shares, in addition, the documents on «Doralin»
shares pledge have significant difference, as not all of the documents are available to the Seller;
according to the available information, the Borrower will not be able to provide the above
documents to the Seller within the primary period of validity of the exclusive rights extended until
17.04.2009, this makes it possible for the Buyer to consider two options: the issue of termination
of the Letter on granting the exclusive rights in accordance with clause 4.4, and the request to
refund the Deposit in accordance with clause 2.4.1; the development of a new form of cooperation
with the Seller (v. 78, case sheets 199-200);

- by the letter of «Deutsche Bank» (the Seller) to «Inscred Company Corp.» (the Buyer)
dated 19.03.2009, which states that the Buyer has expressed an interest in purchasing all rights of
the Seller under the Loan Agreement dated 06.10.2006 in the amount of USD 100 million (as
amended on 27.12.2006); in accordance with clause 2.1.2 the Buyer transfers to the Seller's
account 5 million U.S. dollars as a Deposit for the payment of the Purchase Price; in accordance
with section 3, upon receiving the Deposit the Seller agrees, during the exclusivity period, to ensure
the Buyer's access to the copies of necessary transaction documents, not to enter into negotiations
with any person in connection with the sale of all or part of its rights under the Loan Agreement;
in accordance with section 4, the Buyer has

the right at any time during the Initial exclusivity period to notify the Seller of its intention to acquire the rights and obligations under the Loan at the Purchase Price that shall not less than 75 million U.S. dollars. The exclusivity period shall mean the period from the effective date to the earlier of: 1) the date after 21 days; 2) the date on which the Seller will receive the purchase notification in accordance with section 4 (v. 78, case sheets 212-226, 227-243);

- by the corporate structure diagram of the Borrower, in accordance with which as of 27.12.2006 D. Garkusha owns 100% of the shares in «Blendensol» company (v. 78, case sheets 248, 249);

- by the corporate structure diagram of "Europark" as of 27.12.2006, according to which D. Garkusha, V. Smagin and «Kalken» company, have, respectively, 7%, 20% and 73% in «Tufts» company, which owns 100% of «Doralin» company, which owns 100% of CJSC «Centurion Alliance» (v. 78, case sheets 251, 252);

- by the record of seizure dated 19.01.2012 in non-profit partnership «Russian Gas Society», of materials in the case on a claim of CJSC Trade House «Unikomimpeks» to «Doralin» company (v. 79, case sheets 10-13), which were examined on 20.01.2012 (v. 79, case sheets 124-131);

- by the statement of claim of CJSC Trade House «Unikomimpeks» to «Doralin» company dated 04.05.2009 on the recognition of the right of ownership and compelling to transfer the shares, filed with the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» (v. 79, case sheets 19-21);

- by the share purchase agreement dated 26.12.2006, according to which CJSC Trade House «Unikomimpeks» (the Seller), represented by General Director R.V. Novikov, sells, and «Doralin» company (the Buyer), represented by the attorney-in-fact D.V. Garkusha, accepts and pays for 460 shares of CJSC «Centurion Alliance» the amount of RUB 6,323,320, the payment term is set within 10 banking days after the relevant entry in the register of shareholders (v. 79, case sheets 29-30); - by the supplementary agreement dated 02.03.2009 to the share purchase agreement dated 26.12.2006 between CJSC Trade House «Unikomimpeks» (the Seller), represented by General Director R.V. Novikov, and «Doralin» company (the Buyer), represented by the attorney-in-fact V.I. Smagin, in which the parties stated the failure of «Doralin» to fulfill its obligations on payment for the shares, in this respect the Buyer has assumed the obligation to pay for the shares within three business days upon signing the agreement (v. 79, case sheet 31);

- by the supplementary agreement dated 25.02.2009 to the share purchase agreement dated 26.12.2006 between CJSC Trade House «Unikomimpeks» (the Seller), represented by General Director R.V. Novikov, and «Doralin» company (the Buyer), represented by the attorney-in-fact V.I. Smagin, in which the parties state that the Buyer has transferred to the Seller the funds in the amount of RUB 6,323,320 in payment for the transaction, but has not fulfilled the obligation to pay the remaining amount of RUB 6,323,320 (v. 79, case sheet 98);

- by the judgement of the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» dated 21.07.2009, in accordance with which the claim of CJSC Trade House «Unikomimpeks» to «Doralin» company has been sustained in full, the right of ownership of CJSC Trade House «Unikomimpeks» for 460 shares of CJSC «Centurion Alliance» has been declared, and «Doralin» company is obliged to return to CJSC Trade House «Unikomimpeks» 460 shares of CJSC «Centurion Alliance» by issuing the transfer order to make an entry in the share register (v. 79, case sheets 114-120);

- by the record of seizure dated 06.03.2012 in non-profit partnership «Russian Gas Society» of materials in the case on a claim of CJSC «Titul» to «Doralin» company (v. 80, case sheets 5-8), which were examined on 12.04.2012 (v. 80, case sheets 106-111);

- by the statement of claim dated 04.05.2009 of CJSC «Titul» to «Doralin» company on the recognition of the right of ownership and compelling to transfer the shares in connection with the default of «Doralin» on its obligations (vol. 80, case sheets 14-16);

- by the share purchase agreement dated 26.12.2006, according to which CJSC «Titul» (the Seller), represented by General Director V. V. Balakina, and «Doralin» company (the Buyer), represented by the attorney-in-fact D.V. Garkusha, have entered into this agreement stating that the Seller sells and the Buyer accepts and pays for 759 shares of CJSC «Centurion Alliance», which is 33% of the total number of shares, the amount of RUB 10,515,000, the payment term is set within 10 banking days after the relevant entry in the register of shareholders (v. 80, case sheets 23-24);

- by the supplementary agreement dated 02.03.2009 to the share purchase agreement dated 26.12.2006 between CJSC «Titul» (the Seller), represented by General Director A.V. Tikhomirov, and «Doralin» company (the Buyer), represented by the attorney-in-fact V.I. Smagin, in which the parties stated the failure of «Doralin» to fulfill its obligations on payment for the shares, in this respect the Buyer has assumed the obligation to pay for the shares within three business days upon signing the agreement; in the event of default on the obligation the share purchase agreement dated 26.12.2006 shall be deemed terminated, upon which fact the Buyer shall prepare and transfer to CJSC «Titul» the signed transfer order to make the relevant entry to the register of shareholders of CJSC «Centurion Alliance» (v. 80, case sheet 25);

- by the supplementary agreement dated 25.02.2009 to the share purchase agreement dated 26.12.2006 between CJSC «Titul» (the Seller), represented by General Director A.V. Tikhomirov, and «Doralin» company (the Buyer), represented by the attorney-in-fact V.I. Smagin, according to which the parties state that the Buyer has transferred to the Seller the funds in the amount of RUB 10,515,000 in payment for the transaction, but has not fulfilled the obligation to pay the remaining amount of RUB 10,515,000 (v. 80, case sheet 81);

- by the judgement of the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» dated 21.07.2009, in accordance with which the claim of CJSC «Titul» to «Doralin» company has been sustained in full, the right of ownership of CJSC «Titul» for 759 shares of CJSC «Centurion Alliance» has been declared, and «Doralin» company is obliged to return to CJSC «Titul» 759 shares of CJSC «Centurion Alliance» (v. 80, case sheets 97-103);

- by the statement of claim of LLC «Milea» to «Doralin» company dated 04.05.2009 on the recognition of the right of ownership and compelling to transfer the shares, filed with the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» (v. 80, case sheets 128-130);

- by the share purchase agreement dated 26.12.2006, according to which LLC «Milea» sells and «Doralin» company accepts and pays for 460 shares of CJSC «Centurion Alliance», which is 20% of the total number of shares, the amount of RUB 6,323,320 (v. 80, case sheet 137);

- by the supplementary agreement dated 25.02.2009 to the share purchase agreement dated 26.12.2006 between LLC «Milea» (the Seller), represented by General Director I.A. Troshin, and «Doralin» company (the Buyer), represented by the attorney-in-fact V.I. Smagin, according to which the parties state that the Buyer has transferred to the Seller the funds in the amount of RUB 6,323,320 in payment for the transaction, but has not fulfilled the obligation to pay the remaining amount of RUB 6,323,320 (v. 80, case sheet 195);

- by the supplementary agreement dated 02.03.2009 to the share purchase agreement dated 26.12.2006 between LLC «Milea» (the Seller), represented by General Director I.A. Troshin, and «Doralin» company (the Buyer), represented by the attorney-in-fact V.I. Smagin,

in which the parties stated the failure of «Doralin» to fulfill its obligations on payment for the shares (v. 80, case sheet 138);

- by the judgement of the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» dated 21.07.2009, in accordance with which the claim of LLC «Milea» to «Doralin» company has been sustained in full, the right of ownership of LLC «Milea» for 460 shares of CJSC «Centurion Alliance» has been declared, and «Doralin» company is obliged to return to LLC «Milea» 460 shares of CJSC «Centurion Alliance» (v. 80, case sheets 211-217);

- by the record of seizure dated 06.03.2012 in non-profit partnership «Russian Gas Society», of materials in the case on a claim of LLC «Milea» to «Doralin» company (v. 80, case sheets 119-122), which were examined on 17.04.2012 (v. 80, case sheets 220-226);

- by the Moscow Arbitration Court determination dated 06.05.2009, which satisfied the motion of «Longlake Holdings Limited» concerning implementation of provisional measures under the claim against CJSC «Centurion Alliance» in the form of a prohibition on official registration of alienation of shopping center «Europark» (v. 81, case sheets 11-12);

- by the Moscow Arbitration Court determination dated 10.03.2010 on reversal of interim measures based on the application of «Longlake Holdings Limited» with the reference to the refusal to accept the improper performance proposed by the Guarantor of obligations under Contract No. 1 dated 31.12.2007 and Surety Agreement No. 2/07 dated 31.12.2007, which shall terminate            the            surety            (v.            81,            case            sheet            32);

-            by the record of seizure dated 30.03.2011, during which materials in the case on a claim of «Longlake Holdings Ltd.» to CJSC «Centurion Alliance» have been seized (v. 82, case sheets 3-6),    which    have    been    reviewed    on    06.04.2011    (v.    83,    case    sheets    247-263);

-            by the statement of claim dated 30.04.2009 of «Longlake Holdings Ltd.» to CJSC «Centurion Alliance» filed with the permanent arbitration tribunal at non-profit partnership «Russian Gas Society», where the Plaintiff asks to be transferred the ownership rights for the following property - 1) shopping center «Europark» located at: 62 Rublyovskoye Highway, Moscow; leasehold for the land with the area of 31,900 sq m located at: Yekaterinovka, Rublyovskoye Highway, Moscow, referring to signing by the parties of agreement No. 1/1 dated 03.09.2008 to Surety Agreement No. 2/07 dated 31.12.2007, under which CJSC «Centurion Alliance» (the Guarantor) undertook the obligation to be liable to «Longlake Holdings Ltd.» (the Creditor) for improper performance by CJSC «Decorum» (the Debtor) of its obligations under agreement            No.1            dated            31.12.2007            (v.            82,            case            sheets            12-15);

-            by the statement and determination on the interim measures dated 30.04.2009(v. 82, case sheets 18-20, 21-22);

- contract No. 1 dated 31.12.2007 between CJSC «Decorum», represented by the first Deputy to General Director E. V. Pavlyuchenko and the company «Hackham», represented by the attorney-in-fact V.G. Gogokhiya, acting under a power of attorney dated 31.10.2005, in which the parties confirm the debt of CJSC «Decorum» in the amount of USD 13,849,918.09 U.S. resulting from loan agreements concluded for the period from 03.09.2003 to 03.08.2007, and agree on the novation of obligations - the obligation of CJSC «Decorum» to pay the funds to «Hackham» in rubles in the corresponding amount (v. 82, case sheets 23-26);

- by the assignment agreement No. 1 dated 01.09.2008 between «Hackham» (Assignor), represented by V.G. Gogokhiya, and «DECORUM CORP. LIMITED» (Assignee), represented by F.A. Pomorski, under which the Assignor transfers to the Assignee all of its rights and obligations under loan agreement No. 1 dated 31.12.2007, and the Assignee pays to the Assignor USD 14,217,756 not later than on 31.12.2020 (v. 82,. case sheets 31-36);

- by the assignment agreement No. 1/1 dated 03.09.2008 between «DECORUM CORP. LIMITED» (Assignor), represented by F.A. Pomorski, and «Longlake Holdings Limited» (Assignee), represented by

E. Nimmo-Smith, under which the Assignor transfers to the Assignee all of its rights and obligations under loan agreement No. 1 dated 31.12.2007, and the Assignee pays to the Assignor USD 141,455,303.55 not later than on 31.12.2012 (v. 82,. case sheets 37-42);

  - Surety Agreement No. 2/07 dated 31.12.2007 between CJSC «Centurion Alliance» (the Guarantor), represented by General Director M. A. Klochin, and company «Hackham» (the Creditor), represented by the attorney-in-fact V.G. Gogokhiya, stating that the Creditor and CJSC «Decorum» (the Debtor) signed loan agreements that were terminated as a result of the contract of novation dated 31.12.2007. CJSC «Centurion Alliance» was the Guarantor under loan agreements. In this regard, the parties have entered into this Surety Agreement, under which the Guarantor undertakes to be liable to the Creditor for proper performance by CJSC «Decorum» of all of its obligations. The Guarantor and Debtor are jointly and severally liable.

     Pursuant to clause 4.1 of the agreement, in case of default by the Guarantor on its obligations under the agreement, the Creditor shall be entitled to replace the requirement to pay him the funds in the amount of outstanding obligation for the requirement to transfer him the property of the Guarantor into ownership: 1) shopping center «Europark» located at: 62 Rublyovskoye Highway, Moscow; 2) leasehold for the land with the area of 31,900 sq m located at: Yekaterinovka, Rublyovskoye Highway, Moscow (v. 82, case sheets 43-45);

     - by the supplementary agreement No. 1 dated 03.08.2008 to the Surety Agreement No. 2/07 dated 31.12.2007 between CJSC «Centurion Alliance» (the Guarantor), represented by General Director M. A. Klochin, and «DECORUM CORP. LIMITED» (Creditor), represented by Philip-Arthur Pomorski, under the new wording of paragraph 1.2 of Agreement No. 1 dated 31.12.2007 (v. 82, case sheet 46);

     - agreement No. 1, dated 01.09.2008 between CJSC «Centurion Alliance» (the Guarantor), represented by M. A. Klochin, and «DECORUM CORP. LIMITED» company (Creditor), represented by Philip-Arthur Pomorski, the company «Hackham Invest&Trade Ltd.», represented by V.G. Gogokhiya, to Surety Agreement No. 2/07 dated 31.12.2007, according to which the parties agreed to change the person on the Creditor's side in the obligation arising from Surety Agreement No. 2/07 dated 31.12.2007 (v. 82, case sheet 47);

     - agreement No. 1, dated 01.09.2008 between CJSC «Centurion Alliance» (the Guarantor), represented by M. A. Klochin, and ««Longlake Holdings Ltd.» company (the Creditor), represented by E. Nimmo-Smith, and «DECORUM CORP. LIMITED» company, represented by Philip-Arthur Pomorski, to Surety Agreement No. 2/07 dated 31.12.2007, according to which the parties agreed to change the person on the Creditor's side in the obligation arising from Surety Agreement No. 2/07 dated 31.12.2007 (v. 82, case sheet 48);

     - by the petition to change the subject of the claim of the company «Longlake Holdings Ltd.» to CJSC «Centurion Alliance», in which the Plaintiff requests to recover from the Defendant RUB 4,668,808,365 (v. 82, case sheets 114-115);

     - by the petition for involvement of another defendant, filed by «Longlake Holdings Ltd.» with the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» under the claim to CJSC «Centurion Alliance», in which the Plaintiff requests to involve CJSC «Decorum» as the joint defender (v. 82, case sheets 120-121);

     - by the reconciliation report on the debt amount dated 25.06.2009 under Contract No. 1 dated 31.12.2007, between «Longlake Holdings Ltd.» (the Creditor), and CJSC «Decorum» (v. 82,  case sheets 166-187);

          - the certificate of incorporation dated 21.05.2008 for «Longlake Holdings Ltd.» (v. 83, case sheets 164-166);

          - by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 21.05.2008, whereby the shareholders of «Longlake Holdings Ltd.» company are the company «Dadlaw Nomenees Ltd.» (1,000 shares) and «Dadlaw Secretarial Ltd.» (1,000 shares) (v. 83, case sheets 167-170);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 21.05.2008, whereby the Directors of «Longlake Holdings Ltd.» company are H.D. Demetriades and D.A. Demetriades, and the secretary – «Dadlaw Secretarial Ltd.» (v. 83, case sheets 175-178);

- by the judgement of the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» dated 05.08.2009, in accordance with which the claim of «Longlake Holdings Limited» has been sustained in full on joint recovery from CJSC «Centurion Alliance» and CJSC «Decorum» of the debt in the amount of RUB 4,689,670,622.74, resulting from loan agreement No. 1 dated 31.12.2007 between «Hackham» and CJSC «Decorum», as well as interim measures in the form of prohibition on alienation of shopping center «Europark» have been cancelled (v. 83, case sheets 233-241);

- by the record of seizure dated 11.04.2011 in non-profit partnership «Russian Gas Society» of materials in the case on the claim of LLC «Daev Plaza» to CJSC «Centurion Alliance» (v. 84, case sheets 3-5), which were examined on 13.04.2011 (v. 84, case sheets 96-99);

- by the statement of claim dated 29.04.2009 of LLC «Daev Plaza» to CJSC «Centurion Alliance» filed with the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» on the recovery of debts in the amount of RUB 187,926,359 (v. 84, case sheets 11-12);

- by the contract of novation No. 12/08 dated 25.12.2008 between CJSC «Centurion Alliance» (the Debtor), represented by M. A. Klochin, and LLC «Daev Plaza», represented by D.A. Fetisov, under which, instead of loan and bill liabilities the Debtor shall pay to the Creditor the amount of RUB 187,926,359 (v.84, case sheets 13-14);

- by the judgement of the permanent arbitration tribunal at non-profit partnership «Russian Gas Society» dated 13.05.2009 on the claim of LLC «Daev Plaza» against CJSC «Centurion Alliance» on collecting RUB 187,926,359 (v. 84, case sheets 87-88, 89-92);

- by the inspection protocol dated 04.03.2011 in the premises of the Moscow Arbitration Court    of arbitration case No. 40-58704/09-38-238 «Б» under the claim of LLC «Daev Plaza» on insolvency of CJSC «Centurion Alliance» (v. 84, case sheets 106-113);

- by the statement of LLC «Daev Plaza» to the the Moscow Arbitration Court dated 25.05.2009 on implementation of the observation procedure and declaration of CJSC «Centurion Alliance» as insolvent (v. 84, case sheets 117-119);

- by the statement of LLC «Daev Plaza» to the Moscow Arbitration Court under case No. 40-58704/09-38-238 «Б» on the Plaintiff's repudiation of the statement on declaration of CJSC «Centurion Alliance» as insolvent (bankrupt) and termination of proceedings in case (v. 84, case sheet 279);

-    by the Moscow Arbitration Court determination dated 21.01.2010 under case No. 40-58704/09-38-238 «Б» on termination of proceedings in case on declaration of CJSC «Centurion Alliance» as bankrupt (v.84, case sheet 282);

- by the special resolution of shareholders of «Doralin» – companies «Tufts» and «Mastero» dated 16.01.2010 on unanimous decision to delete article 74(a) 74(b) 74(c) of the Articles of Association and change it with a new article 74 which reads as follows: «74. The Board of Directors shall consist of two Directors. Each shareholder owning 50% of the share capital shall be entitled to nominate, to appoint and remove one Director. Notwithstanding anything to the contrary set forth in these Articles of Association, all resolutions of the Board of Directors shall be passed unanimously by two Directors, and any contract entered into by the company, shall be valid only if it is signed by all the Directors» (v. 87, case sheets 2, 3);

-                                                                                    by the special resolutions of shareholders of the company «Doralin» dated 20.04.2010 - companies «Famulatos» and «Mastero», according to which «Doralin» is voluntarily dissolved (v. 87, case sheets 4-5);

- by the confirmation dated 22.03.2010, whereby the company «Executive Management Limited», being the sole Director of the company «Mastero» resolves that «Mastero» as the shareholder of «Doralin» agrees with

the sale to «Tufts» of its 230,500 ordinary shares comprising the equity stake in «Doralin», to the company «Famulatos» and waives the relevant pre-emption rights to permit such transaction (v. 87, case sheets 6-7);

- by the written answers of Andreas Haviaras in furtherance of the request of the competent authorities of Cyprus for legal assistance in a criminal case, stating that he is one of the Directors of the company «MPH Law Services Ltd.» (a joint stock limited liability company), which owns a 50 % stake in «Skendleby» founded by «MPH Law Services Ltd.» and «Jella Holdings & Finance Inc.» on December 23, 2009.

In relation to «Doralin», A. Haviaras reported that it was founded by the company Dadlaw Nominees Ltd. (a joint stock limited liability company) and Dadlaw Secretarial Ltd. (a joint stock limited liability company) on September 18, 2006, in 2010 the company «Mastero» and «Famulatos» became the owners of 100% of the share capital of «Doralin».

In relation to «Blendensol», A. Haviaras reported that it was founded by the company Dadlaw Nominees Ltd. (a joint stock limited liability company) and Dadlaw Secretarial Ltd. (a joint stock limited liability company) on August 02, 2006 (v. 87, case sheets 12-15, 58-61, 208-211);

- by the written answers of Ntiana Atsamidow in furtherance of the request of the competent authorities of Cyprus for legal assistance in a criminal case, according to which she is the Director and the Secretary of «Famulatos» founded on October 19, 2009 (v. 87, case sheets 16-19);

- by the corporate register of «Famulatos» dated 20.03.2012, according to which in the period from 19.10.2009 to 15.04.2010 Zida Stavrulla was the Director of the company, from 15.04.2010 till now - Ntiana Atsamidow, who has been the owner of two thousand ordinary shares of the company worth one Euro each since the specified date (v. 87, case sheets 20-31);

- by the corporate register of «Doralin» dated 19.03.2012, according to which the companies «Dadlaw Nominees Limited» and «Dadlaw Secretarial Limited» in the period from 18.09.2006 to 18.10.2006 were the shareholders each owning 500 shares; on 18.10.2006 additional shares were issued, and the above companies became the owners of 230,500 shares each till 21.12.2006. On 21.12.2006 all shares (461,000) were transferred to «Tufts». From 22.12.2006 all shares (461,000) were pledged to «Deutsche Bank»; on 16.01.2010 – 230,500 shares of «Doralin» belonging to «Tufts» were transferred to «Mastero»; on 13.04.2010 – 230,500 shares of «Doralin» belonging to «Tufts» were transferred to «Famulatos» (v. 87, case sheets 62-75, 76-89);

- by the corporate register of «Blendensol» dated 19.03.2012, under which the companies «Dadlaw Nominees Limited» and «Dadlaw Secretarial Limited» were the shareholders in the period from 02.08.2006 to 20.08.2008, from 20.08.2008 to 07.11.2008 the sole shareholder was the company «Konk Select Partners Inc.»; on 07.11.2008 100% of the shares were sold to the company«Solid Rock Trading Ltd.». On 16.01.2010, 50% of the shares belonging to «Solid Rock Trading Ltd.» were sold to «Brich Trading SA»; on 09.09.2010, 50% of the shares belonging to «Brich Trading SA» were sold back to the company «Solid Rock Trading Ltd.»; on 09.09.2010, 1 share owned by «Solid Rock Trading Ltd.» was sold to MRN Management Limited (v. 87, case sheets 90-115);

- by the written answers of Michael Phillipow in furtherance of the request of the competent authorities of Cyprus for legal assistance in a criminal case, according to which he is one of the Directors of the company «MPH Law Services Ltd.» (a joint stock limited liability company). The company «Prechard» was founded

by «Executive Management Ltd.» (a joint stock limited liability company) on July 28, 2010 (v. 87, case sheets 204-207);

 - by the corporate register of «Skendleby» dated 19.03.2012, according to which from 23.12.2009 to 29.12.2009 the sole shareholder was the company «MPH Law Management Limited»; on 29.12.2009, 1,000 shares (50%) were transferred to Jella Holding & Finance Inc. (BVI)              (v.              87,              case              sheets              212-221);

 -by the constituent document of «Skendleby», according to which the registered office of the company will be located in Cyprus; the Company has limited liability; the company's share capital makes EUR 2,000 divided into 2,000 shares with a nominal value one Euro each (v. 88, case sheets 7-15, 21-29);

 - by the Articles of Association of «Skendleby», and the certificate of association dated 07.11.2008 (v. 88, case sheets 16-20, 30-34; 41-42, 173-174);

 - by the certificate of incorporation, whereby the company «Doralin» was founded on 18.09.2006 in accordance with the laws of Cyprus (v. 88, case sheets 51-52; v. 71, case sheets 233-237);

 - by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 28.09.2011, under which the shareholders of «Doralin» are the companies «Mastero» and «Famulatos» owning each 230,500 ordinary shares with the nominal value of EUR 1.71 each (v. 88, case sheets 55-56);

 - by the certificate of association, under which the company «Ionics Secretaries Limited» was founded on 04.11.2002 (v. 88, case sheets 67-68);                                \.

 - - by the certificate of organization of «Famulatos» dated 19.12.2009 in accordance with the legislation of Cyprus, in the form of a limited liability company (v. 88, case sheets 101-102);

 - by the certificate of association of «Kalken» on 10.11.2005 (v. 88, case sheets 77-78, 131-132);

 - by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 28.09.2011, under which the shareholders of the company «Kalken» are Mikhail Ananiev (40 shares), Maxim Klochin (40 shares), Lenik Karapetyan (920 shares), the value of each share is EUR 1.71 (v. 88, case sheets 83-84);

 - by the certificate of registration of «Skendleby» dated 23.12.2009 (v. 88, case sheets 85-86);                                                                                    -

 - by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 11.10.2011, whereby the Directors of «Skendleby» company are Andrey Ilyaev and MPH Law Management Ltd. (v. 88, case sheets 89-90);

 - by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 11.10.2011, whereby the shareholders of «Skendleby» company are the companies «MPH Law Services Limited» and «Jella Holding & Finance Inc.», each owning 1,000 ordinary shares with the nominal value of 1 euro each (v. 88, case sheets 91-92);

 - by the certificate of association, under which the company «Blendensol» was founded on 02.08.2006 (v. 88, case sheets 93-94);

 - by the certificate of association of the company «Famulatos» on 19.12.2009 (v. 88, case sheets 101-102);

 - by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 11.10.2011, whereby the shareholder of «Famulatos» company is Ntiana Atsamidow, owning 2,000 ordinary shares with the nominal value of 1 euro each (v. 88, case sheets 107-108);

 - by the register of members and the share ledger of «Kalken» stating that the sole shareholder of the company for the period from 09.11.2005 to 05.03.2008 was the company «Ionics Nominees Limited», which owned 1,000 shares with the nominal value of 1 Euro each; from 05.03.2008 to 18.01.2010 the shareholders of the company were M. B. Ananiev – 40 shares, M. A. Klochin – 40 shares, «Ionics Nominees Limited» – 920 shares; on 18.01.2010 Lenik Karapetyan purchased 920 shares from the company «Ionics Nominees Limited» (v. 88, case sheets 115-128);

- by the memorandum of association and the Articles of Association of «Kalken» (v. 88, case sheets 133-140, 150-155, 141-149, 156-162);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 15.06.2009 on the secretary and the director of «Mastero» (v. 88, case sheets 75-176);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 09.01.2009, whereby the shareholder of «Mastero» company is «Global Conformity AG», owning 2,000 ordinary shares with the nominal value of 1 euro each (v. 88, case sheets 177-178);

-by the certificate No. 1 dated 07.11.2008, according to which the company Global Conformity AG is the owner of 2,000 ordinary shares of the company «Mastero» with the nominal value of 1 euro each (v. 88, case sheets 181-182);

- by the corporate register of «Mastero», according to which the director and the secretary of the company within the period from 07.11.2008 to 23.02.2009 was «G.A.H. Nominee Services Ltd.», from 23.02.2009 till now - Executive Management Ltd.; the shareholder of the company since 07.11.2008 has been the company «Global Conformity AG» (v. 88, case sheets 183-188, 189-194);

- by the share purchase agreement dated 18.01.2010, whereby the company «Tufts» sold to the company «Mastero» (Cyprus) 230,500 shares of the company «Doralin» at EUR 5,000, that is 50% of issued and distributed shares of the company (v. 88, case sheets 207-221; 225-236);

-the report of transfer of shares dated 16.01.2010, whereby the company «Tufts» has transferred to the company «Mastero» 230,500 shares in the company «Doralin» (v. 88, case sheets 237-238);

- by the search record dated 16.06.2009 in the office of the company «Lovels CIS» for the documents in respect of companies CJSC «Decorum», «Deutsche Bank», «Blendensol» , «Dadlaw Nominees Limited» and «Dadlaw Secretarial Limited» and others (v. 91, case sheets 5-22), which were reviewed on 01.08.2009 (v. 91, case sheets 287-304);

- by the letter of «Deutsche Bank» to the company «Tufts» dated 01.04.2009 with reference to the Report of pledge of shares dated 26.12.2006, provided by «Tufts» in favour of «Deutsche Bank» in respect of the shares of the company «Doralin», with a request to provide the documents under the Report dated 26.12.2006 (v. 93, case sheets 72-75);

- by the resolution of the sole shareholder of the company «Blendensol» dated 23.04.2009, according to which, given the resignations of D.A. Demetriades and H.D. Demetriades, on 23.04.2009 as the Directors of the company, and «Dadlaw Secretarial Ltd.» as the company Secretary, the company «Newgeneration Services Limited» (BVI) is appointed as a new sole Director of the company, and the company «MPH Law Secretarial Limited» (Cyprus) - as a new Secretary of the company (v. 93, case sheets 118-119);

- by the letter from the Director of the company «Doralin» – the company «Newgeneration Services Ltd.» to «Deutsche Bank» (the Pledge Holder) dated 24.04.2009, which states the obligation to the Pledge Holder, during the whole period when the secured obligations are valid (under the Pledge of shares dated 22.12.2006, as amended on 24.04.2009), not to take any action not conforming to the terms of the Agreement or Pledge of shares; take all measure to ensure the receipt by the Pledge Holder all of relevant notifications of any intended General meeting of shareholders of the company «Doralin» (v. 93, case sheets 130-131);

- by the statement dated 24.04.2009 that in accordance with the legislation of Cyprus, Memorandum of the Act on First amendment to the Pledge of shares dated 24.04.2009, which amends the Pledge Agreement on shares dated 22.12.2006 in favour of «Deutsche Bank» in respect of 461,000 shares of the company «Doralin» owned by «Tufts», was duly entered in the Register of shareholders of the company «Doralin» (v. 93, case sheets 132-133);

- by the statement dated 27.12.2006 on entering to the Register of shareholders of the company of a notice of pledge in favour of «Deutsche Bank» in respect of 461,000 shares of the company «Doralin» owned by «Tufts (v. 93, case sheets 144-145);

- by the unanimous written resolution of the Board of Directors of the company «Blendensol» dated 27.12.2006 on the conclusion of the Loan agreement with «Deutsche Bank AG» (v. 93, case sheets 170-173);

- by the unanimous written resolution of the Board of Directors of the company «Doralin» dated 22.12.2006, under which the company will enter into the agreement on pledge of shares with «Deutsche Bank» - transfer into pledge of 2,300 shares of CJSC «Centurion Alliance», to secure the loan of «Blendensol» in the amount of USD 100 million; the company will enter into the Deed of subordination with subordinated creditors and «Deutsche Bank»; the company will enter into the Surety Agreement, under which the company guarantees the proper and timely performance by the company «Blendensol» of its obligations under the Loan agreement with «Deutsche Bank»; the company will issue powers of attorney in the names of Dmitry Garkusha and Eugene Sudets (v. 93, case sheets 178-183);

- by the Memorandum of Association and the Articles of Association of «Tufts» dated 18.09.2006 as amended on 23.11.2009 (v. 94, case sheets 35-82);

- by the draft Deed of settlement and termination dated 2010 (no exact date) between the companies «Skendleby», «Doralin», «Blendensol».

In its preamble the Deed states that on 06.10.2006 «Blendensol» entered into a Loan agreement with «Deutsche Bank», which was amended and restated on 27.12.2006.

As the security for the obligations of the company «Blendensol», «Doralin» signed security documents.

In accordance with the Redemption Agreement dated 18.01.2010 and the Agreement on termination of powers and appointment dated 18.01.2010, the benefit rights under the Loan agreement and the Security documents, respectively, were transferred in favour of the company «Skendleby».

In accordance with the terms of this Agreement, its Parties agree to terminate all of their respective rights and obligations towards each other under Security documents and to refuse all present and future claims against each other under these documents.

Section 1 gives definitions of the terms used in the Agreement. «Company» refers to CJSC «Centurion Alliance»; «shares» - 2,300 shares of the Company; «Pledge Agreement of «Doralin»» - the pledge agreement signed between «Doralin» and «Deutsche Bank» on 22.12.2006; «Security documents» mean collectively the Deed of Guarantee and Indemnity of «Doralin» and the Pledge Agreement of «Doralin».

Section 2 states that «Doralin» guarantees «Skendleby» company that: «Doralin» is the sole legal beneficial owner of «Shares»; «Shares» constitute all of the issued share capital of the Company; there are no encumbrances affecting the Shares, except for the Pledge Agreement of «Doralin».

As a reward for the release of «Doralin» from its obligations under the Security documents by «Skendleby», the company «Doralin» transfers its legal ownership and beneficial right to the Shares in full to «Skendleby».

The company «Skendleby», as a legal pledge holder under the Pledge Agreement of «Doralin», gives its consent to the transfer of shares from «Doralin».

The completion of the transfer of Shares shall be effective on the date occurring not later than on February 10, when the entry confirming that «Skendleby» is the sole owner of the Shares without any encumbrances (except for the Pledge Agreement of «Doralin») has been entered in the register of shareholders of the Company or to the securities account (hereinafter – the «Transfer Date»).

80

Subject to ongoing compliance by the company «Doralin» of its obligations under clause 2 in full, the Parties agree that from the date of transfer, all obligations of «Doralin» under the Pledge Agreement of «Doralin» shall be completely terminated.

From the date of transfer: 1) the company «Skendleby» releases the company «Blendensol» from any obligations, liabilities, claims, guarantees provided by the Loan Agreement; 2) the company «Skendleby» releases the company «Doralin» from any obligations, liability,     claims, guarantees, provided by the Security documents; 3) each Party waives any and all rights on filing a lawsuit against one or more Parties; 4) the Parties agree that the Loan Agreement and the Security documents have terminated and shall be void.

Section 9 specifies that the relevant notices in respect of companies «Doralin», «Blendensol», «Skendleby» shall be sent to the addresses of Artem Yeghiazaryan (20, Daev Lane, Moscow) and Vladimir Deryugin (13/5 Podkolokolny Lane, Moscow) (v. 94, case sheets 191-208, 212-247);

- by the record of seizure dated 24.11.2011 from the witness E.M. Nimmo-Smith of the documents related to the companies «MPH Law Services Ltd.», «MPH Law Management Ltd.», «Famulatos», «Skendleby» and others (v. 95, case sheets 57-64), which were reviewed on 28.11.2011 and 02.02.2012 (v. 95, case sheets 67-72, 204-211);

-   by the letter on behalf of E. M. Nimmo-Smith to the company «Famulatos», in which he entrusts the adoption of the relevant resolutions of the Board of Directors to the company «Doralin», dated 19.04.2010, including that the company has had no activities since March 2010 and there is no intention to revive the company; the company owns no assets, and according to the Directors' knowledge has no obligations (v. 95, case sheets 120-121);

- by the letter of E. M. Nimmo-Smith dated 15.04.2010 to the name of Stavroulla Kseda, in which he instructs to change the names of nominee shareholders, the Director and the Secretary of the company «Famulatos» for the name of a citizen of Greece Ntiana Atsamidow (v. 95, case sheets 122-123);

- by the letter on behalf of Artem Yeghiazaryan to the company «New Generation Services Ltd.», in which he entrusts the adoption of the further resolutions of the Board of Directors to the company «Doralin», dated 19.04.2010, including that the company has had no activities since March 2010 and there is no intention to revive the company; the company owns no assets, and according to the Directors' knowledge has no obligations (v. 95, case sheets 124-125);

- by the declaration of trust dated 17.12.2009, under which Stavroulla Kseda is the Trustee in respect of 2,000 shares of the company «Famulatos», the actual exclusive owner of which is E.M. Nimmo-Smith (v. 95, case sheets 126-129);

- by the fiduciary contract and the terms of execution of orders entered on 22.12.2009, between E. M. Nimmo-Smith (Principal) and S. Kseda (Director) in respect to the company «Famulatos», with the exception of the Principal, only Galina Belykh is entrusted with the right to give instructions to the Director (v. 95, case sheets 130-135);

- by the letter of E. M. Nimmo-Smith (undated) in the name of Stavroulla Kseda, in which he instructs to terminate to act as the person appointed by E. M. Nimmo-Smith in respect of all shares in the capital of the company «Famulatos», and instead to act as the appointed person in respect of Suren Yeghiazaryan (v. 95, case sheets 136-137);

- by the declaration of trust dated 22.12.2009, according to which the company «MPH Law Services Ltd.» is the Trustee in respect of 1,000 shares of the company «Skendleby», the actual exclusive owner of which is E.M. Nimmo-Smith (v. 95, case sheets 138-141);

- by the fiduciary contract and the terms of execution of orders entered on 22.12.2009 between E. M. Nimmo-Smith (the Principal) and the company «MPH Law Services Ltd» (the Director) in relation to the company «Skendleby», with the exception                of                the                Principal

only Artem Yeghiazaryan has the right to give instructions to the Director (v. 95, case sheets 142-149);

- by the irrevocable instructions of E. M. Nimmo-Smith (undated) to the company «MPH Law Services Ltd.», in which he instructs to terminate to act as the Trustee in respect of 50% of the shares, i.e. 1000 shares of «Skendleby» in the interests of E. M. Nimmo-Smith, and instead to act as the Trustee for these shares in the interests of Suren Yeghiazaryan (v. 95, case sheets 150-151);

- by the inspection protocol of the documents dated 13.08.2012, during which the documents seized on 01.12.2010 during the search in CJSC «Centurion Alliance» were reviewed (v. 96, case sheets 15-23);

- by the notification to «Deutsche Bank» from CJSC «Status» dated 01.03.2010 about the transaction under the client account (v. 96. case sheet 26);

- by the record of seizure of documents dated 14.12.2010 in JSCB «Fora-Bank», during which the documents related to companies «Skendleby» and CJSC «Centurion Alliance» were seized (v. 97, case sheets 65-68), which were examined on 14.02.2010 (v. 97, case sheets 69-73);

- by the order of the representatives of the company «Skendleby» K.R. Gazarova and M. V. Sukhov dated 19.02.2010 to the Depository Department of JSCB «Fora-Bank» on opening of the securities account (v. 97, case sheet 74);

- by the order for the depository operation No. 1 dated 02.03.2010 on crediting 2,300 shares of CJSC «Centurion Alliance» to the securities account of the company «Skendleby» in JSCB «Fora-Bank» (v. 97, case sheet 76);

- by the depository agreement dated 19.02.2010 between JSCB «Fora-Bank» (the Depositary) and the company «Skendleby» (the Depositor), in accordance with which the Depositary undertakes to provide the Depositor the services of safekeeping of securities certificates, accounting and certification of the rights to securities, transfer of the rights to securities owned by the Depositor on the right of ownership (v. 97, case sheets 79-86);

- by report on the state of the securities account of the company «Skendleby» in JSCB «Fora-Bank» dated 02.03.2010, according to which 2,300 shares of CJSC «Centurion Alliance» are kept on the specified account (v. 97, case sheet 174);

- by the record of seizure dated 25.04.2011 from the witness L.M. Volkova of the documents of CJSC «Centurion Alliance» (v. 98, case sheets 117-119), which were reviewed on 11.05.2011 (v. 98, case sheets 131-133, 136-140);

- by the record of seizure dated 17.11.2010 from the witness S.I. Smagina of the documents of CJSC «Centurion Alliance» (v. 98, case sheets 173-176), which were reviewed on 24.02.2011 (v. 98, case sheets 230-232);

- by the order dated 20.06.2005 No. 771-РП of the prefect of the Western Administrative Okrug of Moscow on approval of the acceptance commission certificate on acceptance of the facility: «Multifunctional shopping and entertainment complex «Europark» at: building 62, Rublyovskoye Highway, Moscow (v. 98, case sheet 180);

- by the document of «Deutsche Bank» dated 18.01.2011 in respect of the loan in the amount of USD 100 million of the company «Blendensol», stating that in accordance with the policies of «Deutsche Bank», the London branch of «Deutsche Bank», and, in particular, the trading group working on the markets of countries in transition, shall be completely responsible for the management of all business and for making decisions regarding the sale of the credit asset of «Europark», as well as for the price of sale (v. 101, case sheets 12-14, 15-17);

- by the document on the appointment of the first Directors of the company «Tufts» dated 18.09.2006, whereby the first Directors shall be Luis A. Davis and Pamela D. Hall (v. 106, case sheets 120-121);

- by the transfer instrument dated 21.12.2006, according to which the company «Dadlaw Secretarial Ltd.» (Cyprus) for the good and valuable consideration enters into

82

the transaction on sale, assignment and transfer to the company «Tufts» of 500 shares in the company «Doralin» (v. 107, case sheets 5, 6);

- by the transfer instrument dated 21.12.2006, according to which the company «Dadlaw Secretarial Ltd.» (Cyprus) for the good and valuable consideration enters into the transaction on sale, assignment and transfer to the company «Tufts» of 500 shares in the company «Doralin» (v. 107, case sheets 7-8);

- by the transfer instrument dated 21.12.2006, according to which the company «Dadlaw Secretarial Ltd.» (Cyprus) for the good and valuable consideration enters into the transaction on sale, assignment and transfer to the company «Tufts» of 230,000 shares in the company «Doralin» (under numbers from 1001 to 230,000) (v. 107, case sheets 9-10);

- by the transfer instrument dated 21.12.2006, according to which the company «Dadlaw Secretarial Ltd.» (Cyprus) for the good and valuable consideration enters into the transaction on sale, assignment and transfer to the company «Tufts» of 230,000 shares in the company «Doralin» (under numbers from 230,001 to 461,000) (v. 107, case sheets 11-12);

- by the General Power of Attorney issued by «Blendensol» company dated 05.10.2006 in the name of Eugene Sudets for a period of 1 year (v. 107, case sheets 243-246);

- by the acceptance and transfer certificate dated 19.01.2010, according to which «Deutsche Bank» (Current Creditor) and the company «Skendleby» (New Creditor) give their consent on the transfer by novation by the Current Creditor to the New Creditor of all obligations, rights and liabilities of the Current Creditor, in particular the total Loan in the amount of USD 100 mln (v. 108, case sheets 31-35, 36-40);

- by the statement of «Deutsche Bank» on the appointment of the Facility Agent and the Security Agent dated 19.01.2010 addressed to the company «Blendensol», stating that the company «Skendleby» is appointed as the Facility Agent and the Security Agent in respect of the Loan agreement for USD 100 million dated 06.10.2006 (as amended on 27.12.2006) (v. 108, case sheets 43-48);

- by the financial statement of «Tufts» as of 31.12.2007, according to which in 2007 the company had a loss of USD 38,957 (v. 108, case sheets 90-138);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 29.04.2010, whereby the shareholders of «Doralin» company are the companies «Mastero» (230,500 shares) and «Famulatos» (230,500 shares) (v. 108, case sheets 253, 254);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 17.02.2010, whereby the shareholders of «Doralin» company are the companies «Tufts» - 230,500 shares and «Mastero» 230,500 shares (v. 108, case sheet 256);

- by the certificate issued by the Ministry of Commerce, Industry and Tourism of Cyprus dated 06.05.2010, whereby the shareholder of «Famulatos» company is Stavroulla Kseda, owning 2,000 ordinary shares with the nominal value of 1 euro each (v. 108, case sheets 259-260);

- by the Memorandum of Association and Articles of Association of «Doralin» dated 12.09.2006 (v. 109, case sheets 49-56, 81-88; 57-80; 89-112; v. 71, case sheets 210-231);

- by the confirmation of the beneficial owner, under which the Director of the company «Skendleby» A. Ilyaev declares, that according to his information the company Jella Holding&Finance Inc. owns 1,000 shares of the company «Skendleby» in the interests of Varuzhan Artenyan (v. 10, case sheets 149-150);

- by the report from the US National Bureau of Interpol that Ashot Yeghiazaryan has the status allowing him to reside in the U.S., but the Department of Homeland Security could not confirm or deny the fact of his physical presence in the USA (v. 107, case sheets 47-48);

- by the letter of the United States Department of Justice of 20.08.2012 to the effect that the USA can not extradite anyone without the bilateral treaty on extradition, this case is submitted to the United States Department of Homeland Security to investigate the possibility of deportation.

The United States Department of Justice closed the case on extradition of Ashot G. Yeghiazaryan in administrative proceedings (v. 117 case sheets 168-169);

- by the National Central Bureau of Interpol in the Ministry of Internal Affairs (Russia) of 19.11.2012 № 43061/193 to the effect that the Bureau received no information from the competent authorities of the Interpol member states that A.G. Yeghiazaryan had been brought to criminal liability in the territory of foreign countries (v. 113 case sheet 242);

- by the National Central Bureau of Interpol in the Ministry of Internal Affairs (Russia) of 13.07.2015 No. 34267/181 to the effect that the Bureau received no information from the competent authorities of the Interpol member states that Ashot G. Yeghiazaryan, Artem G. Yeghiazaryan and M.V. Klochin had been brought to criminal liability in the territory of foreign countries (v. 118 case sheet 122);

- by the copy of the work record book of Artem G. Yeghiazaryan whereby on 21.08.2006 he was employed as the first deputy director of the CJSC «Centurion Alliance »; on 06.02.2007 he was re-assigned to the position of the deputy general director for General Issues (тv. 31 case sheets 109-113, v. 45 case sheets 243-247);

- by the labor contract of 21.08.2006 concluded between CJSC «Centurion Alliance» (Employer) and Artem G. Yeghiazaryan (Employee) whereby A.G. Yeghiazaryan should enter upon the office of the first deputy general director of the CJSC «Centurion Alliance» from 21.08.2006 (v. 31 case sheets 97-99);

- by the addendum of 01.09.2008 to the labor contract of 21.08.2006 whereby Artem G. Yeghiazaryian's salary is set equal to RUB 164,450.00 per month (v. 31 case sheets 103);

- by the letter of the general director of the CJSC «Centurion Alliance » of 19:06.2012 dismissing Artem G. Yeghiazaryian from the CJSC «Centurion Alliance » from 09.08.2010 (v. 46 case sheet 270);

- by the administrative order issued by the general director of the CJSC «Centurion Alliance» of 09.08.2010 dismissing Artem G. Yeghiazaryan, the CJSC «Centurion Alliance» deputy general director for general issues (v. 46 case sheet 271);

- by the letter of the National Central Bureau of Interpol in the Ministry of Internal Affairs (Russia) of 18.07.2013 No. 30770/193 to the effect that the Bureau received no information from the competent authorities of the Interpol member states that Artem G. Yeghiazaryan had been brought to criminal liability in the territory of foreign countries (v. 117 case sheet 69);

- by the letter of the Interpol Washington National Central Bureau to the effect that Artem G. Yeghiazaryan is in a position allowing him to reside in the USA but the Department of Homeland Security can neither confirm nor deny that he is physically present in the USA; for the lack of the bilateral treaty between the USA and Russia this person can not be returned to Russia by way of extradition (v. 114 case sheet 175);

- by the letter of the National Central Bureau of Interpol in the Ministry of Internal Affairs (Russia) of 18.07.2013 № 30772/193 to the effect that the Bureau received no information from the competent authorities of the Interpol member states that V.G. Gogokhiya had been brought to criminal liability in the territory of foreign countries (v. 117 case sheet 72);

- by the letter of the Ministry of Justice of Georgia of 10.03.2014 to the effect that V.G. Gogokhiya ranks as a citizen of Georgia; this makes it impossible to extradite V.G. Gogokhiya to the Russian Federation (v. 117 case sheet 165);

- by the blue print copy of the work record book of M.A. Klochin whereby on 01.11.2005 he was appointed as the general director of the CJSC «Centurion Alliance » (v. 31 case sheets 84-90);

- by the labor contract of 01.11.2005 concluded between the CJSC «Centurion Alliance» (Company) and M.A. Klochin (General director); as described in section 3 of the contact the General director shall be obliged to act reasonably and in good faith in the interests of the Company, not to breach his duties; the General director shall manage day-to-day operations of the Company, manage works for fulfillment of the decisions of the general meetings of shareholders of the Company (v. 37 case sheets 28-31);

- by the letter of the National Central Bureau of Interpol in the Ministry of Internal Affairs (Russia) of 18.07.2013 No. 30771/193 notifying that the Bureau received no information from the competent authorities of the Interpol member states that M.A. Klochin had been brought to criminal liability in the territory of foreign countries (v. 117 case sheet 69);

- by the statement of the U.S. National Central Bureau of Interpol to the effect that the best of knowledge of the U.S. Department of National Security M.A. Klochin has been a U.S. citizen since 16.06.2006 and for now he is not deportable or extraditable; for the lack of the bilateral treaty on extradition between the USA and the Russian Federation this person can not be returned to Russia by way of extradition (v. 115 case sheet 227);

- by the letter of the Directorate of Internal Affairs in the Central Administrative Okrug of the Main Directorate of the Ministry of Internal Affairs for Moscow of 23.04.2014, notifying that since 16.06.2006 M.A. Klochin, being on the international wanted list, has been a U.S. citizen; for the lack of the bilateral treaty on extradition between the USA and Russia it is impossible to detain and extradite M.A. Klochin to the Russian Federation (v. 117 case sheet 150).

Above evidence is received as required by the criminal procedure law and contains no mutually exclusive facts concerning circumstances to be proven in the criminal proceedings. Therefore evidence submitted by the prosecution is admissible.

The court trusts the testimony of the victim and witnesses for the prosecution as they are consistent, non-controversial, and compliant with each other and other evidence in the case. When testifying the court found neither facts of interest of the above persons in relation to the accused nor reasons for slander and also no conflict of testimony on the merits of the case diminishing the credibility of such testimony.

The victim's and the prosecution's testimony are reasonably proven to be true by the written evidence investigated before the court in session, i.e. civil law contracts and agreements, investigation reports (search, seizure and inspection), material evidence, experts' opinions and other evidence listed above.

Judicial expert evaluation No. 02/20-01-11 of 20.02.2011 (v. 51 case sheet 27-291) and handwriting examination No. 12/3115 of 24.06.2011 (v. 55 case sheet 103-106) were carried out as required by articles 195, 199 of the Code of Criminal Procedure of the Russian Federation. The experts' opinions meet the requirements of article 204 of the Code of Criminal Procedure of the Russian Federation. Their opinions are properly reasoned. Therefore the court sees no grounds not to trust such opinions.

According to the expert's findings as of 26.02.2010 (by the close of the crime) the value of 20 % of shares in the CJSC «Centurion Alliance» held by V.I. Smagin was RUB 720,605,444.

The circumstances of the alleged crime are not related to Ashot G. Yeghiazaryan's public and political activity. The procedure for stripping Ashot G. Yeghiazaryan, the former deputy of the State Duma of the Federal Assembly of the Russian Federation, of immunity complies with the requirements of part 2, art. 98 of the Constitution of the Russian Federation, art. 20 of the Federal Law of 08.05.1994 No. 3-FZ 'About the status of the member of the Council of the Federation and the status of the deputy of the State Dum of the Federal Assembly of the Russian Federation', Chapter 52 of the Code of Criminal Procedure of the Russian Federation that is evidenced by the representation of the Prosecutor General of the Russian Federation of 28.10.2010 No. 34-08-10 and the Resolution issued on the basis of the said representation by the State Duma of the Federal Assembly of the Russian Federation of 03.11.2010 No. 4355-5 ГД approving the stripping Ashot G. Yeghiazaryan, the deputy of the State Duma of the Federal Assembly of the Russian Federation, of immunity.

85

Thus, during preliminary investigation no violations of criminal procedure law rules evidencing stripping of limitation of the rights guaranteed to the parties to a criminal proceeding have been committed.

Factual circumstances of the crime prove that the accused had criminal intent resulted in passing all shares in the CJSC «Centurion Alliance », including 20% of shares held by affected V.I. Smagin, without his knowledge or consent, into the ownership of «Skendleby», the shareholder of which was MPH Law Services Limited (Cyprus) acting in brothers Yeghiazarans' interests. This allowed to the latter to dispose of the said shares at their own discretion.

The civil law contracts (deeds) concluded with participation of the victim during the alleged crime does not disapprove the accused' intent to commit the same as accused Ashot G. Yeghiazaryan and Artem G. Yeghiazaryan deliberately violated the terms and conditions of contracts and performed no actions stipulated therein. In these conditions, affected V.I. Smagin took his decisions and actions relying on false pretences and abuses of his trust by the accused as methods to commit fraud.

Having evaluated the evidence collected in the case in the aggregate, the court finds that the guilt of the accused is proven by materials in the case and the actions done by Ashot G. Yeghiazaryan and Artem G. Yeghiazaryan are qualified correctly pursuant to part 4, art. 159 of the Criminal Code of the Russian Federation (as revised by the Federal Law of 07.03.2011 No. 26-FZ) as acquisition of the right to the property of another person by false pretences and abuse of trust by a group of persons in collusion causing significant damage to an individual in an especially large amount; actions of M.A. Klochin and V.G. Gogokhiya are properly qualified in accordance with part 5, art. 33, part 4, art. 159 of the Criminal Code of the Russian Federation (as revised by the Federal Law of 07.03.2011 No. 26-FZ) as aid and abet, i.e. assistance in acquisition of the right to the property of another person by false pretences and abuse of trust by a group of persons in collusion causing significant damage to an individual in an especially large amount through provision of information and means for the crime and removal of obstacles.

The crime is committed by accused Ashot G. Yeghiazaryan and Artem G. Yeghiazaryan by a group of persons in collusion with assistance of M.A. Klochin and V.G. Gogokhiya. This is evidenced by the nature of actions done by accomplices and their accessories in committing the crime with the only purpose to acquire the right to the property of another person.

Herewith, Ashot G. Yeghiazaryan involved a number of persons into the crime, managed their actions and gave instructions. He was the ultimate beneficiary of legal entities used in the criminal scheme; Artem G. Yeghiazaryan occupied the position of the deputy general director of the CJSC «Centurion Alliance» and being the accomplice of the crime, he followed the instructions given by his brother Ashot G. Yeghiazaryan.

M.A. Klochin, occupying the post of the general director of the CJSC «Centurion Alliance» and V.G. Gogokhiya, being the director of the companies subordinate to Ashot G. Yeghiazaryan, including «Khekhem» and «Blidensol», when signing contracts investigated during the court hearing and addenda thereto, fictitiously increased accounts payable of the CJSC «Centurion Alliance» in order to create grounds for bankruptcy. In its turn it should result in technical default credit before «Blidensol». Fictitious pre-default credit before «Blidensol» created with participation of M.A. Klochin and V.G. Gogokhiya and inability of pre-trial foreclosure of shares of «Doralin» and CJSC «Centurion Alliance» made Deutsche Bank sell the right of credit claim to «Skendleby» (Cyprus) controlled by Ashot G. Yeghiazaryan.

Thus, actions of M.A. Klochin and V.G. Gogokhiya were the required element to achieve the criminal result and have direct cause-and-effect connection with V.I. Smagin's loss of the right to shares in CJSC «Centurion Alliance»

in determining the amount of which the financial position of each of the accused and their role in the crime are taken into consideration.

In view of the data concerning the identify of the accused the court finds it possible not to impose auxiliary punishment for Ashot G. Yeghiazaryan, Artem G. Yeghiazaryan, in a form of supervised release.

By virtue of part 2. art. 309 of the Code of Criminal Procedure of the Russian Federation due to necessity to resolve issues related to the civil lawsuit requiring postponement of the litigation, the court recognized the right of the affected (civil claimant) to get satisfaction in the civil lawsuit and shall submit the case concerning the amount of satisfaction for review in a civil legal proceeding.

The property is seized in criminal proceeding No. 201/311620-10, whereof this criminal case is separated out. As the investigation of criminal case 201/311620-10 is not finished yet, the injunctive remedies are still required. Therefore their cancellation is premature. Besides the stated property is a security for pecuniary recoveries under this sentence.

The court shall resolve the issue concerning the future of material evidence in the criminal case as stipulated by art. 81 of the Code of Criminal Procedure of the Russian Federation.

Based on the above and governed by articles 307, 308, 309 of the Code of Criminal Procedure of the Russian Federation the Court

## HAS SENTENCED:

to find Ashot Gevorkovich Yeghiazaryan guilty of the crime stipulated by part 4, art. 159 of the Criminal Code of the Russian Federation (as revised by the Federal Law of 07.03.2011 No. 26-FZ) and sentence to seven years imprisonment in the general penal colony and fine equal to RUB 700,000;

to find Artem Gevorkovich Yeghiazaryan guilty of the crime stipulated by part 4, art. 159 of the Criminal Code of the Russian Federation (as revised by the Federal Law of 07.03.2011 No. 26-FZ) and sentence to five years imprisonment in the general penal colony and fine equal to RUB 600,000;

to find Maksim Alekseevich Klochin guilty of the crime stipulated by part 5, art. 33, and part 4. art. 159 of the Criminal Code of the Russian Federation (as revised by the Federal Law of 07.03.2011 No. 26-FZ) and sentence to four year imprisonment in the general penal colony and to the fine equal to RUB 400,000;

to find Vitaliy Gramitonovich Gogokhiya guilty of the crime stipulated by part 5, art. 33, and part 4. art. 159 of the Criminal Code of the Russian Federation (as revised by the Federal Law of 07.03.2011 No. 26-FZ) and sentence to four year imprisonment in the general penal colony and to the fine equal to RUB 400,000;

not to change the preventive measure of remand in custody for Ashot G. Yeghiazaryan, Artem G. Yeghiazaryan, M.A. Klochin and V.G. Gogokhiya till the judgment enters into legal force;

to determine the start of the term for servicing punishment by Ashot G. Yeghiazaryan, Artem G. Yeghiazaryan, M.A. Klochin and V.G. Gogokhiya from their actual seizure after detection;

to recognize the right of affected (civil claimant) V.I. Smagin to get satisfaction in the civil proceedings and to submit the case concerning the amount of satisfaction for review in a civil legal proceeding;

not to release the seized property till execution of the sentence related to recovery against property and investigation of the separated criminal case.

Upon entry of the court judgment into legal force the material evidence shall be at the place at which it is normally kept.

You can file an appeal against the court judgment with Moscow City Court within 10 days from declaration thereof. In case of the appeal petition the convicted shall be entitled to move for participation in the criminal case hearing by the court of appeal stating the said request in the appeal petition within 10 days from the date, on which the copy of the court judgment is served, and within the same period from the date, on which the copy of the plea or appeal petition affecting their interests is served.

Judge                                                                                    E.P. Averchenko

Stamp: TRUE COPY OF THE ORIGINAL
Judge ____ /signature/
Secretary _____ /signature/

Stamp:
This document consists of _____pages bound and sealed
Judge
Secretary

Seal: Zamoskvoretskiy District Court for Moscow * Russian Federation

**КОПИЯ**

Дело № 1- 15/2018

# ПРИГОВОР
## ИМЕНЕМ РОССИЙСКОЙ ФЕДЕРАЦИИ

г. Москва

31 мая 2018 г.

Судья Замоскворецкого районного суда г. Москвы Аверченко Е.П.,

с участием государственных обвинителей Ибрагимовой Г.Б., Апухтиной Е.О.,

защитников – адвоката Алиева Г.А., представившего удостоверение № 9450 и ордер № 604, адвоката Новикова И.С., представившего удостоверение № 11735 и ордер 3704, адвоката Елисеева О.В., представившего удостоверение № 16266 и ордер № 414, адвоката Анашкина П.И., представившего удостоверение № 14598 и ордер № 204,

потерпевшего Смагина В.И., представителя потерпевшего адвоката Шашкова Д.А.,

при секретарях Логачевой О.А., Голубеве А.М., Субботине В.В., Гордёевой А.М., Катукии Н.Р., Кузнецовой О.Л., рассмотрев в открытом судебном заседании уголовное дело в отношении

Егиазаряна Ашота Геворковича, 24 июля 1965 года рождения, уроженца г. Москвы, в Российской Федерации места жительства и регистрации не имеющего, гражданина Российской Федерации, с высшим образованием, женатого, имеющего несовершеннолетних детей, нетрудоустроенного, не судимого,

обвиняемого в совершении преступления, предусмотренного ч. 4 ст. 159 УК РФ;

Егиазаряна Артема Геворковича, 13 августа 1977 года рождения, уроженца г. Москвы, зарегистрированного по адресу: г. Москва, Трехгорный пер., д. 11/13, стр. 2а, кв. 166, гражданина Российской Федерации, женатого, имеющего малолетнего ребенка, нетрудоустроенного, не судимого,

обвиняемого в совершении преступления, предусмотренного ч. 4 ст. 159 УК РФ;

Гогохии Виталия Грамитоновича, 24 мая 1956 года рождения, уроженца г. Ахалкалаки Грузинской ССР, зарегистрированного по адресу: г. Москва, пр-т Ю.В. Андропова, д. 21, кв. 27, гражданина Российской Федерации, с высшим образованием, женатого, несовершеннолетних детей не имеющего, нетрудоустроенного, информация о воинской обязанности отсутствует, не судимого,

обвиняемого в совершении преступления, предусмотренного ч. 5 ст. 33, ч. 4 ст. 159 УК РФ;

Клочина Максима Алексеевича, 08 апреля 1975 года рождения, уроженца г. Москвы, зарегистрированного по адресу: г. Москва, ул. Костякова, д. 8/6, кв. 171, гражданина Российской Федерации и Соединенных Штатов Америки, с высшим образованием, холостого, нетрудоустроенного, не судимого,

обвиняемого в совершении преступления, предусмотренного ч. 5 ст. 33 ч. 4 ст. 159 УК РФ;

## УСТАНОВИЛ:

Егиазарян Ашот Г. и Егиазарян Артем Г. виновны в мошенничестве, то есть приобретении права на чужое имущество путем обмана и злоупотребления доверием, группой лиц по предварительному сговору, с причинением значительного ущерба гражданину, в особо крупном размере.

Клочин М.А. и Гогохия В.Г. виновны в пособничестве в мошенничестве, то есть содействии приобретению права на чужое имущество путем обмана и злоупотребления доверием, совершенном группой лиц по предварительному сговору, с причинением значительного ущерба гражданину, в особо крупном размере, путем предоставления информации и средств совершения преступления, а также устранением препятствий.

2

Так, Егиазарян Ашот Г. в составе группы лиц по предварительному сговору с Егиазаряном Артемом Г. , при пособничестве Гогохии В.Г. и Клочина М.А., в период с 26.12.2006 по 26.02.2010 на территории г. Москвы совершили приобретение путем обмана и злоупотребления доверием права на чужое имущество, а именно 20% акций Закрытого акционерного общества «Центурион Альянс» (г. Москва) стоимостью не менее 720 605 444 руб., принадлежавших Смагину В.И.

Так, в 2006 г. Смагин В.И. являлся собственником 460 простых именных бездокументарных акций, что составляло 20% от общего количества акций ЗАО «Центурион Альянс», владеющего имущественным комплексом «Европарк», расположенным по адресу: г. Москва, Рублевское шоссе, д. 62, остальные 80% акций данного акционерного общества находились в фактической собственности Егиазаряна Ашота через связанных с ним физических и юридических лиц.

В 2006 году Егиазарян Ашот через подконтрольные ему компании участвовал в проекте по реконструкции гостиницы «Москва», для реализации которого требовалось финансирование, исчисляемое сотнями миллионов долларов США. У Егиазаряна Ашота, осведомленного о владении Смагиным В.И. указанным выше пакетом акций, в период октября-ноября 2006 года возник преступный умысел на приобретение путем обмана и злоупотребления доверием права на данное чужое имущество, для реализации которого он (Егиазарян Ашот) в указанный период времени в г. Москве вступил в преступный сговор со своим родным братом Егиазаряном Артемом, заранее договорившись о совместном совершении преступления, а в качестве пособников для совершения преступления они привлекли своих знакомых Клочина М.А. и Гогохию В.Г., выполнявших функции их доверенных лиц. В период ноября - первой половины декабря 2006 года в помещении бизнес-центра «Даев Плаза» по адресу: г. Москва, Даев переулок, д. 20, Егиазарян Ашот в ходе встречи со Смагиным В.И., с которым к тому моменту он был знаком несколько лет и вел совместный бизнес, сообщил, что банк «DEUTSCHE BANK A.G.» (далее «Дойче Банк») готов предоставить подконтрольной Егиазаряну Ашоту компании «BLIDENSOL TRADING & INVESTMENTS LIMITED» (далее «Блиденсол») для финансирования реконструкции гостиницы «Москва» кредит в сумме 100 млн. долларов США под поручительство ЗАО «Центурион Альянс» и предоставления в залог в качестве обеспечительных мер 100% акций данного общества и принадлежащего ему имущественного комплекса «Европарк». При этом единственным акционером ЗАО «Центурион Альянс» должна быть подконтрольная Егиазаряну Ашоту компания «DORALIN TRADING & INVESTMENTS» (далее «Доралин»), так как её акции также подлежат залогу в «Дойче Банк». Егиазарян Ашот, убеждая Смагина В.И. передать свои 20% акций ЗАО «Центурион Альянс» компании «Доралин», оформив это договором купли-продажи акций по номинальной стоимости без их реальной оплаты, заверил, что его (Смагина В.И.) имуществу ничто не угрожает, так как 100% акций компании «Доралин» владеет компания «TUFTS INVEST & TRADE INC.» (далее – «Тафтс»), в которой 20% акций будут оформлены на Смагина В.И., а контрольный пакет акций в размере 73% принадлежит компании «KALKEN HOLDINGS LIMITED» (далее «Калкен»), подконтрольной Ашоту Егиазаряну через его родного брата Егиазаряна Артема.

Егиазарян Ашот, действуя умышленно, реализуя свой преступный план, убедил Смагина В.И., обманув его, что 20% акций ЗАО «Центурион Альянс» будут переоформлены на компанию «Доралин» на срок не более одного года, после чего действие залога будет прекращено и Смагин В.И. получит обратно свой пакет акций. Кроме того, Егиазарян Ашот, склоняя Смагина В.И. к передаче акций, обещал ему впоследствии увеличить его (Смагина В.И.) пакет акций ЗАО «Центурион Альянс» до 50%, а также организовать назначение последнего вторым директором компании «Тафтс» с правом подписи для обеспечения контроля за распоряжением акциями и имуществом компании «Доралин».

С целью введения Смагина В.И. в заблуждение относительно своих истинных намерений Егиазарян Ашот предложил изменить устав ЗАО «Центурион Альянс» и назначить Смагина В.И. председателем совета директоров, ввести должность первого заместителя генерального директора, который будет назначаться советом директоров и обеспечить назначение на эту должность доверенного лица Смагина В.И. При этом согласно изменениям, внесенным в устав акционерного общества, все сделки, заключаемые от имени ЗАО «Центурион Альянс» на сумму свыше 5 млн руб., признаются законными только при наличии одновременно подписей генерального директора и его первого заместителя.

Смагин В.И. не был связан с компанией «Блиденсол» и проектом по реконструкции гостиницы «Москва», в связи с чем вопрос о предоставлении данной компании кредита на 100 млн долларов США не относился к его личным или коммерческим интересам. Несмотря на это, учитывая наличие давних партнерских отношений с Егиазаряном Ашотом и желая ему помочь, Смагин В.И. согласился передать компании «Доралин» свои 20% акций ЗАО «Центурион Альянс», не подозревая, что Егиазарян Ашот злоупотребляет его доверием и совместно с Егиазаряном Артемом реализует заранее разработанный план совершения преступления, не намереваясь в будущем возвращать ему (Смагину В.И.) данный пакет акций.

25.12.2006 на территории г. Москвы Егиазарян Ашот с целью придания видимости исполнения своих обязательств перед Смагиным В.И. обеспечил принятие новой редакции устава ЗАО «Центурион Альянс», в пункте 9.9 которого установлено ограничение полномочий генерального директора, а именно, что «...сделка или несколько взаимосвязанных сделок, заключаемых от имени общества генеральным директором, связанных с отчуждением, приобретением или возможностью отчуждения, приобретения более 5 млн. руб. или эквивалента в любой другой валюте, считаются законными и действительными лишь в случае их подписания одновременно генеральным директором и первым заместителем генерального директора. При отсутствии одновременно двух подписей на указанных документах, последние считаются недействительными».

26.12.2006, находясь в помещении бизнес центра «Даев Плаза» и действуя под воздействием обмана, Смагин В.И. подписал договор купли-продажи акций от 26.12.2006, согласно которому продал компании «Доралин» 460 простых именных бездокументарных акций, что составляет 20% от общего количества акций ЗАО «Центурион Альянс», по номинальной стоимости 4,6 млн. руб., оплату за которые фактически не получил, в этот же день в реестр акционеров ЗАО «Центурион Альянс» были внесены соответствующие изменения.

Кроме того, Смагин В.И. в указанное выше время и в указанном месте, подписал договор купли-продажи акций от 26.12.2006, согласно которому купил у Гаркуши Д.В., действующего по указанию Егиазаряна Ашота и не осведомленного о преступных целях последнего, 2000 простых именных акций, что составляет 20% от общего количества акций компании «Тафтс», общей стоимостью 2000 долларов США, что в рублевом эквиваленте составляет 52 705,6 руб. (по курсу доллара США, установленному Центральным Банком России на 26.12.2006 1 доллар США – 26,3528 руб.). В связи с чем, 04.01.2007 в реестр акционеров компании «Тафтс» были внесены соответствующие изменения.

26.12.2006 Егиазарян Артем, находясь в помещении бизнес центра «Даев Плаза», действуя умышленно, в группе лиц по предварительному сговору с Егиазаряном Ашотом и согласованно с ним, подписал от имени компании «Калкен» договор акционеров от 26.12.2006 в отношении компании «Тафтс», содержащий ранее оговоренные Егиазаряном Ашотом и Смагиным В.И. условия. При указанных обстоятельствах данный договор также подписал Смагин В.И., находящийся под воздействием обмана, и Гаркуша Д.В., не осведомленный о преступных намерениях соучастников преступления.

4

Согласно п. 9.1.5 указанного договора срок его действия установлен в один год с момента подписания. После чего в течение одного месяца компания «Калкен» обязана обеспечить прекращение действия залога всех акций компании «Доралин» и ЗАО «Центурион Альянс», а также самого комплекса «Европарк». В случае неисполнения данных обязательств компания «Калкен» обеспечивает передачу принадлежащих ей 73% акций компании «Тафтс» Смагину В.И. на основании передаточных распоряжений и иных документов, хранящихся у эскроу агента, которым на основании договора эскроу от 26.12.2006 назначен «Дойче Банк». При этом Егиазарян Ашот и Егиазарян Артем исполнять условия договора акционеров не собирались, чем вводили Смагина В.И. в заблуждение.

Не позднее 05.02.2007 Егиазарян Ашот, создавая видимость исполнения своих обязательств перед Смагиным В.И., обеспечил избрание последнего на должность председателя совета директоров ЗАО «Центурион Альянс».

27.12.2006 в г. Москве между компанией «Блиденсол» и «Дойче Банком» заключен кредитный договор на сумму 100 млн. долларов США под залог 100% акций компании «Доралин», 100% акций ЗАО «Центурион Альянс» и имущественного комплекса «Европарк».

06.02.2007 на территории г. Москвы генеральный директор ЗАО «Центурион Альянс» Ключин М.А., являясь пособником Егиазаряна Ашота и Егиазаряна Артема, с целью создания видимости исполнения обязательств перед Смагиным В.И., в исполнение пункта 9.9 устава ЗАО «Центурион Альянс», подписал приказ № 29-л от 06.02.2007, согласно которому с указанной даты на должность первого заместителя генерального директора ЗАО «Центурион Альянс» принята жена Смагина В.И. - Смагина С.И.

Однако после подписания указанного выше кредитного договора, Егиазарян Ашот и Егиазарян Артем, действуя умышленно, отказались передать «Дойче Банку» принадлежащие подконтрольной им компании «Калкен» 73% акций компании «Тафтс», владеющей компанией «Доралин», чем нарушили условия договора акционеров и договора Эскроу от 26.12.2006, а также имевшиеся договоренности и обязательства перед Смагиным В.И.

В течение 2007 г. и до марта 2008 г. Смагин В.И. в ходе неоднократных встреч с Егиазаряном Ашотом и Егиазаряном Артемом, проходивших на территории г. Москвы, просил последних исполнить принятые на себя обязательства, закрепленные в договоре акционеров и договоре эскроу от 26.12.2006. Однако эти усилия Смагина В.И. ни к чему не привели.

В марте 2008 года в помещении бизнес центра «Даев Плаза» Егиазарян Ашот, действуя в составе группы лиц по предварительному сговору с Егиазаряном Артемом, умышленно, с целью придания видимости законности своих действий и исполнения обязательств перед Смагиным В.И., подписал с последним соглашение, в котором указано, что Егиазарян Ашот контролирует компанию «Калкен», являющуюся акционером копании «Тафтс» с размером акций в уставном капитале 73%, которая в свою очередь через компанию «Доралин», ЗАО «Центурион Альянс» владеет имущественным комплексом «Европарк». В соответствии со статьей 2 данного соглашения Егиазарян Ашот и контролируемые им акционеры обязаны подписать и передать «Дойче Банку» передаточные распоряжения на все принадлежащие и подконтрольные ему (Егиазаряну Ашоту) акции компании «Тафтс»; Егиазарян Ашот обязан внести в уставы подконтрольных компаний «Блиденсол», «Доралин» и «Тафтс» изменения, согласно которым все документы от имени указанных компаний считаются надлежаще оформленными и имеющими юридическую силу только после их подписания двумя уполномоченными лицами – Егиазаряном Артемом и Смагиным В.И., а также передать последнему по номинальной стоимости 50% акций компании «Блиденсол». Статьями 4 и 5 соглашения было установлено распределение доходов от деятельности ЗАО «Центурион

Альянс» по использованию имущественного комплекса «Европарк» между Смагиным В.И. и Егиазаряном Ашотом в пропорции 50% на 50%.

В действительности обязательства, закрепленные в указанном выше соглашении, Егиазарян Ашот выполнять не намеревался. Из перечисленных условий впоследствии было выполнено только одно – Смагин В.И. с 18.08.2008 стал директором компании «Тафтс», однако 25.11.2009 решением директора компании «Калкен», действовавшего по указанию Егиазаряна Ашота, Смагин В.И. был уволен с должности директора компании «Тафтс» и соответственно утратил контроль за принятием решений в компании «Доралин». Новым директором «Тафтс» 25.11.2009 по указанию Егиазаряна Ашота и Егиазаряна Артема назначена кипрская сервисная компания «MPH LAW Ltd.», действовавшая в их интересах.

Реализуя совместный план совершения преступления, в ноябре 2007 г. на территории г. Москвы Егиазарян Ашот и Егиазарян Артем, действуя группой лиц по предварительному сговору, из корыстных побуждений, обеспечили образование ряда неисполненных кредитных обязательств ЗАО «Центурион Альянс» с целью создания условий для преднамеренного банкротства данного общества и наступления технического дефолта по кредиту компании «Блиденсол».

Так, Гогохия В.Г., выполняя функции пособника в совершении Егиазаряном Ашотом и Егиазаряном Артемом преступления, 31.12.2007 в    г. Москве от имени компании «HACKHAM INVEST&TRADE INC.» (далее «Хекхем») подписал с ЗАО «Декорум» в лице первого заместителя генерального директора Павлюченко Е.В. договор № 1, согласно которому констатируется, что ЗАО «Декорум» имеет обязательства по возврату компании «Хекхем» займа в размере 134 849 918,09 долларов США.

Кроме того, в тот же день Гогохия В.Г. от имени компании «Хекхем» и Клочин М.А. от имени ЗАО «Центурион Альянс», действующие при совершении преступления в качестве пособников Егиазаряна Ашота и Егиазаряна Артема, в  г. Москве подписали договор поручительства № 2/07 от 31.12.2007, согласно которому ЗАО «Центурион Альянс», являясь поручителем, отвечает перед кредитором - компанией «Хекхем» за надлежащее исполнение должником - ЗАО «Декорум» по вышеуказанному договору № 1 от 31.12.2007.

При этом Клочин М.А., действуя при совершении преступления в качестве пособника Егиазаряна Ашота и Егиазаряна Артема и находясь в их фактическом подчинении на должности генерального директора ЗАО «Центурион Альянс», в нарушение п. 9.9 устава ЗАО «Центурион Альянс», без согласия первого заместителя генерального директора Смагиной С.И., обязался указанным выше   договором поручительства в случае неисполнения ЗАО «Декорум» обязательств по возврату денежных средств в сумме 134 849 918,09 долларов США уплатить компании «Хекхем» невозвращенную сумму займа. В случае неисполнения ЗАО «Центурион Альянс» указанных обязательств компания «Хекхем» получала право требовать у ЗАО «Центурион Альянс» передачи здания многофункционального комплекса «Европарк», а также права аренды на земельный участок, стоимостью  2 636 320 806  руб., что противоречит кредитному договору, заключенному между «Дойче Банком» и компанией «Блиденсол», по условиям которого акции ЗАО «Центурион Альянс» и имущественный комплекс «Европарк» до погашения кредита компании «Блиденсол» находятся в залоге у «Дойче Банка».

Далее, в неустановленном месте Гогохия В.Г., действуя в качестве пособника Егиазаряна Ашота и Егиазаряна Артема в совершении преступления и находясь в их фактическом подчинении, выполняя их указания, на основании договоров уступки № 1 от 01.09.2008 и № 1/1 от 03.09.2008 обеспечил переход права требования указанной выше задолженности ЗАО «Декорум» (поручителем которого являлось ЗАО «Центурион Альянс») от компании «Хекхем» к компании «ООО DECORUM CORP. LIMITED» («ООО Декорум Корп. Лимитед»), а затем к компании «LONGLAKE HOLDINGS LIMITED»

(«Лонглейк Холдингс Лимитед»), соответственно. При этом сокращен срок возврата долга до 01.02.2009 и включена оговорка о рассмотрении споров по возврату указанной задолженности в третейском суде.

До 01.02.2009 Егиазарян Ашот и Егиазарян Артем, действуя умышленно, не приняли мер для погашения имевшейся у подконтрольных им обществ ЗАО «Декорум» и ЗАО «Центурион Альянс» задолженности перед компанией «LONGLAKE HOLDINGS LIMITED». При этом Клочин М.А. и Гогохия В.Г., действуя в качестве пособников Егиазаряна Ашота и Егиазаряна Артема, письменно информировали кредиторов об отсутствии денежных средств и о невозможности исполнения своих обязательств по возврату денег.

В связи с этим компания «Лонглейк Холдингс Лимитед» 30.04.2009 обратилась с исковым заявлением в постоянно действующий третейский суд при некоммерческом партнерстве «Российское газовое общество», которым 05.08.2009 вынесено решение о взыскании с ЗАО «Декорум» и ЗАО «Центурион Альянс» солидарно общей суммы задолженности, составляющей на тот момент 4 689 670 622,74 руб., и приняты обеспечительные меры в виде запрета ЗАО «Центурион Альянс» отчуждать многофункциональный торговый комплекс «Европарк» до исполнения данного решения.

Таким образом, Егиазарян Ашот и Егиазарян Артем при пособничестве Клочина М.А. и Гогохия В.Г. создали условия для признания ЗАО «Центурион Альянс» банкротом с целью обеспечения наступления технического дефолта по кредиту компании «Блиденсол».

Кроме того, 03.12.2008 в г. Москве, точное место не установлено, Клочин М.А. от имени ЗАО «Центурион Альянс» и Гогохия В.Г. от имени компании «Блиденсол», действуя при совершении преступления в качестве пособников Егиазаряна Ашота и Егиазаряна Артема и по указанию последних, с целью создания условий для признания ЗАО «Центурион Альянс» банкротом, подписали дополнительное соглашение № 1 к договору № 1 от 08.12.2006, устанавливающее размер обязательств по возврату ЗАО «Центурион Альянс» компании «Блиденсол» денежных средств. Указанным дополнительным соглашением увеличен размер процентной ставки с 1% до 12,5% годовых на сумму долга 1 082 963 530 руб., при этом, Клочин М.А. в нарушение п. 9.9 устава ЗАО «Центурион Альянс» подписал указанное дополнительное соглашение без согласия первого заместителя генерального директора Смагиной С.И.

04.12.2008 в г. Москве Клочин М.А. от имени ЗАО «Центурион Альянс» и Гогохия В.Г. от имени компании «Блиденсол», действуя при совершении преступления в качестве пособников Егиазаряна Ашота и Егиазаряна Артема и по указанию последних, подписали дополнительное соглашение № 2 к договору № 1 от 08.12.2006, согласно которому изменили валюту обязательства по возврату указанной выше суммы долга с рублей на доллары США в эквивалентном размере. Кроме того, 30.12.2008 Клочин М.А. и Гогохия В.Г. в г. Москве подписали дополнительное соглашение № 3 к договору № 1 от 08.12.2006, согласно которому с 01.01.2009 повысили размер процентной ставки до 22,5% годовых. При этом, в нарушение п. 9.9 устава ЗАО «Центурион Альянс» данное соглашение было подписано Клочиным М.А. без согласия первого заместителя генерального директора Смагиной С.И.

Таким образом, Егиазарян Ашот и Егиазарян Артем при пособничестве Клочина М.А. и Гогохии В.Г. искусственно увеличили кредиторскую задолженность ЗАО «Центурион Альянс» с целью создания оснований для его банкротства.

Кроме того, Гогохия В.Г., действуя в качестве пособника Егиазаряна Ашота и Егиазаряна Артема, являясь генеральным директором ЗАО «Прогресс Лайн» (г. Москва) - единственного акционера подконтрольного Егиазаряну Ашоту ООО «Даев Плаза» (г. Москва), 14.11.2007 назначил на должность генерального директора ООО «Даев Плаза» Фитисова Д.А.

25.12.2008 Клочин М.А., действуя в качестве пособника Егиазаряна Ашота и Егиазаряна Артема, в нарушение п. 9.9 устава ЗАО «Центурион Альянс», единолично, без согласия первого заместителя генерального директора Смагиной С.И. заключил с ООО «Центурион Альянс» договор новации № 12/08 с ООО «Даев Плаза», от имени которого действовал генеральный директор Фитисов Д.А., не осведомленный о преступных намерениях соучастников преступления и находившийся в их фактическом подчинении.

Согласно п. 1.2. данного договора прекращены новацией заемные и вексельные обязательства на сумму 187 926 359,26 руб., вытекающие из ранее заключенных договоров, а также установлена обязанность ЗАО «Центурион Альянс» выплатить ООО «Даев Плаза» сумму долга 187 926 359,26 руб. в срок до 31.01.2009. Воспользовавшись фактом невозврата в установленный срок указанного долга, Егиазарян Ашот и Егиазарян Артем обеспечили подачу 29.04.2009 в г. Москве в постоянно действующий третейский суд при Некоммерческом партнерстве «Российское газовое общество» от имени ООО «Даев Плаза» искового заявления о взыскании суммы займа. На основании данного иска 13.05.2009 постоянно действующим третейским судом вынесено решение о взыскании с ЗАО «Центурион Альянс» 187 926 359,26 руб. в пользу ООО «Даев Плаза».

Искусственно создав условия для признания ЗАО «Центурион Альянс» несостоятельным (банкротом), Егиазарян Ашот и Егиазарян Артем 25.05.2009 в г. Москве организовали подачу заявления от имени подконтрольного им ООО «Даев Плаза» в Арбитражный суд г. Москвы о признании ЗАО «Центурион Альянс» несостоятельным (банкротом).

В период с мая 2009 года по январь 2010 года Егиазарян Ашот, действуя в составе группы лиц по предварительному сговору с Егиазаряном Артемом, в ходе неоднократных встреч с представителями «Дойче Банка» в г. Москве убеждал последних в возможности наступления банкротства ЗАО «Центурион Альянс» и как следствие - технического дефолта по кредиту, выданному «Дойче Банком» компании «Блиденсол». Действуя таким образом, Егиазарян Ашот добился от «Дойче Банка» права для кипрской компании «SKENDLEBY INVESTMENTS LIMITED» (далее «Скендлби»), от имени которой он выступал, выкупить указанный кредит.

В связи с достигнутой договоренностью с «Дойче Банком» о праве выкупа указанного выше кредита и права распоряжения залогом по данному кредиту, Егиазарян Ашот, действуя умышленно в составе группы лиц по предварительному сговору с Егиазаряном Артемом, в период декабря 2009 г. – января 2010 г. обеспечил направление в Арбитражный суд г. Москвы заявления от имени ООО «Даев Плаза» об отказе от заявления о признании ЗАО «Центурион Альянс» несостоятельным (банкротом). На основании данного заявления 21.01.2010 Арбитражный суд г. Москвы, прекратил производство по делу о признании ЗАО «Центурион Альянс» банкротом.

Егиазарян Ашот и Егиазарян Артем, заведомо не намереваясь исполнять принятые на себя обязательства по сохранению права собственности Смагина В.И. на 20-ти процентную долю в ЗАО «Центурион Альянс» и соответственно имущественном комплексе «Европарк», продолжая реализовывать свой преступный умысел, 18.01.2010 обеспечили продажу по номинальной цене кипрской компании «Mastero Investments Ltd.» (далее «Мастеро») 50% акций компании «Доралин», принадлежавших компании «Тафтс» и находившихся в залоге «Дойче Банка». При этом Смагин В.И., как собственник 20% акций «Тафтс» не был поставлен в известность об этой сделке, своего согласия на ее совершение не давал и не получил за это никакой имущественной компенсации.

18.01.2010 между «Скендлби» и «Дойче Банком» заключено соглашение о выкупе прав требования по кредиту компании «Блиденсол» от 27.12.2006. В результате этой сделки компания «Скендлби» полностью заменила «Дойче Банк» в отношениях по

8

кредиту и залогу имущества. Вместе с тем акции «Доралин», ЗАО «Центурион Альянс», а также имущественный комплекс «Европарк» оставались под залогом в качестве обеспечения возврата кредита.

Завершая реализацию преступного умысла, Егиазарян Ашот и Егиазарян Артем 25.02.2010 организовали заключение между компаниями «Скендлби», «Доралин» и «Блиденсол» соглашения «О распоряжении имуществом и прекращении обязательств», согласно которому снимается залог с акций «Доралин» и ЗАО «Центурион Альянс», задолженность «Блиденсол» перед «Скендлби» аннулируется, а 100% акций ЗАО «Центурион Альянс» передаются из собственности «Доралин» в собственность «Скендлби».

26.02.2010 в г. Москве Егиазарян Артем и Егиазарян Ашот с учетом указанного соглашения от 25.02.2010 обеспечили подписание залогового распоряжения о прекращении залога акций ЗАО «Центурион Альянс» и инструкции на осуществление операций с ценными бумагами, на основании которых 2300 обыкновенных именных акций ЗАО «Центурион Альянс», что составляет 100% акционерного капитала, включая 460 акций, ранее принадлежавших Смагину В.И., в тот же день были перечислены со счета депо № K40DORN10001 компании «Доралин», открытом в ООО «Дойче Банк» (г. Москва, ул. Садовническая, д. 82, строение 2), на счет депо № K40004020008 компании «Скендлби», открытом в том же банке.

Таким образом, 26.02.2010 100% акций ЗАО «Центурион Альянс» перешли в собственность компании «Скендлби», тем самым Егиазарян Ашот и Егиазарян Артем получили возможность распоряжаться по собственному усмотрению 20% акций ЗАО «Центурион Альянс», ранее принадлежавшими Смагину В.И., без согласия и какой-либо имущественной компенсации для последнего, чем причинили ему (Смагину) значительный имущественный ущерб.

В результате вышеуказанных действий соучастников преступления 20% акций компании «Тафтс», принадлежащих Смагину В.И., с 26.02.2010 полностью обесценились в связи с выходом имущественного комплекса «Европарк» из активов компаний «Тафтс» и «Доралин».

Таким образом, в период с 26.12.2006 по 26.02.2010 Егиазарян Ашот и Егиазарян Артем при пособничестве Клочина М.А. и Гогохии В.Г. путем обмана и злоупотребления доверием Смагина В.И., противоправно, безвозмездно и умышленно приобрели право на принадлежавшие последнему 460 бездокументарных акций (20% общего количества акций) ЗАО «Центурион Альянс» рыночной стоимостью не менее 720 605 444 руб., что является особо крупным размером, причинив Смагину В.И. значительный имущественный ущерб на указанную сумму.

Подсудимые Егиазарян Ашот Г., Егиазарян Артем Г., Клочин М.А., Гогохия В.Г. через защитников вину в совершении инкриминируемого им преступления не признали, дело рассмотрено в порядке ч. 5 ст. 247 УПК РФ в отсутствие подсудимых, которые находятся за пределами территории Российской Федерации, объявлены в международный розыск, на территории иностранного государства к ответственности привлечены не были.

Вина подсудимых подтверждается исследованными в суде доказательствами:

Показаниями в судебном заседании потерпевшего **Смагина В.И.** о том, что в 2001-2002 году он владел 35 % доли компании «Центурион Альянс», осуществлявшей строительство торгового комплекса «Европарк» (г. Москва, Рублевское шоссе, д. 62), участники которой Каплун и Локтионов решили выйти из инвестиционного проекта, поэтому он (Смагин) стал подыскивать новых партнеров.

С депутатом Государственной Думы Федерального Собрания Российской Федерации Егиазаряном Ашотом Г. он (Смагин) познакомился весной 2002 года, тот представил ему свое доверенное лицо и правую руку - Гаркушу Дмитрия, пояснив, что в связи со статусом депутата он (Егиазарян) не может подписывать документы, владеть

публичными активами и что ведением всех дел будет заниматься Гаркуша от его (Егиазаряна) лица.

Все их совместные с Ашотом Егиазаряном договоренности по дальнейшему участию в проекте строительства торгового комплекса были зафиксированы в соглашении от 29.08.2003, согласно которому у него (Смагина) впоследствии оставалось 22 % акций общества, преобразованного в ЗАО, но дивиденды он (Смагин) должен был получать только с первого года деятельности торгового центра, при этом его (Смагина) доля не участвовала в возврате заемных средств.

Строительство ТК «Европарк» началось примерно в середине лета 2003, завершилось в середине 2005. До июля 2003 проектная документация и подготовительные работы оплачивались за счет займов от различных иностранных компаний, принадлежащих Егиазаряну Ашоту. Из своих личных средств Смагин вложил в прокладку коммуникаций около 700 тыс. долларов США. Был получен кредит в Сбербанке сумму 42 млн. долларов США, который был погашен в связи с привлечением Егиазаряном 45 млн. долларов США по договору займа с компанией «Хекхэм», подконтрольной Ашоту. Егиазаряном также привлекались займы от офшорных компаний на завершение строительных работ.

Общая стоимость строительства ТК «Европарк» ЗАО «Центурион Альянс» составляет около 1,5 млрд. рублей.

К 2006 году он (Смагин) владел 22 % акций в уставном капитале ЗАО «Центурион Альянс», купив у подконтрольных Егиазаряну Ашоту компаний «Техэнергодом» - 20 % акций, у «Титула» - 2 % акций. Участвовавшие в проекте строительства ТК «Европарк» подконтрольные Егиазаряну структуры - ЗАО «Титул», ТД «Уникомимпекс», ООО «Милеа», ООО «Мерхав» совокупно владели 73 % акций. Позже он (Смагин) из своей доли передал 2 %, Ашот – 5 % в управленческий фонд с целью оптимизации эксплуатации и управления торговым центром. Соответственно у генерального директора «Центурион Альянс» на тот момент Гаркуши в собственности находилось 7 % акций, которые после своего увольнения он не вернул.

Помимо строительства торгового комплекса Ашот Егиазарян участвовал в дорогостоящем проекте реконструкции гостиницы «Москва» и нуждался в заемных средствах, в связи с чем осенью 2006 на одной из встреч в Бизнес-центре «Даев плаза» по адресу: г. Москва, Даев переулок, д. 20, Ашот Егиазарян предложил ему (Смагину) продать свою долю в ЗАО «Центурион Альянс» в рассрочку за 17 млн. долларов США, поскольку хотел консолидировать 100%-ный пакет акций для их залога в «Дойче Банке» с целью получения кредита на реконструкцию гостиницы «Москва».

Примерно в ноябре – декабре 2006 в ходе встречи с Егиазаряном Ашотом и Гаркушей Егиазарян Ашот Г. сообщил, что Дмитрий Гаркуша является владельцем компании «Блиденсол» (Кипр), которая будет получателем кредита в размере 100 млн. долларов США от «Дойче Банка», при этом банк не желает, чтобы акции ЗАО «Центурион Альянс» на момент их залога принадлежали российским юридическим или физическим лицам. Егиазарян Ашот Г. рассказал, что схема должна выглядеть следующим образом: он (Смагин), как и остальные акционеры, должен был продать свои акции кипрской компании «Доралин» по номинальной стоимости. Данную компанию создали граждане Кипра, а генеральная доверенность на управление была у Гаркуши. 100% акций компании «Доралин» приобретает компания «Тафтс» (Британские Виргинские острова), а в самой компании «Тафтс» акции должны быть распределены также, как это было и в ЗАО «Центурион Альянс», то есть 73% у Егиазаряна Ашота Г., 7% у Дмитрия Гаркуши, а 20% у него (Смагина).

Егиазарян Ашот сказал, что войдет в компанию «Тафтс» своей подконтрольной фирмой «Калкен» (Кипр), генеральная доверенность на управление данной компанией была у Егиазаряна Артема – брата Егиазаряна Ашота.

10

При этом Егиазарян  Ашот заверял его (Смагина), что имуществу ничто не угрожает, после многочисленных переговоров и предложений со стороны Егиазаряна Ашота, он (Смагин) выразил свое предварительное согласие, но настаивал на обязательном письменном оформлении всех документов и договоренностей с привлечением юристов.

В 2006-2007 ему (Смагину) передавались подтверждающие документы, что компания «Тафтс» является акционером компании «Доралин» на 100%, соответственно, владея 20% акций компании «Тафтс», он опосредованно владел и 20% акций в компании «Доралин», и как следствие 20% акций ЗАО «Центурион Альянс» и ТК «Европарк», так как это был единственный актив указанной компании.

С Клочиным он (Смагин) познакомился летом 2005 года  в присутствии Ашота Егазаряна и Ананьева. Они сказали, что не довольны работой Гаркуши Д.В. во всех их совместных проектах, в частности, по ТК «Европарк», открытие которого прошло неудачно, в связи с чем было принято решение назначить Клочина новым генеральным директором ТК «Европарк» вместо Гаркуши, Клочин присутствовал на этой встрече.

Егиазарян Артем был назначен заместителем генерального директора ЗАО «Центурион Альянс» Клочина по общим вопросам, при этом он выполнял указания старшего брата Егиазаряна Ашота.

С Гогохией он (Смагин) познакомился через Ашота Егиазаряна, виделись на днях рождения Ашота Егиазаряна или его жены, в «Даев Плаза», Гогохия был близким человеком в семье Ашота.

После долгих переговоров Егиазарян Ашот пообещал выполнить свои обязательства относительно того, что он (Смагин) передает свои акции компании «Доралин» только с условием, что сможет контролировать это имущество через участие в компании «Тафтс» на срок не более года; что все документы подписывались одновременно и что между акционерами должно быть подписано соглашение с участием «Дойче Банка», являющегося гарантом его исполнения. Ашот сказал, что понимает его обеспокоенность по поводу риска своими работой на 20 % акций в проекте ТК «Европарк», но заверил, что его имуществу ничто не угрожает. При любых обстоятельствах  20 % акций останутся у него (Смагиина), поскольку в случае дефолта компании «Блиденсол» Егиазарян Ашот предоставит ему (Смагину) право продажи подконтрольных ему 73% акций, стоимость которых по  официальной оценке превышала стоимость кредитных обязательств. Кроме того, Егиазарян заверил его, что в компании «Тафтс» ни один документ не будет иметь юридической силы без его (Смагина) подписи.

Ашот Егиазарян пояснил, что ему нужен один год, на 100 млн. долларов США ему надо быстро достроить торговую галерею гостиницы «Москва» и запустить первую очередь проекта реконструкции, а саму гостиницу будет достраивать на другие деньги, что выглядело правдоподобно, так как проект гостиницы был уже в высокой степени готовности, и у него (Смагина) не было оснований в этом сомневаться.

Также Егиазарян Ашот предложил ему посредством внесения изменений в устав ЗАО «Центурион Альянс» контролировать деятельность общества, чего он ранее был лишен и не мог рассчитывать на справедливое распределение дивидендов, также предложил назначить его председателем совета директоров общества, ввести должность первого заместителя генерального директора, который будет назначаться советом директоров, то есть, фактически будет его (Смагина) человеком. Также Ашот согласился с его (Смагина) предложением об ограничении права генерального директора на заключение сделок на сумму свыше 5 млн. рублей и введении обязательного наличия второй подписи первого заместителя генерального директора для одобрения таких сделок, что в дальнейшем было сделано.

Находясь в дружеских и деловых – партнерских отношениях с Егиазаряном Ашотом, он (Смагин) был вынужден согласиться на его предложение.

26.12.2006 они подписали Соглашение акционеров и договор Эскроу с участием «Дойче Банка», по которому последний должен был выступать гарантом исполнения обязательств акционерами.

Положения Соглашения акционеров от 26.12.2006 были направлены на защиту его (Смагина) доли в случае неисполнения кредитных обязательств в размере 100 млн. долларов США, в нем была прописана процедура продажи 73% акций «Тафтс», принадлежащих компании «Калкен», стоимость которых перекрывала стоимость кредита в размере 100 млн. долларов США, что являлось гарантией и защитой его доли.

По условиям договоров, заключенных между акционерами, в обеспечение возврата кредита, выданного «Дойче Банком» компании «Блиденсол», банку должны были быть переданы все обеспечительные документы для обращения внесудебного взыскания на акции «Доралин», ЗАО «Центурион Альянс» и ТК «Европарк». В частности, «Дойче банку» как независимому (эскроу) агенту должны были быть переданы на хранение передаточные распоряжения акциями «Доралин» от компании «Тафтс» и 73% акций «Тафтс», формально принадлежащие компании «Калкен», подконтрольной Ашоту Егиазаряну.

Договор Эскроу не предусматривал передачу на хранение принадлежащие ему (Смагину) 20 % акций в «Дойче Банк», согласно последнему, а также соглашению акционеров компании «Тафтс», в случае дефолта Егиазарян Ашот должен был положить 73% акций компании «Калкен», а Смагин должен был выставить их на продажу. Кроме того, акции потерпевшего не должны были передаваться, так как он не являлся акционером гостиницы «Москва» и получателем кредита.

Однако после подписания всех документов и получения кредита Ашот Егиазарян отказался выполнить свои обещания.

Прошел год, в течение которого он (Смагин) видел, что торговая галерея в гостинице «Москва» не была запущена, куда делись деньги, Ашот пояснить не мог.

Поскольку в январе 2008 года истек юридический год по заключенным между ними договоренностям, он (Смагин) неоднократно обращался к Егиазаряну Ашоту с требованием выполнить обязательства и дать команду подконтрольным лицам, в том числе его брату Артему Егиазаряну, оформить свои обещания надлежащим образом. В феврале 2008 года он (Смагин) написал письмо в «Дойче Банк» на имя Герберта Смитта, чем воспрепятствовал получению Егиазаряном Ашотом нового транша кредита «Дойче Банка» по гостинице «Москва».

В результате настойчивых действий ему (Смагину) удалось добиться подписания с Егиазаряном Ашотом 03.03.2008 соглашения, подготовленного начальником юридического отдела компании «Центурион Гипермаркетс» Араповой Ириной. Егиазарян Ашот лично расписался под указанными в соглашении обещаниями, в том числе о выполнении условий договоренностей 2006, о передаче своих 73 % акций в компании «Тафтс» на хранение «Дойче Банку», заключении нового договора Эскроу с «Дойче Банком», поскольку старые договоры 2006 и 2007 не были исполнены по вине Егиазаряна Ашота, он же (Смагин) со своей стороны по условиям соглашения открыл счет в «Дойче Банке».

У него (Смагина) создалось впечатление, что Ашот Егиазарян намерен выполнить условия соглашения, поскольку после его подписания Артем Егиазарян стал взаимодействовать с ним (Смагиным) - они совместно отозвали доверенности у Гаркуши, став двумя директорами «Тафтс», получив совместную доверенность от «Доралина» на управление ТК «Европарк»; на него (Смагина) было оформлено право второй подписи от имени компании «Тафтс» по распоряжению имуществом (акциями) компании «Доралин», при отсутствии которой документ был бы недействительным. Это создавало у Смагина впечатление, что Ашот ведет с ним честные деловые отношения.

Кроме того, Егиазарян Ашот обещал дать указание своим структурам и адвокатам оформить на него по номиналу 50 % акций в компании «Блиденсол», с тем, чтобы он не

беспокоился. Вследствие этого они определили сумму, которую Егиазарян Ашот должен был выбрать в виде дивидендов в размере 34,5 млн. долларов США, после чего его (Смагина) доля возрастала в ЗАО «Центурион Альянс» до 50%, и они становились партнёрами 50 на 50, что его (Смагина) устраивало.

Позднее выяснилось, что компания «Блиденсол» не вернула кредит «Дойче банку». В начале 2009 банк принял решение о продаже кредита, при этом Егиазарян заверил его (Смагина), что держит ситуацию под контролем, и предложил разные варианты противодействия «Дойче Банку». Однако кредит был выставлен на рынок на продажу, несмотря на отсутствие проблем с его обслуживанием, поскольку кредит на 100 млн. долларов США перед «Дойче Банком» обслуживался за счет ТК «Европарк», так была построена схема: проценты, которые «Блиденсол» платил банку, поступали в качестве погашения задолженности от ЗАО «Центурион Альянс», являющегося фактически и залогодателем, и поручителем, и плательщиком по процентам в трех лицах.

Так, 08 декабря 2006 года между ЗАО «Центурион Альянс» и компанией «Блиденсол» в «Даев Плаза» был заключен договор займа (новации) на сумму около 1,5 миллиарда рублей, однако кредитных денег «Дойче Банка» там не было, это были аккумулированные займы прошлых периодов. Компания «Хэкхем» и другие иностранные кредиторы ЗАО «Центурион Альянс» за 1 доллар продали право требования по договорам займа компании «Блиденсол». Сделано это было для того, чтобы ЗАО «Центурион Альянс» возвращал заем не компании «Хэкхем», а компании «Блиденсол», которая являлась получателем кредита «Дойче Банка» и полученные от ЗАО «Центурион Альянс» деньги должна была пускать на погашение процентов по этому кредиту.

Также, выдавая в декабре 2006 кредит, в конце января 2007 «Дойче Банк» 90 % этого кредита продал, переуступив его в виде деривативна американскому фонду, оставив за собой роль кредитного агента и представителя по кредиту.

В феврале 2009 «Дойче Банк», как и было ранее оговорено в соглашении от 26.12.2006, предложил ему (Смагину) выкупить кредит или найти покупателя на этот кредит и получить права на заложенное имущество.

При изучении кредитного пакета им (Смагиным) было обнаружено отсутствие части обеспечительной документации (передаточных распоряжений), дающей право «Дойче Банку» на наложение внесудебного взыскания на акции компании «Доралин» и ЗАО «Центурион Альянс», что означало, что приобретатель прав по кредиту не сможет получить акции «Доралин» во внесудебном порядке в случае невозврата кредита фирмой «Блиденсол».

Сотрудниками банка неоднократно высказывались требования Ашоту Егиазаряну и его юристам передать недостающую часть обеспечительной документации, предлагалось повторно подписать данные передаточные распоряжения, которые в соответствии с правилами управления компании «Тафтс» должны были быть подписаны им (Смагиным) и Артемом Егиазаряном в качестве ее новых директоров. Однако Артем отказался это сделать, сославшись на отсутствие команды старшего брата Ашота Егиазаряна.

Сам Ашот Егиазарян обещал передать передаточные распоряжения в «Дойче Банк» в ходе переговоров в «Дойче Банк» и «Даев Плаза», но также не сделал этого.

Как впоследствии он (Смагин) выяснил, кредит приобрела компания «Скендлби», которая является 100 % владельцем ЗАО «Центурион Альянс» и его актива – ТК «Европарк». Одна из двух офшорных компаний – учредителей «Скендлби» принадлежит Егиазаряну Ашоту, поэтому ему не нужны были передаточные распоряжения. Ашот Егиазарян выкупал свой кредит сам у себя, ничем не рискуя, он мог выписать передаточные распоряжения в любой момент.

Однако отсутствие данных обеспечительных документов при выкупе кредита для него (Смагина) означало невозможность во внесудебном порядке забрать акции «Доралин», которые на 100% принадлежали «Тафтс», а также акции ЗАО «Центурион Альянс», которые на 100% принадлежали компании «Доралин».

По его (Смагина) просьбе юридическая компания «Бейкер и Маккензи» подготовила передаточные распоряжения и направила ему 25.09.2009 электронной почтой для дальнейшей пересылки Ашоту Егиазаряну, однако от того никакой реакции не последовало.

Номинальными директорами «Доралин» были киприоты из секретарской компании, которые выполняли исключительно номинальные административные функции. С директорами он (Смагин) не общался, взаимодействовал с ними Артем Егиазарян. Поскольку единственным акционером «Доралин» была компания «Тафтс», акционерами которой являлись он (Смагин), Егиазарян Артем и компания «CIG INTERNATIONAL GROUP LIMITED» (до 2007 года - Гаркуша Д.В.), то ему и Артему Егиазаряну не было необходимости отчитываться перед директорами компании «Доралин». Их деятельность в качестве представителей компании «Доралин» никак не оплачивалась. Все решения, которые принимались от имени компании «Доралин», имели юридическую силу только в случае, если они были подписаны им (Смагиным) и Артемом Егиазаряном, действующим от имени и по поручению Ашота Егиазаряна.

Кроме того, в период весны-лета 2009 он (Смагин) обратил внимание, что генеральным директором ЗАО «Центурион Альянс» Клочиным по указанию братьев Егиазарянов осуществляются действия, направленные против ЗАО «Центурион Альянс»: «раздувается» кредиторская задолженность, заключаются сомнительные сделки, без его (Смагина) ведома осуществляются платежи на суммы выше 5 млн. рублей, происходит давление на лояльный к нему (Смагину) персонал.

После прекращения партнерских отношений между Егиазаряном Ашотом и Гаркушей вследствие конфликта, выяснилось, что в период 2008-2009, пользуясь возможностью управлять компанией ЗАО «Центурион Альянс» и компанией «Блиденсол», Егиазарян Ашот с целью воспрепятствования продажи ТК «Европарк», у которого были заложены и здание, и земля, с целью снижения его ликвидности как актива, через генерального директора ЗАО «Центурион Альянс» Клочина Максима и управляющего по доверенности компанией «Блиденсол» Гогохию Виталия, без его (Смагина) согласия сменил валюту ранее заключенного вышеуказанного займа с рублей на доллары США и задним числом увеличил процентную ставку с 1% на 12%, а затем - до 22% годовых.

Таким образом, к концу 2009 на момент, когда «ДойчеБанк» продолжал предпринимать попытки продать вышеуказанный кредит, искусственно увеличенная забалансовая кредиторская задолженность ЗАО «Центурион Альянс» перед компанией «Блиденсол» уже составляла свыше 140 млн. долларов США.

Третейские разбирательства по его (Смагина) иску, а также по искам ЗАО «Титул», ООО «Милеа» и ЗАО «Торговый дом «Уникомимпэкс» к компании «Доралин» были инициированы Ашотом Егиазаряном, как способ воздействия на «Дойче Банк», который рассматривал возможность переуступки залога 100% акций ЗАО «Центурион Альянс» другим лицам, либо вообще в будущем мог бы объявить дефолт по кредиту. Иски в третейский суд были так называемой защитной мерой Ашота от возможных действий «Дойче Банка». Решение суда должно было иллюстрировать, что в случае принятия «Дойче Банком» решения о переуступки 100% акций ЗАО «Центурион Альянс» другим лицам, последние столкнуться с юридическими проблемами и ничего не получат. Кроме того, наличие любого судебного спора относительно предмета залога существенным образом снижает его стоимость в случае переуступки прав по нему.

Помимо этого, ЗАО «Центурион Альянс» также имело обязательство по договору займа перед подконтрольной Ашоту Егиазаряну компанией «Даев Плаза» примерно на 160-180 млн. долларов США, имея при этом на счету 200 млн. долларов США. Следовательно, никакого реального банкротства быть не могло. Но именно эта компания в мае 2009 подала заявление о банкротстве ЗАО «Центурион Альянс» в Арбитражный суд г. Москвы, для того, чтобы «напугать» «Дойче Банк» и всех желающих выкупить кредит.

14

Несмотря на то, что этот иск был отозван через несколько месяцев и производство по делу прекращено, это обстоятельство повлияло на решение «Дойче Банка» как можно быстрее уступить права по кредиту любому желающему лицу. Однако по состоянию на май 2009 ТК, «Европарк» приносил прибыль, достаточную для погашения всей имеющейся кредиторской задолженности.

Несмотря на то, что «Дойче Банк» выставил кредит на продажу за 75 млн. долларов США, покупать у банка фактически было нечего, поскольку это являлось прямым билетом на войну с Егиазаряном Ашотом или заменой себя «Дойче Банком» сроком на 10 лет ввиду отсутствия возможности продать акции, чтобы погасить кредит.

Предпринятые Егиазаряном меры по противодействию «Дойче Банку» достигли своей цели, и осенью 2009 банк согласился продать кредит за 55 млн. долларов США группе компаний «Ташир», о чем он (Смагин) узнал в январе 2010 года из газеты «Ведомости».

Таким образом, по его (Смагина) мнению, на принятие «Дойче Банком» такого решения повлияли факторы, связанные с иском ООО «Даев Плаза» о признании ЗАО «Центурион Альянс» банкротом, отсутствием передаточных распоряжений, увеличенной кредиторской задолженности, решениями третейских судов, а именно Постоянно действующего третейского суда при Некоммерческом партнерстве «Российское Газовое общество» о возврате компанией «Доралин» акций ЗАО «Центурион Альянс» бывшим собственникам четырем юридическим лицам – «Милеа», «Мерхав», «Титул» и «Уникомимпекс», которые были переданы «Доралин» 26.12.2006. Это повлияло на снижение стоимости кредита на 45 млн. долларов США.

Поскольку Егиазарян скрывался от него (Смагина), не выходил на связь, он встретился с главой группы компании «Ташир» Самвелом Карапетяном, который пояснил, что узнал о нем (Смагине) как акционере ТК «Европарк» в конце января 2010 года, при этом Ашот обещал урегулировать все вопросы с ним (Смагиным).

По поводу иска в Арбитражный суд г. Москвы к компании «Доралин» пояснил, что указанные действия являлись защитной мерой на случай принятия «Дойче Банком» решения о продаже кредита, выданного компании «Блиденсол», третьим лицам. Юридически все сводилось к тому, что из-за неоплаты компанией «Доралин» проданных им акций, они должны были вернуться в его собственность. Впоследствии на одной из встреч с Егиазаряном Ашотом последним было озвучено, что никто из продавцов акций, кроме Гаркуши, не получил их оплаты, и необходимо подать иск в суд. По решению Егиазаряна Ашота интересы истца в данном процессе представлял адвокат Каревик, которому он (Смагин) передал оригиналы договора купли-продажи акций и дополнительного соглашения к нему, заключенного между ним (Смагиным) и компанией «Доралин» для предоставления на обозрение суду. После того как судом было отказано в удовлетворении исковых требований, ввиду того, что адвокатом Каревиком было выбрано неправильное основание для иска, он (Смагин) потребовал возвратить оригиналы договора купли-продажи и дополнительного соглашения к нему, однако Каревик ему отказал, сославшись на то, что передал их Егиазаряну Ашоту. В марте 2010 года Егиазарян Ашот пояснил ему (Смагину), что не вернет ни договор, ни дополнительное соглашение.

При этом в отсутствие оригиналов документов он (Смагин) был лишен дальнейшей возможности защитить свои интересы по данному договору купли-продажи. По его (Смагина) мнению в данном случае арбитражный процесс был специально затеян Егиазаряном Ашотом для завладения оригиналами документов с целью воспрепятствования ему (Смагину) в возврате 20 % акций ЗАО «Центурион Альянс», фактическим владельцем которых он являлся. Таким образом, он был лишен возможности возвратить принадлежавшие ему акции в арбитражном порядке в рамках российской юрисдикции.

Заподозрив хищение своего имущества, он (Смагин) направил в Республику Кипр запрос о предоставлении сведений, касающихся акционеров и директоров компании «Доралин», на который в апреле 2010 получил ответ о том, что компанией «Доралин» владеет не компания «Тафтс», а две кипрские компании – «Мастеро» и «Фамулатос» в соотношении 50% на 50%. Одну из указанных компаний контролирует группа компаний «Ташир», принадлежащая Самвелу Карапетяну, а вторую - сам Егиазарян Ашот, что свидетельствовало об утрате им (Смагиным) контроля над ТК «Европарк».

Кроме того, из представленного отчета следовало, что в компании «Доралин» были сменены директора, ими стали компания «Нью Дженерэйшн Сервисес Лтд» (Британские Виргинские острова) и гражданка России Елена Демина, являющаяся сотрудницей одной из структур Карапетяна С.С. Директорами компании «Тафтс», уполномоченными давать обязательные указания или распоряжаться акциями компании «Доралин», были только он (Смагин) и Артем Егиазарян. По условиям, предусмотренными акционерными документами компании «Тафтс» и акционерным соглашением, они оба должны были ставить свои подписи для осуществления каких-либо значимых действий с имуществом компании «Тафтс», опосредованно владеющей ТК «Европарк». Вместе с тем, он никаких подписей не ставил. О продаже 18.01.2010 компанией «Тафтс» компании «Мастеро» 50% акций компании «Доралин» за 5 000 евро ему никто не сообщал, согласия на распоряжение своим имуществом он не давал ни Ашоту Егиазаряну, ни Самвелу Карапетяну, ни их представителям или фирмам.

Указание директору компании «Тафтс» - компании «MPH Law» о продаже за 5 000 евро компании «Мастеро» 50% акций компании «Доралин» мог дать только Ашот Егиазарян, поскольку по состоянию на 18.01.2010 он контролировал компании «Калкен» и «Тафтс».

Насколько ему (Смагину) известно, было две редакции устава «Тафтс». Первый устав был принят при регистрации компании в 2006, второй - в ноябре 2009, о чем он (Смагин) узнал лишь в середине октября 2010 от своих зарубежных адвокатов. При этом директор «Тафтс» обязан был уведомить его (Смагина) как акционера компании об изменении устава, 25.11.2009 он (Смагин) был снят с должности генерального директора, на его место назначили номинальных лиц. При этом его (Смагина) умышленно не проинформировали об этом, чтобы он своевременно не предпринял какие-либо действия по защите своих прав.

В этот же период времени Клочиным был издан приказ об увольнении его супруги Смагиной, главного бухгалтера Волковой и других сотрудников.

Действия Ашота Егиазаряна изначально были направлены на хищение принадлежащих ему (Смагину) акций, невыплату дивидендов и вывод его из состава акционеров ЗАО «Центурион Альянс» с последующим завладением ТК «Европарк».

Подтверждением указанного обстоятельства является решение об увеличении уставного капитала ЗАО «Центурион Альянс» путем выпуска дополнительных акций с целью увеличения пакета акций и как следствие «размывания» его (Смагина) доли. В результате этих действий принадлежащие ему (Смагину) 20% акций обесцениваются, а его 460 акций могут стать 5%.

Таким образом, Ашот Егиазарян, введя его (Смагина) в заблуждение относительно своих истинных намерений, уговорил его (Смагина) оформить акции ЗАО «Центурион Альянс» на компанию «Доралин», которые впоследствии присвоил, оформил без его (Смагина) ведома в пользу своей подконтрольной компании и иного лица, обманув его, тем самым совершил хищение его имущества, общая стоимость которого составила более полутора миллиардов рублей.

Также он (Смагин) для защиты своих прав подал иск в Лондонский международный третейский (арбитражный) суд, решением которого от 11.11.2014 было постановлено о взыскании с ответчиков – Ашота Егиазаряна и компании «Калкен» солидарно в его (Смагина) пользу денежной суммы в счет возмещения убытков.

16

Вместе с тем, выплаты Егиазаряном Ашотом не осуществляются, поскольку он раскидал все свои активы в различных юрисдикциях. На счетах, которые следствием были арестованы, также ничего нет. ТК «Европарк» и «Даев Плаза» оформлены на иных лиц. Возместить ущерб в России не представляется возможным, поскольку Ашоту ничего не принадлежит, в настоящее время он проживает в США и заявляет, что ничем не владеет, в отношении него возбуждено исполнительное производство.

В июне 2015 года Королевским судом Англии рассматривалась апелляционная жалоба Ашота Егиазаряна на решение Лондонского Арбитражного международного суда от 12.11.2014 года. В судебном заседании с использованием видеоконференц - связи был допрошен Ашот Егиазарян, который признал владение 4 российскими компаниями - ООО «Милеа», ТД «Уникомимпэкс», ЗАО «Титул», а также компанией «Блиденсол», получившей в «Дойче Банке» кредит в размере 100 млн. долларов США; компания «Калкен» принадлежит Артему Егиазаряну, и он к ней никакого отношения не имеет; также подтвердил свое владение офшорными компаниями «Блиденсол», «Доралин» и др. оформленными на доверенных ему лиц, которыми являются Артем Егиазарян, Виталий Гогохия и Дмитрий Фитисов, а сам он является их конечным выгодоприобретателем. Гаркуша был его сотрудником, но не доверенным лицом. Согласно достигнутой с ним (Смагиным) договоренности он (Ашот Егиазарян) должен был организовать финансирование строительства ТК «Европарк» в качестве инвестора данного проекта, вложил в него свои денежные средства, а в декабре 2006 через компанию «Блиденсол» забрал их под видом кредита в размере 100 млн. долларов США, несмотря на то, что эта сумма в два раза превышала его личные вложения в проект; также доказывал, что в России как депутат Государственной Думы он мог владеть имуществом, и закон ему это разрешал.

Показаниями в судебном заседании свидетелей **Окорокова Ю.М., Коршунова В.В. и Каплуна Н.Н.** об обстоятельствах их участия в первоначальном этапе проектирования и строительства ТК «Европарк», согласно которым Смагин В.И. принимал наиболее активное участие в вопросах организации строительства торгового комплекса, инвестировали которое также сначала Окороков Ю.М. и Коршунов В.В., а затем в 2002 году - Каплун Н.Н. и Локтионов А.Г., однако последние через непродолжительное время продали свои доли покупателю, в чьих интересах действовал Гаркуша Д.В., оформив сделку на юридические лица.

Показаниями свидетеля **Ананьева М.Б.** в судебном заседании о том, что знаком с Ашотом Егиазаряном с 1982 года, со студенческой скамьи. В 1996 Ашот пригласил его в новый проект в «Уникомбанк», где являлся заместителем председателя совета директоров банка, их личные и деловые отношения длились до 2009. В конце весны - в начале лета 2002 Ашот Егиазарян на одной из встреч рассказал об идее строительства торгового комплекса на Рублевском шоссе, впоследствии получившего название «Европарк», а также познакомил его с Виталием Смагиным, который первоначально со своей идеей строительства ТК «Европарк» пришел именно к Егиазаряну Ашоту, предложил ему участие в этом проекте, так как тот обладал финансовыми и административными ресурсами. Егиазарян обещал финансирование строительства «Европарка». Со своей стороны Ашот Егиазарян предложил ему (Ананьеву) участие в виде денежных вложений в строительство комплекса. В связи с тем, что ни он (Ананьев), ни Ашот Егиазарян, который уже являлся депутатом Государственной Думы ФС РФ, не могли заниматься бизнесом, Ананьев предложил кандидатуру Гаркуши в качестве менеджера этого проекта и выделил ему 20 % акций в «Инвест-Центре», контрольный пакет которого был у его (Ананьева) супруги и кузины. В августе 2002 были куплены доли в уставном капитале тогда еще ООО «Центурион Альянс» у владельцев проекта Смагина, Локтионова и Каплуна.

Чтобы не проходить процедуру согласования в антимонопольном органе, Гаркуша предложил войти в проект «Европарк» не самим ОАО «Инвест-Центром», - крупной компанией по торговле ценными бумагами, а через дочерние компании, в марте 2003 ООО «Центурион Альянс» было преобразовано в ЗАО; 73% акций ЗАО «Центурион Альянс» были куплены на ряд дочерних компаний: ЗАО «ТД Уникомимпекс» (20%), ЗАО «Титул» (18%) и ООО «Мерхав» (20%), единственным акционером данных компаний было ОАО «ИнвестЦентр». Еще 20% выкупила подконтрольная ему с Гаркушей компания - ООО «Милеа». ЗАО «Уникомимпекс» формально является дочерней компанией, генеральным директором которой стал его (Ананьева) давний приятель Новиков Роман. Трошин Игорь, являющийся его родственником, был назначен им (Ананьевым) директором ООО «Милеа», которое не на прямую также было аффилировано «Инвест-Центру».

Относительно кредита «Дойче Банка» он (Ананьев) дал Новикову и Трошину указание о подписании документов о продаже акций по номиналу на «Доралин», пояснив, что с ним (Ананьевым) все согласовано, после чего  26.12.2006 все документы были подписаны.

В период с 2003 по 2006 годы изначально 25 % акций ЗАО «Центурион Альянс» принадлежали Смагину, 2% акций - Гаркуше, как физическому лицу, и 73 % акций принадлежало ОАО «Инвест-Центр» через дочерние компании, с учетом акций ООО «Милеа». Позже Смагин передал часть акций Гаркуше. Фактическими владельцами ЗАО «Центурион Альянс» в период с 2003 по 2006 г. являлся он, Смагин и Гаркуша.

Кроме вхождения своей компанией ОАО «Инвест-Центр» в проект «Европарк» он (Ананьев) вкладывал личные деньги. Ашоту Егиазаряну он полностью доверял, они были почти родственниками.  В 2003-2004 он передал Егиазаряну 18 млн. долларов США на финансирование проектов – ТК «Европарк» и гостиница «Москва» в обмен на обещание оформить на него доли в этих проектах, соразмерно финансированию, . после его (Ананьева) ухода с государственной службы.

Весной 2005 он ушел с занимаемой должности в РФФИ и обратился к Егиазаряну с просьбой упорядочить структуру холдинга и оформить свою долю в ЗАО «Центурион Альянс», являющегося владельцем ТК «Европарк», и в других проектах. Однако Егиазарян Ашот просил его с этим подождать, так как все равно проект «Европарк» фактически оформлен на него  (Ананьева) через ОАО «Инвест-Центр», а Ашот лишь управляет деньгами. С аналогичной просьбой он обращался к Ашоту Егиазаряну и в 2006, но тот говорил, что сейчас у него проблемы с финансированием гостиницы «Москва». В конце 2006 или начале 2007  Ашот Егиазарян сказал ему, что в настоящий момент акции ЗАО «Центурион Альянс» заложены в «Дойче Банк» под кредит в 100 млн. долларов США, который Ашот рассчитывает направить на реконструкцию гостиницы Москва. В связи с этим вхождение в учредители ЗАО «Центурион Альянс» и в проект по реконструкции гостиницы «Москва» затруднено, однако пообещал, что постарается каким-либо образом зафиксировать его (Ананьева) право на долю в данных проектах, и попросил его подождать.

В 2007 году после его долгих и настойчивых требований Егиазарян Ашот предложил ему стать директором компании ООО «Даев Плаза» и самостоятельно решить вопрос с оформлением своей доли в проектах совместно с юристами компании «Уайт энд Кейс». Он согласился на этот вариант и где-то летом 2007 г. вступил в должность директора ООО «Даев Плаза».

С юристами «Уайт энд Кейс» он обсуждал различные варианты своего вхождения в акционеры компаний, владеющих ТК «Европарк» и гостиницей  «Москва». Общение происходило с Мельникас Майей и другими юристами, которые ему пояснили, что брату Егиазаряна Ашота - Артему принадлежат 100 % акций компании «Калкен», в свою очередь данная фирма владеет 73 % акций компании «Тафтс», а фирма «Тафтс» является 100 % акционером компании «Доралин», владеющей 100 % доли ЗАО «Центурион Альянс». То есть, Егиазарян Артем фактически являлся владельцем 73 % доли уставного

капитала ЗАО «Центурион Альянс», при этом Артем являлся лишь номинальным владельцем этих акций в пользу своего брата – Ашота Егиазаряна.

Юристами был подготовлен ряд проектов договоров покупки им долей компаний, фактически владеющих ТК «Европарк» и гостиницей «Москва», за средства, ранее переданные им Егиазаряну Ашоту. Они стали согласовывать проекты данных договоров, однако Егиазаряна Ашота они все не устраивали, он придумывал различные отговорки, чтобы не подписывать договоры, в результате их приходилось постоянно переделывать.

В итоге в 2008 году ему позвонил Егиазарян Артем и сообщил, что они, наконец, оформили его долю в ТК «Европарк», зарегистрировав на него 40 акций (4%) в уставном капитале «Калкен», стоимость которой составляет около 4,2 млн. долларов США. Это его (Ананьева) категорически не устраивало. Более того, когда он узнал от Ашота о подписании им понятийного соглашения со Смагиным об увеличении доли последнего до 50% в связи с не получением им дивидендов, то между ними возникло непонимание из-за того, что такое решение было принято без его (Ананьева) участия. Он потребовал от Ашота оформить его доли, а поскольку проекты «Европарк» и гостиница «Москва» повязли в обязательствах перед банком, и это произошло без его участия, передать ему часть акций в компаниях, которые участвуют в реализации других проектов.

В итоге Ашот согласился передать ему 50% акций ОАО «Кремлин Сайт», 50% акций ОАО «Каменный Мост», которые были собственниками земельных участков, предоставленных под строительство комплекса зданий на Софийской набережной, а также еще 73 % акций ОАО «Даев Плаза». Ашот предложил все договоренности закрепить в понятийном соглашении, пояснив, что, поскольку акции будут передаваться иностранной компанией «БрукМил», которая является акционером вышеуказанных обществ, то соглашение с ним будет подписывать доверенное лицо Ашота - Виталий Гогохия, который имеет полномочия действовать от имени этих компаний. Ашот взамен попросил полностью отдать ему ОАО «Инвест-Центр», чтобы обмен был равнозначным. ОАО «Инвест-Центр» на тот момент владело 70% акций банка «Республиканский», а также почти 80% долей в проекте «Европарк». Он согласился, так как для него был интересен проект на Софийской набережной. Составлением соглашения занимался Д. Гаркуша. Соглашение было подписано им (Ананьевым) и Гогохией в присутствии Гаркуши.

После того, как он исполнил свою часть соглашения, он стал ждать исполнения обязательств со стороны Ашота Егиазаряна. Однако после этого Егиазарян Ашот стал избегать с ним встречи, ссылаясь на занятость. В «Европарке» тоже происходили какие-то странные вещи, он неоднократно обращался за разъяснениями к другим акционерам «Европарка», в частности к Смагину и Гаркуше. Однако они пояснили, что редко встречаются с Ашотом Егиазаряном, на тот момент владельцем компании «Тафтс» на 73 % являлась фирма «Калкен», 20 % принадлежало Виталию Смагину и 7 % Гаркуше.

Впоследствии от Смагина он (Ананьев) узнал, что компания «Доралин», ранее принадлежащая «Тафтс», которая была создана для получения кредита в «Дойче Банк», была выведена Ашотом из-под контроля компании «Тафтс» и оформлена на две кипрские фирмы – «Мастеро» и «Фамулатус», это было сделано без его (Смагина) подписи, незаконно, так как Смагин и Артем Егиазарян были директорами с правом подписи в этой компании только вдвоем.

С Ашотом Егиазаряном его (Ананьева) связывали близкие личные и деловые отношения, однако в 2008   Ашот стал уходить от дружеского общения, перед расставанием в 2010 он сильно изменился.

Артем Егиазарян, Клочин Максима и Гогохия Виталий, с каждым из которых он (Ананьев) лично знаком, находились под влиянием Ашота Егиазаряна, являлись зависимыми от него людьми.

Клочин Максим, будучи назначен на должность генерального директора ЗАО «Центурион Альянс», выполнял указания Ашота и Артема Егиазарянов, последний также действовал лишь по указанию своего брата Ашота, самостоятельных решений не

принимал, вопросами финансирования проектов не занимался. Гогохия Виталий был также беззаветно предан Ашоту и полностью зависим от него, Ашот мог «подставлять» его куда угодно и записывать на него что угодно.

Показаниями свидетеля **Смагиной С.И.** в судебном заседании о том, 06.02.2007 решением совета директоров ЗАО «Центурион Альянс» была назначена первым заместителем генерального директора общества, в уставном капитале ЗАО «Центурион Альянс» её супругу Смагину В.И. принадлежали 20% акций, компаниям, аффилированным Ашоту Егиазаряну, - 73% акций и 7% акций владел Гаркуша Д.В., из которых 2% были ему переданы в управление ее супругом, а 5% - Ашотом Егиазаряном.

В конце 2006 она узнала от своего супруга, что его партнер по бизнесу Ашот Егиазарян, с которым он знаком с 2003, предложил переоформить его (Смагина) акции на юридическое лицо иностранной юрисдикции - компанию «Доралин» взамен на 20% акций компании «Тафтс», которая была единственным акционером компании «Доралин», с целью залога здания ТК «Европарк» и 100% акций ЗАО «Центурион Альянс» для получения кредита в «Дойче Банке» в размере 100 млн. долларов США на строительство гостиничного комплекса «Москва».

Они опасались лишиться принадлежащего им имущества, так как после совершения этой сделки, они теряли бы реальный контроль за деятельностью ЗАО «Центурион Альянс» в виде 20% акций ТК «Европарк», который, по ее сведениям, оценивался в 150 млн. долларов США. Их доля составляла около 30 млн. долларов США. Поскольку Смагин не хотел участвовать в каких-либо кредитных отношениях, то предложил Ашоту Егиазаряну выкупить у него акции, но последний предложил смешную цену в рассрочку, и это их не устроило. Тогда Ашот Егиазарян предложил Смагину внести изменения в Устав ЗАО, устанавливающие ограничение полномочий генерального директора Общества по совершению сделок, превышающие сумму 5 млн. рублей; введение должности первого заместителя генерального директора, который будет осуществлять контроль за финансово- хозяйственной деятельностью общества, и платежи свыше 5 млн. рублей будут проводиться только с согласия последнего и при наличии его подписи на платежных поручениях и договорах. Председателем Совета Директоров будет избран Смагин. Решение о назначении первого заместителя генерального директора должно приниматься советом директоров общества. По договоренности с Ашотом Егиазаряном на должность первого заместителя Генерального директора должно назначаться лицо, которое рекомендует Смагин.

Смагин согласился с этими предложениями только после долгого обдумывания, принимая во внимание положение и статус Ашота Егиазаряна, сложившиеся между ними доверительные отношения.

Примерно в 2006-2007 она лично познакомилась с Ашотом Егиазаряном, который являлся депутатом Государственной Думы ФС РФ и его женой – Цаголовой Н.Н., с которыми у них сложились дружеские отношения, а также совместный бизнес, организованный Цаголовой в конце 2007, успешно просуществовавший в ТК «Европарк» на протяжении нескольких лет. У Цаголовой не было должности, но по вопросам деятельности ТК «Европарк» в отсутствие Клочина она принимала активное участие.

В декабре 2006 был заключен кредитный договор, а также все договоры, связанные с обеспечением возврата кредита. Смагин передал свои акции компании «Доралин», а взамен получил акции компании «Тафтс». Ашот Егиазарян должен был передать «Дойче Банку» как эскроу-агенту 73% акций компании «Тафтс». Акционером последней была компания «Калкен», которой номинально руководил Артем Егиазарян. Указанные договоренности акционеры общества закрепили 26.12.2006 подписанием Соглашения акционеров. Получателем кредита должна была быть принадлежащая Гаркуше компания «Блиденсол», которая была создана для этой сделки, а в 2008 году ее представителем стал Гогохия Виталий.

В процессе исполнения обязанностей она (Смагина) познакомилась с генеральным директором общества Клочиным М.А. и его заместителем Артемом Егиазаряном, который был доверенным лицом своего брата Ашота Егиазаряна и номинальным владельцем 73% акций ЗАО «Центурион Альянс». Первоначально с Клочиным у нее сложились деловые отношения, вопросы деятельности общества он согласовывал со Смагиным, а с ней (Смагиной) сделки и платежи, превышающие 5 млн. руб. Смагин продолжал активно заниматься деятельностью Общества, проводил совещания, решал текущие вопросы, к нему постоянно обращались сотрудники. Это вызывало сильное раздражение Артема Егиазаряна. Из-за того, что Артем Егиазарян обо всем, что происходило в обществе, докладывал Ашоту и действовал только по его указанию, у них с Артемом, а впоследствии и с Клочиным, появились разногласия по вопросам осуществления финансово-хозяйственной деятельности общества.

От главного бухгалтера ЗАО «Центурион Альянс» Волковой ей стали известны факты проведения платежей свыше 5 млн. руб. без согласования с ней и Смагиным. Волкова отказывалась проводить такие платежи, без наличия двух подписей, как было предусмотрено Уставом общества, но Клочин утверждал, что все эти платежи проводятся по указанию Ашота Егиазаряна, и если она (Волкова) их не подпишет, то у нее возникнут проблемы. На тот момент в ЗАО «Центурион Альянс» все знали, что реальными собственниками общества являются Смагин и Ашот Егиазарян. Принимая во внимание, что между ними были дружественные отношения, никто не сомневался в том, что решения принимаются совместно. Начиная с весны-лета 2009 Клочин перестал отвечать на ее вопросы, приглашать на собрания, стали происходить конфликты у Клочина и Артема Егиазаряна с Волковой.

В ходе проведения совещания она объяснила сотрудникам сложившуюся ситуацию и поставила их в известность о том, что фактическими хозяевами общества являются Ашот Егиазарян и Смагин, между которыми существуют определенные договоренности, закрепленные в Уставе общества и иных документах, она попросила их добросовестно выполнять свои обязанности и соблюдать положения Устава. Клочин на собрании отсутствовал, однако позже ей стало известно, что он собрал сотрудников ЗАО «Центурион Альянс» и провел другое совещание, на которое ее не пригласил, при этом сообщил, что если кто-либо будет выполнять поручения Смагиной, то будет уволен. На этом же совещании он озвучил, что единственным хозяином общества является Ашот Егиазарян. Так как Артем Егиазарян и он являются доверенными лицами Егиазаряна Ашота, то все должны выполнять только их указания. 02.12.2009 Клочин подписал приказ об ее (Смагиной) увольнении: В декабре была принята и зарегистрирована новая редакция Устава ЗАО «Центурион Альянс», в котором уже отсутствовали положения об ограничении полномочий генерального директора, а также положения о первом заместителе генерального директора и совете директоров.

В начале 2009 параллельно с этой ситуацией начали возникать проблемы, связанные с возвратом кредита «Дойче Банку». Последний предложил Смагину, как лицу, за которым закреплено первоочередное право на переуступку прав требования по кредиту, приобрести права по кредитному договору.

В первой половине года Смагин участвовал в нескольких переговорах с «Дойче Банком» и ему, как потенциальному приобретателю, были предоставлены все документы, включая всю обеспечительную документацию и переписку с должником по кредиту - компанией «Блиденсол». Но в результате проведенного Смагиным и адвокатами «Бейкер энд Макензи» анализа этих документов, стало известно об отсутствии части обеспечительной документации - подписанных передаточных распоряжений от компании «Тафтс» по уступке акций компании «Доралин» в пользу третьего лица - приобретателя акций, дающей право «Дойче Банк» на наложение внесудебного взыскания на акции компании «Доралин».

Их наличие было предусмотрено положениями кредитного договора. Это означало, что приобретатель прав по кредиту не сможет получить акции «Доралин» во внесудебном порядке в случае дефолта должника по кредиту.

Смагин совместно с адвокатами пришел к выводу о том, что Ашот Егиазарян, как лицо, контролирующее компанию «Тафтс», «Доралин» и ЗАО «Центурион Альянс», в случае объявления «Дойче Банком», или иным кредитором, дефолта по кредиту, может затянуть процесс обращения взыскания на акции «Доралин», одновременно начав процедуру банкротства ЗАО «Центурион Альянс», что впоследствии и было сделано Ашотом Егиазаряном в мае 2009.

8 декабря 2006 года между ЗАО «Центурион Альянс» и компанией «Блиденсол» был заключен договор займа на сумму около 1,5 млрд. руб. В 2008-2009 г.г., пользуясь возможностью управлять компанией ЗАО «Центурион Альянс» и компанией «Блиденсол», Ашот Егиазарян через «подчиненных» ему людей - директора ЗАО «Центурион Альянс» Клочина и директора «Блиденсол» Гогохию, без согласия Смагина В.И, сменил валюту указанного займа с рублей на доллары и процентную ставку с 1% на 12%, а затем на 20% годовых, искусственно увеличив кредиторскую задолженность ЗАО «Центурион Альянс» перед компанией «Блиденсол».

Кроме того, ЗАО «Центурион Альянс» также было обязано по займу перед подконтрольной Ашоту Егиазаряну компанией ООО «Даев Плаза». О том, что Егиазарян Ашот фактически контролировал деятельность ООО «Даев Плаза», ей известно со слов Клочина, Цаголовой и Смагина. Именно ООО «Даев Плаза» подало в мае 2009 г. заявление о фактически фиктивном банкротстве ЗАО «Центурион Альянс» в Арбитражный суд г. Москвы, что также повлияло на решение «Дойче Банка», как можно быстрее уступить права по кредиту другому лицу, представленному самим Ашотом Егиазаряном.

Смагин В.И. 14 апреля 2009 г. встречался с Ашотом Егиазаряном, последний сообщил, что в случае объявления «Дойче Банк» дефолта по кредиту компании «Блиденсол» или продаже банком прав по кредиту несогласованному с ним (Ашотом) лицу, он сможет организовать противодействие в виде банкротства компании ЗАО «Центурион альянс» с последующей продажей (выводом) имущества, а именно торгового комплекса «Европарк».

Сотрудники «Дойче Банка» неоднократно высказывали требование Ашоту Егиазаряну передать им ранее согласованные и подписанные передаточные распоряжения в отношении акций компании «Доралин», Ашот Егиазарян обещал это сделать, но обещания не выполнил; также Ашот Егиазарян не отреагировал на переданные ему по электронной почте для повторного подписания передаточные распоряжения, которые были подготовлены юридической компанией по просьбе Смагина.

Смагин в то время наряду с Артемом Егиазаряном являлся директором компании «Тафтс» и готов был подписать такие распоряжения, однако Артем Егиазарян отказался их подписывать, ссылаясь на отсутствие одобрения своего брата – Ашота Егиазаряна.

Впоследствии Смагин узнал о покупке компанией «Ташир» и Егиазаряном Ашотом кредита за 55 млн. долларов США по заниженной цене.

Принадлежащие Смагину акции в компании «Тафтс» обесценились, так как компания «Тафтс» перестала быть единственным акционером компании «Доралин», которая на 100 % владела ЗАО «Центурион Альянс». Стало понятно, что Ашот Егиазарян обманул их и лишил имущества.

Свидетель **Волкова Л.М.**, занимавшая в 2007-2009 годах должность главного бухгалтера ЗАО «Центурион Альянс», в судебном заседании дала показания, аналогичные свидетелю Смагиной С.И. и потерпевшему Смагину В.И. об обстоятельствах ведения финансово-хозяйственной деятельности общества в указанный период и порядке управления торговым комплексом «Европарк» при непосредственном участии Смагина, который наравне с Ашотом Егиазаряном являлся фактическим владельцем торгового

комплекса, при этом свидетель пояснила, что Смагин, Клочин и она (Волкова) в составе
ограниченного круга лиц периодически присутствовали на совещаниях у Ашота
Егиазаряна в «Даев Плаза» в Даеве переулке, д. 20. В процессе работы ей стало известно,
что ЗАО «Центурион Альянс» является поручителем по кредитному договору,
заключенному в 2006 году, согласно которому «Дойче Банк» предоставил компании
«Блиденсол» кредит в размере 100 млн. долларов США для финансирования
реконструкции гостиницы «Москва», также обществом были заключены договоры залога
недвижимого имущества в «Дойче Банком» в качестве обеспечения исполнения
обязательств «Блиденсол» перед банком по кредитному договору. Между «Центурион
Альянсом» и компанией «Блиденсол» 26.12.2006 был заключен договор новации, по
условиям которого ЗАО «Центурион Альянс» обязалось выплачивать проценты в счет
исполнения обязанностей компании «Блиденсол» перед «Дойче Банком» по кредитному
договору. Компания «Блиденсол» была полностью подконтрольна Ашоту Егиазаряну. В
соответствии с указанными договорами ЗАО «Центурион Альянс» своевременно
осуществляло погашение задолженности компании «Блиденсол» перед «Дойче Банком».
В ёе (Волковой) обязанности входила аккумуляция денежных средств на счетах ЗАО,
необходимых для своевременной уплаты «Дойче Банку» сумм процентов за пользование
компании «Блиденсол» кредитом. Денежные средства в размере, необходимом для уплаты
процентов за пользование кредитом, первоначально перечислялись ЗАО «Центурион
Альянс» на расчетный счет компании «Блиденсол», после чего компания «Блиденсол»
должна была их перечислить в счет погашения задолженности «Дойче Банку». Весной
2009 года на сайте Арбитражного суда она увидела, что «Даев Плаза» предъявила
претензии по возврату долга, но он не являлся кредитором третьей очереди. Клочин и
Артем Егиазарян сказали ей не обращать внимания, поскольку деньги были, средний
доход от арендаторов составлял больше миллиона долларов в месяц.

Весной этого же года ее отношения с Клочиным и Артемом Егиазаряном обострились.
Это было вызвано тем, что она стала задавать Клочину вопросы касательно платежей
третьим лицам, так как суммы по стоимости их услуг были явно завышены, не
согласованных со Смагиным и без ведома Смагина. Не получая от него никаких
объяснений по этому поводу, за исключением того, что требования об оплате данных
счетов поступили непосредственно от Ашота Егиазаряна, она отказывалась визировать и
производить от имени ЗАО оплату по вызывавшим подозрения счетам.

В результате она узнала о том, что Клочин открыл новый расчетный счет ЗАО в
Киевском отделении Сбербанка РФ, предоставив право второй подписи не главному
бухгалтеру, а заместителю генерального директора по безопасности Кирееву К.М., с
указанного расчетного счета Клочин начал производить оплату счетов общества, которые
она отказалась визировать и исполнять в связи с их явной необоснованностью. 19.11.2009
Киреев К.М. передал ей приказ Клочина М.А. о её отстранении от должности главного
бухгалтера. В начале декабря она по почте получила приказ от 03.12.2009 о ее увольнении
за прогулы. Она написала заявление в прокуратуру, а также обратилась в суд с исковым
заявлением о восстановлении на работе. Решением суда она была восстановлена на работе
в прежней должности, однако 27.04.2010, явившись на работу, не смогла приступить к
исполнению своих обязанностей, поскольку у нее не было доступа к документам
общества, всем сотрудникам офиса Клочин и Артем Егиазарян запретили общаться с ней
под угрозой увольнения, то есть для нее создали невыносимые для работы условия.

С осени 2009, если на совещаниях Смагин давал какие-либо указания,
впоследствии Клочин или Артем Егиазарян после отъезда Смагина сразу отменяли их. В
это же время Клочин очень часто стал высказываться по поводу того, что Смагин в
обществе вообще «никто». С весны 2009 на совещаниях стала присутствовать супруга
Ашота Егиазаряна – Цаголова Н.Н., полномочия которой не были официально
оформлены, однако она часто принимала решения, выполнение которых обеспечивал
Клочин. С начала декабря 2009 Клочин дал указание Кирееву не впускать в офисную

часть здания Смагиных. В конце декабря из СМИ и от сотрудников ей стало известно, что Ашот выкупил у «Дойче Банка» кредит, выданный компании «Блиденсол», для чего им был привлечен новый компаньон – группа компаний «Ташир». 09.12.2009 была утверждена новая редакция Устава ЗАО, в которой отсутствовали ограничения полномочий генерального директора и положения, касающиеся должности первого заместителя генерального директора и совета директоров. Ее (Волковой) внимание также привлекла большая кредиторская задолженность перед компанией «Блиденсол», которая была оформлена Договором № 1 от 08.12.2006. Общая сумма задолженности составляла приблизительно полтора миллиарда рублей и была образована за счет имевшихся ранее договоров займа с различными компаниями, подконтрольными Ашоту Егиазаряну. Впоследствии эта задолженность была передана компании «Блиденсол». Как пояснил Артем Егиазарян, это было сделано для того, чтобы ЗАО «Центурион Альянс» имело основания перечислять денежные средства компании «Блиденсол» для погашения процентов по кредиту, выданному «Дойче Банком» на строительство гостиницы «Москва». Первоначально Договором № 1 была предусмотрена уплата процентов на сумму задолженности в размере 1% годовых. Все деньги, которые ЗАО «Центурион Альянс» получало от использования ТК «Европарк», направлялись компании «Блиденсол» на погашение процентов по кредиту. 01.06.2008 было заключено дополнительное соглашение № 1, которым была изменена процентная ставка по Договору № 1 с 1% на 12,5% годовых, и устанавливался график погашения задолженности по основному долгу и процентам, начисленным с 09.12.2006 по Договору № 1, в связи с чем долг ЗАО «Центурион Альянс» перед 24 кредиторами увеличился.  Позже в бухгалтерии появилось дополнительное соглашение № 1 от 03.12.2008, которое также предусматривало возможность изменения размера процентной ставки по данному Договору; 04.12.2008 дополнительным соглашением № 2 к Договору № 1 от 08.12.2006 была изменена валюта выданного займа с рублей на доллар США. Клочин, подписывая дополнительные соглашения с неисполнимыми условиями, был в курсе, что этого делать нельзя. Она объясняла Клочину, что в период скачка доллара США и кризиса, они не смогут набрать необходимую сумму, чтобы обслуживать кредит, и банк может забрать торговый центр. Она всегда возражала против осуществления платежей по указанному договору по таким процентным ставкам, так как понимала, что это отрицательно сказывается на финансовых показателях предприятия и уменьшает ликвидность. Данные вопросы не были согласованы ни с ней, ни со Смагиными. Дополнительное соглашение к договору об изменении процентной ставки готовила Запускалова Е.М. по указанию Артема Егиазаряна, подписанное соглашение ей передал непосредственно Артем Егиазарян, никаких объяснений причин изменения процентной ставки не было, кроме одной – это указание Ашота Егиазаряна. Впоследствии в начале 2009 процентная ставка по Договору № 1 была еще раз повышена, до 22,5 % годовых. Об этом она узнала в 2010, когда была вызвана в 30-ю налоговую инспекцию по проверке, которая проводилась в ЗАО «Центурион Альянс». Все дополнительные соглашения от имени компании «Блиденсол», которую фактически контролировал Ашот Егиазарян, были подписаны ее директором Виталием Гогохией. Ей (Волковой), в том числе со слов Артема Егиазаряна, было известно, что Гогохия находится в федеральном розыске, однако документы с его подписью ей приносили и передавали Артем Егиазарян и Клочин. Также в 2008 году она общалась с Гогохией в Москве по телефону в кабинете Клочина в присутствии Артема Егиазаряна, последний набирал номер, который она не знала, и она разговаривала с Гогохией, который подтверждал, что направлял документы и просил их оплатить, по телефону они также обсуждали деятельность компании «Хекхэм».

24

♦   Показаниями свидетеля **Селезнева Я.И.**, который пояснил в судебном заседании, что с марта 2008 по июль 2009 работал в ЗАО «Центурион Альянс» в должности заместителя директора юридического департамента, но фактически возглавлял его ввиду вакантной должности директора. В силу занимаемой должности он осуществлял юридическое сопровождение вопросов, касающихся взаимоотношений между акционерами, представлял интересы ЗАО в судах общей юрисдикции и арбитражных судах, а также занимался другими вопросами. Его непосредственным руководителем являлся генеральный директор Клочин М.А., также он исполнял указания заместителя генерального директора по общим вопросам Артема Егиазаряна. По его (Селезнева) мнению, Клочин занимал должность номинально, самостоятельно никаких решений не принимал, а только исполнял распоряжения Артема. Ему (Селезневу) было известно по роду деятельности, что Ашоту Егиазаряну фактически принадлежало 73% акций ЗАО «Центурион Альянс», при этом Ашот Егиазарян являлся депутатом Государственной Думы ФС РФ от фракции ЛДПР, ему запрещалось лично напрямую владеть акциями компаний, поэтому номинальным держателем акций и доверенным лицом был его брат Артем Егиазарян; 20% акций общества принадлежало Смагину В.И. и 7 % - Гаркуше Д.В.

Из имеющихся в его распоряжении корпоративных документов ЗАО «Центурион Альянс», компаний «Доралин» и «Тафтс», владевшей компанией «Доралин», реестра акционеров, следовало, что данная акционерная структура была устроена таким образом, что Смагин лично владел 20% акций компании «Тафтс», зарегистрированной на Британских Виргинских Островах, а 73% были зарегистрированы на компанию «Калкен». Единственным 100%-ным акционером ЗАО «Центурион Альянс» была кипрская компания «Доралин». Представителем по доверенности от имени этой компании являлся Гаркуша Д.В. до сентября 2008. С 20.02.2009 представителями от имени «Доралин» по доверенности являлись Смагин и Артем Егиазарян, которые имели все права акционера общества, принимающего решения в соответствии с Уставом ЗАО «Центурион Альянс». 10.09.2008 было принято решение единственного акционера Общества о назначении Совета директоров и об избрании Смагина Председателем Совета директоров, которое было подписано Гаркушей. С 20.02.2009 до 20.02.2010 все решения от имени компании «Доралин» должны были быть оформлены только двумя подписями уполномоченных лиц - Смагина и Артема Егиазаряна, они же являлись директорами компании «Тафтс», которая владела компанией «Доралин».

В ноябре 2008 Артем Егиазарян и Клочин включили его (Селезнева) в состав рабочей группы по подготовке и проведению оценки рыночной стоимости ТК «Европарк», куда также вошли главный бухгалтер Волкова Л.М. и финансовый директор Запускалова Е.М. Данная оценка проводилась в соответствии с требованиями кредитного договора, заключенного между «Дойче Банком» и компанией «Блиденсол» как заемщиком, поручителем и залогодателем по которому выступало ЗАО «Центурион Альянс». В соответствии с условиями кредитного договора, если оценка комплекса будет менее 150 млн. долларов США, это являлось основанием для объявления технического дефолта, у банка появлялось право требования досрочного погашения кредита. По итогам оценки стоимость комплекса составила 234 млн. долларов США. Обязательства перед «Дойче Банком» компанией «Блиденсол» выполнялись своевременно, дважды в год - в марте и сентябре выплачивались проценты. Деньги, полученные ЗАО «Центурион Альянс» от использования торгового комплекса, направлялись на счет компании «Блиденсол» для погашения кредита. Артем Егиазарян давал указания Волковой о перечислении сумм на счета компании «Блиденсол», которая являлась компанией, аффилированной по отношению к Ашоту Егиазаряну, а ее директором являлся находившийся на тот момент в федеральном розыске Виталий Гогохия. О том, что Гогохию разыскивают, он (Селезнев) узнал на одном из совещаний, проводимых Артемом Егиазаряном в начале апреля 2009.

Смагина и Егиазаряна Ашота крайне волновала    сложившаяся  в стране экономическая ситуация, риск объявления технического дефолта и выставления кредита на торги, вследствие чего залоговое имущество, выступающее в качестве обеспечения обязательства, могло быть реализовано третьим лицам. В связи с чем с его (Селезнева) участием обсуждались возможные варианты досрочного выкупа кредита.

Артем Егиазарян самостоятельных решений по этим вопросам никогда не принимал, переадресовывал их своему брату Ашоту, который был всегда на прямой телефонной связи, любой вопрос с ним обсуждался.

В качестве меры по сохранению контроля над «Европарком» в случае угрозы объявления технического дефолта Ашотом Егиазаряном предлагалось обратиться в арбитражный суд от имени подконтрольных ему компаний с иском о банкротстве ЗАО «Центурион Альянс», при этом планировалось, что банкротство будет контролируемым и со слов Артема поможет сохранить контроль над активом ЗАО - ТК «Европарк». В середине июня 2009 г. Клочин стал открыто игнорировать Смагина и Смагину, объясняя это тем, что они «никто» и не имеют никого отношения к Обществу. Все платежи, предназначенные для компании «Блиденсол», Клочин стал визировать лишь своей подписью, несмотря на ограничения его прав, предусмотренные Уставом общества, а именно в документах о проведении платежей свыше 5 млн. рублей отсутствовала подпись первого заместителя директора Смагиной. Соблюдение данного условия также перестал выполнять Артем Егиазарян. Главный бухгалтер постоянно писала служебные записки на имя Клочина о согласовании платежей со Смагиной, отказываясь их осуществлять. Со своей стороны он (Селезнев) лично направлял служебные записки на имя генерального директора Клочина, в которых обращал внимание на отсутствие второй подписи Смагиной в договорах аренды, на это же обстоятельство указывали  некоторые арендаторы.

Впоследствии Волкова была отстранена от исполнения обязанностей главного бухгалтера, ввиду ее отказа проводить несоответствующие требованиям Устава платежи. Клочин и Егиазарян Артем также перестали посещать совещания, организованные Смагиным, на которых обсуждались текущие финансовые вопросы.

Свидетель Корниенко С.В. дал суду показания, аналогичные свидетелям Волковой Л.М. и Селезнева Я.И., пояснив, что в ЗАО «Центурион Альянс» работал с 2006 года, являлся свидетелем акционерного конфликта между фактическими владельцами торгового комплекса «Европарк» Смагиным и Егиазаряном Ашотом, от лица последнего в котором участвовали генеральный директор общества Клочин и его заместитель по общим вопросам Егиазарян Артем – родной брат Ашота.

Свидетель Арапова И.В. показала, что с 2007 работала в ЗАО «Центурион Парк» и в ЗАО «Центурион Гипермаркете» в должности начальника юридического отдела, владельцем которых и одним из акционеров являлся Смагин. Она также лично знакома с Егиазаряном Артемом, Клочиным и Гогохией, последний приносил документы в офис ЗАО «Титул», где в период с 1999 по 2007 она (Арапова) работала в должности юриста, само общество также оказывало юридические услуги. Возглавлял ЗАО «Титул» директор Балакин В.В., поручивший ей в 2006 заниматься юридической экспертизой документов для получения кредита компанией «Блиденсол» в «Дойче Банке», к подготовке указанных документов  были привлечены международные юридические фирмы «Саланс» и «Уайт энд Кейс». Так, она (Арапова) проверяла подготовленные фирмой «Саланс» кредитный договор и договоры залога на предмет соответствия российскому законодательству, а также договоренностям между сторонами, о которых ей  известно со слов Балакина и Гаркуши, являющегося генеральным директором ООО «Даев Плаза» и одним из акционеров ЗАО «Центурион Альянс». Эти организации были задействованы в готовящейся сделке – ООО «Даев Плаза» должно было быть поручителем, а ЗАО «Центурион Альянс» закладывало в обеспечение кредита ТК «Европарк» и земельный

участок под ним. Соглашение акционеров и договор Эскроу, которыми занималась фирма «Уайт энд Кейс», она не проверяла, поскольку не является специалистом в области международного права.

Примерно в 2008 году Смагин сообщил ей, что желает исполнить вышеуказанные соглашение акционеров и договор Эскроу, предъявив ей эти документы, которые ранее в подписанном виде она не видела. Это было соглашение акционеров компании «Тафтс» заключенное между тремя акционерами – Смагиным, Гаркушей, а также компанией «Калкен» в лице Артема Егиазаряна, смысл которого заключался в том, чтобы Смагин не потерял права на ТК «Европарк», поскольку в случае обращения «Дойче Банк» взыскания на торговый комплекс, Смагин должен был получить контроль над акциями компании «Тафтс», принадлежащими компании «Калкен».

Суть претензий Смагина заключалась в том, что акции «Тафтс», которые принадлежали компании «Калкен», не были помещены на счет Эскроу, вследствие чего он не мог их получить. От компании «Калкен» действовал брат Ашота Егиазаряна – Артем Смагин также сообщил ей, что он ведет переговоры с Ашотом Егиазаряном по вопросу исполнения вышеуказанного соглашения.

В конце 2008 - начале 2009 по указанию Смагина она готовила проект соглашения между Смагиным и Егиазаряном Ашотом от 2008 года без подписей сторон. Смагин говорил ей, что Ашот Егиазарян не желает его подписывать. На переговорах Ашота Егиазаряна и Смагина по поводу данного соглашения она не присутствовала.

В начале 2009 Смагин стал собирать документы, чтобы выкупить у «Дойче Банка» этот кредит. Поскольку в апреле 2009 она уволилась из компаний Смагина, то дальнейшее развитие событий ей не известно.

Согласно показаниям свидетеля **Тимченко А.И.** в судебном заседании, в 2002 он был принят на работу в ЗАО «Центурион Альянс» на должность генерального директора и занимался, прежде всего, строительством и управлением ТК «Европарк», в марте 2003 года он был переведен на должность исполнительного директора ЗАО «Центурион Гипермаркетс», а на его место был назначен Гаркуша Д.В., который являлся непосредственным руководителем организации до назначения Клочина. Находясь в новой должности, он (Тимченко) по поручению акционеров общества продолжал решать многие вопросы по ТК «Европарк» с момента его проектирования до момента его сдачи, поскольку у сотрудников ЗАО «Центурион Альянс» не было достаточного опыта в сфере строительства. Ему известно, что ТК «Европарк» был построен на заемные средства «Сбербанка». В последующем в период с 2007 по 2015 он (Тимченко) работал в качестве генерального директора ЗАО «Центурион Парк», а затем ООО «Центурион Групп».

С подсудимыми познакомился на этапе строительства ТК «Европарк» в 2006 году, общался с Клочиным и Артемом Егиазаряном, с которыми у него сложились деловые отношения. С Ашотом Егиазаряном и Гогохией происходили встречи в «Даев Плаза», но тесных контактов не было.

По его (Тимченко) мнению, двумя владельцами ТК являлись Ашот Егиазарян и Виталий Смагин. От Артема Егиазаряна и Клочина звучало, что они полноценные партнеры и с ними нужно было согласовывать все решения.

Документально партнерские взаимоотношения между Ашотом Егиазаряном и Виталием Смагиным были закреплены в Соглашении от 2008 относительно реализации проекта строительства ТК «Европарк», о котором ему (Тимченко) известно от Смагина и юриста Араповой, занимавшейся подготовкой данного соглашения. Она оказывала Смагину содействие в попытке выкупа кредита «Дойче Банка», который был связан с долей Смагина в проекте ТК «Европарк». Более того, весной-летом 2008 Арапова занималась подготовкой договоров между Смагиным, Гаркушей и Егиазаряном Ашотом, касающихся перераспределения долей владения акциями ЗАО «Центурион Альянс». Он (Тимченко) работал с Араповой в одном кабинете в бизнес-центре «Даев Плаза»,

принадлежащем Егиазаряну Ашоту, поэтому был в курсе происходящего. В начале 2008 Арапова сообщила ему (Тимченко), что к ней вновь обратился Смагин по вопросу проведения переговоров с Егиазаряном Ашотом по разделению прибыли от деятельности ТК «Европарк». Она попросила у него (Тимченко) разрешения на оказание указанной помощи, так как данная работа отвлекала ее от выполнения прямых обязанностей, против чего он не возражал. Арапова периодически делилась с ним новостями о ходе указанных переговоров, показывая проекты составленного ею текста договора между Смагиным и Егиазаряном, которые просила передать Смагину. В ходе оказания услуг Смагину Арапова обращалась за консультацией в юридическую фирму «Герберт Смит», поскольку между данной компанией и Смагиным также был заключен договор об оказании юридических услуг. Соглашение между Смагиным и Егиазаряном Ашотом было подписано весной 2008, о чем ему примерно в тот период времени сообщила Арапова. В тот же день он встретился со Смагиным и тот передал ему соглашение с Егиазаряном Ашотом, чтобы положить этот документ в сейф, ключ от которого находился только у него (Тимченко).

Свидетель **Олефир К.В.** показал в судебном заседании, что с конца декабря 2006 до июля 2012 работал начальником юридического отдела по России и СНГ ООО «Дойче Банк», расположенного по адресу: г. Москва, ул. Садовническая, д. 82, стр. 2, общество является дочерней компанией «Дойче Банк АГ» (Германия), имеющей филиал в Великобритании в г. Лондон. В 2006 лондонским филиалом «Дойче Банк АГ» был выдан кредит компании «Блиденсол», зарегистрированной на Кипре, для строительства и реконструкции гостиницы «Москва». Поручителем по кредиту выступало ЗАО «Центурион Альянс», предоставившее в имущественное обеспечение ТК «Европарк». Изначально кредит планировался на 200 млн. долларов США, сумма могла быть выбрана траншами. Это была стандартная сделка по финансированию под залог объекта недвижимости, то, что заемщиком выступала кипрская компания также являлось обычной практикой, как в России, так и за рубежом. Основная цель использований компаний специального назначения на Кипре и Британских Виргинских островах – это улучшение качества кредита, поскольку такая компания занимается лишь обслуживанием кредита, к ней не могут быть предъявлены претензии третьих лиц, которые могли бы помешать выплате кредита. Такие компании находятся в юрисдикциях, которые имеют более высокий кредитный рейтинг. Непосредственного участия в переговорах и заключении сделок по данному кредиту он (Олефир) участия не принимал, проектом в Москве от имени лондонского филиала «Дойче Банк» занимался Виктор Макшанцев, юридическое сопровождение оказывали юристы фирмы «Саланс» - Тимоти Стабс и Сергей Транхтенберг, со стороны заемщика «Блиденсол» выступали юристы фирмы «Вайт энд Кейс» в лице Майи Мельникас.

Фактически компании «Блиденсол» было выдано 100 млн. долларов США, однако после финансового кризиса, произошедшего в конце 2008 – в начале 2009, «Дойче Банк АГ» и его лондонский филиал пересмотрели свою позицию по отношению к инвестициям в российскую недвижимость. Было принято решение, кем конкретно он не знает, о том, что от этого кредита нужно каким-то образом избавляться - продавать или передавать права по нему третьим лицам. Это было связано с тем, что цены на недвижимость в России стремительно падали. Такая тактика продажи высоко рискованных кредитов, как настоящий, является стандартной в международной банковской практике и для «Дойче Банка» в этой ситуации было выгодно продать этот кредит, а не держать его на своем балансе.

В 2009 от сотрудника отдела структурных продуктов банка Александра Пономаренко он узнал, что «Дойче Банк» заинтересован в уступке прав требования по кредиту компании «Блиденсол» всем, кто мог позволить себе купить такой кредит. В первую очередь его предложили выкупить Смагину, велись переговоры с другими

структурами. Фамилию Егиазарян он впервые услышал от Пономаренко, Егиазарян также хотел выкупить этот кредит. Задачей банка было продать кредит по максимально выгодной цене. Пономаренко переживал, что не удастся продать кредит и финансовое состояние ЗАО «Центурион Альянс» может ухудшиться, говорил, что существует риск банкротства залогодателя - ЗАО «Центурион Альянс», но на момент продажи кредита дефолта не было. Разница в ценах, по которым был продан и выкуплен кредит, была вызвана экономической ситуацией в стране. Группа компаний «Ташир» обсуждалась в качестве одного из покупателей данного кредита, в конечном итоге кредит выкупила компания «Скендлби». В ноябре 2010 к ним по телефону обратилась представитель компании «Скендлби» Газарова К.Р., просила передать ей обеспечение по кредиту - то есть документы обо всех правах требования по залогу ТК «Европарк». Его ассистент разъяснила, чтобы она направляла все свои вопросы в лондонский офис «Дойче Банк АГ». После этого звонков из компании «Скендлби» больше не было. 31.03.2011 он получил письмо из лондонского филиала «Дойче Банк», в котором сообщалось, что решение о выдаче и продаже вышеназванного кредита лондонским филиалом «Дойче Банка» было принято самостоятельно. Офис Дойче Банк Москва не имел таких средств и не мог выдать такой кредит. Роль сотрудников московского филиала банка сводилась исключительно к оказанию консультативной помощи представителям лондонского филиала банка по каким-то аспектам российского права.

На стадии выдачи кредита никаких нарушений не было выявлено. Никаких комментариев и претензий к пакету документов (часть из которых хранилась в Лондоне, часть в Москве и на Кипре) на момент выдачи не предъявлялось. На стадии продажи кредита был обнаружено, что в том пакете документов, который находился в лондонском отделении, не хватало передаточного распоряжения на акции компании «Блиденсол». В связи с этим по электронной почте он написал в лондонский офис юристу Алексу Скотту Галлу, который подтвердил, что этот документ был в списке подписанных документов, но при пересылке почты в Лондон потерялся. Однако через некоторое время документ был обнаружен в лондонском отделении банка в столе юриста, позже приобщен к делу, никак не использовался, и к нему не было доступа третьих лиц. Документ носит технический характер, он не мог помешать продаже кредита третьим лицам и имел своей целью создать удобство для быстрого получения контроля над акциями заемщика, на Кипре его можно было заменить решением директоров. В ходе консультаций с кипрскими юристами ему стало известно, что директора компании «Блиденсол» обязаны были выдать новому кредитору аналогичное передаточное распоряжение, если бы кипрские директора не выполнили бы свои обязанности по закону, им угрожала бы гражданская или уголовная ответственность.

Свидетель **Трахтенберг С.В.** показал, что с августа 2005 по настоящее время он работает в ЗАО «Саланс», оказывающем юридические услуги в различных сферах деятельности, в 2013 году общество было переименовано. С 2006 «Дойче Банк» является клиентом ЗАО «Саланс» на основании договора об оказании юридических услуг. В августе - сентябре 2006 по просьбе Виктора Макшанцева, возглавлявшего Департамент недвижимости в банке, для работы над проектом выдачи кредита компании «Блиденсол» была сформирована группа юристов, куда он также вошел. В курс дела его (Трахтенберга) и Тимоти Стаббса вводил Виктор Макшанцев - основной участник переговоров по кредиту. С его слов «Дойче Банк» готов был выдать кредит компании «Блиденсол» в размере 100 млн. долларов США. Представителем компании «Блиденсол» являлся Гаркуша Д.В., ему помогала Евгения Судец. Макшанцев довел до их рабочей группы общие условия (срок, сумма, процентная ставка и т.п.), после чего они составили проект кредитного договора. На завершающем этапе сделки по кредиту компании «Блиденсол» принимал участие Олефир К.В., который смотрел документацию как внутренний юрист банка и участвовал в обсуждении.

На момент составления кредитного договора была зафиксирована структура обеспечения, согласно которой 100% акций ЗАО «Центурион Альянс» должны находиться в собственности кипрской компании «Доралин», а 100% акций компании «Доралин» должны принадлежать компании «Тафтс», зарегистрированной на Британских Виргинских островах, и эти акции должны быть заложены в пользу «Дойче Банка» в обеспечение кредита. После внесения некоторых изменений совместно с юристами «Уайт энд Кейс» и стороной заемщика был подготовлен экземпляр кредитного договора, подписанный в начале октября 2006, в нем был предусмотрен пакет обеспечительной документации, согласованный сторонами, который был передан банку в полном объеме, иначе он бы не выдал кредит. В ходе работы над кредитным договором ему стало известно, что конце 2006 произошла реструктуризация ЗАО «Центурион Альянс», в результате которой компания «Доралин» стала единственным 100 % акционером ЗАО «Центурион Альянс». Согласно сложившейся практике «Дойче Банк» потребовал от заемщика сосредоточить на одном юридическом лице все акции ЗАО «Центурион Альянс» для последующего залога в обеспечение кредита. К тому же иностранные банки, как правило, требуют, чтобы акционерами российских компаний были иностранные компании, чтобы в случае дефолта по кредиту банк мог бы обратить взыскание на акции таких иностранных  компаний, в том числе, во внесудебном порядке. В случае с компанией «Доралин» взыскание происходило бы в соответствии с законодательством Кипра. Возможно, это и послужило причиной смены акционеров и сосредоточением 100 % акций ЗАО «Центурион Альянс» на компании «Доралин». Его работа над проектом завершилась в конце 2006. Согласно информации  «Дойче Банка» кредит был выдан либо в конце 2006, либо в начале 2007 года.  Ему знакомы Гогохия и Егиазарян Артем, с которыми он встречался в 2007, когда «Дойче Банк» планировал выдачу кредита компании «Фальмиро». Также знаком с Клочиным, с которым встречались в декабре 2006 в процессе работы над проектом, связанным с выдачей кредита. Он подписывал какие-то документы от имени ЗАО «Центурион Альянс».

Свидетель **Мельникас М.** показала в судебном заседании, что с 1993 г. по 2013 г. работала в московском представительстве американской юридической компании «Уайт энд Кейс». Примерно в 2004-2005 годах через Гаркушу Д.В. она познакомилась с депутатом Государственной Думы ФС РФ Егиазаряном Ашотом, имеющим отношение к группе компаний, в которую, в том числе, входили ЗАО «Центурион Альянс», ЗАО «ДекМос», американская компания «Decorum», ОАО «Даев Плаза». Об этом ей было известно от Гаркуши, который важные вопросы, возникающие в ходе переговоров, согласовывал с Ашотом,  в том числе в ходе реализации проекта по реконструкции гостиницы «Москва». С Артемом Егиазаряном она познакомилась примерно в период 2006 - 2008 в офисе «Уайт энд Кейс» (Москва), Гаркуша представил его как брата Егиазаряна Ашота. Артем также принимал участие в переговорах, связанных с кредитованием проекта гостиницы Москва или «Европарк». Он занимал какое-то место в цепочке владения компаниями, которые в той или иной мере контролировались Ашотом («Доралин», ЗАО «Центурион Альянс», «Блиденсол» и другие). В 2010 она общалась с ним при подписании документов в офисе компании «Уайт энд Кейс» по выкупу компанией «Скендлби» прав требования по кредиту к компании «Блиденсол» у «Дойче Банка». Клочин М.А. в процессе переговоров по получению кредита предоставлял «Дойче Банку» информацию о хозяйственной деятельности ТК «Европарк», принадлежащего ЗАО «Центурион Альянс». Гогохию В.Г. она видела в 2008 - 2009 годах. Ей известно, что он был генеральным директором компании «ДекМос». Она его видела при подписании им различных документов о залогах, которые мог дать «ДекМос», когда решался вопрос о получении кредита на гостиницу «Москва». Поскольку она присутствовала при подписании документов непосредственно, то видела его подпись. Был еще один кредит по ТК «Европарк». Припомнить в связи с чем  Гогохия должен был в качестве представителя «ДекМос» что-то подписывать по ТК «Европарк», затруднилась. Смагин В.И. знаком ей в

качестве одного из миноритариев ЗАО «Центурион Альянс». Их познакомил Гаркуша примерно в 2006 в ходе переговоров о возможном предоставлении «Дойче Банком» кредита компании «Блиденсол» под залог 100% акций компании «Доралин», 100% акций ЗАО «Центурион Альянс» и ТК «Европарк». Примерно в середине лета 2006 Гаркуша сказал ей, что, действуя по доверенности в качестве представителя компании «Блиденсол», он договорился в «Дойче Банке» о предоставлении этой компании кредита в 100 млн. долларов США и предложил ей принять участие в работе в качестве внешнего юриста. Сделки подобного финансирования являются типовыми и реализуются по налаженной схеме на рынке. Юристы банка разрабатывают первый вариант всех необходимых документов. Впоследствии юристы заемщика либо комментируют, представив перечень своих замечаний на данные документы, либо вносят свои коррективы и передают банку. Она как юрист, представлявшую сторону заемщика, смягчала или улучшала положения чернового проекта договора, чтобы они были выполнимы и приемлемы. При необходимости стороны встречаются для согласования тех или иных моментов и устранения разногласий. Юристы могут договориться по исключительно юридическим разногласиям, но, как правило, коммерческие вопросы оставляют на рассмотрение своих клиентов. Компания «Блиденсол» была учреждена на территории Британских Виргинских островов по заказу Гаркуши, как исполнительного директора так называемой группы компаний «Даев Плаза». Целью учреждения компании являлось ее использование в качестве получателя кредитных средств. То есть, данная компания являлась технической. Ашот Егиазарян являлся одним из владельцев или контролирующих лиц группы компаний «Даев Плаза», но ни в каких документах это отражено не было. В ходе работы было видно, что Гаркуша занимался реализацией проектов группы компаний «Даев Плаза», а Ашот Егиазарян - согласованием необходимых вопросов на высшем уровне. Ашот Егиазарян до 2008 принимал самые важные коммерческие решения в деятельности компаний, входивших в холдинг «Даев Плаза», а после ухода Гаркуши из группы, сам принимал участие в переговорах, в том числе, по продаже кредитов компании «Скендлби». Компания «Блиденсол» была определена в качестве получателя кредита Гаркушей, поскольку он заказал создание этой компании для данной цели. Денежные средства были использованы компанией «Блиденсол» для выдачи последующего займа юридическому лицу из цепочки ЗАО «ДекМос» с целью реализации строительства гостиницы «Москва». Основными переговорщиками со стороны компании «Блиденсол» являлись Гаркуша и Евгения Судец – финансовый директор группы компаний «Даев Плаза». Смагин В.И. не принимал участие в переговорах по получению данного кредита. Клочин, хотя и являлся генеральным директором ЗАО «Центурион Альянс», но фактическое управление деятельностью общества осуществлял Смагин В.И. Со стороны «Дойче Банка» в переговорах участвовал Виктор Макшанцев совместно с юристами московского представительства международной компании «Саланс» Трахтенбергом с его английским партнером. Представленные «Дойче Банком» условия кредита являлись сложившейся практикой. Документально Егиазарян Ашот никакого отношения к компаниям «Доралин», «Тафтс», «Калкен» не имел, но фактически через Артема Егиазаряна он контролировал и принимал ключевые решения по деятельности компании «Калкен», которая, в свою очередь, являлась владельцем контрольного пакета акций компании «Тафтс», владевшей 100% акций компании «Доралин», владевшей 100 % акций ЗАО «Центурион Альянс». Суть кредитного договора по ТК «Европарк» заключалась в том, что недвижимость закладывается путем ипотеки и под этот залог и залог иных прав, которыми обладают компании. В данном случае компании, которые напрямую связаны с ТК «Европарк». Например, залог акций в цепочке владения торговым комплексом, залог прав на получение арендной платы в ТК, но основное - это залог самой недвижимости. Под эти залоги получается кредит одного или группы банков. В последующем, кредит в течение нескольких лет выплачивается из доходов торгового комплекса. Вопрос о залоге 100%

31

акций компании «Доралин», 100 % акций ЗАО «Центурион Альянс» и здания ТК «Европарк» в качестве обеспечения возврата кредита Гаркуша согласовывал с Егиазаряном Ашотом и Смагиным, поскольку последний являлся миноритарным бенефициарным владельцем ЗАО «Центурион Альянс». Поскольку она (Мельникас) занималась составлением Договора акционеров между Смагиным, Гаркушей и компанией «Калкен» в отношении компании «Тафтс» от 26.12.2006, то пояснила, что компания «Калкен» на 26.12.2006 владела 73% акций компании «Тафтс». Данный договор был заключен с целью обезопасить права миноритариев, владеющих акциями (Смагина - 20% и Гаркуши - 7%) компании «Тафтс». Из данного договора следует, что в случае направления «Дойче Банком» письменного требования к одному из ряда цепочки лиц - «Калкен», «Тафтс» «Доралин», «Блиденсол», ЗАО «Центурион Альянс», Смагину, Гаркуше, или самому себе, в качестве эскроу агента, о необходимости досрочного погашения кредита, то у Смагина возникало право получить акции компании «Тафтс», находившиеся во владении компании «Калкен». Гаркуша должен был обеспечить независимую оценку стоимости комплекса ТК «Европарк» не старше двух лет с момента ее выполнения. После этого, Смагин В.И. должен был попытаться продать либо ТК «Европарк», либо 100% акций ЗАО «Центурион Альянс», либо 100% акций компании «Доралин», либо 100% акций компании «Тафтс» по наиболее высокой цене, но при этом цена не могла быть меньше независимой оценки стоимости ТК «Европарк», и обеспечить погашение кредита перед «Дойче Банком» из суммы продажи. В случае, если 73% от суммы продажи будет выше суммы, необходимой для погашения кредита, Смагин должен погасить кредит в «Дойче Банк» за счет указанных средств в течение 5-ти рабочих дней после сделки купли-продажи, а оставшуюся сумму от 73% вырученных денежных средств передать компании «Калкен». Если 73% от суммы вырученных денежных средств от продажи будет меньше стоимости кредита, то компания «Калкен» обязуется передать Смагину недостающую сумму для погашения им кредита перед «Дойче Банком». Условия, необходимые для внесения в содержание данного договора, были до нее доведены Гаркушей, после чего они совместно занимались составлением указанного договора акционеров. Из содержания пункта 9.1.5 этого договора следует, что в случае, если в течение одного года компанией «Калкен» не будет снято залоговое обременение со 100% акций компании «Доралин», 100 % акций ЗАО «Центурион Альянс» и с ТК «Европарк», у Смагина возникало право забрать 73 % акции компании «Тафтс», принадлежавших компании «Калкен». При этом договор акционеров не может прекратить свое действие до исполнения этого условия, то есть, до момента передачи акций Смагину. По ее (Мельникас) мнению, она бы перенесла отраженные в нем условия в п. 2.3. и не обозначила бы срок окончания действия данного договора в один год. Допускает, что данный пункт был внесен кем-то по указанию Гаркуши или иными лицами, являвшимися подписантами договора акционеров. Договор Эскроу от 26.12.2006 между Смагиным, Гаркушей, компанией «Калкен» и «Дойче Банком» заключался с целью обезопасить права миноритариев, но в большей степени прав Смагина от внезапного исчезновения 73% акций компании «Тафтс», принадлежавших компании «Калкен». Самое печальное для любого акционера, это когда банк забирает собственность, переданную в залог. Все акционеры лишились бы своих долей участия. По условиям данного договора компания «Калкен» должна была передать «Дойче Банку» 73 % акции компании «Тафтс». Договором акционеров предусмотрены случаи, при которых, в том числе, при выплате банку кредиторской задолженности Смагиным, у последнего возникало право получить акции компании «Тафтс», принадлежавшие «Калкен». Для того, что бы с акциями компании «Тафтс» ничего не случилось, они должны были быть переданы акционерами компании «Калкен» на хранение в «Дойче Банк» путем их размещения на депозитарный счет. Также, согласно условиям договора «эскроу», высвобождение акций с депозита «Дойче Банка» могло быть осуществлено только при согласии на это Смагина и компании «Калкен». Предложенный механизм реализации залога являлся стандартным для

32

подобных сделок и его формулировки были обыденными в сложившейся практике. Механизмы реализации залога имеют нюансы лишь в том, что при их исполнении применяются нормы права страны, где находится заложенное имущество. В соответствии с общепринятыми нормами считается, что заложенные акции или имущество находятся на территории страны, в которой зарегистрировано юридическое лицо, чьи акции находятся в залоге.    Поскольку компанией «Тафтс» были переданы в залог акции компании «Доралин», зарегистрированной на Кипре, то в соответствии с кипрским законодательством в случае дефолта по кредиту акции компании «Доралин» должны были реализовываться путем переоформления «Дойче Банком» акций на себя как на залогодержателя или на конечного покупателя, в зависимости от того, каким методом решит воспользоваться банк. По предложению юристов компании «Саланс» в договор залога был заложен механизм реализации залога, предусматривающий порядок внесудебного взыскания в случае наступления дефолта по кредиту. Примерно осенью 2009 от Ашота Егиазаряна она узнала о его договоренности с Самвелом Карапетяном об осуществлении выкупа у «Дойче Банка» за 55 млн. долларов США на паритетной основе права требования по кредиту в размере 100 млн. долларов США, выданного компании «Блиденсол» на основании кредитного договора от 06.10.2009. Имя Смагина не фигурировало при продаже кредита компании «Скендлби». Ашот Егиазарян попросил ее посодействовать в оформлении данной сделки. «Дойче Банк» решил выставить кредит на продажу в связи с тем, что в конце 2008 - начале 2009 года ЗАО «Центурион Альянс» была под угрозой или в процессе банкротных процедур. «Дойче Банк» таким образом хотел ликвидировать активы, которые не имеют перспективы, которым как ей (Мельникас) кажется был ТК «Европарк». Она приняла участие в работе со стороны группы компаний «Даев Плаза» в интересах компании «Скендлби». Ее работа заключалась в ведении переговоров относительно сделки и подготовке документации по двум направлениям: совместное паритетное участие в сделке по выкупу права требования по кредиту группы компаний «Даев Плаза» и группы компаний «Ташир»; ведение переговоров и оформление необходимых документов, непосредственно связанных с выкупом права требования по кредиту между компанией «Скендлби» и «Дойче Банком». Ашот Егиазарян привлек Артема Егиазаряна, Фитисова и юристов ЗАО «Титул». В этих переговорах принимала участие ГК «Ташир», интересы которой представляла группа юристов из солидной российской юридической фирмы, названия которой она не помнит. Конечным бенефициаром компании «Скендлби» являлась одна из компаний, входивших в ГК «Даев Плаза», название которой не помнит. Компания «Скендлби» была обязана выплатить 55,5 млн. долларов США «Дойче Банку», после чего становилась новым кредитором компании «Блиденсол». Когда «Скендлби» выкупило кредит у «Дойче банка», к нему должны были перейти права по кредиту. «Скендлби» имел залог акций ЗАО «Центурион Альянс», однако затруднилась пояснить, давало ли это право взять себе эти акции, если кредит не выплачен или «Скендлби» должен был пройти процедуру публичных торгов в отношении заложенных акций, чтобы получить за них максимальную цену. В честь выкупа кредита был дан праздничный ужин, на котором она познакомилась с Карапетяном С.С., являющимся основным бенефициаром ГК «Ташир», где присутствовали Ашот Егиазарян, юристы «Дойче Банка» и ГК «Ташир». Кроме того, уточнила, что в результате изменения структуры собственности ЗАО «Центурион Альянс» 26.12.2006 Смагин стал владеть акциями ЗАО «Центурион Альянс» не напрямую, а через две офшорные компании «Доралин» и «Тафтс». В связи с этим, экономически объем имущественных прав Смагина на принадлежавшие ему акции, возможно, и не изменился, но юридически изменился объем прав Смагина, позволяющий ему осуществлять права акционера в той мере, при которой он мог их реализовывать при прямом владении 20% акций ЗАО «Центурион Альянс». Возможно, он не мог требовать получения от руководства торгового комплекса тех или иных документов, касающихся деятельности ТК «Европарк», оспаривать какие-либо сделки, совершенные его генеральным директором.

Свидетель **Кузин К.А.** - директор департамента по недвижимости юридической компании «Бейкер энд Маккензи Сервис лимитед» показал в судебном заседании, что со Смагиным познакомился в 2006 году, оказывая юридическое сопровождение одного из проектов ЗАО «Центурион Гипермаркетс», где Смагин В.И. являлся акционером. Из числа подсудимых знаком с братьями Егиазарянами Ашотом и Артемом. С Ашотом общался в процессе представления интересов Смагина. Артем формально значился как директор компании «Тафтс» и представитель компании «Калкен». О Клочине М.А. ему известно, что он подписывал дополнительные соглашения от имени ЗАО «Центурион Альянс» между компанией «Блиденсол» и ЗАО «Центурион Альянс», а о Гогохии знает, что тот участвовал в управлении ЗАО «Центурион Альянс». В феврале 2009 Смагин попросил его принять участие в переговорном процессе по поводу потенциальной уступки прав по кредиту «Дойче Банка», выданного компании «Блиденсол» в размере 100 млн. долларов США. Этот кредит был выдан банком в 2006 году. Обеспечением кредита «Дойче Банка» выступали 100% акций ЗАО «Центурион Альянс». Основным активом компании был ТК «Европарк». Перед выдачей кредита «Дойче Банк» выдвинул условия о проведении реструктуризации акционерного владения ЗАО «Центурион Альянс», чтобы на 100 % его акциями владела кипрская компания «Доралин». В свою очередь, компанией «Доралин» владела компания «Тафтс». В «Тафтсе» доли были распределены аналогично тем долям, в которых акционеры ЗАО «Центурион Альянс» владели акциями в 2006, то есть 73% - у конечного бенефициарного собственника компании «Калкен» Егиазаряна Ашота, 20% - у Смагина и 7% - у Гаркуши. Это было сделано по требованию «Дойче Банка» для оформления достаточной, по мнению банка, кредитной документации. В конце 2006 фактически в обмен на 20% акций ЗАО «Центурион Альянс» Смагин получил 20% акций компании «Тафтс». Из изученных им документов и пояснений Смагина следовало, что последний уступил свои акции ЗАО «Центурион Альянс» компании «Доралин» по просьбе Ашота Егиазаряна в конце 2006 на тех условиях, что он (Смагин) будет осуществлять контроль за деятельностью ЗАО «Центурион Альянс», будучи председателем совета директоров, а фактически владеть тем же имуществом через компанию «Тафтс», где он стал акционером на 20% и впоследствии директором этой компании с правом обязательной подписи. Вопрос продажи акций и одновременно приобретение Смагиным акций компании «Тафтс» необходимо рассматривать в качестве нескольких взаимозависимых сделок, а не как отдельные сделки, не связанные между собой. Это касается не только продажи акций ЗАО «Центурион Альянс» и приобретение акций в «Тафтс». В эту же цепочку необходимо отнести и приобретение компании «Тафтс» 100% в компании «Доралин». Таким образом, Смагин продолжал иметь такой же миноритарный пакет в 20% в группе компаний ЗАО «Центурион Альянс», как он имел и непосредственно в компании «Центурион Альянс». Между Смагиным, Гаркушей и компанией «Калкен» в 2006 было заключено соглашение о том, что в случае дефолта «Блиденсол» по кредиту, Смагин будет иметь право реализовать 73% акций «Тафтс», принадлежащих компании «Калкен». В соответствии с заключенным договором эскроу с участием тех же лиц и «Дойче банка» как эскроу агента «Калкен» должна была передать принадлежащие ей 73% акций «Тафтс» на счет эскроу. В случае дефолта по кредиту Смагин имел возможность реализовать указанные 73% акций компании «Тафтс» в целях получения средств и погашения кредита «Дойче Банка». Он был заинтересован в том, чтобы его экономический интерес в ТК «Европарк» не был затронут в результате дефолта. Таким образом, Смагин был застрахован от риска наложения взыскания «Дойче Банком» на его имущество и на контролируемое им имущество в ЗАО «Центурион Альянс», так как по договоренности с Ашотом Егиазаряном возврат кредита «Дойче Банку» при такой схеме осуществлялся исключительно из имущества Ашота Егиазаряна. Это было обусловлено тем, что кредитными средствами «Дойче Банка», по словам Смагина, пользовался исключительно Ашот Егиазарян для своих коммерческих проектов. Ни Смагин, ни «Доралин», ни ЗАО «Центурион Альянс» к пользованию кредитом «Дойче

Банка» отношения не имели. По его (Кузина) мнению, соглашения 2006-2007 годов имели исключительный характер. Соглашение от 2008 было подписано лично Егиазаряном Ашотом и Смагиным, по нему Егиазарян был обязан передать 50% акций компании «Тафтс», точнее довести долю до 50%. Оно было подписано только после выдачи кредита, потому что Егиазарян не исполнил те обещания, которые он дал Смагину в 2006, 2007, 2008 годах. Соглашение от 2008 года было учтено Лондонским арбитражным судом только в отношении юрисдикции, но не в отношении процента акций. По решению суда Смагину была присуждена стоимость 20% акций компании «Тафтс». В момент обращения к нему Смагина, произошел кризис 2008 года и «Дойче Банк» стал сокращать свое участие на российском рынке, распродавал кредиты, которые он выдал компаниям России. «Дойче банк» еще в 2007 документально подтвердил права Смагина в первоочередном порядке получить предложение на уступку прав требования по кредиту, если банк когда-либо решит их уступить и в начале 2009 банк обратился к Смагину с этим предложением, предоставив документы, относящиеся к кредиту, включая всю обеспечительную документацию и переписку с должником по кредиту - компанией «Блиденсол». Проанализировав представленные документы, сотрудники «Бейкер энд Мдккензи» пришли к выводу, что часть обеспечительной документации, дающей право «Дойче Банку» на наложение внесудебного взыскания на акции компании «Доралин» отсутствует. При этом наличие такой документации было предусмотрено положениями кредитного договора, а именно не хватало подписанных передаточных распоряжений от компании «Тафтс» по уступке акций компании «Доралин» в пользу третьего лица - приобретателя акций. По кипрскому праву возможно подписание такого рода распоряжений заранее в пользу непоименованного третьего лица. Таким образом, при наступлении дефолта по кредиту, банк имеет возможность передать немедленно заложенные акции третьему лицу, тем самым реализовав имущество. При отсутствии такого рода передаточных распоряжений требуется длительная процедура обращения взыскания на указанные акции по кипрскому законодательству. Тем самым приобретатель прав по кредиту не сможет получить акции «Доралин» во внесудебном порядке в случае дефолта должника по кредиту. Представители «Дойче Банка» подтвердили, что передаточные распоряжения действительно отсутствуют по двум причинам - либо они утеряны, либо, возможно, они не были подписаны залогодателем, поскольку в «Дойче Банке» сменилась команда, занимавшаяся оформлением кредита, не было людей, которые могли бы эту информацию предоставить. Принятие судом решения об обязании подписания такого документа не гарантирует исполнения требования суда со стороны компании «Блиденсол», как ответчика, не обеспечившего предоставление всей необходимой обеспечительной документации. Спор бы рассматривался по английскому праву, поскольку в соответствии с ним заключены обеспечительные документы. Поэтому единственным реальным механизмом воздействия у банка оставалось объявление дефолта по кредиту. Ими был сделан вывод о том, что приобретение этого кредита не имело экономического и юридического смысла. Экономического, потому что кредит не предусматривал возврата основной суммы займа до окончания срока займа, а юридического - невозможно было осуществить наложение взыскания на заложенные акции компании «Доралин». Смагин принял решение "не покупать" этот кредит, о чем официально уведомил банк. Несмотря на то, для объявления официального дефолта было несколько оснований: нарушения условий договора со стороны «Блиденсол», например отсутствие указанных выше передаточных распоряжений, наличие иска о банкротстве ЗАО «Центурион Альянс» и другие технические моменты, вместе с тем банк не желал этого делать, поскольку реализовать дефолтный кредит несоизмеримо тяжелее. 14.04.2009 на их совместной встрече с Ашотом Егиазаряном в «Даев Плаза» рассматривалось несколько сценариев развития событий. Первый сценарий - Смагин В.И. и Егиазарян Ашот совместно выкупают кредит «Дойче Банка» с дисконтом. Обсуждались цифры 50-60 млн. долларов США, необходимых для выкупа 100-миллионного кредита. Егиазарян

Ашот выражал готовность продать свой реактивный самолет – бизнес-джет для финансирования выкупа кредита «Дойче Банка». Второй сценарий - «Дойче Банк» пытается переуступить кредит третьим лицам, не связанным с Ашотом Егиазаряном и Смагиным В.И. В этом случае Ашот Егиазарян предлагал разные способы противодействия такой переуступке, в том числе организацию процесса контролируемого банкротства компании ЗАО «Центурион Альянс» с последующей продажей имущества, а именно ТК «Европарк» со стороны компании «Даев Плаза» как кредитора компании ЗАО «Центурион Альянс». Смагин был обеспокоен относительно своих 20% акций в компании «Тафтс» и неоднократно высказывал свои опасения Ашоту Егиазаряну, но тот обнадеживал Смагина, говоря ему, что его интересу в ТК «Европарк» ничего не угрожает. Сотрудники «Дойче Банка» неоднократно высказывали требование Ашоту Егиазаряну передать им ранее согласованные с ними и подписанные передаточные распоряжения с тем, чтобы иметь полный пакет согласованных обеспечительных документов по кредиту. «Бейкер энд Маккензи» со своей стороны подготовила проекты передаточных распоряжений, требуемых «Дойче Банком», и переслала их 25.09.2009 Смагину электронной почтой для дальнейшей передачи Ашоту Егиазаряну. Смагин в то время являлся наряду с Артемом Егиазаряном директором компании «Тафтс» и готов был подписать такие распоряжения. Однако в соответствии с правилами управления компании «Тафтс» для легитимности передаточного распоряжения в отношении акций требовалось две подписи, а именно Смагина и Артема Егиазаряна, последний отказался что-либо подписывать, поскольку не получил на это одобрения своего брата Ашота. Ни в 2007, ни позднее Егиазаряны так и не предприняли никаких действий для того, чтобы передать указанные 73% акций в эскроу владение «Дойче Банка». Таким образом, Смагин был лишен возможности реализовать 73% акций компании «Тафтс» и возвратить средства по кредиту. Из представленных Смагиным копий дополнительных соглашений к договору займа, ему известно, что 08.12.2006 между ЗАО «Центурион Альянс» и компанией «Блиденсол» был заключен договор займа на сумму около 1,5 миллиарда руб. В 2008-2009 годах генеральный директор ЗАО «Центурион Альянс» Клочин М.А. и директор компании «Блиденсол» Гогохия В.Г. без согласия Смагина сменили валюту указанного займа с рублей на доллары и процентную ставку с 1% на 12%, а затем на 22,5% годовых. Таким образом, была искусственно увеличена кредиторская задолженность ЗАО «Центурион Альянс» перед компанией «Блиденсол». Для компании «Блиденсол» изменение валюты договора и увеличение процентных ставок означало получение значительно большего количества денежных средств, чем ей было первоначально по договору займа положено. Поскольку компания «Блиденсол» на 100% бенефициарно принадлежала Ашоту Егиазаряну, ЗАО «Центурион Альянс» бенефициарно принадлежало ему только на 73%, тем самым Егиазарян перераспределил доходы за ЗАО «Центурион Альянс» в свою пользу. Смагин не являлся ни акционером, ни бенефициарным владельцем компании «Блиденсол». ЗАО «Центурион Альянс» также являлось должником по договору займа перед ООО «Даев Плаза», сумма займа не являлась значительной, вместе с тем именно «Даев Плаза» подала в мае 2009 заявление о банкротстве ЗАО «Центурион Альянс» в Арбитражный суд г. Москвы, которое отозвала, как только «Дойче Банк» продал кредит, что, по его (Кузина) мнению, повлияло на решение банка как можно быстрее уступить права по кредиту любому желающему лицу. В начале 2009 он (Кузин) присутствовал на переговорах с «Дойче Банком», когда им была озвучена цена выкупа кредита в размере 65-70 млн. долларов США, а в начале 2010 банк продал его компании «Скендлби» за 55 млн. долларов США. Разница в цене объясняется временным промежутком между их договоренностями и моментом продажи кредита, составившего один год, в течение которого банк не мог избавиться от кредита. Первоначально у «Дойче Банк» были завышенные ожидания в отсутствие информации на рынке продажи кредитов в России на тот момент, плюс Егиазарян Ашот начал процедуру банкротства ЗАО «Центурион

36

Альянс» по иску «Даев Плаза» в мае 2009. Соответственно, ценность кредита для любого третьего лица резко снизилась, чем воспользовался Ашот Егиазарян в ходе своих собственных переговоров с «Дойче Банком». Несмотря на то, что Смагин остался 20%-ным собственником компании «Тафтс», фактически он ничем не владел, поскольку никаких активов во владении компании «Тафтс» больше не было. Это была достаточно хитрая схема - сначала компания «Тафтс» продала по 50% компании «Доралин» двум разным кипрским компаниям - «Фамулатос» и «Мастеро», это был первый этап вывода активов из-под «Тафтс». После чего был второй вывод активов уже из-под «Доралин», когда «Доралин» продала 100% акций в ЗАО «Центурион Альянс» компании «Скендлби». Кроме того, в конце 2008 право подписания Смагиным документов наряду с Артемом Егиазаряном было из документов «Тафтс» удалено, он (Смагин) перестал быть директором компании «Тафтс». В конце 2009 изменения в учредительные документы были внесены без уведомления и согласия миноритарных акционеров, произошла смена директоров в компании «Тафтс», зарегистрированной на Британских Виргинских островах. В начале 2010 компания «Тафтс» продала свои акции компании «Доралин» двум юридическим лицам - «Мастеро» и «Фамулатос», но проданы они были не одномоментно, а с разницей в два месяца. Таким образом, в компании «Тафтс» был допущен целый комплекс нарушений прав акционеров, а у Смагина остались ничего не стоящие акции. При этом, хищение акций произошло не тогда, когда Смагин передавал акции, а тогда, когда в отношении него были совершены мошеннические действия по завладению активами ЗАО «Центурион Альянс». Конечным активом, которым завладели иностранные компании на территории России, был ЗАО «Центурион Альянс». На сегодняшний день схема владения ТК «Европарк» выглядит следующим образом: он 100% по-прежнему принадлежит ЗАО «Центурион Альянс»; последний на 100% принадлежит компании «Скендлби», 50% компании «Скендлби» владеет компания «Джела», принадлежащая ГК«Ташир», а 50% компании «Скендлби» владеет компания «ЭмПиЭйч», которая держит их в интересах Ашота Егиазаряна. Начиная с конца 2014 года компания «Бейкер энд Маккензи» работает над приведением в исполнение решения Лондонского международного третейского (арбитражного) суда от 11.11.2014 года против Ашота Егиазаряна и компании «Калкен» в отношении оценки 20% акций Смагина В.И.

Свидетель **Быстрых** (Богатеева) Л.В. в судебном заседании показала, что примерно с 28.02.2005 по настоящее время работает в АО «Регистраторское общество «Статус», ранее общество располагалось в г. Москве, ул. Добровольческая, д. 64, затем они переехали на ул. Новую Рогожскую, д. 32, стр. 1. На основании договора на ведение реестра № 94-03 от 07.07.2003 по 07.06.2010 ЗАО «Статус» являлось реестродержателем ЗАО «Центурион Альянс», в 2010 данный договор расторгнут по письменному распоряжению эмитента ЗАО «Центурион Альянс». Если в 2006 ЗАО «Статус» осуществило перевод ценных бумаг с лицевых счетов акционеров ЗАО «Центурион Альянс» на счета ДЕПО, открытые у номинального держателя – «Дойче Банк» (Москва), то дальнейшее зачисление и списание ценных бумаг ЗАО «Центурион Альянс» со счетов ДЕПО в ЗАО «Статус» не отражалось. Никакую информацию об этом ни ЗАО «Центурион Альянс», ни номинальный держатель – «Дойче Банк» предоставлять в ЗАО «Статус» не должны. При этом необходимо иметь ввиду, что права на акции, если они переданы держателю, подтверждаются выпиской со счета ДЕПО, которую получает владелец, обратившись в депозитарий банка. В данном случае имеется в виду депозитарий «Дойче Банка». В связи этим в АО «Регистраторское общество «Статус» никаких сведений о компаниях «Доралин» и «Скендлби» как о новых акционерах ЗАО «Центурион Альянс» не поступало. С момента зачисления акций на счет номинального держателя ЗАО «Статус» не могло осуществлять учет акций владельцев ЗАО «Центурион Альянс». В реестре имеется счет номинального держателя, который видит регистратор, но сведений о нем регистратор не имеет. Основанием для списания 2 300 акций ЗАО «Центурион Альянс» со счета номинального держателя «Дойче Банк» и их зачисления на

37

счет номинального держателя АКБ «Фора-Банк» явилось распоряжение «Дойче Банка».
После операции номинальным владельцем акций ЗАО «Центурион Альянс» стало АКБ
«Фора Банк».

Свидетель **Ильяев А.Г.** - вице-президент группы компаний «Ташир» показал в
судебном заседании, что в период с 2009 по 2015 являлся одним из двух директоров
компании «Скендлби». Из числа подсудимых он (Ильяев) знаком со всеми, кроме
Гогохии. С Ашотом Егиазаряном познакомился в 2001, в декабре 2009 - январе 2010 с
Артемом. От Карапетяна С.С., возглавляющего группу компаний «Ташир», ему (Ильяеву)
стало известно, что Егиазарян Ашот в телефонном разговоре предложил ему приобрести у
«Дойче Банка» права требования по кредитному договору, заключенному с компанией
«Блиденсол». В связи с этим Карапетян С.С. поручил ему (Ильяеву) руководить данным
проектом и принять участие во встрече, состоявшейся в декабре 2009 в офисе
юридической фирмы «Уайт энд Кейс», в которой приняли участие Карапетян, Егиазаряны
Ашот и Артем, Фитисов, Дерюгин. Юристы «Уайт энд Кейс», представлявшие интересы
Ашота Егиазаряна, рассказывали о ситуации, в которой находится ЗАО «Центурион
Альянс» в связи с выдачей кредита, что ему грозит банкротство и потеря имущества, на
переговорах также были представлены документы, имеющие отношение к кредитному
договору. Позднее состоялось еще несколько встреч по данному вопросу, в ходе которых
от Артема Егиазаряна и Фитисова он узнал, что компания «Блиденсол» не могла погасить
кредит «Дойче Банка», в связи чем существовал риск утраты заложенных банку акций и
имущества. В этой связи «Дойче банк» предлагал всем заинтересованным лицам
приобрести права требования по данному кредитному договору, и в конце 2009
представители данка объявили об их продаже. Ему известно, что Ашот Егиазарян,
который на тот момент являлся депутатом Государственной Думы ФС РФ, контролирует
компанию «Даев Плаза», а также компании «Калкен», «Блиденсол», «Доралин», которые в
свою очередь опосредованно контролируют деятельность ЗАО «Центурион Альянс»,
владеющего ТК «Европарк». До октября 2010 генеральным директором ЗАО «Центурион
Альянс» был Клочин М.А., который все вопросы, касающиеся доходной и расходной
частей деятельности общества, согласовывал с Ашотом Егиазаряном. До момента
увольнения Клочина он (Ильяев) также общался с ним по вопросам обеспечения
деятельности ЗАО «Центурион Альянс» и ТК «Европарк». На время отсутствия
последнего его обязанности исполнял его заместитель Ковалев П.В., с которым он по
познакомился через Клочина М.А. в феврале 2010. В феврале 2010 компания «Скендлби»
стала 100%-ным акционером ЗАО «Центурион Альянс», что было отражено в реестре
акционеров, который они видели до августа 2010, но затем он пропал, поскольку его
забрал с собой Клочин М.А. После ухода Клочина М.А. было принято решение о
назначении Ковалева П.В. генеральным директором ЗАО, которое было согласовано с ним
(Ильяевым) как с директором «Скендлби» и вторым директором кипрской компании
«ЭмПиЭйч», подконтрольной на момент рассматриваемых событий Ашоту Егиазаряну.
Данное решение им было подписано. После назначения Ковалева на должность он
(Ильяев) давал ему поручения по расходной части, а также Ковалев согласовывал с ним
платежи ЗАО «Центурион Альянс». Участие ГК «Ташир» в управлении ТК «Европарк»
улучшило экономическую ситуацию, так как увеличилась выручка, уменьшились
расходы. Ему (Ильяеву) также известно, что до 2009 Смагин В.И. занимался управлением
ТК «Европарк». По документам Смагин В.И. являлся участником «Тафтс», в которой у
него имелась 20%-ная доля. После того, как Егиазаряны Ашот и Артем, Клочин М.А.
выехали из Российской Федерации, Смагин В.И. предъявил исковые требования к
Егиазаряну Ашоту о причиненном ущербе в результате потери контроля компании
«Тафтс» над ЗАО «Центурион Альянс», рассмотренных в Лондонском арбитражном суде.
Одним из ответчиков являлась компания «Калкен». Юристы компании «Ташир», нанятые
за рубежом, принимали участие в этом процессе, в связи с чем у него (Ильяева) была

38

возможность знакомиться с судебными документами. 14.01.2010 между ООО «Даев Плаза» в лице Егиазаряна Ашота и ГК «Ташир» в лице Карапетяна С. было согласовано и подписано Базовое соглашение о приобретении активов, которое определяло последовательность действий сторон после приобретения компанией «Скендлби» права требования по кредитному договору. В подпунктах с 4.1 по 4.16 раздела 4 Базового соглашения содержатся условия выкупа актива ЗАО «Центурион Альянс», достигнутые в ходе переговоров между сторонами и отражен порядок и условия приобретения ими актива, в пропорции 50 на 50. Покупателем права требования по кредиту должна была выступать компания «Скендлби» (Кипр), которая принадлежала секретарской компании «MPH Law Services Limited», зарегистрированной на Кипре. Задействовать данную компанию в сделке в качестве покупателя было предложено Егиазаряном Ашотом. Он же предложил ГК «Ташир» приобрести 50% акций компании «Скендлби» у «MPH Law Services Limited» для вхождения в сделку и участия через нее в выкупе права требования по кредиту. На тот момент в группу компаний «Ташир» входила компания «Jella Holding & Finance Inc», которую он не решил задействовать в качестве покупателя акций компании «Скендлби». Для паритетности управления в Базовом соглашении прописано условие назначения двух директоров компании «Скендлби», по одному от каждой из сторон для совместного и единогласного принятия решений. В целях исполнения обязательств Егиазаряном Ашотом (Акционер А) в Базовом соглашении предусмотрено обеспечение Акционером А заключения договора купли-продажи и передачи 920 (92%) акций компании «Калкен» по номинальной стоимости в пользу аффилированного лица Карапетяна С. (Акционер «В») и назначение директором компании «Калкен» лица указанного Акционером «В». В конечном итоге компания «Скендлби» выкупила кредит примерно за 55 млн. долларов США. Источником его финансирования являлись заемные средства, полученные от компаний «Ташир», а именно: ОАО «Калугаглавснаб», ООО «Газойлтрейд», «Гровер холдинг» в сумме около 33 250 000 долларов США. От других компаний, относящихся к Егиазаряну А.Г., было заимствовано около 22 500 000 долларов США. В процессе приобретения «Скендлби» 100% акций ЗАО «Центурион Альянс» принимали участие компании ООО «Даев Плаза» «Доралин», «Тафтс», «Калкен» «Фамулатус», и «Мастеро», последняя компания принадлежит ГК «Ташир». Переход 100% акций ЗАО «Центурион Альянс» от компании «Доралин» компании «Скендлби» произошел на основании «Договора об урегулировании и прекращении обязательств («Deed of settlement end termination») от 25.02.2010, так называемого «договора о отступном», заключенного между «Скендлби» и «Доралин», а также на основании передаточного распоряжения. Данный договор составлялся примерно в январе – феврале 2010 на Кипре, юристами «MPH Law Services Limited» и юристами одной из секретарских компаний Кипра и был подписан им (Ильяевым), Майклом Филлипоу (в лице директоров компании «Скендлби») и директорами компании «Доралин», одним из которых являлась Елена Демина, в рамках поручительства за кредит, выданный «Дойче Банком», компании «Блиденсол». Его оригинал хранится на Кипре в офисе компании «Скендлби». Также ему (Ильяеву) известно, что ООО «Даев Плаза» подавало в Арбитражный суд г. Москвы заявление к ЗАО «Центурион Альянс» о банкротстве в связи с имеющейся кредиторской задолженностью. Поскольку одним из условий входа ГК «Ташир» в сделку с акциями компании «Доралин» было прекращение производства по заявлению о банкротстве в связи с риском утраты объекта, производство по делу было прекращено в связи с отказом ООО «Даев Плаза» от заявления. Инициатором процедуры банкротства ЗАО «Центурион Альянс» являлся Ашот Егиазарян, но с какой целью это делалось ему (Ильяеву) известно. В настоящее время компанию «Скендлби» администрирует кипрская компания «MPH Law Services Limited». Лично он (Ильяев) и представители ГК «Ташир» не давали указаний директорам компании «Тафтс» на продажу акций компании «Доралин», так как это произошло до того, как ГК «Ташир» стала владельцем компании «Калкен», которая в свою очередь является собственником 73% акций компании «Тафтс». Директор

компании «Тафтс» самостоятельно проводили эту сделку, указания на совершение которой могли дать лишь Ашот или Артем Егиазаряны.

Свидетель **Дерюгин В.А.**, возглавляющий в ГК «Ташир» юридический департамент, и свидетель **Бортников Ю.Ф.**, занимавший на момент рассматриваемых событий должность старшего юриста адвокатского бюро «Вегас-Лекс», дали в судебном заседании показания, аналогичные показаниям свидетеля Ильяева А.Г., об обстоятельствах проведения переговоров и приобретения у «Дойче Банка» права требования по кредитному договору, заключенному с компанией «Блиденсол», и получения ГК «Ташир» контроля за 50 % ТК «Европарк», при этом свидетель Бортников Ю.Ф. также показал, что во время переговоров Ашот Егиазарян убеждал представителей ГК «Ташир», что все физические и юридические лица, входящие в структуру текущего владения торговым комплексом контролируются им (Ашотом Егиазаряном), никаких вопросов возникнуть не должно, их также убеждали в том, что соглашение акционеров от 26.12.2006 и договор эскроу не действуют, по договору эскроу в «Дойче Банк» компанией «Калкен», являющейся акционером компании «Тафтс», так и не были переданы акции «Тафтс», а положения соглашения акционеров о снятии всех обременений через год после его подписания не были исполнены, Ашот и Артем Егиазаряны были заинтересованы лишь в скорейшем получении денег без каких-либо формальных обязательств со своей стороны, несмотря на настойчивое требование о предоставлении поручительства со стороны братьев Егиазарянов и подготовку проектов двух поручительств, последние от их подписания отказались. Ему (Бортникову) также известно, что в январе 2010 компания «Тафтс» продала 50% акций компании «Доралин» компании «Мастеро», входящей в группу компаний «Ташир». Со стороны «Тафтс» сделка совершалась Артемом Егиазаряном, который действовал от имени «Тафтс» на основании генеральной доверенности, о которой ему (Бортникову) известно со слов Артема Егиазаряна. Результатом переговоров относительно приобретения ГК «Ташир» 50 % акций ЗАО «Центурион Альянс» путем выкупа у «Дойче Банка» права требования по кредиту компании «Блиденсол» стало «Базовое соглашение» от 14.01.2010 между группой компаний «Даев Плаза» в лице Егиазаряна Ашота и группой компаний «Ташир» в лице Карапетяна С., в разработке которого он (Бортников) также принимал участие.

Свидетель **Борисенко Ю.В.** показал в судебном заседании, что с августа 2009 по июнь 2010 он являлся партнером адвокатского бюро «Вегас-Лекс», постоянным клиентом которого была группа компаний «Ташир», а ее владельцем Самвел Карапетян, юридический департамент возглавлял Дерюгин В.А. Приблизительно в ноябре 2009 по просьбе последнего он (Борисенко) принял участие во встрече, состоявшейся в офисе ГК «Ташир», с участием вице-президента Ильяева. Последний пояснил, что ГК «Ташир» планирует реализовать сделку по приобретению доли в кипрской компании, владеющей ТК «Европарк». В связи с этим предстоит получить согласие у «Дойче Банка» на данную сделку и погасить перед ним часть кредита для высвобождения акций или здания ТК «Европарк», которые находятся в залоге в обеспечение возврата кредита в размере 100 млн. долларов США, выданного «Дойче Банком». Он (Борисенко) участвовал в данной сделке в качестве юридического консультанта, в его обязанности входили проверка законности строительства ТК «Европарк», заключения договоров с арендаторами торговых помещений, находящихся в торговом комплексе, договоров аренды земельного участка, на котором он был построен и проверка документации, связанной с залогом имущества (акций или здания ТК «Европарк»), владельцем указанного объекта являлось ЗАО «Центурион Альянс», в свою очередь, последним владела иностранная компания.

По результатам работы был подготовлен меморандум по рискам, связанным с недвижимостью, в котором указано на отсутствие каких-либо проблем, связанных с вышеуказанными вопросами.

Свидетель **Демина Е.В.** показала в судебном заседании, что с января 2008 по 2010 она работала в должности экономиста ООО «Ар-Инвест», являющимся одним из подразделений холдинга «Ташир», владельцем которого является Карапетян С.С. Приблизительно с января-февраля 2010 она по просьбе одного из директоров компании «Скендлби» Ильяева А. стала одним из директоров кипрской компании «Доралин» по совместительству с вышеуказанной должностью для участия в одной сделке. Вторым директором в соответствии с требованиями кипрского законодательства являлась компания «Нью Дженерейшен».

Юристы компании «Вегас Лекс», в том числе Бортников, а также юристы ГК «Ташир» в лице Дерюгина разъяснили ей, что эта компания является владельцем акций компании ЗАО «Центурион Альянс», которой принадлежит ТК «Европарк». Акционером компании «Доралин» является компания «Мастеро». По сути сделки от указанных юристов ей стало известно, что компания «Блиденсол» взяла кредит в «Дойче Банке» на 100 млн. долларов США, банк выставил право требования по кредиту на продажу. Компания «Скендлби» выкупила это право требования у «Дойче Банка». Обеспечением этого кредита был залог акций компании «Доралин», в связи с чем она и должна была их передать по «Договору об урегулировании и прекращении обязательств» («Deed of settlement end termination»), так называемом «договоре об отступном» от января - февраля 2010, компании «Скендлби». После совершения данной сделки эта компания больше ни в каких сделках не участвовала, хозяйственной деятельности не ведет.

В указанный период времени подписывала договоры на английском языке о передаче акций компании «Доралин» компании «Скендлби», а также указанный договор об отступном. Сторонами в этом договоре от компании «Скендлби» выступали ее директора, один из которых был Ильяев, а от компании «Доралин» в документе была указана она и компания «Нью Дженерейшен». В ее (Деминой) распоряжении был перевод документов на русский язык и консультации тех же юристов. В январе-феврале 2010 было заключено трехстороннее соглашение между компаниями «Доралин», «Скендлби» и «Блиденсол» относительно договора о передаче своих акций компанией «Доралин» компании «Скендлби». Договор был составлен на английском языке, его суть ей также объясняли юристы. Никаких выплат, зарплаты, иных вознаграждений в связи с занимаемой должностью она (Демина) не получала, так как являлась директором формально.

Показания потерпевшего и свидетелей подтверждаются следующими доказательствами –

- заявлением Смагина В.И. на имя Генерального прокурора Российской Федерации с просьбой провести проверку по факту хищения Егиазаряном Ашотом Г. и иными лицами принадлежащего ему (Смагину) имущества в виде акций ЗАО «Центурион Альянс» стоимостью около 30 миллионов долларов США, привлечь виновных лиц к уголовной ответственности (т. 1 л. 78-82);

- генеральным соглашением от 12.02.2002 между Смагиным В.И., Коршуновым В.В., Окороковым Ю.М. (Продавцы) и Локтионовым А.Г., Каплуном Н.Н. (Приобретатели), согласно которому Продавцы обязуются обеспечить передачу Приобретателям 100% долей в ООО «Центурион Альянс», путем передачи каждому по 50% долей в ООО «О.К.С. Холдинг», являющегося единственным участником ООО «Центурион Альянс» (т. 11 л.д. 187-194);

- договором на право выкупа доли от 12.02.2002, согласно которому Локтионов А.Г. и Каплун Н.Н. (Продавцы) обязуются в срок до 31.09.2002 по письменному требованию Смагина В.И. (Приобретатель) за 6 900 000 руб. приобретателю или указанным им лицам 30% доли участия в ООО «Центурион Альянс» (т. 11 л.д. 194-200);

- соглашением участников от 12.02.2002 между Локтионовым А.Г., Каплуном Н.Н. и Смагиным В.И., согласно которому в соответствии с Генеральным соглашением от

12.02.2002 Смагин, Коршунов и Окороков должны в совокупности получить 8 000 000 долларов США, из которых Смагин получает 3 150 000 долларов США за вычетом суммы общей задолженности ООО «Ценутрион Альянс»; в связи с тем, что Локтионов и Каплун после приобретения 100% доли в ООО «Центурион Альянс» намерены передать Смагину 30% доли, стороны пришли к соглашению, что стоимость этой доли равна 3 150 000 долларов США и стороны осуществят взаимозачет встречных обязательств, образующаяся после взаимозачета разница, составляющая сумму общей задолженности ООО «Центурион Альянс», выплачивается Смагиным Локтионову и Каплуну (т. 11 л.д. 201-205);

- соглашением от 30.05.2002 между Смагиным В.И. (Сторона 1) и Гаркушей Д.В. (Сторона 2) об акционерной структуре проекта строительства торгового центра по адресу: г. Москва, Рублевское шоссе, вблизи д. Екатериновка.

В соглашении констатируется, что Стороне 2 принадлежат компании ЗАО «ТД «Уникумимпекс», ООО «Милеа», ООО «Мерхав», ЗАО «Титул», ООО «Техэнергодон».

Учитывая договоренности с Егиазаряном А.Г., стороны договорились о приобретении долей Каплуна Н. и Локтионова А. в ООО «Центурион Альянс» на определенных условиях. В частности, Смагин В.И. остается в проекте и не продает свою долю. Сторона 2 выкупает 100% долей ООО «Центурион Альянс» на принадлежащие ей компании. Сторона 2 гарантирует Стороне 1 передачу 33,3 % доли в ООО «Центурион Альянс», учитывая договоренности с Егиазаряном А.Г., путем подписания договоров купли-продажи 33,3% доли в принадлежащих стороне 2 компаниях с открытой датой до 01.07.2002.

Сторона 2 обязуется осуществлять финансирование строительства в полном объеме и за счет собственных средств по инвестиционной схеме без привлечения кредита (т. 11 л.д. 183-184);

- протоколом № 04/12 общего собрания акционеров ЗАО «Центурион Альянс» от 04.12.2006, согласно которому единогласным решением акционеров одобрено совершение Обществом крупной сделки по заключению Акта о гарантиях и компенсации с «Дойче Банком», где Общество выступает

поручителем по кредитному договору на полную сумму кредита – 100 миллионов долларов США, а также процентов за пользование кредитом и прочих выплат (т. 4 л. 91-92);

- протоколом № 01/12 общего собрания акционеров ЗАО «Центурион Альянс» от 01.12.2006, согласно которому единогласным решением акционеров одобрено совершение Обществом крупной сделки по передаче в залог (ипотека) «Дойче Банку» здания МТК «Европарк», расположенного по адресу: г. Москва, Рублевское шоссе, д. 62, и права аренды расположенного под зданием земельного участка (т. 4 л. 93-94);

- решением № 06/08 единственного акционера ЗАО «Центурион Альянс» от 10.09.2008, согласно которому компания «Доралин» приняла решение об избрании совета директоров ЗАО «Центурион Альянс» в составе Тимченко А.И., Клочина М.А., Смагина В.И., Денисова Д.В. и Фитисова Д.А., Председателем совета директоров избран Смагин В.И., решение подписано представителем единственного акционера – Гаркушей Д.В. по доверенности от 19.09.2007 (т. 4 л.д. 99);

- уставом ЗАО «Центурион Альянс», утвержденным на общем собрании акционеров 25.12.2006, согласно п. 1.1. которого ЗАО «Центурион Альянс» создано путем преобразования из ООО «Центурион Альянс» в соответствии с решением его участников 27.12.2002; место нахождения Общества: г. Москва, Кутузовский проспект, д. 39;

общее количество акций 2300 номинальной стоимостью 10 000 рублей каждая (п. 4.1);

высшим органом управления Общества является общее собрание акционеров (п. 7.1);

42

совет директоров Общества осуществляет общее руководство деятельностью Общества, за исключением решения вопросов, отнесенных законом и уставом и исключительной компетенции общего собрания акционеров (п. 8.1.);

генеральный директор является исполнительным органом Общества, руководит текущей деятельностью Общества и решает все вопросы его текущей деятельности за исключением тех, которые относятся к исключительной компетенции Общего собрания акционеров и компетенции совета директоров Общества (п. 9.1);

первый заместитель генерального директора Общеаства назначается и снимается с должности Советом директоров (п. 9.8);

устанавливается ограничение полномочий генерального директора: сделка и/или несколько взаимосвязанных сделок, заключаемых от имени Общества генеральным директором, и связанных с отчуждением/приобретением или возможностью отчуждения/приобретения более 5 миллионов рублей или эквивалента в любой другой валюте, считаются законными и действительными лишь в случае их подписания одновременно генеральным директором и первым заместителем генерального директора. При отсутствии одновременно двух подписей на указанных документах последние считаются недействительными (п. 9.9) (т. 4 л.д. 100-116);

- новой редакцией устава ЗАО «Центурион Альянс», утвержденной  на общем собрании акционеров 09.12.2009, в которой отсутствуют положения о первом заместителе генерального директора Общества и необходимости одновременного наличия его подписи и подписи генерального директора для действительности сделок на сумму свыше 5 миллионов рублей (т. 4 л.д. 118-130);

- соглашением 2008 г. (без точной даты) между Смагиным В.И. (Партнер 1) и Егиазаряном Ашотом Г. (Партнер 2), в котором указано, что Партнер 1 является собственником 20% акций «Тафтс», Партнер 2 контролирует 73% акций компании «Тафтс», которая является собственником 100% акций компании «Доралин», которая является собственником 100% акций ЗАО «Центурион Альянс», которое является собственником торгового комплекса «Европарк».

Компания «Блиденсол» (Заемщик) привлекла кредит в размере 100 миллионов долларов США от «Дойче Банка» (Кредитор) в соответствии с кредитным договором от 06.10.2006.

Партнеры заключат дополнительное соглашение к договору акционеров «Тафтс» от 26.12.2006, в котором урегулируют порядок распределения доходов ЗАО «Центурион Альянс».

В связи с неисполнением договора эксроу от 13.11.2007 Партнеры заключат аналогичный договор эскроу и обеспечат его исполнение всеми сторонами. Партнер 2 обязан подписать и передать «Дойче Банку» передаточные распоряжения на все подконтрольные ему акции «Тафтс».

В учредительные документы «Блиденсол», «Доралин» и «Тафтс» необходимо внести изменения о том, что любой документ считается надлежаще оформленным и имеющим юридическую силу только после подписания его двумя уполномоченными лицами, а именно Партнером 1 и Партнером 2.

Партнер 1 приобретает 50% акций «Блиденсол» по номинальной стоимости и 23% акций «Тафтс» (цена не указана). Если Партнер 2 не исполнит свои обязательства, Партнер 1 заявит иск против Партнера 2 в Лондонский международный арбитражный суд.

Партнеры подтверждают, что в соответствии с ранее достигнутыми договоренностями и соглашением о реализации проекта строительства ТК «Екатериновка» от 29.08.2003 обязанность Партнера 2 по финансированию затрат по реализации проекта в размере 52 500 000 долларов США выполнена в полном объеме.

Партнер 1 получает 50% от всех доходов от деятельности ЗАО «Центурион Альянс» и самостоятельно распоряжается ими. Партнер 2 получает 50% всех доходов от

деятельности ЗАО «Центурион Альянс» и направляет их на погашение кредита и выплату процентов за его использование.

На последнем листе соглашения имеются подписи от имени Смагина В.И. и Егиазаряна А.Г. (т. 5 л.д. 76-79, 80-83);

- договором эскроу между Смагиным В.И. (сторона 1), Гаркушей Д.В. (сторона 2) и компанией «Калкен» (сторона 3) и «Дойче Банком» (эскроу агент) от 26 декабря 2006 г., в котором констатируется, что 26 декабря 2006 г. Сторонами заключен договор акционеров в отношении «Тафтс», согласно которому компания «Калкен» предоставила Смагину В.И. опцион на покупку акций «Тафтс» на определенных условиях.

Смагин В.И. и компания «Калкен» согласились открыть счет эскроу у эскроу агента – «Дойче Банка» совместно на их имя. Компания «Калкен» согласилась поместить свои акции «Тафтс» на счет эскроу. При условии реализации Смагиным В.И. опциона в соответствии с договором акционеров Стороны выражают согласие на подачу совместных письменных указаний эскроу агенту о выдаче Смагину В.И. акций со счета эскроу.

Договор подлежит регулированию и толкованию в соответствии с правом Англии.

Договор подписан Смагиным В.И. в присутствии свидетеля Судец Е.Л., Гаркушей Д.В. в присутствии свидетеля Кургузовой Н.М., Егиазаряном Артемом Г. от имени компании «Калкен».

От имени эскроу агента – «Дойче Банка» договор не подписан (т. 5 л.д. 90-100);

- договором эскроу (условного депонирования) между Смагиным В.И. (сторона 1), Гаркушей Д.В. (сторона 2) и компанией «Калкен» (сторона 3) и «Дойче Банком» (эскроу агент) от 13 ноября 2007 г., согласно которому 26 декабря 2006 г. Сторонами заключен договор акционеров в отношении «Тафтс», согласно которому компания «Калкен» предоставила Смагину В.И. опцион на покупку акций «Тафтс» на определенных условиях.

Смагин В.И. и компания «Калкен» согласились открыть счет эскроу у эскроу агента – «Дойче Банка» совместно на их имя. Компания «Калкен» согласилась поместить свои акции «Тафтс» на счет эскроу. При условии реализации Смагиным В.И. опциона в соответствии с договором акционеров Стороны выражают согласие на подачу совместных письменных указаний эскроу агенту о выдаче Смагину В.И. акций со счета эскроу.

Договор подлежит регулированию и толкованию в соответствии с правом Англии.

Договор подписан Смагиным В.И. в присутствии свидетеля П. Дода, Гаркушей Д.В. в присутствии свидетеля Судец Е.Л., Егиазаряном Артемом Г. от имени компании «Калкен», Беном Хартли и Мириам Келер от имени эскроу агента – «Дойче Банка» (т. 5 л.д. 135-163);

- сертификатом акций компании «Тафтс» от 04.01.2007, согласно которому Смагин В. является зарегистрированным владельцем 2000 акций без номинальной стоимости (т. 5 л.д. 225;230);

- договором акционеров между Смагиным В.И., Гаркушей Д.В. и компанией «Калкен» в отношении «Тафтс» от 26 декабря 2006 г. о том, что Смагин В.И. является собственником 20% акций компании «Тафтс», которая является собственником 100% акций компании «Доралин», которая является собственником 100% акций ЗАО «Центурион Альянс», которое является собственником торгового комплекса «Европарк».

Компания «Блиденсол» (Заемщик) желает привлечь кредит в размере до 100 миллионов долларов США от «Дойче Банка» (Кредитор) в соответствии с кредитным договором от 06 октября 2006 г.

В договоре указано, что незамедлительно после вступления в силу договора эскроу компания «Калкен» обязана передать во владение эскроу агенту – «Дойче Банку» все акции «Тафтс» и передаточные распоряжения на них в пользу Смагина В.И. В случае отзыва кредита Стороны обеспечат передачу «Дойче Банком» всех акций «Тафтс» в собственность и владение Смагина В.И. на основании бланков передаточных распоряжений.

44

Компания «Калкен» предоставляет Смагину В.И. опцион на покупку всех акций «Тафтс», принадлежащих компании «Калкен», в случае направления Кредитором письменного требования в адрес Заемщика, «Доралина», «Тафтс» либо любой из Сторон, досрочном погашении Кредита.

Согласно п. 9.1.5 указанного договора срок его действия установлен в один год момента подписания. После чего в течение одного месяца компания «Калкен» обязан обеспечить прекращение действия залога всех акций компании «Доралин» и ЗА «Центурион Альянс», а также самого комплекса «Европарк». В случае неисполнени данных обязательств компания «Калкен» обеспечивает передачу принадлежащих ей 73% акций компании «Тафтс» Смагину В.И. на основании передаточных распоряжений и иных документов, хранящихся у эскроу агента - «Дойче Банка».

Договор подлежит регулированию и толкованию в соответствии с правом Англии.

Договор составлен на русском языке и подлежит переводу на английский язык.

Договор подписан Смагиным В.И. в присутствии свидетеля  Судец Е.Л., Гаркуше Д.В. в присутствии  свидетеля Филиппова А.Ю., Егиазаряном Артемом Г. от имени компании «Калкен» (т. 5 л.д. 233-252);

- письмом Макшанцева В. на имя Смагина В.И. от 22.01.2007 о направлени утвержденного и подписанного документа от «Дойче Банка» о возможности приобретени Смагиным В.И. в случае дефолта прав требования по кредиту, выдаваемому «Дойч Банку» компании «Блиденсол» под залог ТЦ «Европарк» (т. 5 л.д. 257);

- письмом компании «Herbert Smith» в интересах клиента – Смагина В.И. о 19.02.2008 в «Дойче Банк», о том, что договор акционеров от 26.12.2006 прекратил сво действие в соответствии со ст. 9.1.5, которая также предусматривает, что компани «Калкен» обязана в течение одного календарного месяца с момента прекращения действи договора акционеров обеспечить прекращение залога акций «Доралин» и всех акций ЗА «Центурион Альянс», а также ипотеки ТЦ «Европарк»; компания «Калкен» не выполнил своих обязательств, поэтому Смагин намеревается добиваться соблюдения своих прав соответствии с договором акционеров, заявив иск в Лондонский международны арбитражный суд. Спор между Смагиным и компанией «Калкен» может привести наступлению События Неисполнения в соответствии с кредитным договором, стороной которого является «Дойче Банк» (т. 5 л.д. 259, 260);

- дополнительным соглашением от 02.03.2009 к договору купли-продажи акций о 26.12.2006 между Смагиным В.И. и компанией «Доралин», в котором стороны констатировали, что Покупатель – «Доралин» не исполнил свое обязательство по оплат Продавцу – Смагину В.И. суммы сделки. Стоимость акций определена в 9 200 000 руб., которую Покупатель выплачивает Продавцу в течение трех банковских дней, следующих за датой  подписания данного дополнительного соглашения. В случае неисполнения этой обязанности по оплате договор купли-продажи от 26.12.2006 считается расторгнутым с 31.03.2009, от имени «Доралин» договор подписан Егиазаряном Артемом Г. по генеральной доверенности (т. 6 л.д. 22);

- исковым заявлением Смагина В.И. к компании «Доралин», поступившее в Арбитражный суд г. Москвы 02.06.2009, с требованием признания за Смагиным В.И. права собственности на 460 акций ЗАО «Центурион Альянс» и обязании компанию «Доралин» возвратить их Смагину В.И. (т. 6 л.д. 15-17);

- решением Арбитражного суда г. Москвы от 10.11.2009, согласно которому в иске Смагину В.И. к компании «Доралин» отказано, поскольку истом неверно  избран способ защиты (т. 6 л.д. 77-78);

- рыночной оценкой стоимости ТК «Европарк» по состоянию на 05.11.2008, согласно которой рыночная стоимость права собственности ТК «Европарк» и доли долгосрочной аренды земельного участка под ним составляла 234 300 000 долларов США (т. 7 л.д. 93-172);

- договором займа от 21.12.2009, согласно которому ЗАО «Центурион Альянс» (Займодавец) выдает ОАО «Инвест-Центр» 51 800 000 руб. со сроком возврата не позднее 21.01.2010 под 12% годовых (т. 7 л.д. 174-175);

- дополнительным соглашением № 3 от 30.12.2008 к договору № 1 от 08.12.2006 между ЗАО «Центурион Альянс» и «Блидэнсол», согласно которому с 01.01.2009 установлен новый размер процентной ставки 22,5% годовых (т. 7 л.д. 176);

- письмом Смагина В.И. от 20.02.2009 в «Дойче Банк» о том, что 26.12.2006 был заключен договор акционеров «Тафтс» и 13.11.2007 договор эскроу, сторонами данных договоров в качестве эскроу агента был привлечен «Дойче Банк», однако указанные договоры не были исполнены компанией «Калкен», о чем «Дойче Банк» был уведомлен письмом от 19.02.2008. Несмотря на уведомление, «Дойче Банк», попустительствовал дальнейшему нарушению компанией «Калкен» договорных обязательств, а 22.01.2007 «Дойче Банк» письменно предоставил Смагину В.И. право приобрести требования по кредитному договору при наступлении соответствующих обстоятельств. С учетом этого Смагин В.И. уведомляет «Дойче Банк» о желании и состоятельности приобрести все права требования по кредитному договору от 06.10.2006 (т. 4 л. 97-98);

- решением № 06/08 единственного акционера ЗАО «Центурион Альянс» от 10.09.2008, согласно которому компания «Доралин» приняла решение об избрании совета директоров ЗАО «Центурион Альянс» в составе Тимченко А.И., Клочина М.А., Смагина В.И., Денисова Д.В. и Фитисова Д.А. Председателем совета директоров избран Смагин В.И. (т. 4 л.д. 99);

- решением единственного акционера ЗАО «Центурион Альянс» - компании «Доралин» от 09.12.2009, согласно которому утверждена новая редакция устава Общества, решение подписано директором «Доралин» - компанией «Нью Дженерейшн Сервисез Лимитед» (т. 4 л.д. 131);

- сертификатом регистрации обременения компании «Доралин» от 04.01.2007, согласно которому ипотекой или обременением в пользу «Дойче Банка» на сумму 100 миллионов долларов США обеспечены все текущие и будущие активы компании «Доралин» (т. 4 л.д. 188-191);

- сертификатом регистрации обременения компании «Доралин» от 05.01.2007, согласно которому ипотекой или обременением в пользу «Дойче Банка» на сумму 100 миллионов долларов США обеспечены 2 300 акций ЗАО «Центурион Альянс», находящиеся во владении компании «Доралин» (т. 4 л.д. 192-195);

- письменным решением собрания акционеров компании «Тафтс» от 06.10.2008 о том, что Артем Егиазарян и Виталий Смагин, являющиеся держателями 93% акций компании приняли решения: о замене своего зарегистрированного агента на компанию «Порткаллис Трастнет»; о смене адреса регистрации на абонентский ящик 344, Роад Таун, Британские виргинские острова; о том, что только оба директора компании, текущий зарегистрированный агент и компания «Порткаллис Трастнет» уполномочиваются исполнять любые формы и документы и предпринимать все действия, необходимые для полного завершения процедуры смены зарегистрированного агента и адреса регистрации (т. 4 л.д. 196-197);

- письмом Артема Егиазаряна и Виталия Смагина от 20.11.2008 директорам компании «Доралин» Д. Деметриадесу и Х. Деметриадес с указанием о выдаче решения совета директоров компании, уполномочивающего Артема Егиазаряна и Виталия Смагина совместно открыть счет в «Дрезден Банк» и управлять им, а также о выдаче других необходимых документов по формам банка (т. 4 л.д. 198-200);

- письмом Артема Егиазаряна и Виталия Смагина от 11.02.2009 директорам компании «Доралин» Д. Деметриадесу и Х. Деметриадес с указанием о выдаче генеральной доверенности на имя Артема Егиазаряна и Виталия Смагина с правом исключительно совместной подписи (т. 4 л.д. 201-202);

- письмом - соглашением от 18.08.2008 участников компании «Доралин» Виталия Смагина и компании «Калкен» о том, что директора компании получают инструкции и указания от Виталия Смагина и Артема Егиазаряна, при этом данные полномочия участников осуществляются только совместно друг с другом (т. 4 л.д. 203-208);

- протоколом выемки от 01.10.2010 у потерпевшего Смагина В.И. документов в отношении ЗАО «Центурион Альянс», «Доралин», «Тафтс», «Калкен» (т. 5 л.д. 6-12), которые осмотрены 01.10.2010 в установленном порядке (т. 5 л.д. 13-15);

- уставом ЗАО «Центурион Альянс», утвержденный на общем собрании акционеров 27.12.2002, согласно которому ЗАО «Центурион Альянс» создано путем преобразования из ООО «Центурион Альянс»; место нахождения Общества: г. Москва, Кутузовский проспект, д. 39; общее количество акций 2300 номинальной стоимостью 10 000 рублей каждая (п. 4.1), при создании Общества все его акции размещаются среди учредителей – прежних участников ООО «Центурион Альянс» (т. 5 л.д. 46-61);

- учредительным договором и уставом «Тафтс» от 18.09.2006, согласно которым первый зарегистрированный офис компании расположен по адресу: Пасеа Эстейт, Роуд Таун, Тортола, Британские Виргинские острова, первым регистрирующим агентом компании является «Моргэн энд Моргэн Траст Корпорейшн Лимитед»; компания уполномочена осуществлять любой вид деятельности или заключать любые сделки, уполномочена выпустить 10 000 акций одного класса без номинальной стоимости. Компания вправе на основании решения акционеров или директоров вносить изменения в учредительный договор или устав, за исключением того, что на основании решения директоров не могут быть внесены изменения, касающиеся ограничения прав или полномочий акционеров по внесению изменений в учредительный договор и устав; изменения количества акционеров, необходимого для принятия решения акционеров по внесению изменений в учредительный договор или устав; при обстоятельствах, когда акционеры не могут внести изменения в учредительный договор или устав; или пунктов 6, 16.1, 8 или 11. Изменения в учредительный договор или устав вступят в силу после регистрации регистратором уведомления об изменении или новой редакции учредительного договора и устава, поданной зарегистрированным агентом. Согласно п. 2.1 устава компания должна выдать каждому акционеру сертификат, подписанный директором компании или скрепленный печатью с указанием количества акций, которыми он владеет. Согласно п. 8.1. любой директор компании вправе созывать собрания участников компании в то время, таким образом и в том месте, на территории или вне территории Британских Виргинских островов, как директор сочтет необходимым или целесообразным.

При требовании в письменной форме участников, владеющих не менее 30% голосующих акций компании, директоры вправе созвать собрание участников (п. 8.2).

Директор, созывающий собрание, должен направить акционерам и другим директорам уведомление о собрании не менее чем за 7 дней до его проведения (п. 8.3).

Собрание участников является должным образом проведенным, если на момент начала собрания присутствуют собственники не менее 50% голосующих акций (п. 8.12).

Согласно разделу 9 первые директоры компании должны быть назначены первым зарегистрированным агентом в течение 6 месяцев с момента учреждения компании, и впоследствии директоры должны избираться решением акционеров или решением директоров на срок, который определят акционеры или директоры. Минимальное количество директоров – 1, максимальное – 12. Директор может быть смещен с поста согласно решению акционеров на собрании акционеров либо посредством решения в письменной форме, принятого семидесяти пятью процентами акционеров компании.

Согласно разделу 10 директоры имеют все полномочия для управления и руководства деятельностью компании. Каждый директор должен осуществлять свои полномочия в интересах компании (т. 5 л.д. 163-197);

- списком акционеров ЗАО «Центурион Альянс» по состоянию на 01.11.2005, согласно которому Гаркуше Д.В. принадлежит 161 акция (7%), Смагину В.И. – 460 акций (20%), ЗАО «Титул» 299 акций (13%), ЗАО ТД «Уникомимпекс» - 460 акций (20%), ООО «Мерхав» - 460 акций (20%), ООО «Милеа» - 460 акций (20%) (т. 5 л.д. 198-199);

- доверенностью компании «Калкен» от 27.12.2006 на имя Егиазаряна Артема Г., сроком действия один год (т. 5 л.д. 200-206);

- реестром акций компании «Тафтс» по состоянию на 29.09.2008, согласно которому с 18.09.2006 по 04.01.2007 Гаркуша Д. являлся зарегистрированным владельцем 10 000 акций, Смагин В. с 04.01.2007 является зарегистрированным владельцем 2 000 акций, компания «Калкен» с 04.01.2007 – 7300 акций, Д. Гаркуша – 700 акций; с 27.08.2008 Д. Гаркуша более не является владельцем 700 акций; с 27.08.2008 владельцем 700 акций стала компания «ЦентрИнвест Капитал» (Каймановы Острова) (т. 5 л.д. 219-224);

- сертификатом акций компании «Тафтс» от 04.01.2007, согласно которому Виталий Смагин является зарегистрированным владельцем 2000 акций без номинальной стоимости (т. 5 л.д. 225-230);

- договором купли-продажи акций от 26.12.2006, согласно которому продавец – Гаркуша Д.В. передает, а покупатель – Смагин В.И. принимает и оплачивает 2 000 простых именных акций «Тафтс» (сертификат № 1 от 18.09.2006) без номинала, что составляет 20% всех размещенных акций Общества. Стоимость акций, которую покупатель выплачивает продавцу, равна 2000 долларам США (т. 5 л.д. 253-254);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 15.10.2008, согласно которому единственным акционером компании «Доралин» является компания «Тафтс» - 461 000 акций (т. 5 л.д. 261-262);

- протоколом выемки от 12.11.2010, в ходе которой у Смагина В.И. изъяты документы: копия искового производства по иску Смагина В.И. в Арбитражный суд г. Москвы, материалы оценки ТК «Европарк», документы в отношении компаний ЗАО «Центурион Альянс» и «Доралин» (т. 6 л.д. 3-6), которые осмотрены в соответствии с протоколом осмотра документов от 07.01.2011 (т. 6 л.д. 7-11);

- исковым заявлением Смагина В.И. в Арбитражный суд г. Москвы от 02.06.2009, с требованием признания за Смагиным В.И. права собственности на 460 акций ЗАО «Центурион Альянс» и обязать компанию «Доралин» возвратить их Смагину В.И. (т. 6 л.д. 15-17);

- дополнительным соглашением от 02.03.2009 к договору купли-продажи акций от 26.12.2006 между Смагиным В.И. (продавец) и компанией «Доралин» (покупатель) о том, что покупатель не исполнил свое обязательство по оплате продавцу суммы сделки; стоимость акций определена в 9 200 000 руб., которую покупатель выплачивает продавцу в течение трех банковских дней, следующих за датой подписания данного дополнительного соглашения; в случае неисполнения обязанности по оплате договор купли-продажи от 26.12.2006 считается расторгнутым с 31.03.2009; от имени «Доралин» договор подписан Егиазаряном Артемом Г. по генеральной доверенности (т. 6 л.д. 22);

- решением Арбитражного суда г. Москвы от 10.11.2009, согласно которому в иске Смагина В.И. к компании «Доралин» отказано, поскольку, по мнению суда, с учетом условий заключенных сторонами сделок в отношении акций ЗАО «Центурион Альянс» нельзя признать правомерным избранный истцом способ защиты, описанный в просительной части иска (т. 6 л.д. 77-78);

- оценкой рыночной стоимости ТК «Европарк» по состоянию на 01.12.2006, которая составила 150 710 000 долларов США, что эквивалентно 3 964 600 000 руб. по курсу ЦБ РФ на дату оценки (т. 6 л.д. 85-165);

- свидетельством о государственной регистрации права собственности ЗАО «Центурион Альянс» в отношении здания площадью 83 154,6 кв.м. по адресу: г. Москва, Рублевское шоссе, д. 62 (т. 7 л.д. 173);

48

- письменной резолюцией члена компании «Тафтс» - компании «Калкен» в лице директора – компании «Ionics Directors Ltd.» от 25.11.2009 о назначении компании «MPI Law Services Ltd.» (Кипр) директором компании «Тафтс» (т. 7 л.д. 188, 195);

- письменной резолюцией члена компании «Тафтс» - компании «Калкен» в лице директора – компании «Ionics Directors Ltd.» от 25.11.2009 о назначении компании «MPI Law Services Ltd.» (Кипр) секретарем компании «Тафтс» и отстранении от этой должности Памеллы Д. Холл (т. 7 л.д. 189, 199);

- письменной резолюцией члена компании «Тафтс» - компании «Калкен» в лице директора – компании «Ionics Directors Ltd.» от 25.11.2009 об отстранении Артема Егиазаряна с должности директора компании «Тафтс» (т. 7 л.д. 190, 197);

- письменной резолюцией члена компании «Тафтс» - компании «Калкен» в лице директора – компании «Ionics Directors Ltd.» от 25.11.2009 об отстранении В. Смагина с должности директора компании «Тафтс» (т. 7 л.д. 191, 198);

- выпиской из Единого государственного реестра прав на недвижимое имущество и сделок с ним от 28.10.2010, согласно которой ЗАО «Центурион Альянс» является собственником здания площадью 83 154,6 кв.м. по адресу: г. Москва, Рублевское шоссе, д. 62 (т. 8 л.д. 66-67);

- дополнительным соглашением № 2 от 18.11.2008 к договору № 1 от 31.12.2007 между ЗАО «Декорум», в лице генерального директора Гогохии В.Г. и компанией «Longlake Holdings Limited» в лице Э. Ниммо-Смита, в котором стороны подтвердили, что все споры из договора № 1 подлежат разрешению в третейском суде при некоммерческом партнерстве «Российское газовое общество» (т. 8 л.д. 119);

- дополнительным соглашением № 1 от 03.09.2008 к договору № 1 от 31.12.2007 между ЗАО «Декорум», в лице генерального директора Гогохии В.Г. и «ООО Decorum Corp. Ltd.» в лице Ф.-А. Поморски, согласно которому стороны констатировали, что по состоянию на 03.09.2008 общая задолженность ЗАО «Декорум» по договору № 1 от 31.12.2007 составляет 3 496 548 775,28 руб., стороны договорились о замене обязательства на доллары США и ежемесячном начислении процентов в размере 10% годовых, а также разрешение споров отнесено в подведомственности Третейского суда при Некоммерческом партнерстве «Российское газовое общество» (т. 8 л.д. 124-125);

- протоколом выемки от 25.03.2011, в ходе которой у Смагина В.И. изъяты документы в отношении компаний «Декорум», «Хэххем», «Лонглейк», «Блиденсол», ЗАО «Центурион Альянс», «Доралин» и третейского суда при Некоммерческом партнерстве «Российское газовое общество» (т. 8 л.д. 85-90); которые осмотрены в соответствии с протоколом осмотра документов от 07.01.2011 (т. 8 л.д. 170-175);

- письмом - сообщением компании «Доралин» от 31.12.2009 на имя Клочина М.А. о том, что совет директоров ЗАО «Центурион Альянс» в 2008-2009 гг. не избирался, в связи с чем Смагин В.И. не является председателем совета директоров (т. 8 л.д. 137);

- протоколом выемки от 11.05.2012 у Смагина В.И. документов, относящихся к иску Смагина В.И. к Ашоту Егиазаряну и компании «Калкен», рассмотренному Лондонским международным третейским судом (т. 10 л.д. 30-34); которые осмотрены в соответствии с протоколом осмотра документов от 07.01.2011 (т. 10 л.д. 85-87);

- протоколом выемки от 20.03.2015 в ЗАО «Центурион Парк» документов, связанных с рассмотрением Лондонским международным третейским судом иска Смагина В.И. к Ашоту Егиазаряну и компании «Калкен» (т. 12 л.д. 156-160), которые осмотрены 25.03.2015 (т. 13 л.д. 253-257);

- заявлением Смагина В.И. от 24.08.2011 в Лондонский международный арбитражный суд по делу № 101721 против «Калкен» и Ашота Егиазаряна (т. 12 л.д. 161-199);

- отзывом на исковое заявление и ходатайство от имени второго ответчика - Ашота Егиазаряна, поданным компанией «Gibson, Dunn&Crutcher LLP» в Лондонский

международный третейский суд по делу № 101721, в котором второй ответчик – Ашот Егиазарян соглашается организовать продажу 50% доли акций в компании «Европарк» и 40% от продажи отдать Смагину В.И., то есть – 20% от общей доли «Европарка»; если договоренность о цене не будет достигнута, Ашот Егиазарян организует передачу 20% акций «Европарк» Смагину В.И., не отрицая тем самым факт утраты Смагиным В.И. прав на 20% акций ЗАО «Центурион Альянс» (т. 10 л.д. 38-58, 59-73);

- отчетом об оценке ТЦ «Европарк», подготовленным компанией «Cushman and Wakefield LLC» по состоянию на 15.01.2013, согласно которому рыночная стоимость ТЦ «Европарк» на дату оценки составляет 348 700 000 долларов США (т. 12 л.д. 24-81);

- вторым экспертным заключением И. Новиковой от 13.06.2013, представленным в Лондонский международный арбитражный суд по делу № 101721, согласно которому откорректированная оценка общей суммы убытков истца (Смагина В.И.), включая право на получение прибыли и стоимость 20% доли в ЗАО «Центурион Альянс», находится в диапазоне от 85 млн. до 99,5 млн. долларов США (т. 12 л.д. 82-153);

- окончательным решением Лондонского международного третейского суда от 11.11.2014 по делу № 101721 по иску Смагина В.И. (Истец) к компании «Калкен» (Первый Ответчик) и Ашоту Егиазаряну (Второй Ответчик), согласно которому установлено, что в начале 2000-х Истец начал проект по строительству Европарка, торгового центра в Москве, совместно с двумя деловыми партнерами. Строительство комплекса осуществлялась через компанию под названием ООО «Центурион альянс» (далее - «Центурион»), в 2002 году деловые партнеры Истца на тот момент решили выйти из проекта. Истец связался с Ашотом Егиазаряном (Вторым Ответчиком) и г-ном Гаркушей, которые оба были заинтересованы в инвестировании в Европарк.

29 августа 2003 года Истец, Гаркуша и группа из четырех российских компаний (которые, как утверждает Истец, находились под контролем Второго Ответчика) заключили договор (далее - «Договор 2003»). Помимо прочего, данный договор по свидетельствам регулировал порядок распределения прибыли от Европарка/Центуриона.

После заключения Договора 2003 изменился состав директоров Центурион. Стороны договора сотрудничали друг с другом нормальным образом. Строительство Европарка было закончено в мае 2005 года, и он должен был снова открыться в январе 2006 года после неудачного запуска.

Истец заявляет, что Второй Ответчик обратился к нему в 2006 году с просьбой использовать Европарк в качестве обеспечения по кредиту, который Второй Ответчик пытался получить в Дойче Банке для целей финансирования реконструкции отеля в Москве (Отель Москва).

Истец также утверждает, что Второй Ответчик заверил его, будто цена сделки по Отелю Москва была значительной и реальные риски нарушения кредитного договора с Дойче Банком отсутствовали. Истец согласился на использование своих акций в компании Центурион в качестве обеспечения по кредиту Дойче Банка.

Для осуществления этого была изменена структура владения Европарком в соответствии с указаниями Дойче Банка. Компания Центурион была передана во владение компании «Доралин», зарегистрированной на Кипре, которая в свою очередь принадлежала компании «Тафтс», зарегистрированной на Британских Виргинских Островах. Акционерами компании Тафтс являлись Первый Ответчик (который, по утверждению Истца, находится под контролем Второго Ответчика) с 73% акций, Истец с 20% акций и Гаркуша с 7% акций, таким образом, отражая их доли участия в Центурионе.

Истец заявил, что Второй Ответчик использовал Первого Ответчика для того, чтобы обойти ограничения, накладываемые на Второго Ответчика как на депутата Государственной Думы Российской Федерации. Это оспаривается Вторым Ответчиком.

26 декабря 2006 года Истец, Гаркуша и Первый Ответчик заключили Акционерное соглашение по компании Тафтс.

50

По словам Истца, Акционерное соглашение было направлено на защиту доли владения Истца в Европарке в случае невыплаты кредита в течение года, как обещал Второй Ответчик. Более того, чтобы предоставить Истцу обеспечение, стороны договорились, что принадлежащая Первому Ответчику доля в акциях компании Тафтс должна быть помещена в эскроу в Дойче Банке в порядке, установленном Договором эскроу, подписанным акционерами компании Тафтс и банком. В случае невозврата Вторым Ответчиком кредита на Отель Москва у Истца возникло бы право на акции в эскроу.

По утверждению истца, Акционерное соглашение и Договор эскроу обеспечивали получение Истцом акций Тафтс, находящихся в эскроу, право Истца продать данные акции (а также акции компании Центурион и/или Европарк) для погашения кредита Дойче Банку и возврата своих вложений. Истец заверил, что какие-либо излишние суммы по результатам такой продажи были бы выплачены Первому Ответчику, который также подвергался риску недополучения платежей, а если суммы, полученные от продажи акций в эскроу, оказались бы недостаточны для выплаты кредита и вложений Истца, от Второго Ответчика потребовалось бы компенсировать разницу Истцу.

Истец заявил, что вскоре после подписания Акционерного соглашения и Договора эскроу ему стало известно, что Первый Ответчик не поместил акции компании Тафтс в эскроу. Истец также указал, что в течение последующих лет Второй Ответчик неоднократно обещал ему сохранность доли владения Истца в Европарке. Более того, Истец заявил, что он заключил обеспечительное соглашение со Вторым Ответчиком, который, в частности, делал различные обещания и заявления, и в соответствии с данным соглашением Второй Ответчик принимал на себя обязательство защищать и сохранять долю владения Истца в Европарке, обеспечивая следующее: (a) что Истец сможет получить акции компании Тафтс, и (b) что состав собственников и структура владения Европарка останутся неизменными, то есть, что компания Тафтс останется владельцем Европарка. Ответчики оспаривают наличие обязательства, подразумеваемого или выраженного иным образом, сохранять структуру владения Европарка.

В 2008 году кредит Дойче Банку не был погашен и акции Тафтс не были помещены в эскроу. После того, как Истец выразил свое беспокойство, он предложил, чтобы они со Вторым Ответчиком заключили соглашение о сотрудничестве 3 марта 2008 года (далее - «Договор 2008»). Второй Ответчик возразил, что Договор 2008 не имеет обязательной силы и что его подпись на документе, который был представлен Истцом, была подделана. По утверждению Истца, поскольку Второй Ответчик не мог погасить кредит на тот момент. Истец согласился продолжать предоставлять Европарк (через свои акции в компании Тафтс) в качестве обеспечения по кредиту в обмен на увеличение доли участия Истца в компании Тафтс до 50%.

20 ноября 2009 года в устав компании Тафтс было внесено изменение таким образом, чтобы смещение директора стало возможным простым большинством голосов. До этого, в соответствии с уставом требовалось большинство в 75%. Истец был смещен с должности директора компании Тафтс и заменен компанией МПХ Ло Сервисез.

В начале 2010 года компания Тафтс продала принадлежащие ей акции компании Доралин в пользу компаний «Мастеро» и «Фамулатус». Истец заявил, что в результате данной продажи он утратил свою долю владения в Европарке и свой контроль над ним. Истцу по-прежнему принадлежат его акции в компании Тафтс.

Позиция Истца основывается, главным образом, на четырех аргументах: Договор 2003, Акционерное соглашение, Договор эскроу и Договор 2008.

Истец заявил, что Ответчики принимали активное участие в незаконном присвоении доли владения Истца в Европарке и не совершили платежи в пользу Истца, предусмотренные Договором 2003.

Истец заявил, что в соответствии с Акционерным соглашением и Договором эскроу: (i) Первый Ответчик (от лица Второго Ответчика) должен был поместить акции

компании Тафтс на счет эскроу в Дойче Банке, (ii) Ответчики были обязаны в любой момент времени обеспечивать сохранность, безопасность и защиту доли участия Истца, и (iii) Истец получил право требовать передачи ему Дойче Банком принадлежащих Первому Ответчику акций компании Тафтс, если обременения, установленные в результате залога Европарка и акций компании Доралин, не будут сняты к 13 декабря 2008 года. Кроме того, Истец заявил, что Ответчики были косвенным образом обязаны и по Акционерному соглашению, и по Договору эскроу обеспечить сохранение состава собственников и структуры владения Центуриона и Европарка. При отсутствии Европарка в качестве актива акции компании Тафтс не имели бы какой-либо ценности. Истец также заявил, что Второй Ответчик неоднократно заверял его, что его доля владения в Европарке будет сохранена. Истец высказал аргумент, что Первый и Второй Ответчики несут солидарную ответственность. По утверждению Истца, Первый Ответчик действовал в качестве агента Второго Ответчика и оба Ответчика несут ответственность, поскольку Первый Ответчик не только выступал в качестве агента, но также играл существенную роль как законный владелец акций компании Тафтс.

Первый Ответчик высказал аргумент, что его действующие руководители не играли какой-либо роли в предполагаемом незаконном присвоении доли владения Истца в Европарке и, следовательно, не несут за это ответственности. Продажа акций компании Доралин осуществлялась компанией Тафтс, а не Первым Ответчиком. Первый Ответчик также заявил об отсутствии подразумеваемого обязательства сохранять структуру владения и состав собственников Европарка. Первый Ответчик не играл никакой роли в продаже акций компании Доралин     и никогда не имел возможности передать акции компании Тафтс в эскроу, поскольку Истец не открыл счет эскроу.

Второй Ответчик заявил, что у Третейского суда отсутствует подсудность в отношении него, поскольку он не является стороной ни Акционерного соглашения, ни Договора эскроу. Второй Ответчик никогда не являлся конечным собственником-бенефициаром акций Первого Ответчика.

Истец заявил, что Договором 2008 установлено следующее: (i) обязательство обеспечить сохранение структуры владения и состава собственников Центуриона и Европарка, (ii) обязательство в любой момент обеспечивать сохранность и защиту доли участия Истца, (iii) обязательство соблюдать условия Акционерного соглашения и Договора эскроу, (iv) обязательство организовать передачу акций Первого Ответчика в эскроу в соответствии с Акционерным соглашением, Договором эскроу и Договором 2008, (v) гарантию о том, что документы по компаниям Тафтс и Доралин могут быть оформлены исключительно Истцом и Вторым Ответчиком, действующими совместно, и (vi) обязательство перечислить Истцу причитающуюся ему прибыль по Договору 2003. Кроме того, Истец заявил, что у Второго Ответчика были обязанности доверенного лица по всем соглашениям и в связи с взаимодоверительными отношениями сторон. Истец также заявил, что у него со Вторым Ответчиком было совместное обязательство по строительству Европарка, что приводит к возникновению доверительного обязательства соблюдать лояльность. Кроме того, в соответствии с Договором 2008 доля участия Истца в Европарке увеличивалась до 50%.

Истец заявил, что Первый Ответчик и Второй Ответчик нарушили свои обязательства по Акционерному соглашению, Договору эскроу и Договору 2008, а также организовали сложный сговор с целью незаконного присвоения доли владения Истца в Европарке путем совершения следующих действий:

- невыплата Истцу сумм, связанных с прибылью, по Договору 2003;

- непередача акций компании Тафтс на счет эскроу, как предусмотрено в соглашении;

- неустранение обременений в отношении заложенных акций;

- изменение в одностороннем порядке структуры владения и состава собственников Европарка путем осуществления передачи акций Центуриона от компании Доралин в пользу двух номинальных Кипрских компаний;

- изменение устава компании Тафтс и принятие решений, инициированных Вторым Ответчиком, чтобы компания Тафтс могла продать принадлежащие ей акции Доралин в пользу других компаний; и

- заключение Вторым Ответчиком сделки с группой Ташир с целью получения контроля над Центурионом и Европарком и полного исключения участия Истца.

Второй Ответчик заявил, что его подпись на Договоре 2008 была подделана. В доказательство данного заявления Второй Ответчик привел экспертное заключение д-ра Гуса Лесневича о том, что данная подпись была подделана.

Истец требует выплаты компенсации за (i) свою долю владения в Центурионе и Европарке (И) и свои заявленные права на прибыль, полученную Европарком, в соответствии с положениями Договора 2003. Истец и Второй Ответчик представили заключения экспертизы по расчету заявленных убытков Истца.

Истец заявил, что утверждение Второго Ответчика о том, что он не мог согласно любой теории причинить более половины заявленного ущерба, в связи с тем, что компания Мастеро получила лишь половину акций компании Доралин и что продажа в пользу компании Фамулатус осуществилась лишь после приобретения группой Ташир контроля над Первым Ответчиком, неверно. По утверждению Истца, продажа осуществлялась Первым Ответчиком, но была инициирована Вторым Ответчиком, а кроме того, непосредственное владение компанией Фамулатус не относится к данному вопросу.

На основании представленных доказательств, Третейский суд установил, что Второй Ответчик не смог доказать, что подпись на Договоре 2008 не является подлинной. Бремя доказательства утверждения о фальсификации лежит на стороне, которая делает такое утверждение. Второй Ответчик не представил требуемые доказательства. Третейский суд установил, что подпись Второго Ответчика на Договоре 2008 не была подделана.

Истец придерживается мнения, что Второй Ответчик принял на себя обязательства по соблюдению условий Акционерного соглашения и Договора эскроу. В связи с этим, он также обязался, по словам Истца, обеспечить передачу своих акций в Первом Ответчике в эскроу в соответствии с Акционерным соглашением и Договором эскроу.

В результате анализа Статей 2.1, 2.2 и 2.10 Договора 2008 Третейский суд поддерживает доводы Истца о том, что это были обязательства Второго Ответчика.

Истец заявил, что Договор 2008 обязал Второго Ответчика беречь, защищать и сохранять в любой момент времени долю владения Истца, а также обеспечить, что состав собственников и структура владения компаний Центурион и Европарк должны сохраняться таким образом, что Истец через свое владение долей в компании Тафтс сохраняет стоимость своей доли в компании Европарк.

Поскольку в Договоре 2008 отсутствуют какие-либо явные условия, устанавливающие данные обязательства, Истец придерживается позиции, что данные обязательства происходят из подразумеваемых условий договора. По мнению Истца, основной целью Договора 2008 является защита и сохранение его доли владения в компании Европарк. Для того, чтобы придать договору действительность и обеспечить достижение этой цели, было необходимо сохранить состав собственников и структуру владения компания Европарк.

На основании доказательств, представленных Третейскому суду, включающих, в частности, свидетельские показания Истца, Третейский суд убежден в том, что целью Акционерного соглашения и Договора эскроу была защита состава собственников и структуры владения компании Европарк, а, следовательно, и интересов акционеров компании Тафтс, которая являлась конечным косвенным владельцем Европарка.

Третейский суд также удостоверился в том, что Договор 2008 был направлен на защиту доли владения Истца в компании Европарк. Это следует из анализа Статьи 1 Преамбулы Договора 2008, в которой подробно раскрывается структура распределения акций и состав акционеров, а также Статей 2.1-2.4 и 2.10. Этот вывод также подкрепляется ссылкой в Статье 2.10 на Статью 2.1.5 Акционерного соглашения, которая, в свою очередь, ссылается на Статью 5 данного договора, которая, в свою очередь, зависит от структуры владения и распределения акций, раскрываемой во вводной части Акционерного соглашения.

Во-первых, Второй Ответчик возразил, что Истец не может установить причинно - следственную связь с возникновением своего ущерба. Второй Ответчик утверждает, что Истец не понес какого-либо ущерба, поскольку ему по-прежнему принадлежат 20% в составе компании Центурион. Однако, в 2010 году структура распределения акций и состав акционеров были коренным образом изменены, так что принадлежащие Истцу акции в компании Тафтс обесценились. Как выше отметил Третейский суд, сохранение состава собственников и структуры владения компании Европарк было подразумеваемым условием Договора 2008, а также Акционерного соглашения и Договора эскроу. В Договоре 2008 Второй Ответчик подтвердил, что он контролировал 73 процента акций компании Тафтс, включая акции, принадлежащие Первому Ответчику. В этом качестве Второй Ответчик побудил Первого Ответчика совершить необходимые действия для передачи акций в компании Доралин в пользу компаний Фамулатус и Мастеро. Такие действия включали в себя изменение Устава компании Тафтс и смещение Истца с поста директора компании Тафтс. Тем самым, Второй Ответчик нарушил свои обязательства по Договору 2008, Статьи 2.3 и 2.4.

Во-вторых, Ответчик также возразил, что он не причинил Истцу предполагаемый ущерб, поскольку отсутствовало досрочное взыскание суммы Кредита или обращения взыскания по Акционерному соглашению и Договору эскроу. Статья 2.10 Договора 2008 относится к праву Истца на принудительное исполнение своих прав по Статье 9.1.5 Акционерного соглашения. В соответствии с этим положением. Истец был вправе потребовать передачи ему принадлежащих Первому Ответчику акций в компании Тафтс (которые предполагалось поместить в эскроу) и продать данные акции, при условии если Кредит не был возвращен и Обременения не были сняты. Кредит не был выплачен, а Обременения не были сняты, при этом акции в компании Тафтс так и не были помещены в эскроу. Соответственно Истец был лишен возможности продать акции Тафтс. Второй Ответчик, таким образом, не осуществил действия, которые он должен был осуществить в соответствии с Договором 2008, Статьи 2.1 и 2.2.

В-третьих, Второй Ответчик придерживается мнения, что он причинил Истцу не более половины заявленного ущерба. Этот аргумент основывается на том, что Второму Ответчику принадлежит только компания Мастеро, которая приобрела половину акций в компании Доралин, а осуществление передачи акций Тафтс в пользу компании Фамулатус произошло только после приобретения группой Ташир контроля над Первым Ответчиком. Как упоминалось выше, Третейский суд установил, что Второй Ответчик побудил Первого Ответчика совершить действия, ведущие к продаже акций Тафтс. Эти действия включали в себя смещение Истца с должности директора компании Тафтс и замена его другим директором, компанией МПХ Ло (MPH Law), которая и осуществила продажу акций. Любые убытки, которые мог понести Истец, были, таким образом, вызваны нарушением Договора 2008 со стороны Второго Ответчика.

В-четвертых, Второй Ответчик настаивает, что его действия были нацелены на защиту и охрану Европарка. Третейский суд не нашел какого-либо подтверждения или уточнения такого утверждения в материалах по делу, представленных Вторым Ответчиком.

Третейский суд установил, что Второй Ответчик нарушил Договор 2008. На основании этих данных отсутствует необходимость для Третейского суда определять, являлся ли Второй Ответчик стороной Акционерного соглашения и Договора эскроу.

Третейский суд отметил, что обязанность передать акции в эскроу лежала именно на Первом Ответчике. Первый Ответчик не может ссылаться на собственное нарушение обязательств в поддержку того аргумента, что рассматриваемые соглашения были отменены.

В соответствии с правом Англии, совершенно очевидно, что для того, чтобы доказать факт отказа от действующего договора, сторона, заявляющая об этом, должна доказать взаимное согласие на такой отказ. Такое взаимное согласие может быть прямо выраженным или подразумеваемым.

Первый Ответчик не смог доказать наличие какого-либо явно выраженного взаимного согласия, при этом такое согласие не следует из фактов дела. Истец показал, что он неоднократно и регулярно просил Первого Ответчика, равно как и Второго Ответчика, обеспечить передачу акций Тафтс в эскроу. Благодаря этому, Первый Ответчик должен был безусловно понять, что Истец настаивал на исполнении Первым Ответчиком своих обязательств по Акционерному соглашению и Договору эскроу.

По вышеуказанным причинам Третейский суд установил, что рассматриваемые соглашения не были отменены.

В-четвертых, Первый Ответчик отрицал какую-либо свою роль в передаче акций Тафтс или ответственность за нее. Несмотря на то, что ему принадлежит 73 процента акций Тафтс, он отрицает свою роль в продаже принадлежащих компании Тафтс акций в компании Доралин в пользу компаний Фамулатус и Мастеро. Первый Ответчик отрицает, что он одобрял какие-либо такие сделки.

На основании последовательности событий, которая перевела к такой продаже акций, Третейский суд установил, что Первый Ответчик принимал активное участие в данной сделке.

Хронология событий следующая:

8 сентября 2008 года Истец был назначен на должность директора компании Тафтс;

В соответствии с Уставом компании Тафтс в первоначальной редакции от 18 сентября 2006 года для смещения директора с должности требовалось 75% голосов акционеров. Это минимальное количество голосов означало, что Первый Ответчик (73% акций Тафтс) должен был голосовать совместно с Истцом (20% акций) и/или г-ном Гаркушей (7% акций) для смещения директора;

23 ноября 2009 года Первый Ответчик изменил Устав компании Тафтс от 2006 года без ведома Истца таким образом, что минимальное количество голосов для смещения директора было сокращено с 75% до 50% акций. Это означало, что в соответствии с Уставом компании Тафтс в редакции 2009 года Первый Ответчик мог единолично сместить г-на Смагина с поста директора Тафтс; через два дня после внесения изменений в Устав компании Тафтс от 2006 года, 25 ноября 2009 года, Первый Ответчик в одностороннем порядке принял решение о смещении Истца с должности директора компании Тафтс, не уведомив об этом Истца;

Также, в соответствии с Уставом компании Тафтс в редакции 2009 года директора Тафтс, действуя совместно, были уполномочены одобрить сделку по продаже активов Тафтс. Это позволило Первому Ответчику после смещения Истца назначить единоличным директором подконтрольное ему юридическое лицо (под непосредственным руководством Второго Ответчика) и, таким образом, вывести из компании Тафтс все ее активы в одностороннем порядке;

В результате смещения Истца с должности директора компании Тафтс, его согласие больше не требовалось для одобрения продажи компанией Тафтс принадлежащих компании Тафтс акций в компании Доралин в пользу компаний Мастеро

55

и Фамулатус;

25 ноября 2009 года Первый Ответчик назначил компанию МПХ Ло Сервисез Лимитед (MPH Law Services Limited) (далее - «МПХ Ло») единоличным директором компании Тафтс. Компания МПХ Ло, по собственному утверждению Второго Ответчика, находится под его контролем. Таким образом, в результате этих действий вся деятельность компании Тафтс, включая полномочия по продаже принадлежащих компании Тафтс акций в компании Доралин, оказалась под контролем Второго Ответчика;

16 января 2010 года и 13 апреля 2010 года компанией Тафтс было принято решение о продаже принадлежащих компании Тафтс акций в компании Доралин в пользу компаний Мастеро и Фамулатус. В результате данной сделки доля владения Истца в Центурионе/Европарке была незаконным образом присвоена.

Принимая таким образом участие в продаже акций, Первый Ответчик нарушил лежащее на нем подразумеваемое обязательство поддерживать и не нарушать состав собственников и структуру владения Европарка. Как Третейский суд отметил выше, это условие подразумевалось в Договоре 2008, а также в Акционерном соглашении и Договоре эскроу. Первый Ответчик нарушил свои обязательства по Акционерному соглашению и Договору эскроу.

Третейский суд установил, что Второй Ответчик нарушил свои обязательства по Договору 2008, а Первый Ответчик нарушил свои обязательства по Акционерному соглашению и Договору эскроу. Нарушение каждого из них относится к одним и тем же событиям, а именно, продаже принадлежащих компании Тафтс акций в компании Доралин в пользу компаний Фамулатус и Мастеро, в результате чего была утрачена доля владения Истца в Европарке. Первый и Второй Ответчики оба несут ответственность за какие-либо убытки, понесенные Истцом. Первый Ответчик и Второй Ответчик оба принимали активное участие в рассматриваемых событиях. Следовательно, они должны нести солидарную ответственность.

Согласно резолютивной части решения суда, в том числе установлено, что

компания Калкен Холдингз Лимитед и Ашот Егиазаряи должны солидарно выплатить Виталию Ивановичу Смагину сумму в размере 72 243 000 долларов США в качестве компенсации за причиненные убытки;

компания «Калкен» и г-н Ашот Егиазарян должны солидарно выплатить проценты, начисленные на сумму в размере 72 243 000 долларов США по простой ставке 7 процентов годовых, начиная с 1 июля 2013 года до даты настоящего Решения, в размере 6 899 701,32 долларов США;

компания «Калкен» и Ашот Егиазарян должны солидарно выплатить проценты, начисленные на сумму в размере 72 243 000 долларов США, а равно и на сумму начисленных процентов в соответствии с пунктом 3 выше, начиная с даты настоящего Решения до даты платежа, по сложной ставке 8 процентов годовых, исчисленных на ежеквартальной основе (т. 94 л.д. 85-181);

- решением Лондонского международного третейского суда от 09.01.2015 по делу № 101721 по иску Смагина В.И. к компании «Калкен» и Ашоту Егиазаряну, об исправлении арбитражного решения в соответствии со статьей 27.1 регламента ЛМТС 1998 г. в части технических ошибок (т. 94 л.д. 182-189);

- реестром директоров компании «Тафтс», согласно которому с 18.09.2006 до 22.12.2008 директорами компании являлись Луис а. Дэвис и Памела Д. Холл, с 08.09.2008 до 25.11.2009 директорами были Смагин В.И. и Егиазарян Артем, с 25.11.2009 директором стала компания «MPH Law Services Ltd.» (т. 14 л.д. 174,179);

- реестром акций компании «Тафтс», из которого следует, что Д. Гаркуша с 18.09.2006 по 04.01.2007 являлся собственником 10 000 акций (т. 14 л.д. 175-178, 180-183);

56

- протоколом выемки от 14.10.2010 у свидетеля Гаркуши Д.В. документов отношении гостиницы «Москва», ЗАО «Декорум», ОАО «Инвест-Центр», «Блиденсол ОАО «ДекМос», «Даев Плаза», ЗАО «Центурион Альянс», «Калкен», «Тафтс», «Хекхем «Centerinvest», «Хэмфест» (т. 15 л.д. 36-43), которые осмотрены 15.10.2010 (т. 15 л.д. 44 52);

- декларацией об учреждении доверительной собственности от 02.10.2006 отношении компании «Блиденсол» (т. 15 л.д. 130);

- генеральной доверенностью компании «Блиденсол» на имя           Гаркуши Д.В от 19.09.2007 сроком на 1 год (т. 15 л.д. 142-143);

- протоколом № 01/12 общего собрания акционеров ЗАО «Центурион Альянс» о 25.12.2006, согласно которому единогласным решением акционеров: ЗАО «Титул» (33%) ООО «Милеа» (20%), ЗАО «ТД «Уникомимпекс» (20%), Смагиным В.И. (20%), Гаркуше Д.В. (7%), одобрено заключение Обществом и «Дойче Банком» договора уступки прав п договорам страхования МТК «Европарк» и ответственности Общества за ущерб причиненный третьим лицам – посетителям МТК «Европарк»; договора залога прав п банковским счетам Общества в ЗАО «Республиканский банк»; договора уступки прав п договорам аренды МТК «Европарк»; договора субординирования долговых обязательств между Обществом, «Блиденсол», «Тафтс», «Доралин», «Дойче Банком» (т. 15 л.д. 160-161);

- договором купли-продажи акций между Гаркушей Д.В. (Продавец) и В. Гогохией (Покупатель) в отношении акций компании «Хекхем» от 27.01.2009, согласно которому 10 000 акций компании (100%) продаются за 1 000 долларов США (т. 15 л.д. 192-200);

- договором купли-продажи акций между Гаркушей Д.В. (Продавец) и В. Гогохией (Покупатель) в отношении акций компании «Хамфаст» от 01.02.2008, согласно которому компания «Хамфаст» является собственником 100% акций компании «Блиденсол», в обмен на действительное и ценное вознаграждение Продавец продает Покупателю 100% акций компании «Хамфаст». В оплату за проданные акции Покупатель уплачивает продавцу 1 000 000 долларов США (т. 15 л.д. 233-244);

- договором № 1 от 08.12.2006 между ЗАО «Центурион Альянс» в лице генерального директора Клочина М.А. и «Блиденсол» в лице представителя по доверенности – Гаркуши Д.В., согласно которому стороны констатируют наличие у ЗАО «Центурион Альянс» обязательства перед «Блиденсол» по возврату 1 495 512 541,88 руб.; стороны договариваются о прекращении данного обязательства путем его замены на новое обязательство – сумма займа 1 399 963 530 руб., процентная ставка 1% годовых (т. 16 л.д. 18-21);

- декларацией об учреждении доверительной собственности от 01.02.2008 в отношении компании «Хамфаст», согласно которой В. Гогохия признает и заявляет, что является номинальным держателем акций компании «Хамфаст» в интересах действительного владельца – Артема Егиазаряна (т. 17 л.д. 42);

- электронным сообщением В. Макшанцева (victor.makshantsev@db.com) на электронный адрес garkusha@daevnet.ru от 17.08.2006 с приложением описания сделки по Москве, предложенного «нашими структураторами» (т. 18 л.д. 130, 152);

- электронным сообщением В. Макшанцева victor.makshantsev@db.com на адрес garkusha@daevnet.ru от 27.10.2006 о направлении документации по протоколу о намерениях в отношении отеля «Москва» (т. 18 л.д. 131, 154);

- соглашением о конфиденциальности и эксклюзивности в отношении предполагаемой сделки от 27.10.2006 (проект), согласно которому «Дойче Банк» и ОАО «ДекМос» желают задокументировать конфиденциальные и эксклюзивные условия о том, что они будут работать в отношении предполагаемой сделки, как описано в протоколе о намерениях, прилагаемому к данному документу; согласно схеме под названием «Структура сделки» - ТК «Европарк» находится в собственности ЗАО «Центурион

Альянс», 100% которого принадлежат компании специального назначения на БВО, 100% которой в свою очередь принадлежат второй специальной компании на БВО; акции компаний и сам торговый комплекс подлежат залогу (т. 18 л.д. 155-184);

- протоколом выемки от 19.11.2010 в ИФНС России № 30 по г. Москве юридического, регистрационного, финансового и учетного дела ЗАО «Центурион Альянс» (т. 21 л.д. 11-29); которые осмотрены в соответствии с протоколами 24.12.2010 (т. 30 л.д. 85-137), 24.12.2010 (т. 30 л.д. 138-154), 27.12.2010 (т. 30 л.д. 155-180);

- протоколом № 25/12 общего собрания акционеров ЗАО «Центурион Альянс» от 25.12.2006, согласно которому единогласным решением акционеров: ЗАО «Титул» (33%), ООО «Милеа» (20%), ЗАО «ТД «Уникомимпекс» (20%), Смагиным В.И. (20%), Гаркушей Д.В. (7%) утверждена новая редакция устава ЗАО «Центурион Альянс» (т. 21 л.д. 74);

- протоколом № 01/11 общего собрания акционеров ЗАО «Центурион Альянс» от 01.11.2005, согласно которому единогласным решением акционеров на должность генерального директора Общества назначен Клочин М.А. (т. 21 л.д. 92);

- свидетельством о государственной регистрации юридического лица, согласно которому 21.03.2003 в единый государственный реестр юридических лиц внесена запись о создании ЗАО «Центурион Альянс» (т. 21 л.д. 175);

- выпиской из Единого государственного реестра юридических лиц от 21.03.2003 в отношении ЗАО «Центурион Альянс» (т. 21 л.д. 177-183);

- протоколом № 1/12 от 27.12.2002 общего собрания участников ООО «Центурион Альянс», согласно которому участники Общества единогласно приняли решение о преобразовании Общества в ЗАО, с ЗАО размещаются путем их пропорционального обмена на доли участников преобразуемого ООО, в результате чего ЗАО «Титул» получает 18% акций, ООО «Милеа» - 20%, ООО «ТД «Уникомимпекс» - 20%, ООО «Мерхав» - 20%, Смагину В.И. – 22% (т. 21 л.д. 198-202);

- договором о преобразовании (о создании путем реорганизации) от 27.12.2002, в соответствии с которым участники ООО «Центурион Альянс» – ЗАО «Титул», ООО «Милеа», ООО «ТД «Уникомимпекс», ООО «Мерхав», Смагин В.И. договорились преобразовать Общество в ЗАО «Центурион Альянс» (т. 21 л.д. 203-205);

- договором новации № 9 от 30.09.2009 между ЗАО «Центурион Альянс» и ООО «Даев Плаза», согласно которому стороны констатируют наличие у ЗАО «Центурион Альянс» перед ООО «Даев Плаза» обязательства оплатить не позднее 30.09.2009 сумму займа в размере 37 млн. руб. и проценты, указанное обязательство заменяется на новое – выписать и передать ООО «Даев Плаза» собственный простой вексель, на сумму 50 044 721,41 руб. со сроком платежа – по предъявлении; со стороны ЗАО «Центурион Альянс» договор подписан генеральным директором Клочиным М.А., со стороны ООО «Даев Плаза» - генеральным директором Фитисовым Д.А. (т. 27 л.д. 255-256);

- дополнительным соглашением № 1 от 03.12.2008 к договору № 1 от 08.12.2006 между ЗАО «Центурион Альянс» в лице генерального директора Клочина М.А. и «Блиденсол» в лице представителя по доверенности Гогохия В.Г., согласно которому стороны договорились установить следующий размер процентной ставки – с 01.06.2008 – 12,5 % на сумму долга 1 082 963 530 руб. (т. 28 л.д. 226-227);

- дополнительным соглашением № 2 от 04.12.2008 к договору № 1 от 08.12.2006 между ЗАО «Центурион Альянс» в лице генерального директора Клочина М.А. и «Блиденсол» в лице представителя по доверенности Гогохия В.Г. о замене валюты денежных обязательств на доллары США (т.28 л.д. 228-230);

- дополнительным соглашением № 3 от 30.12.2008 к договору № 1 от 08.12.2006 между ЗАО «Центурион Альянс» и «Блиденсол», согласно которому стороны договорились установить с 01.01.2009 новый размер процентной ставки - 22,5% годовых (т. 7 л.д. 176);

- договором № 1 от 31.12.2007 между ЗАО «Декорум» в лице первого заместителя генерального директора Павлюченко Е.В. и компанией «Хэкхем» в лице поверенного

58

Гогохия В.Г., действующего на основании доверенности от 31.10.2005, в котором стороны констатируют наличие у ЗАО «Декорум» задолженности в размере 134 849 918,09 долларов США, вытекающей из договоров займа, заключенных за период с 03.09.2003 по 03.08.2007, стороны договариваются о прекращении новацией обязательства ЗАО «Декорум» оплатить компании «Хекхем» денежной суммы в рублях (т. 8 л.д. 91-94);

    - договором уступки № 1 от 01.09.2008 между «Хекхем» (Цедент) в лице Гогохия В.Г. и «ООО Decorum Corp. Ltd.» (Правопреемник) в лице Ф.А. Поморски, в котором констатируется, что 31.12.2007 «Хекхем» и ЗАО «Декорум» (Заемщик) заключили договор займа № 1, Заемщик получил в качестве займа 2 763 458 785,91 руб. По настоящему договору Цедент - «Хекхем» передает Правопреемнику - «ООО Decorum Corp. Ltd.» все свои права и обязательства по договору займа № 1 от 31.12.2007, а Правопреемник выплачивает Цеденту 14 217 756 долларов США в срок не позднее 31.12.2020 (т. 8 л.д. 101-106);

    - протоколом выемки от 05.06.2012 в ЗАО «Республиканский банк» помимо прочего юридических дел ЗАО «Центурион Альянс», ООО «Мерхав», ЗАО «Титул», ЗАО «ТД «Уникомимпекс» (т. 30 л.д. 269-277), которые осмотрены 31.07.2012 (т. 30 л.д. 278-282);

    - протоколом обыска от 01.12.2010, в ходе которого в ЗАО «Центурион Альянс» изъяты документы, касающиеся строительства, ввода в эксплуатацию, использования нежилых помещений ТК «Европарк», а также бухгалтерские, учредительные и регистрационные документы ЗАО «Центурион Альянс» (т. 31 л.д. 5-16); которые осмотрены 27.12.2010 (т. 35 л.д. 1-41, т. 35 л.д. 42-73); 24.01.2011 (т. 35 л.д. 74-89);

    - выпиской из единого государственного реестра прав на недвижимое имущество и сделок с ним от 11.10.2006 (т. 31 л.д. 17-20);

    - приказом № 15-л от 01.11.2005 генерального директора ЗАО «Центурион Альянс» Клочина М.А., согласно которому он приступает к выполнению обязанностей генерального директора данного юридического лица с 01.11.2005 в соответствии с решением общего собрания акционеров (т. 31 л.д. 77);

    - протоколом обыска от 01.12.2010, в ходе которого в ЗАО «Центурион Альянс» изъяты документы, касающиеся строительства, ввода в эксплуатацию, использования нежилых помещений ТК «Европарк», а также бухгалтерские, учредительные и регистрационные документы ЗАО «Центурион Альянс» (т. 36 л.д. 3-26); которые осмотрены 27.12.2010 (т. 40 л.д. 1-131), 11.01.2011 (т. 40 л.д. 132-229);

    - актом приемки комиссии от 27.05.2005 законченного строительством объекта – многофункционального торгового комплекса по адресу: г. Москва, Рублевское шоссе (д. Екатериновка), вл. 62 (т. 36 л.д. 103-109);

    - письмом Смагина В.И. от 16.04.2010 Егиазаряну Артему Г. с просьбой на основании договора купли-продажи от 26.12.2006 и дополнительного соглашения к нему от 02.03.2009 вернуть акции ЗАО «Центурион Альянс» в количестве 460 штук и дать соответствующее распоряжение ЗАО «Регистраторское общество «Статус» о внесении записи в реестр акционеров (т. 36 л.д. 111);

    - договором купли-продажи акций от 26.12.2006, согласно которому Смагин В.И. (Продавец) передает, а «Доралин» в лице Гаркуши Д.В. (Покупатель) принимает и оплачивает 460 простых именных бездокументарных акций ЗАО «Центурион Альянс» номинальной стоимостью 10 000 рублей каждая (т. 37 л.д. 83-87);

    - договором ипотеки в отношении ТК «Европарк» и прав аренды на земельный участок по адресу: г. Москва, Рублевское шоссе, д. Екатериновка, от 15.12.2006, заключенным между «Дойче Банк АГ» (залогодержатель) и ЗАО «Центурион Альянс» (залогодатель), согласно Кредитному договору от 06.10.2006 между компанией «Блиденсол» (Заемщик) и Залогодержателем, последний согласен предоставить заемщику кредит под обеспечение на общую сумму до 100 млн. долларов США на срок в 10 лет, залогодатель согласен заложить ТК «Европарк» и право аренды земельного участка в

качестве обеспечения должного и точного исполнения Заемщиком своих обязательств (т. 37 л.д. 194-237);

- отчетом № 26/2009 об определении рыночной стоимости объектов основных средств ЗАО «Центурион Альянс», согласно которому рыночная стоимость объектов основных средств, за исключением здания ТК «Европарк», по состоянию на 30.09.2009 с учетом допустимого округления составляет 216 млн. 400 тыс. руб. (т. 38 л.д. 1-243);

- списком акционеров от 10.02.2009 ЗАО «Центурион Альянс», удостоверенному регистратором – ЗАО «Регистраторское общество «Статус», согласно которому на личном счете номинального держателя – «Дойче Банк» числятся 2 300 штук акций (100%) ЗАО «Центурион Альянс», в чьих интересах осуществляется номинальное владение в документе не указано (т. 39 л.д. 6);

- списком лиц от 30.06.2008, имеющих право на участие в годовом общем собрании акционеров ЗАО «Центурион Альянс», согласно которому единственным владельцем 2300 штук акций (100%) ЗАО «Центурион Альянс» является компания «Доралин» (т. 39 л.д. 10);

- рыночной оценкой стоимости ТК «Европарк» по состоянию на 05.11.2008, согласно которой рыночная стоимость права собственности в отношении ТК «Европарк» и доли долгосрочной аренды земельного участка под ним составляла 234 300 000 долларов США (т. 39 л.д. 199-283);

- протоколом выемки от 27.10.2011 в Федеральной службе по финансовым рынкам в ЦФО документов эмитента ЗАО «Центурион Альянс» (т. 41 л.д. 7-11), которые осмотрены 16.11.2011 (т. 42 л.д. 203-237);

- отчетом об итогах выпуска ценных бумаг ЗАО «Центурион Альянс», утвержденным советом директором ЗАО «Центурион Альянс» 03.06.2003, зарегистрированным 23.06.2003 в ФКЦБ России в ЦФО, согласно п. 3 которого акционерами ЗАО «Центурион Альянс» являются: ЗАО «Титул» - 18%; ООО «Милеа» - 20%; ЗАО «ТД «Уникомимпекс» - 20%; ООО «Мерхав» - 20 %; Смагин В.И. – 22%., члены совета директоров Смагин В.И., Гаркуша Д.В., Трошин И.А. (т. 41 л.д. 24-27);

- протоколом № 2/03 заседания совета директоров ЗАО «Центурион Альянс» от 03.06.2003, согласно которому члены совета директоров – Смагин В.И., Гаркуша Д.В. и Трошин И.А. утвердили решение о первом выпуске ценных бумаг – обыкновенных именных акций ЗАО «Центурион Альянс» в бездокументарной форме номинальной стоимостью 10 000 руб. каждая на общую сумму 23 млн. руб., утвердили отчет об итогах выпуска ценных бумаг и приняли решение о регистрации выпуска акций в региональном отделении ФКЦБ России в Центральном федеральном округе (т. 41 л.д. 48);

- протоколом общего собрания акционеров ЗАО «Центурион Альянс» № 2/03 от 24.03.2003, согласно которому акционеры избрали совет директоров ЗАО «Центурион альянс» в составе Смагина В.И., Гаркуши Д.В. и Трошина И.А. (т. 41 л.д. 50);

- протоколом общего собрания акционеров ЗАО «Центурион Альянс» № 1/03 от 24.03.2003, согласно которому акционеры общества избрали генеральным директором ЗАО «Центурион Альянс» Гаркушу Д.В. (т. 41 л.д. 54);

- договором передачи доли участия между Смагиным В.И. (приобретатель) и ООО «Техэнергодон» (продавец) от 25.12.2002, согласно которому продавец обязуется передать приобретателю 20 % долю участия номинальной стоимостью 4 600 000 руб. в уставном капитале ООО «Центурион Альянс», а приобретатель обязуется принять и оплатить продавцу стоимость доли участия в размере 6 000 000 руб. в течение трех календарных месяцев (т. 41 л.д. 170-175);

- договором передачи доли участия между Смагиным В.И. (приобретатель) и ООО «Титул» (продавец) от 25.12.2002, согласно которому продавец обязуется передать приобретателю 2% долю участия номинальной стоимостью 460 000 руб. в уставном капитале ООО «Центурион Альянс», а приобретатель обязуется принять и оплатить

60

продавцу стоимость доли участия в размере 600 000 руб. в течение трех календарных месяцев (т. 41 л.д. 182-187);

- изменением № 1 в устав ООО «Центурион Альянс», утвержденным общим собранием участников 10.09.2002, согласно которому уставный капитал Общества составляет 23 000 000 руб., размер доли каждого участника определяется в процентах и составляет: 1. ЗАО «Титул» - 20%; 2. ООО «Милеа» - 20%; 3. ЗАО «ТД «Уникомимпекс» - 20%; 4. ООО «Мерхав» - 20 %; 5. ООО «Техэнергодон» – 20% (т. 41 л.д. 197);

- уставом ООО «Центурион Альянс», утвержденный решением общего собрания участников 03.04.2002, согласно которому местонахождение Общества: г. Москва, Кутузовский проспект, д. 39; участниками Общества являются Локтионов А.Г. (50%) и Каплун Н.Н.(50%).; уставный капитал Общества составляет 23 000 000 руб. и на 100% оплачен денежными средствами (т. 41 л.д. 198-207);

- письмом АО «Регистраторское общество «СТАТУС» от 16.06.2015, согласно которому документы (передаточные распоряжения), явившиеся в 2006 г. основаниями для внесения записей в реестр владельцев ценных бумаг ЗАО «Центурион Альянс» о переходе прав собственности на акции были уничтожены в связи с истечением срока хранения; запись о зачислении ценных бумаг на лицевой счет номинального держателя АКБ «Фора-Банк» была внесена в реестр ЗАО «Центурион Альянс» 01.03.2010 на основании электронного документа, поступившего в АО «СТАТУС» от ООО «Дойче Банк»; за период ведения реестра ЗАО «Центурион Альянс» (до 07.06.2010) АО «СТАТУС» не вносило записей о списании ценных бумаг с лицевого счета номинального держателя АКБ «Фора-Банк» (т. 46 л.д. 203);

- передаточным распоряжением от 01.03.2010, согласно которому 2300 штук акций ЗАО «Центурион Альянс» со счета номинального держателя ООО «Дойче Банк» переводятся на счет номинального держателя АКБ «Фора-Банк» на основании инструкции клиента на перевод от 27.02.2010  (т. 46 л.д. 204-207);

- анкетой зарегистрированного лица – АКБ «Фора-Банк» в АО «Статус» от 09.02.2010, согласно которой «Фора-Банк» является номинальным держателем эмитента ЗАО «Центурион Альянс» (т. 46  л.д. 216);

- протоколом выемки от 10.12.2010 в ИФНС России № 8 по г. Москве документов в отношении ООО «Милеа» (т. 49 л.д. 11-18), которые осмотрены  28.01.2011 (т. 49 л.д. 229-250);

- заключением судебной оценочной экспертизы № 02/20-01-11 от 20.02.2011, по выводам которого рыночная стоимость 20% акций ЗАО «Центурион Альянс» по состоянию на 26.12.2006 составляла 666 480 521 руб., по состоянию на 26.02.2010 и 01.03.2010 – 720 605 444 руб. (т. 51 л.д. 27-291);

- заключением почерковедческой судебной экспертизы  № 12/3115 от 24.06.2011, по выводам которого подпись от имени Егиазаряна Ашота, расположенная в разделе «Подписи партнеров» соглашения от 2008 г. между Смагиным В.И. и Егиазаряном А.Г., выполнена Егиазаряном Ашотом (т. 55 л.д. 103-106);

- протоколом обыска в жилище Клочина М.А. от 01.12.2010 по адресу:     г. Москва, ул. Костякова, д. 8/6, кв. 171, в ходе которого изъят системный блок компьютера и документы (т.  57 л.д. 9-15), осмотренные 19.05.2011 (т. 57  л.д. 26-28) и 08.06.2011 (т. 57 л.д. 37-39);

- перечнем документов для закрытия сделки по приобретению ТЦ «Европарк» (т. 57 л.д. 29-33);

- протоколом обыска 13.12.2010 в офисе ОАО «Калугаглавснаб», в ходе которого изъяты документы в отношении компаний ЗАО «Центурион Альянс», «Дойче Банк», «Скендлби», «Калкен», «Доралин», «Блиденсол» (т. 62 л.д. 10-16), осмотренные в соответствии с протоколом осмотра документов от 14.12.2010 (т. 62 л.д. 261-279);

- договором займа от 14.01.2010 между ООО «Газойлтрейд» (кредитор) и «Скендлби» (заемщик), согласно которому кредитор предоставляет Заемщику 16 млн. долларов США путем перечисления на счет в «Дойче Банк» со сроком возврата не позднее 14.01.2013, по ставке 11% годовых (т. 62 л.д. 17-22);

- договором займа от 14.01.2010 между «Гровер Холдинг&Инвест Лтд.» (кредитор) и «Скендлби» (заемщик), согласно которому кредитор предоставляет заемщику 5 млн. долларов США путем перечисления на счет в «Дойче Банке» со сроком возврата не позднее 14.01.2013, по ставке 9,51% годовых (т. 62 л.д. 23-28);

- договором займа от 30.12.2009 между ОАО «Универсальный коммерческий инвестиционный центр» (Кредитор) и «Скендлби» (Заемщик), согласно которому Кредитор предоставляет Заемщику 20 млн. долларов США путем перечисления на счет в «Дойче Банке» со сроком возврата не позднее 14.01.2013, по ставке 9,5% годовых (т. 62 л.д. 29-34);

- договором займа от 14.01.2010 между ОАО «Калугаглавснаб» (кредитор) и «Скендлби» (заемщик), согласно которому кредитор предоставляет заемщику 12 250 000 долларов США путем перечисления на счет в «Дойче Банке» со сроком возврата не позднее 14.01.2013, по ставке 9,5% годовых (т. 62 л.д. 35-40);

- соглашением от 18.01.2010 между «Дойче Банком» (продавец) и компанией «Скендлби» (покупатель) о приобретении прав по кредитному договору на сумму 100 млн. долларов США от 06.10.2006 (измененному 27.12.2006) для компании «Блиденсол» (соглашение о выкупе) о том, что покупная цена составила 55 млн. долларов США, которые покупатель должен перечислить на счет продавца не позднее 19.01.2010; к этой же дате должно быть перечислено обеспечение в виде денежных средств в размере 500 000 долларов США, со стороны компании «Скендлби» соглашение подписано от имени А. Ильяева, принадлежность второй подписи не указана (т. 62 л.д. 157-195 (оригинал договора с приложениями на английском языке), л.д. 196-237 (перевод договора и приложений к нему, заверенный нотариусом);

- договором от января 2010 г. между «Дойче Банком» в качестве Первоначального кредитора, Первоначального кредитного агента, Первоначального агента по обеспечению и компанией «Скендлби» в качестве Нового кредитного агента и Нового агента по обеспечению о сложении полномочий и новом назначении по кредитному договору на сумму 100 млн. долларов США от 06.10.2006 (измененному 27.12.2006) для компании «Блиденсол», в соответствии с условиями Соглашения от 15.01.2010 о приобретении прав между «Дойче Банком» и «Скендлби» Первоначальный кредитор согласен передать в пользу компании «Скендлби» свое Принятое обязательство и суммарную основную сумму, применительно к кредитам в размере 100 млн. долларов США по Кредитному договору. Первоначальный кредитор намерен назначить компанию «Скендлби» как Агента по обеспечению и Кредитного агента для Финансовых сторон (т. 62 л.д. 174-195, 216-237);

- базовым соглашением о приобретении активов от 14.01.2010 между группой компаний «Даев плаза» в лице Егиазаряна Ашота Геворковича (Акционер А) и группой компаний «Ташир» в лице Карапетяна Самвела Саркисовича (Акционер В), согласно которому стороны намереваются совершить несколько сделок в целях установления совместного паритетного контроля в отношении ЗАО «Центурион Альянс». Вступление Акционера В в Проект обусловлено наступлением определенных условий и гарантиями Акционера А. До даты вхождения в сделку афиллированная компания Акционера В Jella Holding& Finance Inc. (БВО) приобретает по номинальной стоимости у аффилированной компании Акционера А – MPH Law Services Ltd. (Кипр) 50% акций компании «Скендлби», созданной Акционером А исключительно для целей настоящей сделки. Стороны назначают двух директоров в компании «Скендлби», по одному от каждой из сторон, которые будут иметь право принимать решения по всем вопросам только совместно и единогласно. Акционер А обеспечит заключение договора купли-продажи и

62

передачу 920 (92%) акций компании «Калкен» по номинальной стоимости в пользу аффилированного лица Акционера В. Компания «Скендлби» заключает договоры о получении займов от компаний, аффилированных акционеру А – ОАО «Универсальный коммерческий инвестиционный центр» и ООО «Decorum Corp. Ltd.» на общую сумму 22 250 000 долларов США со сроком возврата до 11.01.2013 со ставкой 9,5% годовых. От компаний, аффилированных акционеру В – ОАО «Калугаглавснаб», «Grover Holding & Invest» и ООО «Газойлтрейд» - на общую сумму 33 250 000 долларов США. Целевое назначение займов – оплата в пользу «Дойче Банка» за приобретение компанией «Скендлби» всех прав в соответствии с Соглашением о выкупе. Компания «Скендлби» заключит соглашение с «Дойче Банком» о приобретении за 55,5 млн. долларов США 100% долга и всех прав кредитора и залогодержателя по займу, вытекающему из кредитного соглашения на сумму 100 млн долларов США. Акционер А обеспечивает заключение между контролируемой им компанией ООО «Даев плаза» и ЗАО «Центурион Альянс» соглашение об урегулировании условий всей просроченной задолженности и передачу Акционеру В всех полномочий на подачу от имени ООО «Даев плаза» в Арбитражный суд г. Москвы заявления об отказе от требования о признании должника банкротом с приложением соглашения об урегулировании просроченной задолженности для прекращения производства по делу о банкротстве ЗАО «Центурион Альянс». Акционер А передает 50% акций «Блиденсол» и 50 % акций «Доралин» компаниям акционера В. Компании «Скендлби», «Блиденсол» и «Доралин» заключат Договор об урегулировании и прекращении обязательств, вытекающих из Кредитного соглашения и обеспечительных договоров к нему на следующих условиях:

- к «Скендлби» переходят права собственности на 100% акций ЗАО «Центурион Альянс», а обязательства компаний «Тафтс», «Доралин» и «Блиденсол», вытекающие из Кредитного соглашения и обеспечительной документации к нему, прекращаются;

- вступление в силу Договора об урегулировании долга обусловлено моментом перехода от «Дойче Банка» всех прав кредитора к «Скендлби» в соответствии с Соглашением о выкупе.

Акционер А дает гарантии Акционеру В, что любые из сделок, предусмотренные настоящим Базовым соглашением, не будут оспорены в результате предъявления претензий акционерами «Тафтс».

У Акционера А нет каких-либо договоренностей с третьими лицами, кроме Акционера В, о совместном осуществлении Проекта на момент заключения настоящего Базового соглашения. Если выявится нарушение акционером А данного условия, он выплачивает Акционеру В 10 млн долларов США.

Базовое соглашение подписано от Акционера А – Егиазаряном Ашотом Г. и Егиазаряном Артемом Г., от Акционера В – Карапетяном С.С. и Ильяевым А.Г. (т. 62 л.д. 243-260);

- договором покупки акций от 29.12.2009, согласно которому компания «Jella Holding&Finance Inc.» (Покупатель) купила у компании «MPH Law Services Ltd.» (Продавец) за 1 000 евро акции компании «Скендлби» в количестве 1 000 штук, что составляет 50 % выпущенных и распределенных акций компании, на момент продажи Продавец являлся единственным законным и бенефициарным владельцем компании «Скендлби» (т. 63 л.д. 12-24, 25-37);

- подтверждением компании «MPH Law Services Ltd.» от 29.12.2009 о том, что она получила от компании «Jella Holding&Finance Inc.» полную оплату за продажу 1 000 акций компании «Скендлби» (т. 63 л.д. 38-39, 40-41);

- решением компании «MPH Law Services Ltd.» от 29.12.2009 в качестве единоличного директора компании «Скендлби» о назначении Ильяева А.Г. дополнительным директором компании «Скендлби» (т. 63 л.д. 42, 43);

- решением компании «MPH Law Services Ltd.» в качестве единоличного директора компании «Тафтс» от 16.01.2010 о заключении компанией договора покупки акций, в

соответствии с которым компания должна будет продать компании «Мастеро» по номинальной стоимости 230 500 акций в капитале компании «Доралин» (т. 63 л.д. 54, 55);

- распиской в получении оплаты от 18.01.2010, согласно которой компания «Тафтс» в соответствии с договором покупки акций компании «Доралин» от 18.01.2010 между компанией «Тафтс» и «Мастеро» подтверждает получение от компании «Мастеро» 5000 евро в качестве оплаты цены покупки (т. 63 л.д. 58, 59);

- решением единоличного директора «Тафтс» от 16.01.2010, согласно которому директор компании «Тафтс» - компания «MPH Law Services Ltd.» утверждает передачу в пользу «Мастеро» 230 500 штук акций в капитале компании «Доралин» (т. 63 л.д. 90, 91);

- решением «New Generation Services Ltd.» и Елены Деминой от 16.01.2010 в качестве директоров компании «Доралин» об утверждении передачи 230 500 акций в капитале компании от «Тафтс» в пользу «Мастеро» (т. 63 л.д. 92, 93);

- актом передачи акций от 16.01.2010, согласно которому компания «Solid Rock Trading Ltd.» (Британские виргинские острова) передает компании «Brich Trading SA» (Британские виргинские острова) 855 штук акций с номерами 856-1710 в капитале компании «Блиденсол» (т. 63 л.д. 98, 99);

- договором покупки акций от 18.01.2010, согласно которому компания «Solid Rock Trading Ltd.» за 855 евро продала компании «Brich Trading SA» 855 штук акций компании «Блиденсол», что составляет 50 % от выпущенных и распределенных акций компании (т. 63 л.д. 106-120, 121-135);

- специальным решением акционеров «Блиденсол» - компаний «Solid Rock Trading Ltd.» и «Brich Trading SA» от 16.01.2010, согласно которому единогласно решено удалить статью 74(а)-(с) Устава и заменить ее новой статьей 74 следующего содержания: «74. Совет директоров должен состоять из двух директоров. Каждый акционер, владеющий 50% акционерного капитала, вправе предложить кандидатуру, назначить и сместить одного директора. Невзирая на любое иное положение настоящего Устава, все решения совета директоров должны приниматься единогласно двумя директорами, и любой договор, заключаемый компанией, действителен только при условии его подписания всеми директорами» (т. 63 л.д. 142, 143);

- письмом-соглашением о субординировании от 18.01.2010 в адрес «Дойче Банка» от имени компаний ООО «Газойлтрейд», ОАО «Калугаглавснаб», «Grover Holding&Invest Ltd.», «Скендлби», в котором подтверждается, что субординированные кредиторы все поступления по договорам субординированного займа на общую сумму 55,5 млн. долларов США должны быть использованы компанией «Скендлби» исключительно для финансирования Цены покупки по соглашению о выкупе от 18.01.2010 с «Дойче Банком» (т. 63 л.д. 282-284, 285-287, 288-291, 292-295);

- решением директоров «Скендлби» от 15.01.2010 – компании «MPH Law Services Ltd.» и Ильяева А.Г. о том, что компания в качестве Покупателя должна заключить соглашение о выкупе с «Дойче Банком», в соответствии с которым Продавец за Цену покупки в размере 55 млн. долларов США согласится продать свои права в качестве Первоначального кредитора по Договору займа от 06.10.2006 (в редакции от 27.12.2006), по которому Продавец предоставил «Блиденсол» заем в размере 100 млн. долларов США. Компания должна ратифицировать и утвердить 5 договоров субординированного займа на общую сумму 55 млн. долларов США между «Скендлби» в качестве заемщика и каждым из следующих лиц: ОАО «Универсальный коммерческий инвестиционный центр», «ООО Декорум Корп. Лтд.», ООО «Газойлтрейд», ОАО «Калугаглавснаб» и «Grover Holding&Invest Ltd.» в качестве кредиторов с единственной целью финансирования выплаты Цены покупки и прочих сумм, причитающихся по соглашению о выкупе (т. 63 л.д. 302-303, 304-305);

- решением директоров «Скендлби» от 30.12.2009 – компании «MPH Law Services Ltd.» и Ильяева А.Г. о том, что компания в качестве заемщика заключит договоры займа с компанией ОАО «Универсальный коммерческий инвестиционный центр» на сумму 20

млн. долларов США, с «ООО Декорум Корп. Лтд.» на сумму 2 250 000 долларов США, с
ООО «Газойлтрейд» на сумму 16 млн. долларов США, с ОАО «Калугаглавснаб» на сумму
12 250 000 долларов США и с «Grover Holding&Invest Ltd.» на сумму 5 млн. долларов
США (т. 63 л.д. 306, 307);

   - протоколом заседания совета директоров компании «Калкен» от 18.01.2010,
согласно которому приняты решения об утверждении акта передачи 920 акций компании
в пользу Л. Карапетяна и о выпуске нового акционерного сертификата № 6 с указанием Л
Карапетяна в качестве зарегистрированного владельца 920 акций компании,
одновременно аннулировав акционерный сертификат № 5 от 05.03.2008 (т. 63 л.д. 326,
327);

   - актом передачи от 18.01.2010, согласно которому компания «Ionics Nomenees
Ltd.» (Кипр) передает Леннику Карапетяну 920 акций компании «Калкен» с номерами от
0081 до 1000 (т. 63 л.д. 320, 321);

   - отказом М. Клочина, являющегося владельцем 40% акций компании «Калкен» от
права       преимущественной       покупки       920       акций       в       пользу
Л. Карапетяна (т. 63 л.д. 322, 323);

   - отказом М. Ананьева, являющегося владельцем 40% акций компании «Калкен» от
права       преимущественной       покупки       920       акций       в       пользу
Л. Карапетяна (т. 63 л.д. 324, 325);

   - протоколом специального заседания совета директоров компании «Калкен» от
18.01.2010, согласно которому принято решение о назначении Л. Карапетяна на
должность директора компании (т. 63 л.д. 328, 329);

   - протоколом обыска от 07.02.2012 в офисе ЗАО «Профессиональные
коммуникации», где изъяты документы в отношении ЗАО «Центурион Альянс», МТК
«Европарк», гостиницы «Москва» (т. 64 л.д. 3-6), осмотренные 14.02.2012 (т. 64 л.д. 220-
227);

   - соглашением от 29.08.2003 о реализации проекта строительства торгового
комплекса «Екатериновка» по адресу: Рублевское шоссе, вл. 62 (т. 64 л.д. 26-27);

   - протоколом выемки 23.11.2010 в «Дойче Банк» по адресу г. Москва, ул.
Садовническая, д. 82, стр. 2 документов в отношении Смагина В.И., Гаркуши Д.В.,
компаний «Доралин», ЗАО «Титул», ЗАО «ТД «Уникомимпекс», ЗАО «Центурион
Альянс» (т. 66 л.д. 72-88), которые осмотрены 18.01.2011 (т. 66 л.д. 89-127);

   - протоколом выемки от 20.01.2011 в «Дойче Банк» по адресу г. Москва, ул.
Садовническая, д. 82, стр. 2 документов в отношении Смагина В.И., Гаркуши Д.В.,
компаний «Доралин», ЗАО «Титул», ЗАО «ТД «Уникомимпекс», ЗАО «Центурион
Альянс» (т. 66 л.д. 160-183), которые осмотрены в соответствии с протоколом осмотра
документов от 21.01.2011 (т. 70 л.д. 155-197);

   - инструкцией Смагина В.И. в депозитарный отдел ООО «Дойче Банк» от
25.12.2006, согласно которой производится внешний перевод без смены собственника
акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук,
контрагент – Смагин В.И., депозитарий контрагента – «Дойче Банк», поставляющий агент
– ЗАО «Статус» (т. 67 л.д.13 (оригинал);

   - уведомлением Смагина В.И. от ЗАО «Статус» от 25.12.2006 об операции,
проведенной по лицевому счету, согласно которому с лицевого счета Смагина В.И. в ЗАО
«Статус» списано 460 акций ЗАО «Центурион Альянс», которые 25.12.2006 зачислены на
лицевой счет номинального держателя – ООО «Дойче Банк» (т. 67 л.д.14 (оригинал);

   - инструкцией на осуществление операций с ценными бумагами от «Доралин» в
депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится
внутренний перевод со сменой собственника акций обыкновенных именных ЗАО
«Центурион Альянс» в количестве 161 штука в отношении контрагента Гаркуша Д.В. по
договору купли-продажи акций от 24.11.2006 (т. 67 л.д. 16, 17);

- инструкцией на осуществление операций с ценными бумагами от «Доралин» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук, контрагент – Смагин В.И. на основании договора купли-продажи акций от 26.12.2006 (т. 67 л.д. 20,21);

- инструкцией на осуществление операций с ценными бумагами от «Доралин» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук, контрагент – ЗАО «ТД «Уникомимпекс» по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 24, 25);

- инструкцией на осуществление операций с ценными бумагами от ЗАО «ТД Уникомимпекс» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук, контрагент – «Доралин», по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 26);

- инструкцией на осуществление операций с ценными бумагами от ЗАО «Титул» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 759 штук, контрагент – «Доралин», по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 29, 32);

- инструкцией на осуществление операций с ценными бумагами от «Доралин» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 759 штук, контрагент – ЗАО «Титул», по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 30, 31);

- инструкцией на осуществление операций с ценными бумагами от ООО «Милеа» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве  460 штук, контрагент – «Доралин», по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 35, 37);

- инструкцией на осуществление операций с ценными бумагами от «Доралин» в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук, контрагент – ООО «Милеа», по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 36, 38);

- инструкцией на осуществление операций с ценными бумагами от Гаркуши Д.В. в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук, контрагент – «Доралин», по договору купли-продажи акций от 24.11.2006 (т. 67 л.д. 41, 42);

- инструкцией  Смагина В.И. в депозитарный отдел ООО «Дойче Банк» от 26.12.2006, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 460 штук в отношении контрагента «Доралин» по договору купли-продажи акций от 26.12.2006 (т. 67 л.д. 44, 45, 46);

- инструкцией компании «Скендлби» в депозитарный отдел ООО «Дойче Банк» от 27.02.2010, согласно которой производится внешний перевод без смены собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 2 300 штук, № счета депо – «К40004020008», контрагент – компания «Скендлби», депозитарий контрагента – ЗАО «Фора-Банк», поставляющий агент – ЗАО «Фора-Банк»; документы, подтверждающие совершение сделки – депозитарный договор № 16-1/SKIL/945 от 16.02.2010, депозитарный договор № Д-107/02/10 от 19.02.2010 (т. 67 л.д. 52);

- выпиской по счету депо № К40004020008 компании «Скендлби» в депозитарии «Дойче Банка» от 27.02.2010, согласно которой компания «Скендлби» является собственником 2300 акций ЗАО «Центурион Альянс» (т. 67 л.д. 53);

- передаточным распоряжением от 27.02.2010, согласно которому 2300 акций ЗАО «Центурион Альянс», не обремененные никакими обязательствами, передаются со счета номинального держателя – ООО «Дойче Банк» на счет номинального держателя – ЗАО «Фора-Банк», основанием для внесения записи в реестр является инструкция клиента на перевод № б/н от 27.02.2010, депозитарный договор № 16-1/SKIL/945 от 16.02.2010, депозитарный договор № Д-107/02/10 от 19.02.2010 (т. 67 л.д. 56);

- залоговым распоряжением «Доралин» в депозитарный отдел ООО «Дойче Банк» от 26.02.2010 с указанием назначения - прекращение залога; залоговый договор от 25.02.2010, наименование эмитента – ЗАО «Центурион Альянс»; количество ценных бумаг – «2300 штук», залогодержатель – «Скендлби» (т. 67 л.д. 61);

- выпиской по счету депо № К40DORN10001 компании «Доралин» в депозитарии «Дойче Банка» от 26.02.2010, согласно которой компания «Доралин» является собственником 2300 акций ЗАО «Центурион Альянс» (т. 67 л.д. 62);

- уведомлением о совершении операции от 26.02.2010, согласно которому «Дойче Банк» уведомляет, что на основании инструкции о прекращении залога клиента «Доралин» № 2 от 26.02.2010 с раздела DORN1006 счета депо № К40DORN10001 на раздел DORN1001 «Основной раздел» счета депо № К40DORN10001 было переведено 2300 штук акций ЗАО «Центурион Альянс»; номер и дата залогового договора - «Deed of settlement and termination» от 25.02.2010 (т. 67 л.д. 63, 65);

- инструкцией на осуществление операций с ценными бумагами от «Скендлби» в депозитарный отдел ООО «Дойче Банк» от 26.02.2010, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 2300 штук, контрагент – «Доралин», на основании документа, подтверждающего совершение сделки - «Deed of settlement and termination» от 25.02.2010 (т. 67 л.д. 66);

- выпиской по счету депо № К40004020008 компании «Скендлби» в депозитарии «Дойче Банка» от 26.02.2010 по состоянию на 16 ч. 05 мин., согласно которой компания «Скендлби» является собственником 2300 акций ЗАО «Центурион Альянс» (т. 67 л.д. 67);

- инструкцией на осуществление операций с ценными бумагами от «Доралин» в депозитарный отдел ООО «Дойче Банк» от 26.02.2010, согласно которой производится внутренний перевод со сменой собственника акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 2300 штук в отношении контрагента – «Скендлби» по документу, подтверждающему совершение сделки - «Deed of settlement and termination» от 25.02.2010 (т. 67 л.д. 69);

- депозитарным договором № 16-1/SMGN/374 от 21.12.2006, согласно которому Депозитарий - ООО «Дойче Банк» предоставляет Клиенту – Смагину В.И. услуги по хранению сертификатов ценных бумаг и учету и удостоверению прав на ценные бумаги посредством открытия отдельного счета депо, а также сопутствующие услуги (т. 67 л.д.72-95 (оригинал), л.д. 96-147 - оригинал приложения к договору);

- залоговым поручением от «Доралин» в депозитарий «Дойче Банк» от 26.12.2006, назначение поручения – проихождение залога; дата залогового договора – 26.12.2006; эмитент – ЗАО «Центурион Альянс»; количество ценных бумаг – 2300 штук; № депозитного счета залогодателя – К40DORN1001; № залогового субсчета DORN 1004; получатель залога – «Дойче Банк» (т. 67 л.д. 179, 180);

- инструкцией на осуществление операций с ценными бумагами от «Доралин» в депозитарный отдел ООО «Дойче Банк» от 25.02.2010, согласно которой производится внутренний перевод без изменения бенефициара акций обыкновенных именных ЗАО «Центурион Альянс» в количестве 2300 штук в отношении контрагента – «Доралин», субсчет DORN1006, субсчет заложенные ценные бумаги в пользу «Скендлби» (новый

получатель Залога на основании договора о выкупе от 18.01.2010),   депозитарий
контрагента – «Дойче Банк», место расчета - «Дойче Банк»; документы, подтверждающие
сделку, - Договор о выкупе между «Дойче Банк» и «Скендлби» от 18.01.2010 (т. 67 л.д.
185, 186);

- заявлением от 15.02.2010 представителей по доверенности компании «Скендлби»
- Газаровой К.Р. и Сухова М.В. в «Дойче Банк» об открытии счета депо (т. 69 л.д. 160);

- заявлением от 25.03.2010 представителей по доверенности компании «Скендлби»
- Газаровой К.Р. и Сухова М.В. в «Дойче Банк» о закрытии счета депо (т. 69 л.д. 161);

- депозитарным договором № 16-1/SKTL/945 от 16.02.2010, согласно которому
депозитарий    -    ООО    «Дойче    Банк»,    расположенный    по    адресу:
г. Москва, ул. Садовническая, д. 82, предоставляет клиенту – компании «Скендлби»
услуги по хранению сертификатов ценных бумаг и учету и удостоверению прав на ценные
бумаги посредством открытия отдельного счета депо, а также сопутствующие услуги, от
имени компании «Скендлби» договор подписан представителями по доверенности -
Газаровой К.Р. и Суховым М.В. (т. 69 л.д. 163-188);

- генеральной доверенностью компании «Скендлби» на имя Сухова М.В. и
Газаровой К.Р. от 11.02.2010 сроком на 1 год (т. 69 л.д.193-196);

- свидетельством Министерства торговли, промышленности и туризма Кипра от
25.01.2010, согласно которому акционерами компании «Скендлби» являются компания
MPH Law Services Ltd. (1000 штук акций) и Jella Holding&Finance Inc.(1000 штук акций)
(т. 69 л.д. 209, 210);

- подтверждением бенефициарного права собственности от 29.01.2010, согласно
которому компания MPH Law Services Ltd. владеет 1000 акциями компании «Скендлби»
как доверительный собственник и в интересах Эдварда-Майкла Ниммо-Смита (т. 69   л.д.
213, 214);

- свидетельством Министерства торговли, промышленности и туризма Кипра от
25.01.2010, согласно которому директорами компании «Скендлби» являются Андрей
Ильяев    и    компания    MPH  Law Management Ltd., выступающая также секретарем
компании (т.  69 л.д. 227, 228);

- сведениями о директорах MPH Law Management Ltd. от 25.01.2010, согласно
которым директорами компании являются Майкл Филиппу и Лукас Хавиарас (т.
69 л.д. 232, 233);

- депозитарным договором № 16-1/DORN/380 от 25.12.2006, согласно которому
депозитарий - ООО «Дойче Банк» предоставляет клиенту – компании «Доралин» услуги
по хранению сертификатов ценных бумаг и учету и удостоверению прав на ценные
бумаги посредством открытия отдельного счета депо, а также сопутствующие услуги, от
имени компании «Доралин» договор подписан поверенным – Гаркушей Д.В. (т. 71 л.д. 88-
165);

- свидетельством Министерства торговли, промышленности и туризма Кипра от
19.09.2006, согласно которому директорами компании «Доралин» являются Д. А.
Деметриадес и Х. Д. Деметриадес, секретарем – «Дэдло Секретариал Лтд.» (т. 71 л.д. 241-
245);

- генеральной доверенностью компании «Доралин» на имя Гаркуши Д.В. от
19.09.2007 сроком на 1 год (т. 71 л.д. 246-251);

- генеральной доверенностью компании «Доралин» от 20.02.2009 на имя Смагина
В.И. и Егиазаряна Артема Г., сроком на 1 год (т. 71 л.д. 252-257);

- генеральной доверенностью компании «Доралин» на имя Гаркуши Д.В. от
05.10.2006, сроком на 1 год (т. 71 л.д. 258-264);

- заявлением 22.12.2006 поверенного компании «Доралин» - Гаркуши Д.В. в
«Дойче Банк» об открытии счета депо (т. 71  л.д. 286);

- схемой корпоративной структуры компании «Блиденсол» от 04.03.2008, согласно
которой 100% акций компании «Блиденсол» находятся в собственности  компании

«Хамфаст Инвестмент Лтд» (Британские Виргинские острова), которой на 100% владеет
Гаркуша Д.В., в рамках сделки Д. Гаркуша передает 100% Виталию Гогохии. Договор
купли-продажи акций между Д. Гаркушей и В. Гогохией подписан. Сделка находится в
процессе оформления. Данный документ подписан директорами компании «Блиденсол»
Деметриадесом и Х.Д. Деметриадесом (т. 72 л.д. 208);

    - протоколом выемки от 18.03.2011 в офисе юридической фирмы «Клиффорд Чанс
СНГ Лимитед» документов (т. 72 л.д. 3-21), которые осмотрены с переводами на русский
язык в соответствии с протоколами осмотра 11.04.2011 (т. 73 л.д. 313-337), 27.07.2011 (т.
77 л.д. 211-220), 27.07.2011 (т. 78 л.д. 262-270);

    - сертификатом  Министерства торговли, промышленности и туризма Кипра от
02.08.2006, согласно которому зарегистрированный офис компании «Блиденсол»
находится по адресу: Тасу, 3, Дадло Хаус, п/я 1520, Никосия, Кипр (т. 72 л.д. 185-189
(копия с переводом);

    - сертификатом Министерства торговли, промышленности и туризма Кипра от
02.08.2006, согласно которому директорами компании «Блиденсол» являются граждане
Кипра – Деметриос А. Деметриадес и Харрис Д. Деметриадес, секретарем – «Дадло
Секретариал Лтд.» (т. 72 л.д. 198-200);

    - схемой корпоративной структуры компании «Блиденсол» от 04.03.2008 за
подписью директоров  компании «Блиденсол» Деметриадеса и Х.Д. Деметриадеса,
согласно которой 100% акций компании «Блиденсол» находятся в собственности
компании «Хамфаст Инвестмент Лтд» (Британские Виргинские острова), которой на 100%
владеет Гаркуша Д.В., в рамках сделки Д. Гаркуша передает 100% Виталию Гогохии;
договор купли-продажи акций между Д. Гаркушей и В. Гогохией подписан, сделка
находится в процессе оформления (т. 72 л.д. 208);

    - договором займа от 11.01.2010 между «ООО Decorum Corp. Ltd.» (кредитор) и
«Скендлби» (заемщик), согласно которому кредитор предоставляет заемщику 2 250 000
долларов США путем перечисления на счет в «Дойче Банке» со сроком возврата не
позднее 11.01.2013, по ставке 9,5% годовых (т. 73 л.д. 286-291);

    - договором займа от 06.10.2006, исправленным и пересмотренным 27.12.2006,
между компанией «Блиденсол» в качестве Заемщика и «Дойче Банком» в качестве
Организатора Займа, Первоначального займодателя, Кредитного агента и Залогового
агента. Согласно данному договору «Дойче Банк АГ» (г. Франкфурт-на-Майне), действуя
через свой лондонский филиал, предоставляет Заемщику – компании «Блиденсол», кредит
на сумму 100 млн долларов США, которые Заемщик будет использовать на достижение
общих целей компании, включая строительство гостиницы по адресу: г. Москва, Охотный
ряд, д. 2.

    Заемщик обязан полностью погасить кредит одной выплатой при наступлении
Окончательного срока платежа (п. 7.1.1) – дата, которая наступит через 10 лет после
Первого использования кредита.

    Периоды начисления процентов на Заем составляют по 6 месяцев каждый (п.
10.1.1) (т. 74 л.д. 16-137);

    - договором о залоге акций и активов в обмен на кредит от 22.12.2006 между
компанией «Тафтс» в качестве Залогодателя и  «Дойче Банком» в качестве Залогового
агента, согласно которому  Залогодатель является зарегистрированным держателем 461
000 акций в компании «Доралин». Залогодатель согласился заключить настоящий договор
о залоге в качестве обеспечения, гарантирующего должное и своевременное выполнение
Заемщиком – компанией «Блиденсол» обеспеченных залогом обязательств в соответствии
с Договором займа от 06.10.2006 (с изменениями от 27.12.2006). В качестве обеспечения
Залогодатель закладывает и передает Залоговому агенту все принадлежащие акции в
компании «Доралин» (т. 75 л.д. 2-36, 37-71);

    - договором залога акций ЗАО «Центурион Альянс» от 26.12.2006 между
«Доралин» в качестве Залогодателя и  «Дойче Банком» в качестве Залогодержателя,

согласно которому в качестве обеспечения исполнения Заемщиком (компания «Блиденсол») Обеспеченных обязательств по Договору займа от 06.10.2006 Залогодатель отдает Залогодержателю в залог 100% акций ЗАО «Центурион Альянс» (т. 76 л.д. 67-91, 92-116);

- договором о залоге оборотного капитала (активов) от 22.12.2006 между компанией «Блиденсол» (Залогодатель) и «Дойче Банком» (Залоговый агент), согласно которому Залогодатель обременяет залогом посредством залога активов свое предприятие, стоимость деловых связей и репутация предприятия и собственность любого характера, включая свой невостребованный капитал в настоящее время, чтобы гарантировать выполнение Обеспечиваемых обязательств по Договору займа от 06.10.2006 (т. 76 л.д. 118-143, 144-169);

- соглашением о субординировании долга от 22.12.2006 между ЗАО «Центурион Альянс», «Доралин» и «Тафтс» в качестве кредиторов второй очереди, «Дойче Банком» в качестве залогового агента и кредитного агента и компанией «Блиденсол» в качестве заемщика, в котором констатируется, что согласно договору займа от 06.10.2006 «Дойче Банк» согласился предоставить компании «Блиденсол» (заемщик) кредит на сумму 100 млн. долларов США, каждый кредитор второй очереди соглашается на заключение настоящего соглашения в качестве обеспечительного документа.

В качестве первоочередной задолженности в соглашении понимаются все обязательства заемщика по оплате капитальной суммы долга, процентов, пошлин, залогов и других сумм в пользу «Дойче Банка» по Договору займа от 06.10.2006; задолженность второй очереди – любая задолженность Заемщика какому-либо или всем Кредиторам второй очереди.

В соответствии с данным соглашением оплата всей или какой-либо части задолженности второй очереди откладывается и является второочередной по отношению к полной оплате задолженности первой очереди. Никакие платежи в отношении задолженности второй очереди не осуществляются, пока окончательно не выплачена задолженность первой очереди.

Со стороны компаний «Блиденсол», «Доралин» и «Тафтс» договор подписан Д. Гаркушей; со стороны ЗАО «Центурион Альянс» - М. Клочиным и В. Тимчёнко (т. 77 л.д. 2-24, 25-47);

- договором цессии страхования от 22.12.2006 между ЗАО «Центурион Альянс» в качестве Правоуступателя и «Дойче Банком» в качестве Залогового агента, согласно которому констатируется, что в соответствии с Договором займа от 06.10.2006 «Дойче Банк» предоставит кредит компании «Блиденсол» (Заемщик) на сумму 100 млн долларов США; Правоуступатель дал свое согласие заключить настоящий договор с целью обеспечения должного и своевременного выполнения Заемщиком своих обеспеченных обязательств; в соответствии с настоящим договором Правоуступатель безотзывно и безусловно берет на себя обязательства Залогового агента, который в любой момент времени; когда наступил и продолжается Случай невыполнения обязательств, и после которого Заемщику было направлено уведомление о досрочном истребовании с копией Правоуступателю, в результате чего Правоуступатель по требованию осуществляет платеж и погашает Обеспеченные обязательства в момент, когда наступает или наступит срок уплаты такого платежа; со стороны ЗАО «Центурион Альянс» документ подписан М. Клочиным и В. Тимченко (т. 77 л.д. 138-170, 171-203);

- письмом генерального директора ООО «Даев Плаза» Д. Фитисова в «Дойче Банк» на имя Г. Колесницкого, согласно которому единственным бенефициаром ООО «Даев Плаза» является Виталий Гогохия (т. 78 л.д. 31);

- свидетельством о передаче от 19.01.2010 между «Дойче Банком» (Текущий Заимодавец) и компанией «Скендлби» (Новый Заимодавец), согласно которому Текущий Заимодавец и Новый Заимодавец согласны, чтобы Текущий Заимодавец передал Новому Заимодавцу по новации все обязательства, права и обязанности по договору займа от

06.10.2006 (с исправлениями от 27.12.2006) между компанией «Блиденсол» и «Дойче Банком» (т. 78 л.д. 41-50);

  - свидетельством о финансовой состоятельности от 18.01.2010, адресованным в «Дойче Банк», согласно которому компания MPH Law Management Ltd. и А. Ильяев в качестве директоров компании «Скендлби» заявляют, что изучили положения закона Кипра о несостоятельности в отношении способности компании «Скендлби» исполнять обязательства в соответствии с Субординированными кредитами, включая без ограничения: принятие суммы в размере 55 500 000 долларов США Субординированных кредитов для единственной цели приобретения кредитов по Договору займа и Соглашению от 18.01.2010 между «Дойче Банком» и «Скендлби»; завершение сделок, исполненных в соответствии с Соглашением, включая приобретение кредитов по Договору займа; погашение Субординированных кредитов (т. 78 л.д. 146-151);

  - свидетельством о полномочиях, в соответствии с которым компания MPH Law Management Ltd. в качестве секретаря компании «Скендлби» подтверждает актуальную информацию в отношении данной компании по состоянию на 15.01.2010 (т. 78 л.д. 153-156, 158-161);

  - декларацией доверительной собственности от 16.10.2006, согласно которой номинальный держатель «Дадлоу Секретариал Лтд.» подтверждает и гарантирует, что владеет акциями компании «Доралин» в качестве номинального держателя, за и от имени собственника – компании «Тафтс» (т. 78 л.д. 163-164);

  - письмом «Дойче Банка» в ЗАО «Центурион Альянс» от 01.04.2009 со ссылкой на Соглашение о залоге прав на счет от 25.12.2006 и просьбой предоставления документов в соответствии с указанным Соглашением (т. 78 л.д. 179-180);

  - письмом «Дойче Банка» в компании «Блиденсол», «Тафтс», «Доралин» и ЗАО «Центурион Альянс» от 08.04.2009 со ссылкой на Договор займа от 06.10.2006 с исправлениями от 27.12.2006, на сумму 100 млн. долларов США, с просьбой предоставления информации и документов, в том числе – оригинала выписки со счета Депо компании «Доралин» в «Дойче Банк» в качестве депозитария, подтверждающей, что залог всех акций ЗАО «Центурион Альянс» надлежащим образом зарегистрирован, и акции в настоящее время находятся под залогом в пользу «Дойче Банка» (т. 78 л.д. 182-191);

  - письмом компании «Inscred Company Corp.» (Покупатель) в «Дойче Банк» (Продавец) от 13.04.2009 со ссылкой на письмо от 19.03.2009 о предоставлении исключительных прав, при этом сообщается, что Продавец (Дойче Банк) не предоставил Покупателю определенных документов в отношении залога акций «Доралин», кроме того, между документами относительно залога акций «Доралин» есть существенная разница, так как не все документы находятся у Продавца; согласно имеющейся информации Заемщик не сможет предоставить вышеуказанные документы Продавцу в течение первоначального периода действия исключительных прав, продленного до 17.04.2009, в связи с этим Покупатель рассматривает два варианта: вопрос прекращения Письма о предоставлении исключительных прав в соответствии с п. 4.4 и просьбу возмещения Депозита в соответствии с п. 2.4.1; разработка нового формата сотрудничества с Продавцом (т. 78 л.д. 199-200);

  - письмом «Дойче Банка» (Продавец) в «Inscred Company Corp.» (Покупатель) от 19.03.2009, в котором констатируется, что Покупатель выразил заинтересованность в приобретении всех прав Продавца по Договору займа на сумму 100 млн. долларов США от 06.10.2006 (с изменениями от 27.12.2006); в соответствии с п. 2.1.2 Покупатель перечисляет на счет Продавца 5 млн. долларов США как Депозит для оплаты Цены покупки; в соответствии с разделом 3 после получения Депозита Продавец соглашается в течение периода эксклюзивности обеспечить доступ Покупателя к копиям необходимых документов по сделке, не вступать в переговоры с любым лицом в связи с продажей всех или части своих прав по Договору Займа; в соответствии с разделом 4 Покупатель имеет

право в любой момент времени в течение Первоначального периода эксклюзивности уведомить Продавца о своем намерении приобрести права и обязательства по Займу за Цену покупки, которая составляет не менее 75 млн. долларов США. Период эксклюзивности означает период от даты вступления в силу по дату, наступившую ранее: 1) даты по просшествии 21 дня; 2) даты, на которую Продавец получит уведомление о покупке в соответствии с разделом 4 (т. 78 л.д. 212-226, 227-243);

- схемой корпоративной структуры Заемщика, в соответствии с которой по состоянию на 27.12.2006 Д. Гаркуша владеет 100% акций в компании «Блиденсол» (т. 78 л.д. 248, 249);

- схемой корпоративной структуры «Европарк» от 27.12.2006, согласно которой Д. Гаркуша, В. Смагин и компания «Калкен» владеют соответственно 7%, 20% и 73% в компании «Тафтс», которая владеет 100% в компании «Доралин», которая владеет 100% в ЗАО «Центурион Альянс» (т. 78 л.д. 251, 252);

- протоколом выемки от 19.01.2012 в Некоммерческом партнерстве «Российское газовое общество» материалов дела по иску ЗАО «Торговый Дом «Уникомимпекс» к компании «Доралин» (т. 79 л.д. 10-13), которые осмотрены 20.01.2012 (т. 79 л.д. 124-131);

- исковым заявлением ЗАО «Торговый Дом «Уникомимпекс» к компании «Доралин» от 04.05.2009 о признании права собственности и обязании передать акции, поданным в Постоянно действующий третейский суд при Некоммерческом партнерстве «Российское Газовое общество» (т. 79 л.д. 19-21);

- договором купли-продажи акций от 26.12.2006, согласно которому ЗАО «ТД «Уникомимпекс» (Продавец) в лице генерального директора Новикова Р.В., продает, а компания «Доралин» (Покупатель) в лице представителя по доверенности Гаркуши Д.В. принимает и оплачивает 460 акций ЗАО «Центурион Альянс» за 6 323 320 руб., срок оплаты установлен в течение 10 банковских дней после внесения соответствующей записи в реестр акционеров (т. 79 л.д. 29-30);

- дополнительным соглашением от 02.03.2009 к договору купли-продажи акций от 26.12.2006 между ЗАО «ТД «Уникомимпекс» (Продавец) в лице генерального директора Новикова Р.В. и компанией «Доралин» (Покупатель) в лице представителя по доверенности Смагина В.И., в котором стороны констатировали неисполнение компанией «Доралин» обязательства по оплате акций, в связи с этим Покупатель принял на себя обязательство оплатить акции в течение трех банковских дней после подписания соглашения (т. 79 л.д. 31);

- дополнительным соглашением от 25.02.2009 к договору купли-продажи акций от 26.12.2006 между ЗАО «ТД «Уникомимпекс» (Продавец) в лице генерального директора Новикова Р.В. и компанией «Доралин» (Покупатель) в лице представителя по доверенности Смагина В.И., в котором стороны констатируют, что Покупатель перечислил Продавцу денежную сумму в размере 6 323 320 руб. в счет оплаты суммы сделки, но не исполнил обязательство по оплате оставшейся части суммы сделки в размере 6 323 320 руб. (т. 79 л.д. 98);

- решением Постоянно действующего третейского суда при Некоммерческом партнерстве «Российское Газовое общество» от 21.07.2009, в соответствии с которым в полном объеме удовлетворен иск ЗАО «ТД «Уникомимпекс» к компании «Доралин», за ЗАО «ТД «Уникомимпекс» признано право собственности на 460 акций ЗАО «Центурион Альянс», а также компания «Доралин» обязана возвратить ЗАО «ТД «Уникомимпекс» 460 акций ЗАО «Центурион Альянс» путем выдачи передаточного распоряжения для внесения записи в реестр владельцев ценных бумаг (т. 79 л.д. 114-120);

- протоколом выемки от 06.03.2012 в Некоммерческом партнерстве «Российское газовое общество» материалов дела по иску ЗАО «Титул» к компании «Доралин» (т. 80 л.д. л.д. 5-8), осмотр документов проведен 12.04.2012 (т. 80 л.д. 106-111);

- исковым заявлением от 04.05.2009 ЗАО «Титул» к компании «Доралин» о признании права собственности и обязании передать акции в связи с неисполнением обязательств компанией «Доралин» (т. 80 л.д. 14-16);

- договором купли-продажи акций от 26.12.2006, согласно которому ЗАО «Титул» (Продавец) в лице генерального директора Балакина В.В. и компания «Доралин» (Покупатель) в лице представителя по доверенности Гаркуши Д.В. заключили настоящий договор о том, что Продавец продает, а Покупатель принимает и оплачивает 759 акций ЗАО «Центурион Альянс», что составляет 33% от общего количества акций, за 10 515 000 руб., со сроком оплаты в течение 10 банковских дней после внесения соответствующей записи в реестр акционеров (т. 80 л.д. 23-24);

- дополнительным соглашением от 02.03.2009 к договору купли-продажи акций от 26.12.2006 между ЗАО «Титул» (Продавец) в лице генерального директора Тихомирова А.В. и компанией «Доралин» (Покупатель) в лице представителя по доверенности Смагина В.И., согласно которому стороны констатировали неисполнение компанией «Доралин» обязательства по оплате акций, в связи с чем Покупатель принял на себя обязательство оплатить акции в течение трех банковских дней после подписания настоящего соглашения; в случае неисполнения данного обязательства договор купли-продажи акций от 26.12.2006 считается расторгнутым, после чего Покупатель обязан подготовить и передать ЗАО «Титул» подписанное передаточное распоряжение для внесения соответствующей записи в реестр владельцев ценных бумаг ЗАО «Центурион Альянс» (т. 80 л.д. 25);

- дополнительным соглашением от 25.02.2009 к договору купли-продажи акций от 26.12.2006 между ЗАО «Титул» (Продавец) в лице генерального директора Тихомирова А.В. и компанией «Доралин» (Покупатель) в лице представителя по доверенности Смагина В.И., согласно которому стороны констатируют, что Покупатель перечислил Продавцу денежную сумму в размере 10 515 000 руб. в счет оплаты суммы сделки, но не исполнил обязательство по оплате оставшейся части суммы сделки в размере 10 515 000 руб. (т. 80 л.д. 81);

- решением Постоянно действующего третейского суда при Некоммерческом партнерстве «Российское Газовое общество» от 21.07.2009, согласно которому в полном объеме удовлетворен иск ЗАО «Титул» к компании «Доралин», за ЗАО «Титул» признано право собственности на 759 акций ЗАО «Центурион Альянс»; компания «Доралин» обязана возвратить ЗАО «Титул» 759 акций ЗАО «Центурион Альянс» (т. 80 л.д. 97-103);

- исковым заявлением ООО «Милеа» к компании «Доралин» от 04.05.2009 о признании права собственности и обязании передать акции, поданным в Постоянно действующий третейский суд при Некоммерческом партнерстве «Российское Газовое общество» (т. 80 л.д. 128-130);

- договором купли-продажи акций от 26.12.2006, согласно которому ООО «Милеа» продает и компания «Доралин» принимает и оплачивает 460 акций ЗАО «Центурион Альянс», что составляет 20 % от общего количества акций, за 6 323 320 руб. (т. 80 л.д. 137);

- дополнительным соглашением от 25.02.2009 к договору купли-продажи акций от 26.12.2006 между ООО «Милеа» (Продавец) в лице генерального директора Трошина И.А. и компанией «Доралин» (Покупатель) в лице представителя по доверенности Смагина В.И., согласно которому стороны констатируют, что Покупатель перечислил Продавцу денежную сумму в размере 6 323 320 руб. в счет оплаты суммы сделки, но не исполнил обязательство по оплате оставшейся части суммы сделки в размере 6 323 320 руб. (т. 80 л.д. 195);

- дополнительным соглашение от 02.03.2009 к договору купли-продажи акций от 26.12.2006 между ООО «Милеа» (Продавец) в лице генерального директора Трошина И.А. и компанией «Доралин» (Покупатель) в лице представителя по доверенности Смагина

В.И., в котором стороны констатировали неисполнение компанией «Доралин» обязательства по оплате акций (т. 80 л.д. 138);

- решением Постоянно действующего третейского суда при Некоммерческом партнерстве «Российское Газовое общество» от 21.07.2009, в соответствии с которым в полном объеме удовлетворен иск ООО «Милеа» к компании «Доралин», за ООО «Милеа» признано право собственности на 460 акций ЗАО «Центурион Альянс», компания «Доралин» обязана возвратить ООО «Милеа» 460 акций ЗАО «Центурион Альянс» (т. 80 л.д. 211-217);

- протоколом выемки от 06.03.2012 в Некоммерческом партнерстве «Российское газовое общество» материалов дела по иску ООО «Милеа» к компании «Доралин» (т. 80 л.д. 119-122), которые осмотрены 17.04.2012 (т. 80 л.д. 220-226);

- определением Арбитражного суда г. Москвы от 06.05.2009, согласно которому удовлетворено требование компании «Longlake Holdings Limited» о принятии обеспечительных мер по иску к ЗАО «Центурион Альянс» в виде запрета осуществлять государственную регистрацию отчуждения ТК «Европарк» (т. 81 л.д. 11-12);

- определением Арбитражного суда г. Москвы от 10.03.2010 об отмене обеспечительных мер на основании заявления компании «Longlake Holdings Limited» со ссылкой на отказ от принятия ненадлежащего исполнения, предложенного Поручителем обязательств по договору № 1 от 31.12.2007 и договора поручительства № 2/07 от 31.12.2007, что влечет прекращение поручительства (т. 81 л.д. 32);

- протоколом выемки от 30.03.2011, в ходе которой в Некоммерческом партнерстве «Российское газовое общество» изъяты материалы дела по иску компании «Longlake Holdings Ltd.» к ЗАО «Центурион Альянс» (т. 82 л.д. 3-6), которые осмотрены 06.04.2011 (т. 83 л.д. 247-263);

- исковым заявлением от 30.04.2009 компании «Longlake Holdings Ltd.» к ЗАО «Центурион Альянс», поданным в Постоянно действующий третейский суд при Некоммерческом партнерстве «Российское Газовое общество», в котором истец просит передать ему в собственность имущество - 1) ТК «Европарк», расположенный по адресу: г. Москва, Рублевское шоссе, д. 62; право аренды земельного участка площадью 31 900 квадратных метров по адресу: г. Москва, Рублевское шоссе, д. Екатериновка, ссылаясь на заключение сторонами 03.09.2008 соглашения № 1/1 к Договору поручительства № 2/07 от 31.12.2007, по которому ЗАО «Центурион Альянс» (Поручитель) приняло обязательство отвечать перед компанией «Longlake Holdings Ltd.» (Кредитор) за надлежащее исполнение ЗАО «Декорум» (Должник) всех его обязательств по Договору № 1 от 31.12.2007 (т. 82 л.д. 12-15);

- заявлением и определением о принятии обеспечительных мер от 30.04.2009 (т. 82 л.д. 18-20, 21-22);

- договором № 1 от 31.12.2007 между ЗАО «Декорум» в лице первого заместителя генерального директора Павлюченко Е.В. и компанией «Хэкхем» в лице поверенного Гогохия В.Г., действующего на основании доверенности от 31.10.2005, в котором стороны констатируют наличие у ЗАО «Декорум» задолженности в размере 134 849 918,09 долларов США, вытекающей из договоров займа, заключенных за период с 03.09.2003 по 03.08.2007, и договариваются о новации обязательства – обязанности ЗАО «Декорум» выплатить денежные средства компании «Хекхем» в рублях в соответствующей сумме (т. 82 л.д. 23-26);

- договором уступки № 1 от 01.09.2008 между «Хекхем» (Цедент) в лице Гогохии В.Г. и «ООО Decorum Corp. Ltd.» (Правопреемник) в лице Ф.-А. Поморски, по которому Цедент передает Правопреемнику все свои права и обязательства по договору займа № 1 от 31.12.2007, а Правопреемник выплачивает Цеденту 14 217 756 долларов США в срок не позднее 31.12.2020 (т. 82 л.д. 31-36);

- договором уступки № 1/1 от 03.09.2008 между «ООО Decorum Corp. Ltd.» (Цедент) в лице Ф.-А. Поморски и «Longlake Holdings Limited» (Правопреемник) в лице Э.

74

Ниммо-Смита, по которому Цедент передает Правопреемнику все права и обязательства по договору займа № 1 от 31.12.2007, а Правопреемник выплачивает Цеденту 141 455 303,55 долларов США в срок не позднее 31.12.2012 (т. 82 л.д. 37-42);

- договором поручительства № 2/07 от 31.12.2007 между ЗАО «Центурион Альянс» (Поручитель) в лице генерального директора Клочина М.А. и компанией «Хекхем» (Кредитор) в лице поверенного Гогохии В.Г. о том, что между Кредитором и ЗАО «Декорум» (Должник) были заключены договоры займов, которые прекращены в результате заключения договора новации от 31.12.2007. Поручителем по договорам займов было ЗАО «Центурион Альянс». В связи с этим стороны заключили настоящий договор поручительства, по которому Поручитель обязуется отвечать перед Кредитором за надлежащее исполнение ЗАО «Декорум» всех его обязательств. Поручитель и Должник несут солидарную ответственность.

Согласно п. 4.1. Договора в случае неисполнения Поручителем обязательств по договору, Кредитор имеет право заменить требование выплатить ему денежные средства в размере неисполненного обязательства на требование передать ему в собственность имущество Поручителя: 1) ТК «Европарк», расположенный по адресу: г. Москва, Рублевское шоссе, д. 62; 2) право аренды земельного участка площадью 31900 квадратных метров по адресу: г. Москва, Рублевское шоссе, д. Екатериновка (т. 82 л.д. 43-45);

- дополнительным соглашением № 1 от 03.08.2008 к договору поручительства № 2/07 от 31.12.2007 между ЗАО «Центурион Альянс» (Поручитель) в лице генерального директора Клочина М.А. и компанией «ООО Decorum Corp. Ltd.» (Кредитор) в лице Филиппа-Артура Поморски о новой редакции п. 1.2 Договора № 1 от 31.12.2007 (т. 82 л.д. 46);

- соглашением № 1 от 01.09.2008 между ЗАО «Центурион Альянс» (Поручитель) в лице Клочина М.А., компанией «ООО Decorum Corp. Ltd.» (Кредитор) в лице Филиппа-Артура Поморски, компанией «Hackham Invest&Trade Inc.» в лице Гогохии В.Г. к Договору поручительства № 2/07 от 31.12.2007, согласно которому стороны договорились произвести перемену лица на стороне Кредитора в обязательстве, вытекающем из договора Поручительства № 2/07 от 31.12.2007 (т. 82 л.д. 47);

- соглашением № 1 от 01.09.2008 между ЗАО «Центурион Альянс» (Поручитель) в лице Клочина М.А., компанией «Longlake Holdings Ltd.» (Кредитор) в лице Э. Ниммо-Смит, компанией «ООО Decorum Corp. Ltd.» в лице Филиппа-Артура Поморски к Договору поручительства № 2/07 от 31.12.2007, согласно которому стороны договорились произвести перемену лица на стороне Кредитора в обязательстве, вытекающем из договора Поручительства № 2/07 от 31.12.2007 (т. 82 л.д. 48);

- ходатайством об изменении предмета иска компании «Longlake Holdings Ltd.» к ЗАО «Центурион Альянс», в котором Истец просит взыскать с Ответчика 4 668 808 365 руб. (т. 82 л.д. 114-115);

- ходатайством о привлечении другого ответчика, поданным компанией «Longlake Holdings Ltd.» в Постоянно действующий третейский суд при Некоммерческом партнерстве «Российское Газовое общество» по иску к ЗАО «Центурион Альянс», в котором Истец просит привлечь в качестве солидарного Ответчика ЗАО «Декорум» (т. 82 л.д. 120-121);

- протоколом сверки размера задолженности от 25.06.2009 по Договору № 1 от 31.12.2007, между компанией «Longlake Holdings Ltd.» (Кредитор) и ЗАО «Декорум» (т. 82 л.д. 166-187);

- свидетельством о регистрации 21.05.2008 компании «Longlake Holdings Ltd.» (т. 83 л.д. 164-166);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 21.05.2008, согласно которому акционерами компании «Longlake Holdings Ltd.» являются компания Дедлоу Номинис Лтд. (1000 штук акций) и Дедлоу Секретариал Лтд. (1000 штук акций) (т. 83 л.д. 167-170);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 21.05.2008, согласно которому директорами компании «Longlake Holdings Ltd.» являются Х.Д. Деметриадес и Д.А. Деметриадес, секретарем - Дедлоу Секретариал Лтд (т. 83 л.д. 175-178);

- решением постоянно действующего третейского суда при некоммерческом партнерстве «Российское газовое общество» от 05.08.2009, согласно которому удовлетворен иск компании «Longlake Holdings Limited» (Кипр) о солидарном взыскании с ЗАО «Центурион Альянс» и ЗАО «Декорум» задолженности в размере 4 689 670 622,74 руб., вытекающей из договора займа № 1 от 31.12.2007 между «Хекхем» и ЗАО «Декорум», а также отменены обеспечительные меры в виде запрета ЗАО «Центурион Альянс» отчуждать ТК «Европарк» (т. 83 л.д. 233-241);

- протоколом выемки от 11.04.2011, в ходе которой в Некоммерческом партнерстве «Российское газовое общество» изъяты материалы дела по иску компании ООО «Даев Плаза» к ЗАО «Центурион Альянс» (т. 84 л.д. 3-5), которые осмотрены 13.04.2011 (т. 84 л.д. 96-99);

- исковым заявлением от 29.04.2009 ООО «Даев Плаза» к ЗАО «Центурион Альянс», поданным в Постоянно действующий третейский суд при Некоммерческом партнерстве «Российское Газовое общество» о взыскании задолженности в размере 187 926 359 руб. (т. 84 л.д. 11-12);

- договором новации № 12/08 от 25.12.2008 между ЗАО «Центурион Альянс» (Должник) в лице Клочина М.А. и ООО «Даев Плаза» в лице Фитисова Д.А., согласно которому взамен заемного и вексельных обязательств Должник обязуется выплатить Кредитору сумму в размере 187 926 359 руб. (т. 84 л.д. 13-14);

- решением от 13.05.2009 Постоянно действующего третейского суда при Некоммерческом партнерстве «Российское Газовое общество» по иску ООО «Даев Плаза» к ЗАО «Центурион Альянс» о взыскании 187 926 359 руб. (т. 84 л.д. 87-88, 89-92);

- протоколом осмотра от 04.03.2011 в помещении Арбитражного суда г. Москвы арбитражного дела № 40-58704/09-38-238 «Б» по иску ООО «Даев Плаза» о признании ЗАО «Центурион альянс» банкротом (т. 84 л.д. 106-113);

- заявлением ООО «Даев Плаза» в Арбитражный суд г. Москвы от 25.05.2009 о введении процедуры наблюдения и признании ЗАО «Центурион Альянс» (несостоятельным) банкротом (т. 84 л.д. 117-119);

- заявлением ООО «Даев Плаза» в Арбитражный суд г. Москвы по делу № 40-58704/09-38-238 «Б» об отказе истца от заявления о признании ЗАО «Центурион Альянс» несостоятельным (банкротом) и прекращении производства по делу (т. 84 л.д. 279);

- определением Арбитражного суда г. Москвы от 21.01.2010 по делу № 40-58704/09-38-238 «Б» о прекращении производства по делу о признании ЗАО «Центурион Альянс» банкротом (т. 84 л.д. 282);

- специальным решением акционеров «Доралин» - компаний «Тафтс» и «Мастеро» от 16.01.2010 о том, что единогласно решено удалить статью 74(а), 74(b) и 74(с) Устава и заменить ее новой статьей 74 следующего содержания: «74. Совет директоров должен состоять из двух директоров. Каждый акционер, владеющий 50% акционерного капитала, вправе предложить кандидатуру, назначить и сместить одного директора. Невзирая на любое иное положение настоящего Устава, все решения совета директоров должны приниматься единогласно двумя директорами, и любой договор, заключаемый компанией, действителен только при условии его подписания всеми директорами» (т. 87 л.д. 2, 3);

- особыми резолюциями акционеров компании «Доралин» от 20.04.2010 – компаний «Фамулатус» и «Мастеро», согласно которым компания «Доралин» добровольно ликвидируется (т. 87 л.д. 4-5);

- подтверждением от 22.03.2010, согласно которому компания «Executive Management Limited», являясь единственным директором компании «Мастеро», постановляет, что компания «Мастеро» в качестве акционера «Доралин» соглашается с

продажей «Тафтс» ее 230500 обыкновенных акций, составляющих долю в капитале «Доралин», компании «Фамулатус», а также отказывается от соответствующих преимущественных прав для разрешения на эту сделку (т. 87 л.д. 6-7);

- письменными ответами Андреаса Хавиараса в порядке исполнения компетентными органами Кипра запроса о правовой помощи по уголовному делу о том, что является одним из директоров компании «MPH Law Services Ltd.» (акционерного общества с ограниченной ответственностью), которой принадлежат 50 % акций компании «Скендлби», основанной  «MPH Law Services Ltd.» и «Jella Holdings & Finance Inc.» 23 декабря 2009 года.

В компании «Доралин» А. Хавиарас сообщил, что она была основана компанией Dadlaw Nominees Ltd. (акционерным обществом с ограниченной ответственностью) и Dadlaw Secretarial Ltd. (акционерным обществом с ограниченной ответственностью) 18 сентября 2006 года, в 2010 году компания «Мастеро» и компания «Фамулатус» стали 100% владельцами акционерного капитала компании «Доралин».

В отношении компании «Блиденсол» А. Хавиарас сообщил, что она была основана компанией Dadlaw Nominees Ltd. (акционерным обществом с ограниченной ответственностью) и Dadlaw Secretarial Ltd. (акционерным обществом с ограниченной ответственностью) 02 августа 2006 года (т. 87 л.д. 12-15, 58-61, 208-211);

- письменными ответами Нтианы Атцамидоу в порядке исполнения компетентными органами Кипра запроса о правовой помощи по уголовному делу, согласно которым является директором и секретарем компании «Фамулатус», основанной 19 октября 2009 г. (т. 87 л.д. 16-19);

- корпоративным реестром компании «Фамулатус» от 20.03.2012, согласно которому в период с 19.10.2009 по 15.04.2010 директором компании являлась Ставрулла Зида, с 15.04.2010 по настоящее время - Нтиана Атзамиду, которая с указанной даты владеет двумя тысячами обыкновенных акций компании стоимостью один евро каждая (т. 87 л.д. 20-31);

- корпоративным реестром компании «Доралин» от 19.03.2012, согласно которому компании «Dadlaw Nominees Limited» (Дедло Номиниз Лтд.) и  «Dadlaw Secretarial Limited» (Дедло Секретариал Лтд.) в период с 18.09.2006 по 18.10.2006 являлись акционерами с количеством акций по 500 штук у каждой; 18.10.2006 произведен выпуск дополнительных акций, и данные компании до 21.12.2006 стали владельцами по 230 500 штук акций. 21.12.2006 все акции (461 000) переданы компании «Тафтс». С 22.12.2006 все акции (461 000) находились в залоге у «Дойче Банка»; 16.01.2010 - 230 500 акций компании «Доралин», принадлежащих «Тафтс», переданы компании «Мастеро»; 13.04.2010 - 230 500 акций компании «Доралин», принадлежащих «Тафтс», переданы компании «Фамулатус» (т. 87 л.д. 62-75, 76-89);

- корпоративным реестром компании «Блиденсол» от 19.03.2012, согласно которому компании «Dadlaw Nominees Limited» (Дедло Номиниз Лтд.) и  «Dadlaw Secretarial Limited» (Дедло Секретариал Лтд.) являлись акционерами в период с 02.08.2006 по 20.08.2008, с 20.08.2008 по 07.11.2008 единственным акционером являлась компания «Konk Select Partners Inc.»; 07.11.2008 100% акций проданы компании «Solid Rock Trading Ltd.». 16.01.2010 50% акций, принадлежащих «Solid Rock Trading Ltd.», проданы компании «Brich Trading SA.»; 09.09.2010 50% акций, принадлежащих «Brich Trading SA.», проданы обратно компании «Solid Rock Trading Ltd.»; 09.09.2010 1 акция, принадлежащая «Solid Rock Trading Ltd.», продана компании MPH Management Limited (т. 87 л.д. 90-115);

- письменными ответами Майкла Филиппоу в порядке исполнения компетентными органами Кипра запроса о правовой помощи по уголовному делу, согласно которым он является одним из директоров компании «MPH Law Services Ltd.» (акционерного общества с ограниченной ответственностью). Компания «Prechard» была основана

«Executive Management Ltd.» (акционерным обществом с ограниченной ответственностью) 28 июля 2010 года (т. 87 л.д. 204-207);

- корпоративным реестром компании «Скендлби» от 19.03.2012, согласно которому с 23.12.2009 по 29.12.2009 единственным акционером являлась компания «MPH Law Management Limited»; 29.12.2009 1000 штук акций (50%) переданы компании Jella Holding & Finance Inc. (БВО) (т. 87 л.д. 212-221);

- учредительным документом компании «Скендлби», согласно которому зарегистрированный офис компании будет находиться на Кипре; ответственность участников Компании ограничена; акционерный капитал компании составляет 2000 евро, который разделен на 2000 акций номиналом один евро каждая (т. 88 л.д. 7-15, 21-29);

- уставом компании «Скендлби» и свидетельством об учреждении от 07.11.2008 (т. 88 л.д. 16-20, 30-34; 41-42, 173-174);

- свидетельством регистрации, согласно которому компания «Доралин» учреждена 18.09.2006 в соответствии с законодательством Кипра (т. 88 л.д. 51-52; т. 71 л.д. 233-237);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 28.09.2011, согласно которому акционерами компании «Доралин» являются компании «Мастеро» и «Фамулатус», владеющие каждая по 230 500 обыкновенных акций стоимостью 1,71 евро каждая (т. 88 л.д. 55-56);

- свидетельством об учреждении, согласно которому компания «Ionics Secretaries Limited» учреждена 04.11.2002 (т. 88 л.д. 67-68);

- свидетельством об учреждении компании «Фамулатус» 19.12.2009 в соответствие с законодательством Кипра, в форме общества с ограниченной ответственностью (т. 88 л.д. 101-102);

- свидетельством об учреждении «Калкен» 10.11.2005 (т. 88 л.д. 77-78, 131-132);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 28.09.2011, согласно которому акционерами компании «Калкен» являются Михаил Ананьев (40 акций), Максим Клочин (40 акций), Леник Карапетян (920 акций), стоимость каждой акции составляет 1,71 евро (т. 88 л.д. 83-84);

- свидетельством о регистрации компании «Скендлби» 23.12.2009 (т. 88 л.д. 85-86);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 11.10.2011, согласно которому директорами компании «Скендлби» являются Андрей Ильяев и компания «MPH Law Secretarial Limited» (т. 88 л.д. 89-90);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 11.10.2011, согласно которому акционерами компании «Скендлби» являются компании «MPH Law Services Limited» и «Jella Holding & Finance Inc.», владеющие по одной тысяче обыкновенных акций каждая стоимостью один евро за акцию (т. 88 л.д. 91-92);

- свидетельством об учреждении, согласно которому компания «Блиденсол» учреждена 02.08.2006 (т. 88 л.д. 93-94);

- свидетельством об учреждении компании «Фамулатус» 19.12.2009 (т. 88 л.д. 101-102);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 11.10.2011, согласно которому акционером компании «Фамулатус» является Нтиана Атзамиду, владеющая 2000 обыкновенных акций стоимостью один евро каждая (т. 88 л.д. 107-108);

- реестром членов и книгой учета акций компании «Калкен» о том, что единственным акционером компании в период с 09.11.2005 по 05.03.2008 являлась компания «Ionics Nominees Limited», которой принадлежало 1000 штук акций стоимостью 1 евро каждая; с 05.03.2008 по 18.01.2010 акционерами компании были Ананьев М.Б. – 40 штук акций, Клочин М.А. – 40 штук акций, «Ionics Nominees Limited» - 920 штук акций; 18.01.2010 Леник Карапетян приобрел 920 штук акций у компании «Ionics Nominees Limited» (т. 88 л.д. 115-128);

78

- договором об учреждении и уставом компании «Калкен» (т. 88 л.д. 133-140, 150-155, 141-149, 156-162);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 15.06.2009 о секретаре и директоре компании «Мастеро» (т. 88 л.д. 175-176);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 09.01.2009, согласно которому акционером компании «Мастеро» является компания «Global Conformity AG», владеющая 2000 обыкновенных акций стоимостью один евро каждая (т. 88 л.д. 177-178);

- сертификатом № 1 от 07.11.2008, согласно которому компания Global Conformity AG является владельцем 2000 обыкновенных акций компании «Мастеро» стоимостью один евро каждая (т. 88 л.д. 181-182);

- реестром компании «Мастеро», согласно которому директором и секретарем компании в период с 07.11.2008 по 23.02.2009 являлась «G.A.H. Nominee Services Ltd.», с 23.02.2009 по настоящее время – Executive Management Ltd.; акционером компании с 07.11.2008 является компания «Global Conformity AG» (т. 88 л.д. 183-188, 189-194);

- договором покупки акций от 18.01.2010, согласно которому компания «Тафтс» за 5000 евро продала компании «Мастеро» (Кипр) 230 500 штук акций компании «Доралин», что составляет 50% от выпущенных и распределенных акций компании (т. 88 л.д. 207-221; 222-236);

- актом передачи акций от 16.01.2010, согласно которому компания «Тафтс» передала компании «Мастеро» 230 500 акций в компании «Доралин» (т. 88 л.д. 237-238);

- протоколом обыска от 16.06.2009 в офисе компании «Лавеллз Си-Ай-Эс» документов в отношении компаний ЗАО «Декорум», «Дойче Банк», «Блиденсол», «Дэдлоу Номинил Лтд.», «Дэдлоу Секретериал Лтд.» и других (т. 91 л.д. 5-22), которые осмотрены 01.08.2009 (т. 91 л.д. 287-304);

- письмом «Дойче Банка» в компанию «Тафтс» от 01.04.2009 со ссылкой на Акт о залоге акций от 26.12.2006, предоставленный компанией «Тафтс» в пользу «Дойче Банк» в отношении акций компании «Доралин», с просьбой предоставления документов в соответствии с Актом от 26.12.2006 (т. 93 л.д. 72-75);

- решением единственного акционера компании «Блиденсол» от 23.04.2009, согласно которому с учетом отставок Д.А. Деметриадеса и Х. Д. Деметриадеса 23.04.2009 с должности директоров компании, а «Дадло Секретариал Лтд» - с должности секретаря компании, новым единоличным директором компании назначается компания «Newgeneration Services Limited» (БВО), а новым секретарем – компания «MPH Law Secretarial Limited» (Кипр) (т. 93 л.д. 118-119);

- письмом директора компании «Доралин» - компании «Newgeneration Services Ltd.» в «Дойче Банк» (Залогодержатель) от 24.04.2009, в котором констатируется обязательство перед Залогодержателем, что в течение всего периода, когда обеспеченные Залогом обязательства действительны (по Залогу акций от 22.12.2006 с изменениями от 24.04.2009), - не совершать никаких действий, не соответствующих условиям Договора или Залога акций; принимать меры, чтобы Залогодержатель своевременно получал все надлежащие уведомления любого предполагаемого общего собрания акционеров компании «Доралин» (т. 93 л.д. 130-131);

- свидетельством от 24.04.2009 о том, что в соответствии с законодательством Кипра, Меморандумом Акта о Первой поправке к Залогу акций от 24.04.2009, который вносит поправки в Договор Залога акций от 22.12.2006 в пользу «Дойче Банка» в отношении 461 000 акций компании «Доралин», принадлежащих компании «Тафтс», было надлежащим образом внесено в Реестр акционеров компании «Доралин» (т. 93 л.д. 132-133);

- свидетельством от 27.12.2006 о внесении в Реестр акционеров компании уведомления о залоге в пользу «Дойче Банка» в отношении 461 000 акций компании «Доралин», принадлежащих компании «Тафтс» (т. 93 л.д. 144-145);

- единогласной письменной резолюцией совета директоров компании «Блиденсол» от 27.12.2006 о заключении Кредитного договора с Дойче Банк АГ (т. 93 л.д. 170-173);

- единогласным письменным решением совета директоров компании «Доралин» от 22.12.2006, согласно которому компания заключит с «Дойче Банком» Договор о Залоге акций – передаче в залог 2 300 акций ЗАО «Центурион Альянс», для обеспечения кредита компании «Блиденсол» на сумму 100 млн долларов США; компания заключит Договор о субординировании Долга с субординированными кредиторами и «Дойче Банком»; компания заключит Договор Поручительства, по которому компания гарантирует надлежащее и своевременное выполнение компанией «Блиденсол» обязательств по Кредитному договору с «Дойче Банк»; компания предоставит доверенности на имя Дмитрия Гаркуши и Евгении Судец (т. 93 л.д. 178-183);

- учредительным договором и уставом «Тафтс» от 18.09.2006 с изменениями от 23.11.2009 (т. 94 л.д. 35-82);

- проектом соглашением о распоряжении имуществом и прекращении обязательств (Deed of settlement and termination) от 2010 (без указания точной даты) между компаниями «Скендлби», «Доралин», «Блиденсол».

В преамбуле договора указано, что 06.10.2006 компания «Блиденсол» заключила Кредитный договор с «Дойче Банком», который был изменен и оформлен в новой редакции 27.12.2006.

В качестве обеспечения обязательств, принятых компанией «Блиденсол», компания «Доралин» подписала Обеспечительные документы.

В соответствии с Договором выкупа от 18.01.2010 и Договором об освобождении от обязанностей и назначении от 18.01.2010 права на получение выгоды по Кредитному договору и Обеспечительным документам соответственно были переданы в пользу компании «Скендлби».

В соответствии с условиями настоящего Соглашения его Стороны выражают согласие прекратить все свои соответствующие права и обязательства в отношении друг друга по Обеспечительным документам и отказаться от всех настоящих и будущих требований в отношении друг друга по этим документам.

В разделе 1 дается толкование терминам, используемым в Соглашении. Под «Компанией» имеется в виду ЗАО «Центурион Альянс»; под «Акциями» - 2300 штук акций Компании; под «Договором Залога «Доралин» - договор залога, заключенный между компанией «Доралин» и «Дойче Банком» 22.12.2006»; под «Обеспечительными документами» - в совокупности Договор поручительства и гарантии возмещения ущерба «Доралин» и Договор залога «Доралин».

В разделе 2 записано, что компания «Доралин» гарантирует компании «Скендлби», что: «Доралин» является единственным законным бенефициарным собственником «Акций»; «Акции» составляют весь выпущенный акционерный капитал Компании; отсутствуют какие-либо обременения, затрагивающие Акции, за исключением Договора залога «Доралин».

В качестве вознаграждения за освобождение компанией «Скендлби» компании «Доралин» от обязательств по Обеспечительным документам компания «Доралин» в полном объеме передает компании «Скендлби» юридическое право собственности и бенефициарное право на Акции.

Компания «Скендлби», являясь законным залогодержателем по Договору залога «Доралин», дает свое согласие на передачу акций от «Доралин».

Завершение передачи Акций считается состоявшимся в дату, наступающую не позднее 10 февраля, когда запись, подтверждающая, что «Скендлби» является единоличным владельцем Акций без каких-либо обременений (за исключением Договора Залога «Доралин»), была внесена в реестр акционеров Компании или на счет депо (далее – «Дата передачи»).

80

При условии постоянного соблюдения компанией «Доралин» своих обязательств по пункту 2 в полном объеме, Стороны соглашаются, что начиная с Даты передачи, все обязательства «Доралин» по Договору залога «Доралин» полностью прекращаются.

С Даты передачи: 1) компания «Скендлби» освобождает компанию «Блиденсол» от любых обязательств, ответственности, претензий, гарантий, предусмотренных Кредитным договором; 2) компания «Скендлби» освобождает компанию «Доралин» от любых обязательств, ответственности, претензий, гарантий, предусмотренных Обеспечительными документами; 3) каждая Сторона отказывается от всех без исключения прав подачи иска против одной или нескольких Сторон; 4) Стороны соглашаются, что Кредитный договор и Обеспечительные документы расторгаются и теряют юридическую силу.

В разделе 9 указано, что необходимые уведомления в отношении компаний «Доралин», «Блиденсол», «Скендлби» подлежат направлению на адреса Артема Егиазаряна (г. Москва, Даев пер., д. 20) и Владимира Дерюгина (г. Москва, Подколокольный пер., 13/5) (т. 94 л.д. 191-208, 212-247);

- протоколом выемки 24.11.2011 у свидетеля Э.М. Ниммо-Смита документов в отношении компаний «MPH Law Services Ltd.», «MPH Law Management Ltd.», «Фамулатус», «Скендлби» и другие (т. 95 л.д. 57-64), которые осмотрены 28.11.2011 и 02.02.2012 (т. 95 л.д. 67-72, 204-211);

- письмом от имени Э.М. Ниммо-Смита в компанию «Фамулатус», в котором поручается принятие соответствующих решений совета директоров компании «Доралин» от 19.04.2010, в том числе компания не осуществляет никакой деятельности с марта 2010 г. и отсутствует намерение возродить компанию; компания не владеет никакими активами и по сведению директоров не имеет никаких обязательств (т. 95 л.д. 120-121);

- письмом Э.М. Ниммо-Смита от 15.04.2010 на имя Ставроулла Ксида, в котором поручается изменить имена номинальных акционеров, директора и секретаря компании «Фамулатус» на имя гражданки Греции Нтиану Атзаниду (т. 95 л.д. 122-123);

- письмом от имени Артема Егиазаряна в компанию «New Generation Services Ltd.», в котором поручается принятие следующих решений совета директоров компании «Доралин» от 19.04.2010, в том числе компания не осуществляет никакой деятельности с марта 2010 г. и отсутствует намерение возродить компанию; компания не владеет никакими активами и по сведению директоров не имеет никаких обязательств (т. 95 л.д. 124-125);

- декларацией доверительной собственности от 17.12.2009, согласно которой Ставрулла Ксида является Доверительным собственником в отношении 2000 акций компании «Фамулатус», фактическим исключительным собственником которых является Э.М. Ниммо-Смит (т. 95 л.д. 126-129);

- фидуциарным договором и сроками исполнения поручений, заключенными 17.12.2009, между Э.М. Ниммо-Смитом (Принципал) и С. Ксида (Директор) в отношении компании «Фамулатус», за исключением Принципала, только Галина Белых наделяется правом давать инструкции Директору (т. 95 л.д. 130-135);

- письмом Э.М. Ниммо-Смита (без даты) на имя Ставроулла Ксида, в котором поручается прекратить действовать в качестве назначенного Э.М. Ниммо-Смитом лица в отношении всех акций в капитале компании «Фамулатус», и вместо этого действовать в качестве назначенного лица в отношении Сурена Егиазаряна (т. 95 л.д. 136-137);

- декларацией доверительной собственности от 22.12.2009, согласно которой компания «MPH Law Services Ltd.» является Доверительным собственником в отношении 1000 акций компании «Скендлби», фактическим исключительным собственником которых является Э.М. Ниммо-Смит (т. 95 л.д. 138-141);

- фидуциарным договором и сроками исполнения поручений, заключенными 22.12.2009 между Э.М. Ниммо-Смитом (Принципал) и компанией «MPH Law Services Ltd.» (Директор) в отношении компании «Скендлби», за исключением Принципала

только Артем Егиазарян наделяется правом давать инструкции Директору (т. 95 л.д. 142-149);

- безотзывной инструкцией Э.М. Ниммо-Смита (без даты) в компанию «МРН Law Services Ltd.», в котором поручается прекратить действовать в качестве Доверительного собственника в отношении 50% акций, то есть 1000 штук, компании «Скендлби» в интересах Э.М. Ниммо-Смита, и вместо этого действовать в качестве Доверительного собственника данных акций в интересах Сурена Егиазаряна (т. 95 л.д. 150-151);

- протоколом осмотра документов от 13.08.2012, в ходе которого осмотрены документы, изъятые 01.12.2010 в ходе обыска в ЗАО «Центурион Альянс» (т. 96 л.д. 15-23);

- уведомлением в «Дойче Банк» от ЗАО «Статус» от 01.03.2010 об операции, проведенной по лицевому счету (т. 96 л.д. 26);

- протоколом выемки от 14.12.2010 в АКБ «Фора-Банк», в ходе которой изъяты документы в отношении компаний «Скендлби» и ЗАО «Центурион Альянс» (т. 97 л.д. 65-68), которые осмотрены 14.02.2010 (т. 97 л.д. 69-73);

- поручением представителей компании «Скендлби» Газаровой К.Р. и Сухова М.В. от 19.02.2010 в депозитарный отдел АКБ «Фора-Банк» на открытие счета депо (т. 97 л.д. 74);

- поручением на депозитарную операцию № 1 от 02.03.2010 о зачислении 2300 штук акций ЗАО «Центурион Альянс» на счет депо компании «Скендлби» в АКБ «Фора-Банк» (т. 97 л.д. 76);

- депозитарным договором от 19.02.2010 между АКБ «Фора-Банк» (Депозитарий) и компанией «Скендлби» (Депонент), в соответствии с которым Депозитарий принимает на себя обязательства по предоставлению Депоненту услуг по хранению сертификатов ценных бумаг, учету и удостоверению прав на ценные бумаги, переходу прав на ценные бумаги, принадлежащие Депоненту на праве собственности (т. 97 л.д. 79-86);

- отчетом о состоянии счета депо компании «Скендлби» в АКБ «Фора-Банк» от 02.03.2010, согласно которому на указанном счете учитываются 2300 штук акций ЗАО «Центурион Альянс» (т. 97 л.д. 174);

- протоколом выемки от 25.04.2011 у свидетеля Волковой Л.М. документов ЗАО «Центурион Альянс» (т. 98 л.д. 117-119); которые осмотрены 11.05.2011 (т. 98 л.д. 131-133, 136-140);

- протоколом выемки от 17.11.2010 у свидетеля Смагиной С.И. документов ЗАО «Центурион Альянс» (т. 98 л.д. 173-176); которые осмотрены 24.02.2011 (т. 98 л.д. 230-232);

- распоряжением от 20.06.2005 № 771-РП префекта Западного административного округа г. Москвы об утверждении акта приемочной комиссии по приемке объекта: «Многофункциональный торговый комплекс «Европарк» по адресу: Г. Москва, Рублевское шоссе, владение 62 (т. 98 л.д. 180);

- документом «Дойче Банка» от 18.01.2011 в отношении предоставленного кредита в размере 100 млн. долларов США компании «Блиденсол» о том, что в соответствии с политикой «Дойче Банка» ответственность за руководство всей деловой активностью и за принятие решения относительно продажи кредитного актива «Европарк», а также относительно цены продажи, полностью несет Лондонский филиал компании «Дойче Банк», и, в частности, трейдерская группа по работе на рынках стран с переходной экономикой (т. 101 л.д. 12-14, 15-17);

- документом о назначении первых директоров компании «Тафтс» 18.09.2006, согласно которому первыми директорами назначены Луис А. Дэвис и Памела Д. Холл (т. 106 л.д. 120-121);

- актом переуступки от 21.12.2006, согласно которому компания «Дадло Секретариал Лимитед» (Кипр) за надлежащее встречное удовлетворение заключает

сделку о продаже, переуступке и передаче компании «Тафтс» 500 акций в компании «Доралин» (т. 107 л.д. 5, 6);

- актом переуступки от 21.12.2006, согласно которому компания «Дадло Секретариал Лимитед» (Кипр) за надлежащее встречное удовлетворение заключает сделку о продаже, переуступке и передаче компании «Тафтс» 500 акций в компании «Доралин» (т. 107 л.д. 7-8);

- актом переуступки от 21.12.2006, согласно которому компания «Дадло Секретариал Лимитед» (Кипр) за надлежащее встречное удовлетворение заключает сделку о продаже, переуступке и передаче компании «Тафтс» 230000 акций (под номерами с 1001 по 230000) в компании «Доралин» (т. 107 л.д. 9-10);

- актом переуступки от 21.12.2006, согласно которому компания «Дадло Секретариал Лимитед» (Кипр) за надлежащее встречное удовлетворение заключает сделку о продаже, переуступке и передаче компании «Тафтс» 230000 акций (под номерами с 230001 по 461000) в компании «Доралин» (т. 107 л.д. 11-12);

- генеральной доверенностью компании «Блиденсол» от 05.10.2006 на имя Евгении Судец сроком на 1 год (т. 107 л.д. 243-246);

- актом приема-передачи от 19.01.2010, согласно которому «Дойче Банк» (Действующий Кредитор) и компания «Скендлби» (Новый кредитор) дают свое согласие на передачу путем новации Действующим кредитором Новому кредитору всех обязательств, прав и обязанностей Действующего кредитора, а именно совокупную сумму Займа в размере 100 млн долларов США (т. 108 л.д. 31-35, 36-40);

- заявлением «Дойче Банка» о назначении Кредитного агента и Залогового агента от 19.01.2010, адресованным в компанию «Блиденсол», о том, что компания «Скендлби» назначается в качестве Кредитного агента и Залогового агента в отношении Договора займа на 100 млн. долларов США от 06.10.2006 (с изменениями от 27.12.2006) (т. 108 л.д. 43-48);

- финансовым отчетом «Тафтс» по состоянию на 31.12.2007, согласно которому за 2007 г. убыток компании составил 38 957 долларов США (т. 108 л.д. 90-138);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 29.04.2010, согласно которому акционерами компании «Доралин» являются компания «Мастеро» - 230500 акций, и компания «Фамулатус» - 230500 акций (т. 108 л.д. 253, 254);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 17.02.2010, согласно которому акционерами компании «Доралин» являются компания «Тафтс» - 230500 акций, и компания «Мастеро» - 230500 акций (т. 108 л.д. 256);

- свидетельством Министерства торговли, промышленности и туризма Кипра от 06.05.2010, согласно которому акционером компании «Фамулатус» является Стайройлла Ксида, владеющая 2000 обыкновенных акций стоимостью один евро каждая (т. 108 л.д. 259-260);

- учредительным договором и уставом компании «Доралин» от 12.09.2006 (т. 109 л.д. 49-56, 81-88; 57-80; 89-112; т. 71 л.д. 210-231);

- подтверждением бенефициарного владельца, согласно которому директор компании «Скендлби» А. Ильяев заявляет, что согласно его сведениям компания Jella Holding&Finance Inc. владеет 1000 акциями компании «Скендлби» в интересах Варужана Артеняна (т. 110 л.д. 149-150);

- сообщением Национального бюро Интерпола США о том, что Егиазарян Ашот имеет статус, позволяющий ему проживать на территории США, но Министерство национальной безопасности не может подтвердить или опровергнуть факт его физического нахождения в США (т. 107 л.д. 47-48);

- письмом Министерства юстиции США от 20.08.2012 о том, что США не могут экстрадировать кого-либо при отсутствии двустороннего договора об экстрадиции, данное дело передается в Министерство внутренней безопасности США для рассмотрения

83

возможности депортации. Министерство юстиции США в административном порядке закрывает дело об экстрадиции Егиазаряна Ашота Г. (т. 117 л.д. 168-169);

- письмом НЦБ Интерпола МВД России от 19.11.2012 № 43061/193 о том, что информация о привлечении Егиазаряна А.Г. к уголовной ответственности на территории зарубежных государств в адрес Бюро из компетентных органов стран-членов Интерпола не поступала (т. 113 л.д. 242);

- письмом НЦБ Интерпола МВД России от 13.07.2015 № 34267/181 о том, что информация о привлечении Егиазаряна Ашота Г., Егиазаряна Артема Г., Гогохии В.Г. и Клочина М.А. к уголовной ответственности на территории зарубежных государств в адрес Бюро из компетентных органов стран-членов Интерпола не поступала (т. 118 л.д. 122);

- копией трудовой книжки Егиазаряна Артема Г., согласно которой 21.08.2006 он принят на должность первого заместителя генерального директора ЗАО «Центурион Альянс»; 06.02.2007 переведен на должность заместителя генерального директора по общим вопросам (т. 31 л.д. 109-113, т. 45 л.д. 243-247);

- трудовым договором от 21.08.2006 между ЗАО «Центурион Альянс» (Работодатель) и Егиазаряном Артемом Г. (Работник), согласно которому Егиазарян А.Г. обязан приступить к исполнению своих трудовых обязанностей на должности первого заместителя генерального директора ЗАО «Центурион Альянс» с 21.08.2006 (т. 31 л.д. 97-99);

- дополнительным соглашением от 01.09.2008 к трудовому договору от 21.08.2006, согласно которому Егиазаряну Артему Г. устанавливается оклад в размере 164 450 руб. в месяц (т. 31 л.д. 103);

- письмом генерального директора ЗАО «Центурион Альянс» от 19.06.2012 об увольнении Егиазаряна Артема Г. из ЗАО «Центурион Альянс» 09.08.2010 (т. 46 л.д. 270);

- приказом генерального директора ЗАО «Центурион Альянс» от 09.08.2010 об увольнении заместителя генерального директора по общим вопросам ЗАО «Центурион Альянс» Егиазаряна Артема Г. (т. 46 л.д. 271);

- письмом НЦБ Интерпола МВД России от 18.07.2013 № 30770/193 о том, что информация о привлечении Егиазаряна Артема Г. к уголовной ответственности на территории зарубежных государств в адрес Бюро из компетентных органов стран-членов Интерпола не поступала (т. 117 л.д. 69);

- письмом НЦБ Интерпола Вашингтона о том, что Егиазарян Артем Г. имеет статус, позволяющий ему проживать на территории США, но Министерство национальной безопасности не может подтвердить или опровергнуть его физическое присутствие в США, отсутствие двустороннего договора между США и Россией препятствует возвращению данного лица в Россию путем выдачи (т. 114 л.д. 175);

- письмом НЦБ Интерпола МВД России от 18.07.2013 № 30772/193 о том, что информация о привлечении Гогохии В.Г. к уголовной ответственности на территории зарубежных государств в адрес Бюро из компетентных органов стран-членов Интерпола не поступала (т. 117 л.д. 72);

- письмом Министерства юстиции Грузии от 10.03.2014 о том, что Гогохия В.Г. считается гражданином Грузии, данное обстоятельство является фактором, препятствующим экстрадиции Гогохии В.Г. в Российскую Федерацию (т. 117 л.д. 165);

- светокопией трудовой книжки Клочина М.А., согласно которой 01.11.2005 он назначен генеральным директором ЗАО «Центурион Альянс» (т. 31 л.д. 84-90);

- трудовым договором от 01.11.2005 между ЗАО «Центурион Альянс» (Общество) и Клочиным М.А. (Генеральный директор), согласно разделу 3 договора Генеральный директор обязан действовать в интересах Общества добросовестно и разумно, не допускать нарушения своих обязанностей; Генеральный директор осуществляет руководство текущей деятельностью Общества, организует работу по обеспечению выполнения решений общего собрания акционеров Общества (т. 37 л.д. 28-31);

84

- письмом НЦБ Интерпола МВД России от 18.07.2013 № 30771/193, в котором сообщается, что информация о привлечении Клочина М.А. к уголовной ответственности на территории зарубежных государств в адрес Бюро из компетентных органов стран-членов Интерпола не поступала (т. 117 л.д. 69);

- сообщением НЦБ Интерпола США о том, что по информации Министерства национальной безопасности США Клочин М.А. является гражданином США с 16.06.2006 и в настоящее время не подлежит депортации или выдаче, отсутствие двустороннего соглашения об экстрадиции между США и Российской Федерацией препятствует возвращению данного лица в Россию путем экстрадиции (т. 115 л.д. 227);

- письмом УВД по ЦАО ГУ МВД России по г. Москве от 23.04.2014, в котором сообщается, что с 16.06.2006 находящийся в международном розыске Клочин М.А. является гражданином США, в связи с отсутствием международных договоров между Россией и США о выдаче задержание и экстрадиция Клочина М.А. в Российскую Федерацию невозможно (т. 117 л.д. 150).

Вышеперечисленные доказательства получены в соответствии с требованиями уголовно-процессуального закона, каких-либо взаимоисключающих сведений относительно обстоятельств, подлежащих доказыванию по уголовному делу, не содержат, в связи с чем доказательства, представленные стороной обвинения, являются допустимыми.

Суд доверяет показаниям потерпевшего и свидетелей обвинения, поскольку они последовательны, не противоречивы, согласуются между собой и другими доказательствами по делу, каких- либо сведений о заинтересованности вышеуказанных лиц при даче показаний в отношении подсудимых, оснований для их оговора, равно как и противоречий в показаниях по обстоятельствам дела, ставящих эти показания под сомнение, судом не установлено.

Показания потерпевшего и свидетелей обвинения объективно подтверждаются исследованными в судебном заседании письменными доказательствами — гражданско-правовыми договорами и соглашениями, протоколами следственных действий – обысков, выемок и осмотров, вещественными доказательствами, заключениями экспертов, иными вышеперечисленными доказательствами.

Судебная оценочная экспертиза № 02/20-01-11 от 20.02.2011 (т. 51 л.д. 27-291), а также почерковедческая судебная экспертиза № 12/3115 от 24.06.2011 (т. 55 л.д. 103-106) проведены в соответствии с требованиями ст.ст. 195, 199 УПК РФ, заключения экспертов соответствуют требованиям ст. 204 УПК РФ, их выводы надлежащим образом мотивированы, в связи с чем оснований не доверять данным заключениям суд не усматривает.

Согласно выводам эксперта по состоянию на 26.02.2010 (на момент окончания преступления) стоимость 20 % акций ЗАО «Центурион Альянс», принадлежащих Смагину В.Й., составляла 720 605 444 руб.

Обстоятельства инкриминируемого преступления не связаны с общественно - политической деятельностью Егиазаряна Ашота Г., процедура лишения неприкосновенности бывшего депутата Государственной Думы ФС РФ Егиазаряна Ашота Г. соответствует требованиям ч. 2 ст. 98 Конституции Российской Федерации, ст. 20 Федерального закона от 08.05.1994 г. № 3-ФЗ «О статусе члена Совета Федерации и статусе депутата Государственной Думы Федерального Собрания Российской Федерации», гл. 52 УПК РФ, что подтверждается представлением Генерального прокурора Российской Федерации от 28.10.2010 № 34-08-10, и вынесенным на основании данного представления Постановлением Государственной Думы Федерального Собрания Российской Федерации от 03.11.2010 № 4355-5 ГД о даче согласия на лишение депутатской неприкосновенности депутата Государственной Думы Федерального Собрания Российской Федерации Егиазаряна Ашота Г.

Таким образом, нарушений норм уголовно-процессуального закона, свидетельствующих о лишении или ограничении гарантированных прав участников уголовного судопроизводства, на стадии предварительного расследования не допущено.

Об умысле подсудимых свидетельствуют фактические обстоятельства преступления, в результате которого все акции ЗАО «Центурион Альянс», включая 20 % акций, принадлежащих потерпевшему Смагину В.И., без его ведома, перешли в собственность компании «Скендлби», акционером которой являлась «MPH Law Services Limited» (Кипр), действующая в интересах братьев Егиазарянов, что затем позволило последним распорядиться указанными акциями по собственному усмотрению.

Заключение гражданско-правовых договоров (сделок) с участием потерпевшего в ходе инкриминируемого преступления не опровергает умысла подсудимых на его совершение, поскольку условия договоров подсудимыми Егиазаряном Ашотом Г. и Егиазаряном Артемом Г. были умышленно нарушены, предусмотренные в них действия выполнены не были, при этом действия и решения потерпевшего Смагина В.И. были обусловлены обманом и злоупотреблением его доверия со стороны подсудимых как способах совершения мошенничества.

Оценив в совокупности собранные по делу доказательства, суд считает, что вина подсудимых материалами дела доказана, а действия Егиазаряна Ашота Г. и Егиазаряна Артема Г. правильно квалифицированы ч. 4 ст. 159 УК РФ (в редакции Федерального закона от 07.03.2011 № 26-ФЗ) как приобретение права на чужое имущество путем обмана и злоупотребления доверием, группой лиц по предварительному сговору с причинением значительного ущерба гражданину, в особо крупном размере; действия Клочина М.А. и Гогохия В.Г. квалифицированы правильно по ч. 5 ст. 33, ч. 4 ст. 159 УК РФ (в редакции Федерального закона от 07.03.2011 № 26-ФЗ) как пособничество, то есть содействие приобретению права на чужое имущество путем обмана и злоупотребления доверием, группой лиц по предварительному сговору с причинением значительного ущерба гражданину, в особо крупном размере, путем предоставления информации и средств совершения преступления, а также устранением препятствий.

Преступление совершено подсудимыми Егиазаряном Ашотом Г. и Егиазаряном Артемом Г. группой лиц по предварительному сговору, при пособничестве Гогохия В.Г. и Клочина М.А., о чем свидетельствует характер действий соучастников и их пособников при совершении преступления, направленных на достижение единой цели - приобретения права на чужое имущество.

При этом Егиазарян Ашот Г. привлек к совершению преступления ряд лиц, руководил их действиями и давал указания, являлся конечным бенефициаром юридических лиц, используемых в преступной схеме; Егиазарян Артем Г. занимал должность заместителя генерального директора ЗАО «Центурион Альянс», являясь соучастником преступления, выполнял указания своего брата Егиазаряна Ашота Г.

Клочин М.А., занимая должность генерального директора ЗАО «Центурион Альянс», и Гогохия В.Г., будучи директором подконтрольных Егиазаряну Ашоту Г. компаний, в том числе «Хекхем» и «Блиденсол», подписывая исследованные в судебном заседании договоры и дополнения к ним, искусственно увеличили кредиторскую задолженность ЗАО «Центурион Альянс» с целью создания оснований для его банкротства, что в свою очередь влекло наступление технического дефолта по кредиту компании «Блиденсол». Искусственно созданное при непосредственном участии Клочина М.А. и Гогохии В.Г. преддефолтное состояние по кредиту «Блиденсол» и невозможность внесудебного взыскания на акции компании «Доралин» и ЗАО «Центурион Альянс» вынудили «Дойче Банк» продать право требования по кредиту подконтрольной Егиазаряну Ашоту Г. компании «Скендлби» (Кипр).

Таким образом, действия Клочина М.А. и Гогохии В.Г. являлись необходимым элементом достижения преступного результата и находятся в прямой причинно-следственной связи с утратой Смагиным В.И. прав на принадлежащие ему акции ЗАО

Case 2:20-cv-11236-RGK-PLA   Document 2-4   Filed 12/11/20   Page 175 of 177   Page ID #:599

87

при определении размера которого учитывается материальное положение каждого из подсудимых и их роль в совершении преступления.

С учетом данных о личности подсудимых суд полагает возможным не назначать Егиазаряну Ашоту Г., Егиазаряну Артему Г., Клочину М.А., Гогохии В.Г. дополнительный вид наказания в виде ограничения свободы.

В силу ч. 2 ст. 309 УПК РФ в связи с необходимостью разрешения вопросов, связанных с гражданским иском, требующих отложения судебного разбирательства, суд признает за потерпевшим (гражданским истцом) право на удовлетворение гражданского иска и передает вопрос о размере его возмещения для рассмотрения в порядке гражданского судопроизводства.

Арест на имущество наложен по уголовному делу № 201/311620-10, из которого выделено настоящее уголовное дело, поскольку расследование уголовного дела № 201/311620-10 не завершено, необходимость в обеспечительных мерах не отпала, в связи с чем их отмена преждевременна, а кроме того, указанное имущество является обеспечением исполнения имущественных взысканий по настоящему приговору.

Вопрос о судьбе вещественных доказательств по уголовному делу суд разрешает в соответствии со ст. 81 УПК РФ.

На основании изложенного, руководствуясь ст. ст. 307, 308, 309 УПК РФ, суд

ПРИГОВОРИЛ:

Признать Егиазаряна Ашота Геворковича виновным в совершении преступления, предусмотренного ч. 4 ст. 159 УК РФ (в редакции Федерального закона от 07.03.2011 № 26-ФЗ), и назначить ему наказание в виде лишения свободы сроком на 7 лет с отбыванием наказания в исправительной колонии общего режима, со штрафом в размере 700 000 рублей.

Признать Егиазаряна Артема Геворковича виновным в совершении преступления, предусмотренного ч. 4 ст. 159 УК РФ (в редакции Федерального закона от 07.03.2011 № 26-ФЗ), и назначить ему наказание в виде лишения свободы сроком на 5 лет с отбыванием наказания в исправительной колонии общего режима, со штрафом в размере 600 000 рублей.

Признать Клочина Максима Алексеевича виновным в совершении преступления, предусмотренного ч. 5 ст. 33, ч. 4 ст. 159 УК РФ (в редакции Федерального закона от 07.03.2011 № 26-ФЗ), и назначить ему наказание в виде лишения свободы сроком на 4 года с отбыванием наказания в исправительной колонии общего режима, со штрафом в размере 400 000 рублей.

Признать Гогохию Виталия Грамитоновича виновным в совершении преступления, предусмотренного ч. 5 ст. 33, ч. 4 ст. 159 УК РФ (в редакции Федерального закона от 07.03.2011 № 26-ФЗ), и назначить ему наказание в виде лишения свободы сроком на 4 года с отбыванием наказания в исправительной колонии общего режима, со штрафом в размере 400 000 рублей.

Меру пресечения Егиазаряну Ашоту Г., Егиазаряну Артему Г., Клочину М.А., Гогохии В.Г. до вступления приговора в законную силу оставить без изменения - в виде заключения под стражу.

Срок отбывания наказания Егиазаряну Ашоту Г., Егиазаряну Артему Г., Клочину М.А., Гогохии В.Г. исчислять с момента их фактического задержания после розыска.

За потерпевшим (гражданским истцом) Смагиным В.И. признать право на удовлетворение гражданского иска, вопрос о размере которого передать для рассмотрения в порядке гражданского судопроизводства.

Арест на имущество не снимать до исполнения приговора в части имущественных взысканий и расследования выделенного уголовного дела.

Вещественные доказательства по вступлению приговора в законную силу – оставить по месту хранения.

Приговор может быть обжалован в апелляционном порядке в Московский городской суд в течение 10 суток со дня его провозглашения. В случае подачи апелляционной жалобы осужденные вправе ходатайствовать о своем участии в рассмотрении уголовного дела судом апелляционной инстанции, заявив указанное ходатайство в апелляционной жалобе в течение 10 суток со дня вручения копии приговора, и в тот же срок со дня вручения копии апелляционного представления или апелляционной жалобы, затрагивающих их интересы.

Судья:  Аверченко Е.П.



Всего п ош ровано
прог ерс но и
скреп до т лат

Судья

Секр