# EXHIBIT 13

1  *Natalia Tsagalova v. Ashot Egiazaryan*                    Attachment to form FL-300
   LASC Case No.: BD 595136
2

3                    **DECLARATION OF NATALIA TSAGALOVA**

4         I, NATALIA TSAGALOVA, declare and state as follows:

5         1.    I am the Petitioner in the above-entitled action. If called upon to testify as a

6  witness, I could and would testify competently to the following facts, all of which are within my

7  own personal knowledge.

8         2.    This Declaration is prepared and submitted in lieu of personal testimony pursuant to

9  Code of Civil Procedure §§ 2009 and 2015.5, California Rules of Court, Rule 5.118(f), and Reifler

10 v. Superior Court (1974) 39 Cal.App.3d 479, 114 Cal.Rptr. 356.

11        3.    I submit this Declaration in support of my *ex parte* Request for Orders to Freeze All

12 Bank Accounts Associated with Clear Voice, Inc.

13        4.    Respondent, ASHOT EGIAZARYAN ("Respondent") and I were married on August

14 20, 1987. Our date of separation was January 15, 2014, for a marriage length of twenty-six (26)

15 years and five (5) months. We have two (2) minor children of the marriage, Stefan Egiazaryan, born

16 August 11, 1998, age 16; and Anthony Egiazaryan, born June 19, 2001, age 13. We also have two

17 adult children of the marriage.

18        5.    I am making this *ex parte* application, without notice to Respondent, because I have

19 information that shows that Respondent has been selling community assets, and transferring

20 community funds to a variety of companies held by his cousin, SUREN EGIAZARYAN ("Suren"),

21 specifically a Nevada Corporation by the name of Clear Voice, Inc. If I am not able to freeze the

22 bank accounts associated with Clear Voice, Inc. on an *ex parte* basis without notice, Respondent will

23 simply have Suren move the funds to another account.

24        6.    Respondent and Suren have engaged in a complicated and involved ploy to make it

25 appear as if Respondent has no assets outside of Russia. The main reason for this is that up until

26 2010 Respondent and I principally lived in Russia with our family, where Respondent was a well

27 known national figure, and a member of the State Duma.

28        7.    By way of background, in 1993, Respondent established and became the Chairman

                    **DECLARATION OF NATALIA TSAGALOVA**
                              – 1 –

1    of the Moscow National Bank (MNB). By 1995, the MNB had become one of the largest banks in
2    Russia, housing accounts of the Administration of Moscow region, The Ministry of Defense of the
3    Russian Federation, Russian State Arms Export Company, The Russian Space Agency and the
4    General Prosecutor's Office. In 1998, MNB's banking license was revoked due to involvement in
5    an embezzlement scheme, but no criminal charges were brought against Respondent. In 1999,
6    Respondent became a member of the State Duma and deputy chairman of the Committee on Budget
7    and Taxes. In October 2010, the State Duma's Credentials and Ethics Commission recommended
8    stripping Respondent of parliamentary immunity at the request of the Investigative Committee. On
9    November 3, 2010, Respondent was stripped of his immunity and subsequently fled to the United
10    States where he is seeking political asylum.

11      8.      Because of Respondent's involvement with the Moscow National Bank and his
12    membership in the State Duma, Respondent was not allowed to own property outside of Russia.
13    Because of this, it appears as if all of our community property is actually owned by his cousin, Suren,
14    or other members of Respondent's family.

15      9.      For example, our family residence, located at 655 Endrino Place, Beverly Hills,
16    California 90210 was purchased by Respondent in 1999, however, the property is held under the
17    name, Endrino Corp. Despite Respondent's purchase of the residence, Suren is the sole shareholder
18    of Endrino Corp., creating the appearance that Respondent and I do not own our family residence.
19    Attached hereto as **Exhibit "A"** is a true and correct copy of a share certificate indicating that Suren
20    owns 100% of Endrino Corp.

21      10.      Coincidentally, Endrino Corp. is owned by a Luxembourg corporation known as Sun
22    Side Holdings, S.A.

23      11.      As a result of Respondent's subversive actions, it can appear that there are no
24    community assets to speak of, however, that is simply not the case.

25      12.      The primary emergency, and the reason for this *ex parte* application, is that I have
26    recently learned that Respondent has caused to be sold thirteen (13) rental properties owned by the
27    community and situated in and around London, England. The funds from said sales are being
28    transferred to the bank account of Clear Voice, Inc. Clear Voice, Inc., on paper, is owned by Suren.

1    That being said, as discussed below, I have evidence that Clear Voice, Inc. in reality is owned by
2    Respondent, and is holding community property of at least $20 million, not including the recent
3    deposits totaling $16,840,883.55.

4    13.    Since 2010, all of the community expenses have been paid by the checking account
5    in the name of Clear Voice, Inc. Every month, I receive a check from Suren and I deposit the funds
6    into my personal bank account where I pay the community expenses from. At some point between
7    2010 and currently, Suren began to label the checks as loans in the memo notation. I asked
8    Respondent about this, and he simply responded that it was done for tax purposes. Attached hereto
9    as **Exhibit "B"** are true and correct copies of some of the checks that I have received from Clear
10   Voice, Inc. since December 2012. I can obtain all of the check copies if necessary. As you can see,
11   between April 2013 to December 2013, just from the check copies that I have Clear Voice, Inc.
12   distributed $344,000 to me in just eight (8) months. All of these funds were used to pay the
13   community expenses.

14   14.    As of August, 2014 Suren has ceased making any payments to me for community
15   expenses. I believe this is because he was served with a deposition subpoena in early August 2014.
16   Suren has repeatedly avoided sitting for his deposition.

17   15.    In 2012 Respondent was involved in litigation with Peter Zalmayev in the United
18   States District Court of the Southern District of New York. As part of that litigation, Respondent
19   was deposed on January 18 and January 19, 2012. During his deposition, Respondent stated that he
20   had $20 million that was his money (pg. 168), that he did not disclose that income in his Duma
21   reports (pg. 181), that he transferred the money to his cousin, Suren (pg. 181-182), that Suren needed
22   $20 million to respond to an audit of a company named SP Capital (pg. 186-188), and that Suren
23   owns Clear Voice, Inc. (pg. 255-256). Attached hereto as **Exhibit "C"** are true and correct copies
24   of the relevant transcript pages from the deposition of ASHOT EGIAZARYAN in the United States
25   District Court of the Southern District of New York Case Number 11-CV-02670.

26   16.    It should be noted that SP Capital Partners, LP, is a partnership, of which Clear Voice,
27   Inc. is a member. Attached hereto as **Exhibit "D"** is a true and correct copy of the 2001 K-1 for
28   Clear Voice, Inc. from SP Capital Partners, LP.

**DECLARATION OF NATALIA TSAGALOVA**

1      17.    On February 22, 2012, in the same matter with Peter Zalmayev, there was a hearing

2 on Suren and Clear Voice, Inc.'s Motion to Quash the subpoena issued to Clear Voice, Inc. for bank

3 records and other financial information. In ruling on the Motion to Quash, the Judge stated as

4 follows:

5           This arises in the context of a motion quash a subpoenas. Subpoenas are
subject to Rule 26's relevance requirement which we're all familiar with.

6           Nonetheless, a court does have to weigh the relevance or probative value of the
documents being sought against the privacy interests asserted.

7

8           As I've already mentioned, the issue of what -- whether and how Ashot
Egiazaryan has given money to the LDPR is the critical issue in this case and there
is evidence that's been obtained in discovery and otherwise that makes it clear that

9           Ashot moves money around for no apparent reason, that the money has gone to his
cousin, Seren, that the source of this money -- that this money ends up with Clear

10           Voice and that we're talking about millions of dollars. So inquiry into what Clear
Voice is doing is certainly important.

11

12           Now, there are some situations where we can go to a company and say you
know what, give me the records that relate to this particular issue and we trust them
to do that. I don't think this is such a situation because of these unexplained

13           payments and the -- and the way Clear Voice and Ashot move money around as I say
for no apparent reason and the clear evidence that Clear Voice is being used for

14           Ashot's benefit.

15           So when Seren says that no payments were made for the benefit of LDPR,
which is a conclusory statement, I don't even see how Seren could know that because

16           of the evidence that exists that Clear Voice is being used by Ashot to move money
around.

17

18           So, accordingly, I'm not going to quash the subpoena. I'm ready to talk about
a limitation certainly that this material should be used only for purposes of this
litigation but it becomes very unwieldy if I give a higher level of confidentiality

19           designation because it prevents a party from presenting evidence to me that's
available to the public which it should be regarding this case or presenting in a

20           summary judgment motion or a trial. (Pg. 13, ln 9 - pg. 14, ln 18)

21 Attached hereto as **Exhibit "E"** is a true and correct copy of the hearing transcript dated February

22 22, 2012 in the matter of *Ashot Egiazaryan v. Peter Zalmayev*, United States District Court of the

23 Southern District of New York Case number 11-CV-02670.

24      18.    As detailed above and observed by the Judge in the prior litigation, there is significant

25 evidence that Clear Voice, Inc. is simply a vehicle for Respondent to hide and shelter funds derived

26 from other countries and through other entities owned by Respondent. I am able to provide further

27 evidence regarding this connection at a later hearing if necessary.

28      19.    Turning to the current emergency, on October 4, 2014, I discovered that Respondent

1    had recently sold thirteen (13) rental properties owned by the community and situated in and around
2    London, England (the "Silver Oak properties"). Respondent and I purchased those properties with
3    community funds in and around 1999. I was responsible for managing the properties before we
4    moved to the United States in 2010. The properties were initially purchased under the company
5    names Brightmoor Properties, Ltd., Dikama Holding, S.A., and Shenton Enterprises, Ltd. Originally
6    an individual by the name of Edward Lozansky was the nominee with respect to the properties,
7    however, in 2006 Respondent changed the nominee from Edward Lozansky to Suren Egiazaryan,
8    Respondent's cousin. Attached hereto as **Exhibit "F"** is a true and correct copy of payment
9    instructions from Suren dated August 10, 2008 directing the transfer of rental income earned by the
10   properties from Dikama Holding, S.A. to his bank account, presumably the account held by Clear
11   Voice, Inc.

12   20.    On October 4, 2014, I discovered that Respondent had caused the Silver Oak
13   properties to be sold, and that all of the proceeds from said sales were being transferred to the Clear
14   Voice, Inc. account held at Wells Fargo. Attached hereto as **Exhibit "G"** are true and correct copies
15   of payment instructions dated September 22, 2014 to Brightmoor Properties, Ltd., Dikama Holding,
16   S.A., and Shenton Enterprises, Ltd. from Suren, as the owner of the companies, to the Director of
17   the companies (also being Suren), ordering that GBP 10,470,874.62 (approximately $ 16,840,883.55)
18   be transferred to the Clear Voice, Inc. checking account held at Wells Fargo.

19   21.    I have come to discover that Clear Voice, Inc. has several banking accounts at various
20   financial institutions. There is a checking account at Wells Fargo, account number REDACTED .
21   Attached hereto as **Exhibit "H"** is a true and correct copy of the statement associated with said
22   account for October 31, 2009. There is a savings account at Wells Fargo, account number
23   REDACTED . Attached hereto as **Exhibit "I"** is a true and correct copy of the statement associated
24   with said account for May 31, 2010. There is a checking account at Bank of America, account
25   number REDACTED . Attached hereto as **Exhibit "J"** is a true and correct copy of the statement
26   associated with said account for June 30, 2007. There are also investment accounts held at Merrill
27   Lynch, account numbers REDACTED and REDACTED1. Attached hereto as **Exhibit "K"** are true and
28   correct copies of the statement associated with account REDACTED dated May 31, 2010, and letter

1  correspondence from Merrill Lynch dated August 2, 2010 indicating that a new account was opened,
2  account number REDACTED . In addition to the above referenced account, I am informed and believe
3  that Clear Voice, Inc. also holds accounts with TD Ameritrade.

4      22.    It is imperative that I obtain an order that the above accounts be frozen pending a
5  hearing on the character of the assets contained in those accounts. Additionally, I am requesting an
6  order that I be permitted to subpoena the records associated with said accounts without providing
7  consumer notice.

8      23.    Respondent's financial deception is deep-rooted and extremely complex. In his 2011
9  and 2012 tax returns Respondent lists 15 foreign entities with principal places of business in the
10  British Virgin Islands, Cyprus, Luxembourg and Russia. One of the entities located in Russia shows
11  accumulated earnings of $439,111,000.

12      24.    Respondent's behavior with respect to Clear Voice, Inc. is not an isolated incident.
13  We have a Villa that we purchased in the Cote D'Azur of France in March 2006, which I personally
14  oversaw the renovation of, that has a fair market value of $68,510,000, which Respondent claims
15  in his discovery responses is not owned by us. I have paid the salary of the house staff for that
16  property and the relevant taxes in the total sum of 88,000 Euros per year since 2010. Attached hereto
17  as **Exhibit "L"** is a true and correct copy of a Banque Populaire statement for May 2011 showing
18  payments to Monsieur Antoine and Madame Araceli, as well as the quarterly tax payment labeled
19  as Vir Urssaf.

20      25.    Additionally, our family residence located at 655 Endrino Place, Beverly Hills,
21  California 90210 Respondent claims in his discovery responses is not owned by us. The only piece
22  of property that Respondent acknowledges owning is the family residence that we were building
23  when we left Russia in 2010, 1 Barvicha, Rublevka, Russia. However, in his discovery responses
24  Respondent claims, "This real property was previously owned by Respondent and Petitioner. Both
25  Respondent and Petitioner executed documents that sold this property to a business entity. The
26  property located at 1 Barvicha, Rublevka, Russia is held by an entity for the benefit of Respondent.
27  The name of the entity holding this property is NGY Holdings Limited, Stasandrou, 20 Anna
28  Nicolaou Court, 1st Floor, P.C. 1060, Nicosia, Cyprus." We did execute documents transferring this

1   property to an entity, however, I was told that I had a 50% interest in the entity. Since 2010, and

2   currently, I manage all of the employees associated with that property which is a cleaning lady, four

3   (4) guards, and two (2) managers.

4       26.    There is significant community property related to this matter located throughout the

5   world, all of which Respondent has gone through significant efforts to avoid being tied to him. The

6   only assets that I have been able to tie back to Respondent are those currently being held under the

7   name of Clear Voice, Inc. It is imperative that this Court order that the accounts being held by Clear

8   Voice, Inc. be frozen pending a hearing on the character of those funds so as to preserve whatever

9   community property is located within the United States.

10      27.    As mentioned above, my counsel has served Suren Egiazaryan with a deposition

11  subpoena on August 10, 2014, however, Suren has repeatedly refused to sit for his deposition

12  claiming that he has had eye surgery and sitting under lights for more than an hour is not possible

13  for him. This is a repeated pattern of conduct for both Suren and Respondent. I believe that Suren

14  is attempting to delay his deposition until he has moved all community funds out of the country. On

15  or about September 23, 2014 I saw Suren driving his car with Respondent. It is clear that Suren does

16  not have a problem with his eyes and is simply avoiding his deposition to cause delays. Attached

17  hereto as **Exhibit "M"** is a true and correct copy of the picture of Suren driving his car with

18  Respondent.

19      28.    In addition to deposing Suren, my counsel will be preparing a Motion for Joinder, to

20  join Suren in this matter. That being said, the accounts associated with Clear Voice, Inc. must be

21  frozen in the interim, so as to avoid any movement of the community funds held therein.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

**DECLARATION OF NATALIA TSAGALOVA**
-7-

1 | **REQUESTED RELIEF**

2 | 29. Taking all of the above into consideration, I respectfully request the following relief:

3 | (A) That all bank accounts held under the name of Clear Voice, Inc., EIN# REDACTED

4 | be frozen until a hearing can be held on the character of the funds contained therein,

5 | including but not limited to:

6 | (i) Wells Fargo checking account number REDACTED ;

7 | (ii) Wells Fargo savings account number REDACTED ;

8 | (iii) Bank of America checking account number REDACTED ;

9 | (iv) Merrill Lynch investment account number REDACTED ;

10 | (v) Merrill Lynch investment account number REDACTED ; and

11 | (vi) All accounts held at TD Ameritrade.

12 | (B) That SUREN EGIAZARYAN be ordered not to withdraw, transfer, hypothecate or

13 | otherwise remove any funds held by him in the name Clear Voice, Inc., or for the

14 | benefit of Respondent.

15 | (C) That this Court order that my counsel may subpoena the above listed accounts

16 | without providing consumer notice.

17 |

18 | I declare under penalty of perjury under the laws of the State of California that the foregoing

19 | is true and correct.

20 | Executed on this $\underline{09}$ day of October, 2014, at Los Angeles, California.

21 |

22 | NATALIA TSAGALOVA,
Declarant

23 |

24 |

25 |

26 |

27 |

28 |

**DECLARATION OF NATALIA TSAGALOVA**

$-8-$

# EXHIBIT "C"

ASHOT EGIAZARYAN - 1/18/2012

Page 166

| 1 | ASHOT EGIAZARYAN |
| 2 | A.   Yes. |
| 3 | Q.   Why did you ask Mr. Gloriozov |
| 4 | to act as the named owner of offshore |
| 5 | companies when they were actually owned |
| 6 | by you? |
| 7 | A.   Because we needed a person who |
| 8 | would handle this, in this direction who |
| 9 | would handle international financial |
| 10 | consulting.   Andrey Gloriozov knows |
| 11 | English and French very well.   And in |
| 12 | practice he performed the functions of a |
| 13 | trustee which was not in contradiction |
| 14 | with the law and he possessed a certain |
| 15 | degree of trust on my part.   And that is |
| 16 | why he produced the impression of a well |
| 17 | educated and professional specialist on |
| 18 | me. |
| 19 | Before that he was the manager |
| 20 | of a large Russian bank, which was called |
| 21 | Imperial.   After that, he was the manager |
| 22 | of the state bank, Sovzagranbank, |
| 23 | S-o-v-z-a-g-r-a-n-b-a-n-k, which |
| 24 | testifies about his professionalism. |
| 25 | Q.   What is the company Gascony |

Page 167

| 1 | ASHOT EGIAZARYAN |
| 2 | limited? |
| 3 | A.   I remember that company was |
| 4 | mentioned.   It was one of the companies. |
| 5 | I cannot tell you exactly how these |
| 6 | companies operated, but there was such a |
| 7 | company. |
| 8 | Q.   What is the company Cavali |
| 9 | Foundation? |
| 10 | A.   The same. |
| 11 | Q.   Did you arrange for Gascony |
| 12 | and Cavali to possess $20 million that |
| 13 | were yours? |
| 14 | MR. LUPKIN:   Hold on a second. |
| 15 | Can I have the question back again. |
| 16 | (Record read as requested.) |
| 17 | MR. LUPKIN:   Go ahead, you can |
| 18 | answer. |
| 19 | A.   I did not do that. |
| 20 | Q.   Do you know how Gascony and |
| 21 | Cavali got the $20 million that Mr. |
| 22 | Gloriozov is describing? |
| 23 | MR. LUPKIN:   Objection; lacks |
| 24 | foundation.   I would also ask if |
| 25 | you are going to be questioning the |

Page 168

| 1 | ASHOT EGIAZARYAN |
| 2 | witness about this paragraph that |
| 3 | it be translated for him. |
| 4 | MR. GOLDEN:   Mr. Translator, |
| 5 | would you read paragraph 3, please. |
| 6 | (At this time, the requested |
| 7 | material was read to the witness.) |
| 8 | Q.   So do you see that Mr. |
| 9 | Gloriozov describes transferring $20 |
| 10 | million? |
| 11 | MR. LUPKIN:   Objection to |
| 12 | form.   You may answer. |
| 13 | A.   Yes, I've heard it. |
| 14 | Q.   And he says in paragraph 3 |
| 15 | that the $20 million was your money.   Was |
| 16 | it your money? |
| 17 | A.   Yes. |
| 18 | Q.   Was that part of the $60 |
| 19 | million that you described a few minutes |
| 20 | ago? |
| 21 | A.   I'm finding it difficult today |
| 22 | to follow up and to see whether it was |
| 23 | part of that or what was part of this |
| 24 | after such time.   I think probably it is |
| 25 | much simpler to request this information |

Page 169

| 1 | ASHOT EGIAZARYAN |
| 2 | from Gloriozov and get the response. |
| 3 | Because I cannot judge by the names of |
| 4 | the companies which companies he formed |
| 5 | and which companies he had kept the |
| 6 | money.   He did not furnish me accounts |
| 7 | thereof. |
| 8 | Q.   Did you keep track of the |
| 9 | money that you gave to Mr. Gloriozov to |
| 10 | handle? |
| 11 | A.   Yes, I counted the money of |
| 12 | course. |
| 13 | Q.   Where did you keep the records |
| 14 | of the money that you gave to Mr. |
| 15 | Gloriozov? |
| 16 | A.   At that time I had it, but now |
| 17 | I don't think I've kept it. |
| 18 | Q.   Where did you have it when you |
| 19 | had it? |
| 20 | A.   Well, I kept it in my archives |
| 21 | in Russia. |
| 22 | Q.   Do you think that's where it |
| 23 | is today? |
| 24 | A.   Maybe. |
| 25 | Q.   Did Mr. Gloriozov give you |

36  (Pages 166 to 169)

Page 178

1    ASHOT EGIAZARYAN
2  no understanding of the beneficiary
3  ownership, beneficiary property.
4      Q.  Did you list --
5      A.  In other words, using just
6  simple words, if a person owns property
7  and it is registered directly in his
8  name, in this case, he's supposed, he's
9  obligated to declare that.
10     Q.  In --
11     A.  Well this situation as far as
12 I understand differs from foreign laws.
13     Q.  Mr. Egiazaryan, you've
14 answered the question, thank you.
15       MR. LUPKIN:  Are you finished
16 with your answer?
17       THE WITNESS:  No.
18       MR. LUPKIN:  Please let him
19 finish answering.
20       MR. GOLDEN:  He stopped
21 answering this question five
22 minutes ago and he's just going on
23 to kill time.  I'm going to
24 interrupt him and ask a question.
25       MR. LUPKIN:  He's answering

Page 179

1    ASHOT EGIAZARYAN
2  the question to the best of his
3  ability.  I'm sorry that you're
4  dissatisfied with it, but the fact
5  remains that's what he's doing.
6       MR. GOLDEN:  The question --
7       MR. LUPKIN:  Excuse me, I'd
8  like him -- let me finish, please.
9  I'd like him to be able to finish
10 the answer to his question and when
11 he's completed it, you may go on.
12       MR. GOLDEN:  Let me find what
13 the question was.
14       The question was were you
15 supposed to disclose annual income
16 or your assets, that was the
17 question.  Even if he had answered
18 it, it wouldn't have taken him ten
19 minutes to respond to that
20 question.  So whatever he's saying
21 now is not responsive and I want to
22 go on to another question.
23       MR. LUPKIN:  I'm not going to
24 engage in a colloquy with you on
25 the record, Mr. Golden.  The

Page 180

1    ASHOT EGIAZARYAN
2  witness is answering the question
3  as he sees appropriate to answer
4  the question and you'll either
5  accept the answer or you won't
6  accept the answer.  I am not
7  controlling the witness' questions,
8  you're not controlling -- the
9  witness' answers rather, you're not
10 controlling the witness' answers.
11 I'm sorry that you're unhappy with
12 it, let's please move on, I'd like
13 the witness to be able to finish
14 his answer.
15     Q.  Do you remember the question?
16     A.  Naturally.
17     Q.  Finish your answer.
18     A.  But if you dislike it, I can
19 keep mum.
20     Q.  Keep what?
21     A.  Keep mum.  I can keep silent.
22     Q.  Now the $20 million that's
23 referenced in Mr. Gloriozov's
24 description, was that disclosed in your
25 Duma reports?

Page 181

1    ASHOT EGIAZARYAN
2       MR. LUPKIN:  Objection to
3  form.  You may answer.
4     A.  I was not supposed to disclose
5  it in my declaration that I submitted to
6  The Duma according to the Russian laws.
7     Q.  Did you tell Mr. Gloriozov to
8  transfer that $20 million to someone or
9  some company in the United States?
10    A.  Mr. Gloriozov told me that he
11 had a man with whom he had worked before.
12 It was a professional regarding the
13 utilization of finances.  He had been a
14 banker prior to that.  On one hand I
15 wanted that the money would be handled by
16 my cousin Suren.  This is my elder
17 cousin.  He's an economist.  According
18 his education, he's a candidate of
19 economic sciences.
20       And naturally, as I trusted
21 Suren, agreed to the proposal of Mr.
22 Gloriozov for the money to be transferred
23 so that they would operate, grow in their
24 operations to the joint venture where my
25 cousin was and who could, of course,

39  (Pages 178 to 181)

Page 182

1    ASHOT EGIAZARYAN
2  monitor and control that money so that
3  money would not be stolen.
4    Q.  Was the --
5    A.  It's so just like with a
6  regular bank, when a man brings his money
7  to the bank which he trusts to keep the
8  money and to let this money grow, only
9  banks at that time they offered very
10 little interest, more interest. And here
11 there was a realistic opportunity that
12 money would be increased tremendously.
13   Q.  Was that man in the United
14 States that Gloriozov knew, Sergei
15 Ponomarev?
16   A.  Yes.
17   Q.  Who was supposed to make the
18 money grow, Mr. Ponomarev or Suren?
19   A.  As far as my understanding
20 was, mainly Sergei So in reality, that
21 money was in the possession of Andrey
22 Gloriozov, although the money was with
23 Sergei because they were partners.
24   Q.  How were they supposed to make
25 the money grow?

Page 183

1    ASHOT EGIAZARYAN
2    A.  To make investments in either
3  profitable projects or bonds.
4    Q.  Did they do that?
5    A.  On my part, I made my
6  recommendations so that they would invest
7  in some development projects.
8    Q.  What did they do with the
9  money?
10   A.  But my recommendations could
11 be just recommendations.
12   Q.  What did they do with the
13 money? What did they do with the money?
14      MR. LUPKIN: I think there's
15   an answer that's going to be coming
16   out in English.
17   A.  Maybe because when I
18 transferred the money the responsibility
19 was also transferred to Gloriozov, to
20 Ponomarev, to Suren.
21   Q.  What did they do with the
22 money?
23   A.  When I found out, when I
24 learned later on Ponomarev, when he
25 consulted of course Gloriozov, they

Page 184

1    ASHOT EGIAZARYAN
2  invested money in bonds.
3      MR. VESLER: Securities.
4    A.  Securities. When I learned
5  after that -- when I -- as I learned
6  later on, they managed to invest monies
7  in government organizations, and that was
8  Fannie Mae and Freddie Mac, which had a
9  negative effect on the monies.
10   Q.  Where are the records of those
11 investments?
12   A.  I never had records. They did
13 not furnish them to me.
14   Q.  Did Mr. Ponomarev and Suren
15 file tax returns in the United States
16 about the handling of that money?
17   A.  I think, and this is my
18 personal opinion, that they did file
19 because they couldn't, couldn't do
20 otherwise.
21   Q.  Do you know what a promissory
22 note is?
23   A.  Yes.
24   Q.  Did you ask Gloriozov to sign
25 a promissory note in 2011 relating to

Page 185

1    ASHOT EGIAZARYAN
2  this $20 million?
3      MR. LUPKIN: Excuse me, can I
4    have the question back, please.
5      (Record read as requested.)
6      MR. LUPKIN: Please go ahead.
7    A.  I remember I had asked
8  Gloriozov together with Suren to
9  originate or to process some documents if
10 there were not enough documents or if
11 some documents had been lost. Which
12 documents specifically I did not discuss
13 that with Andrey.
14   Q.  When you said that you asked
15 Gloriozov and Suren to originate or to
16 process documents, when did you ask them
17 that?
18   A.  Not with Suren, but at the
19 request of Suren. Because Suren tried to
20 find Andrey, reach him on the telephone,
21 he failed, and he asked me to call
22 Andrey. After that, they were in
23 telephone contact and they agreed which
24 documents they had to process.
25   Q.  Did you ask them to prepare

40  (Pages 182 to 185)

ASHOT EGIAZARYAN – 1/18/2012

| Page 186 | Page 188 |
|---|---|
| ASHOT EGIAZARYAN<br>1  those documents in 2011?<br>2  A.  I did not ask them.  I just<br>3  forwarded Suren's request to Andrey.<br>4  Q.  What was Suren's request?<br>5  A.  Suren's request was in view of<br>6  the, well, tax audit that was conducted.<br>7  As far as I can understand, some<br>8  documents were missing that were either<br>9  lost or were signed verbally.  Some<br>10  documents that were signed their<br>11  expiration date, they expired, and it was<br>12  necessary to prepare some more documents .<br>13  which a lot of time had elapsed, how many<br>14  years, 14 years or more than 15 years.<br>15  Q.  What tax audit are you<br>16  referring to?<br>17  A.  The tax audit that was<br>18  conducted of the, of Suren's company.<br>19  Q.  Which company?<br>20  A.  I cannot tell you which<br>21  company, I don't know.  I was not<br>22  interested in that.<br>23  Q.  Did you ever know the name of<br>24  the company? | ASHOT EGIAZARYAN<br>1  wrong about it.<br>2  Q.  Was –<br>3  MR. LUPKIN:  Excuse me, don't<br>4  speculate.<br>5  Q.  Was a company –<br>6  A.  I cannot tell you exactly<br>7  because I can be mistaken.<br>8  Q.  Was the company involved named<br>9  Clear Voice?<br>10  A.  I do not know which companies<br>11  were audited.  Because I did not read the<br>12  auditing requests for these companies.  I<br>13  cannot state.  I really was not<br>14  interested in that.<br>15  Q.  Did Suren tell you that he<br>16  needed this $20 million note to respond<br>17  to the audit?<br>18  A.  You said $20 million –<br>19  MR. LUPKIN:  Whoa, whoa, too<br>20  many things going on.<br>21  A.  There was no such promissory<br>22  note of $20 million.<br>23  Q.  When you say there was no<br>24  promissory note with $20 million, you |

| Page 187 | Page 189 |
|---|---|
| ASHOT EGIAZARYAN<br>1  A.  Which one?<br>2  Q.  The name of the company that<br>3  was being audited?<br>4  A.  No.<br>5  Q.  So Suren –<br>6  A.  I think it was not one<br>7  company, there was a group of companies.<br>8  Q.  And do you remember any of the<br>9  names?<br>10  A.  Yes, I do remember.  I do<br>11  remember all these companies, but which<br>12  questions, which questions were directed<br>13  to which company because I did not talk<br>14  to the auditing offices I cannot give you<br>15  a correct answer.  But there are no<br>16  secrets about it.<br>17  Q.  Did Suren tell you the name of<br>18  the company or companies that were being<br>19  audited?<br>20  A.  Well, I think it was the<br>21  company, I can tell you approximately.<br>22  Q.  Yes, tell me approximately.<br>23  A.  There was a company that was,<br>24  had the name SP Capital, but I can be | ASHOT EGIAZARYAN<br>1  mean when the money was first transferred<br>2  there was no note?<br>3  A.  No, I did not say that.  When<br>4  did I say that?<br>5  Q.  That was my question.<br>6  A.  No, I did not say it, you said<br>7  that.<br>8  Q.  Did Suren ask you or tell you<br>9  that he needed a $20 million promissory<br>10  note with regard to the audit?<br>11  A.  Well I can repeat what I said.<br>12  Suren said that some documents were<br>13  missing that could be lost with time,<br>14  part of the documents and that needed to<br>15  be reinstated.  I don't see anything<br>16  illegal there.  But he said a portion,<br>17  part of the documents.  He said some of<br>18  the documents were missing, part of the<br>19  documents.  He said please call Andrey so<br>20  that he would get in touch with me so<br>21  that we could reinstate the documents.<br>22  Q.  Was the $20 million note<br>23  signed when the first – when the money<br>24  was transferred in 1996 or 1998? |

41  (Pages 186 to 189)

Page 252

| | |
|---|---|
| 1 | ASHOT EGIAZARYAN |
| 2 | Q. Did White & Case do the legal |
| 3 | work for the sale of that airplane? |
| 4 | MR. LUPKIN: Objection; asked |
| 5 | and answered. You may answer |
| 6 | again. |
| 7 | A. I've already responded. I |
| 8 | will answer once again. |
| 9 | Q. Is the answer yes? |
| 10 | A. Well, the answer is just the |
| 11 | way I can formulate that. |
| 12 | Q. Did White & Case handle the |
| 13 | sale of the airplane? |
| 14 | A. I did not handle the technical |
| 15 | transaction or the conversations with |
| 16 | White & Case about the sales of the |
| 17 | aircraft, of the airplane. |
| 18 | Q. Who made the decision to |
| 19 | sell -- |
| 20 | A. I know that the owner of the |
| 21 | company Mogford, my brother, Artem, |
| 22 | handled that. That is why all the |
| 23 | negotiations with White & Case were |
| 24 | conducted by him. I did not communicate |
| 25 | with White & Case about the |

Page 254

| | |
|---|---|
| 1 | ASHOT EGIAZARYAN |
| 2 | A. I've heard -- I've heard about |
| 3 | this company during my conversations with |
| 4 | my brother Artem or Suren. I think it |
| 5 | was Artem. |
| 6 | Q. What does Lulie International |
| 7 | do? |
| 8 | A. I don't know. |
| 9 | Q. Turn to page -- |
| 10 | A. I could only guess. |
| 11 | Q. Turn to page 3740. |
| 12 | MR. GOLDEN: Mr. Translator, |
| 13 | would you please read to him the |
| 14 | second entry on the account sheet. |
| 15 | (At this time, the requested |
| 16 | material was read to the witness.) |
| 17 | THE INTERPRETER: May I, |
| 18 | interpreter's remark, may I ask you |
| 19 | a question? Payment is abbreviated |
| 20 | for payment, right, the second |
| 21 | line? |
| 22 | MR. GOLDEN: That's how I read |
| 23 | the statement. |
| 24 | THE INTERPRETER: Okay, |
| 25 | payment. And then Ord meaning |

Page 253

| | |
|---|---|
| 1 | ASHOT EGIAZARYAN |
| 2 | technicalities of the sales of the |
| 3 | airplane and that's why I'm not familiar |
| 4 | with them. |
| 5 | Q. Do you know of a company -- |
| 6 | MR. LUPKIN: He's not finished |
| 7 | with his answer. |
| 8 | MR. GOLDEN: He's long |
| 9 | finished. |
| 10 | MR. LUPKIN: No, he's not. |
| 11 | A. That's why I cannot guess |
| 12 | about the negotiations with White & Case |
| 13 | regarding the technicalities of this |
| 14 | issue. |
| 15 | Q. Did you have in 2009 an |
| 16 | attorney/client relationship with White & |
| 17 | Case? |
| 18 | MR. LUPKIN: Objection; calls |
| 19 | for a legal conclusion, but you may |
| 20 | answer based on your understanding. |
| 21 | A. Yes. |
| 22 | Q. Do you know of a company named |
| 23 | Lulie International? |
| 24 | A. I've heard about this company. |
| 25 | Q. What is that company? |

Page 255

| | |
|---|---|
| 1 | ASHOT EGIAZARYAN |
| 2 | order? |
| 3 | MR. GOLDEN: That's how I read |
| 4 | it. |
| 5 | THE INTERPRETER: What is |
| 6 | favor, meaning in favor? |
| 7 | MR. GOLDEN: That's how I read |
| 8 | it. |
| 9 | THE INTERPRETER: Thank you, |
| 10 | it's for my -- |
| 11 | (At this time, the requested |
| 12 | material was read to the witness.) |
| 13 | Q. Is Lulie International an |
| 14 | offshore company? |
| 15 | MR. LUPKIN: Objection; lacks |
| 16 | foundation. You may answer. |
| 17 | A. I've already responded that I |
| 18 | don't know the registration, the type of |
| 19 | business of this company, of Lulie |
| 20 | International. I did not own Lulie and I |
| 21 | don't own it. |
| 22 | Q. What is the -- do you know a |
| 23 | company named Clear Voice? |
| 24 | MR. LUPKIN: Objection; asked |
| 25 | and answered, but you may answer |

7 (Pages 252 to 255)

| | Page 256 | | Page 258 |
|---|---|---|---|
| 1 | ASHOT EGIAZARYAN | 1 | ASHOT EGIAZARYAN |
| 2 | again. | 2 | read it. |
| 3 | A. I've heard about that company. | 3 | Q. Were you aware that on the |
| 4 | If we are talking about the same company. | 4 | 18th of November 2009 Mogford Impex |
| 5 | That my brother Suren has such a company. | 5 | Corporation opened an account at the Hypo |
| 6 | Q. Mr. Translator, please -- | 6 | Investment Bank of Liechtenstein? |
| 7 | A. My cousin. | 7 | A. They could have done it. |
| 8 | MR. GOLDEN: Mr. Translator, | 8 | Q. Please turn to page 3764. |
| 9 | please read to the witness the two | 9 | MR. GOLDEN: Mr. Translator, |
| 10 | lines in the approximate middle of | 10 | please read the portion of this |
| 11 | the page, both dated the 12th of | 11 | that begins at the top where it |
| 12 | October 2009. | 12 | says client and there's a number |
| 13 | MR. LUPKIN: Excuse me, may I | 13 | and through the line that says to |
| 14 | just interrupt here, Jim, for a | 14 | Edward Lozansky. |
| 15 | second? I think you may have the | 15 | (At this time, the requested |
| 16 | dates wrong. I think they're using | 16 | material was read to the witness.) |
| 17 | the European dates, in which case | 17 | Q. Mr. Egiazaryan, who is Edward |
| 18 | the month would be in the middle | 18 | Lozansky? |
| 19 | instead of the day. It says | 19 | A. Edward Lozansky is a citizen |
| 20 | 12/10/09. That means October 12th, | 20 | of the United States, a scientist. In |
| 21 | 2009. | 21 | his time he came to America, he was |
| 22 | MR. GOLDEN: That's what I | 22 | granted political asylum. His wife owns |
| 23 | said, I said the 12th of October | 23 | the magazine -- he and his wife own the |
| 24 | 2009. | 24 | magazine called Continent. He is the |
| 25 | MR. LUPKIN: Is that what you | 25 | president of the so-called Russia House |

| | Page 257 | | Page 259 |
|---|---|---|---|
| 1 | ASHOT EGIAZARYAN | 1 | ASHOT EGIAZARYAN |
| 2 | said? I apologize. Forgive me. | 2 | in Washington. |
| 3 | (At this time, the requested | 3 | His wife was the daughter of a |
| 4 | material was read to the witness.) | 4 | general who brought the Russian, the |
| 5 | A. Okay. | 5 | Soviet troops into Czechoslovakia when |
| 6 | Q. Do you know why Lulie | 6 | they crushed the Czechoslovakian revolt |
| 7 | transferred $5 million to this Mogford | 7 | there. |
| 8 | account on the 12th of October 2009? | 8 | Q. Are you referring to 1967? |
| 9 | A. Let me say once again. I'm | 9 | A. Absolutely correct. |
| 10 | not handling either Lulie, the Lulie | 10 | Q. When did Mr. Lozansky get |
| 11 | company or Mogford company. The | 11 | political asylum? |
| 12 | companies Lulie and Mogford do not belong | 12 | A. I don't know in what year he |
| 13 | to me. I'm not handling their financial | 13 | got it. |
| 14 | operations and do not know about them. | 14 | Q. Was it in the last ten years, |
| 15 | That is why I cannot comment on these | 15 | or before that? |
| 16 | companies' operations. | 16 | A. I know that it was still when |
| 17 | Q. Please look at page 3759. | 17 | there was the Soviet Union. |
| 18 | MR. GOLDEN: Mr. Translator, | 18 | Q. When did you first meet him? |
| 19 | please read the portion of this | 19 | A. I met him approximately in the |
| 20 | page between the line "Opening of | 20 | year 1990. |
| 21 | bank account" and the number | 21 | Q. What were the circumstances |
| 22 | information about four lines down. | 22 | when you met him? |
| 23 | (At this time, the requested | 23 | A. Oh maybe it was in 1991. The |
| 24 | material was read to the witness.) | 24 | circumstances, when he was engaged in the |
| 25 | THE INTERPRETER: Okay, I've | 25 | student exchange with I think Moscow |

8 (Pages 256 to 259)

# EXHIBIT "E"

```
1                        UNITED STATES DISTRICT COURT
                         SOUTHERN DISTRICT OF NEW YORK
2

3       ------------------------------------X
                                            :
4       ASHOT EGIAZARYAN,                   :
                                            :   11-CV-02670 (GWG)
5                           Plaintiff,      :
                                            :   500 Pearl Street
6                   v.                      :   New York, New York
                                            :
7       PETER ZALMAYEV,                     :
                                            :   February 22, 2012
8                           Defendant.      :
        ------------------------------------X
9
                      TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
10                  BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
                          UNITED STATES MAGISTRATE JUDGE
11
        APPEARANCES:
12
        For the Plaintiff:          JONATHAN DANIEL LUPKIN, ESQ.
13                                   Flemming Zulack Williamson
                                        Zauderer, LLP
14                                   One Liberty Plaza
                                     New York, New York  10006
15

16      For the Defendant:          JAMES P. GOLDEN, ESQ.
                                     THOMAS ROBERTS, ESQ.
17                                   Hamburg & Golden, P.C.
                                     1601 Market Street
18                                   Suite 3310
                                     Philadelphia, Pennsylvania  19103
19

20      For Clear Voice:            MICHAEL RAKOWER, ESQ.
                                     Law Office of Michael C. Rakower
21                                   747 Third Avenue
                                     32nd Floor
22                                   New York, New York 10017

23
        Court Transcriber:          SHARI RIEMER
24                                   TypeWrite Word Processing Service
                                     211 N. Milton Road
25                                   Saratoga Springs, New York  12866


        Proceedings recorded by electronic sound recording,
        transcript produced by transcription service
```

2

1           THE COURT: Ashot Egiazaryan v. Peter Zalmayev.

2           Counsel, please state your name for the court.

3           MR. RAKOWER:  Good morning, Your Honor.  Michael

4  Rakower representing non party Clear Voice Inc. from the law

5  office of Michael C. Rakower.

6           MR. LUPKIN:  Jonathan Lupkin, firm of Flemming,

7  Zulack, Williamson, Zauderer, LLP, on behalf of the plaintiff

8  and non party Seren Egiazaryan [Ph.].  Good morning.

9           MR. GOLDEN:  James Golden from Hamburg & Golden for

10 the defendant Peter Zalmayev.

11          MR. ROBERTS: And Tom Roberts also from Hamburg &

12 Golden for Mr. Zalmayev.

13          THE COURT: You can be seated if you're not addressing

14 the court.

15          We're here primarily because of a motion from Clear

16 Voice and Seren Egiazaryan to quash the subpoenas.  I think I'm

17 also going to deal with the letter, the February 7th letter

18 since that seems to be done with.  I might mention a couple of

19 other issues.

20          So on the motion -- well, I mean I've read the

21 letters.  If there's something that hasn't been said that

22 someone wants to add feel free, I guess starting with the

23 movant.  Mr. Rakower, anything?

24          MR. RAKOWER: Yes, Your Honor.  Thank you.  I realize

25 that you're familiar with the papers that have been submitted.

3

1  I wanted to just stress the point that there is a very, very
2  real privacy concern here.  I learned moments before today's
3  hearing that one of our fears has come true in that the
4  defendant is using information to publish in a negative light
5  about plaintiff Ashot Egiazaryan but we're certainly concerned
6  that in the event these documents are released the next in line
7  will be Clear Voice and Seren.

8            I printed out a copy of a cartoon that's published on
9  the web that's been published in conjunction with an article
10  that contains I believe the entire sur reply brief from
11  defendant Zalmayev in this motion including all of the exhibits
12  but for those that have been sealed for attorney-client -- that
13  have been sealed.

14            The purpose of their discovery purportedly is to
15  determine whether Clear Voice has made payments to the LDPR for
16  the benefit of Ashot Egiazaryan.  It is not purportedly to
17  publish on the internet cartoons about Ashot Egiazaryan or to
18  publish transcripts of Ashot Egiazaryan's deposition or to
19  publish Clear Voice banking records on the web.  This, in my
20  view, and in the movant's view, is quite problematic and it's
21  precisely the reason why we move to quash.  We move to quash
22  only after I spoke with opposing counsel to see if we could
23  reach terms, agreement on some kind of limited scope of
24  discovery, limit their subpoena in some way.  That request
25  which was issued on multiple occasions -- we talked about

4

1  different possible permutations, all of them were flatly
2  rejected.  The position was that they're entitled to all of the
3  discovery they seek notwithstanding the fact that they're
4  seeking supposedly information concerning payments by Clear
5  Voice after having received payments from Mogford [Ph.] onto
6  the LDPR.  They want bank -- account opening records.  They
7  want every document that Wells Fargo has concerning Clear
8  Voice.  Most of the documents they request couldn't have
9  anything to do with transfers of payments.  They just don't.
10 Account opening records don't do that but they want them and
11 they also want unredacted complete banking statements, not just
12 entries that relate to transfers from Clear Voice to the LDPR
13 or transfers --

14        THE COURT:  Well, here's my problem.  I have sympathy
15 on the privacy front.  We can talk about that.  But the -- I'm
16 not sure how to phrase this but the reds here is itself
17 compromised, at least that's what the evidence shows so far.
18 So we're not talking about IBM and we could have a narrow
19 subpoena that relates only to the issues for which the person
20 is suing IBM or vice-versa.  We have an entity that gets money
21 for no apparent reason whose existence is unexplained who Ashot
22 has himself says he gives money to for no apparent reason.

23        So we're not in the realm of what -- the typical
24 discovery situation.  That's your big hurdle.

25        MR. RAKOWER:  Well, in response to that hurdle -- let

5

1   me see if I can leap over it, Your Honor.  You say the entity's
2   purpose has not been explained but I don't think the entity's
3   purpose has been properly questioned yet.  There was a
4   deposition of Ashot Egiazaryan.  I wasn't at that deposition
5   but I am certain because I've -- well, I'm certain with respect
6   to all aspects of that transcript but for that which has been
7   sealed that only two questions were asked concerning Clear
8   Voice.  One was have you ever heard of the entity named Clear
9   Voice.  The answer was yes.  Another question was is Clear
10  Voice one of the entities that you know of that has been
11  audited.  That's the only question --

12        THE COURT:  This is not your problem but I wouldn't
13  put too much faith in the two question problem given for a
14  reason no one has mentioned which is that when he actually
15  asked directly about Clear Voice the question was objected to.

16        MR. RAKOWER:  But not directed -- he wasn't directed
17  not to answer.

18        THE COURT:  It doesn't matter.  Once that objection is
19  made to me that waives any argument that there should have been
20  follow up questioning.  So I wouldn't go there with that.  What
21  else do you have?

22        MR. RAKOWER:  Okay, Your Honor.  I hear you.  I'm not
23  sure why but okay.

24        The other point though is, Your Honor, that Seren
25  himself hasn't yet been deposed.  Now, the plaintiffs deposed

6

1  Ashot Egiazaryan without the benefit of any financial
2  statements.  They asked him questions and there's actually good
3  reason to that because the possibility, the possibilities of
4  what could be discovered here are virtually limitless.  It's a
5  fact Your Honor essentially acknowledged back in November.  So
6  in deposing Ashot they were able to ask him anything and
7  everything and now they tailor their questions and follow any
8  track, any line of inquiry they wanted.  The same can be done
9  here with Clear Voice.

10        After having -- they have said repeatedly in their
11  papers and during this motion that the people in the know about
12  this issue, about what Clear Voice does and how it does it are
13  Ashot, Artami Egiazaryan and Seren Egiazaryan.  They've deposed
14  Ashot without financial statements.  Let them depose --

15        THE COURT:  Again, the normal rule is you get the
16  documents and then you question the person.  When I was being
17  presented with this these many months ago, I don't know that it
18  was in front of me that there was an affidavit from Gloriazoff
19  or whatever his name about millions of dollars being used by
20  Ashot and Clear Voice.  That was one thing.

21        And the second thing I think as I was imagining the
22  elderly aunts and cousins being questioned for no reasons.  So
23  this is not what I was thinking about back then when I said
24  let's do some other things first.  Maybe it was in front of me
25  and I hadn't focused on it but it's certainly in front of me

1  now.  So I wouldn't put too much stake in that either.

2       MR. RAKOWER: Understood.  The Gloriazoff statement

3  doesn't say precisely what you just suggested, Your Honor.  I

4  don't believe it identifies Clear Voice.  It does mention an

5  entity controlled by Seren but it does not mention Clear Voice.

6  One can make any inferences they want --

7       THE COURT: Hold on.  Let's look.  If I'm wrong I'd

8  like to know.

9       MR. RAKOWER: I hope I'm right, Your Honor.

10       THE COURT: It mentions Seren.  I apologize.

11       MR. RAKOWER: But, Your Honor --

12       THE COURT: I could make it worse for Seren but

13  given -- we have this other entity that's -- that Ashot

14  controlled.  I forget is name that is giving money to Clear

15  Voice and that we have actual records on that.  I mean this is

16  just not a normal business.  This is not a business where

17  someone is giving something to someone for value.  This has to

18  be looked into.

19       MR. RAKOWER: I don't protest that it shouldn't be

20  looked into, Your Honor.  I just -- my position is that there

21  are privacy interests at stake and so we now need to think

22  about what less intrusive mechanisms are there.  There's no

23  prejudice to the defendants in requiring them to -- because

24  they won't limit their subpoena in any way in requiring them to

25  ask questions in the form of a deposition where they can be

8

1 counsel present who can object where they can ask narrowly
2 tailored questions before they just get the full Monty, Your
3 Honor, if you will, and get all the documents. Let them ask in
4 and then they can come back either to us or if necessary the
5 court and seek those records.

6          THE COURT: So what happens, they go to Seren, he says
7 what he says in his affidavit, I've never given money for --
8 Clear Voice has never transferred money for the benefit LDPR
9 and that's the end of it?

10          MR. RAKOWER: No. But, Your Honor --

11          THE COURT: It's clear that I don't think he has any
12 way of knowing where his money is going. I don't know. I mean
13 given the way -- what's his name? Ashot is moving stuff around
14 if he's giving money -- if Ashot tells him oh, give money to
15 corporation XYZ. For all we know that's the corporation that
16 gives money to LDPR. That's the problem when we have people
17 moving money for no apparent reason.

18          MR. RAKOWER: I appreciate --

19          THE COURT: And without consideration.

20          MR. RAKOWER: I appreciate the complexity, Your Honor,
21 I do. My only concern is in an effort to try to protect the
22 privacy interests we go forward with a less intrusive means
23 while preserving the possibility that the most intrusive means
24 can be used.

25          THE COURT: Anything else?

9

1        MR. RAKOWER: If you can just give me one moment, Your
2   Honor, to take a look?
3        THE COURT: Sure.  Take your time.
4              [Pause in proceedings.]
5        MR. RAKOWER: I'll reserve an opportunity to rebut
6   what the defendant says but that's it for now.  Thank you, Your
7   Honor.
8        THE COURT: Mr. Lupkin, were you going to speak or
9   should I go to the other side?
10       MR. LUPKIN: You can go to the other side.
11       THE COURT: You're representing the same parties;
12  correct?
13       MR. LUPKIN: Except for Clear Voice.
14       THE COURT: Got it.  Mr. Golden, anything?
15       MR. GOLDEN: I think just two things, Your Honor.  The
16  first is to put some names to what Your Honor recollected is
17  that in our responsive brief that included as an exhibit the
18  Gloriazoff declaration we also had bank records from one of the
19  companies controlled by Gloriazoff for Ashot.  That company is
20  called Mogford Impacts.  Mogford Impacts is the company that
21  had transferred huge amounts of money to Clear Voice.
22       The second comment I had about the real -- the
23  realistic probability that we will uncover money that went to
24  the LDPR relates to something that we discovered when we
25  reviewed the asylum records.

10

1    THE COURT: Now that you mention that, I was going to
2  get to this later, but my -- I don't like having secret
3  evidence in a public proceeding. So the theory on my ruling on
4  the asylum application was that you were going to look at it
5  and if there was something obviously relevant you would make an
6  application that the designation be lifted. So I noticed one
7  of the February 17th letters quotes from it. It seems clearly
8  relevant. I don't know what could be more relevant. So right
9  now I want to keep this a public proceeding. There's someone
10  in the audience. I don't know who it is. Maybe he's with one
11  of you but in any event the transcript is public as far as I'm
12  concerned.

13    So I don't want to reveal anything that I've ordered
14  to be held confidential. However, you are entitled to make an
15  application to reveal it and in fact the presumption is if it's
16  going to be in papers given to me and for which I might be
17  issuing a decision, it shouldn't be confidential unless there's
18  very good reason to keep it confidential. So before you say
19  anything on the asylum application, I thought I'd make that
20  point. I don't know that I -- unless they want to say they're
21  not going to object to that piece being made public I don't
22  want to talk about it. Are you going to be objecting?

23    MR. RAKOWER: Yes, I will be.

24    THE COURT: So I want to have a process for doing
25  that. You should send me a letter and do it soon explaining

11

1   why it should be lifted and to what degree and for what purpose
2   and so forth and what piece of the application.  Let them
3   respond and then we'll do it but otherwise let's not talk about
4   it here.  This is public.

5           MR. GOLDEN: I understand.  So that it's clear, what I
6   was about to do was to ask Your Honor how you wanted to handle
7   that.  You answered my question before I asked it.  So I have
8   nothing else to say.

9           THE COURT: Why don't you address the issue of things
10  being thrown up on the internet if you feel that's relevant?

11          MR. LUPKIN: I can say two things.

12          THE COURT: Specifically in the context of the Clear
13  Voice documents which if I were to rule that you were to get
14  them I think we should talk about whether there should be
15  restrictions because the fact is this is a non party.  I don't
16  buy the arguments that there's no difference between corporate
17  interests and individual interests.  I think the case law does
18  not address the question that's arising here.  Totally
19  different contexts.  I think these are -- right now these are
20  corporate documents, the conclusory statements to the contrary
21  notwithstanding, not to mention the fact that there -- again,
22  this business is not a corporation.  As most human beings
23  normal understand a corporation which is receiving money for
24  things given for value.  So there's that.

25          On the other hand, I don't know that I want this

12

1  stuff being thrown up on the internet. So tell me what you
2  think we should do about that.

3        MR. GOLDEN: To answer what I think is your first
4  question, Mr. Egiazaryan's public relations firm, BGR Bagarra,
5  has been regularly providing members of the Russian press in
6  particular but also the United Kingdom press and the American
7  press with very detailed reports about this proceeding. My
8  speculation is that someone among the many members of the press
9  who has been contacted by Mr. Egiazaryan has been accessing the
10  docket, the public docket in this case and somebody chose to
11  take something that was filed in the docket and either publish
12  the whole thing or be inspired to write a cartoon.

13        With regard to your second question, we certainly can
14  maintain some kind of confidentiality for the Clear Voice
15  records.

16        THE COURT: What's your proposal? What's your
17  proposal on that?

18        MR. GOLDEN: Well, the first is because I prefer not
19  to have things filed under seal because it's burdensome and
20  it's also contrary to the idea of public proceedings.
21  Certainly we will agree to maintain its confidentiality and to
22  use it only for purposes of this. That's a common level of
23  confidentiality. Then we get to the problem of if we have to
24  make a motion we have those exhibits and if we want to use them
25  we make a motion then. It otherwise becomes a public record.

13

1          THE COURT: Right.  Well, obviously I would -- it
2   would be bad if things were put in the public record for the
3   purpose of making them public, a public record of this case.
4   You understand what I'm getting at.

5          MR. GOLDEN: Yes.

6          THE COURT: So I'm not sure how to solve that problem.
7   I cert -- let me go through my ruling and then we'll talk about
8   the level of confidentiality.

9          This arises in the context of a motion quash a
10  subpoenas.  Subpoenas are subject to Rule 26's relevance
11  requirement which we're all familiar with.  Nonetheless, a
12  court does have to weigh the relevance or probative value of
13  the documents being sought against the privacy interests
14  asserted.

15          As I've already mentioned, the issue of what --
16  whether and how Ashot Egiazaryan has given money to the LDPR is
17  the critical issue in this case and there is evidence that's
18  been obtained in discovery and otherwise that makes it clear
19  that Ashot moves money around for no apparent reason, that the
20  money has gone to his cousin, Seren, that the source of this
21  money -- that this money ends up with Clear Voice and that
22  we're talking about millions of dollars.  So inquiry into what
23  Clear Voice is doing is certainly important.

24          Now, there are some situations where we can go to a
25  company and say you know what, give me the records that relate

14

1   to this particular issue and we trust them to do that.  I don't
2   think this is such a situation because of these unexplained
3   payments and the -- and the way Clear Voice and Ashot move
4   money around as I say for no apparent reason and the clear
5   evidence that Clear Voice is being used for Ashot's benefit.

6          So when Seren says that no payments were made for the
7   benefit of LDPR, which is a conclusory statement, I don't even
8   see how Seren could know that because of th evidence that
9   exists that Clear Voice is being used by Ashot to move money
10  around.

11         So, accordingly, I'm not going to quash the subpoena.
12  I'm ready to talk about a limitation certainly that this
13  material should be used only for purposes of this litigation
14  but it becomes very unwieldy if I give a higher level of
15  confidentiality designation because it prevents a party from
16  presenting evidence to me that's available to the public which
17  it should be regarding this case or presenting in a summary
18  judgment motion or a trial.

19         So if someone -- since I didn't really hear argument
20  on this, I'm willing to give you one last shot, Mr. Rakower, as
21  to some additional restriction and to give me a basis for it
22  but right now that's the way I'm looking at it.

23         MR. RAKOWER: Thank you, Your Honor.  If you don't
24  mind, may I just backtrack and ask Your Honor a question with
25  respect to your ruling?

15

1          THE COURT: Yes.

2          MR. RAKOWER: I understand Your Honor's position with
3   respect to payments from Clear Voice and onward. What about
4   items like the account opening documents that wouldn't bear at
5   all on the question of payments?

6          THE COURT: Well, it might bear upon Ashot's
7   relationship to this account. So I'm overruling that objection
8   too.

9          MR. RAKOWER: With respect, Your Honor, to the
10  question of confidentiality, a designation of the documents is
11  confidential for the purpose of usage, utilization of the
12  documents is fine if --

13         THE COURT: I didn't say confidential. What I said is
14  they can be used only for purposes of this litigation which
15  means they can't be put on the internet or handed out. They
16  can be used only for the litigation. That means that if Mr.
17  Golden wants to show it to a witness at a deposition and say
18  what's this about, that's not going to -- that's not going to
19  be automatically confidential. If he wants to put in his brief
20  just the way he did in the briefs in this case, you know, I've
21  got a declaration from this guy, I've got this, and now I've
22  got an account document that says Clear Voice paid $1 million
23  to this entity and this entity then gave it to LDPR, that's not
24  going to be sealed off from the public.

25         MR. RAKOWER: So I was going to try to take it step by

16

1  step with respect to the question of -- the concept of using
2  the documents only for purposes of this litigation.  As a
3  corollary to that, I would ask that if they -- outside a
4  deposition for a moment, if they were to show the documents to
5  anyone that that person sign an undertaking acknowledging the
6  documents would be only used for the purposes of this
7  litigation.

8          THE COURT: Yes, absolutely.

9          MR. RAKOWER: Thank you, Your Honor.

10          Now, with respect to depositions, Your Honor, in my
11  view those depositions at the moment when documents produced by
12  Clear Voice -- I'm sorry, produced by Wells Fargo related to
13  Clear Voice, if those documents were going to be shown to the
14  witness at that moment those -- the pages of that transcript
15  could be designated as confidential.

16          THE COURT: So now you're making a very different
17  request.

18          MR. RAKOWER: I understand.  I'm moving on now.

19          THE COURT: It's not just -- I mean it seems to me
20  that it would -- you're not just going to limit this request to
21  depositions, are you?

22          MR. RAKOWER: No, no.  I was going to --

23          THE COURT: You're going to do the same thing for the
24  exhibit to the summary judgment motion.

25          MR. RAKOWER: Yes, but I was going to describe a

17

1  process whereby even prior to the deposition if they wanted to
2  approach counsel and see if an agreement can be worked out with
3  respect to certain documents. We haven't yet seen the
4  documents, Your Honor. So we don't really know what's in
5  there. We don't know -- and we had asked defense counsel if
6  they would allow us to review them actually in the context of
7  this motion because we might have been able to rescind the
8  motion.

9       THE COURT: Clear Voice can't get its own documents?
10      MR. RAKOWER: Theoretically we could but in the
11 process of this motion when we filed it there wasn't time to
12 get those documents and then review them. So I'm not trying to
13 cast dispersions on defense counsel. My only point is it may
14 be that if we see particular documents that they want to ask
15 questions about we will have no issue but in the event that
16 there is an issue I'm asking for some kind of mechanism to
17 provide.

18      THE COURT: The normal mechanism. Is there a
19 confidentiality order in this case?

20      MR. RAKOWER: There is not.

21      THE COURT: There is not, okay. The normal mechanism
22 and maybe it is what should be used, and I'll hear from Mr.
23 Golden, is if they want to look through those documents and
24 designate because they think they have a justification, certain
25 of them is confidential. Maybe they relate to -- maybe they

18

1  have a social security number in it, all kinds of things, but
2  they should be entitled to do so and then you can protest and
3  bring it to me rather than just being allowed to automatically
4  put it into a summary judgment motion or show it at a
5  deposition.  So I think there's some fairness in that.

6          MR. RAKOWER: Your Honor, if I may since I'm wearing
7  two hats here.

8          THE COURT: Yes.

9          MR. LUPKIN: Your Honor, if I may since I'm wearing
10 two hats here.

11         THE COURT: Yes.

12         MR. LUPKIN: Both for the party and also for Seren
13 who's a non party.  I think that that makes sense.  My
14 suggestion -- it's not my goal to inhibit Mr. Golden from
15 putting in anything he thinks is appropriate in terms of
16 prosecuting or defending the case.  I would imagine that with
17 respect to a submission to the court there is a process for
18 sealing certain documents.  It's very common and it's discussed
19 at length in the Lugosh case out of the Second Circuit.

20         THE COURT: I'm quite familiar with it.  I'm trying to
21 avoid that if necessary.  The way to -- Mr. Golden, do you have
22 any basis for objecting to what I just said?  I know this makes
23 it more cumbersome for you but given that we don't even know
24 what these are.  The normal process is people get to designate
25 things as confidential and then there's a process where you can

19

1  challenge it and they have the burden of showing it's
2  confidential.

3          MR. GOLDEN: I do not object to that.

4          THE COURT: So that's what we should do here.  We
5  should use the normal process which means you folks need a
6  confidentiality order.  If you can't agree on one I can just
7  issue one on my own.  It should allow for one side at any time
8  to designate as long as it's in good faith and a belief they
9  could make an argument under Rule 26(c) documents as
10  confidential and that says that if there's a disagreement by
11  the other side they -- the parties confer.  If they can't reach
12  agreement then once side writes me and the burden is of course
13  always on the party that made the designation to justify the
14  level of restriction.

15          So once designated as confidential use only for
16  purpose of litigation and can't be shown to anyone except
17  attorneys and parties involved on the case or deponents or
18  other people -- the normal list, experts and so forth.  This
19  can't be the first confidentiality order you folks have been
20  involved in.  So let's have a standard order and the defendants
21  or rather Clear Voice will be allowed to designate under that
22  order as long as they agree to be bound by it.

23          MR. RAKOWER: Thank you, Your Honor.

24          THE COURT: I think that takes care of this motion
25  unless there's questions.  Should I go onto the February 7th

20

1   letter?

2         MR. RAKOWER: Just for the sake of clarity then.  We

3   are -- we understand that number one, the documents will be

4   treated -- will be used only for this case and number two, we

5   can designate certain documents as confidential.

6         THE COURT: Yes, those go together.  So even if

7   there's no -- even if I overrule the confidentiality

8   designation -- let me think about this.  Now your question is

9   can it be used outside the case.  I don't know.  See how you

10  draft the order, if you want different levels but I don't think

11  I want to decide that right now.  Let the designation process

12  decide that and the confidentiality order work that out.  If

13  you can't I'll figure something out.

14        MR. RAKOWER: I see them as mutually exclusive.  I

15  think I have a good understanding.  Thank you, Your Honor.

16        MR. LUPKIN:  I do actually have one point of

17  clarification.  I just want to make sure I understand. If

18  something under this sort of broad concept is designated as

19  confidential it may not be used in any -- not only may not used

20  outside of this litigation but it may only be used in the

21  submission to the court if we reached an understanding that it

22  is no longer confidential.

23        THE COURT: Say it again.

24        MR. LUPKIN: Let me try it again.  In lieu of a

25  sealing procedure which I gather you want to avoid at least at

21

1   this juncture, if something is designated confidential by these
2   Clear Voice records those documents may not be put into a
3   submission.  Is that what --
4              THE COURT: Unless I remove that designation.
5              MR. LUPKIN: Yes, that's exactly right.
6              THE COURT: But if you win on that or if he doesn't
7   want to challenge it then we have confidential documents that
8   the protective order will itself tell us what can be done with
9   it and most protective orders say that those documents can't be
10  put into the public record.  They have to be sealed and so
11  forth.  So, yes.
12             MR. LUPKIN: So I just wanted to make sure that the
13  confidentiality order that you're contemplating does provide
14  for some sort of sealing mechanism.
15             THE COURT: Yes.  Assuming that I uphold the
16  confidentiality designation if it's challenged.
17             MR. LUPKIN: Thank you.
18             THE COURT: So I'm ready to go on to the February 7th
19  matters.  Hold on one moment.
20                      [Pause in proceedings.]
21             THE COURT: I read the letters.  Does anyone want to
22  add anything?  I guess we would start with Mr. Golden.
23             MR. GOLDEN: I don't have anything to add.  I would
24  just with the court's position summarize in two sentences what
25  this is about, that the bank records necessarily include all

22

1 kinds of things that are unrelated to the case and the most
2 important part is unlike our attempt to get financial records
3 from Mr. Egiazaryan. We have provided lots of specific
4 financial records, copies of checks, a few entries in bank
5 statements that are relevant to the case. We have provided
6 those things and the irony is is that it's because we provided
7 those things that Mr. Egiazaryan's counsel knew the identity of
8 the accounts so they could serve the subpoenas on the banks and
9 in particular no request in the normal request for documents
10 was made for the broader collection of financial records that
11 the would obtain in response to the subpoena to the banks.

12            THE COURT: Say that last thing again.

13            MR. GOLDEN: No request -- let me back up.  There was
14 a request for what I'll call relevant financial records.   In
15 response to that we provided things like checks and deposit
16 references, some money that Mr. Zalmayev has received to do the
17 work that he did, and some checks that he wrote to other people
18 who were helping them.  We provided that.  That's what
19 identified the bank accounts.

20            Then Mr. Egiazaryan instead of asking us by a request
21 for documents for all of the bank records to which we would
22 have objected they skipped that step and just went right --
23 went right to the bank.  So we're in a situation now where the
24 things that have been -- that are relevant have been produced
25 and what's left is much broader irrelevant and in some cases

23

1 | inherently confidential information.

2 | THE COURT: You know what their argument is going to

3 | be given my last ruling?

4 | MR. GOLDEN: Yes.

5 | THE COURT: I'm not saying there isn't an answer but

6 | I'm not sure the answer is we produced the relevant stuff.

7 | Shall I tell you what their argument is going to be?

8 | MR. GOLDEN: Well, you and I agree. We have the same

9 | expectation about what their argument is going to be.

10 | THE COURT: Their argument is going to be my guy,

11 | Clear Voice, has to produce all its records, you don't trust

12 | him to find the LDPR things. Your guys should have to produce

13 | all his records, we don't trust him to find the Egiazaryan

14 | things.

15 | MR. GOLDEN: That is the expectation. That is my

16 | expectation also of what they're going to say and the

17 | difference is we actually produce some information.

18 | THE COURT: Well, you didn't actually give Clear Voice

19 | or Seren -- even if you had given them a chance you're not

20 | trusting them as to saying there's nothing in there anyway. So

21 | the fact that you produced information doesn't seem to me to be

22 | all and end all of your argument. Let me hear from them and

23 | then you can get your rebuttal. Go ahead.

24 | MR. RAKOWER: I'm not going to take time on the record

25 | repeating the very same arguments that you made. I'm making

24

1  that argument that it's made but I think that there's an
2  additional consideration here that bears mentioning.  This is
3  not in any way casting dispersions on counsel.  I assume
4  counsel is acting professionally.  But the reality is that the
5  way in which these documents came out was anything but normal.
6  We received a large chunk of documents that was produced.

7            THE COURT: Which was explained in his letter.  If
8  there's something wrong with the explanation tell me.

9            MR. RAKOWER: There's nothing with the explanation but
10  the bottom line is that we didn't get an enormous number of
11  these financial related documents until we served the bank
12  records.  So putting aside whether Mr. Golden is discharging
13  his duties, I have no reason to believe that he's not, I don't
14  trust that something that may not be self evident to Mr. Golden
15  will be produced because I frankly have doubts about the
16  defendant's reliability.

17            THE COURT: Anything else?  I'm sorry.

18            MR. RAKOWER: Not at this time, Judge.

19            THE COURT: I believe this presents a different
20  situation and I'm going to try to explain it.  Maybe it will
21  help future disputes.  I don't know.

22            First --

23            MR. RAKOWER: I'm sorry, Judge.  There is one thing I
24  wanted to mention. I apologize.

25            THE COURT: Sure.

25

1         MR. RAKOWER: The other difference is that Mr.
2  Zalmayev is a party to this case. In light of the order that
3  you just issued pertaining to non parties, it would seem that
4  the production of these bank records almost flows [inaudible]
5  from the earlier ruling.

6         THE COURT: I'll see if the flow gets stopped or not.
7         First, one distinction between the subpoena to Clear
8  Voice and what is being sought here is the centrality of the
9  issue to the case. The payments by Ashot to the LDPR are
10 absolutely central. That's what plaintiff is suing about, one
11 of the two or three things that he's suing about and probably
12 the main thing which is his denial that that occurred and the
13 claim that this defamed him.

14        So that -- discovery on that I'm going to allow much
15 more leeway than I might in other areas that are less central.
16 Here, there's no question that the issue of the defendant's
17 truth -- knowledge of the truth or falsity of the statement
18 which is the actual malice defense is certainly central but the
19 relationship between the defendant and others as a way of
20 proving the defendant's knowledge is sort of an order of
21 removal from that central issue. I'm not saying it's
22 irrelevant. I accept the plaintiff's argument that motive,
23 intent can be relevant and for what it's worth I'll cite a
24 Second Circuit case, Celle v. Filipino Reporters, 209 F.3d 163,
25 183 (2d Cir. 2000).

26

1         ·       So they make clear that it's possible in some
2    instances to use motive in conjunction with other evidence they
3    say or as they put it evidence of ill will combined with other
4    circumstantial evidence could go to this question of whether
5    the defendant acted with reckless disregard as to the truth or
6    falsity.  But as I say, this is sort of removed from the
7    central issues which are payment and the defendant's knowledge.
8    So that puts a different light on this request.

9         Another -- but I'm not denying the relevance.  So --
10   and, in fact, the defendant is offering to produce all the
11   material that's relevant to the question of his relationship
12   with others vis-a-vis his activities in regard to the
13   plaintiff.  What we have is the defendant saying we're not
14   trusting the defendant to do this, we want to see the records.
15   The problem is is that sweeps in a whole -- necessarily sweeps
16   in a number of private and irrelevant records.  While in some
17   instances I'm willing to let a party look through those,
18   instances where there seems to be unexplained and potentially
19   illegitimate corporate activity, transfers for no value and
20   things like that, there's no evidence of anything like that
21   here.  So that casts an entirely different light on the
22   situation.

23        The normal rule in discovery -- think about the old
24   days when the defendant had a correspondence file and we say to
25   the defendant give me all letters to -- that you sent to the

27

1   XYZ Corporation and then the lawyer or somebody document
2   custodian would go through the correspondence file, pull out
3   all the letters to the XYZ Corporation. Well, the plaintiff
4   didn't get the entire correspondence file. There is a certain
5   level of trust in some situations. So that is a paradigm that
6   in some cases applies and some cases doesn't, and in this case
7   I think it does apply and that there's no reason not to use it
8   and if you accumulate some evidence down the road that
9   documents on this question were not produced then by all means
10  bring it to my attention and maybe the paradigm will shift but
11  I guess I'm overruling the defendant's objection that there's
12  no relevance to this information. So they are obligated to
13  produce it. Their answer is they produced it all and I'm
14  prepared to leave it at that until I get evidence that they in
15  fact didn't do what I'm now directing them to do if they
16  haven't already done it.

17          I don't know if it's going to matter for purposes of
18  some disputes I see floating in later letters but whether a
19  party received payment for attorney's fees I don't see any
20  reason why that's going to be relevant. The rule as far as I
21  understand it is that the attorney's -- the right to attorney's
22  fees belongs to a client, that they're entitled to receive it
23  even if an attorney was appearing pro bono on their behalf or
24  someone else was funding their attorney's fees or there was a
25  contingency arrangement. That's been the rule for statutory

28

1  attorney's fees for thirty years.  So if they're entitled to
2  attorney's fees or damages they just get those attorney's fees
3  and while you're certainly entitled to know what they paid
4  their lawyer as attorney's fees if someone was advancing them
5  payments for that I don't see how that's going to be relevant
6  down the road.

7          THE COURT: Go ahead.

8          MR. LIPKIN: Since that application has not yet been
9  fully briefed --

10         THE COURT: It seemed like it was mentioned in this
11 one.  Did I imagine that?

12         MR. LIPKIN: It was mentioned but it was a reference
13 to it in a later application where it's really sort of
14 distilled and presented further.

15         My point is really two-fold.  I understand what
16 you're saying, Judge, about the identity of who's paying for it
17 for the purposes of damages.  I don't necessarily agree with it
18 but I understand it.  It does not change the fact that the
19 identity of who is paying Mr. Zalmayev's lawyers is relevant to
20 the first issue that we were just talking about, and that is --

21         THE COURT: Correct. I didn't mean to say otherwise.
22 I was thinking, specifically thinking about whether it was
23 relevant to the attorney's fees argument.  It may be relevant
24 to this other point.  I didn't intend to speak to that.

25         MR. LIPKIN: Okay.  I wanted to just clarify that and

29

1   to the extent that Your Honor is ruling, I don't know whether
2   you are or you're not, on the -- our entitlement to get
3   redacted invoices from Mr. Golden --
4           THE COURT: I wasn't really intending to rule on that
5   although I kind of started talking about it but maybe it will
6   forestall something. Can we perhaps deal it out now? What is
7   it you want, invoices that Mr. Golden is charging the client
8   for purposes of seeing what their attorney's fees claim is
9   against you.
10          MR. LIPKIN: Whoever -- well, it's Mr. Golden and his
11  local counsel, Mr. Ryan, or whoever else they're going to be
12  claiming attorney's fees for.
13          THE COURT: Do you have a problem -- are you going to
14  have a problem with that?
15          MR. GOLDEN: Yes, for two reasons. Of course most of
16  the overwhelming content of the bills is privileged because it
17  shows exactly --
18          THE COURT: As to what you were doing for them.
19          MR. GOLDEN: What I did. The second --
20          THE COURT: Do you want that contents?
21          MR. LIPKIN: Not at this time, Judge.
22          THE COURT: So the --
23          MR. GOLDEN: The second is the other reason it's being
24  requested is to find out the identity if it's somebody other
25  than Mr. Zalmayev who's paying the bills and I think that Your

30

1  Honor just gave us your view that that part is not relevant.

2          THE COURT: Well, it's not relevant for the attorney's

3  fees claim but it may be relevant for the motive ill will

4  issue.  So I guess I'm a little confused.  Are you not sending

5  the bills to Zalmayev?  Is that the problem, or don't you want

6  to answer that question?

7          MR. GOLDEN: I prefer not to answer that question now

8  although I have a way -- I have a suggestion that I'll talk to

9  Mr. Lupkin about in light of Your Honor's comments where we

10 might be able to get to the central issue -- the central point

11 that is important to him without going into --

12          THE COURT: He needs to know how much is being paid.

13          MR. GOLDEN: That I have done.  I'm a month or two

14 behind --

15          THE COURT: For the damages thing.

16          MR. GOLDEN: Of course I'll update that.

17          THE COURT: And to the extent someone is advancing

18 money to your client for this case it has some relevance to

19 this ill will problem.  So you need to deal with that.

20          MR. GOLDEN: Yes, I understand.

21          MR. LUPKIN: Your Honor, it is true that Mr. Golden

22 has provided me in an email with the total amounts that were

23 billed as of -- I believe the last time he gave it to me was

24 December.  I believe I'm entitled to the actual evidence of

25 what it is that he rendered by way of invoices in a redacted

31

1  form.   The bill, no description, the hours.

2              THE COURT: What is it you didn't get that you want?

3              MR. LUPKIN: All I received was an email from Mr.

4  Golden saying --

5              THE COURT: You want to see the bill redacted with --

6  you want to see the hours and the dates?

7              MR. LUPKIN: I want to see the hours, the dates, the

8  total, the expenses, and I want to -- and on this other issue

9  of ill will I want to see the source, who is paying for this.

10             THE COURT: One thing at a time.   So I'm just thinking

11  about what we require.   It seems to me you should be giving

12  what one would normally give in an attorney's fees application,

13  statutory attorney's fee application, which would include

14  normally the dates and the hours and usually some description

15  which -- I have no problem with your altering but you have to -

16  - at some point a description will have to be provided briefing

17  on summary judgment motion, letter to the court, something like

18  that.   I'm not saying that you need to do that now.   If the

19  descriptions are revealing things they shouldn't, I don't have

20  a problem with your redacting it but the dates an the hours for

21  right now it seems to me would have to come out.

22             MR. GOLDEN: The dates and the hours can be provided.

23  That's a request that wasn't made before.

24             THE COURT: Let's not worry about what was made.

25             MR. GOLDEN: But with regard to Your Honor's question,

32

1  in attorney's fees cases that I've handled both seeking
2  attorney's fees and opposing them, the overwhelming custom is
3  at that point in the case the case is over, at least the trial
4  is over and normally the entire bills are provided.

5          THE COURT: Right.

6          MR. GOLDEN: Because identification of what witness
7  was being discussed, prepared, researched, it doesn't matter,
8  it doesn't matter at that point.  During the case that matters
9  a lot.

10         THE COURT: Okay.  I see the difference and I guess as
11 long as you're going to get them eventually.  When you get them
12 may not matter so much.  I don't know.  I have a feeling that a
13 jury is not going to decide this issue because there is special
14 case law about damages claims for attorney's fees which says
15 that a judge is supposed to decide that.  I'm pretty sure
16 that's out there unlike the normal claim for damages which have
17 to be brought before a jury.  In fact, I feel like I may have
18 written on this once but I'm sure you can find the case law
19 yourself.  So you'll be entitled to it at some point and we'll
20 figure out a way.

21         That was my agenda, I think.  Let me just make sure.
22 Do we need to talk about when you're going to ask to lift the
23 designation on the asylum piece? I want to get things going a
24 little bit because I'm going to be a little bit unavailable for
25 parts of March.

33

1         MR. GOLDEN: I think we can get that in -- I'm away
2   next week but at the end of the following week I think we can
3   do that.

4         THE COURT: You two work out a schedule.  The sooner
5   things happen the better.

6         MR. LUPKIN:  With respect to -- since we started on
7   the subject, it seems to me that if there's some sort of way in
8   which we can reach a resolution about the source of payments
9   now --

10        THE COURT: So what's the position on the source of
11  payments?  Again, this is not for purposes of the attorney's
12  fees claim but for purposes of their ill will malice claim
13  which I've said is relevant.  So if someone is giving money to
14  your client for this litigation talk about whether -- why that
15  would not be relevant or you can say anything that might be
16  relevant.  I don't know.  Or do you want to think about it?

17        MR. GOLDEN: I'd like to think about it.  Your Honor
18  suggested that it might be relevant and what I'd like to do
19  because there are other people that I need to talk to about how
20  to do this, I would like to talk to them before directly
21  answering Your Honor's question and most particularly I also
22  want to talk to Mr. Lupkin about whether he'll be satisfied if
23  we tell him who it's not without telling him who it is or
24  whether he wants to know who it is because that means I have to
25  have more conversations.

34

1    THE COURT: I have a feeling I know the answer to the

2 question.

3    MR. LUPKIN: Judge, I didn't even have to be here

4 today. You're making all of my arguments.

5    THE COURT: I think he wants to know who it is.

6    MR. LUPKIN: Right.

7    MR. GOLDEN: In that case I just have to talk to other

8 people and --

9    THE COURT: If you can't work it out then you know

10 what to do. Send me a letter.

11    MR. GOLDEN: Thank you.

12    THE COURT: You folks can exit and my clerk will lock

13 up.

14          * * * * *

15

16

17

18

19

20

21

22

23

24

25

35

1    I certify that the foregoing is a court transcript from an

2    electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                                Shari Riemer

7    Dated:    February 24, 2012

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25