2:20-cv-11236-RGK-PLA

1   Artem Egiazaryan
    artem3artem@gmail.com
2   342 Hauser blvd. apt.429
    Los Angeles, Ca, 90036
3   Telephone: 3109261772

4   Defendant

5              UNITED STATES DISTRICT COURT
        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION
6   VITALY IVANOVICH SMAGIN,          Case No. 2:20-cv-11236-RGK-PLA

7                                     ANSWER TO COMPLAINT
                                      CIVIL RICO LIABILITY

8   Plaintiff,
    v
9
    COMPAGNIE MONÉGASQUE DE         Stipulation to Extend Time to Respond to
10  BANQUE a/k/a CMB BANK; ASHOT    Initial Complaint by Not More Than 30
    YEGIAZARYAN a/k/a ASHOT         Days (L.R. 8-3)
11  EGIAZARYAN, an individual; SUREN
    YEGIAZARYAN a/k/a SUREN          Complaint served: December 29, 2020
12  EGIAZARIAN, an individual; ARTEM  Response date: January 19, 2021
    YEGIAZARYAN a/k/a ARTEM          New response date: February 19, 2021
13  EGIAZARYAN, an individual;
    STEPHAN YEGIAZARYAN aka
14  STEPHAN EGIAZARYAN, an
    individual; VITALY GOGOKHIA, an
15  individual; NATALIA DOZORTSEVA,
    an individual; MURIELLE JOUNIAUX,
16  an individual; ALEXIS GASTON
    THIELEN, an individual; RATNIKOV
17  EVGENY NIKOLAEVICH, an
    individual; H. EDWARD RYALS, an
18  individual; and PRESTIGE TRUST
         COMPANY, LTD.,

19

1.     My name is Artem Egiazaryan and this is my statement. In order not to bring more unnecessary complexity to this case I will do my best to be as concise as possible.

2.     The Plaintiff does his best to present me, my brother Ashot and my cousin Suren as some kind of "criminal enterprise", "white collar army", a "syndicate" that steals other people's funds, that our "stock in trade is real estate fraud", and that we "cover and protect stolen funds".  That is the main theme of the Plaintiff that he repeats over and over throughout the statement. This is wrong on many levels and I would have to go one by one to clarify the situation.

3.     We come from a very well known family in Russia (in business and economic circles). Our father was for many years an economics professor at the Moscow State University. He was a member of numerous economic and business commissions in the 1990s and was an ardent supporter of the development of small businesses in Russia as he believed that it would play a major part in the Russian transition after the collapse of the Soviet Union in 1991. That was the time when the whole communist economy underwent privatization - transition from the state owned economy to a market economy. As far as I know, that transition in terms of scale and timing was absolutely unique in history. People who understood the perspectives of that transition were making huge fortunes just within years and sometimes months. Our father who created this family business understood it all

1    too well. He introduced his brother (who was Suren's father) to the business as

2    well.  Both brothers died in 1995 within several days of each other leaving the

3    family business to us. Ashot and Suren were involved while our fathers were alive.

4    I was in my first college year at that time and joined later.

5        4.    We can now go directly to 2008-2009 where everything started to

6    unfold. Our main asset was the shares of the Moscow hotel - two million sq. ft.

7    mixed use project with the anchor tenant Four Seasons hotel. The project has a

8    prime location right next to the Red Square in Moscow. At that time when the

9    project was nearing completion and hundreds of millions of dollars were spent,

10   Ashot was told that we have to give up our shares to Suleiman Kerimov (who is

11   close to Kremlin) or face the consequences. Not going into the details of why that

12   happened I can only say that democratic institutions have not yet evolved in Russia

13   and the efforts of countless people have not brought the country far enough from

14   the Soviet dictatorship. The political system in Russia once again evolved as what

15   is known to be "the vertical of power". The main aspect of that system is that you

16   have to do whatever you are told to do by those in power. There is no room for

17   dissent or negotiation. In some sense the system is pretty simple – do what you are

18   told and you will have everything, oppose – you get the whole power of the state.

19       5.    Initially we tried to stop that attack by legal means; however on 1

20   June 2009 our opponents started their first fabricated criminal proceedings against

1   us. Those proceedings were in connection with the Hotel Moscow. Dozens

2   specially equipped police units in masks and with automatic weapons were sent to

3   our offices and offices of our legal consultants - White and Case and Lovells.

4   Within days we had our homes searched, I was interrogated as well as our

5   employees. The attack on such a scale was rarely seen. This was one of the biggest

6   raids since the attacks on the Yukos company.

7       6.     The same month – June 2009 Luzhkov  (who was at that time the

8   Mayor of Moscow) wrote to the Prosecutor General requesting that Ashot be

9   stripped of his parliamentary immunity and commence criminal proceedings. We

10  decided that the risk was too high and I flew to Cyprus with Kerimov's people to

11  hand over the project. Within one month of commencing criminal proceedings we

12  handed over to Kerimov an asset worth a billion dollars for nothing. To the best of

13  my knowledge this criminal investigation went nowhere.

14      7.     A lot has happened between Summer 2009-2010. The main thing we

15  realized was that it was not over and that our opponents would not stop. In summer

16  2010 I flew to Cyprus to see whether we can have a legal claim. It turned out that

17  we can do both proceedings in Cyprus and LCIA, and so we did in September

18  2010. I testified about what has happened to us. My Affidavit Exhibit #1 exposed

19  top Russian officials and I managed to secure injunctions in the amount of $ 500

20  000 000 (half a billion dollars) on Kerimov's and others assets. Imagine blocking

1   half a billion USD of some cartel's funds for several months and then see what

2   happens.  The power of people such as Kerimov is way greater than the power of

3   any cartel, as those people have all the powers of the Russian state and they are not

4   being shy to use it.

5      8.      After filing those proceedings, in October 2010 I went from Cyprus to

6   Los Angeles to visit Ashot. We needed some time to collect our thoughts and see

7   what we do next.

8      9.      The consequences came immediately. Just upon my arrival at Los

9   Angeles Ashot was stripped of his parliamentary immunity. Parliament in Russia is

10  not an independent entity so it was a clear sign for us that the order was from the

11  top. That happened just over a month after filing the injunctions and proceedings in

12  Cyprus and LCIA. In October 2010, Plaintiff commenced his arbitration in LCIA,

13  In November 2010 criminal proceedings were initiated against Ashot.  On

14  December 7, 2010 our relative Aslan Aslanbekov was killed by a gunshot wound

15  to the head Exhibit #2. Up to this date this crime remains unsolved. For the

16  avoidance of any doubt, I do not put any blame on the Claimant for this crime as

17  he has nothing to do with it; however, it is important to put into perspective what

18  we were up against just after I submitted my Affidavit. In 2010 and 2011 more

19  searches were conducted at our offices. In May and June 2011 additional fabricated

20  criminal proceedings were initiated against me and my colleagues. In March 2012

1  new criminal proceedings were started. I was charged and a warrant for my arrest

2  was issued, I was put on the Interpol search list and later received a 5 year

3  conviction.

4       10.    I have lost count to how many criminal proceedings were initiated

5  against us. As I understand it they made a criminal proceeding per each of our

6  asset.

7       11.    One important note I want to make here. Our opponents try to picture

8  us as some kind of evil master planners. The reality of the situation is the opposite.

9  At all those times since June 2009 (when the first criminal proceeding has started)

10  we were mostly reacting to what was happening to us and did not plan it at all.

11  When I went to Cyprus in 2010 we did not even have a plan to go forward with all

12  those proceedings and injunctions. We were more in a position where we had to

13  react to the changing dynamics of the enormous pressure that we had and still have

14  to deal with. Every one small step led to another one on a steady vector of

15  escalation.  In summer 2010 I left my home with a small suitcase that would last

16  me several days in Cyprus just to see whether we had an opportunity for such

17  actions and now 10 years later I still have not returned back.

18

19

20

1          **<u>Plaintiff's criminal proceedings</u>**

2          12.     Paragraph 36 of the complaint says that my brother "perpetrated a

3     fraudulent scheme" and that with my assistance "concocted an elaborate scheme to

4     steal Plaintiff's shares and profits" which we "accomplished through a series of

5     fraudulent transactions using offshore nominee companies" and that we used

6     Deutsche Bank as a tool to do that "fraudulent scheme". This statement is

7     absolutely false. We did not take either Plaintiff's shares or his profits.

8          13.     The investigation prepared a very sophisticated document – 122

9     volumes of the material of numerous facts that they tried to put together. What

10    really happened can be best described by the witness statements given by the

11    Deutsche Bank's Head of the Legal Department and their legal consultant

12    "Salans". I will put here their direct quotes. (Exhibit 9 of the complaint, pages 27-

13    29)

14         <u>Deutsche Bank's Head of the Legal Department.</u>

15               14.     "the fact that the borrower was a Cypriot

16               company was also a **common practice** both in Russia

17               and abroad. The main idea of using the **special purpose**

18               **company in Cyprus and the British Virgin Island** is to

19               improve the quality of the loan, because such a company

20               is engaged only in servicing the loan, the third party

1    could not lay their claims that could interfere with the

2    repayment of the loan. Such companies are in jurisdiction

3    that has a higher credit rating"

4         15.    "In fact, "Blidensol" was given 100 million

5    US dollars, but after **the financial crisis in late 2008-**

6    **early 2009,** Deutsche Bank and its London branch

7    reconsidered their position towards investments into the

8    Russian real estate. It was decided, he does not know by

9    whom exactly, that it was necessary to get rid of the loan

10   – to sell it or to transfer the rights for it to third parties.

11   **That was due to the fact that the property prices in**

12   **Russia were falling rapidly. Such a tactic of selling**

13   **high risk loans, like this, is standard in international**

14   **banking practice and for Deutsche Bank in this**

15   **situation it was profitable to sell this loan, and not to**

16   **hold it on its balance sheet."**

17        16.    "he knew that Deutsche Bank was interested

18   in cession of rights on the loan of the company

19   "Blidensol" to anyone who could afford to buy such a

20   loan. **First of all, it was offered to Smagin, the**

1  **negotiations were also held with other structures.** He

2  heard about Yegiazaryan for the first time from

3  Ponomarenko, Yegiazaryan also wanted to redeem the

4  loan. **The bank's task was to sell the loan at the most**

5  **favorable price.** Ponomarenko worried that it would not

6  be possible to sell the loan, and the financial condition of

7  "Centurion Alliance" could worsen, he said that there

8  was a risk of bankruptcy of the pledger "Centurion

9  Alliance" , **but at the moment of selling the loan, there**

10  **was no default. The difference in prices for which the**

11  **loan was sold and redeemed was caused by the**

12  **economic situation in the country.**

13      17.   "**the decision to issue and sell the above-**

14  **mentioned loan was made by the London branch of**

15  **Deutsche Bank itself.** The office of Deutsche Bank in

16  Moscow did not have such funds and could not issue

17  such loan."

18      18.   "**at the stage of issuing the loan, there**

19  **were not found any violations"**. No comments or

20  complaints about the package of documents (some of

1      which were kept in London, some part in Moscow and

2      Cyprus) at the moment of issuing the loan were not

3      given."

4      <u>Salans</u>

5      19. "According to the established practice,

6      Deutsche Bank **demanded from the borrower** to

7      concentrate all shares of "Centurion Alliance" on one

8      legal entity for the subsequent pledge in securing the

9      loan. **In addition, foreign banks, as a rule, demand the**

10      **shareholders of Russian companies to be foreign**

11      **companies**, so that in case of the default on a loan, the

12      bank could impose a court enforced collection of the

13      shares of such foreign companies, including extrajudicial

14      procedure."

15      20. Contrary to the Plaintiff's statement it was the Deutsche Bank's

16 demand to put an offshore structure in place. After 2008 crisis Deutsche Bank was

17 selling the loan to the highest bidder, and the one who got the loan would get the

18 Europark. Before this sale we had a 73% stake in the project, Plaintiff had 20%.

19 He was actively negotiating with the bank but then decided to go the other route.

20 We could only afford to purchase 50% of the Europark by paying half of the loan

1 (55 million USD was the total amount of loan for sale). Not only did we not get or

2 "steal" the shares of the Plaintiff, **but we also lost even more than he did** – we

3 lost 23% of the shares and had to bring more funds in order to keep the remaining

4 50%. That was the result of the financial and real estate collapse following the

5 2008 crisis.

6     21.    The Plaintiff did not start the criminal proceedings regarding this

7 transaction in particular as this transaction was just a routine practice. In order to

8 start a criminal proceeding they concocted a story that we planned it all in 2006

9 and that bank's loan buy out was a part of the bigger plan to steal the Plaintiff's

10 shares. That just does not make any sense. In order to do so we must have at least

11 predicted the financial collapse of 2008 and the decision of Deutsche Bank to sell

12 the loan. Even financially that transaction does not make any sense for us as we

13 ended up losing 23% shares and paying to the bank for the remaining ones.

14     22.    Also Plaintiff fails to point out that if we wanted to default on the loan

15 we did not need to bring any elaborate plan - we could have just missed any due

16 payment to the bank which we did not (and that was not an easy task during those

17 times as shopping centers were defaulting on their payments quite often). **All the**

18 **payments to the bank were up to date.** We did our best to keep that loan in

19 place.

1   23.    That was not Plaintiff's first attempt to attack us with the criminal

2   charges. In 2009 when Plaintiff was a 20% owner of Europark he started his first

3   attack on us, trying to initiate another criminal proceeding on trumped up charges

4   against the management of Europark. I have not seen him mentioning that episode

5   in his testimony. That was **even before** he lost his shares in this project. I was

6   interrogated during that attempt as well.   They decided not to go with that

7   proceeding (I say they as Plaintiff is just their tool), instead they went forward with

8   the new one – the one that later led to my conviction.

9   24.    One of the most important documents during the proceedings

10  (regarding Moscow Hotel) was the so called "take over plan" signed by the Mayor

11  of Moscow  – Luzhkov (dated August 2008) Exhibit #3. This document goes into

12  detail about how to steal our shares in Moscow Hotel and ruin Europark. Paragraph

13  3 of that document particularly states different options how to artificially

14  orchestrate the default of the Deutsche Bank loan of Europark. The last paragraph

15  states that the "**Deutsche Bank may be ready to sell or transfer the rights** of

16  creditors for the Moscow hotel to the bank that has the necessary credit rating or on

17  the condition of full coverage. A condition may be enlisting it into financing more

18  profitable projects while obtaining the right to have a stake in their profit in the

19  form of a shareholder".

25.    To sum it up – we have a document signed by the Mayor of Moscow and labeled for "internal use only". In that document they consider different options how to take our property including artificially orchestrating the default of the Deutsche Bank loan. **By the way that is exactly what the Plaintiff accuses us of doing**. Then we have in 2009 the first attempt of the Plaintiff to commence the criminal proceedings and later after 2010 Injunctions – his second criminal proceeding and LCIA arbitration.

26.    Plaintiff tries to present that his LCIA proceeding has nothing to do with the received Kerimov reward. Paragraph 42 of the Complaint states that "award in an unrelated arbitration against fellow Russian businessman Kerimov" The reality of the situation is that this claim is the direct consequence of Kerimov's proceeding.


## Plaintiff's LCIA proceeding.

27.    Initially we were entertaining the possibility to sell Europark upon completion. Plaintiff wanted to take an active part in it. The lawyers prepared the documents (including the shareholders agreement and escrow agreement) in accordance with the Deutsche Bank's loan agreement. However, the project was not successful at the time of opening and it was impossible to sell. Initially it did not even generate enough funds to cover utilities and operational expenses, so I

1  spent several years recovering it while meeting all the financial obligations to the

2  bank. Once the cash flow started to normalize – the 2008 financial crisis hit. So the

3  option to sell did not come to fruition at all. We did not feel the need to officially

4  cancel those agreements. Unfortunately the wording of this document is so vague,

5  that it leaves much room for interpretation, and subsequently Plaintiff's LCIA

6  lawsuit. Plaintiff managed to persuade the court that his loss of shares had

7  something to do with those agreements. Those agreements whether they were

8  executed or not had absolutely no bearings on the Deutsche Bank's decision to sell

9  the loan. It did not matter whether the Bank sold the loan to us to Plaintiff or any

10  other party, this shareholders agreement and escrow agreement could not have

11  prevented it or stop it.

12       28.    In October 2010 the Plaintiff commences his LCIA proceeding – right

13  after one month of my Cyprus injunctions and the commencement of different

14  arbitrations.

15       29.    Initially I thought that this lawsuit was completely bogus. We were

16  overwhelmed with what was going on at that time and just could not allocate the

17  necessary resources to it. We had neither time nor finances to handle it properly.

18  Instead of one LCIA arbitration as we were planning to do in regard to the Moscow

19  Hotel project – our opponents insisted that each respondent has its own

20  proceedings, so we ended up with three LCIA cases regarding the Moscow Hotel;

1    in addition we had Plaintiff's LCIA complain, numerous criminal proceeding to

2    deal with and more. We also had to relocate all together 5 families from Russia

3    (over 15 people, who also had no previous plans for emigration).

4        30.    I thought that the maximum damage from the Claimant's LCIA

5    proceeding would be Plaintiff's 20% of the buy out amount (total buy out was

6    USD 55 mill.)  That would account to maximum $11 million dollars. That was the

7    price of his shares at the time Deutsche Bank sold the loan in the middle of the

8    aftermath of the 2008 crisis. In order to cancel those proceeding we offered to give

9    the Plaintiff 20% from our remaining 50% of the project that would leave us 30%.

10   **<u>He refused.</u>** That showed their real intention – that is to put additional pressure on

11   us with the continuation of that lawsuit.

12       31.    Contrary to my belief the Plaintiff managed to secure valuation on a

13   different date, after the financial crisis, when the market was recovering and the

14   price of Europark was completely different. It was as though there was no 2008

15   crisis at all. Plaintiff claimed that his 20% were worth $ 72 million dollars. That

16   did not make any sense as the Deutsche Bank sold the loan for $ 55 Million

17   dollars, anyone could have purchased that loan and get 100% shares of Europark

18   for that price.

32.     From $ 11 million (the value of the Plaintiff's shares that he lost) the price rose to $ 92 million then it came to $ 130 million and now they try to **triple it.** To me such a jump in price looks like a pure judicial alchemy.

**Handwritten agreement.**

33.     The paragraph 73 of the complaint says:

> "In an attempt to move their tactics to the Caribbean Island of Nevis and other jurisdictions, Mr Yegiazaryan, his brother, Artem, and his cousin, Suren, **fabricated a handwritten "agreement",** purportedly entered into on February 20, 2011"

This statement is false.

34.     The handwritten agreement is real and it is my handwriting. This agreement symbolized a turning point for me when we decided to move forward. It had nothing to do with what Plaintiff claims – "an attempt to move their tactics to the Caribbean Island". This agreement had the addendum #1. I have found in my emails that I have sent it to my lawyers in 2015 Exhibit #4– way before any Caribbean actions as Plaintiff presents it.

35.     Paragraph 74 of the complaint states:

1       "For his part, Artem was purportedly required to

2       fund necessary legal procedures, as well as to render, if

3       necessary, any other financial support to Mr.

4       Yegiazaryan also in the amount up to $ 20 million,

5       including expenses in the amount of $550,000 previously

6       paid by Artem. This loan was also in exchange for one-

7       third of the **$ 180 million Kerimov Award** settlement

8       and required Mr. Yegiazaryan to "compensate" Artem

9       for losses related to "Sofiyskaya Embarkment", another

10      project with which Mr. Yegiazaryan had no

11      involvement."

12      36.   The agreement does not state $180 million Kerimov Award. This

13  statement is made up. We did not know how much the reward would be. What we

14  thought we would get from the LCIA arbitration is our market value that was lost –

15  that is about $ 1,000,000,000 (one billion dollars)  out of which around $ 250

16  million were project expenses, the rest -  the value of the shares. Actually it was

17  our conservative scenario as we were advised that this amount would be doubled

18  with the penalties, percentages, etc. I had a range of the reward between 1-2 billion

19  USD. I understood that our court proceedings would destroy the other asset - that is

20  why came the compensation for the loss of another project - "Sofiyskaya

1  Embarkment", and that is where the addendum to the agreement stipulated the

2  details of the compensation. In reality that is exactly what has happened.

3  "Sofiyskaya Embarkment" project was stolen and there are now court proceedings

4  in Cyprus against the "Alfa group".

5      37.   We considered that the LCIA proceedings would get us the lost 1

6  billion dollars, which would leave each of us with aroun $ 300 million. So the

7  additional compensation was just a part of that.

8      38.   In reality we won only expenses in the amount of $240 million

9  (Kerimov award). The amount we got was around $200 million.

10      39.   In September 2010 I spent EUR 550,000 (that were mentioned in that

11  document) that was used as a court deposit for the injunction that I made during

12  my Cyprus trip. (I have not yet received it back)

13      40.   In May 2011 I have spent over $ 12 million dollars on judicial

14  proceedings alone. I want to make it very clear that without those payments there

15  would be no proceedings and no award.

16      41.   Paragraph 77 states:

17          "nor Suren or Artem ever tried to enforce the alleged

18          agreement against Mr. Yegiazaryan. That is because the

19          agreement is a post-hoc sham concocted to Encumber

20          Alpha Trust. The "funds" Suren and Artem purportedly

provided to Mr. Yegiazaryan were not theirs to begin with, but were funneled from Mr. Yegiazaryan through his companies and surrogates for use by him and his syndicate".

42.   The Claimant accuses me that I never tried to enforce that agreement and that is correct. I have never enforced it as I felt secure that my share of Kerimov's award is in the Trust. When we won the award and everybody was getting their commissions, I felt safe that my money is in the Trust and I did not feel the need to move it. I have not got a penny from the Trust. Later the Plaintiff put an injunction on the Trust. Even if Plaintiff got all that he claims from the Trust it would still leave funds for me in the Trust.

43.   Exhibit #4 clearly states that this agreement is not a "post-hoc sham". Plaintiff also states that all the funds I had spent on the proceedings connected to the Moscow Hotel were not my funds. This statement is false. The funds that I spent were my personal funds. If those funds were not mine then I would have withdrawn my share of the reward as a commission from the Trust as everyone else. That just does not add up as I have not taken a dime from the Trust.

44.   After the Kerimov award was paid, due to my personal circumstances, my involvement with the project was quite limited and I cannot comment on what happened after that.

1                           **Conclusion**

2       45.    Neither I nor my brothers have a reputation of a crime family. It is

3 impossible to hide it. On the other hand our opponents have exactly that kind of

4 reputation. Whether it is Suleiman Kerimov, or the Plaintiff or Alfa group.

5       46.    Both the Plaintiff and Mr. Kerimov were mentioned in the Atlantic

6 Counsel report "Russia's interference in the US Judiciary. Exhibit #5 page 24.

7       47.    Plaintiff is characterized there as a "government fixer".

8       48.    Mr. Kerimov in April 2017 was sanctioned by the US Treasury

9 Department. Exhibit #6 page 3. In November 2017 Mr. Kerimov was detained for

10 two days in France on money laundering allegations.

11       51.    Paragraph 82 states:

12                "Artem still has not disavowed the agreement, and

13                thus an action by Artem in a foreign jurisdiction similar

14                to that brought by Suren in Nevis is possible and could be

15                brought at any time."

16       52.    I cannot disavow the agreement as the agreement is real, but I can

17 confirm that I have not brought any actions in that regard and can give my

18 assurances to continue to do so.

19

2:20-cv-11236-RGK-PLA

1   53.  Therefore I am respectfully asking the court to dismiss this entire

2 action.

3

4

5

6

7 /S/_____      Date: February 16, 2021

8 Artem Egiazaryan