# EXHIBIT 31

Case No: HC-2014-000262

Neutral Citation Number: [2017] EWHC 2426 (Ch)
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Royal Courts of Justice
Rolls Building, Fetter Lane,
London, EC4A 1NL

Date: 11/10/2017

**Before** :

**THE HON. MR JUSTICE BIRSS**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**(1) JSC MEZHDUNARODNIY PROMYSHLENNIY
BANK
(2) STATE CORPORATION "DEPOSIT
INSURANCE AGENCY"**                               <u>**Claimants**</u>

**- and -**
**(1) SERGEI VIKTOROVICH PUGACHEV
(2) KEA TRUST COMPANY LIMITED
(3) FINETREE COMPANY LIMITED
(4) BRAMERTON COMPANY LIMITED
(5) BLUERING COMPANY LIMITED
(6) MARU LIMITED
(7) HAPORI LIMITED
(8) MIHARO LIMITED
(9) AROTAU LIMITED
(10) LUXURY CONSULTING LIMITED
(11) VICTOR SERGEYEVITCH PUGACHEV
(12) ALEXIS SERGEEVICH PUGACHEV
(13) IVAN SERGEEVICH PUGACHEV
(14) MARIA SERGEEVNA PUGACHEV
(The 12th, 13th and 14th Defendants by their
litigation friend ALEXANDRA TOLSTOY)**         <u>**Defendants**</u>

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**STEPHEN SMITH QC, TIM AKKOUH** and **CHRISTOPHER LLOYD** (instructed by
**HOGAN LOVELLS INTERNATIONAL LLP**) appeared on behalf of the Claimants.

**HODGE MALEK QC** and **PAUL BURTON** (instructed by **DEVONSHIRES SOLICITORS LLP**) appeared on behalf of the Twelfth to Fourteenth Defendants.

Hearing dates: 4th, 5th, 10th - 13th, 28th 31st July

- - - - - - - - - - - - - - - - - - - -

**Judgment**

**Mr Justice Birss:**

| | |
|---|---|
| Introduction and narrative | 1 |
| The issues | 70 |
| The witnesses | 80 |
| The terms of the trust deeds | 103 |
| The law | 143 |
|     Shams | 145 |
|     Illusory trusts | 155 |
|     Discretionary trusts, protectors and fiduciaries | 173 |
| *Assessment* | 204 |
| The involvement of Victor and his father as sources of assets | 204 |
| **The True Effect of the Trusts claim** | 212 |
| (i)    Preliminary general points | 214 |
| (ii)   Exclusion and indemnity clauses | 216 |
| (iii)  The position of Protector | 222 |
|     What if the Protector's powers are personal? | 234 |
|     Are the Protector's powers purely personal? | 248 |
|     The nature and scope of the Protector's powers – conclusion | 265 |
| **The Sham claim** | 279 |
| (i)    The subsidiary characters – Ms Hopkins and Mr Pugachev's lieutenants | 283 |
| (ii)   Mr Pugachev | 286 |
| (iii)  Mr Patterson | 299 |
|     Mr Patterson as a witness | 308 |
|     (a)  Dealings with trust assets without Mr Patterson's knowledge and agreement | 312 |
|     (b)  and (c) Mr Pugachev as settlor | 325 |
|     (d)  Not aware of any basis for the trusts being shams | 336 |
|     (e)  Only link to the OPK trusts was as corporate administrator | 341 |
|     Mr Patterson's trust law article | 347 |
|     (f)  No distributions to Mr Pugachev from the trusts before the freezing order | 350 |
|     (g)  Mr Pugachev exercising control via Ms Dozortseva | 353 |
|     Mr Patterson as a witness - conclusion | 357 |
| (iv) The establishment of the trusts | 359 |
| (v)  The operation of the trusts | 381 |
|     Trust and non-trust assets administered interchangeably | 384 |
|     Administration did not change after property put into trusts | 392 |
|     Mr Patterson's involvement was limited to formalities | 401 |
|     Mr Pugachev referred to as beneficial owner after transfers into the trusts | 403 |
|     Operation of the trusts - conclusion | 407 |
| (vi) The loans and the appointment of the New Trustees | 410 |
| Considering sham as a whole | 422 |
| Sham and the true effect of the trusts | 438 |
| **The s423 claim** | 443 |

| Relief | 449 |
| **Summary of conclusions** | 453 |

*Introduction and narrative*

1.  This action is about five New Zealand trusts.  It arises as follows.

2.  The first claimant Mezhprom Bank is a Russian bank which entered into insolvent liquidation in Russia in late 2010.  The second claimant, the Deposit Insurance Agency (DIA), is its liquidator.  The claimants claim to be owed the sum of RUR 76.6 billion (in excess of US $1bn) by the first defendant, Mr Sergei Viktorovich Pugachev.

3.  Mr Pugachev is a Russian.  He was an oligarch.  He currently lives in a chateau in France.  Mr Pugachev founded Mezhprom Bank in 1992 and developed it in to one of Russia's largest private banks.  He was active in Russian politics at the highest level and was elected as a Senator of the Russian Federation in 2001.  He initially found favour with the ruling regime and assisted President Putin's rise to power.

4.  By 2008 Mr Pugachev had two sons, Victor Pugachev (the eleventh defendant) and Alexander Pugachev.  At that time they were young adults.

5.  In 2008 Mr Pugachev started a relationship with Ms Alexandra Tolstoy.  Ms Tolstoy is the daughter of Count Nikolai Tolstoy and Georgina Tolstoy.  Count Tolstoy is the head of the Tolstoy family and a relative of Leo Tolstoy.  Ms Tolstoy's paternal grandfather fled Russia at the time of the revolution and settled in England.  Ms Tolstoy was born and educated in England.

6.  When their relationship began, Ms Tolstoy's former marriage was breaking down and, while Mr Pugachev was married, he had been separated from his former wife for ten years.

7.  At that time Mr Pugachev was a man of enormous wealth.  He told Ms Tolstoy he was worth $15bn.  As well as Mezhprom Bank, he told Ms Tolstoy he owned a number of other things.  They included a huge property on Red Square in Moscow, the largest shipyard in Russia (in St Petersburg), the second largest coking coal mine in the world (in Tuva, Siberia), the French retail chain Hediard, the French national newspaper France Soir, a chateau in the south of France, three yachts (worth $35m, $25m and $5m), two private jets and a "massive" helicopter.

8.  Mr Pugachev used a company called OPK to hold some of his major assets, such as Mezhprom Bank, the Red Square property, the shipyard and the coking coal mine.

9.  In late 2008 in common with many banks all over the world the Mezhprom Bank was in difficulty.  The bank received support from the Russian Central Bank but this ultimately failed.  The bank's license was revoked and the Russian Court declared the bank was insolvent and appointed the DIA as liquidator.  At the time the bank was collapsing so too was Mr Pugachev's standing with the Russian ruling elite.  The claimants contend that Mr Pugachev misappropriated very large sums of money from the bank.  On the other hand Mr Pugachev contends that the Russian state unlawfully

expropriated his major Russian assets. He contends that the Red Square property was taken in 2009 and the shipyards were expropriated in 2010.

10. In 2009 and 2010 Ms Tolstoy and Mr Pugachev had two children, Alexis (born 20th March 2009) and Ivan (born 21st June 2010). With their sister Maria, who was born later, these children are the 12th, 13th and 14th Defendants to these proceedings. They are represented by their mother acting as litigation friend.

11. When their relationship started Ms Tolstoy and Mr Pugachev lived in Russia in a property known as Gorki 2. Ms Tolstoy returned to London in 2009 to have her first child and from that time a property at 53 Glebe Place was rented as their London home. Later, in 2010, 53 Glebe Place was bought outright and later still, in 2011, the next door property at 54 Glebe Place was purchased as well and knocked through. From 2009 the couple lived in London, Moscow, the south of France and St Barths in the Caribbean. The property in St Barths was called Sand Club and had been bought as a holiday home in May 2010. A value of $40 million has been given for it. A country residence in Herefordshire called Great Venn was also purchased in 2010. Later the couple sought to purchase another country house in Wiltshire called Doves House but that purchase fell through.

12. By early 2011 Mr Pugachev's position had deteriorated and he fled Russia on 28th January 2011, just after criminal investigations were opened in Russia relating to the bank's collapse. Ms Tolstoy said she did not remember him being particularly worried at a point around this time. She may have meant a few months before Mr Pugachev fled, in which case it does not matter. If the evidence was intended to suggest that his departure in January 2011 cannot fairly be called fleeing the country, then I do not accept it.

13. A complete picture of how Mr Pugachev's personal and business interests are operated is not available but what can be said is that in this period a company called Galaxis Capital LLP was involved, with an office in Knightsbridge. The individuals there were Pierre Lussato and Alexis Gurdjian. Many very rich families run their affairs through a "family office" and at that time the family office seems to have been operated by Mr Lussato at Galaxis. Later the family office seems to have been run by Martin Liechti of a company called Oakhill Management Ltd. Another close associate of Mr Pugachev's was and remains Natalia Dozortseva. She was the head of legal at Mezhprom Bank. While no longer associated with the bank, she is still closely associated with Mr Pugachev.

14. Mr Pugachev and Ms Tolstoy looked for a property in London to be their main residence. They identified Old Battersea House in Chelsea. Contracts were exchanged in November 2011 and the property was bought for £12 million. It needed very substantial renovation. That work has never been completed and the property stands empty today.

15. A New Zealand trust called the London Residence Trust was declared of Old Battersea House on 6th December 2011. The trust deed was drafted by William Patterson, a New Zealand solicitor, on instructions from Mr Lussato. The trust is a discretionary trust. Mr Pugachev, Ms Tolstoy and their children are among the named discretionary beneficiaries, as well as Victor and Alexander Pugachev. The trustee was a newly incorporated New Zealand company called Kea Trust Company Ltd, the

second defendant.  In addition the trust deed provides for a "Protector" with various powers.  The First Protector is Mr Pugachev.  If Mr Pugachev dies or is "under a disability" (see below) the Protector is Victor Pugachev.  The London Residence Trust has terms in it expressly providing for a right of residence for Ms Tolstoy and her children in the residential property.

16.     Mr Patterson's firm Patterson Hopkins is a partnership with his wife Robyn Hopkins. The firm had been acting as corporate administrator for trust companies called OPK Trust Company and OPK Holding Trust Company.  These trust companies related to Mr Pugachev's OPK vehicle.    Mr Patterson explained that as a corporate administrator he carried out tasks like filing company accounts.  He was not a director of those companies and took no trustee decisions relating to OPK.  Unlike the position with OPK, for the London Residence Trust, Mr Patterson was one of the two directors and two shareholders of the trust company.  The other director at incorporation was Mr Liechti and the other shareholder was Ms Hopkins.

17.     The relationship between Mr Pugachev and Ms Tolstoy had become volatile after the birth of their first child and for a period in 2012 the relationship seriously deteriorated although it endured all the same.    In early March 2012 there was an episode involving Mr Pugachev and Ms Tolstoy's parents'.  At that time Ms Tolstoy was heavily pregnant.  She visited her parents' house after having a terrible argument with Mr Pugachev.  Mr Pugachev had changed the locks at Glebe Place and refused to let her back in.  Mr Pugachev came to Ms Tolstoy's parents house.

18.     A private conversion took place between Mr Pugachev and Ms Tolstoy's father. Count Tolstoy raised the question of marriage (Mr Pugachev had promised him in 2009 that he would marry Ms Tolstoy and repeated that promise in 2010) but Mr Pugachev said he had not been able to divorce his first wife because she would make a huge claim on his assets.  The financial security of Ms Tolstoy and her children was discussed and Mr Pugachev told Count Tolstoy he had bought Old Battersea House in a trust for Ms Tolstoy and the children.  He said he was putting other assets in trust for them and said they were financially secure.  Mr Pugachev said that no-one could circumvent the purpose of the trust which was to look after Ms Tolstoy and her children.

19.     A particular issue was the position of Victor Pugachev.  Ms Tolstoy and Victor did not get on.  She thought he had prevented the purchase of a possible family home before 53 Glebe Place.  Ms Tolstoy had obtained a copy of the trust deed for the London Residence Trust and taken legal advice on it.  This deed names Victor as one of the beneficiaries and as the Protector after Mr Pugachev.  Count Tolstoy discussed the position of Victor with Mr Pugachev.  Mr Pugachev said that Victor would not have the ability to undermine the trust.  Old Battersea House was to be the family home and he and Ms Tolstoy were going to live there with the children.

20.     The couple's daughter Maria was born on 28th March 2012.

21.     Also in March 2012, Alexander Pugachev, Victor's brother, was removed as a Discretionary Beneficiary from the London Residence Trust.

22.     In 2012 the pressure on Mr Pugachev from Russia was increasing.    There were Russian press reports in September/October that the creditors committee of the bank

was contemplating proceedings in London to sue Mr Pugachev and trace his assets held outside Russia. At the end of 2012 Mr Pugachev's company's licence for the Tuva coking coal mine was revoked and by April 2013 the licence had been vested in another party. Mr Pugachev contends that this represented another unlawful expropriation by the Russian state.

23. In December 2012 Mr Pugachev engaged with an organisation called GPW + Co Ltd in London. The purpose was to obtain advice about how to defend his assets from claims by Russian creditors. A letter from GPW of 12th December discusses the possibility of asset searches being made against him "to identify real property or cash which can be enforced against". The letter makes the point that knowing where the vulnerabilities in Mr Pugachev's current asset structure are will enable him "either to remedy them or prepare other defences". This recommends urgently undertaking a full asset search on Mr Pugachev in order to mimic the work his opponents will do and to establish what can be found out from public information. Then "weak points" can be "strengthened".

24. The risk of an *ex parte* asset freezing order and an order requiring asset disclosure is also discussed in the letter and it notes that seizure of assets would have a substantial impact on Mr Pugachev's personal and business life. It continues:

> "However, of greater concern is the possibility that you choose to disclose only those assets believed to be identifiable and recorded in the public domain. If it is proven that you have wilfully withheld information, your opposing party may appeal to have you held in contempt of court. If such an appeal was upheld you may lose the ability to defend the action, regardless of the strength of the initial case against you."

25. In April 2013 an organisation called "The Private Office", which had been appointed by Galaxis to raise finance for Mr Pugachev and his family, sent a memo to Mr Liechti about Mr Pugachev's asset position. Various major banks, including Credit Suisse, UBS, Barclays and Deutsche Bank had refused to lend money to Mr Pugachev. One bank, the Bank of Singapore, had expressed a willingness to lend subject to a successful "Know Your Client" process. Galaxis provided a list of assets owned by Mr Pugachev to be used as collateral. They included the London properties (Glebe Place and Old Battersea House). But the bank wanted more information about the scandal surrounding the bankruptcy of Mezhprom Bank, the activity of the DIA and the implications for Mr Pugachev. There is no evidence that the London properties were pledged as collateral for any such loan.

26. In July 2013 Count Tolstoy and his wife travelled to Mr Pugachev's French chateau for a party for Ms Tolstoy's 40th birthday. When they arrived they found that Mr Pugachev had cancelled the party and locked the gates. The Count was angry and spoke to Mr Pugachev by telephone about the position of his daughter. Mr Pugachev said that she was fully taken care of and there were trusts (plural) in place for their benefit.

27. Between July and November 2013 four more New Zealand trusts were set up and assets placed into them. The work was done by Mr Patterson on instructions from Mr Gurdjian and Ms Dozortseva.

28. The trusts were the Kea Three Trust and the Riviera Residence Trust (both declarations of trust made on 16th July 2013), the Wiltshire Residence Trust (declared on 3rd October 2013) and the Green Residence Trust (declared 28th November 2013). The terms of these trusts are essentially the same as the terms of the London Residence Trust apart from certain differences which are minor in the context of this case. They are discretionary trusts and although the named beneficiaries are not identical to those named in the London Residence Trust, Mr Pugachev and the children of Ms Tolstoy by Mr Pugachev are among the discretionary beneficiaries. Mr Pugachev is First Protector, followed by Victor. There is no residence clause in these trusts equivalent to the residence terms in the London Residence Trust.

29. Broadly, the Kea Three Trust holds shares in an Isle of Man company Redflame Ltd, which owns 53/54 Glebe Place; the Riviera Residence Trust holds shares in companies which ultimately hold the Sand Club in St Barths, an empty watch factory in Switzerland and some other things; the Wiltshire Residence Trust holds cash which was to be used to buy Doves House in Wiltshire; and the Green Residence trust ultimately holds the property in Russia called Gorki 10.

30. At the outset the trustee of the Kea Three Trust was Kea Trust Company Ltd, the same company which was trustee of the London Residence Trust. The trustees of the other three trusts were newly incorporated New Zealand companies: Kea Two Trust Company Ltd (later changing its name to Finetree Company Ltd), Kea Four Trust Company Ltd (later changing its name to Bramerton Company Ltd), and Bluering Company Ltd. They are the third to fifth defendants. Finetree's directors and shareholders were always Mr Patterson and Ms Hopkins. The initial directors of Bramerton and Bluering were Mr Patterson and Ms Dozortseva while shareholders were Mr Patterson and Ms Hopkins.

31. Ms Tolstoy was aware that Doves House was to have been bought in trust but she was not aware of these four trusts until these proceedings.

32. Before being depleted, the value of all the assets in all the trusts, including the London Residence Trust, was over $95 million.

33. On 2nd September 2013 the Swiss authorities froze bank accounts associated with Mr Pugachev and his companies.

34. A claim in Russia against Mr Pugachev was filed by the DIA on 2nd December 2013. It is known as the "Article 14" claim.

*Proceedings start in London*

35. The Russian liquidation of Mezhprom Bank was recognised by an order made by Henderson J on 11th July 2014 pursuant to the Cross Border Insolvency Regulations 2006. The deficiency in the bank's assets at the date of its entry into liquidation was approximately RUR 70.1bn (about US $ 2.2 billion).

36. In aid of the Russian proceedings and also on 11th July 2014 Henderson J made a without-notice worldwide asset freezing injunction against Mr Pugachev. The worldwide freezing order was the start of a series of steps which took place in the Chancery Division. At times Mr Pugachev has instructed solicitors and counsel to act

for him and at times he has represented himself. There have been numerous hearings in this Division in the litigation between the claimants and Mr Pugachev. There have also been two appeals to the Court of Appeal. There are proceedings in other jurisdictions too.

37.    It is impossible to summarise all the steps that have taken place in this jurisdiction since 11th July 2014. The major events in the litigation which are relevant to the issues I have to decide, and other things which happened after the freezing orders were made, are set out below.

38.    As part of the freezing order in 2014, Mr Pugachev was required to disclose information about his assets. The fact that Mr Pugachev was one of the discretionary beneficiaries of the five New Zealand trusts was disclosed in a schedule of assets provided by Mr Pugachev's solicitors Stephenson Harwood on 23rd July 2014. This was pursuant to a freezing order on 11th July 2014 varied by a further order on 18th July. All that was disclosed about the trusts was their names.

39.    On 16th July 2014 a Part 8 Claim was issued by the claimants in this Division against Mr Pugachev in aid of the Article 14 Russian proceedings.

40.    On 25th July 2014, on the claimants' application, Henderson J directed that Mr Pugachev disclose further information about the trusts. This included details of the trustees, the beneficiaries and the location and value of trust assets. Mr Pugachev appealed Henderson J's order.

*The trustees seek directions from the New Zealand court*

41.    Following a Beddoes application to the New Zealand court by the trustees of the New Zealand trusts, the trustees made an application to the English court to vary or discharge the order for disclosure relating to the trusts. The application was supported by two witness statements made by Mr Patterson. He explained that the trustees were New Zealand companies and that he was a director of each of the trustee companies. The claimants make serious criticisms of Mr Patterson's evidence on that application. The application to set aside was dismissed by David Richards J ([2014] EWHC 3547 (Ch)). The trustees appealed to the Court of Appeal.

42.    Over the latter half of 2014 the London Residence Trust advanced substantial sums of money to Mr Pugachev. By November about £3.5 million had been advanced to him from that trust. The sums are expressed as unsecured loans.

43.    On 5th January 2015 Mr Pugachev sought a further £½ million from the London Residence Trust but the trustee refused without further security.

*Further proceedings in London and in Russia*

44.    On 27th February 2015 the Court of Appeal upheld the orders of David Richards J and Henderson J ([2015] EWCA Civ 139).

45.    On 2nd March 2015 Peter Smith J granted an injunction requiring Mr Pugachev not to leave the jurisdiction and requiring him to deliver up all his passports. Mr Pugachev

applied for the temporary return of his passports.  That was refused and the Court of Appeal upheld that refusal ([2015] EWCA Civ 1108).

46.    In March/April 2015 Mr Pugachev attended court for cross examination as to his assets.  This took place before Mr Justice Hildyard (see the judge's judgment of 12th June at [2015] EWHC 1694 (Ch)).

47.    On 23rd April 2015 the Russian Court gave judgment in the Article 14 claim against Mr Pugachev for a sum of about RUR 76bn.  That is equivalent to about US $1bn.  In June 2015 the Article 14 judgment became effective in Russia.  The ruling of the Court of Appeal in Russia dismissing the appeal was on 24th June 2015 but see below.

48.    On 12th June 2015 Hildyard J made a further order restricting Mr Pugachev's travel but in breach of that order, in June 2015, Mr Pugachev left England for France.  He remains there.

49.    On 1st July 2015 Rose J made a without notice search and seizure order relating to four UK premises associated with Mr Pugachev.  This included the premises of Mr Pugachev's family office in London.

*Replacement of the original trustees with new trustees*

50.    On 24th July 2015 instruments removing the original trustees of the New Zealand trusts and replacing them with newly incorporated trust companies more closely controlled by Mr Pugachev were signed by Mr Pugachev and his son Victor.  On 27th July the new trustees entered into a funding agreement with Mr Pugachev.  The new trustees are the sixth to ninth defendants.

51.    The claimants applied to bring the trust assets within the scope of the worldwide freezing order, naming both the original trustees and the new trustees as respondents.  Although that was refused at first instance, the order was made on appeal by the Court of Appeal on 13th August 2015.  Nevertheless on 14th August the new trustees paid US$ 800,000 to Mr Pugachev's lawyers King and Spalding.  The *ex parte* order was continued by Snowden J on 27th August.

52.    Shortly after they were removed the original trustees applied to the New Zealand court for directions to determine if the removal was valid.  In a judgment on 2nd October 2015 Heath J decided that the original trustees were validly removed.

*Further proceedings*

53.    On 29th September 2015 Mr Pugachev brought a claim against the Russian state under the Bilateral Investment Treaty between France and Russia.  The claim was issued in the International Court of Arbitration in the Hague.  By the claim Mr Pugachev seeks to recover some of the very valuable assets he said were unlawfully expropriated by the Russian state.  They include the shipyard in St Petersburg and the coking coal mine.  The claim accuses senior Russian officials, including Mr Putin, of dishonest and fraudulent conduct.

54.    On 19th October 2015 the claimants issued a claim in this court to enforce the Russian Article 14 judgment.  At that time the firm King and Spalding were acting for Mr

Pugachev. There was correspondence between Hogan Lovells for the claimants and King and Spalding about service out of the jurisdiction. On 29th November 2015, in a letter from King and Spalding on behalf of Mr Pugachev, Mr Pugachev confirmed that he was willing to accept service at his property in France but reserved the right to object to jurisdiction. On 12th December 2015 there was deemed service in France of the enforcement proceedings and on 27th January 2016 King and Spalding ceased to act for Mr Pugachev. On 28th January 2016 the claimants applied for default judgment in the enforcement proceedings.

*Committal of Mr Pugachev for contempt of court*

55.    Meanwhile proceedings to commit Mr Pugachev for contempt of court had been brought by the claimants against Mr Pugachev. In a judgment on 8th February 2016 ([2016] EWHC 192 (Ch)) Rose J found that Mr Pugachev was in contempt of court on a large number of grounds. Mr Pugachev himself had participated in those proceedings via a videolink over which he was cross examined.

56.    One of the grounds for contempt was Mr Pugachev's breach of the travel restrictions order. Mr Pugachev said that he had left the jurisdiction because of fears for his safety. One factor in this was that devices had been found underneath cars belonging to him in May 2015 and the anti-terrorist branch of the police, SO15, had been called (although they were not summoned immediately). It turned out that the devices were not explosives but were tracking devices used by enquiry agents Diligence acting for the claimants. (The claimants and Hogan Lovells deny that they authorised this or were aware this method of surveillance was being used.)

57.    At paragraph 75 of her judgment Rose J found that Mr Pugachev does have a genuine fear that his life is in danger from agents of the Russian state but she was also fully satisfied that there was no link between his fears for his safety and his decision to leave England. Mr Pugachev's leaving the jurisdiction was found by Rose J to be a serious breach of the order and not excused by his fears for his personal safety. Mr Pugachev was able to flee the jurisdiction because he also breached the order to deliver up his passports. He kept back a French passport. That contempt was found proved by Rose J in paragraphs 50-73 of her judgment.

58.    Rose J also found that Mr Pugachev was in contempt for breaching the terms of the freezing orders by procuring or permitting the transfers of large sums of money. For example Allegation B3, dealt with at paragraphs 124-141 of the judgment, related to the transfer of about €3.75m and £1m. These sums were the proceeds of the sale of shares in a company which ultimately held the French business Hediard. The shares had been held by one of the companies named in the relevant freezing order. In breach of the freezing order the sums were paid from that company (Luxury Investments) to accounts of an entity called Luxury Consultants Ltd and then dissipated. Mr Pugachev had contended that these payments were within the exceptions to the freezing order relating to living expenses, legal expenses or tax payments but those excuses were not accepted by Rose J.

59.    Other contempts found by Rose J included further dealings in frozen assets, failures to deliver up mobile devices and passwords for email accounts, failure to set out what happened to large sums of money and giving false evidence with no honest belief it was true.

60.     In her second judgment Rose J sentenced Mr Pugachev to the maximum period for contempt of court which is 24 months [2016] EWHC 254 (Ch).

*Further events in 2016*

61.     On 22nd February 2016 Mr Justice Henry Carr gave default judgment in respect of the Article 14 Russian judgment. No permission was sought to serve out of the jurisdiction in relation to those proceedings. The claimants say that is because of the agreement about service made with King and Spalding mentioned above.

62.     By early 2016 the relationship between Ms Tolstoy and Mr Pugachev was breaking down. Mr Pugachev wanted Ms Tolstoy and the children to live with him in France but Ms Tolstoy did not wish to do that. The last time Ms Tolstoy saw Mr Pugachev was in March 2016 around the time of their daughter's birthday. After this their relationship became very hostile. Mr Pugachev cut Ms Tolstoy off financially. She explained that they speak from time to time by telephone and he speaks to his children. Ms Tolstoy wanted to defend the trusts to protect the London home for her and her children but Mr Pugachev did not want her to do this. Ms Tolstoy says that Mr Pugachev's motive for this is to force Ms Tolstoy and the children to move to France and live with him.

63.     On 5th May 2016 the new trustees gave Hogan Lovells notice of an intention to pay out £2.7 million from the trusts' bank accounts but later the same day Morgan J granted an injunction restraining the payments. After that two of the individuals who were the directors of the new trustee companies resigned and the new trustees ceased to engage with these proceedings.

64.     On 18th May 2016 I made an order giving permission to the claimants to serve the Amended Claim Form and Particulars of Claim. These amendments set out the claimants' case which is to be adjudicated upon at this trial. On that occasion I also gave directions allowing Ms Tolstoy's children, the twelfth to fourteenth defendants, to defend the claims against the trusts. That is because the children of Mr Sergei Pugachev and Alexandra Tolstoy are discretionary beneficiaries under the trusts. Their defence of these proceedings is paid for out of trust assets.

65.     Since then other events have taken place which the claimants regard as steps orchestrated by Mr Pugachev to deal with or diminish the value of the property covered by the freezing injunction but the details of these matters are not relevant.

*This trial*

66.     This trial began on 4th July 2017. At the outset counsel for the infant children applied for an order imposing reporting restrictions in relation to the proceedings. The restrictions were for the benefit of the children and related to four topics: three topics directly concerned with the children and the fourth with the breakdown of the relationship between their parents. I made the order. The judgment is at [2017] EWHC 1767 (Ch). In the end it has not been necessary in this judgment to refer to any details which would have been covered by the restrictions.

67.     When the trial began Mr Pugachev had not played any part in the proceedings since 18th May 2016 nor had the second to eleventh defendants. Only the infant children

defendants defended the trial and in this judgment when I refer to the defendants' submissions, I mean the infant children defendants.

68.    Once the trial started counsel acting for Mr Pugachev applied on his behalf to adjourn the trial and to set aside the default judgment. Those matters were dealt with in various other judgments of mine given during the course of this trial. They are a judgment on 10th July 2017 ([2017] EWHC 1761 (Ch)), two judgments on 13th July 2017 ([2017] EWHC 1847 (Ch) and [2017] EWHC 1853 (Ch)) and a judgment on 26th July 2017 ([2017] EWHC 1972 (Ch)). The net result was that I dismissed Mr Pugachev's attempt to adjourn the trial. I adjourned any outstanding matters arising from these applications to be dealt with once this judgment has been handed down.

69.    Another event which took place during the trial was an application by Julia Pugacheva. Ms Pugacheva is the ex-wife of Mr Alexander Pugachev. They have two young children. The children fall within the class of discretionary beneficiaries of the London Residence Trust. Ms Pugacheva applied to be appointed as litigation friend for her children and for them to be joined as defendants and financial provision be made for them. It was not practical or appropriate to deal with that application in the middle of trial and I adjourned it to be addressed once this judgment has been handed down. The judgment on that is [2017] EWHC 1936 (Ch).

*The issues*

70.    The claimants' case is that the beneficial interest in the assets held by all the trusts belongs to Mr Pugachev. They seek an order requiring the assets to be vested in the claimants or alternatively in such persons or a receiver as the court thinks fit. The claimants' case is put on three bases.

71.    The first basis is referred to as the "Illusory Trust" claim. The submission is that according to the terms of the deeds, properly construed and on a proper application of the law to them, the trusts were not effective to divest Mr Pugachev of his beneficial ownership of the assets put into them. That claim depends on consideration of the effect of the trust deeds themselves. A key aspect of this argument relates to the role of a Protector set out in the deeds. For reasons explained below I prefer not to use the term "Illusory Trust" except to refer to some of the claimants arguments. This part of the claimants' case will be called the "True Effect of the Trusts" claim.

72.    The second basis is referred to as the "Sham" claim. The submission is that, in the alternative to the so-called Illusory Trusts claim, the trusts, or strictly the trust deeds, are shams. Therefore they have no effect and the assets are not in fact held on whatever terms purport to be set out in the deeds.

73.    The third basis for the claimants' claim is s423 of the Insolvency Act 1986. It is an alternative to the first two claims. If the trusts are effective to divest Mr Pugachev of ownership of the assets, then the transfers of the assets into the trusts was carried out to prejudice the interests of his creditors, including the claimants.

74.    An important feature of all three claims is that even if one of them succeeds in principle, it does not follow that any asset which was supposedly in the trust is automatically held by Mr Pugachev beneficially. That is because some of the assets were transferred into the trusts by Victor Pugachev. For assets transferred by Victor

rather than his father, the claimants have to establish that Victor was acting as nominee for his father and the beneficial ownership of the assets was with the father not the son.

75. These claims are denied on behalf of the children. They contend that the trusts are not illusory. Rather the deeds on their face set up valid discretionary trusts with real duties, rights and obligations. They have the effect that Mr Pugachev does not hold the beneficial ownership of any of the assets subject to the trusts. So the so-called Illusory Trust claim, whatever it is called, should be dismissed.

76. The defendants contend that the Sham claim should fail on the facts because in order to establish a sham the claimants have to show that the trustees were in on the sham and had the relevant state of mind (at least to the extent that they went along with any sham, even assuming the settlor was Mr Pugachev and he did have the relevant state of mind). The relevant individual for this purpose is Mr Patterson. The court should hold that he was not a mere cipher for Mr Pugachev but was a man with backbone, ready to stand up to Mr Pugachev as and when necessary.

77. Moreover Ms Tolstoy was determined to get Mr Pugachev to provide for the children and he did so by setting up the trusts. The value of the property in the trusts, while large, is small as compared to Mr Pugachev's wealth and he had no need to try and hang on to such assets. So the submission that Mr Pugachev did not intend to set up valid trusts is wrong too.

78. As for the s423 claim, the defendants criticise the quality of the evidence from the claimants. All the claimants evidence is given through the vehicle of Mr Roberts, the partner in Hogan Lovells with conduct of these proceedings. They submit that there are better or more plausible explanations for the relevant transactions said to be caught by s423 than putting the assets beyond the reach of creditors.

79. As to the position of Victor as nominee, the defendants submit that the evidence does not establish the Claimant's case in this regard. They argue that Mr Pugachev gave substantial assets to Victor and Alexander for their own benefit and so one cannot assume or infer that assets placed into the trusts by Victor were not owned by Victor outright.

*The witnesses*

*Mr Roberts*

80. The only witness called by the claimants was their solicitor, Michael Roberts. The witness statement for the trial (his forty-third) sets out the claimants' case and narrates the claimants' view of what has happened by reference to the available documents and other sources. The only direct knowledge Mr Roberts has is about the conduct of the legal proceedings. Everything else is inference.

81. The defendants point out that no-one from the DIA has been called as a witness. They submit this was a tactical decision to avoid cross-examination about a number of issues. The issues to be avoided include what the DIA knows about other assets held by Mr Pugachev, the expropriation claims of Mr Pugachev, and wrongdoing inside the DIA. The defendants also point out that the claimants had provided witness

statements from DIA staff at an early stage of these proceedings but those were interlocutory hearings at which no cross-examination would take place.

82.    I understand that the claimants needed to pull together the materials and present a coherent picture to the court in Mr Roberts evidence. Liquidators often have to do something like this, and it justifies the bulk of the witness statement, which works through the documents relating to money flows and the setting up and operation of the trusts and explains the claimants' case about inferences to draw.

83.    However the position is different in relation to the claimants' allegations about Mr Pugachev's alleged wrongdoing in relation to Mezhprom Bank. For this aspect of the evidence I accept the fundamental criticisms the defendants make of Mr Roberts' evidence. It is a mass of hearsay, some of which is unattributed and most of which is based on materials which are themselves based on hearsay, such as press reports and a review by the DIA into the operation of the bank.

84.    The difference between these two classes of evidence is that the former is based on admissions and primary source material so the basis for the inference the claimants invite to be drawn can be understood, whereas the latter is based on secondary sources rather than the primary material. Primary material from Mezhprom Bank and elsewhere plainly does exist but it has not been relied on and not exhibited, so far as I am aware. Now this may not matter very much as long as one is clear about what facts it is the court is being asked to decide. I am not being asked to decide the merits of the claims by the DIA and Mezhprom Bank against Mr Pugachev. The evidence produced is entirely insufficient for that purpose. The true relevance of this evidence is to show how over time very serious allegations have been made against Mr Pugachev relating to Mezhprom Bank. Mr Roberts' statement is potentially effective for that purpose but it is important to keep the distinction in mind. The claimants believe that Mr Pugachev misappropriated very substantial sums of money from the bank but they have not set out to prove that at this trial, because their case is that they do not have to.

85.    However the two aspects are intertwined in a manner which can make disentangling them difficult. I will take a single example. One of the allegations against Mr Pugachev is about a deposit scheme. The essential allegation is that:

>    "US$700 million of a US$1 billion bail-out handed to the Bank by the Central Bank of Russia (almost certainly necessitated by earlier thefts from the Bank by Mr Pugachev) was swiftly moved in December 2008 to the Swiss bank account of a newly incorporated Cypriot company, Safelight Enterprises Limited, whose director was Alexander Pugachev, Mr Pugachev's then 21-year old son."

86.    Some of this money is said to have ended up in the trusts in this case. Mr Roberts deals with this in paragraphs 123-126 and 261 of his witness statement. This evidence is in four parts. The first part is paragraph 123. That deals with allegations of misappropriation and forgery:

>    "123 In December 2008 and January 2009, very shortly following the receipt of the Central Bank funds, RUR

> *28,810,800,000 (then equivalent to approximately US\$ 900 million) was withdrawn from an account at the Bank in the name of CJSC OPK Development (**"OPK Development"**), which formed part of the OPK Group (MGR2/29-30). I shall refer to the funds as the **"OPK Deposit"**. (I understand that the Investigative Committee has concluded that the OPK Deposit never in fact truly existed and that the relevant deposit agreements were forged to facilitate the theft of the monies from the Bank by the creation of a book entry falsely showing a credit balance in favour of OPK Development.)*
>
> *[C3/876.5-876.6]"*

87.    The reference after the quotation is a marginal cross-reference to a source on which the paragraph is based.  I will come back to this.

88.    The second part is in paragraphs 124-125, which explain that nearly all of the deposit was transferred into accounts of companies whereby the shares in the company at the top of the relevant corporate structure were in each case held by a David Henderson-Stewart purportedly as trustee, but Mr Pugachev admitted in the course of these proceedings that he was the ultimate beneficial owner of the relevant companies and the beneficiary of the transactions.  The money was then channelled to a Cypriot company Safelight Enterprises Ltd in which Alexander Pugachev was a director and Mr Pugachev ultimately admitted in these proceedings was beneficially owned by him.  This second part is solidly based on admissions by Mr Pugachev in witness statements in these proceedings, as Mr Roberts says.

89.    The third part is in paragraph 126 in which Mr Roberts states that Mr Pugachev has provided some information in these proceedings but that while it does not explain the whereabouts of over \$500 million of the funds:

> *"it became clear that at least a significant proportion of those monies had been channelled into (or through) a number of Mr Pugachev's other assets and overseas business interests, including the Villa that is now in the Riviera Residence Trust, Hediard SA and OPK Biotech, and large unexplained amounts had apparently been transferred to his eldest son, Victor."*

90.    The reference to the villa in the Riviera Residence Trust is dealt with further in paragraph 261 in which Mr Roberts explains that in one of his affidavits for the committal application, Mr Pugachev effectively admitted that \$31.2 million of the Safelight monies were used to buy that villa.  This is not perfectly explained but it is reasonably clear from the underlying document (Mr Pugachev's 12th affidavit dated 20th November 2015 at paragraph 69, 69.2 and 69.10).

91.    So the flow of money into one of the trusts in reasonably clear from the second, third and fourth parts of this evidence but the starting point, based on allegations of theft and forgery, is not supported in the same way.  I return to paragraph 123 of Mr Roberts statement which is quoted above.  It is based only on three apparent sources.  The first and second sources are "MGR2/29-30" and the marginal reference "[C3/876.5-876.6]".  That first reference to MGR2/29-30 refers to the second exhibit

to Mr Roberts first affidavit which is not in the trial bundles. In the draft judgment I understood MGR2 to mean something different but nothing turns on that because the documents it does refer to are apparently the same as the ones in the marginal reference. So these first and second sources are the same source. The document cited in the marginal reference is a report by the DIA dated March 2012. The report is in the bundles but not any underlying documents or evidence from the DIA themselves. The pages referred to include a table which puts a figure of RUR 28 824 662 against "CJSC OPK Development" but that is all. The third source for part of the paragraph is Mr Roberts' understanding from "the Investigative Committee". That is unexplained. Counsel for the defendants submitted that committee was the Russian equivalent of the FBI. This is the source for allegations of forgery and theft. This kind of evidence has no value at all and it is all the more surprising when the claimants had the means to call proper evidence on these topics if they wished to. In the draft judgment I said that the fact Mr Roberts was prepared to put this before the court in this manner is unfortunate. After the draft judgment was provided I was told that there was a document on which this part of Mr Roberts' evidence was based. It is C5/1821 and seems to be a decision of the special investigator Lieutenant Colonel of Justice Komarda KP of the Investigative Committee of the Russian Federation. At least it explains where Mr Roberts got what he said from, but the evidence is still not based on any underlying documents or evidence. I remain of the view that this approach is unfortunate.

92.    It is not practical to run through the entire witness statement and tease it apart as has been done above. The statement runs to 479 paragraphs.

93.    Overall I can rely on some of Mr Roberts' evidence but not all of it. Mr Roberts did not purport to be independent. This was borne out by his attitude to the behaviour of an agency called Diligence who had surreptitiously placed tracking devices in cars used by the Pugachev family in London, although as a matter of substance that issue is not germane. Mr Roberts evidence (written and oral) is an exercise in advocacy for his clients' cause.

*The Tolstoy family*

94.    The defendants served witness statements from five witnesses, three from the Tolstoy family: Ms Tolstoy and her father and mother. Count Tolstoy's evidence related to his contact with Mr Pugachev and the discussions between these two about Mr Pugachev marrying Ms Tolstoy and about the trusts providing for the children. Georgina Tolstoy corroborates her husband's evidence. All three were available for cross-examination but the claimants chose only to cross-examine Ms Tolstoy.

95.    Ms Tolstoy's evidence describes her relationship with Mr Pugachev and when she knew about the properties and the trusts. Her key evidence is directed to undermine the allegation that the trusts were shams. She explained that Mr Pugachev told her that the family properties were bought and were to be in trust for her and the children.

96.    Ms Tolstoy is obviously an articulate and intelligent person. As a witness she was often nervous, no doubt because of the difficult position she and her children are in. Ms Tolstoy's relationship with Mr Pugachev has been very volatile over a number of years. By participating in these proceedings Ms Tolstoy is acting against Mr

Pugachev's wishes but she is a mother trying her best to defend the interests of her children.

97.    For the most part Ms Tolstoy was a reliable witness.  Her evidence about Mr Pugachev's character was credible and I will address it below.  The claimants invited me to disbelieve her evidence that Mr Pugachev absolutely adored his children and was passionate about them.  I do not disbelieve it.  That evidence was also entirely credible.

98.    There were aspects of Ms Tolstoy's oral evidence which I do not accept.  They were occasions in which the obvious interpretation of contemporaneous documents could be said to support the claimants' case.  Ms Tolstoy either did not accept that interpretation or proposed a different one but the attempt lacked credibility.  One example was in 2012 when Ms Tolstoy asked for her and the children to be removed from the London Residence Trust and also for Victor to be removed as Protector.  The documents show that the reason for the former was because she thought their status was meaningless.  In cross-examination Ms Tolstoy suggested that the only real motivation for all this was about Victor and that she did not want out.  Rather than a reflection of the meaningless nature of the status as beneficiaries, Ms Tolstoy said that the request to remove her and the children was an act of defiance.  I do not accept that evidence.  It simply does not suit her case now to accept the idea that after the London Residence Trust was set up her status and that of her children as Discretionary Beneficiaries was seen as effectively meaningless.  I prefer the documents written at the time.

99.    Other examples are matters of emphasis.  First is an email dated 28th September 2012 which shows Ms Tolstoy complaining to Mr Pugachev that she has been left with no money and no-one in London is receiving their wages "because Victor hasn't transferred your money…".  This supports an inference that at least on occasions a transfer of money from Victor was in substance a transfer of Mr Pugachev's money.  In cross-examination Ms Tolstoy sought to downplay her knowledge of whether Victor held Mr Pugachev's money and also said that this sort of arrangement "might have only been a few times".  I do not doubt that Ms Tolstoy did not know the full details of the arrangements between Mr Pugachev and Victor.  But I do not accept Ms Tolstoy's attempt to reduce the significance of that item of evidence.  Second is evidence that Ms Tolstoy told one of her friends in February 2015 that the whole family (except Mr Pugachev's mother) was dependent on him financially.  Again Ms Tolstoy sought to suggest that she really did not know whether that was correct and emphasised the very difficult relationship she had with Mr Pugachev.  I find that this communication in 2015 does reflect what Ms Tolstoy thought at the time and was not an idle remark.  No doubt there was a great deal of information that Ms Tolstoy was not privy to but given the length of her relationship with Mr Pugachev by then, she was in a position to have a pretty shrewd idea of what the situation was.

*Mr Patterson*

100.    Mr Patterson is the fourth witness called by the defendants.  He explains the circumstances in which the trusts were set up and how they were run while he was the director of the trustee companies.  He denies that the trusts were shams and denies that they were under the complete control of Mr Pugachev.

101.    The claimants submit he was an unreliable witness, both based on his evidence at trial and on evidence he gave at the interlocutory stage. They also contend he was not impartial. It is convenient to address the detailed criticisms of Mr Patterson in the context of the sham issue.

*Ms Hewlett*

102.    The fifth witness statement on behalf of the defendants is from Louise Hewlett, the London estate agent involved in the sale of Old Battersea House. She says that from her point of view the purchase was an ordinary transaction to buy a family home. She was not cross-examined.

*The terms of the trust deeds*

103.    It is convenient to deal with the trust deeds in one go, starting with the London Residence Trust.

104.    The material terms of the trust deed for the London Residence Trust are as follows. Under the heading "Introduction" the deed states:

> *"The trustee wishes to declare this trust and has accordingly transferred and irrevocably settled the sum of TEN DOLLARS ($10) upon the trustee to be held by the trustee upon the trusts and with the powers, authorities and discretions declared in this deed or conferred on the trustee by the law."*

105.    The document is dated 6th December 2011 by Kea Trust Company and by that date the company was in fact already the owner of Old Battersea House.

106.    After the introduction are a series of covenants. Definitions are in section 1.1. Discretionary Beneficiaries are defined in 1.1(c) as follows:-

> *"(i) SERGEI VICTOROVITCH PUGACHEV;*
>
> *(ii)VICTOR SERGEYEVITCH PUGACHEV and ALEXANDER SERGEYEVICH PUGACHEV the sons of SERGEI VICTOROVITCH PUGACHEV;*
>
> *(iii) ALEXANDRA TOLSTOY the partner of SERGEI VICTOROVITCH PUGACHEV;*
>
> *(iv) ALEXIS SERGEIVICH PUGACHEV and IVAN SERGEIVICH PUGACHEV the children of SERGEI VICTOROVITCH PUGACHEV and ALEXANDRA TOLSTOY;*
>
> *(v) The children of Sergei Victorovitch Pugachev hereafter born or adopted;*
>
> *(vi) The grandchildren and remoter issue of Sergei Victorovitch Pugachev;*

> *(vii) Such other person or person, charitable trust, foundation, institution or other body corporate or unincorporated (whether now in existence or established hereafter) established exclusively for any objects or purposes recognised as charitable by the laws of New Zealand as the Protector shall before the Date of Distribution either revocably or irrevocably appoint by deed PROVIDED THAT the Protector shall have no power to appoint the Trustee as a Discretionary Beneficiary;*
>
> *BUT shall not include any person whether previously a Discretionary Beneficiary or not who has been declared pursuant to clause 12.1 to have ceased to be or not to be capable of being a Discretionary Beneficiary."*

107.    The Definitions also define a Date of Distribution as 80 years from the date of execution of the deed provided that it can be an earlier date declared by the trustee with the written consent of the Protector.

108.    The definitions also define a "Protector" as follows:-

> *"Protector" means the person or persons from time to time acting as Protector and the "First Protector" means Sergei Victorovitch Pugachev.*

109.    "Residential property" is defined as Old Battersea House and any property purchased in substitution for that property.

110.    The term "Under a Disability" has an elaborate definition as follows:

> *"in relation to any person means any event of happening which renders the person temporarily or permanently incapable of exercising free will and includes imprisonment or other form of involuntary detention, being subject to coercion or duress whether physical or mental, including coercion by operation of law, and suffering from mental disorder as defined in the Mental Health (Compulsory Assessment and Treatment) Act 1992 or any enactment amending or replacing that Act (as to which a certificate in writing given to the Trustee by a duly qualified medical practitioner shall be conclusive and binding) AND a person shall be deemed to be Under a Disability if the person has disappeared or otherwise not been heard from despite the best endeavours of the Trustee to contact the person over a period of not less than 2 months."*

111.    A "Trustee's Minute Book" is defined in 1.3 which provides that when a discretion is conferred on the Trustee, in addition to any other mode of exercise of a discretion, that discretion "shall be deemed to have been exercised when a resolution of the Trustee exercising that discretion has been recorded in Trustee's Minute Book relating to this settlement and the minutes so maintained shall be prima facie evidence of the nature and content of all such resolutions". (The claimants contend that no minute book has been produced in these proceedings).

112.    The governing law is defined in clause 1.4 as the law of New Zealand provided that the trustee has the power to change the governing law at any time by resolution in writing to that effect.  Before me at this trial the parties agree that although the governing law of the Trust Deeds is New Zealand law, for all the relevant purposes in these proceedings New Zealand law and English law are the same.

113.    Paragraph 3 is the "Declaration of Trust of Original and Additional Property", as follows:

> *"3.1 The Trustee shall stand possessed of the Trust Fund upon the terms contained in this Deed.*
>
> *3.2 The Trustee shall be at liberty prior to the Date of Distribution to accept on trust any money, investments or other property of whatsoever nature and wheresoever situation from any person, or by will or by the provisions of any other trust or otherwise.  Such money, investments or other property shall be held by the Trustee as an accretion of the Trust Fund.*
>
> *3.3 The Trust is irrevocable."*

114.    Note that clause 3.3 provides the trust is irrevocable.

115.    Section 4 of the Trust Deed deals with the Protector.  Given the importance of the position of the Protector in these proceedings I will set out the provisions in full:-

> *"4  Protector*
>
> *4.1 The Protector shall be:*
>
> *(a) Sergei Victorovitch Pugachev while he is living and not Under a Disability and after death of Sergei Victorovitch Pugachev or while he is Under a Disability Victor Sergeyevitch Pugachev;*
>
> *(b) Subject as above such person as the Protector for the time being may appoint in writing, revocably or irrevocably;*
>
> *(c) If there is no Protector for the time being such person as the Trustee may appoint in writing, revocably or irrevocably.*
>
> *4.2 Resignation and Disability*
>
> *Any Protector may resign by notice in writing to the Trustee,  If any Protector being a natural person is Under Disability or is bankrupt or being a body corporate is in receivership or liquidation, that Protector shall automatically and immediately cease to serve as a Protector.*
>
> *4.3 Information*

*The Protector shall have the right to request information from the Trustee and such requests shall not be unreasonably refused.*

*4.4 Remuneration*

*The Protector shall be entitled to reimbursement of reasonable expenses incurred as part of their role as Protector and any such remuneration fir their services as may be reasonable having regard to their duties and responsibilities as Protector.*

*4.5 Protector's Consent Required*

*Notwithstanding any provision in this deed conferring an absolute or uncontrolled discretion on the Trustee, the following powers and discretions which are vested in the Trustee by the provisions of this deed, shall only be exercisable after the Protector has been given fourteen (14) days prior written notice and the Trustee has received the prior written consent of the Protector:*

*(a) Specification of a Date of Distribution that is earlier than eighty (80) years (clause 1.1(b));*

*(b) Distribution of income and/or capital of the Trust Fund (clauses 5.2, 5.3, 5.4 and 5.5);*

*(c) Investment of the Trust Fund (clause 9);*

*(d) Declaring that any person shall cease to be a Discretionary Beneficiary and/or shall not be capable of being a Discretionary Beneficiary (clause 12);*

*(e) Variation of this trust deed (clause 13.1); and*

*(f) Releasing and revoking any power conferred on the Trustee by this deed (clause 14.1).*

*4.6 Power for Protector to direct sale of residential property*

*(a) The First Protector may by written instruction to the Trustee direct the Trustee to sell the residential property forming part of the Trust Fund on such terms and conditions as the Protector shall direct and the Trustee shall act in accordance with such direction. The net proceeds of sale shall then be held upon the trusts declared in clauses 5.2-5.5 of the Trust Deed (but with power thereafter with the written consent of the Protector to purchase a further residential property).*

*(b) If the First Protector has died or is Under a Disability the Protector for the time being may also instruct the Trustee in writing to sell the residential property PROVIDED*

*(i) such instruction may only be given if all the children born to Alexandra Tolstoy and the First Protector have attained the age of 21 years or subclause (d) applies; and*

*(ii) The Trustee has pursuant to clause 1.1(b) of the Trust Deed (with the written consent of the Protector) declared an earlier Date of Distribution of the Trust Fund TO THE INTENT that the net proceeds of sale of the residential property will be distributed pursuant to clause 5.5 of the Trust Deed.*

*(c) The Protector may also exercise the power conferred by clause 4.6(a) above if he is satisfied that Alexandra Tolstoy and her children are in financial distress and that it is desirable that the residential property be sold so that clauses 5.2-5.4 of the Trust Deed can take effect.*

*(d) The provisions of clause 4.6(b) also apply if more than two thirds of the trust beneficiaries (being those beneficiaries named or described in clause 1.1(c) of the Trust Deed) advise the Trustee in writing that they wish the residential property to be sold. If a trust beneficiary is under the age of 18 years the Trustee may accept written instruction signed on behalf of such beneficiary by its legal guardian."*

116. Features of these clauses worth highlighting are as follows. By clause 4.5, the Protector's consent is required before the trustee may exercise many of the powers normally vested in a trustee such as the distribution of income or capital and investment. Other steps which require the Protector's consent are the exclusion of a discretionary beneficiary and variation of the deed. By clause 4.6 the Protector can direct the sale of the residential property, subject to various provisions. By clause 4.1 while Mr Pugachev is Under a Disability (which is defined as including "coercion by operation of law" in 1.1 (i)) the Protector is Victor Pugachev.

117. Clause 4 is not an exhaustive list of all the Protector's powers. For example the definition of Discretionary Beneficiaries at clause 1.1(c) (vii) above the Protector can appoint further Discretionary Beneficiaries in addition to those named or described, and at clause 6 (below) the Protector has the power to remove and appoint trustees.

118. The trusts are declared in paragraph 5. The first part of this section deals with a right of residence in the "residential property" (i.e. Old Battersea House), as follows:-

*"5 The Trustee shall stand possessed of the Trust Fund upon trust as follows:*

*5.1 In respect of any residential property (subject to clause 4.6[)]*

*(a) to permit SERGEI VICTOROVITCH PUGACHEV together with such other persons as he may from time to time permit personally to reside in the residential property and to use and*

> *enjoy the furniture and household effects in the residential property free of rent and otherwise subject to such reasonable terms and conditions as the Trustee may think fit including if the Trustee thinks it fit keeping the residential property insured against such risks as the Trustee may require to its full insurable value and paying all rates and taxes and other outgoings payable in respect of the residential property and keeping it in the same state of repair as it was in at the date on which it became an asset of the Trust Fund fair wear and tear damage by fire flood tempest earthquake and other inevitable accident excepted PROVIDED THAT if at any time SERGEI VICTOROVITCH PUGACHEV does not wish to reside in the residential property he may require the Trustee to lease the same on such terms as the Trustee thinks fit and the net rentals shall be treated as income arising under clause 5.2; and*

> *(b) After the death of SERGEI VICTOROVITCH PUGACHEV or if he is Under a Disability to permit his partner ALEXANDRA TOLSTOY to have a similar right of residence until all children she has had with SERGEI VICTOROVITCH PUGACHEV have reached the age of 21 years or sooner died"*

119. Clause 5.2 provides a wide power (prior to the date of distribution) to pay any of the income or capital to any of the Discretionary Beneficiaries. In addition to the terms of clause 4, this power is expressly subject to the prior written consent of a Protector. The words of the clause are:

> *"At any time prior to the Date of Distribution **with the prior written consent of the Protector** to pay apply, vest or transfer such part or parts of the income arising from the Trust Fund or of the capital of the Trust Fund as [the trustee] thinks fit for or towards the maintenance education advancement or benefit of such of them the Discretionary Beneficiaries as are from time to time living or in existence or of any one or more of them to the exclusion of the others or other of them in such shares and proportions and generally in such manner as the Trustee thinks fit and regardless of whether there is any other fund available for the purpose."*

120. This clause expressly permits the Trustee to distribute any part of the income or capital to any single Discretionary Beneficiary to the exclusion of all the other Discretionary Beneficiaries.

121. Clause 5.3 deals with accumulations of income.

122. Clause 5.4 provides that the Trustee has additional powers, again with the prior written consent of the Protector. The relevant words of clause 5.4 are:

> *"5.4 Notwithstanding any of the foregoing provisions of this clause 5 until the Date of Distribution the Trustee **with the***

> *prior written consent of the Protector* *shall have the following additional powers:*
>
> *(a) by irrevocable deed to vest in any Discretionary Beneficiary the whole or such part of the Trust Fund as the Trustee in its absolute discretion thinks fit whether or not it is otherwise probable that such person would have become entitled pursuant to the provisions of this deed to any part of the Trust Fund.*
>
> *(b) […]"*

123.    These powers permit the trustees to vest the whole or part of the Trust Fund in any Discretionary Beneficiary (clause 5.4(a)). The terms omitted, which are in clause 5.4(b), allow for resettlement by the declaration of fresh trusts for the benefit of any one or more of the Discretionary Beneficiaries.

124.    Clause 5.5 provides that after the Date of Distribution the Trustee shall hold the Trust Fund for Alexandra Tolstoy and the children of Sergei Victorovitch Pugachev who are living at the Date of Distribution and have obtained the age of 21 years, subject to further provisions which do not matter.

125.    Section 6 deals with the appointment and removal of Trustees. Clause 6.1 vests the power to appoint new trustees in the Protector:

> *The minimum number of Trustees of this trust shall be one PROVIDED that at all times one trustee is not a person who is for the time being a Discretionary Beneficiary. The power of appointment of new Trustees shall be vested in the Protector."*

126.    Clause 6.2 deals with the case when there is no Protector and provides that in that case the trustees for the time being have the power of appointment of trustees.

127.    Clause 6.3 deals with removal and provides that:

> *"the Protector shall also have the following powers namely*
>
> *(a) to remove any existing Trustee with or without cause,*
>
> *(b) to appoint at any time or times an additional Trustee or additional Trustees of this Trust*
>
> *(c) upon the retirement of the Trustee of this Trust to appoint a new Trustee or Trustees".*

128.    The claimants draw particular attention to the words "with or without cause" in clause 6.3(a).

129.    Clause 6.4 provides that the appointment and removal or replacement of Trustees shall be made by the Protector by instrument in writing. Clause 6.6 deals with withdrawal from the trusts by a trustee.

130.    Clause 6.9 provides that

> *"When a Trustee resigns, retires is removed or stops acting as Trustee for any other reason, that Trustee shall duly surrender or transfer all Trust property (including written or electronic documentation) in his possession or under his control to the remaining or successor Trustee or Trustees AND such Trustee ("the Retiring Trustee") is deemed to irrevocably appoint the Protector on behalf of the Retiring Trustee and in the Retiring Trustee's name or otherwise to do all things and execute all documents as are necessary to vest the Trust Fund or any part of the Trust Fund in the continuing or any new Trustees of the Trust Fund and no person shall be concerned to enquire into the validity of such a vesting."*

131.    This is another provision involving the Protector, who is irrevocably appointed as a retiring trustee's agent to vest the trust fund in the continuing or new trustees.

132.    Clause 7 deals with trustees out of the jurisdiction and clause 8 with trustees acting as directors. Nothing turns on these clauses.

133.    Clause 9 deals with the investment of the Trust Fund. Clause 9.1 (a) declares the primary investment of the Trust Fund is Old Battersea House. Clause 9.1(b) provides the Trustees may with the prior written consent of the Protector invest or reinvest portions of the Trust Fund and clause 9.1 (c) provides for a trustee's indemnity as follows:

> *"The Trustee shall not be liable for and shall be indemnified by and out of the Trust Fund in respect of any loss or liability which may be sustained or incurred by reason of the exercise of any of the powers of investment herein conferred".*

134.    General powers, authorities and discretions of the Trustees are dealt with in clause 10. A further "Schedule of Trustees' Powers" is attached to the trust deed and runs to a further 8 pages and numerous sub-paragraphs. Although neither clause 10 nor any other part of the deed refers to the schedule by name, it is obviously appropriate to construe the deed as including this schedule. They refer to trust property generally, to carrying on business, farming, partnership, companies, power to appropriate and partition, guarantees, disputes, delegation, trustees remuneration and audit of accounts.

135.    In the trust deed itself, clause 11 deals with exclusion from liability and indemnities, as follows:

> *"11.1 The Trustee shall not be liable for and shall be indemnified by and out of the Trust Fund in respect of any loss or liability which may be sustained or incurred by reason of the exercise, the mode of exercise, or the non-exercise of any of the powers, authorities, or discretions hereby or by law conferred upon it AND no Trustee shall be liable for:*

> (a)  Any loss not attributed to dishonesty or to the wilful commission or omission by the Trustee of an act known to the Trustee to be a breach of trust.
>
> (b)  The neglect or default of any solicitor, bank accountant, auditor, stockbroker, investment advisor or other agent employed in good faith by the Trustee.
>
> (c)  Any claim made against the Trustee by any beneficiary or any creditor or any other person having any claim whatsoever against the Trust Fund which cannot be satisfied because of any resettlement or other distribution of any or all of the Trust Fund to or for the benefit of any Discretionary Beneficiary
>
> AND in particular no Trustee shall be bound to take any proceedings against a co-Trustee or former Trustee for any breach or alleged breach of trust committed by such co-Trustee or former Trustee."

136.  As part of their so-called Illusory Trust claim the claimants contend this cause is very widely drawn and excludes liability for fraud by a trustee.

137.  Clause 12 deals with the exclusion of beneficiaries, as follows:

> "12.1 Not withstanding the foregoing provisions of this deed IT IS DECLARED that the Trustee with the prior written consent of the Protector may at any time or times prior to the Date of Distribution by deed revocable or irrevocable declare that the Discretionary Beneficiaries shall cease to include any person or persons named or described in such deed or that any person or persons named or described in such deed shall not as from the date such deed comes into effect and while such deed is in effect be capable of being a Discretionary Beneficiary."

138.  As provided for in clause 4, the exclusion of a beneficiary is subject to the consent of the Protector.

139.  Clause 13 deals with variation of the trust deed. Subject to restrictions concerned with perpetuities and the prejudice of any interest of a Discretionary Beneficiary which has already vested, the clause provides:

> "13.1 Prerequisite: The Trustee may vary or amend any of the provisions contained in this deed with the prior written consent of the Protector."

140.  Clause 14 deals with the release or revocation of powers and provides that with the prior written consent of the Protector the Trustee may release and revoke any power conferred on the Trustee under the trust deed.

*The other trust deeds*

141. The only material differences between the other trust deeds and the London Residence Trust which have been drawn to my attention are:

    i)    In all four of the other trusts the named or described Discretionary Beneficiaries do not include Victor or Alexander Pugachev nor do they include Ms Tolstoy. The definitions name Mr Pugachev and his children by Ms Tolstoy. Like the London Residence Trust they also include after born children of Mr Pugachev (nb not necessarily by Ms Tolstoy). In the other trusts the clause about grandchildren and remoter issue is limited to Mr Pugachev and Ms Tolstoy, unlike the drafting of the London Residence Trust.

    ii)    There are no residence terms in the other four deeds equivalent to the one in the London Residence Trust.

142. So the material clauses, about the Protector and the position of the trustees, are the same in all five trusts.

*The law*

143. As a starting point I accept the claimants' submission from **Underhill & Hayton** about the correct approach to the interpretation of trust deeds, one must:

> *"identify the meaning of the relevant words (a) in the light of (i) the natural and ordinary meaning of those words, (ii) the overall purpose of the document, (iii) any other provisions of the document, (iv) the facts known and assumed by the party or parties at the time of execution of the document, and (v) common sense, but (b) ignoring subjective evidence of the parties' intentions."*
>
> ***Underhill & Hayton*** *Art 8.1(2)*

144. The more controversial issues are addressed below as the following topics:

    i)    Shams

    ii)    Illusory trusts

    iii)    Discretionary trusts, protectors and fiduciaries

*Shams*

145. Despite the frequent references to a "sham trust", there is not really any such thing. What may or may not be a sham are the acts or documents which purport to set up the trust. The famous passage on sham in the judgment of Lord Diplock in **_Snook v London and West Riding Investments_** [1967] 2QB 786 at 802 is as follows:

> *"...it is I think, necessary to consider what, if any, legal concept is involved in the use of this popular and pejorative word. I apprehend that, if it has any meaning in law, it means acts done or documents executed by the parties to the "sham" which are intended by them to give to third parties or to the court the*

> *appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create. But one thing, I think, is clear in legal principle, morality and the authorities ... that for acts or documents to be a "sham," with whatever legal consequences follow from this, all the parties thereto must have a common intention that the acts or documents are not to create the legal rights and obligations which they give the appearance of creating. No unexpressed intentions of a "shammer" affect the rights of a party whom he deceived".*

146.    The same point was made in New Zealand ***Official Assignee v Wilson*** [2008] 3 NZLR 45 at paragraphs 48/49:

> *"The two situations (valid trust and sham trust) do not fall into combination. The finding that the purported trust is void as a sham does not amount to an invalidation of a trust. It is not the trust as such which is a sham. There is no trust to be a sham. It is the trust documentation that is the sham*

147.    To find that a document is a sham, the focus is on the intentions of the relevant parties. In ***Hitch v Stone*** [2001] STC 214 at paragraph 66 Arden LJ put it this way:

> *"The test of intention is subjective. The parties must have intended to create different rights and obligations from those appearing from (say) the relevant document, and in addition they must have intended to give a false impression of those rights and obligations to third parties."*

148.    Both parties referred to the same authorities: ***Snook v London West Riding Investments Ltd***; ***Official Assignee v Wilson***; and ***Hitch v Stone*** as well as further cases: ***Natwest Bank v Jones*** [2001] 1 BCLC 98; ***Re Abacus (CI) Ltd (Trustee of the Esteem Settlement)*** 6 ITELR 368 [2003] JRC 092; ***Shalson v Russo*** [2005] Ch 281; ***Painter v Hutchison*** [2007] EWHC 758 (Ch); ***A v A*** [2007] EWHC 99 (Fam) and ***Clayton v Clayton*** [2016] 1 NZLR 551. I was taken to all of these cases in argument or, in the case of ***Painter***, although not taken to it during the trial I reviewed it afterwards. ***Re: Nurkowski*** [2005] BPIR 842 was also mentioned but no-one took me to that.

149.    In opening there seemed to be a disagreement of principle about who had to be a party to the sham in a case like this one in which the settlor transfers an asset to a separate trustee, on the face of it to be held on the trusts in a deed. The claimants seemed to be arguing that only the settlor's intention mattered for a finding of sham but it soon became clear that that was not really the submission and in fact there was nothing between the parties on the principles. The debate was based on the decision of David Young QC in ***Midland Bank v Wyatt*** [1997] 1 BCLC 242. In that case the judge considered a declaration of trust which was executed by a husband and wife, declaring that the property was held on trust by the husband for the wife and his daughters, was a sham. The judge found that the wife gave no thought to the content of the document or its effect so she did not share any shamming intention with her husband.

Nevertheless, the trust was held to be a sham on the basis that the husband intended it to be a sham because:

> *"a sham transaction will still remain a sham transaction even if one of the parties to it merely went along with the "shammer" not either knowing or caring about what he or she was signing." (p245 g-h)*

150.   However I was referred to the full and clear analysis of all these authorities up to 2007 which Munby J conducted in ***A v A*** at paragraphs 32 to 54, including extracts of the relevant passages.  The judge deals with ***Midland Bank*** and later cases on the same point, including the Jersey decision in ***Re Esteem*** (also known as ***Re Abacus*** (above)). I respectively agree with Munby J's analysis and will adopt it.  I highlight the following points from ***A v A*** simply because they have a particular relevance in this case:

   i)   A finding of sham requires careful analysis of the facts.  External evidence is relevant.  The fact that an arrangement is artificial is not the same as saying it is a sham.  The fact that parties subsequently depart from an agreement does not necessarily mean they never intended the agreement to be effective.  (para 33, all these matters derive from ***Hitch v Stone***);

   ii)   The unilateral intentions of the settlor are not enough to establish a sham (para 34-40);

   iii)   For a sham there must be a common intention (para 52);

   iv)   Reckless indifference will be taken to constitute a common intention.  That is the way to interpret the point made in ***Midland Bank*** about a person "going along with" the shammer neither knowing or caring about what he or she is signing (para 49-52);

   v)   A trust which is not initially a sham cannot subsequently become one (para 42);

   vi)   A finding of sham is a serious matter (para 53) especially for professional trustees (para 54).

151.   In this case the claimants relied on evidence of conduct by the trustees after the trusts were set up as evidence of sham and the defendants replied by emphasising the point summarised at (i) above.  Evidence that the trustees may have done something later which was contrary to the terms of the trust deed may or may not support a finding of sham. It may simply be that the trustees have acted in breach of trust.  However the converse is also true in the following sense.  Just because the trustees do something later which is in accordance with the trust deed, that is not necessarily indicative of no sham.  And that will be all the more so when the trustees are acting at a time when they know they are under scrutiny.  Evidence of proper behaviour when the trustees knows they are being watched may not count for much.  Actions when no-one was looking carry more weight.

152.    In addition there was a point on dishonesty which does not arise directly out of _A v A_ but is relevant nevertheless.  The defendants submitted that dishonesty is a necessary component in the shamming intention.   The claimants submitted that a sham document is a pretence, so that if it is deployed it will be misleading; but the sham document may never see the light of day. For example, an individual may create a sham deed of trust declaring that he holds his family home on trust for his children, and then put the document in the bottom drawer of his desk.  It may be that the document never sees the light of day: in that case, although the individual might have intended to act dishonestly if he ever produced the document, his dishonesty is at best latent. The submission is that there can be no actual dishonesty until the document is actually produced to a third party.  For that reason, the claimants argued that the defendants are wrong to suggest that a sham is necessarily dishonest.  I accept that qualification but I do not believe anything turns on it.  To be a sham the document must be created with an intention to mislead, but the fact that the document is never deployed to mislead does not stop it being a sham.

153.    In paragraph 58 Munby J held that a transaction cannot be a sham for one purpose but not for another.  I agree.

154.    In this case the trustees are companies.  Therefore to ascertain the intention of those trustees one needs to consider the principles for the attribution of intention to companies.  The principles were not in dispute.  The intention may or may not be that of the _de jure_ directors.  The intention is that of the natural person or persons who manage and control the relevant actions of the company, in other words the directing mind(s) in respect of the relevant act or omission (see **_El Ajou v Dollar Land Holdings_** [1994] BCC 143 at 150-151).  Who those persons are in a given case will be a question of fact.

_Illusory trusts_

155.    The claimants referred to a number of cases in which the term "illusory" has been applied to a trust.  So in **_Re AQ Revocable Trust_** [2010] 13 ITELR 260 (Bermuda) the settlor was the sole trustee; he had the power to absolve himself of any breaches of trust such that he could not be held accountable as trustee; and he had the power to revoke the trust at any time prior to his death.  Ground CJ held at [29] that:

> "the concatenation of rights and powers in the settlor, when coupled with the fact that he was the sole trustee at the time of the constitution of the trusts, _rendered this trust illusory during his lifetime_...the cumulative effect of the trust documents, when taken with the de facto situation, means that the settlor as trustee could not effectively be called to account in his lifetime."
>
> _(my emphasis)_

156.    However the defendants submitted that there is no cause of action in English law of "illusory trust", arguing that absent a finding of sham there is no justification for ignoring the express declaration of trust in favour of a default resulting trust, and arguing that there is no legal principle that would enable the court to ignore an express declaration of trust in favour of ascertained and unascertained beneficiaries

and view the deeds instead as creating bare trusts in favour of one of those beneficiaries, owing to the presence of certain provisions in the deed.

157.    The defendants refer to the decisions of the New Zealand courts in **_Clayton v Clayton_**. That dispute involved allegations of sham and of an illusory trust. The case went to the New Zealand Supreme Court ([2016] NZSC 29) but it is convenient to start at the Court of Appeal ([2015] NZCA 30). At paragraphs 71-85 the Court of Appeal considered and rejected the concept of an "illusory trust" as distinct from a "sham trust".

158.    At paragraphs 72 -73 the Court of Appeal explained that the judges in the Family Court and the High Court had held that the trust in question was "illusory". Their reasons were not the identical but the differences do not matter. The point was the very extensive control which the settlor was found to have over the trusts. A distinction had been drawn between shams and illusory trusts. The trusts were not shams. The Court of Appeal held that the difference between a sham and an illusory trust was not supportable and noted the absence of such a distinction in other jurisdictions (paragraph 79 - the USA, Canada, and Australia). The Court of Appeal was concerned that once the court accepts on the evidence that a valid trust has been established and is not a sham, the trust should not be treated as non-existent because the trustee has wide powers of control over trust property. That approach would undermine the court's acceptance of a valid trust and overlooks the trustee's irreducible core obligations and the rights of beneficiaries to have them enforced by the court (paragraph 80). In paragraphs 81 – 82 the court referred to **_Official Assignee_** **_v Wilson_** and in paragraph 83 expressed a concern that a decision to invalidate trusts other than on proof of sham might have possible unintended consequences for other valid New Zealand trusts including other discretionary trusts. At paragraphs 84-85 the court held that there was no separate principle justifying setting aside a valid trust on the ground that it is illusory, in the absence of a finding it is a sham (or some statutory power).

159.    However the NZ Supreme Court set aside the Court of Appeal's finding that the trust was not an illusory trust and instead positively declined to rule on the point. The Supreme Court's reasoning is instructive. The case was a matrimonial dispute between Mr and Mrs Clayton. The issue was whether the property held in the trust in issue was "relationship property" under the relevant legislation. The trust was called the VRPT. It was a discretionary trust settled by Mr Clayton. He was sole trustee. The Discretionary Beneficiaries included Mr Clayton as "Principal Family Member", Mrs Clayton and their daughters. The first issue the Supreme Court addressed was whether the bundle of rights and entitlement held by Mr Clayton under the deed as Principal Family Member, Trustee and Discretionary Beneficiary gave him such a degree of control over the assets of the trust that it was appropriate to classify those powers as within the definition of property in the New Zealand legislation. One power (clause 7.1) gave Mr Clayton a right to remove Discretionary Beneficiaries and the Court of Appeal had held that this meant he could remove all the Discretionary Beneficiaries, leaving himself as sole beneficiary and so leading to a conclusion that it was relationship property. The Supreme Court said at paragraph 44:

> *"We agree with the Court of Appeal that, if Mr Clayton had a non-fiduciary power as Principal Family Member to make himself the sole beneficiary under the VRPT deed, the effect of*

> *the exercise of that power would be analogous to the revocation of the VRPT, justifying the application of the same analysis as in **TMSF**. [....]"*

160.    Interpolating - **TMSF** is a decision of the Privy Council: ***Tasarruf Mevduati Sigorta Fonu v Merril Lynch*** [ 2011] UKPC 17. In that case the Privy Council held that the defendant's power of revocation of the trusts was not a fiduciary power (that was not disputed) and was in equity tantamount to ownership and so he could be ordered to delegate his powers to receivers.

161.    After the quoted part of paragraph 44 the Supreme Court in ***Clayton v Clayton*** explained that the Court of Appeal's reasoning based on clause 7.1 was challenged. They went on to consider it and held that the Court of Appeal had been in error because clause 7.1 did not give Mr Clayton power to remove "Final Beneficiaries" (his daughters). However from paragraphs 50 – 58 the court went on to examine what practical limitations the Final Beneficiaries had on Mr Clayton's ability to appoint the property to himself. The powers Mr Clayton had as trustee were examined. They were very wide and allowed him to appoint assets to the Discretionary Beneficiaries (including himself) in favour of the Final Beneficiaries, and included provisions which modified the fiduciary duties of the trustee to permit a trustee who is also a beneficiary (as Mr Clayton was) to exercise a trustee's power in his own favour. At paragraph 58 the Supreme Court held that this meant Mr Clayton was not constrained by any fiduciary duty when exercising the trust powers in his own favour to the detriment of the Final Beneficiaries. Then from paragraph 58 to 68 the Supreme Court held that this amounted to a general power of appointment, i.e. one in which the donee of the power is free to appoint himself without considering the interests of anyone else (citing well known texts ***Underhill and Hayton*** and ***Lewin on Trusts***) and was tantamount to ownership (citing Lord Collins of Mapesbury in ***TMSF*** which in turn refers to ***Thomas on Powers***). After that the Supreme Court went on to consider the specific issues arising from New Zealand matrimonial law, concluding in Mrs Clayton's favour.

162.    The Supreme Court then turned to sham and illusory trusts. The finding of no sham was upheld. On the issue of illusory trust, the Supreme Court noted that the finding of an illusory trust by Rodney Hansen J in the High Court was based effectively on the same considerations which had led the Supreme Court to hold that Mr Clayton had a general power of appointment. At paragraph 119 the Supreme Court said:

> *"The concept of "illusory trust" was described by Rodney Hansen J as a trust under which the trustee retains such control that the proper construction is that he did not intend to give or part with control over the property sufficient to create a trust. The essence of the concept appears to be that the trust as constituted has the attributes of a trust, including the imposition on the Trustee of the obligation to act honestly and in good faith; but the powers given to the Trustee and, we would add in this case, the Principal Family Member, given that Mr Clayton had both roles, are so broad that the Trustee can 'basically ... do whatever he wants with the property'."*

163.    Then, after dealing with a point about whether Mr Clayton was still subject to the irreducible core of obligations owed by trustees over which the Family Court and the High Court had differed, and noting the Court of Appeal's overturning of the finding of illusory trust because there was no difference between that and a sham, at paragraph 123 the Supreme Court held:

> *"We will come back later to the distinction between a sham and an illusory trust. For the present we observe that a finding that a trust deed is not a sham does not seem to us to preclude a finding that the attempt to create a trust failed and that no valid trust has come into existence. That would lead to a finding that the trust is illusory, to use the terminology adopted in the Courts below. For our part we do not see any value in using the "illusory" label: if there is no valid trust, that is all that needs to be said."*

164.    The Supreme Court then observed (paragraphs 124-127) that there were alternative lines of analysis concerning the trusts validity given the extensive powers held by Mr Clayton under the deed.  One approach was that Mr Clayton had reserved so much power to himself that there was no valid trust at all and the breadth of the powers called into question the irreducible core of trustee obligations referred to in ***Armitage v Nurse*** [1998] Ch 241.  The other approach was that even though the trust was in effect defeasible because of Mr Clayton's wide powers, there is no reason why it should not be regarded as a trust and required to be administered in accordance with the deed until the exercise of those powers to bring it to an end.  The latter was related to but different from the position in ***TMSF***.  Determining which of these approaches was correct was complicated and the court did not have a unanimous view.  Since a settlement had occurred it was unnecessary.

165.    Finally the Supreme Court held that argument about a distinction between sham and illusory trust was academic and they did not find the term "illusory trust" helpful.  The conclusion was at paragraph 130:

> *"In the present case, Mr Clayton intended to create a trust on the terms recorded in the VRPT deed. The issue would be whether the powers held by Mr Clayton are so broad that what he intended to be a trust was not, in fact, a trust. As already noted, we are not determining that issue."*

166.    I have dealt with ***Clayton v Clayton*** at some length for two reasons. First it is a decision from the Supreme Court of New Zealand.  Such decisions are authoritative and will always command respect but all the more so in this case which concerns New Zealand trusts albeit the parties agree that English law and New Zealand law are the same.  Second the judgment illuminates some important principles relevant to the issues I have to decide.  Those principles relate to the analysis of trusts themselves.  The fact that the court then goes on to apply its findings about the trusts to the question of matrimonial law applicable in New Zealand does not diminish the relevance of the analysis of the trusts.

167.    The case shows that when considering what powers a person actually has as a result of a trust deed, the court is entitled to construe the powers and duties as a whole and

work out what is going on, as a matter of substance. Even though the VRPT deed in that case named more than one Discretionary Beneficiary and named Final Beneficiaries which did not include Mr Clayton, when the deed is examined with care, what emerged is that in fact Mr Clayton had effectively retained the powers of ownership.

168.    This conclusion is not the same thing as a finding of sham. The analysis is all concerned with what the effect of the deed truly is. It is not concerned with the subjective intentions of the parties to create a pretence to mislead.

169.    One can see why someone might have described the trust in ***Clayton v Clayton*** as illusory because no doubt at first sight, the deed looks as though Mr Clayton has divested himself of control over the property whereas after careful consideration one reaches the conclusion that he has not. However the word is not helpful and I will only use it in this judgment as a label to refer to the claimants' arguments. As explained in paragraph 71 above, the section of the judgment which analyses what the overall effect of the trust deeds actually is will be called the "True Effect of the Trusts" claim.

*The irreducible core*

170.    In the context of the so-called illusory trust claim, the claimants also referred to the idea of an irreducible core of a trust. This was based on ***Armitage v Nurse*** at 253G-H at which Millett LJ stated the following proposition:

> *"there is an irreducible core of obligations owed by trustees to the beneficiaries and enforceable by them which is fundamental to the concept of a trust. If the beneficiaries have no rights enforceable against the trustees there are no trusts."*

171.    The judge then went on to reject the idea that this included duties of reasonable skill and care, prudence or diligence. What the minimum necessary to give substance to the trusts did require was that the trustees perform the trusts honestly and in good faith for the benefit of the beneficiaries. Accordingly an exclusion clause in the deed which exempted the trustees from liability no matter how negligent (etc.) they had been, unless the loss was caused by the trustees' own actual fraud, was valid.

172.    There was no dispute about these principles before me.

*Discretionary trusts, protectors and fiduciaries*

173.    I start with what will no doubt seem to some to be elementary or even jejune observations in order to put the issues into context. The trusts in this case are discretionary trusts, in other words whether any individual beneficiary receives any benefit from the trust at all is in the discretion of the trustees, albeit that discretionary power is subject to fiduciary obligations. That distinguishes these trusts from a simpler kind of trust in which a trustee holds property on trust for a particular individual beneficiary. In that simpler kind of trust the conventional analysis distinguishes between legal ownership and beneficial (or equitable) ownership. In the simpler kind of trust the legal ownership is held by the trustee but the beneficial ownership of the property remains held by the beneficiary. The concept of a trust in

the common law allows for this distinction to exist between the "legal" owner (the trustee) and the person whose property it really is. The beneficiary has the right to call for an assignment of the legal title from the trustee but it may suit the beneficiary not to do that. There are more complicated versions of what I have called the simpler kind of trust but that does not matter.

174.    Consider an unscrupulous person is trying to "protect" one of their assets from creditors when the asset is a house. Since the asset is real property, it can be seen, identified and there is likely to be a public register of ownership, as there is in the UK. The simpler kind of trust achieves a significant goal for the person because it allows the public information to name the trustee as the owner of the house instead of the person. The trustee can be an anonymous "special purpose vehicle", in other words a company with no assets whose directors and shareholders are professionals. All the better if the trusts and the trustees are in a jurisdiction a long way away; that just makes the task of searching a little bit harder.

175.    However there is still a significant disadvantage inherent in the simpler kind of trust. Imagine the unscrupulous person fears or is advised that they might be ordered by a court, on pain of contempt, to identify any assets they hold. Crucially the order will or may make clear that this includes any assets of which they are the beneficial owner even if they do not hold the bare legal title. To comply with that order honestly they would have to identify the asset held in the simpler kind of trust because in that arrangement the person is still the beneficial owner. Now they might decide to lie by falsely not revealing the asset but there is always a risk that the lie would be discovered. Particularly if the asset is a house which the unscrupulous person has an obvious connection with because they or their family lives in it. In addition once the beneficial ownership has been identified, a creditor may well be able to get their hands on the property beneficially held by the person.

176.    This is where the discretionary trust can come in. In a discretionary trust over a piece of property the beneficiaries are themselves discretionary (cf ***Clayton v Clayton*** above). The trustees may exercise their powers to advance property to a discretionary beneficiary, but then again they may not. The trustees are fiduciaries but that does not compel them to advance property to any given beneficiary. So the analysis is that none of the discretionary beneficiaries have a proprietary interest in the property. As Lewison LJ explained when the Court of Appeal upheld the trust disclosure order in these proceedings ([2015] EWCA Civ 139) at paragraphs 13 and 15:

> "13. A beneficiary under a discretionary trust has a right to be considered as a potential recipient of benefit by the trustees. That is an interest which equity will protect. The trustees must apply some objective criterion in deciding whether or not to exercise their discretion in favour of a particular beneficiary; so that each beneficiary has more than a mere hope. But that right is not a proprietary interest in the assets held by the trustees, although it can be described as an interest of sorts: Gartside v IRC [1968] AC 553, 617-8. In some areas of the law, such as matrimonial finance, legislation is drawn widely enough to enable the court to take into account the likelihood that trustees will exercise their discretion in favour of a particular beneficiary in deciding what provision to make for a

*former spouse on divorce: Whaley v Whaley [2011] EWCA Civ
611. But even then the trust assets are not owned by the
beneficiary spouse."*

*[...]*

*15. On the face of it assets held by the trustees of a
discretionary trust would not be amenable to execution if
judgment is entered against one of the class of potential
beneficiaries at the suit of a third party. The trustees might in
such circumstances decide to confer a benefit on the
beneficiary to save him from bankruptcy; but that would be a
matter for them. If they did exercise their discretion in favour of
a particular beneficiary the amount of the benefit would
thereupon cease to be a trust asset and would become the asset
of the beneficiary. It would then truly be his asset."*

177.  Furthermore in a trust like the ones in this case, the class of discretionary beneficiaries
itself is open to be changed.  Discretionary beneficiaries can be removed altogether
and other people added.

178.  So by passing the house into a discretionary trust which names the unscrupulous
person as one of the discretionary beneficiaries, the person can achieve a number of
goals.  They can hide their relationship with the property by having the trustees
named on the public registers as the owner.  They can also truly state that they have
no proprietary interest in or beneficial ownership of the property and, given that they
are not the beneficial owner, a creditor who does find out about the property cannot
get their hands on it.

179.  But there is a problem.  Subject to the law on unwinding transactions to defraud
creditors, if a person gives away their property to someone else then it is no longer
theirs.  But that is not what the unscrupulous person in the example wants to do at all.
As far as they are concerned the property is theirs.  The objective is not to lose control
of it, the objective is to hide it and protect it from creditors.  Since the unscrupulous
person would only be a discretionary beneficiary in this example, the trustees acting
lawfully might well not do that person's bidding at all and might refuse to distribute
the property back to the unscrupulous person.

180.  The problem for the unscrupulous person is that in the kind of discretionary trust
discussed so far, all the power is in the hands of the trustees.  Now while it is not the
reason the concept was invented, this is where the concept of a protector may come
in.  It was common ground before me that whatever its origins, the concept of
"protector" is not a term of art, in that different trusts may provide for different rights
and obligations on a protector.  I gather that trust deeds which include a protector
often provide for one or both of the following: a power to remove and appoint trustees
and a power of negative consent, in that various powers of the trustees are only
exercisable with the protector's consent.  In the trust deeds in this case the protector
has both powers and some others.

181.  A question which comes up in this context is about the nature of the protector's power
and duties.  Are they fiduciary in nature, in other words are they only to be exercised

for the benefit of the beneficiaries as a whole?  One can see that in a different context from the example I am considering, it may make sense to hold a protector's powers and duties to be fiduciary in nature.  Consider a trust of family property where the objective is not to hide and protect the settlor's assets from creditors but rather to hold assets for the benefit of members of a family over an extended period of time.  In that family context, a scheme with trustees – who may be professionals - and a protector who is neither a trustee nor the settlor nor a member of the class of beneficiaries, and who exercises their powers and obligations as a fiduciary, makes sense.  That could be a wise old aunt or uncle.  This sort of protector is there to guard the guardians.  Assuming they have the relevant powers, such a protector can remove and appoint trustees and may veto distributions by the trustees but always and only while acting in a fiduciary capacity.  Even if the trust deeds do not state in terms that the protector's powers and duties are those of a fiduciary, the court may well hold that they are, based on normal principles.

182.    In the example of an unscrupulous person seeking to use a discretionary trust to protect assets from creditors, a trust which includes a role for that unscrupulous person as a protector with very wide powers of veto and to remove and appoint trustees may perhaps achieve the desired result.  The unscrupulous person is only a discretionary beneficiary and so can truly state to a court that they do not hold any of the assets beneficially.  However consider a protector who is not a fiduciary.  In the capacity of such a protector, the unscrupulous person can prevent the trustees from distributing the money to anyone but himself (or herself) and can remove recalcitrant trustees who fail to do his or her bidding and replace them with trustees willing to do what the unscrupulous person wants.  Viewed in that way, perhaps the discretionary trust is not really a discretionary trust at all; the unscrupulous person has retained effective control of the assets or at least can recover that control whenever they like.  That is the claimants' case on the facts.

*Textbooks and other articles*

183.    It is clear that in general a protector's powers are not necessarily fiduciary in nature.  They may or may not be.  The defendants refer to a passage on protectors in ***The International Trust*** 3rd Edition by The Hon Mr Justice David Hayton in order to dispel the idea that there is something sinister about a beneficiary protector having non-fiduciary powers of the sort in this case.  The passage is as follows:

> *"Finally, it is fair at this juncture to refer to the existence of what might be regarded as a different approach to the role of protectors from that favoured above.  The cornerstone proposition of the approach favoured above ('the wide view') is that although a protector may be in a fiduciary position, this is not necessarily the case: it all depends upon the circumstances.  The alternative school of thought ('the narrow view') views the protector as the holder of a fiduciary office.  By definition classified as a fiduciary, the protector, according to the narrow view, has an irreducible core of duties imposed upon him.  It is submitted that the distinction between the wide and narrow views is largely semantic.  <u>For it cannot, surely, be disputed that it is possible to nominate a person with a non-fiduciary watchdog role under the express terms of a trust deed.  If this is</u>*

> *not the case, the expectations of many settlors and their*
> *advisers will be disappointed. To say that a person is a*
> *fiduciary is (as Frankfurter J once observed) the beginning, not*
> *the end, of analysis to which we would add that to say that a*
> *person is not a fiduciary is not the end of the analysis. It should*
> *not, in our view, be supposed that the courts will be powerless*
> *to review the actions of a protector simply because he is not in*
> *a fiduciary position. The court's general jurisdiction to secure*
> *the good administration of trusts should, in principle, enable*
> *the court to intervene even if, for example, the trust instrument*
> *in terms lays down that the protector is to owe no fiduciary*
> *duties."*

> *(my emphasis)*

184. This passage shows that it is or should be possible to nominate a person with a non-fiduciary watchdog role under the express terms of the trust deed without undermining the terms of the trust itself. Stated as generally as that I agree but it does not answer the question in a particular case.

185. The defendants also rely on this passage to show that even if aspects of a protector's powers are not fiduciary, the court can still intervene. I accept that the court may still be able to intervene but again it depends on the particular circumstances, not least because the concept of a protector is not well defined anyway. A protector has whatever powers and duties are conveyed by the deed on its true construction.

186. The question whether the powers given to the protector can be labelled "fiduciary" or not probably does not matter. The distinction which really matters is between a power which the protector (who in this case is also one of the Discretionary Beneficiaries) could lawfully exercise in a selfish way in favour of himself and against the interests of the other Discretionary Beneficiaries (such as his children by Ms Tolstoy and others) on the one hand, and a power which could only properly be exercised for the purpose of furthering the interests of the Discretionary Beneficiaries as a class on the other hand. The latter may well be the same thing as a fiduciary power but it does not matter. If the power is in the latter class then its exercise against the interests of the other Discretionary Beneficiaries could be unlawful and ineffective, and a court could so rule.

187. The defendants also submit, citing an extract from ***Tolley's Administration of Trusts***, that the court may be reluctant to find that a power is a personal power because it can take the matter beyond scrutiny of the court, at least if it is a "beneficial person power". I will not get into the distinction between beneficial personal powers and non-beneficial personal powers. When I refer to personal powers I mean powers which the person may exercise selfishly if they wish. The reluctance of the court which is referred to makes sense if one is looking at the trust from the point of view of protecting what seem to be the interests of beneficiaries as a whole and the good administration of trusts but these proceedings illustrate that there is another perspective, that of a creditor of the settlor. From that perspective the same sort of considerations work the other way round. Why should a court help a settlor who tried to hide but retain his beneficial ownership of property by using a trust deed which vested unfettered powers on the settlor as protector so that the settlor could retain

control.  By construing expressly unfettered powers as subject to a fetter, whether it is as a fiduciary or as subject to some other limit and scrutiny, the court could be assisting the settlor in avoiding his creditors.

188.  The defendants also refer to various passages from **_Thomas on Powers_** (2nd Ed). Again the main submission being made is that this work shows that one way or another the powers will always be subject to scrutiny and the supervision of the court. However the defendants' repeated point about court supervision is circular.  If the exercise of the power is subject to some limitation (such as a fiduciary duty or a power conferred for a limited purpose) then there is a standard against which a court can measure whether the power was used lawfully or not.  But if the power can be exercised selfishly putting the holder's own interests ahead of anyone else's then the court's scrutiny makes no difference.  An analysis based on the idea of a fraud on the power does not add anything.  If the purpose of the protector's powers in this case allows the protector to act in his own selfish interest then it cannot be a misuse of such a power to exercise it for example by vetoing distributions to any other of the discretionary beneficiaries or removing a trustee who does not act in the protector's wishes.

189.  The claimants referred to two passages from **Underhill & Hayton**, which I will take into account along with the above references.  They are at 1.86 and 71.7:

> *"1.86 ... if [a settlor] is a discretionary object of a trust or power and has a personal power (expressed to be unchallengeable in the courts in every respect unless its exercise contravenes the fraud on a power principle) from time to time to replace the current trustee with a new one, there is a danger that the trustee will be regarded as in his thrall, so that the trust is in substance a bare trust for the settlor....*

> *and*

> *71.7 Where a power to remove trustees by replacing them with new trustees is vested in a beneficiary who is the primary object of the settlor's bounty and whose power is not restricted to a few specified eventualities, the obvious inference is that the power has been conferred on the beneficiary to look after his own personal interests and not those of the beneficiaries as a whole..."*

*Judgments in England*

190.  I invited the parties to consider the decision of Henderson J in **_Davidson v Seelig_** [2016] EWHC 549 (Ch).  The case was an application to amend the Defence in a claim about two settlements.  The second defendant Mr Haringman, who was applying to amend, held the office of one of the protectors (or purported protectors) of the settlements. In considering the application the judge said as follows:

> *"55. Assuming that the protectorship regime was validly introduced, the protectors have four principal functions to perform in relation to the administration of the trusts. First,*

> *they have power to give or withhold consent to any exercise by the Trustees of their beneficial powers of appointment, or revocation of earlier appointments, from time to time. Secondly, they have power to remove any trustee from office, with or without cause, provided that there will still remain a minimum number of trustees. Thirdly, they have a contingent power to appoint new trustees which will be exercisable only after the death or incapacity of both Settlors. Finally, the protectors may together appoint new protectors. **<u>These powers are fiduciary, and they must be exercised in the interests of the beneficiaries.</u>** The protectors do not, however, have a general power or duty to supervise the administration of the Settlements, and they may only apply to the court for relief which relates to the proper exercise of their own powers.*
>
> *56. I would provisionally accept these submissions, which appear to me firmly based on general principles of trust law and to reflect the limited nature of the powers conferred on the Protector by the 2003 Deeds. In the light of these principles, I can now examine the main forms of relief sought by Mr Haringman."*
>
> *(my emphasis)*

191.  So not only did the judge at least provisionally accept that protector's powers similar to the ones in this case are fiduciary but he did so when the important power to remove a trustee from office was expressed as exercisable with or without cause (as in this case).  On the other hand the protectors in these settlements were in a different position from the Protectors in the trusts before me.  In ***Davidson*** there were two protectors (who acted jointly) and they were neither the settlor nor beneficiaries.  One of the arguments for trial in that case was to be that the individuals appointed as protectors were unsuitable on personal grounds to fulfil that role.

192.  Nevertheless, as the defendants also submitted, Henderson J's judgment proceeds on the basis that the court's inherent powers include a power to remove a validly appointed protector from office (see e.g. paragraph 68) and that the beneficiaries have standing to make such an application.  But this cannot be taken too far since it is not surprising that the court's inherent powers might include a power to remove a protector if the powers of that protector are fiduciary.

193.  Overall, ***Davidson*** does provide some support for the defendants' case, but in the end it is concerned with quite different facts.

194.  In ***Twin Benefits v Barker*** [2017] EWHC 142 (Ch) Marcus Smith J followed and cited ***Davidson*** on the question of a protector's powers being fiduciary, but the decision was not concerned with the questions I have to decide.  The point in ***Twin Benefits*** was that there was no serious issue to be tried of breach of fiduciary duty because of the way the allegations were pleaded.  There was nothing to suggest that the breaches pleaded arose because the defendant breached his fiduciary duty as protector (paragraph 71).

*Commonwealth judgments*

195.    The defendants also referred to **_New Zealand Maori Council v Foulkes_** [2016] 3 NZLR 337 for the proposition that in considering the nature of a power to appoint or remove trustees, one must bear in mind that the subject matter of the power is the office of trustee.  I accept that.

196.    The claimants referred me to the judgment of Henderson J (a different judge) in the Cayman Islands in **_Re Circle Trust_** 9 ITELR 676.    There the judge held that a protector was to act in a fiduciary capacity.    The conclusion was reached by objectively determining the intentions of the settlor by construing the trust deed in the surrounding circumstances (not including the settlor's subjective intention).    The judge held that the fact a power was conferred on a beneficiary did not mean it could not be fiduciary in nature.  The case was about a power to nominate trustees and the judge reviewed a number of authorities on the issue, starting from the judgment of Kay J in **_Re Skeats Settlement_** (1889) 42 Ch D 522, 58 LJ Ch 656.  At paragraph 21 the judge held:

> *"Collectively, these authorities establish that the right to nominate a trustee, even when it resides with a beneficiary, is likely to impose fiduciary obligations. That will not always be the case. Everything depends upon the intentions of the settlor and the surrounding circumstances."*

197.    The claimants also cited two cases in which a power was held to be personal and not fiduciary: **_Re Z Trust_** [1997] CILR 248 (Cayman Islands) in which a power of the settlor and a management committee together to amend the terms of the trust deed was held to be personal; and **_Rawson v Perlman_** [1990] BOCM 31 (Bahamas) in which the court held that when protectors who were beneficiaries were given a power to protect their own interests they are not fiduciaries.

198.    Both sides also referred to the decision in Jersey in **_Re the Bird Charitable Trust and the Bird Purpose Trust_** [2008] JRC 13, (2008) 11 ITELR 157.  The case concerned the power to appoint new trustees and the power to appoint a replacement protector of a charitable trust.  The Court held that both powers were fiduciary powers by approaching the question as a matter of construction of the trust deed.  It is not disputed that this is the right approach.   The charitable trust in that case is quite different from the trusts I have to consider.

199.    Before I finish considering the authorities on the nature of protector's powers I will refer to the judgment of Heath J on 2nd October 2015 when he was considering the actual trusts in this case.  In this judgment (**_Kea Trust Co. Ltd v Pugachev_** [2015] NZHC 2412) Heath J ruled that the removal of the original trustees by the Protector(s) and appointment of the new trustees was valid.   The defendants relied on the judgment as a finding that the powers of the Protector in the trust deeds in issue were not unfettered.  I will address that below.  At this stage I will refer to the judge's analysis of the law.

200.    The judge considered the question of whether the Protector owed fiduciary obligations to the beneficiaries of the trust.  He referred to the decision of the Jersey court in **_Re Bird Charitable Trust_** and the review of authorities there, to **_Vatcher v_**

*Paull* [1915] AC 372 (PC) as well as to two New Zealand decisions, **_Kain v Hutton_** [2008] 3 NZLR 589 (SC) and **_Clayton v Clayton_** at the level of the Court of Appeal, noting that leave to appeal to the Supreme Court had been given. Heath J held that:

> *"[48] The debate about whether, in any given case, a protector exercises a fiduciary or personal power may be arid because of the need, in either event, for the power to be exercised for proper purposes. The doctrine of fraud on a power is equally applicable to both types of power. The inquiry focuses on whether the power has been exercised for a purpose, or with an intention, that goes beyond the scope of or is not justified by the instrument creating the power."*

201.    Later, citing a passage from a paper by Matthew Conaglen and Elizabeth Weaver (**_Protectors as Fiduciaries: theory and practice_** (2012) 18(1) *Trusts and Trustees* 1 at 19) Heath J then held at paragraph [52] that:

> *"[52] Whether, in this case, the Protector is or is not labelled a fiduciary is unlikely to affect the duty cast upon the Protector to exercise powers to promote the objects of the trust. There is nothing in the Declaration to suggest that the basic duty of loyalty to beneficiaries has in any way been compromised its terms. As Matthew Conaglen and Elizabeth Weaver have said:*
>
>> *'The paramount consideration is the settlor's intention, as derived from construction of the trust documentation. Not only will that determine whether the protector is a fiduciary, but also what sort of a fiduciary role the protector has. As we have shown, the fiduciary label can cover a number of situations and fiduciary and personal powers can co-exist in the hands of a protector. Where the purpose and intention of the settlor was that the protector was also to be able to benefit under the trusts, the courts will usually respect that intention and not find fiduciary obligations which would disable the protector from acting in his own interest, although they might still hold that the protector owes limited or qualified fiduciary duties to consider the exercise of his powers on a regular basis. On the other hand, the cases show that powers which impinge upon the trustees' position as 'ultimate guardians of the trust' are likely to be treated as fiduciary, to some degree at least, so that the court can retain a supervisory jurisdiction. We suggest that it is unlikely that the court will allow that supervision to be avoided by language purporting to free the protector from any fiduciary obligations, but, again the touchstone is always the settlor's objectively determined intention.'*

202.    The judge decided that the power to remove trustees had to be exercised in the best interests of the Discretionary Beneficiaries as a class (the Pugachev family, as he put

it) and held on the facts that there was no reason to think it had not been. I will return to that below.

*Protectors and fiduciaries – conclusion*

203.    Having been through the citations from cases and text books put forward by both sides, the principles which I will derive from all these sources are brief and not controversial. They are that:

i)      What matters is whether or not a power given to a protector is purely personal, in the sense that it can be exercised in the protector's own selfish interests. A power will not be purely personal if it must be exercised for a purpose, such as having regard to the interests of the Discretionary Beneficiaries as a whole or in order to promote the objects of the trust. In that case the exercise of the power will be subject to the court's supervision.

ii)     In this case there is no need to make a distinction between a power conferred for a purpose which takes into account the interests of the Discretionary Beneficiaries as a class and a fiduciary power. Even if they differ in other cases, they do not differ in this case. So I will use the terms "fiduciary" and "purely personal" to draw the distinction which matters in this case.

iii)    The task of determining the scope and nature of a power conferred in the deed is one of construction of the deed, taking into account all relevant circumstances (which do not include the subjective intentions of the settlor). A relevant consideration is whether the donee of the power also has other roles such as trustee, discretionary beneficiary and/or settlor. Also relevant will be the actual powers conferred and their effect both individually and together. The task of construction is to consider objectively what the purpose is for which the power has been conferred. Putting it another way, the question is: for whose benefit, as a matter of construction of the trust deed, has the power been given?

## Assessment

*The involvement of Victor and his father as sources of assets*

204.    Before dealing with the major issues, I will address the position of Victor Pugachev, since he provided much of the money or other assets which ultimately went into the trusts. The first step is to address the involvement of Victor and his father, Mr Pugachev, as sources of funds and assets in the various trusts. The position is as follows:

*London Residence Trust*

i)      Victor transferred £12.5 million into Kea Trust Company Ltd's bank account on 5th December 2011 to fund the purchase of Old Battersea House on 6th December. The London Residence Trust was declared on the 6th.

ii)     Victor transferred further sums into the London Residence Trust in late 2013. Mr Patterson's understanding was that these were to fund the renovation of the

Old Battersea House and he prepared a number of deeds of gift relating to these payments. There was one in October 2013 for $8.8 million, one on 22nd November for $5 million. The defendants interpret the $8.8 million as going into the Kea Three Trust rather than the London Residence Trust (the two trusts have the same trustee although they appear have had distinct accounts run by Oakhill Management in 2013) although Mr Patterson's evidence relates this payment to the London Residence Trust.

*Kea Three Trust*

iii)   Mr Pugachev himself had provided £4.125 million to Redflame in July 2010 as a loan to purchase 53 Glebe Place. When 54 Glebe Place was bought, the money came from Victor as another loan to Redflame of £4.2 million in July 2011, although later accounting documents show the lender as Mr Pugachev and include a loan agreement executed by Mr Pugachev and Redflame.

iv)   The key trust asset in the Kea Three Trust is the shareholding in Redflame. The shares were transferred to the trustee company by Mr Pugachev on 8th August 2013 under a deed of gift.

v)   The $8.8 million from Victor mentioned above may have been for this trust instead (see above).

*Riviera Residence Trust*

vi)   The two key assets of this trust are the shareholdings of two Luxembourg companies called Topaze Funds SA and Romy Finance SA.

vii)   The Sand Club property in St Barths is held by an entity called Sand Club SCI. Topaze owns 0.1% of Sand Club SCI directly and wholly owns a Belgian company called Notting Hill Invest SA which in turn holds the other 99.9% of Sand Club SCI.

viii)   Romy Finance holds the Swiss watch factory (apparently valued at CHF 2.74 million in 2014) and two companies – Hediard Monaco and Delare LLC (a Delaware company). Hediard Monaco apparently has no assets and did not hold anything relating to the Hediard group. Delare owns about 35% of an entity called Eleven Street Associates which in turn owns a property at 11 Hurley Street, Cambridge, Massachusetts, USA.

ix)   Mr Pugachev transferred the shares in Topaze SA to the third defendant (now called Finetree) on 9th August 2013, recorded in a deed of gift. Mr Pugachev transferred the shares in Romy Finance on 16th December 2013, also recorded in a deed of gift.

*Wiltshire Residence Trust*

x)   The price agreed in August 2013 for the purchase of Doves House in Wiltshire had been £4.2 million. Deeds of gift seem to show that Victor transferring two sums to Bramerton as trustee of this trust. The money was paid into Oakhill's Bramerton account held at Barclays Bank in London. The deeds show sums of

$5 million on 1st December 2013, and $6 million on 16th December.  Since the purchase did not proceed that money remained on deposit.  However it seems that the total paid into the trust was in fact only US$4.5 million.

*Green Residence Trust*

xi)    The deed for this trust declares the primary investment as shares in Lenux Group Ltd.  This is a BVI company.  It holds a Russian company called Korporatsiva Obligaz LLC which in turn holds land in Russia (Gorki-10).  The original trustee of this trust was Bluering.

xii)    On 1st December 2013 Victor transferred the shares in Lenux to Bluering, recorded in a deed of gift.  Prior to that the sole shareholder of Lenux was Hearnville Properties Ltd, which was beneficially owned by Victor.

205.    There is no evidence which shows how Victor came to hold any of the money or other assets which Victor transferred into these trusts.  There is only a circumstantial basis from which to draw an inference that Victor did so as nominee for his father and a similarly thin basis from which to infer that if Victor was not the beneficial owner, than that person was Mr Pugachev.  Nevertheless I find that for all these transfers Victor was acting entirely on the instruction of his father and that the beneficial ownership of each asset (money or shares) belonged to Mr Pugachev until the property was transferred into the trusts.  I reach these conclusions from considering the evidence as a whole and for essentially the following reasons.

206.    I am sure that Mr Pugachev is the source of all the assets held by Victor.  There is no evidence Victor had the ability or means to generate this kind of wealth independently of his father.  I do not doubt that Mr Pugachev has given his son sums of money and property which to an outside observer would seem very large.  There is evidence that Victor has his own residential property.  However just because some of the property held by Victor was given to him by his father outright does not mean that the property Victor was transferring into these trusts was his own money or assets.  No obvious reason why he should do this has been suggested.

207.    For the London Residence Trust it is true that Victor is named as one of the Discretionary Beneficiaries and his children would fall within the class of grandchildren, but the residence clause shows that on its terms the trust is to provide a residence for Ms Tolstoy and her children, not Victor or his children.  I cannot think of a plausible reason why Victor would want to do that, all the more so given the poor relationship between Victor and Ms Tolstoy.

208.    For the later four trusts, Victor is not even named as a Discretionary Beneficiary.  The named Discretionary Beneficiaries are Mr Pugachev himself and his children by Ms Tolstoy.  Again no plausible reason why Victor would wish to transfer his own assets into such trusts has been suggested.

209.    The evidence also shows that Victor, Mr Pugachev and Mr Pugachev's associates and family office (Mr Lussato, Mr Liechti and Ms Dozortseva) acted in concert in the setting up of the trusts.  That provides some support for the inference that Victor was doing Mr Pugachev's bidding.

210.    It seems to me I am also entitled to support this inference from the fact that neither Victor nor Mr Pugachev himself provided an alternative explanation to the proposition that all this property was Mr Pugachev's.  Mr Pugachev has been well aware of these trust proceedings for sufficient time to advance such a case.  I infer Victor is well aware of these proceedings too.  There was a suggestion of a more recent falling out between Victor and Mr Pugachev but I am not prepared to place weight on that.

211.    I am also satisfied that all the relevant assets beneficially belonged to Mr Pugachev.  I am not troubled by the inference that the assets would have originally derived from Mr Pugachev's wealth.  There is no other apparent source and for example for the Riviera Residence Trust there is clear evidence that Mr Pugachev regarded the funds to buy the Sand Club villa as his beneficially. But there is no evidence about how they came to be in Victor's hands and no evidence of the terms on which any of them may have been held before they were transferred.  The inference that they were Mr Pugachev's beneficially is a weaker inference to draw from the circumstances than the inference that Victor was simply doing his father's bidding but, standing back, no other conclusion makes sense.

### *The True Effect of the Trusts claim*

212.    The foundation of this claim is the terms of the trust deeds themselves, properly construed.  Although a trust deed is construed against an appropriate factual matrix, I will start by examining the terms at face value because in this case the factual matrix is tangled up with the question of sham.  For the purposes of analysis I wish to keep these things separate.

213.    I will start with some preliminary general points, then address the claimants' point on the wide exclusion of trustee liability and indemnity provisions in clause 11 and then turn to the main argument, which relates to the position of the Protector.

*Preliminary general points*

214.    At times the defendants made submissions about the intentions of the "settlor", by which they meant the trust companies.  I reject that approach.  It is true that these deeds are drafted so that the declaration of trust is over a nominal sum and so from that perspective the trust company could be called a settlor.  However this is unreal.  The real settlor of these trusts is Mr Pugachev.

215.    For the purposes of analysis nothing turns on the differences which do exist between the dates when the various trusts were declared and the dates when property was transferred in.  In another case those differences might matter but in this case they do not.

*Exclusion and indemnity clauses*

216.    It was suggested that the odd grammar in clause 11 is because the text is an amalgam of two different exclusion/indemnity clauses.  That may be right.  The claimants point out that the first few lines both purport to exclude liability on the part of the trustees and to an indemnity.  The words state that the trustees shall not be liable for any loss sustained by the exercise or non-exercise of their powers and also state that the

trustees will be indemnified out of the trust fund for any such loss. The claimants submit these terms are unqualified and exclude all liability so that the trustee's obligations and therefore the beneficiaries' rights to enforce them are rendered nugatory.

217.    The claimants also submit that since the trustees are companies which were set up to undertake these tasks and have no assets, and that there are no compulsory insurance provisions under New Zealand law, the beneficiaries would be unable to recover anything if there were no trust assets left. Similarly they submit clause 11.1(c) also provides that the trustee is not liable for a claim which cannot be satisfied from the Trust Fund.

218.    The defendants contend that the claimants have misconstrued these clauses and that on a proper analysis these terms are reasonable, some are commonplace and in any event they do not nullify the beneficiaries rights. The defendants' points are these:

i)      Clauses of this general form are commonplace because the trust is not a separate legal entity and any contract between the trust and a third party must be with the trustees. Their contractual and tortious liability is *prima facie* unlimited and so it is not surprising trustees would always insist on clauses of this kind.

ii)     The opening lines of clause 11 do not exonerate the trustees if they do something which is not an exercise of their powers at all. In other words, if the trustees simply steal the money, that would be neither an exercise of their powers nor a non-exercise of them and therefore is not excluded or indemnified.

iii)    Although the opening words are unqualified, clause 11.1(a) acts to significantly limit the exclusion or indemnity by expressly providing that losses attributable to dishonesty or wilful action or inaction are <u>not</u> (my emphasis) excluded.

iv)     If the complete clause is construed as a whole, liability for fraud is not excluded nor will the trustees receive protection if they have acted dishonestly and in fact they will be liable for any wilful commission or omission they know to be a breach of trust. A breach which is merely negligent will be covered by the indemnity but that is all. That is less protection for a trustee than is contemplated by the decision in ***Armitage v Nurse***.

v)      Clause 11.1(b) is ordinary and not criticised by the claimants.

vi)     Clause 11.1(c) is misconstrued by the claimants and is in fact a common provision and its absence would seriously hamper trustees in advancing income or capital. The clause is directed to claims made by a person such as a creditor of the trust whose claim cannot be satisfied because the trust fund has already been distributed. The words "having any claim …against the Trust Fund" mean claims against the trust. Without such a clause trustees would have to try and second guess whether claims might be made against the trust in future and retain sufficient assets in the fund to deal with them. In that case the trustees would be reluctant to appoint property out of the trust.

219.    A further point had been taken about whether the trustees were prohibited from taking action against a former trustee but nothing turns on it.

220.    In my judgment the defendants are right that clause 11 does not nullify the beneficiaries' rights. The starting point is that the trustees have fiduciary duties. The wording in the clause is imperfect but properly construed as a whole the clause does not exclude or indemnify fraud by the trustees, nor a case where the trustees have acted outside their powers nor does it exclude or indemnify wilful commission or omission by a trustee of an act known to be a breach of trust. The wide opening words in the clause are qualified by the terms of clause 11.1(a). Clause 11.1(c) does not have the vice alleged by the claimants because it is subject to the same limitations, in other words it does not apply to exclude the trustee's liability for fraud and so on. I accept the defendants' submission about the purpose of clause 11.1(c).

221.    Therefore the points on the exclusion and indemnity clauses do not support the claimants' case.

*The position of the Protector*

222.    In these deeds the First Protector is also the settlor, in the sense that Mr Pugachev was the beneficial owner of all the property placed into the trusts, and he is also one of the discretionary beneficiaries. Indeed, if it matters, he is the first named discretionary beneficiary. Apart from the power to direct sale of the residential property in the London Residence Trust and a minor proviso in clause 1.1(c)(vii), the deeds do not expressly fetter any of the powers of the Protector. Nor do they specify limited circumstances in which the powers may be used. Conversely the deeds require the Protector's consent in a wide variety of circumstances including the trustees' power of distribution, investment, and removal of a Discretionary Beneficiary but there is no express term purporting to limit the exercise of the Protector's power of veto in any of those cases.

223.    The Protector's power to remove trustees may be exercised "with or without cause" (c.f. ***Davidson v Seelig*** dealt with above). Clause 6.9 facilitates the ability of the Protector to remove a trustee by allowing the Protector to act on that removed trustee's behalf to vest the trust property in the new trustee. The Protector is also vested with the power to appoint new Discretionary Beneficiaries in clause 1.1(c)(vii), which is not subject to any express fetter (save for a minor proviso).

224.    There was an argument about the power to vary the trust deed but I do not believe it adds anything significant to the analysis. The claimants submitted that on its face the deed gives the Protector power to vary the terms and that this was not subject to any express fetter. However, that is not accurate. Like the powers of distribution, investment and removal of the Discretionary Beneficiary, the power to vary belongs to the trustee (see clause 13.1) but to take effect the Protector must consent. Therefore the Protector's powers relating to variation of the trusts are the same kind of veto as in the other cases.

225.    As explained above I will not examine whether this trust is "illusory". The claimants' case is that properly interpreted these trust deeds do not create a trust whereby Mr Pugachev has divested himself of control of the assets. The trusts are bare trusts for Mr Pugachev. The legal title to the assets will be with the trustees but the beneficial

title remains with Mr Pugachev despite all the language in the deeds which might suggest to the contrary.

226.    The defendants submit that this is the wrong way of looking at it. The defendants contend that the Protector's powers are all fiduciary in nature, as I use the term in this judgment. The point is not that an unscrupulous Protector might not try to undermine such a trust, the point is that as a matter of legal analysis of the trust deeds, even though he is both settlor and Protector and a Discretionary Beneficiary under the trusts, Mr Pugachev does not have any right in law to do what he pleases with the trust property, his rights qua Protector are only to be exercised for the benefit of the beneficiaries as a whole and are subject to the court's supervision.

227.    The defendants' submissions are as follows. They contend that the key power is to remove and appoint trustees and the cases and other authorities dealt with in the section on the law above support the conclusion that this is a fiduciary power even if the Protector is settlor and beneficiary. They also contend that even if the power is not fiduciary, it is still a power which must be exercised honestly and for a proper purpose. The court's supervisory role is illustrated by what happened in this case when the original trustees challenged their removal before the New Zealand court and Heath J upheld their removal.

228.    They contend that the Protector is an office and that is consistent with its being a fiduciary. Mr Pugachev is only the First Protector. Also Mr Pugachev is only one of the Discretionary Beneficiaries. If he was the sole Discretionary Beneficiary and sole Protector then there may be more scope to argue his powers are personal, but he is not.

229.    As for the Protector's veto powers, the defendants contend these are limited and submit:

i)    The Protector could have been given much wider powers, such as to change beneficiaries, or the deed could have stated that the Protector's power were purely personal. The majority of the powers are vested in the trustees and they must act in the best interests of the beneficiaries as a whole. The provision about the Protector's consent cannot change that. The trustees have ultimate control over when and how the powers are exercised, not the Protector.

ii)    If the Protector withholds consent the trustees can apply to the court.

iii)    If the Protector sought to exercise his powers dishonestly or in bad faith then there can be no doubt this can be challenged in court.

230.    The defendants also submit that whatever the position of the Protector's powers, the powers held by the trustee under the deed are subject to the court's supervisory jurisdiction and an improper exercise of a trustee's power can be challenged or set aside and would be a breach of trust. I do not believe the claimants challenged this but in any case I accept the submission.

231.    The defendants also refer to the Protector's powers relating to the residence in the London Residence Trust, submitting they are fiduciary and are subject to express limits.

232.    That is the defendants' case.

233.    The focus of the argument has been on whether the Protector's powers are subject to relevant limitations or not. Nevertheless in fact I have two questions to decide. First I need to consider what the consequences would be if the Protector's powers (or some of them) are unfettered and second I need to decide what if any limitations those powers are subject to. The reason for taking the questions that way round is because the answer to the first question may inform the answer to the second. The two questions are: (i) what is the position if the Protector's powers are purely personal; and (ii) are the Protector's powers purely personal?

*What if the Protector's powers are personal?*

234.    The decisive factors are the following:

235.    First the Protector has a right to information from the trustees. On its own this is consistent with a watchdog role but it means that the Protector has the right to be fully informed.

236.    Second the Protector has the power to veto all the major decisions a trustee might make – investment, distribution of income or capital, and variation of the deed. So if the powers are purely personal then distributions to anyone but himself can simply be stopped. Even if the trustees had concluded that a distribution to a different given Discretionary Beneficiary should be made taking into account the interests of the Discretionary Beneficiaries as a whole, the Protector could veto it. The defendants submitted that the Protector would have to act honestly. I accept that, but the hypothesis under consideration is that the Protector may act lawfully on selfish grounds. On the relevant hypothesis the Protector may selfishly but lawfully veto a distribution to any other Discretionary Beneficiary. Such an act is not dishonest. If the power is purely personal then in substance the ability of any of the Discretionary Beneficiaries to receive any distribution from this trust would be in the hands of the Protector.

237.    Third, the Protector (and not the trustees) has the right to appoint new Discretionary Beneficiaries. So if the powers are purely personal the Protector would be able to insert a new Discretionary Beneficiary for his own selfish reasons as well as vetoing any distribution to anyone else.

238.    Fourth, the Protector (and not the trustees save in limited circumstances) has the power to appoint his successor and while "Under a Disability" Mr Pugachev's powers as Protector are exercised by Victor, who for all intents and purposes would do his father's bidding.

239.    Fifth, so far the analysis shows that the Protector can stop any of the Trust Fund going to anyone else, but can he actually obtain it if or when he wants it?

240.    The first and crucial aspect of this point is that in these deeds Mr Pugachev is not only the Protector, he is a named Discretionary Beneficiary. So in principle distributions to him are possible.

241.    The powers of distribution in clauses 5.2 and 5.4 are subject to the Protectors' powers of veto but they still require the trustees to initiate actions. The same goes for the right to remove Discretionary Beneficiaries. That is another power vested in the trustees albeit subject to the veto. That makes the position of Mr Pugachev different from the position of Mr Clayton in ***Clayton v Clayton***. Unlike Mr Clayton, in these deeds Mr Pugachev cannot directly remove a Discretionary Beneficiary.

242.    However these powers permit the trustees to transfer part or all of the trust fund to Mr Pugachev alone and to the exclusion of any other Discretionary Beneficiary. That can be either by handing the assets to him directly despite the existence of other Discretionary Beneficiaries or by removing all the other Discretionary Beneficiaries save for Mr Pugachev and then doing the same thing. That is provided for in clauses 5.2, 5.4 and 12.

243.    Now of course the trustees' powers are fiduciary and, as Lewison LJ noted in paragraph 13 of his judgment in the trusts disclosure appeal in these proceedings, the trustees of a discretionary trust must apply some objective criterion in deciding to exercise their discretion in favour of a particular beneficiary. However when the deeds contain express clauses like this it is hard to see how a transfer to a single Discretionary Beneficiary alone by a trustee carrying out the Protector's wishes would be open to a realistic challenge.

244.    But even if it is, this is where the combination of the Protector's status as Discretionary Beneficiary with wide veto powers together with the Protector's power to replace trustees becomes significant. The Protector's power of removal can be exercised on the Protector's own initiative. If it is a purely personal power then the Protector can lawfully remove a trustee who does not act in accordance with the Protector's wishes. A trustee who refused to distribute trust assets to the Protector could be removed and replaced by one who will. If the power of removal is fiduciary and so may only be exercised taking into account the interests of the Discretionary Beneficiaries as a class then the situation is different. The Protector could not exercise that power simply to remove a trustee who refused to put the Protector's interests ahead of the other Discretionary Beneficiaries.

245.    I note the extract from ***The International Trust*** by The Hon. Mr Justice David Hayton which contemplates that a valid trust should be able to have a person appointed to a non-fiduciary watchdog role. I do not doubt that that is possible, but if the Protector's powers in these deeds are non-fiduciary then that person is not simply a watchdog. If the powers are purely personal to Mr Pugachev then these deeds allow him to retain complete control over the assets he settled into the trusts. In substance these trusts would then be nothing more than bare trusts in which the property is held by the trustees on trust for the Protector alone.

246.    If Mr Pugachev's powers as Protector are limited as contended for by the defendants then the effect of these deeds on their face would be that he has ceded control of the assets to the trustees without the power to get them back. He would not then be the beneficial owner of the assets.

247.    A point I will not take into account is that all the trustees are all off the shelf companies with no assets, in which the directors consist of Mr Patterson and Ms Hopkins together with one of Mr Pugachev's lieutenants (Mr Liechti or Ms

Dozortseva) and in which the shareholders are Mr Patterson and Ms Hopkins. That is better addressed in the context of sham.

*Are the Protector's powers purely personal?*

248.   In addition to the fundamental question of construction, the defendants take four further points on this topic which I will address first: (i) the Protector is an office; (ii) the Protector can be removed by the court; (iii) a point on Belize law, (iv) the judgment of Heath J in New Zealand.

*(i) The Protector is an office*

249.   The defendants argue that in the deeds the Protector is an "office" rather than simply being Mr Pugachev. They also note that the deed provides for remuneration. I am not persuaded any of this is a basis for finding that the powers are limited. It is true that the deed defines the Protector as a role or office which can be held by different people, but the First Protector is to be Mr Pugachev and he will remain the Protector unless he dies or is Under a Disability. Even then the next Protector would be Victor. At least while his father is alive, Victor would not be independent. The power to appoint a new Protector is vested in the Protector too, so Mr Pugachev could appoint a suitable successor. The fact that in principle a third party might end up as Protector in the future does not make any difference to the position today.

250.   The defendants submit that the fact that the first office holders are beneficiaries is unobjectionable, but while that may be so in some cases, what matters are the particular circumstances and the particular powers vested in the Protector in this case.

*(ii) The Court could remove the Protector*

251.   The defendants submit that the Protector would be amenable to being removed by the court and so Mr Pugachev and Victor could be replaced. However this argument is circular. It presupposes that there is a relevant fetter on the Protector's power, because breach of that limit would be the reason the court might remove a Protector.

*(iii) Belize law*

252.   Another of the defendants' arguments is that the power to change the governing law in clause 1.4 is not subject to the Protector's consent and so if the trustees were concerned about an excessive exercise of power by the Protector they could change the governing law to the law of Belize, which includes an express provision making the duties of protectors fiduciary in nature, subject to the terms of the trust (Belize Trusts Act 2000 s16(5)). This clever idea does not help. It is unreal to construe the deed by reference to such an idea.

*(iv) The New Zealand decision of Heath J dated 2nd October 2015*

253.   The defendants relied on Heath J's ruling that the removal of the original trustees by the Protector(s) and appointment of the new trustees was valid. I have addressed the judge's approach in law in the section on law above. He decided it did not matter whether or not the Protector was labelled a fiduciary because even if he was not, the

exercise of the powers was still subject to the court's supervisory jurisdiction and could be impugned if the exercise was for an improper purpose.

254. Before the court in New Zealand were the original trustees, the new trustees and three Discretionary Beneficiaries of the London Residence Trust – Mr Pugachev, Ms Tolstoy and Victor. The claimants were served with the application but elected not to participate (paragraph [17]). By the time the matter came to be decided the parties had agreed but the judge nevertheless decided to consider the validity of the removal of the original trustees independently since an order in the original trustees' favour was likely to be used as a shield to protect the original trustees against claims possible by third parties (paragraph [5]).

255. Heath J approached the matter by dealing with the London Residence Trust. He reviewed the powers of the Protector stating (at paragraph [25]):

> "While I have not attempted an exhaustive summary of the rights and powers of the Protector under the Declaration, the ones I have mentioned provide relevant context for a determination to be made about whether certain powers are to be regarded as fiduciary or personal in nature."

256. The removal instruments purporting to remove Kea Trust Company as trustee of the London Residence Trust were executed by Mr Pugachev and by Victor. That makes sense because at that time it was at least possible that Mr Pugachev was "Under a Disability" as a result of the effect of the UK freezing orders. If he was then Victor was the protector. So either one of the two individuals was Protector at that time.

257. In his witness statement before the New Zealand court Mr Patterson explained that while the instruments suggested on their fact that they were valid and effective, he was concerned they might be ineffective. Mr Patterson's concern was explained by Heath J in paragraph [28] as follows:

> "Mr Patterson's fundamental concern was that, if the Court were to take the view that the Protector's power to remove trustees was a fiduciary power that had been exercised improperly in the circumstances, removal may have been ineffective for that reason."

258. Heath J summarised the circumstances which led to the removal of the trustees in paragraphs [29] to [38]. Essentially Mr Patterson said that after reading the judgment of David Richards J on 30th October 2014 (about trust disclosure) he appreciated that the activities of the original trustees would come under "intense scrutiny". He (and Ms Hopkins) wished to take a cautious approach. On 15/16th June 2015 Mr Pugachev requested information from the trustees in his capacity as Protector. Mr Patterson refused on the basis that Mr Pugachev was no longer the Protector because he was "Under a Disability" as a result of the effect of the UK freezing order, and the trustees had had advice from New Zealand counsel to that effect. Mr Patterson said he was concerned that Ms Dozortseva was not assisting them, was being coy, and was acting in the interests of Mr Pugachev to the potential detriment of the interest of the trust beneficiaries as a whole. So on 14th July 2015 Mr Patterson and Ms Hopkins as shareholders of the original trustees resolved to remove Ms Dozortseva as director of

each trust company. That left Mr Patterson and Ms Hopkins in complete control of the original trustee companies. The removal instruments were executed on 24th July 2015. Mr Patterson's concern was about a possible claim by the claimants in this action, Mezhprom Bank and the DIA, against the original trustees. The point was that if the original trustees had not been validly removed then they ought not to have transferred the trust assets to the new trustees and if the claimants are entitled to enforce against the trust assets, the original trustees might be at risk in that case.

259.    The judge started his analysis at paragraph [39]. He had affidavit evidence from Mr Pugachev, Victor, Ms Tolstoy and Ms Dozortseva. The case put to him was that from their point of view the removal of Ms Dozortseva was unexpected. At paragraph [41] Heath J explained:

> *"[41] There is nothing in the evidence to establish that the Pugachev interests have sought to influence or control Ms Dozortseva's activities, directly or indirectly. Ms Dozortseva's removal as a director was seen, as Mr Sergei Pugachev put it:*
>
> > *'As an "unwarranted and impulsive course of action by Mr Patterson", as a result of which he had "lost confidence in Mr Patterson and his ability to act appropriately as a director" of the original trustees.'"*

260.    After making a point about the reason why both Mr Pugachev and Victor executed the removal notice, Heath J continued:

> *"[43] I have also received affidavit evidence from the three persons appointed as directors of the replacement trustees; Mr Smit, Ms Dozortseva and Mr Lenihan. On the face of it, all are qualified persons to act as directors of the replacement trustees and, except for the concerns expressed by Mr Patterson in relation to Ms Dozortseva's involvement, do not appear to be under the influence of Mr Sergei Pugachev.*
>
> *[44] I must accept the affidavit evidence of the witnesses to whom I have referred. They have not been cross-examined on their affidavits and there is nothing to suggest that there is anything inherently implausible about their evidence. Whether or not a different conclusion might have been reached if their evidence had been tested by cross-examination, I cannot say."*

261.    At this stage I note that the evidential position before Heath J was materially different from the position before me. It is perfectly obvious in this court that Ms Dozortseva is at all material times acting for Mr Pugachev and is under his influence. She is not independent at all.

262.    The judges' legal analysis has been addressed already. His conclusions are in paragraphs [51] to [53]. At [51] Heath J notes that the beneficiaries of the trust are members of the Pugachev family and holds that the Protector's powers must be taken in the best interests of that family. He notes that the family have lost trust and confidence in those responsible for directing the original trustees (i.e. Mr Patterson

and Ms Hopkins, as directors and shareholders of those trustee companies). Then at [53] the judge concludes that on the evidence before him, which he notes was uncontested, there is no reason to suggest that the Protector's power to remove the original trustees was exercised improperly.

263.    For my purposes the judge's decision at paragraph [51] is more significant than the conclusion at [53]. The latter is a finding on the facts based on different evidence than is before me. However at [51] Heath J finds that the Protector's powers, such as the power to remove a trustee, are to be exercised "in the best interests of the beneficiaries", by which he means all the Discretionary Beneficiaries, in other words the members of the Pugachev family. The claimants case before me is that there is no such fetter on the Protector's powers.

264.    It is true that one could reach the same result as the judge reached by concluding that there was no fetter on the power at all – and hence it could not have been exercised improperly – but that is clearly not the conclusion Heath J reached. This judgment firmly supports the defendants' case.

*The nature and scope of the Protector's powers – conclusion*

265.    There are good reasons why, in many circumstances, powers conferred on protectors like the ones conferred in this case should be found to be fiduciary in nature or at any rate subject to a requirement that the power is to be exercised to further the purpose of the trust, when the purpose of the trust is found to be to operate in the best interests of the beneficiaries as a class.

266.    A powerful factor in the defendants' favour is the first impression created by these deeds. At first glance these trusts are set up for a well defined class of Discretionary Beneficiaries which makes sense as a class. All the Discretionary Beneficiaries are members of the family of Mr Pugachev. Each trust has an ostensibly independent trustee and elaborate provisions deal with the trustee's powers. Given the conclusion above about the consequences if the Protector's powers are purely personal, construing the deeds that way renders quite a lot of the text superfluous.

267.    However I cannot construe the powers conferred on the Protector in these deeds in the same way as Heath J. In my judgment the true construction of these trust deeds is that the powers conferred on Mr Pugachev as First Protector are conferred to be exercised freely for his own benefit. Or put another way, considered objectively, the powers are personal powers conferred to give the Protector the ability to act in his own best interests. They are not constrained by a consideration of the interests of the Discretionary Beneficiaries as a class.

268.    The fundamental reason for why I reach this conclusion is having regard to the extensive nature of the Protector's powers combined with the fact that the First Protector is the settlor of all the trust assets and is also one of the named Discretionary Beneficiaries. If such extensive powers had been conferred on a third party as protector, with provisions barring that person from being a beneficiary, then I can see that a different result might follow but the fact it is a beneficiary on whom these powers are conferred militates against the idea of a limitation. One would expect a beneficiary ordinarily to be entitled to act in their own interests. Conversely if less

extensive powers were conferred on a beneficiary/protector then again one might arrive at a different result but that is not this case.

269.    The fact that Mr Pugachev is also the settlor reinforces the conclusion. Another different case would be if the settlor did retain these powers as Protector but was excluded from being within the class of Discretionary Beneficiaries. The purpose of conferring those powers in that case could well be to allow the settlor to retain a watchdog role because they would be unable to benefit personally from the exercise of the powers. But that is a long way from the facts of this case.

270.    I have considered whether it could be said that some of the Protector's powers are fiduciary while others are not. However construing these deeds as a whole, there is no warrant to read different limitations as applicable to some of the powers as opposed to others. Nothing in the deed supports such a conclusion.

271.    I suppose it might be said that since the deed does not identify the settlor, it is an inappropriate use of extrinsic evidence into take in account that the settlor is Mr Pugachev. I would reject that approach. The trustee (in effect Mr Patterson) knew that the person behind it all was Mr Pugachev. Furthermore, I doubt it is an accident that the document does not identify a settlor at all. By not showing on the face of the deed that the settlor is the same person as the First Protector and first named Discretionary Beneficiary, the deed does not make what is going on quite so stark.

272.    The fact that the power of removal of trustees is expressed to be "with or without cause" is significant. In the context of all the other factors in this case, to go to the trouble of saying expressly that removal of a trustee may be without cause seems to me to negative any idea that the power is subject to a limitation of any kind. If the Protector had not been the settlor (nor a Discretionary Beneficiary) then I can see that those words might not be read in the same way (cf *Davidson* in which the Protector was neither a settlor nor a beneficiary). Even before Heath J it was not so clear on the evidence before him as it is before me that Mr Pugachev was the settlor (see paragraph [38].)    But on its face the document confers a power on the settlor to remove trustees without cause.

273.    This construction renders much of the deed superfluous but that is not a strong enough factor set against the others to lead to a different conclusion. The language used to refer to the Protector's powers is wide. The fact that the trustees' obligations are fiduciary does not support the proposition that the Protector's powers must also be fiduciary.

274.    It may be the case that for some trust deeds one can say that the trust is for the family (as a whole) rather than for one individual, or one can say that the purpose of the trust is to promote the interests of the Discretionary Beneficiaries as a whole as opposed to one individual. However the deeds here do not expressly identify what the purposes of the trusts are. While the Discretionary Beneficiaries are all members of the same family, to correctly construe the deed account needs to be taken of the Protector's powers. So to construe these trust deeds by identifying the purpose of the trusts takes one back to all the other factors under consideration.

275.    I believe the provisions about the Protector being Under a Disability defined as to include a disability by operation of law support the same conclusion. The

arrangements have been set up so that if the Protector is subject to a court order requiring him to do something he does not want to do, he ceases to be the Protector and his son Victor stands in his place.  If required to act against his will Mr Pugachev can truly say to the court that he has none of the Protector's powers.  If the Protector's powers under the deed were limited to acting only in the best interests of the Discretionary Beneficiaries as a class, rather than in his own selfish interests, then I doubt this provision would be necessary.  What it does is allows Mr Pugachev's effective complete control of the trusts to cease to exist the moment he is compelled to do something he does not want to do, like hand over the assets to a creditor.  It is an attempt to make the trust judgment proof and should not be accepted.

276.    The trust deeds are not identical but I do not believe the differences are significant enough to matter.  The defendant's best case would be whether the unique residence clause in the London Residence Trust makes any difference.  I do not believe it does.  While he is alive the right of residence is given to Mr Pugachev and clause 4.6 allows him to direct a sale, with the proceeds becoming general trust assets.

277.    In the other trusts the class of Discretionary Beneficiaries is more focussed on the children of Ms Tolstoy's union with Mr Pugachev (but not entirely).  That does not make any difference.

278.    I conclude therefore that on their own terms these trusts do not divest Mr Pugachev of the beneficial ownership he had of the assets transferred into them.  In substance the deeds allow Mr Pugachev to retain his beneficial ownership of the assets.

### *The Sham claim*

279.    The claimants' sham claim is put on the footing that if they are wrong on the True Effect of the Trusts claim, and therefore the assets held in the trusts do not beneficially belong to Mr Pugachev, then they contend that each of the deeds of trust is a sham because it was the intention of the parties that the assets should continue to belong to Mr Pugachev.  Nevertheless although it is easy to state the sham claim as a simple alternative to the other claim, in fact they are interrelated and the way the points were argued bore that out.

280.    By closing, the claimants put their case on the facts under eight headings:

    i)      The express basis for establishing the Trusts.

    ii)     Only Mr Pugachev's intentions matter.

    iii)    Mr Pugachev's character.

    iv)     The timing of the establishment of the Trusts.

    v)      The operation of the trusts.

    vi)     The false evidence given by those involved in the administration of the trusts.

    vii)    The appointment of the New Trustees to do Mr Pugachev's bidding.

    viii)   The role of Victor.

281. Some of these topics are more useful than others. The claimants continued assertion that only Mr Pugachev's intentions matter just obscured the issues when even the claimants accepted that the state of mind of the trustees was relevant. A focus on Mr Patterson is a vital aspect of the issues I have to decide. In order to clarify the analysis, I have reorganised the topics to consider into the following:

    i)      The subsidiary characters –Ms Hopkins and Mr Pugachev's associates

    ii)     Mr Pugachev

    iii)    Mr Patterson

    iv)    The establishment of the trusts

    v)     The operation of the trusts

    vi)    The loans and the appointment of the New Trustees

282. Once I have addressed these topics I will stand back and consider the issues as a whole and draw conclusions.

*(i) The subsidiary characters –Ms Hopkins and Mr Pugachev's associates*

283. Ms Hopkins is married to Mr Patterson and they are partners in the firm Patterson Hopkins. She did not give evidence. To the extent the evidence relates to Ms Hopkins at all, she was clearly working closely with Mr Patterson throughout. Mr Patterson did not suggest that Ms Hopkins exercised any independent judgment as a director or shareholder of the trustee companies. Based on everything I have seen, it is sufficient to consider Mr Patterson alone; there is no need to consider the position of Ms Hopkins separately.

284. Mr Pugachev's associates include his son Victor as well as Ms Dozortseva, Mr Liechti and the individuals at Galaxis – Mr Lussato and Mr Gurdjian. I have addressed the position of Victor already. He did not act independently of his father. As for the other associates mentioned here, I find that they do not and did not ever act independently of Mr Pugachev. Mr Liechti, Mr Lussato and Mr Gurdjian all worked in Mr Pugachev's family office at different times and it is not surprising that they would not have exercised any independence from Mr Pugachev. They can all accurately be called Mr Pugachev's lieutenants.

285. Ms Dozortseva is in a different position. She was head of legal in Mezhprom Bank and her precise relationship with Mr Pugachev is not clear. I find that Ms Dozortseva was not independent of Mr Pugachev and is another person who can accurately be regarded as one of Mr Pugachev's lieutenants. This conclusion is based on two matters. One is the evidence as a whole. This shows that once Ms Dozortseva comes on the scene as far as this case is concerned she relays Mr Pugachev's instructions to Mr Patterson and is closely involved in the trusts from then on. Her involvement seems to have started in about March 2013 when she was introduced to Mr Patterson by Mr Gurdjian as someone who works for Mr Pugachev. The other matter is Ms Dozortseva's close relationship with the attempt to adjourn this trial. There is strong evidence that she played a part in dishonestly instructing the firm Hughmans that Mr

Pugachev was unaware of the details of these proceedings until May 2017. Ms Dozortseva was one of the people giving instructions to Mr Jenkins at Hughmans and yet she had accepted service of the relevant papers personally on Mr Pugachev's behalf a year before, in June 2016 (see [2017] EWHC 1847 (Ch) paragraphs 27, 30 and 31).

*(ii) Mr Pugachev*

286.    A critical question in all this is to decide what were Mr Pugachev's intentions in setting up these trusts and transferring his assets into them. Since I have not heard from Mr Pugachev himself on this, I have to draw inferences.

287.    The defendants' evidence, some of which was unchallenged (from Ms Tolstoy's parents) is that at various times Mr Pugachev said he was setting up trusts for his children by Ms Tolstoy and that they would be provided for. There is no reason to doubt that evidence and I find that Mr Pugachev did make statements of that kind on the various occasions throughout his relationship with Ms Tolstoy.

288.    However just because that is what Mr Pugachev said to Ms Tolstoy and her parents, it does not follow that it reflects his true motives either at the time or in general. Ms Tolstoy gave clear evidence that Mr Pugachev is a complex character who can be charming but can also be selfish and manipulative. She accepted that he had lied to her. This is illustrated by two examples. One is from June 2011 when the couple were looking for a London residence. They made on offer on a property in Tite Street but then Mr Pugachev pulled out of the deal without telling Ms Tolstoy. Ms Tolstoy sent an email to Mr Pugachev in Russian which in translation includes the following:

> *"You have no conscience. ... Why are you so dishonest not telling me the truth, and behind my back doing completely different to what you say to me. ... You're such a coward that you always force me to be between you and your debts. I'm ashamed how dishonestly you act. My parents brought me up not to lie and cheat. ... "*

289.    The other example of a lie is from later in 2012. This related to the London Residence Trust. Ms Tolstoy had asked for Victor to be removed as Protector because she did not trust him and had also asked for herself and her children to be removed from the London Residence Trust because their status as beneficiaries was meaningless. Her evidence is that at some point after July 2012 Mr Pugachev told Ms Tolstoy that Victor had been removed as a Protector but that turned out not to be true.

290.    Ms Tolstoy also accepted that she had described Mr Pugachev as controlling and a control freak.

291.    In addition, although Mr Pugachev did not give evidence before me, I refer again to the attempt to adjourn the trial. Mr Pugachev must have been ultimately responsible for the instructions given to Hughmans. The claimants also referred to earlier instances in this litigation in which judges have found that Mr Pugachev gave false evidence. One of the contempts of court found by Rose J was that Mr Pugachev had given false evidence with no honest belief in its truth.

292.    I have accepted that Pugachev adores his children. I do not doubt he truly did and still does intend that his children should benefit from his wealth. All the more so when he was living with Ms Tolstoy and the children. But that is different from saying that at any time he intended to part with ultimate control of the underlying assets in favour of the trustees (or the other Discretionary Beneficiaries aside from himself). The fact he wanted to look after his family is not inconsistent with the idea that he wanted to retain control. Nor is the fact that Mr Pugachev allowed the family to benefit from the trust assets for a number of years. The fact Mr Pugachev and his family enjoyed the use of the trust assets while it suited Mr Pugachev to do so is not reliable evidence of what he really intended in the long run.

293.    Mr Pugachev's personal relationship with Ms Tolstoy gave him an obvious motive to tell her and her parents that she and the children were and would be provided for by trusts. Given his manipulative character I do not accept that these statements by Mr Pugachev bear much weight in support of an inference that Mr Pugachev intended to cede control of trust assets.

294.    A point made by the defendants is that Mr Pugachev seems to have given wealth to his adult children Victor and Alexander. This refers to different assets from the ones transferred into the trusts in issue. This submission is that one can see that Victor and Alexander live in valuable homes given to them by Mr Pugachev and have wealthy lifestyles. The invited inference is that Mr Pugachev has transferred substantial assets to them outright and so he is likely to have wished to do that for his infant children too. This is a reasonable point but it cannot be taken very far. The assumption that the homes of Victor and Alexander came from Mr Pugachev but now belong to the sons beneficially is reasonable although it is only an assumption. It makes it plausible to suppose that Mr Pugachev may also transfer some of his wealth outright to his other children at some stage. However it does not mean he meant do that in 2011 or 2013, when they were infants.

295.    Another point made by the defendants is that at the relevant time the assets in these trusts represented a small fraction of Mr Pugachev's enormous wealth. This is deployed to support an inference that the trusts were more likely genuinely intended to benefit the children and not to protect Mr Pugachev's wealth. In effect the argument is that Mr Pugachev could afford to give it away. The defendants support this argument by criticising the claimants for not giving disclosure about the true state of Mr Pugachev's wealth, the suggestion being that the claimants are well aware that the trust assets are a small fraction of Mr Pugachev's wealth.

296.    This point cannot be taken too far either. Given all the steps being taken by the claimants worldwide against Mr Pugachev I am sure they have more information about his assets than they have disclosed. So it would be wrong to base any inference about the assets in this case on a view that at the time the trusts were set up they represented a substantial fraction of the value of Mr Pugachev's overall wealth or even his accessible wealth outside Russia. However what these trusts do have in common is that they relate to real property. The Wiltshire Residence Trust would have held real property too although the transaction failed. Although the way in which the holdings work through different companies varies, at the heart all these trusts are concerned with land and buildings. The significance of that is that those assets are secure but visible. That is another factor which can be taken into account.

297.    A further point is a rhetorical question – why go to the trouble of naming different classes of Discretionary Beneficiaries in the 2011 trusts from the 2013 trusts if they are all shams. The premise is correct. While the 2013 trusts all have the same Discretionary Beneficiaries as each other, the London Residence Trust from 2011 is different. The differences are summarised above. However the reason the differences in the Discretionary Beneficiaries does not matter is because the sham, if it exists, may not be concerned with who they are, but with how ultimate control over the trusts works.

298.    The conclusions about Mr Pugachev's intentions will be drawn after considering all the other topics but at this stage I can say this. The evidence shows that Mr Pugachev has two important characteristics. He is not a person who would lightly relinquish control of anything and he is a person quite willing to lie and put forward false statements deliberately if it would suit his purpose. The circumstances as a whole and Mr Pugachev's character support a credible inference that one of Mr Pugachev's purposes in transferring the property into these trusts was what is euphemistically called "asset protection", in other words to hide them from possible claims, facilitate a plausible denial of ownership, while retaining control in fact.

*(iii) Mr Patterson*

299.    I must examine Mr Patterson's position carefully. He is a very experienced solicitor. He drafted the trust deeds and set up the trusts and the trust companies on instructions from Mr Pugachev's family office. Mr Patterson and his wife were the shareholders in the trust companies and were directors, along with Mr Liechti or Ms Dozortseva. Mr Patterson looked after all the paperwork concerning the administration of the trusts, drafting various resolutions for the different entities – resolutions of trustees, resolutions of the directors of the trust companies and shareholder resolutions.

300.    I will refer to Mr Patterson as a "trustee" for convenience even though he was in fact a director of the trustee company. It is clear Mr Patterson thought of himself that way and it is convenient anyway because Ms Hopkins was not independent. The point about the other directors of the trustee companies is addressed separately.

301.    The claimants contend that in fact Mr Patterson had no intention independent of Mr Pugachev when the assets were transferred into the trusts and was willing to go along with whatever Mr Pugachev wanted. This submission was founded on the following major points: the criticisms of Mr Patterson as a witness, an examination of what passed between him and Mr Pugachev's family office at various stages, particularly when the trusts were established, and the submission that during the operation of the trusts Mr Patterson did not behave as a normal trustee either at all, or at least until the worldwide freezing orders were made and he realised that the trusts were going to be scrutinised and the impression they might be shams needed to be dispelled.

302.    To the contrary the defendants reject the criticisms of Mr Patterson as a witness and argue that the evidence about the administration of the trusts is selective and does not establish the claimants' case. Also the defendants argue that while in cross-examination of Mr Patterson the claimants always focussed on Mr Pugachev's intentions, they never addressed Mr Patterson's intention himself. They rely on his answers in re-examination that he did not intend Mr Pugachev would have complete control over the assets in the trusts, that from Mr Patterson's point of view Mr

Pugachev was not the absolute owner of the trust assets and that Mr Patterson had no intention to relinquish control over the trusts to Mr Pugachev.

303.   I will say at the outset that I was not convinced by the claimants' attempt to show that once the trusts were set up, Mr Patterson's day to day administration of them overall indicated that he was not behaving as a trustee would.  The claimants' case was stronger concerning the 2013 trusts than the 2011 London Residence Trust but still not persuasive.  I address the detail below.  The reason for mentioning this at this stage is because while I reject that part of the claimants' case, I am not convinced this issue was as important a point as it appeared from the way it was argued.  Mr Patterson was an experienced professional.  He knows how a trustee ought to behave and even before the possibility of scrutiny became overt after the freezing order, he will always have had that in mind.  It would not be surprising if an experienced person like Mr Patterson acted ostensibly as a trustee at a time when Mr Pugachev was not seeking to exert the kind of control over the assets which would undermine the appearance that Mr Pugachev had ceded control to the trustees.  The period running up to the replacement of the Original Trustees with the New Trustees will be addressed separately.

304.   What really matters in this case is not Mr Patterson's position as trustee (or director of the trustee companies).  I do not think it was ever intended to be a sham on any view. The point can be tested this way.  Assume that the relevant persons setting up the trusts all intended that control of the assets was to remain with Mr Pugachev.  The first clever thing about the trust deeds here, if that is their purpose, is that the only aspect which would need to be a sham in order for the trust deeds to mislead anyone would be the status of the Protector (Mr Pugachev and Victor) as a fiduciary.  As I have already held, if the Protector's powers are purely personal and not fiduciary then control has not been relinquished at all anyway.  In that case the deeds simply fulfil the assumed purpose.  They are not shams.

305.   However whether or not Mr Pugachev as Protector is a fiduciary, the trustees can always behave exactly as trustees would because that is not how Mr Pugachev's control is exercised under these deeds.  The trustees do not have to do anything contrary to their fiduciary duties for Mr Pugachev to retain control if he is not a fiduciary.  Moreover, since trustees always pay some regard to the intentions of the settlor, there would be nothing odd about them doing so (as long as it did not go too far).

306.   But the situation would be cleverer still, again assuming the relevant persons setting up the trusts all intended control to stay with Mr Pugachev.  That is because the second thing about these deeds is that the putative status of the Protector as a fiduciary is not stated expressly at all.  The deeds leave it unspoken.  So if a court, when faced with the Protector's powers, construed the deeds so as to read in a limitation on their exercise which is not stated expressly, the court itself would be fulfilling the shammer's purpose for them.

307.   With this in mind, what really matters when considering Mr Patterson's state of mind not what he thought with respect to his own position as trustee, but is what he thought with regard to the position of Mr Pugachev as Protector under these deeds.  That issue requires careful scrutiny.

*Mr Patterson as a witness*

308.    Mr Patterson said in his statement he was giving evidence out of a moral obligation to the beneficiaries.  However Mr Patterson was not impartial.  He was well aware that his position as a professional was at stake in these proceedings.  Also he was paid for his evidence (not only his travelling costs).

309.    A major criticism of Mr Patterson relates to evidence he gave at the interlocutory stage in the context of disclosure of information about the trusts.  The trusts were named in a schedule to Stephenson Harwood's letter of 23rd July 2014.  All that was revealed was that Mr Pugachev was "*one of a class of discretionary beneficiaries under the following New Zealand based trusts …*".  The position taken at the time was that it was not incumbent on Mr Pugachev to identify the "*settlors, trustees, beneficiaries, protectors (if any) and assets of the trust, nor copies of the deeds of trust*".  The trustees applied to discharge an order ancillary to the freezing order which required disclosure about the trusts.  In support were witness statements from Mr Patterson on behalf of the trustees.

310.    The claimants submit that the result which Mr Patterson was hoping to achieve was that the disclosure order would be discharged if the Original Trustees gave an undertaking not to make any distributions from the trusts to Mr Pugachev without first notifying the claimants.  His evidence was intended to demonstrate that he was a responsible individual and that there could be no leakage from the trusts without his knowledge and approval.  I agree.  That is a fair summary of what was going on.

311.    The claimants rely on a number of statements made by Mr Patterson in his interlocutory witness statements.  The claimants say each of the statements was seriously misleading and some were false.  I will address them in turn but in doing so I also must bear in mind the point made by the defendants' counsel that a lot of what the claimants advance as criticisms of Mr Patterson were not put squarely to the witness.  That is a legitimate point and in undertaking this exercise I will have in mind those matters for which I have Mr Patterson's direct response and those I do not.  The latter may have much less weight than the former, or no weight at all.

*(a) Dealings in trust assets without Mr Patterson's knowledge and agreement*

312.    The first statement relied on is in paragraph 2.3 of Mr Patterson's first witness statement:

> "*2.3 Each of the five Trusts is a discretionary trust domiciled in New Zealand and governed by New Zealand law. The Trustees are all New Zealand incorporated companies. The sole shareholders of each of the Trustee companies are me and Ms Hopkins. I am also a director of each of the Trustees companies. In one of the Trustee companies Ms Hopkins is my codirector, in two of the Trustee companies Ms Natalia Dozortseva is my co-director, and in another of the Trustee companies my co-directors are both Ms Dozortseva and Ms Hopkins. It is consequently not possible for the Trust assets to be dealt with without my knowledge and agreement.*"

*(claimants' emphasis)*

313.    The claimants also point out that the statement was reiterated Mr Patterson's second witness statement at paragraph 52, with additional reliance on Mr Patterson being *"a New Zealand solicitor of long standing, regulated by the New Zealand Law Society"*.

314.    The claimants made a number of particular allegations to falsify the statement but during the trial further documents were added to the bundles which dispelled some of the points.  There was a suggestion that in Mr Patterson had "very little knowledge" of what was put into the Riviera Residence Trust and the Green Residence Trust.  As points sufficient to suggest that Mr Patterson misled the court in 2014, this was not established.  For the Riviera Residence Trust I find that Mr Patterson did know that the Sand Club villa in St Barths was a major asset, knew essentially what it was and how it was held, through Sand Club SCI and ultimately via Topaze.  He also knew how to get more information if need be (from Ms Dozortseva).  Similarly he knew the same sort of information about the other major asset – the Swiss property held via Romy Finance.  He did not know about the shares in Hediard Monaco but they were of little value and that is a minor matter.  For the Green Residence Trust, again Mr Patterson knew what the major asset was (the Gorki property), how it was held (via Lenux) and how to get more information - from Ms Dozortseva.

315.    However these were not the only points.  A further point was about Sand Club.   It was clear that although Mr Patterson was aware in a very general sense how the finances of Sand Club were run, through a managing company called Sibarth, he did not know about payments made to Ms Tolstoy from Sibarth.  These were effectively living expenses for Ms Tolstoy and her children while they were staying at Sand Club of the order of tens of thousands of pounds.  The payments were made out of income from renting out Sand Club at times when the family were not in residence.  This way of funding Ms Tolstoy's lifestyle in Sand Club had taken place before Sand Club was put into the trust but it continued afterwards too.  Once the shares in Topaze were in the Riviera Residence Trust, these funds were something the trustee ought to have been concerned to know about.  Mr Patterson's answer to this in cross-examination was that the sums were modest and it was not a case of someone fraudulently taking millions of pounds out of the trusts.  The sums were indeed much less than millions but they are not trivial and the fact remains that he did not know about them.  This undermines the reassurance Mr Patterson sought to give to the court in his evidence in 2014.   The fact it would have been picked up in the accounts prepared later (which were overtaken by the freezing order) is no excuse.

316.    At one stage Mr Patterson sought to rely on the fact that strictly speaking the trust assets were just the shares in companies which ultimately held the property.  That will not do.  It does not reflect the manner in which Mr Patterson actually undertook his duties at the time, no doubt because the deeds do not include a "anti-Bartlett clause" to oust the trustee's duty to enquire into the affairs of trust-owned companies (***Bartlett v Barclays Bank Trust Co*** [1980] 2 WLR 430 at 442).   For the same reason it is convenient to refer to the properties as being held in the trusts even though that is not accurate, instead of repeatedly referring to the corporate structure.

317.    Finally the claimants submitted there were ways in which Mr Pugachev himself could deal with trust assets without Mr Patterson's knowledge or approval.  They relied on

three ways of dealings with assets, at least two of which Mr Patterson himself was actually aware of, further undermining the truth of his evidence to David Richards J.

318.    The first way of dealing with the assets exists because in October 2013 Mr Pugachev was made a joint signatory with Mr Liechti for the "Kea client account" held in the name of Oakhill at Barclays Bank in London for sums over £25,000. There is a mandate form to that effect signed by Mr Pugachev and Mr Liechti. Mr Patterson knew nothing about it and said he was not sure it had ever been implemented. The account was clearly an account for one of the trust companies but given the name changes it is not clear which one. Since there is no evidence this mandate was in fact implemented this point cannot be taken any further in respect of Mr Patterson.

319.    The second allegation is that Mr Pugachev as Protector (via Victor acting on his behalf) was a person authorised to approve expenditure by Oakhill on refurbishment of Old Battersea House. That was clearly true because there is a resolution to that effect of the Kea Trust Company as trustee of the London Residence Trust dated 3rd May 2012 and signed by Mr Patterson and Mr Liechti as directors of the trust company. All the trusts' bank accounts were held by Oakhill. Clause 5 of the resolution provided that Oakhill could approve payments of invoices up to £25,000 without further reference to the trustee while expenditure in excess of a £25,000 as a single payment "can only be approved by [*Oakhill*] upon receipt of email confirmation from Victor Pugachev on behalf of the Protector".

320.    That this authorisation existed was not disputed. The arrangement was that after payment had been made, Mr Patterson would receive schedules of the invoices, so the payments would be with his knowledge, after the event, but the arrangement does mean that Mr Pugachev could authorise the spending of substantial trust money without Mr Patterson's agreement or, at the time the money was spent, his knowledge.

321.    The third allegation is that Mr Pugachev was authorised to give instructions to the Isle of Man administrator company "Andco" which was the administrator of the Isle of Man company Redflame which owned the Glebe Place property which Mr Pugachev and Ms Tolstoy were living in. The shares in Redflame went into the Kea Three Trust on 8th August 2013. A few weeks later on 2nd September 2013 a corporate services agreement was signed by (i) Mr Patterson and Mr Liechti as directors of Kea Trust Company as trustee of the Kea Three Trust, (ii) the directors of Redflame, and (iii) the directors of Andco Corporate Services Ltd. The agreement was for Andco to administer Redflame. In the agreement (Clause 2.2 and Schedule 2) Mr Pugachev is named as an agent for the trustee who is authorised to give Andco instructions in all matters concerning Redflame and its business. Mr Liechti is also similarly named as an agent on the same basis but his authority is limited to property management only and to sums up to £25,000 whereas Mr Pugachev's authority is unlimited. Ms Dozortseva is also named as an agent in the same unrestricted way as Mr Pugachev.

322.    Mr Patterson was clearly well aware of this issue, recognising in cross-examination that "*it probably calls for an explanation*". His explanation was that under the terms of the tenancy between Redflame as landlord and Mr Pugachev as tenant of Glebe Place, Mr Pugachev had the right to direct the landlord to proceed with combining the two properties (53 and 54). He said "*so it didn't seem extraordinary*". Mr Patterson also sought to downplay the scope of the authority given to agents like Mr Pugachev in the relevant schedule to Andco agreement, saying it was a "*pretty standard type of*

*agreement*". However the schedule expressly includes handling the day to day affairs of the company including signing cheques. I reject the idea that the tenancy agreement relating to Glebe Place justifies Mr Pugachev having such unrestricted authority to instruct Redflame.

323.    Although it is a different point, it is convenient at this stage to mention the point on rent. The family appear to have lived in Glebe Place rent free at all times including after the trust was declared but an explanation was provided and not challenged by the claimants and so I find nothing turns on the rent or lack of it.

324.    With these points in mind I have looked again at the passage in Mr Patterson's witness statement before David Richards J. When Mr Patterson said it was not possible for the trust assets to be dealt with without his knowledge and agreement, he was asserting that this was so as a consequence of his and Ms Hopkins' position as shareholder and directors of the trustee companies (along with Ms Dozortseva in some cases). That evidence was wrong. It was not put to Mr Patterson that this was a deliberate lie and I will not draw such an inference. However I cannot accept this was a mere slip. It was a reckless thing for Mr Patterson to say.

*(b) and (c) Mr Pugachev as settlor*

325.    The next statements by Mr Patterson relied on by the claimants as misleading and false are in the first and second witness statements, as follows:

> *First Witness Statement*
>
> *"2.4 The Defendant is one of a number of discretionary beneficiaries of each of the Trusts. As such, the Defendant has no proprietary interest in the Trust assets under the law of New Zealand. I understand the claimants have suggested in correspondence that the Defendant is the Protector of each of the Trusts. That is not now correct. The Trustees sought and obtained advice from leading counsel in New Zealand (the privilege in which is not waived) the effect of which is that the Defendant has ceased to be Protector of the Trusts as a result of the Orders made in these proceedings.* <u>*The claimants have also I understand asserted that the Defendant is probably the settlor of each of the Trusts. That is also incorrect. Each trust was constituted by a declaration of trust by the trustee. Assets were placed into the Trusts.*</u>*"*
>
>  *(claimants' emphasis)*

326.    So here Mr Patterson had said that the claimants' assertion that Mr Pugachev was probably settlor for each of the trusts was incorrect and then referred to the fact that the trusts were constituted by a declaration by the trustee, the point being that the trustees were not Mr Pugachev not least because all the trustees were companies. However as the claimants point out, Mr Patterson knew very well that since the trusts were foreign trusts under New Zealand law, a New Zealand company could not be the settlor anyway.

327.    In any case Mr Patterson clarified his evidence in reply in his second witness statement:

> Second Witness Statement
>
> *"45. Mr Roberts states (at paragraph 50 of his statement) that the claimants do not accept my explanation of why the suggestion that Mr Pugachev is probably the settlor of each of the Trusts is incorrect, and further states that the it is the claimants' position that, if the Trustees made declarations of trust following which assets were gifted into the Trusts, the Trusts Disclosure must identify who gifted the assets to the Trusts, i.e. the source of the assets subject to the Trusts. <u>It may assist if I make clear that, when I was stating that Mr Pugachev is not the settlor of each of the Trusts, my reference to the settlor was intended to refer not only to the person or persons who declared the Trusts, but also those who placed assets into the Trusts."</u>*
>
> *(claimants' emphasis)*

328.    Now as I read this, it is a statement that Mr Pugachev is not the settlor of the trusts. But that is not true. Regardless of the point about whether Victor was a nominee for Mr Pugachev in relation to some transfers into the trusts, Mr Pugachev himself placed the shares in Redflame into the Kea Three Trust and he placed the shares in Topaze and in Romy Finance into the Riviera Residence Trust. The truth was that Mr Pugachev was the settlor of some of the trusts and possibly all of them and the companies who declared the trusts were not the settlors at all. However, as the claimants say, to reveal that would have strengthened the case for maintenance of the trust disclosure order, which is the opposite of Mr Patterson's objective.

329.    The point that Mr Patterson was saying that Mr Pugachev was not the person who put assets into the trusts was put to him in cross-examination. His answers were telling. He said that that was not what he was saying, that his words had been taken out of context and that he did not believe anything about his statement could mislead anyone. He also explained that the witness statements had been "crafted" (Mr Patterson's word) to respond to the claimants' allegations in Mr Roberts' evidence and he agreed that his own witness statements had been very carefully considered. His explanation for the wording was that he was responding to wording used by Mr Roberts in which Mr Roberts asserted that Mr Pugachev was probably the settlor of "each of the trusts" which meant Mr Roberts was asserting that Mr Pugachev was probably settlor of all of them. So in his response Mr Patterson used the term "each of" to mean "all of" and so from his point of view the statement was not untrue because Mr Pugachev was only settlor of two out of the five trusts. Mr Patterson also made clear that throughout all this exercise, his approach was that he was not willing to provide any information about the trusts whatsoever unless ordered to do so. He denied that his evidence was misleading and denied any intention to mislead the court.

330.    Now in fact the statement does appear to have misled David Richards J but I will come back to that.

331.    Before me the defendants' submissions on this are (i) to emphasise that the trustees did not want to defeat the purpose of the application to discharge the trust disclosure order and breach the confidentiality of the trusts by providing information under challenge and (ii) to submit that the statement was "not forthcoming" but was "accurate in the sense that Mr Pugachev was not settlor of each (all) of the trusts." Counsel submitted that Mr Patterson is in his late 70s, a thoroughly decent man, who has been involved in trusts for ages, was a public trustee before going into private practice and is regulated as a solicitor. He was fully aware of the consequences of a finding of sham against him at the end of his career. Counsel also submitted that this point was being magnified by the claimants out of all proportion.

332.    I have these submissions well in mind but I cannot accept the defendants' attempt to play down the significance of this evidence from Mr Patterson. This was important evidence. I listened very carefully to Mr Patterson's testimony when these points were put to him. I was not convinced by his answers. In my judgment the best that can be said is that Mr Patterson rationalised a deliberate attempt to misdirect the court and the claimants by using language which he knew would most likely be understood in one natural (false) sense but which he thought he could rationalise as having a different (true) meaning. That is not acceptable behaviour. If Mr Patterson is prepared to do that in relation to this important issue, I doubt I can rely on anything Mr Patterson says unless it is supported by the documents.

333.    The point about David Richards J being misled is this. Paragraph 17 of the judge's judgment is as follows:

> "Mr Patterson states that Mr Pugachev was not the settlor of any of the trusts which were constituted by declarations of trust by the trustees. He states that assets were placed into the trusts and in his second witness statement, he states that Mr Pugachev did not place any assets in the trusts."

334.    Of course this is not correct. When the draft judgment was circulated to the parties, a note was sent to the judge suggesting changes to this paragraph. The changes would have altered the wording to follow the wording of Mr Patterson's witness statements but did not explain to the judge what the point actually was. David Richards J did not alter the paragraph. In the Court of Appeal, Lewison LJ at paragraphs 34-35 clearly thought there was something odd about this part of Mr Patterson's evidence, noting that whether it was a categorical denial that Mr Pugachev placed or caused to be placed assets into the trusts is hard to say. Mr Patterson did not know whether the representatives of the trustees in the Court of Appeal made sure that the court was not misled in the way David Richards J was.

335.    The claimants levelled a separate criticism at Mr Patterson for not ensuring the problem was explained properly to the court after David Richards J's draft judgment was given. However it is not clear that Mr Patterson was involved in that exercise and I do not accept that as a separate criticism of him.

(d) *Not aware of any basis for the trusts being shams*

336.    In paragraph 4.2 of his first witness statement Mr Patterson said "*Neither I nor Ms Hopkins is aware of any basis on which it could be said that the Trusts are shams.*"

The claimants submit that this statement is not accurate because before the allegation of sham was raised by the claimants, there is evidence of Mr Patterson discussing it with Ms Dozortseva. In an email of 8th September 2014, after the first freezing orders were made, Mr Pugachev asked the Kea Trust Company as trustee for a loan of £½ million to cover various living expenses in France and tax liabilities. At this stage Hogan Lovells for the claimants were contesting certain payments to Mr Pugachev. Mr Patterson responded to the loan request with various questions about trust assets. These questions are part of the basis on which the claimants contend Mr Patterson lacked awareness of trust assets and so did not behave like a trustee until the scrutiny started. The email includes statements by Mr Patterson such as "*I need to understand where in the trust structure certain assets stand ....*" and questions to Ms Dozortseva like "*Is the flat in Monaco a trust asset?*" (the answer was no). In order to help persuade Ms Dozortseva to answer the questions Mr Patterson also wrote:

> "*It is important that we keep in mind that the trustee has responsibilities that effectively are those of the directors. It will not help us defend the sham trust argument if we are seen not to be acting independently.*"

337.   The claimants say this shows that Mr Patterson knew his role hitherto had been merely as a corporate services provider rather than as trustee and that all relevant decisions were made in London. That goes too far, nor was the point put in cross-examination. All the same, given Mr Patterson's own knowledge and experience, he is likely to have been alive to the possibility that an allegation of sham might be made about these trusts. The email indicates that defending against such an argument was part of his thinking.

338.   There is plenty of evidence that Mr Patterson regarded Mr Pugachev as "the client" and "the principal", which he clearly was. It supports the point that Mr Pugachev was the settlor for all the assets but it does not show the deeds were a sham. However there is also evidence of Mr Patterson using the term "UBO". The term is used by Mr Patterson in an exchange of emails on 6th September 2013 with Mr Liechti. UBO stands for ultimate beneficial owner. Of course the idea that Mr Pugachev is the "UBO" of the assets is the claimants' case in a nutshell and is flatly contrary to Mr Patterson's position that as a Discretionary Beneficiary Mr Pugachev has no proprietary interest in the trust assets (c.f. paragraph 2.4 of his witness statement quoted above).

339.   Mr Patterson accepted in cross-examination that in the email he was referring to Mr Pugachev. The emails were about arranging a meeting between Mr Patterson and "the UBO". It is a relatively casual reference in the email but it is not without significance. Mr Patterson was clearly comfortable using that term in relation to Mr Pugachev.

340.   I do not doubt that in his interlocutory evidence Mr Patterson wanted to assert that the trusts were not shams but when he said that he was not aware of any basis on which the trusts could be said to be shams, that was not a candid remark.

*(e) only link to the OPK trusts was as corporate administrator*

341.    The name OPK relates to the companies which held some of Mr Pugachev's very substantial Russian assets, such as the Mezhprom Bank itself.  The claimants noted that the registered address of two OPK companies was Mr Patterson's address in Auckland.  In his second interlocutory witness statement (paragraph 35) Mr Patterson addressed that and said "*the only connection that any of the Trustees have to the* [OPK Trusts] *is that the registered address of the trust companies which acted as trustee of those trusts was that of my firm, my firm having simply acted as corporate administrator for them, with no other broader role.*"

342.    The claimants focussed on the fact that the OPK trust deeds had been used as the template for the trust deeds in this case.  That was true.  The significance of this is a letter from Patterson Hopkins dated 19th August 2009 about the OPK Trust Company and OPK Trust and addressed "to whom it may concern".  The letter explains that Patterson Hopkins are legal advisers to OPK Trust Company Ltd and OPK Trust (cf the assertion in his witness statement that the firm was merely corporate administrator) and goes on to give an opinion concerning the ownership and controlling structure of the company and the trust.  Like the trusts in this case, the OPK trust has a New Zealand company trustee.  The sole director and sole shareholder was a David Henderson-Stewart with an address in Russia.  Mr Henderson-Stewart is a solicitor who seems to have been acting for Mr Pugachev at that time.  The trust has a protector. The initial protector is Mr Pugachev.

343.    The deed itself was not in evidence.  The letter sets out a summary of the relationship between the powers of the trustee and the protector.  The trustee has power to bring forward the date of distribution, appoint further discretionary beneficiaries (from a list) and vary or amend any of the provisions of the deed but they are all subject to prior written consent from the protector.  The protector's powers to appoint new trustees and remove existing trustees seem to be the same as the ones in the deeds in this case.  The letter draws attention to the point that the protector has the power to remove any existing trustee with or without cause.  The terms relating to the office of protector are addressed in paragraph (f) of the letter.  They are different from the deeds in this case because in the OPK deed Mr Pugachev himself is given an overriding power to remove any existing protector, to appoint a successor or co-protector and to stipulate an order of succession.  After that the letter provides the following opinion:

>    "*Opinion*
>
>    *While the trustee is properly appointed as trustee of the deed effective control of the actions of the trustee is held by the protector through the powers referred to above.  In this respect the protector has ultimate control of the trust.*"

344.    The opinion was clearly advanced as being based on an analysis of the trust deed and Mr Patterson accepted that the opinion was unqualified and was not based on knowledge of what control Mr Pugachev in fact exercised.  The claimants put to Mr Patterson that this same opinion would apply to the trusts in this case.  His denial was not convincing.  Mr Patterson accepted that he did not now suggest the opinion was incorrect.  He said:

> *"We were running into this problem of banks wanting to know who the ultimate beneficial owners were, even though it was just a nonsense."; and*

> *"It was apparently required because there had to be some statement that the protector had ultimate control and he may well have."; and*

> *"It depends on context, because I don't believe that statement was necessarily correct in all respects. I didn't – I was asked to do it. I had no knowledge of what control Mr Pugachev – there's a reference at (f) above, but if you're asking me to say that that also applies to the trustee that – the current trustees and trustees – the answer would be no."*

345.    Mr Patterson's answers could be interpreted as suggesting that he was prepared to put his name to whatever statement was wanted but I will not draw that inference. The reference to (f) shows that Mr Patterson was well aware of the detail. This refers to the passage in the letter dealing with the office of protector and they are indeed different from the trust deeds in this case. They appear to be the only significant distinction and I do not believe the distinction makes any difference.

346.    I reach the following conclusions. First, although a lesser example than some of the matters addressed already, this is another example of a lack of candour by Mr Patterson in his interlocutory evidence. The suggestion that the only connection that Kea Trust Co and the other trustees have with the OPK trust is just that Mr Patterson's firm was corporate administrator for OPK is not accurate. The trusts in this case are founded on deeds based closely on the OPK trust and drawn up by Mr Patterson. Second, I find that Mr Patterson did hold the view he expressed in this letter about the effect of the OPK trust deeds. I note that the letter does not suggest the protector's powers are fiduciary or fettered in any way. Third, Mr Patterson believed in 2009 that under the trust expressed in the OPK trust deed, the protector (Mr Pugachev) retained ultimate control.

*Mr Patterson's trust law article*

347.    This is a convenient stage to refer to an article written by Mr Patterson about trusts law. The title is "When is a trust a trust?" It was the opening paper for a major symposium on trust law in New Zealand the Legal Research Foundation. It is not dated but must have been in about 2009. The article is a sophisticated analysis of problems in trust law including the question of whether to regard a trust as obligations based as opposed to property based, focussing on the obligations of the trustee rather than property "rights" held by beneficiaries. Sham trusts are considered and the cases cited above such as ***Snook***, ***Official Assignee v Wilson***, ***Shalson v Russo***, ***Esteem (Re Abacus)*** and ***A v A*** are considered. A particular point Mr Patterson deals with is whether for a sham can exist based on the intention of the settlor alone or whether the settlor and the trustee have to have a common intention for there to be a sham. Mr Patterson supports the common intention doctrine.

348.  Protectors are considered in the article too.  In a historical review of how trusts have developed Mr Patterson refers to "Appointors/Protectors" appearing in about the 1990s.  The paragraph is:

> **"Appointors/Protectors appear**
>
> *About this time too, increasing attention was given to the way offshore trust deeds were drafted for use in tax havens that did not have some of the more limiting rules that applied in most common law jurisdictions. Thus the term "protector" came into vogue. An interesting discussion of the development of the "protector" concept is found in an article by Professor Donovan Waters' "The Protector, New Wine in Old Bottles" in A J Oakley (ed) Trends in Contemporary Trust Law, Clarendon, Oxford 1996 pp63-122. In New Zealand the term "appointor" was usually used. <u>This power was usually limited to appointment (and removal) of trustees and, if appropriate, beneficiaries.  It was not usually a power given to trustees but rather to the settlor client in a separate and non-fiduciary capacity.</u>"*
>
> *(claimants' emphasis)*

349.  It was put to Mr Patterson that here he was expressing the view that a protector's powers of appointment and removal of trustees and beneficiaries were non-fiduciary. His answer was that this was a mistake and that while removal of beneficiaries was not fiduciary, his view was that the power to remove trustees was fiduciary.  I do not accept that answer.  In my judgment this article, which seems to have been reviewed at the time by a professor, represented Mr Patterson's opinions.  That view, that Protector's powers to appoint or remove trustees are not fiduciary is also consistent with Mr Patterson's opinion about the effect of the deeds in the OPK trust.  The two are broadly contemporaneous.

*(f) no distributions to Mr Pugachev from the trusts before the freezing order*

350.  In his second and third interlocutory witness statement at paragraphs 39 and 5 respectively, Mr Patterson said the following:

> *"39. Mr Roberts' assumption that the Trusts have been a significant, if not the principal or sole, source of income for Mr Pugachev for some time prior to the ex parte injunction being served is wrong. Prior to the granting of the ex parte injunction, no distributions had been made from any of the Trusts to Mr Pugachev.*
>
> *5. I now confirm that, prior to the granting of the ex parte injunction on 11 July 2014, no loans or distributions were made from any of the Trusts to [Mr Pugachev]."*

351.  The claimants say this is wrong, relying on evidence which seems to show a transfer of $400,000 which ought to have been under the control of the Riviera Residence

Trust. The transfer was to be done by Mr Liechti and he was seeking Mr Pugachev's approval for it rather than the approval of Mr Patterson as trustee of the Rivera Residence Trust. The evidence is an email exchange on 14th July 2014 in which Mr Liechti seeks Mr Pugachev's approval and Mr Pugachev gives it. When it was put to Mr Patterson he agreed that it should have been referred to him but was not. He had never seen the email before and could not comment.

352. The claimants submitted that the email showed that Mr Patterson could not have made proper enquiries before making the statements in the passages quoted above but since the cross-examination did not connect this email to a point about those passages I am not prepared to drawn the inference.

*(g) Mr Pugachev exercising control via Ms Dozortseva*

353. In paragraph 50 of his second interlocutory witness statement Mr Patterson said:

> *"If Mr Roberts is seeking to suggest that, through Ms Dozortseva, Mr Pugachev controls the Trusts, that is a suggestion I wholly reject and it does not accord with my experience of operating the Trusts."*

354. The claimants say this evidence was wrong and misleading because Ms Dozortseva did control many aspects of the trusts and, save for formal administration which Mr Patterson did perform, before the freezing order the trust assets were all administered by Mr Liechti and Ms Dozortseva. The example relied on was litigation in the USA concerning a company called Delare LLC held ultimately by the Riviera Residence Trust and through which property in Massachusetts was held. Mr Patterson accepted that Ms Dozortseva was the source of his information about that and it was she who had a handle on what was happening.

355. More generally, the position of Ms Dozortseva was as co-director of three of the original trustee companies. It was clear that she was a significant source of information to Mr Patterson and that she (and Mr Liechti) did undertake much of the day to day management of the properties in the trusts.

356. It is clear today that Ms Dozortseva does Mr Pugachev's bidding and probably always has. But Mr Patterson's statement was made in early October 2014 and the cross-examination did not put to him that he knew it was wrong at the time. He said that at that stage he had no reason to doubt the provision of information from Ms Dozortseva. I reject this as a criticism of Mr Patterson as a witness.

*Conclusion on Mr Patterson as a witness*

357. For the reasons explained above, while some of the claimants' criticisms are not well founded, in important respects Mr Patterson's evidence in these proceedings has not been satisfactory. I am well aware of Mr Patterson's position as a professional person but regrettably I cannot always rely on what he says.

358. This is the end of the section addressing Mr Patterson as a witness but it does not complete the consideration of Mr Patterson's role more generally. I now turn to the fourth aspect of the case on sham – the establishment of the trusts.

*(iv) The establishment of the trusts*

359.  The focus in this section is on the discussions which passed between Mr Patterson and Mr Pugachev's family office around the establishment of the trusts. The first trust to be set up was the London Residence Trust in late 2011. Earlier in that year Mr Pugachev had fled Russia. After that he would have had every reason to try to disguise his control of visible assets in order to shield them from potential claims.

360.  At that time Mr Pugachev and Ms Tolstoy were living in Glebe Place with their two children. The property Old Battersea House was identified by Ms Tolstoy and Mr Pugachev. The law firm Jones Day were acting for the purchasers. When contracts were exchanged on 11 November 2011 the property was to be bought by a BVI company called Kudu Property Ltd. For reasons which are not known, it was decided to use a different "ownership vehicle" (Mr Patterson's words).

361.  Mr Patterson became involved on 29th November 2011 when he received an email from David Henderson Stuart referring him to Pierre Lussato. Mr Henderson Stuart was the person who had been the director and shareholder of the OPK Trust Company. There was then a phone call from Pierre Lussato asking Mr Patterson about setting up a New Zealand trust to own real estate in London for Mr Pugachev and his family. Mr Patterson drafted the deed and set up Kea Trust Company Ltd to be the trustee. The OPK trust deed was the template.

362.  His note of the phone call on 29th November records that "they" have a problem. I take it "they" refers to Mr Pugachev's family office in London. The completion is to be on 6th December and "they" will fund the purchase price on behalf of the trust. In a later note Mr Patterson records further details – there will be no settlor, just a declaration of trust. The trustee will be a private trust company with two directors – Mr Patterson and someone from the UK. The Protector will be Mr Pugachev or his son. The beneficiaries will be Mr Pugachev and lineal descendants. In another note dated 1st December Mr Patterson notes that Victor will pay for the property "on behalf of the trust".

363.  Also dated 1st December 2011 is an advice letter from Patterson Hopkins to Pierre Lussato. It clearly accompanied a draft of the deed. The final draft must have changed a little after that but nothing turns on that. The principal features of the trust are described. The point is made that the First Protector is the "principal beneficiary" (i.e. Mr Pugachev). He is also described as the "principal client" in the letter. The various powers which can be exercised by the trustee with the consent of the Protector are noted as well as the other powers of the Protector, such as to add beneficiaries and remove the trustees. In relation to the Protector's power to remove trustees in clause 6, the letter states Mr Patterson thinks the provisions are relatively clear and do not need specific reference in the advice.

364.  Various discussions took place involving Alice Conway at Jones Day, Mr Lussato and Mr Gurdjian at Galaxis and Mr Patterson about the way in which the property was to be held and the terms of the deed. The time difference between London and New Zealand can confuse the apparent timings but emails dated 1st and 2nd December show Mr Lussato asking and Mr Patterson answering some questions.

365.   One particular matter which was discussed was about changing the trust deed.  Mr Pugachev's representatives were asking about the ability to vary the deed.  On its face the deed only gave the Protector power to veto variations initiated by the trustee.  The exchange on 1st/2nd December is:

> *"Lussato: How easy is it to retroactively change the trust document in case we want to fine tune it later?*
>
> *Patterson: Very easy. Cl 13 gives a total power to rewrite the deed with Protector consent."*

366.   Mr Patterson's answer there is consistent with the words of the deed although the tone might be said to imply something less restrictive.  In cross-examination Mr Patterson emphasised the references to fine tuning (the expression is used more than once) and a reference to minor tweaks.  His point was to suggest that this topic was only ever concerned with minor adjustments.  I do not accept that.  Mr Patterson's own words at the time, referring to "total power to rewrite the deed", do not support it.  Whether it was the tone of the response or for another reason, Mr Lussato seems not to have understood the advice from Mr Patterson as being that Mr Pugachev's power to change the trust was qualified, as can be seen by emails on 6th December which are addressed below.  Meanwhile, on 5th December Mr Patterson answered Jones Day's questions about the relationship between their clients (Mr Pugachev and Victor) and Kea Trust Company.  His answer was that:

> *"On the trust it is a conventional family trust to own the house with both S & V (inter alia) as trust beneficiaries & with S then V as Protector with power to change the trustee, negative consent powers in relation to other acts of the trustees etc. "*

367.   Also by that time the details of the trusts had been finalised.  An email on 5th December identifies Ms Tolstoy as a beneficiary as well as the need for a right of residence.  A revised draft of the deed was sent by Mr Patterson to Galaxis on 6th December and in his reply thanking Mr Patterson, Mr Gurdjian refers to the rewriting the deed ("We will revisit with SP to fine tune post closing of the acquisition").  The complete exchange is missing but after this Mr Lussato writes to Mr Patterson and Mr Patterson replies, as follows:

> *"Lussato: Hi just re-read this as well.  As you explained Sergei can always decide to change this after the fact but at least we have a document that reflects his current desires.  Thanks for all your assistance …*
>
> *Patterson: Thanks. Pleased we got there. …"*

368.   So here Mr Lussato's expression of how the deed can be changed goes much further than Mr Patterson's answer on 1st/2nd December.  It is clearly couched in terms of Mr Pugachev deciding to change the deed.  Mr Patterson does not contradict him.  Finally an email dated 6th December from Mr Lussato to Mr Pugachev prior to completion reflects Mr Lussato's understanding of the ability to alter the trust deed.  He says this:

> *"Attached is the trust deed that reflects the conversation we had. You can change this document at anytime and Bill (the lawyer) tells us you can basically do anything you want later but this is a good basis for the trust. Please can you have a quick read through especially clause 4 and 5. Bill has signed the deed already so that you can complete the purchase tomorrow, let me know if you have comments on the attached documents, if not we will proceed on the current basis."*

369.    In this passage "you" means Mr Pugachev.

370.    From one point of view there is only a rather fine distinction between the way the clause is actually drafted (including the way Mr Patterson described it initially on $1^{st}/2^{nd}$ December) and the way the later statements are expressed.    However it is a distinction which Mr Patterson is alive to and in my judgment he always has been.

371.    Through Mr Roberts' evidence the claimants alleged that in reality the Protector had control over the assets under these trusts.    In his witness statement for trial (at paragraph 136) Mr Patterson sought to answer these allegations by taking the point about the difference between control and only a negative veto.    Mr Patterson's answer was to emphasise that the powers Mr Roberts was talking about were the powers of veto and that *"the whole basis of the negative consent system is that it is the trustees that make the decision not the Protector and this regime is quite common in foreign trusts"*.  (By "foreign trusts" I think Mr Patterson means trusts of the kind in this case which are, as far as New Zealand law is concerned New Zealand foreign trusts.)    In the same paragraph Mr Patterson also said that *"even the power to dismiss trustees is fiduciary"*.

372.    The difference between the Protector having only the power to veto changes in the deeds initiated by the trustee and the Protector having the power to decide to change the deed is an important point and Mr Patterson would have known that.    It is also clear that Mr Pugachev being able to change the deed was important to Mr Pugachev's lieutenants.    Although there were more exchanges between Mr Patterson and Galaxis in this period, these passages about variation of the deed are not a trivial part of the overall communication.    I do not accept the notion that Mr Patterson could have allowed his principal's representatives to gain a wrong impression of the effect of the deed or that he would leave Mr Lussato's wider statement uncorrected by accident.

373.    Mr Patterson also sought to explain the exchanges on the basis that time was short and they were rushing the trust deed through.    I accept that time was short and that the timing explains why the family office would be interested in making changes later but I do not accept that that justifies Mr Patterson not expressing himself in a different way or not correcting Mr Lussato, if Mr Patterson really thought Mr Lussato had a wrong impression.

*Finalising the London Residence Trust*

374.    The purchase of Old Battersea House by Kea Trust Company was completed on 6th December 2011 and property was held on trust by that company ostensibly on the terms of the London Residence Trust deed.

*After the London Residence Trust was set up*

375.    On 8th December 2011 Ms Tolstoy was sent a copy of the deed and she in turn sent a copy to the solicitors Schillings for advice. The advice was that there was not much protection for Ms Tolstoy or her children in this deed and that she would be beholden to Victor. In January 2012 Ms Tolstoy questioned Mr Lussato about the London Residence Trust. That was on two grounds, one that they would be beholden to Victor and the other was that Mr Pugachev's grandchildren were beneficiaries but Mr Pugachev had said that was not what he intended. Mr Lussato replied that the trusts can *"easily be amended and tweaked. That's the advantage, hence whatever Sergei wants we can do"*. This is the origin of Mr Patterson's reference to the word "tweak" to support his assertion that the context of the discussion about varying the trust was only ever about minor tweaks. I have addressed it already.

376.    In March 2012 Ms Tolstoy asked that she and her children be removed from the London Residence Trust. She said that was because as the trust structure stood her and her children's status as beneficiaries was meaningless so she would rather be removed. Mr Lussato's reply was that the only person able to do that is Mr Pugachev and only if he instructed them to do it then Mr Lussato would look into it.

377.    This episode occurred at a time when the relationship between Ms Tolstoy and Mr Pugachev was poor. That no doubt partly explains why Ms Tolstoy was doing this. In any case Mr Lussato's reply is another indication of how the trusts were viewed by the family office. Mr Pugachev was in control.

378.    In cross-examination Mr Patterson said he would not have acceded to instructions from Mr Pugachev to alter the deed to remove Ms Tolstoy as a beneficiary. The point was put as if the request came the day after the trust deed was declared but that does not matter. The claimants say his denial was implausible because a very similar thing actually did happen. In March 2012 Alexander Pugachev, who is Victor's brother and was named as a Discretionary Beneficiary in the London Residence Trust, was removed as a Discretionary Beneficiary. An instruction to take this step was sent to Mr Patterson from Mr Lussato by email on 23rd February 2012. The instructions told him that "the family" had decided that Alexander should be removed. On 2nd March Mr Patterson received an email directly from Mr Pugachev confirming that this was to occur. Mr Patterson acted on the instruction and Alexander was removed as Discretionary Beneficiary.

379.    Mr Patterson accepted that he made no attempt to contact Alexander directly about any of this and had no information about Alexander's personal circumstances. He accepted that this was not an act initiated by the trustee. He suggested that it was not an example of Mr Pugachev simply ordering the removal because the email had referred to the family. I do not accept that distinction. In fact it appears that Alexander did want to be removed but Mr Patterson had no proper basis for thinking that at the time. This is a clear example of Mr Patterson simply doing Mr Pugachev's bidding and of Mr Pugachev being in control.

*Setting up the 2013 trusts*

380.    There is not much to add concerning the setting up of the 2013 trusts. It is clear that the London Residence Trust deed was the blue print for those trusts and so everything

which applied to it applies to them. The first trusts set up in 2013 were the Kea Three Trust (over Glebe Place via Redflame) and the Riviera Residence Trust (over Sand Club via Topaze inter alia). Although the discussions had started in March 2013 nothing significant happened for a while until it became urgent in June and July. Ms Dozortseva prepared the first draft of the trust deed, which Mr Patterson described as cheeky. There is an email from Ms Dozortseva to Mr Patterson on 3rd July 2013 in which she writes "*I assume that if any changes are needed in the future, we will be able to amend the trust deed?*" There is no evidence Mr Patterson replied to that question but his answer would have been affirmative. I find that whatever Mr Patterson's state of mind was about Mr Pugachev's intentions concerning his ability to control the assets in the 2013 trusts, it was the same as for the 2011 London Residence Trust. There is no reason to draw a distinction between them from Mr Patterson's point of view.

*(v) The operation of the trusts*

381.   The next aspect of the claimants' case concerns the operation of the trusts and the allegation that Mr Patterson did not behave as a normal trustee either at all, or at least until the worldwide freezing orders were made and he realised that the trusts were going to be scrutinised and the impression they might be shams needed to be dispelled.

382.   The claimants submitted that the Trusts were administered on Mr Pugachev's instructions and for his benefit and argued that:

   i)     Mr Pugachev repeatedly gave instructions in relation to the management and administration of the Trusts' assets and even on the most minor matters;

   ii)    The individuals responsible for administering the Trusts' assets would not take any decisions without Mr Pugachev's approval;

   iii)   The assets were administered by Mr Liechti, Ms Semina and Ms Dozortseva from offices in London without reference to Mr Patterson;

   iv)    Mr Patterson's role was akin to that of a corporate services provider. He drafted resolutions and prepared formal documents but did not make decisions in relation to the Trusts' assets;

   v)     Although there was an effort made after the grant of the freezing order to involve Mr Patterson in decisions and to seek formal "trustee approval", in reality the Trusts continued to be administered from London by Mr Liechti and Ms Dozortseva, on instructions from Mr Pugachev. That was despite the Original Trustees' having received legal advice that Mr Pugachev was "under a disability" such that he was automatically disabled from acting as protector of the Trusts;

383.   To support these arguments the claimants rely on a mass of detailed examples of the manner in which the Trusts were administered. I was taken to a few of these points but much of it was left for me to assess based on the written materials and that is what I have done.

*Trust and non-trust assets administered interchangeably*

384.    The first proposition the claimants assert is that trust and non-trust assets were administered interchangeably. This is based on the following five points.

385.    First, the allegation that the Trusts' assets were administered from London by the same people responsible for administering Mr Pugachev's non-trust assets. That is correct.

386.    Second, it is said that Mr Liechti drew up "weekly lists" with issues relevant to the management of Mr Pugachev's properties. Old Battersea House, Glebe Place and the Sand Club Villa all continued to appear on these lists after they had been transferred into the Trusts, and the lists remained a mixture of trust and non-trust assets. These lists acted as agenda or reports for meetings with Mr Pugachev. This is all correct. However the claimants then assert that Mr Pugachev made all the decisions in relation to all of the properties on the lists, whether owned by the Trusts or not. That is much less clear. I do not accept any of this represents an ousting of the trustee's authority, particularly given that the Discretionary Beneficiaries were the Pugachev family and these houses were their present and future London home and holiday home.

387.    Third, the claimants say that the Trusts' assets were administered by Mr Liechti, Ms Semina and Ms Dozortseva whether or not they had been authorised to do so by the trustee companies. Two examples are relied on but in neither case is there enough evidence to support the inference. There is evidence that in November 2013 Mr Liechti wanted a formal mandate for Oakhill in order to regularise his administration of the Sand Club Villa but there is no evidence that his administration of Sand Club was without the tacit authorisation of the trustee. The other example is very obscure. It may well be that a Ms Semina was given a formal power of attorney to act on behalf of Romy Finance in connection with Hediard Monaco which was granted by a Mr Thielen when it ought to have been by the trustee Finetree (as trustee of the Riviera Residence Trust) but the circumstances are not clear at all and this passage of Mr Roberts evidence (paragraphs 353 (a) to (l) contains a sub-paragraph at (a) in which his selective quotation from the document is unwarranted). I will not rely on this point.

388.    Fourth, the claimants say that money was lent between trust and non-trust entities without any regard for the interests of the purported beneficiaries of the trust. But this is an overstatement. Three examples are given. First is a company called Channelwood (which belonged to Mr Pugachev and owned Lower Venn Farm) borrowing money from Redflame. The sum was £10,000 and it was clearly approved by Mr Liechti who was authorised in relation to sums less than £25,000, so this example does not amount to anything. The second is that Luxury Consulting paid expenses for Kea Trust Co. That was a £252 + VAT courier charge approved by Mr Liechti and proves even less than the first example. The third is that Kea paid £25,000 in May 2014 for expenses associated with Lower Venn Farm. This does not prove anything either since Lower Venn Farm was at that time the English country residence of the family (i.e. the Discretionary Beneficiaries).

389.    Fifth, the claimants say that the assets of the Trusts were used interchangeably. They rely on three episodes. First the claimants say that US$5 m was initially settled on the London Residence Trust but was transferred to the Wiltshire Residence Trust because

Mr Pugachev "*changed his mind*" after the money had been received into the Kea client account. This submission ignores the fact that Mr Patterson only allowed the change to take place because when the instructions changed the transfer of money into the first trust had not been perfected, because the deed of gift had not been finalised. So the alteration was possible. This does not prove that funds were improperly taken out of the first trust.

390.  The second episode the claimants rely on is that they say Kea loaned £20,000 to Bramerton to pay fees associated with the purchase of Doves House. This is right but since Doves House was to be the family's country house it does not amount to much. It is true that the defined classes of Discretionary Beneficiaries in the London Residence Trust and the Wiltshire Residence Trust are not identical but they amount to the same family and are sufficiently similar not to support an inference of the kind the claimants suggest without much better evidence. There is nothing obviously untoward about applying trust funds for the benefit of the mother of beneficiaries who are infant children even if the mother is not named as a beneficiary.

391.  The third episode is that "Doves House was to be purchased by raising a mortgage on Old Battersea House, despite the fact that the London Residence Trust and Wiltshire Residence Trust had different beneficiaries". I put that submission in quotes because it is unfair. The claimants know, but did not state there, that no such mortgage was arranged. It did not happen.

*Administration did not change after property put into trusts*

392.  The second proposition the claimants assert is that there are a large number of documents to show that Mr Pugachev's approach to administering his assets did not change after they were placed into the Trusts. This was based on three examples.

393.  The first example relied on relates to Old Battersea House. Since that property was never not held in a trust it does not really relate to the proposition relied on anyway. Nevertheless the point being made is about the refurbishment of Old Battersea House. It was a large project with a budget of £5 – 7m and that this represented a substantial investment in the trust asset. The submission is that the decision to approve this budget was taken by Mr Pugachev, not by Mr Patterson or Kea. It is said that Mr Patterson was contacted as an afterthought, once a lender had agreed in principle to provide financing. The amount of money involved is significant and so if this was a good point it might well support the claimants' case, but it is not. Mr Pugachev approved the budgets in about April 2012. At that time there was no relevant money in the London Residence Trust bank account. In other words Mr Pugachev was not approving the expenditure of trust money, he was approving a budget of money which he would no doubt have to put into the trust in the future to refurbish the property. The money did come in much later. No significant work could be done without planning permission, which was not given until shortly before the freezing order. After that no work was done.

394.  The claimants also say that Mr Pugachev also made more minor decisions in relation to the development of Old Battersea House including the floor plans; the installation of a swimming pool; the choice of a landscape gardener for the property; and the planning applications in relation to the property. I agree but since this was to be the

dwelling for his family, it does not amount to anything. The point is also made that Mr Pugachev was a signatory on the Kea client account. I have mentioned that above.

395.    The second alleged example of administration not changing when the property went into the trusts is the Sand Club. The claimants contend that Mr Liechti arranged matters concerning the villa (including due diligence on the property's defects; transfer of funds from Sibarth's account to Topaze's account; etc). He sought and obtained Mr Pugachev's approval for these decisions, both before and after the property was transferred into the Riviera Residence Trust. This is true but since this was the family's holiday home it is not clear that it amounts to anything. The claimants emphasise two pieces of evidence as "particularly striking".

396.    First the claimants submit that despite the St Barth's Villa structure being placed into the Riviera Residence Trust in August 2013, Mr Liechti—the person actually administering this asset—explained on 18 December 2013 that he did not *"know anything about"* its trustee, Finetree Company Limited. This submission highlights the problem of this approach to the evidence. The 18th December email from Mr Liechti is to Ms Dozortseva. It arises because he has been sent two invoices for Patterson Hopkins' fees, one for Bluering and one for Finetree. When he wrote that he did not *"know anything about either of these companies"* it was in the context of working out from which of the accounts he managed they should be paid. For all we know he knew what they were but did not know anything about how they should be paid. But it does not end there. Bluering is trustee of the Green Residence trust which had only been declared a few weeks before on 28th November 2013 so he may well not have known what that was. Finetree was the trustee of the Riviera Residence Trust but when that trust was declared the trustee company's name was Kea Trust Two Company. It was only changed to Finetree on 19th November 2013. So again for all we know Mr Liechti just did not recognise the name Finetree. The fact Mr Liechti could not be cross-examined is not the claimants' fault but this kind of submission does not inspire confidence.

397.    The claimants' second "particularly striking" point is an email from Mr Patterson in March 2015 in which he wrote *"I am still not clear what Sand Club is or how it operates"*. The claimants note that the villa was the only income generating asset held within the trusts: it produced US$989,232.14 in 2013, US$863,017.85 in 2014 and US$1,089,428.57 in 2015. The figures are accurate but the reliance on the remark in March 2015 is misplaced. There is clear evidence that Mr Patterson and his office were told what Sand Club was and how it operated contemporaneously with the Riviera Residence Trust being set up. An ownership chart showing Topaze, Notting Hill, Sand Club SCI and the villa was provided by Ms Dozortseva in August 2013 and an email to Rosemary Wood in Patterson Hopkins' office from Ms Dozortseva also in August explains that payments are made through a managing company, Sibarth. No doubt in March 2015 Mr Patterson wanted to find out more but, as he explained in cross-examination when this was put to him, he did know how Sand Club operated but he wanted to get a better understanding. I accept his evidence, which is supported by the documents. This point has been unduly magnified by the claimants.

398.    The third example relied on by the claimants relates to Glebe Place. Before August 2013 (when the trust was set up) decisions relating to domestic improvement works were referred to Mr Pugachev for approval. Funding was then provided by Victor or Mr Pugachev. The evidence does show that this pattern was intended to continue

after the transfer of Redflame into the Kea Three Trust. Ms Dozortseva informed Redflame's corporate services provider when the transfer into the trust was proposed that there were to be no changes at the operational level, the company (Redflame) would continue to hold the residential property and the current banking arrangements would continue. After the trust was declared there were no significant changes to the administration of Redflame and Glebe Place. Funding requests made to Mr Pugachev before the property was transferred were followed up after the transfer and Mr Pugachev continued to both fund the property and make decisions. As addressed above, Mr Pugachev was also authorised as the trustee's agent for the purpose of giving instructions to Redflame's corporate services provider Andco. So these points are well founded as far as they go, the context is that throughout this period the property was the main residence of the family, who were the Discretionary Beneficiaries.

399.   The claimants add to this point the following "*Significantly, Ms Tolstoy and the Infant Children were periodically evicted from Glebe Place by Mr Pugachev – an indication of his control over the property. This happened without reference to anyone else, least of all Mr Patterson.*" This is a bad point. As far as I am aware the evictions referred to were in March 2012 and May 2016. The first is before Glebe Place was in trust and the second is after Mr Patterson ceased to be involved and the New Trustees were in control. After the draft judgment was provided to the parties the claimants referred to a document at C4/1457 which they contended indicates Ms Tolstoy was evicted in August 2013. That is another bad point. At that time Ms Tolstoy had separated from Mr Pugachev and was not living in Glebe Place at all, she was living with her parents in Oxfordshire.

400.   For the Wiltshire Residence Trust and the Green Residence Trust the claimants have little to say. As to the former, they submit that instructions were given by Ms Semina to Mr Liechti to place the funds in the Bramerton client account on treasury deposit. This is no doubt correct but it is not a substantial point. As to the latter, there is no documentation relating to the management of these properties for the period before or after the Trust was established. No doubt the administration did not change and most likely it was undertaken via Ms Dozortseva but there is just no evidence to place weight on.

*Mr Patterson's involvement was limited to formalities*

401.   The claimants' third proposition is that Mr Patterson was only involved in the administration of the Trusts when formal documents were required. One example, which I have addressed already and does support the claimants case is the removal of Alexander. The claimants fairly contend that one can infer Mr Patterson's job was to draw up the deed of removal not to participate in a decision by the Kea directors. More generally it is clear Mr Patterson did not meet any of the Discretionary Beneficiaries, save he had a very short meeting with Mr Pugachev personally. However the general submission is falsified by the evidence that Mr Patterson was not only involved in formalities. The examples I will mention are that he arranged in 2012 for accounts to drawn up for the London Residence Trust, that he was sent lists of invoices paid by Mr Liechti and that when asked to prepare memorandums dealing with the appointment and authorisation of Oakhill by the London Residence Trust, Mr Patterson did not simply draw up resolutions but went back to Mr Liechti with questions seeking more information, which was provided.

402.  Related to this third proposition is the submission that the types of document that one would expect to find in a discretionary trust which was properly administered by the trustees are absent:

    i)    There was an argument about the "minute book" for each trust referred to in the deed. The claimant said no such book had been produced but Mr Patterson explained the minute book in each case was a folder which he did have but which the disclosure exercise seemed to have taken apart. He did not agree there was no minute book. I accept that.

    ii)    The claimants contend there was no due diligence before the (ultimately aborted) acquisition of Doves House or before the acceptance of the St Barth's Villa or Gorki Property or US or Swiss real estate into the relevant trusts. The argument as I understand it is based on treating these trusts as "pilot trusts" – in other words as being declared over NZ\$10 - and then suggesting that the trustees needed to turn their minds to whether any further transfers in should be accepted. That is unreal. Although formally these trusts were declared over \$10, in substance these trusts were set up to receive the property they did.

*Mr Pugachev referred to as beneficial owner after transfer into the trusts*

403.  The claimants' fourth proposition was that Mr Pugachev continued to be referred to as the beneficial owner of assets after they had been transferred into the Trusts. Three pieces of evidence are given.

404.  On 29 June 2012 Mr Pugachev signed Kea Trust Company's application to Bank of Singapore as the beneficial owner of Kea. Of course Kea was then the trustee of the London Residence Trust and the shareholders were Mr Patterson and Mr Hopkins. The claimants' point is a good one.

405.  In November 2012 Mr Liechti drew up a *"companies list"* in which he described each of Redflame, Channelwood, and Kea Trust Company as *"SPV holding company for residential property".* SPV means Special Purpose Vehicle as opposed to SVP which means Sergei Viktorovich Pugachev. At that time Redflame and Channelwood were not in trust whereas of course Kea was trustee of the London Residence Trust. The claimants suggested Mr Liechti drew up a similar document in April 2013 in which he listed Old Battersea House in a *"list of assets owned by SVP".* This is the document mentioned before which was in fact a memo addressed to Mr Liechti from the organisation called "The Private Office". The information in it seems to have come from Galaxis. The November 2012 list and the April 2013 memo corroborate one another in showing that Mr Pugachev's lieutenants, including Galaxis which had been involved in setting up the London Residence Trust over Old Battersea House and Mr Liechti, who was at that time still a director of the trustee for that trust, regarded Old Battersea House as owned by Mr Pugachev.

406.  The third piece of evidence consists of instances in which Mr Pugachev was referred to as "UBO" or the "owner" of what was in fact trust property. One instance has been addressed already in which Mr Patterson used the term UBO. The others are by Mr Liechti but they are small stuff. One instance relied on was an email about Sand Club in January 2013, which is before the Riviera Residence Trust was set up, although the others are all at a time or context in which the asset was or was to be in trust.

*Operation of the trusts - conclusion*

407.    The claimants' fifth and final proposition relating to the operation of the trusts was about the loans to Mr Pugachev made after the freezing order. I will address that separately and so this completes the review of the major arguments about the operation of the trusts. Despite its length this has not covered every point taken but it is sufficient to comprehend the substance of the matter. I am not satisfied that the evidence about the manner in which the trusts were run itself lends weight to an inference that the trusts were shams. As the defendants submitted, these trusts are concerned mostly with residential property held so as to be used by the family of Mr Pugachev and Ms Tolstoy. Ostensibly that is what they were for and the evidence about how they were run is consistent with that. The trusts hold some other assets but the evidence about them is poor. The claimants' best point on administration concerns the removal of Alexander as a Discretionary Beneficiary. I have addressed it already.

408.    Overall however while the operation of the trusts is consistent with their being genuine discretionary trusts for the class of Discretionary Beneficiaries as a whole, it does not allow one to distinguish between that and Mr Pugachev retaining beneficial control of the underlying assets.

409.    There is evidence which shows instances in which each of Mr Pugachev himself, Mr Patterson and Mr Liechti have used language in a way which describes Mr Pugachev as the real owner of the assets. That is a different point from the operation of the trusts.

*(vi) The loans and the appointment of the New Trustees*

410.    The claimants say that following service of the freezing order an effort was made to refer more decisions to Mr Patterson so that the administration of the trusts' assets appeared to be a matter for the trustees. There are more documents of that kind for the period after the freezing order but it is not surprising in the circumstances. It is just as consistent with an inference that administration had been lax before.

*The loans*

411.    What did happen after the first freezing order was that the trusts made a series of payments to Mr Pugachev as loans, ostensibly for the payment of his living expenses and legal fees. They were unsecured and interest free. Kea Trust Company lent about £3 million to Mr Pugachev over a period of just three months. Kea also lent £682k to Redflame. All this money had been transferred to Kea for the renovation of Old Battersea House. The effect of lending the money to Mr Pugachev / Redflame was that there was no way for Kea to fund the renovations needed at the property and the trust was left with a wasting asset.

412.    Mr Patterson's evidence is that these loans were in the best interests of the beneficiaries as a whole. His understanding was that Mr Pugachev had no other sources of income. The claimants scoff at this and knowing what I know now it is manifest that there are other sources of finance available to be applied for Mr Pugachev's benefit. However the claimants did not establish with Mr Patterson that his view was unreasonable at the time. By then the trusts were taking advice from

experienced solicitors and leading counsel as a resolution of the directors of Kea Three Trust Co (as trustee of both the London Residence Trust and Kea Three Trust) records.

413.   It is true that there is no record of the trustee expressly considering the interests of the other Discretionary Beneficiaries.  The claimants submitted that an unsecured loan repayable only if Mr Pugachev succeeded in his complex legal disputes (about which the trustees do not appear to have received any advice) was not in the best interests of the beneficiaries other than Mr Pugachev himself.  However Mr Patterson's testimony on this was to the contrary.  He said: "the whole point of this was that if Mr Pugachev succeeded in his defence of the claims or his applications, the beneficiaries were automatically going to benefit as a consequence" and "As I saw it, Mr Pugachev had no other source of funds to fight the legal battle that he was involved in, and certainly at the time of making the decision, I believe, I still believe, it was a proper decision for the trustees to make."  While I have criticised Mr Patterson as a witness, I cannot see a reason to reject this evidence as other than reflecting what Mr Patterson genuinely thought at the time.

414.   The claimants make a valid point that at this stage Victor was not consulted even though Mr Patterson had been advised that Mr Pugachev was Under a Disability.  His answer in cross-examination was that it never occurred to him.  That is probably true because if he had considered it I do not believe he would have thought Victor would do anything other than consent.

415.   The loans are in fact in various currencies and purport to be for legal expenses in various jurisdictions but are not well explained.  There are also minor inconsistencies in the documents (some figures are stated as "monthly" when they appear to be one off payments).

416.   So while it is striking that the loans represent large sums of money draining out of the trusts in favour of a single Discretionary Beneficiary, the evidence about them does not add to the claimants' case on sham.

*The replacement of the trustees*

417.   There is a letter dated 2nd February 2015 from Kea Trust Company to Mr Pugachev. In it the trust company points out that by that time four loans had been made to Mr Pugachev without security.  Mr Pugachev had sought a fifth loan but in the letter the trustee asks for security to secure all the loans.   The signature on the letter is that of Ms Dozortseva.  The claimants say it was written that way to bolster the idea that Ms Dozortseva was independent of Mr Pugachev.  It is the only evidence I have seen which suggests any kind of independence by Ms Dozortseva.  I do not accept that it shows she was genuinely independent.

418.   In June 2015, acting on advice, Mr Patterson refused to sanction a payment of funds for Glebe Place.  This seems to have led to Mr Pugachev's request for information from the trustees which kicked off the change in trustees.  What then happened is set out above as it was explained by Mr Patterson to Heath J in his evidence to the New Zealand court.  Ms Dozortseva was removed as director on 14th July 2015.  She had been a director of Kea Trust Co since February 2014 when she replaced Mr Liechti, and of Bramerton and Bluering since incorporation.  So the only trust company she

was not a director of was Finetree (the Riviera Residence Trust). Mr Smit and Mr Lenihan were approached to act as director of new trustees and on 21st July they met Ms Dozortseva and signed the relevant paperwork. The new trustees were incorporated on 24th July.

419.    The claimants submit the new trustees have acted for Mr Pugachev's benefit. I agree. The three points are as follows. On 27th July the new trustee of the London Residence Trust Maru entered into a funding agreement with Mr Pugachev to lend him $800,000 to fund his BIT claim in return for a stake in the proceeds, In May 2016 they sought to take £2.7 million out of the trusts' bank accounts but were prevented by a freezing order. After than Mr Smit and Mr Lenihan resigned. In July 2016 they sought to evict Ms Tolstoy from Glebe Place and sell Old Battersea House but again were prevented by an injunction.

420.    Clearly by the first half of 2015 and especially by June/July Mr Patterson was standing up to Mr Pugachev. But by then he was well aware that his conduct would be under scrutiny and he was taking advice. Removing Ms Dozortseva does not demonstrate that there was no sham.

421.    The episode as a whole, including the conduct of the new trustees, supports a number of aspects of the claimants' case. It shows that Mr Pugachev regarded himself as being in control and so, when there was resistance from Mr Patterson, the trustee companies of which he was director and shareholder were removed. As soon as Mr Pugachev perceived resistance from the trustees, he (and Victor) exercised the Protector's powers.

*Considering sham as a whole*

422.    I draw the following conclusions.

423.    First, there is no need to consider the deeds separately.

424.    Second concerning Mr Pugachev: I find that at all material times he regarded all the assets in these trusts as belonging to him and intended to retain ultimate control. The point of the trusts was not to cede control of his assets to someone else, it was to hide his control of them. In other words Mr Pugachev intended to use the trusts as a pretence to mislead other people, by creating the appearance that the property did not belong to him when really it did. The role of Protector was the means by which control was to be exercised. The position of Victor as a potential Protector was part of the pretence. Victor was acting on his father's instructions.

425.    Mr Pugachev's family by Ms Tolstoy would benefit from the use of the assets in the trusts but that would only be on his say so. It would be just the same as a situation in which Mr Pugachev was in control and that control was not hidden. It was no part of Mr Pugachev's purpose to divest control in favour of the family as distinct from himself. Quite the opposite.

426.    Third, as for the trustees, the claimants argue that since Mr Pugachev had a nominee on the board of three of the four trustee companies, his intentions should be imputed to those trustees. The nominee was either Ms Dozortseva or, for a time for one company, it was Mr Liechti. I agree those individuals took their instructions from Mr

Pugachev at all times.  As directors of those companies they were his nominees.  But I do not accept that those individuals are to be found as the directing mind or will of those trustee companies for all the relevant purposes.  For day to day administration that may well be so, but when it came to major decisions, Mr Patterson was clearly involved too (I have not forgotten Ms Hopkins).  I find that for major decisions Mr Patterson would have played a part in directing the trustee companies.  For that purpose he was part of the directing mind and will of each of the trustee companies.

427.    In his cross-examination Mr Patterson said that he was not in a position to comment on Mr Pugachev's intentions.  In one sense that is true of any human being but when an experienced lawyer is being asked to draw up a trust deed it is rather odd for them to disavow knowledge of the settlor's actual intentions.

428.    When it was put to him that keeping control of the assets was clearly what Mr Pugachev intended from the outset, Mr Patterson said he could not express a view and it seemed to him to be a matter of submission.  When it was put to him that Mr Patterson went along with what Mr Pugachev intended, Mr Patterson denied this (in the sense that he denied going along with Mr Pugachev intending to retain control) and said that "*in treating Mr Pugachev as settlor, the intention of the settlor was to place the property in trust … And so on my understanding of a trustee's role in this case, paying close attention to the settlor's intentions is entirely appropriate.*"  Since Mr Patterson disavowed knowledge of Mr Pugachev's actual intentions, the point he was making was in effect that he was entitled to assume that Mr Pugachev intended to place the property in trust.  That is fine up to a point, after all Mr Patterson was instructed to set up a trust.  All the same his clear evidence was that he did not know what Mr Pugachev's actual intentions were.

429.    In re-examination Mr Patterson was asked about his own intentions.  He said that he had no intention that Mr Pugachev would have complete control over the assets in the trust, that he would not have regarded Mr Pugachev as the absolute owner and that it was never his intention to relinquish control over the trust to Mr Pugachev.  I have given this a lot of thought.  I do not accept that evidence.  It does not sit comfortably with other evidence such as Mr Patterson's reference to Mr Pugachev as the UBO, nor with his approach to the removal of Alexander, nor with his opinion about the effect of the OPK trust deed, nor with the totality of his email exchanges about Mr Pugachev's ability to alter the trust deed.

430.    If these really were Mr Patterson's intentions at the time then it is striking that there is no evidence he expressed them to Mr Pugachev directly or indirectly through his lieutenants.  Nor does Mr Patterson suggest he ever told Mr Pugachev directly or indirectly that any of Mr Pugachev's powers as Protector, such as to remove trustees, were fiduciary and therefore fettered in some way.

431.    Furthermore, although in his witness statement for this case at paragraph 136 (quoted above) Mr Patterson asserts that the Protector's power to remove trustees is fiduciary, his thinking on this seems to have evolved over time (compare the trusts law article in 2009 and also what seems to have been a conditional basis on which the point was put to Heath J in New Zealand in 2015).

432.    This case is nothing like *__Midland Bank v Wyatt__*.  Plainly it would be absurd to say that Mr Patterson gave no thought to the contents of the document and it would be

absurd to say that Mr Patterson signed the deed (as director of the trustee) not knowing or caring what he was signing. Mr Patterson knew very well what he was signing. He drafted it.

433.    Mr Patterson himself said in his witness statement that he was concerned by the sham claim because in order for the claim to be made out "*the claimants would have to show that the trustees, which at the time of formation of the Trusts I was a Director of, were participants in the sham and had the requisite shamming intention. For the reasons set out in this statement, the Trusts were not shams.*"

434.    The claimants' case is that Mr Patterson had no intention independent of Mr Pugachev. In my judgment that is the true and fair way of looking at it. Mr Patterson is an experienced professional. For a person in Mr Patterson's position, the obvious inference from the circumstances as a whole was that Mr Pugachev's intentions were what I have found them to be, including in particular that they were a pretence to disguise control, that Victor was part of the pretence and that control was to be maintained via the role of Protector.

435.    Mr Patterson says he did not know what Mr Pugachev's intentions actually were. That may be so, but I do not accept that Mr Patterson did in fact infer that Mr Pugachev wanted to relinquish control. If Mr Patterson had wanted to find out what the settlor's actual intentions were, he could have asked, but he did not. Mr Patterson did nothing to suggest to Mr Pugachev's team that the new deed might not have the effect of leaving Mr Pugachev in ultimate control as Protector. If he had raised it then I am sure there would have been a negative reaction. If he had turned his mind to raising it, then Mr Patterson would have realised that that is what would be likely to happen. The best that can be said is that Mr Patterson prepared and signed these deeds entirely recklessly as to the settlor's true intentions. His involvement directing the trustee cannot add anything to the involvement of Mr Liechti and Ms Dozortseva, who were not independent of Mr Pugachev either.

436.    Given Mr Pugachev's true intentions, the finding on the True Effect of the Trusts claim means that these trusts are not shams. They fulfil Mr Pugachev's true intention not to lose control. That is not surprising. For example it means that the terms of the opinion Mr Patterson gave for the OPK trust deed which was used as a template also applies to these trust deeds in just the same way. In other words – while the trustees of these deeds are properly appointed as trustees, effective control of the actions of the trustees is held by the Protector through the Protector's powers. In this respect the Protector has ultimate control of the trusts.

437.    However if a proper approach to the construction of these deeds was to lead to a conclusion that the Protector's relevant powers are fiduciary, as Mr Patterson now says they are, and that in turn was to lead to a conclusion that under the deeds Mr Pugachev is not the beneficial owner, then those deeds are a sham. The settlor intended to use them to create a false impression as to his true intentions and the trustees went along with that intention recklessly.

*Sham and the true effect of the trusts*

438.    The situation in this case reminds me of a similar phenomenon in patent law known as the Angora cat problem first identified by Professor Franzosi, an eminent academic

expert in the field. It was described by Jacob LJ in the Court of Appeal in ***European
Central Bank v Document Security Systems*** [2008] EWCA Civ 192 at paragraph 5.
In some circumstances a patentee can argue for a narrow interpretation of a document
while defending it in one context but then argue for a different wide interpretation
when asserting it in another context. Jacob LJ explained that:

> *"Professor Mario Franzosi likens a patentee to an Angora cat.
> When validity is challenged, the patentee says his patent is very
> small: the cat with its fur smoothed down, cuddly and sleepy.
> But when the patentee goes on the attack, the fur bristles, the
> cat is twice the size with teeth bared and eyes ablaze."*

439.    This vice, that the same patent document can be presented in radically different ways
in different circumstances to suit the owner's needs is not unique to patents. Both
constructions may be arguable and so the canny professional who drafted the
document can even salve their conscience by presenting two inconsistent but arguable
interpretations on different occasions.

440.    The problem can apply to any written instrument and this case provides another
example in a different context. When the validity or effect of the trust is challenged,
the trustee can put forward emollient submissions about Protector's powers being
confined and narrow as a result of their fiduciary nature. That has happened in these
proceedings. But in other circumstances, for example when Mr Pugachev needs
collateral for a bank loan, a completely different stance can be taken in relation to the
very same instrument. Mr Pugachev can be presented as the owner of the trust assets.
This latter event has happened too. A concrete example was in April 2013, when a
bank asked for collateral for a loan, Mr Pugachev's family office presented a trust
asset (Old Battersea House) as an asset owned by Mr Pugachev. It might have been a
slip by Mr Liechti but I do not believe so. If the bank needed persuading, a formal
opinion could even be written for these trust deeds in just the same terms as the one
Mr Patterson prepared for the OPK deed. The fact the loan did not go ahead is not the
point.

441.    I do not believe this characteristic of the deeds in this case is accidental. Whether
"sham" is a perfect description is not clear but it does not matter. This is not a case in
which, contrary to what an ordinary looking trust deed with just a settlor and a trustee
may state in words, the whole scheme always was in truth that the settlor would
exercise covert control of the trustee and both settlor and trustee always intended that
that would be so. In that sort of case the word sham accurately describes the trust
deed.

442.    However whatever label is to be applied to this case, in my judgment the combination
of circumstances here means that the court should not give an effect to these
instruments that would result in the assets being regarded as outside Mr Pugachev's
ultimate control. The whole scheme was set up to facilitate a pretence about
ownership (or rather its absence) should the need arise.

*The s423 claim*

443.    Given the findings on the previous claims, it is not necessary to look into the s423
claim in any detail. I will focus only on the question of purpose under s423. The

principles are summarised in ***JSC BTA Bank v Ablyazov*** [2016] EWHC 3071.  I take them to be as follows.  The burden is on the claimants.  The focus is on Mr Pugachev's purpose at the time of the transactions.  The purpose must be established for each transaction.  The real and substantial purpose must have been to defeat the creditors.  That result merely being a by-product is not enough.  If the transaction is one which the debtor would have entered into in any event, the court should not too readily conclude that he also had the purpose of defeating his creditors.  The purpose cannot be inferred from the simple fact of the transaction and the question is whether the individual actually did have the purpose required, not whether a reasonable person would have.  Purpose is not the same as result.

444.    I would have found that for each of the trusts Mr Pugachev's purpose in setting it up and each of the transfers of assets in (either himself or by his nominee Victor) satisfied the test in section 423.  That is because even if the deeds do in fact divest Mr Pugachev of control, his intention always was to use the trusts as a pretence to mislead other people, by creating the appearance that the property did not belong to him when really it did.  Even if his purpose failed in the sense that he actually did divest himself of control, he always intended to use the trusts to hide whatever control he had.  The people he intended to hide his control from were persons who might make a claim against him in future.

445.    The discussions about asset protection with GPW & Co in December 2012 firmly support this conclusion.  That date is before all of the 2013 trusts.

446.    A further factor applicable to three of the 2013 trusts and the transfers into them is that the assets were already controlled by Mr Pugachev.  The obvious reason for the change in control was the increasing pressure on Mr Pugachev in Russia and the heightened risk of his being sued.  That applies to the Kea Three Trust concerning Glebe Place via Redflame, the Riviera Residence Trust concerning Sand Club via Topaze and other property via Romy Finance, and the Green Residence Trust concerning Gorki 10 via Lenux.  It does not apply to the Wiltshire Residence Trust because that was to be for a new property but that trust uses the same essential structure as the other 2013 trusts and will have been set up that way for the same purpose.

447.    The defendants' best case is the London Residence Trust, set up in December 2011. That took place a year before the tell-tale discussion with GPW & Co, but even at that stage it will have been quite obvious to Mr Pugachev that he was likely to be pursued outside Russia and his assets were at risk.  Some of his major Russian assets had already been lost to the Russian state by then.  Criminal investigations had been started in Russia and he had fled to England in January 2011.  There is some evidence to support the idea that the notion of a civil court claim against Mr Pugachev personally did not become a likelihood until years later but even if that is right, in my judgment Mr Pugachev was always aware of the risk that assets associated with him were vulnerable.  Mezhprom Bank was in liquidation.  Old Battersea House was valuable and visible.  Mr Pugachev was not trying to hide the asset; he was trying to hide his control of it while it was used as a family home.

448.    I do not need to grapple with the other issues under s423, including the defendants' arguments about the claimants' position as a victim and the issues about relief.

*Relief*

449.    The claimants submitted that the proper orders to make following these findings are declarations and an order that the trust assets be transferred to the claimants or to a receiver.  I am satisfied I should make appropriate declarations but the question of what other relief to grant is not straightforward.

450.    It is not clear to me whether the basis on which the court is being asked to transfer trust assets directly to the claimants is the recognition of the insolvency process or the enforcement of the Russian judgment against Mr Pugachev in the Article 14 claim. Furthermore, after the trial had concluded I was told that the Moscow Commercial Court had postponed the hearing of an appeal (or application) filed by Mr Pugachev seeking to overturn the judgment against him in the Article 14 claim for RUR 76bn. I have not heard the parties about what the effect of that is, if anything.

451.    One thing is clear.  I will not make findings of fact about what Mr Pugachev may or may not have done in Russia in relation to Mezhprom Bank.  If any relief sought requires the court to make such findings then that relief should not be granted because it is not possible to do that based on Mr Roberts' evidence.

452.    I will hear the parties as to the correct orders to be made following the findings in this judgment.  The freezing order(s) will remain in place in the meantime.

## *Summary of conclusions*

453.    Mr Pugachev is the settlor of all the trusts.  All the assets in the trusts were his beneficially before they were transferred.  That includes the assets transferred in Victor Pugachev's name.  Victor was acting as Mr Pugachev's nominee.

454.    None of the Protector's powers in the trust deeds in this case are fiduciary in nature. They are purely personal powers which may be exercised selfishly.

455.    When Mr Pugachev is Protector (and to the extent Mr Pugachev is under a disability, when Victor is Protector) the true effect of all the trust deeds in this case, properly construed, is to leave Mr Pugachev in control of the trust assets.  Mr Pugachev is the beneficial owner.  They amount to a bare trust for Mr Pugachev.

456.    Mr Pugachev's intention in setting up all five trusts was to retain control of the assets but use them as a pretence to mislead third parties by hiding his control.  No other natural person involved in setting up the trusts (neither Mr Liechti, Ms Dozortseva, Ms Hopkins nor Mr Patterson) had an intention independent of Mr Pugachev's. Accordingly if the interpretation of the true effect of the deeds is wrong, such that they would have the effect in law of divesting Mr Pugachev of his beneficial ownership of the trust assets, then they are shams and should not be given effect to.